IN THE UNITED STATES COURT OF FEDERAL CLAIMS

L.P. CONSULTING GROUP, INC., )
Plaintiff, )
vs. ) Case No.
THE UNITED STATES POSTAL ) 98-868 C
SERVICE, ) (Judge Allegra)
Defendant. )

The deposition of RICHARD ANTHONY BATTAGLIN, called for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions for the purpose of discovery, taken before Janet L. Robbins, CSR No. 84-2207, a Notary Public within and for the County of Cook, State of Illinois, and a Certified Shorthand Reporter of said state, at Suite 3300, Three First National Plaza, Chicago, Illinois, on the 10th day of June, A.D. 2004, at 1:36 p.m.



PRESENT:
BELL, BOYD & LLOYD PLLC,
(1615 L Street, N.W., Suite 1200,
Washington, D.C. 20036-5610,
202-955-6830), by:
MR. LAWRENCE M. PROSEN,
appeared on behalf of the Plaintiff;
UNITED STATES DEPARTMENT OF JUSTICE,
CIVIL DIVISION-COMMERCIAL LITIGATION BRANCH,
(1100 L Street, N.W., 8th Floor,
Washington, D.C. 20530,
202-307-0290), by:
MS. DOMENIQUE KIRCHNER,
appeared on behalf of the Defendant
and the Deponent.

ALSO PRESENT:
MR. STEPHEN LOBAUGH, In-House Counsel,
United States Postal Service.

REPORTED BY: JANET L. ROBBINS, CSR, RPR,
CERTIFICATE NO. 84-2207



(WHEREUPON, the witness was duly sworn.)
RICHARD ANTHONY BATTAGLIN,
called as a witness herein, having been first duly sworn, was examined and testified as follows:
EXAMINATION
BY MS. KIRCHNER:
Q. Please state your full name and address for the record.
A. Richard Anthony Battaglin, 10401 South 75th Avenue, Palos Hills, Illinois, 60465-2015.
Q. Mr. Battaglin, my name is Domenique Kirchner. I'm going to ask you some questions today. If I ask you a question you do not understand, please let me know. Please remember that we both can't talk at the same time.
Please remember, also, that you have to put oral -- you have to give us an oral response. If you shake your head, nod your head, that's not sufficient. We need an oral response on the record for the court reporter.
Have you ever been deposed before?
A. Never.
Q. Now, you're here pursuant to our request



for a deposition of you in this lawsuit, correct?
A. Correct.
Q. This is a lawsuit brought by L.P. Consulting Group, Incorporated, correct?
A. Correct.
Q. What is your role with regard to L.P. Consulting Group, Incorporated?
A. The corporate record would show I'm the secretary/treasurer of the company in the State of Illinois, and my function is project superintendent for the company.
Q. Do you have any other titles for the company?
A. No.
Q. Who else is involved in the company?
A. Linda M. Battaglin, that's my wife. She's the president.
Q. Anybody else?
A. No.
Q. During the time frame 1995 through 1999, did the company -- did L.P. Consulting have any employees besides yourself and your wife?
A. No.
Q. Other than yourself and your wife, does

Page 65

that come about?
A. I received a phone call from Mr. McNabb saying that we have three facilities left to visit in this particular geographic area, and it was those three that you just mentioned. And we got together on a date and time and met at the -- I can't remember which one was the first site, but we met at one of those sites first.
Q. And --
A. He drove either a postal vehicle or his own vehicle and I came in mine.
Q. So you met him there?
A. Yes.
Q. And the three of you then went to all three of those sites that you've identified, right?
A. Yes.
Q. Now, how does Mr. Southern fit into this? I'm not following that.
A. Mr. Southern was the one that made the phone call to say you got to get together with Mr. McNabb to come to the site.
Q. So you're not saying that Mr. Southern was at East Lynn with you?
A. No, no.

Page 66

Q. As I'm understanding what you're saying, Mr. Southern, he called you before you made these site visits with Mr. McNabb?
A. Correct.
Q. And he told you to get together with Mr. McNabb?
A. Correct.
Q. Did he tell you anything further in this telephone call?
A. Not that I recall.
Q. Did he tell you -- did Mr. Southern tell you why you were to get together with Mr. McNabb?
A. Other than visit the sites and see what work -- or produce a scope of work for each facility.
Q. In this telephone call with Mr. Southern, did he identify the three sites?
A. Yes, he did.
Q. Did he tell you what you were to do or what you were to look at at those three sites?
A. No.
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. No.

Page 67

BY MS. KIRCHNER:
Q. Just to go down to these three facilities and take a look?
A. Yes.
Q. Do you have any notes or any documents that relate to your site visit on December 17th, 1995 with Mr. McNabb?
A. I'm sorry, did I say December 17th or October 17th?
MR. LOBAUGH: I have December.
BY THE WITNESS:
A. I'm sorry, it's October.
BY MS. KIRCHNER:
Q. We both have December.
A. It's October.
Q. October 17th, 1995. We have that corrected now.
Do you have any documents or any notes that relate to your site visit on October 17th, 1995 with Mr. McNabb?
A. Other than the East Lynn work order, no.
Q. Did you take any photographs of East Lynn when you were out there with Mr. McNabb?
A. No.

Page 68

Q. Did you make any sketches or drawings when you were at East Lynn with Mr. McNabb?
MR. PROSEN: Objection.
BY THE WITNESS:
A. Yes.
MR. PROSEN: Asked and answered.
BY THE WITNESS:
A. Yes.
BY MS. KIRCHNER:
Q. You made some drawings?
A. Yes.
Q. What else happened during this site visit at East Lynn with Mr. McNabb?
A. We did what we usually would do in this situation, which was develop a scope of work.
Q. What was the scope of work that was developed?
A. Well, specifically, I don't know sitting here right now, but it was some sort of interior renovation. We were in the inside, I remember. More than likely lock boxes, but I'm guessing.
Q. Do you remember whether or not it involved countertops or counters?
A. Yes.

Page 81

testimony.
BY THE WITNESS:
A. No. What I'm saying is -- you asked me, if I remember the question correctly, was I received a document that had this total on it. And I'm saying no, there were two. And it was probably -- I don't recall, because it wasn't an official document; it was my rough form. It's probable that they split it because one is an expense and one is a capital. And I can't get into their logic. But there are two distinct things here.
BY MS. KIRCHNER:
Q. Okay. I think I follow you now.
A. Yeah.
Q. Have you your own copies of these two documents for East Lynn that were sent to you by the postal service in your files as opposed to receiving them from the government?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. I cannot find those. I just have the one I have now.
BY MS. KIRCHNER:
Q. Do you have any other -- and that's the

Page 82

one you got from the government in response to the FOIA request.
A. The one I submitted to you, if that's the same one, then that's the same one, yeah.
Q. Do you have anything else regarding your site visit to East Lynn other than the document that you got from the government, the one document?
A. No.
Q. No notes, no field notes --
A. No.
Q. -- no calendars?
A. No.
MS. KIRCHNER: Could you mark this, please.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 53 for identification, as of 6/10/04.)
BY MS. KIRCHNER:
Q. Please a look at what we've marked as Battaglin Exhibit 53. Tell me whether you recognize this document.
A. Yes, this document is a document that I went out with Mr. Paul Steiner, 11/14/95, on my old 94-B-0083 contract.
Q. So you didn't go there with Mr. McNabb?

Page 83

A. I went there with Mr. Steiner, too. I visited the site with Mr. Steiner, but this is not what I'm alleging. This is different than this (indicating). This is a different contract.
Q. Okay. So Exhibit 53 has nothing to do with this lawsuit, is that correct?
A. I can't answer that.
Q. Well, tell me, is your handwriting on Exhibit 53?
A. Yes.
Q. Okay.
A. But this was provided by the government, not by me. It says "Exhibit 6."
Q. So this is not something that you would look to to support your claims in the lawsuit, is that correct?
A. This would probably be identical to what I did with Mr. Southern -- or Mr. McNabb.
Q. Do you know whether it is or isn't?
A. Sitting here looking at this, no.
Q. Tell me more about what this is, Exhibit 53. Who prepared Exhibit 53?
A. Well, looking at the handwriting, I did everything except the quantity and the extended

Page 84

price. That's in somebody else's writing.
And then to add to it, somebody scribbled out -- made those scribble marks all over it.
Q. The cross-outs?
A. Yes.
Q. So that whole quantity column, you did not fill that in, is that correct?
A. Correct.
Q. And you didn't fill in the extended price column?
A. Correct.
Q. What's that last column called on this form? I can't quite read it. That's why I'm asking you.
A. Well, it says "Extended Price."
Q. Okay.
A. That's the cover document.
Q. Where did this form come from before it was filled out?
A. From myself.
Q. So you generate forms of this nature, the form itself?
A. Yes.

Page 97

A. No. I don't.
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. I do not.
BY MS. KIRCHNER:
Q. Did you destroy them?
A. I don't recall where they went.
Q. Where have you looked for them?
A. I've looked in every conceivable place in my office during this time frame to look for those two documents.
Q. What is L.P. Consulting claiming with regard to the St. Anne Post Office in this litigation?
A. That I met in the field with the project manager from the postal service and I developed sketches and/or a scope of work accomplished in exchange for the work itself.
Q. So you went to the St. Anne Post Office?
A. Yes.
Q. When did you do this?
A. Sitting here, I don't recall.
Q. Do you have any notes?
A. Yes.

Page 98

Q. What notes do you have, sir?
A. They're in the -- this document.
Q. Let me go on and ask you some more questions before we look at some notes.
When you were at the St. Anne Post Office, do you recall whether anyone was with you?
A. Yes.
Q. Who was with you?
A. Sam Southern.
Q. Approximately when was this?
A. I have the date, but it's not -- it's in this binder.
Q. So you don't remember right now?
A. Off the top of my head, no.
Q. Now, why did you go to the St. Anne Post Office?
A. To receive work.
Q. When you were at the St. Anne Post Office, what did you do there?
A. Sam and I measured the facility inside and out based on the scope of work developed with the postmaster.
Q. Which postmaster -- who are you referring to for St. Anne?

Page 99

A. At the time, his first name was Bob, and I don't have his name off the top of my head. I'd have to think about it.
Q. At the time of this site visit with Sam Southern, was the postmaster there with you at that site visit?
A. Yes.
Q. Would you do the same thing as you described to me earlier with Mr. McNabb, that you and Sam pulled the tape measure and made the measurements together?
A. Yes.
Q. With regard to St. Anne, what were the important things you were measuring?
A. I believe we were doing a lock box lobby on the inside and what we would call the typical package inside. And on the outside we were measuring for concrete work for an accessibility facility in the front and rear.
Q. You mean handicap accessible?
A. Yes.
Q. And do you recall making measurements with regard to a handicap ramp with Sam?
A. Yes.

Page 100

Q. So is it fair to say that there were two parts to the site visit, the handicap ramp measurements and work associated with that, and then also looking at the lock box for the lobby?
A. Yes.
Q. Now, other than these measurements that you took with Sam, what else did you do at the time of the site visit?
A. Just discussed the project, what we were going to do and the scope of work that would become my work order.
Q. Did you have with you at St. Anne at the time of this site visit your work form with your L.P. Consulting stamp on it? Did you have a blank form like that?
A. Yes.
Q. Did Sam also come with a blank form to this site visit of this nature --
A. No.
Q. -- meaning Battaglin Exhibit 53?
A. No.
Q. What did you and Sam do with regard to the blank form that you brought with you to the site visit at St. Anne?


ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087 800.708.8087 FAX: 312.704.4950

Page 129

MR. PROSEN: Objection, misconstrues the testimony.
BY THE WITNESS:
A. Correct.
BY MS. KIRCHNER:
Q. You made the notes on Southern Exhibit 10 at the request of your attorney, is that correct?
A. Correct.
Q. Now, at the time you made these notes on this exhibit, tell me how you went about making these notes here.
MR. PROSEN: Objection, vague.
BY THE WITNESS:
A. I called everybody that's listed and asked them when did we visit it, if I did not already have the date myself on my -- in my work order, if I didn't write it up at the top. In some cases, like I said, I have East Lynn down and others I didn't. I contacted every one of these.
BY MS. KIRCHNER:
Q. So the ones where you had the work order and it had the date in it, you used that date, is that correct?
A. Yes.

Page 130

Q. And the others you made a telephone call?
A. Correct.
Q. And what did you do for Hoopeston?
A. Hoopeston, it was on the work order.
Q. What did you do for St. Anne?
A. St. Anne and Momence, I called Sam Southern back up, and he looked in his phone record and said we were there -- or his calendar and he said it was May 24th, '96.
Q. May 24th, '96 was for St. Anne?
A. And Momence.
Q. I see. That date is for two?
A. Correct.
Q. You didn't remember in 1998 when you were at St. Anne and Momence?
A. I specifically wanted the exact date for reasons of pursuing the claim, postal documents, per diem, all that that applies to it so I can exactly have a date so I can pursue getting all that information when the time came.
Q. So you put on the document the date Sam gave you for St. Anne and Momence, right?
A. Correct.

Page 131

Q. How did you get the information for East Lynn?
A. Paul Steiner, I think it's on Exhibit 53, 11/14/95 for him. And that was the same time we visited Hoopeston, if you look at the top. And then with Jesse, it was 10/17/95, where I visited East Lynn, Goodwine and Claytonville.
Q. Explain to me, for East Lynn, are you telling me you called up Jesse McNabb or you're telling me you remember it?
A. I talked to Jesse and just said, "Do you recollect this?" "Yeah," and he gave me the date, 10/17/95.
Q. You put the date that Jesse gave you on this document, right?
A. Yes.
Q. At the time you were making these notes in 1998, did you, yourself, have a recollection of being at East Lynn on 10/17/95?
A. I knew it was in October because -- that particular date because it was -- as I said before, that was the date O.J. -- the decision on O.J. came and that was significant at that time in '95.
Q. At the time you made these notes in

Page 132

1998, did you remember that you had been at St. Anne on May 24th, 1996?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. Oh, sure. I mean, not the specific date. I tried -- as I said before, I tried to nail the date down to -- so I can attach the particular date for getting records.
BY MS. KIRCHNER:
Q. Okay. So you nailed it down through Sam?
A. I nailed Sam's down for Sam, yes.
Q. Now, you also have a notation for Aroma Park. Do you see that?
A. Yes.
Q. What are you indicating there in your notes?
A. That's that Paul Steiner and Catherine Marks, September of '95.
Q. How did you go about putting that information down in your notes?
A. I didn't have an exact date. That's from my own notes. That's from my notes.
Q. Was it from notes or memory, sir, when

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

L.P. CONSULTING GROUP, INC., )
Plaintiff, )
vs. ) Case No.
THE UNITED STATES POSTAL ) 98-868 C
SERVICE, ) (Judge Allegra)
Defendant. )

The deposition of RICHARD ANTHONY BATTAGLIN, called for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions for the purpose of discovery, taken before Janet L. Robbins, CSR No. 84-2207, a Notary Public within and for the County of Cook, State of Illinois, and a Certified Shorthand Reporter of said state, at Suite 3300, Three First National Plaza, Chicago, Illinois, on the 11th day of June, A.D. 2004, at 8:43 a.m.



PRESENT:
BELL, BOYD & LLOYD PLLC,
(1615 L Street, N.W., Suite 1200,
Washington, D.C. 20036-5610,
202-955-6830), by:
MR. LAWRENCE M. PROSEN,
appeared on behalf of the Plaintiff;
UNITED STATES DEPARTMENT OF JUSTICE,
CIVIL DIVISION-COMMERCIAL LITIGATION BRANCH,
(1100 L Street, N.W., 8th Floor,
Washington, D.C. 20530,
202-307-0290), by:
MS. DOMENIQUE KIRCHNER,
appeared on behalf of the Defendant
and the Deponent.

ALSO PRESENT:
MR. STEPHEN LOBAUGH, In-House Counsel,
United States Postal Service.

REPORTED BY: JANET L. ROBBINS, CSR, RPR,
CERTIFICATE NO. 84-2207



RICHARD ANTHONY BATTAGLIN,
called as a witness herein, having been previously duly sworn, was examined and testified as follows:
EXAMINATION (Resumed)
BY MS. KIRCHNER:
Q. We're here, for the record, for the continuation of your deposition. And you understand you're still under oath?
A. Yes.
Q. Do you have any licenses, for example, engineering or architect or anything like that?
A. No.
Q. Have you ever had a license as an engineer, an architect?
A. No.
Q. Have you ever had a license regarding construction work?
MR. PROSEN: Objection, vague.
BY THE WITNESS:
A. What does that mean?
BY MS. KIRCHNER:
Q. Well, for example, have you ever had from a state government a license to perform construction work?



A. Yes.
Q. What licenses do you have?
A. The City of Chicago business license.
Q. And how long have you had that?
A. Continuously. It's renewed every year. I've had it since 1993.
Q. Can you describe the nature of that license?
MR. PROSEN: Objection, vague.
BY THE WITNESS:
A. Well, it's a business license.
BY MS. KIRCHNER:
Q. Is it to do construction work?
A. In the City of Chicago, yes.
Q. Only inside the geographical limits of the City of Chicago?
A. Correct.
Q. Have you had any other licenses related to performing construction work?
A. Just in the local counties or little towns that require it.
Q. Do some towns in Illinois have a requirement for a license?
A. Some of them have their little

the shape of the St. Anne Post Office, now that I look at the document.

Q. Okay. But you recognize it as the shape of the post office, but you're not really familiar with the sketch?

A. Correct.

Q. How about the next sketch right behind it. Whoops let me make sure I've got it here. Sorry.

I want you to look at the sketch, which is the second to the last page.

A. Uh-huh.

Q. Tell me whether you recognize that sketch.

A. No.

Q. Is that your handwriting?

A. No.

Q. If you could look at the last page of the document, do you recognize this?

A. No.

Q. And do you see it's dated -- "St. Anne Scope, Cont.," and then it has 2/1/94. Do you see that?

A. Yes.



Q. Let's move on.

Let me ask you this: This Exhibit 58, do you see anything inside this exhibit that in your mind relates to the site visit to St. Anne that you told us about, that you had a site visit with Sam Southern?

A. No.

Q. Okay. I'm going to move on.

Can you turn back to 56 for a moment, sir. It's a one-page sketch.

Could you clarify for me, did you make this sketch at the time of the site visit with Sam Southern?

MR. PROSEN: Objection, asked and answered.

BY THE WITNESS:

A. Yes.

BY MS. KIRCHNER:

Q. So during the very site visit itself?

A. Yes.

(WHEREUPON, a certain document was marked Battaglin Exhibit No. 59 for identification, as of 6/11/04.)

BY MS. KIRCHNER:

Q. Please take a look at what we've marked



as Exhibit 59 to your deposition and tell me whether you recognize this.

A. Yes.

Q. What is Exhibit 59?

A. It's a scope of work for the St. Anne Post Office.

Q. Can you tell me generally what sort of work?

A. Concrete.

Q. Did you prepare this document?

A. Yes.

Q. This is your handwriting?

A. Yes.

Q. Can we refer to this as a scope of work for concrete work at St. Anne?

A. Yes.

(WHEREUPON, a certain document was marked Battaglin Exhibit No. 60 for identification, as of 6/11/04.)

BY MS. KIRCHNER:

Q. Please take a look at what we've marked as Exhibit 60 to your deposition. Do you recognize Exhibit 60?

A. Yes.



Q. What is Exhibit 60?

A. A St. Anne scope of work.

Q. For what sort of work generally, sir?

A. Interior construction.

Q. Is this in your handwriting?

A. Yes.

Q. Did you prepare this document?

A. Yes.

Q. Now, if you could look at Exhibits 59 and 60, look at them together. You have both of them in front of you?

A. Uh-huh.

Q. You told us about your visit to St. Anne with Mr. Sam Southern.

A. Uh-huh.

Q. Do these documents, Exhibits 59 and 60, relate to that site visit?

A. Yes.

Q. And did you prepare Exhibits 59 and 60 at the time of the site visit with Sam Southern?

A. Yes.

Q. Did you go about preparing them in the same way you told us about yesterday where you and Sam measured the various distances and put the

was required.
Q. Was that a judgment that you and Sam arrived at together or yourself?
A. Oh, no, that's a common decision that we would have made together.
Q. And make it together?
A. Right.
Q. I'm directing your attention to Exhibit 55 that we looked at yesterday, sir.
A. Uh-huh.
Q. And do you recall this, that we looked at Exhibit 55 yesterday?
A. Yes.
Q. And do you remember you told me this is all in your handwriting and you prepared Exhibit 55, is that correct?
A. Yes.
Q. But now we have the extend prices on the document, correct?
A. Yes.
Q. If we look at Exhibit 55, can you look at it, compare it with Exhibits 59 and 60, and then satisfy yourself that this includes both the scope of work for concrete at St. Anne and then the scope



of work for interior work at St. Anne?
A. Yeah, it looks pretty similar. There might be some -- something different, but it looks pretty similar.
Q. You remember -- all right.
Can you put in front of you Exhibit 60 and Exhibit 55?
A. Uh-huh.
Q. As I understand it, what you're telling us is at the time of the site visit, Exhibit 60 was filled in and taken by -- you completed Exhibit 60, Sam Southern takes it back with him, and that at a later point in time, you get back Exhibit 60 from the postal service and then fill in the extended prices, is that correct?
A. No.
MR. PROSEN: Objection, misconstrues the testimony.
BY THE WITNESS:
A. That's not correct.
BY MS. KIRCHNER:
Q. Remember you told us about Exhibit 55 that has the extended prices filled in?
A. Yes.



Q. When did you go about putting in the extended prices in Exhibit 55?
A. When I submitted my original copy to Mr. Southern, it was at his discretion to add or subtract any items in the quantity column and send it back to me. And then when I took it for my -- for my --
Q. Your claim?
A. -- my claim, then I had filled in the extended version. So whatever was in the quantity column when he sent it back to, I just carried it over to the extended price.
Q. In 1998, at the time of your claim, you were filling in the extend price column, is that correct?
A. Right, because I realized I wasn't going to get the work order, so I just took what he sent back to me and then extended it over.
Q. And what he took at the time of the site visit, as I understand from your testimony, is Exhibits 59 and 60, is that correct, the two without the extend prices?
A. Yes.
Q. Okay. Do you recall that earlier you



told me that Exhibit -- yesterday you told me that all of Exhibit 55 was in your handwriting?
A. Yes.
Q. I would like to look at a particular item on Exhibit 55, sir.
A. Sure.
Q. Are you on the first page of Exhibit 55, please?
A. Yes. I'm sorry, 55 and 60?
Q. Yes. We can look first at Exhibit 55. And I'm on the first page, and I look down the description column and I see there the item, "Misc. hourly labor, carpenter finish." Do you see that?
A. Yes.
Q. And we have that same item on Exhibit 60, the first page. Do you see that?
A. Yes.
Q. And do you see that on Exhibit 60, there's 32 for the quantity hours, 32 hours, and that on Exhibit 55 -- I'm going a little too fast. I'm probably seeing this wrong. Sorry about that.
Do you see on Exhibit 60 that there's 32 hours for the item "Misc. hourly labor, carpenter finish"? Do you see that?

Page 164

order.
Q. But do you remember in the case of St. Anne that actually happening, that Sam sent it to you back, Exhibit 60, then you made the changes, and do you remember making the changes and sending it back to Sam Southern?
A. Yes.
Q. Do you remember why you made those changes at that time?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. Yes. He requested me to make adjustments as per usual.
BY MS. KIRCHNER:
Q. Did he tell you what adjustments to make?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. Yes, add whatever was on his sticky pad, add or subtract. There may be items I removed from this as well that I didn't put quantities, too, that may be written on this document, that at one time we considered it and we just didn't include it but that don't even have numbers. It's very possible that if

Page 165

I took a minute to look through this, I would find something. That's how they conducted their business with me.
BY MS. KIRCHNER:
Q. So are you telling me that Sam told you to change the zero for drywall casing bead to -- specifically to 275 for drywall casing bead?
MR. PROSEN: Objection, misconstrues the testimony and asked and answered.
BY THE WITNESS:
A. Yes. Otherwise, I wouldn't have put 275.
BY MS. KIRCHNER:
Q. It wasn't a conversation of the nature, "Think about that. Put in what you think is advisable"? It was a specific instruction to put in a specific number?
A. Yes.
Q. Was this an oral conversation as opposed to a sticky, do you remember?
A. I remember it always was a sticky.
Q. Oh, so these are not conversations. Do you have any of these documents, these copies of the scopes of work with the stickies?

Page 166

A. No. The sticky would have been -- I would have made an immediate adjustment, as I said, to this. I would have peeled the sticky off and threw it away and I would have mailed this right back to him hoping to get the work order based on my adds and subtractions.
Q. Do you remember specifically doing that in the case of St. Anne?
A. Yeah.
Q. Let's look at Exhibit 55 and Exhibit 59 together. If you can make sure you have those two in front of you.
A. 55 and 59.
Q. 55 is the scope of work for St. Anne with the extend prices filled in and 59 does not have the extend price column filled in, is that correct?
A. Yes.
Q. What I'd like you to do is look at the second to the last page of Exhibit 55 and then the first page of Exhibit 59 together.
A. Yes.
MR. PROSEN: I think if you go back a page.
BY MS. KIRCHNER:

Page 167

Q. Do you see here -- I want to look at the demolition backhoe line on these two documents, the first line. And do you see that on Exhibit 59, the quantity for demolition backhoe is eight hours, and that when we look at --
MR. PROSEN: I think you have to go back a page.
There you go.
THE WITNESS: Okay.
MS. KIRCHNER: Thank you, Larry.
BY MS. KIRCHNER:
Q. (Continuing) -- and when we look at the second to the last page of Exhibit 55, we see that the quantity is 16 for demolition backhoe? Do you see that?
A. Yes.
Q. And on Exhibit 55, do you see that there's additional handwriting on that line, and can you tell me whose handwriting that is?
MR. PROSEN: Objection, ambiguous.
BY MS. KIRCHNER:
Q. Let me be more specific with you.
Mr. Battaglin, we're on Exhibit 55, the second to the last page. We're looking at

there's an additional line item there, "premium time" --
A. Yes.
Q. -- on Exhibit 55?
A. Yes.
Q. Is that all in your handwriting?
A. Yes.
Q. If you could just read across on that line and tell me what you're indicating on the last line of Exhibit 55?
A. "Clause C-12 premium time." And in the quantity time, it's a percentage. The unit is 25 percent and the quantity is the amount of items covered by the work order to the -- and then I put in the extended price.
Q. When did you put that in on the document?
A. Probably when he determined that we would have to do some premium time work when he said to me we have to maybe do this on an extended period.
Q. Do you remember adding the line "clause C-12 premium time percent, 25 percent, $10,395.68," and then the $2,598.92. Do you remember adding that



line?
A. No, but I see I did. I mean, I know this is my writing. So at some point when I received this back, I followed the direction and put that down.
Q. But as you sit here today, you don't remember specifically when you did that?
A. I only know that within a few days of getting these back, I always would right away send them back because then they would produce the work order that would permit me to go do my work authorized.
So if I didn't get it back to them, if I let this sit a month, I reduced my chances of getting any work. So this would be expedient. A couple of days of getting his requests back, I would immediately send it back to them.
And then they would produce the document called a draft work order for my review. Again, that could have been readjusted again. They could have readjusted it and did some other things and sent it back to me for my review. And then that becomes what I will do. Then that will be what I will actually accomplish if they made that decision.



But this is what I sent back, and they never returned anything, so...
Q. When you say "this is what they sent back," what document are you referring to?
A. Exhibit 55 with all the changes that they requested.
Q. Well, are you telling me at the time you sent it back to them, it had the extend price column filled out?
A. No.
MR. PROSEN: Objection, misconstrues the testimony.
BY THE WITNESS:
A. No. I'm telling you that whatever quantities he needed me to adjust or line items to omit or line items to add, I would make that adjustment and send it back to him. And then I think I've said that I extended the price for the sake of the claim.
BY MS. KIRCHNER:
Q. Well --
A. I could have left it blank. It wouldn't have made any difference.
Q. For the sake of the claim, did you add



the "clause C-12 premium time, 25 percent units, $10,395.68," and then the extend price of $2,598.92?
MR. PROSEN: I'm going to object, ambiguous, misconstrues the facts, lacks a foundation.
BY THE WITNESS:
A. The answer is no.
BY MS. KIRCHNER:
Q. Do you have your original document, sir?
A. No. All the originals would be taken with them and then they would send me a copy back.
Q. But Exhibit 55 is a document that your counsel provided me on Tuesday for the first time in this litigation.
Do you have the originals that we can look at it?
A. I only have the copies that he has somewhere. I never have an original. All my originals went with the government and I was sent back copies, and I have a copy of all my originals. I don't have any original work. The postal service has all the original work.
Q. We're focusing on Exhibit 55 specifically now.
A. Yes, specific to Exhibit 55, the

extended sometime in early '98 because of the benefit of the claim.
Q. And that original document that has your marks on it in the extend price column, did you send that document, that original document to the postal service?
A. No. The postal service wouldn't have needed the extended. I sent -- I could have even faxed it to my attorney. And I probably -- if I didn't keep this document, which I don't think I did, I'd have to look, but I don't think I have it. Whatever I produced I produced, and if it's a copy, it was a copy. But back in '98, I could have thrown them away. I don't recall what I did with all these things. Again, it wasn't important to me. It's not important. What's important is the quantities and the item numbers. That's all.
Q. The extend price column was important for the claim, was it not?
A. No.
Q. Didn't you want to have an amount to put down in your claim?
A. But I don't need to extend it. I could just do it on a calculator or ribbon and write the



final number in. That's all.
Q. As you sit here today, 2004, do you remember in the case of Momence why you changed the 24 hours for miscellaneous hourly labor carpenter to 160 for that same item?
A. At the request of the postal service.
Q. And you mean Sam Southern specifically?
A. In this project, Sam Southern.
Q. Let's look at the second page of Exhibit 61 and the second page of Exhibit 62.
A. Uh-huh.
Q. Do you see there that the last line item on those pages is "clause C-12 premium time"? Do you see that?
A. Yes.
Q. And do you see that at the time of the site visit with Mr. Southern, you had written zero for premium time, is that correct?
A. That's correct.
Q. And you then changed that, is that correct?
A. That's correct.
Q. And what did you change it to?
A. According to this, I changed it to the



amount of items that were going to be covered under premium time.
Q. And what's that amount?
A. $9,356.16.
Q. Where did you get -- I'm not following you. What does that amount refer to?
A. It would reflect the specific items that Mr. Southern would have directed me to do or perform during the premium time or the premium hour time, as stated in my contract.
Q. Did he do that?
A. Yes.
MR. PROSEN: Objection, vague.
BY MS. KIRCHNER:
Q. Mr. Southern directed you to include specific items in the premium time line?
A. Yes.
Q. Which items did he tell you to include in that line?
A. Well, I wouldn't know because he would have put it on his sheet because it would relate to the work or the task that I was to perform at that particular time. So it could be a combination of all these items or some items. I wouldn't know.



Q. What is premium time?
A. Premium time is anything over and above spelled out in the contract documents.
Q. Is it time and a half? Is that what premium time is?
A. Not for this contract.
Q. Does it relate to Sunday work, for example, as opposed to Monday through Friday?
MR. PROSEN: Objection, asked and answered. The contract speaks for itself.
BY THE WITNESS:
A. It's possible.
BY MS. KIRCHNER:
Q. You just don't recall?
A. I don't know his point of view at this time, what he was getting at, but those items that he asked me to perform on premium time would have been added into that quantity column.
Q. Which items did he ask you to perform on premium time?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. I don't have that sticky anymore, so I don't know.