RICHARD ANTHONY BATTAGLIN - JUNE 11, 2004

Page 284

A. One conversation.
Q. Did you call him or did he call you?
A. I called him.
Q. What did you say to Mr. McNabb in this conversation?
A. We discussed a couple of other projects, and then I asked him specifically about the Brookfield project.
Q. And what did he tell you?
A. He told me that he had forwarded it to Mr. Rigsby and Mr. Rigsby would be making a decision on this work order.
Q. Did he tell you what Mr. Rigsby's decision was?
A. No.
Q. Do you remember what else you discussed with Mr. McNabb in the same telephone call that you told me about?
A. No. It was general about other things.
Q. So nothing in particular that would help us to date the telephone call?
A. No.
MS. KIRCHNER: Let's take a break.
(WHEREUPON, the deposition was

Page 285

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

L.P. CONSULTING GROUP, INC., )
Plaintiff, )
vs. ) Case No.
THE UNITED STATES POSTAL ) 98-868 C
SERVICE, ) (Judge Allegra)
Defendant. )

June 11, 2004
1:39 p.m.

The deposition of RICHARD ANTHONY BATTAGLIN resumed pursuant to recess at Suite 3300, Three First National Plaza, Chicago, Illinois.

Page 286

PRESENT:
BELL, BOYD & LLOYD PLLC,
(1615 L Street, N.W., Suite 1200,
Washington, D.C. 20036-5610,
202-955-6830), by:
MR. LAWRENCE M. PROSEN,
appeared on behalf of the Plaintiff;
UNITED STATES DEPARTMENT OF JUSTICE,
CIVIL DIVISION-COMMERCIAL LITIGATION BRANCH,
(1100 L Street, N.W., 8th Floor,
Washington, D.C. 20530,
202-307-0290), by:
MS. DOMENIQUE KIRCHNER,
appeared on behalf of the Defendant
and the Deponent.

ALSO PRESENT:
MR. STEPHEN LOBAUGH, In-House Counsel,
United States Postal Service.

REPORTED BY: JANET L. ROBBINS, CSR, RPR,
CERTIFICATE NO. 84-2207

Page 287

(WHEREUPON, a certain document was marked Battaglin Exhibit No. 77 for identification, as of 6/11/04.)
RICHARD ANTHONY BATTAGLIN,
called as a witness herein, having been previously duly sworn, was examined and testified as follows:
EXAMINATION (Resumed)
BY MS. KIRCHNER:
Q. Please take a look at what we've marked as Exhibit 77 to your deposition. Do you recognize Exhibit 77?
A. Yes.
Q. What is Exhibit 77?
A. It's a fax I sent to Jesse McNabb.
Q. Is this with relationship to the Brookfield job?
A. Yes.
Q. Did you send this fax on or about August 22nd, 1996?
A. Yes.
Q. What does this relate to, sir?
A. He said, and I'm not -- what's the word I'm looking for? I'm going to paraphrase. He basically said, "What would your price be for these

A. If you note the plan, those are my words, which were written in pencil or pen, whatever the medium, those are my words. We went over the job and corrected what was discussed probably, I can't say for sure, with the postal -- postmaster or someone related to the facility who is typically on-site when we're doing these things. I don't recall if this one, if it was maintenance or the postmaster, but there was always someone with us.
Q. You're referring to the first page of Exhibit 80. Which is your handwriting, if you could point that out to me, sir?
A. Sure. If you look starting in your right-hand corner, the upper right-hand corner, the word "insulated," where it says "furnish and install a 10 by 10 panel, flush panel overhead door." We determined it's better to have an insulated door if you're enclosing a dock. Then right below it, we added the 10 by 10 wire glass to a particular door, and that door was also to be, instead of hollow metal, it was to be insulated.
If you sweep down clockwise underneath, I have a little arrow going to a "3 by 7 insulated door with a vision wire kit," a typical postal



special. And then right below it, I also put "insulated for the flush panel overhead door."
And then sweeping back up, again, the word "insulated for flush panel overhead door." And just immediately above that, "insulated door with a 10 by 10 wire glass." Those are my words.
Q. Were those your observations at the site or is that as a result of a discussion with Mr. McNabb at the site as to what work should be done?
A. That was with the discussion.
Q. If you just look through the remaining three pages of Exhibit 80, did you make any marks at all on those pages?
A. Yes.
Q. Which page are you on where you have your handwriting?
A. I don't have any handwriting, but the mark I made was I put my stamp on all three.
Q. Okay.
A. That's all that's on there.
Q. All right. At the time of the second site visit at Downers Grove, did you scope out work and fill out a scope of work form?



A. For this dock enclosure, yes, we did.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 81 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. Please take a look at what we've marked as Exhibit 81 to your deposition, and if you could tell me what Exhibit 81 is.
A. It's a scope of work for the Downers Grove dock.
Q. Did you prepare this scope of work?
A. Yes, I did.
Q. If we focus now on the second site visit at Downers Grove that you performed, at the time of this site visit, had you already filled out the item number and the description and the unit measure and the unit price on the scope of work form that we have here on Exhibit 81?
A. Not on this one. This is the second work order, not the first.
Q. Do you have the first?
A. No. I gave everything to the post office. The first was related to this document called document 80. This is referring to the second



set of drawings that I'm filing as my claim.
If I can elaborate, this first document was calling for a wood partition. And if you look at the top of this, the very first line, this is for a steel tube. This is when we went to a steel framed construction.
So this document 81 is unrelated to document 80, and I can't tell you where the post office put that copy of that work order. This work order that you're referring to now as document 81 is related to another set of drawings. It hasn't been produced yet.
Q. So L.P. Consulting doesn't have that set of drawings?
A. No, they were postal drawings that I don't have.
Q. You don't have a copy of that?
A. No.
Q. Just to make sure I'm following you, at the time of the second site visit at Downers Grove, you're there with Jesse McNabb and you scope out the work.
A. Correct.
Q. It's for a wood frame dock enclosure, is

remodeling at Downers Grove, right?
A. (Nodding.)
Q. In about August of 1996, are you still doing lock box remodeling at the Downers Grove Post Office?
A. Maybe, yes.
Q. How did you learn that you would be scoping out a steel dock enclosure for Downers Grove as opposed to the earlier wood one?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. Mr. McNabb contacted me and said the old print that he produced was null and void and we need to look at these other drawings, and I'm pretty sure they were A.M. Fernandez's drawings.
BY MS. KIRCHNER:
Q. Did you arrive for that site visit, the second site visit, with the scope of work form all filled out in terms of the line -- the item number column, the description column, the unit measure column, the unit price column?
A. This one I don't think was that way. I think this one I drew it up in the field completely with my book because it was a total -- that drawing



was different than this drawing, so my old one was obsolete, if you will.
Q. The new drawing for the dock enclosure at Downers Grove that reflects steel in the construction, was that a blueprint?
A. Yes, it would have been a blueprint.
Q. Approximately what size?
A. The normal post -- whatever you want to call it, typical AE firm size. It might be -- I don't know sizes. I'm sorry. I can't gave you the dimension. It's pretty big. I used to know. 24 by 36 maybe.
Q. Just give me one second.
A. Sure.
MS. KIRCHNER: Go off the record for one second.
(WHEREUPON, there was a pause in the proceedings.)
BY MS. KIRCHNER:
Q. So you drew up the scope of work for the steel tube dock enclosure at Downers Grove, correct?
A. Yes.
Q. What did you do with your scope of work?
A. I gave it to Mr. McNabb.



Q. And at the time you gave it to Mr. McNabb, had you filled in the extend price column on the scope of work form?
A. I don't recall.
Q. Had you put a total price on the scope of work form before you gave it to Mr. McNabb?
A. I don't recall.
Q. After you gave the scope of work form to Mr. McNabb, what happened next with regard to the steel tube dock enclosure for Downers Grove?
MR. PROSEN: Objection, calls for speculation on the witness' part.
BY MS. KIRCHNER:
Q. Let me rephrase. Did you have conversations with Mr. McNabb about your scope of work for the steel constructed dock enclosure at Downers Grove after that site visit?
A. The only conversation I had with him, that was simply -- it was a status update, "Hi, how's it going? What's going on with the Downers Grove dock?" At that point he told me that A.M. Fernandez was going to handle the job and I should talk to Bob Rigsby.
Q. What did you say in response to that



statement from Mr. McNabb?
A. "I will look into it. Thank you very much," something like that probably. And we talked about other things we were working on. That was it.
Q. Did you look into it after that conversation with Mr. McNabb?
A. Yes.
Q. What did you do, sir?
A. I think I -- I didn't talk to Fernandez, but I did talk to Mr. Rigsby at some point in there, just asking what the status of this particular project was.
Q. Was it one conversation or more than one conversation with Mr. Rigsby?
A. I think it was just one that related to the dock. And he basically said that he'd let me know, get back to me, and that he just agreed, yes, it's with the architect. And that was all we talked about.
Q. With the architect --
A. We talked about other things, but, you know, specifically this project.
Q. So the two of you understood that the matter was with the architect at that point in time?

Page 316

A. No, this is now another conversation.
Q. Oh, another conversation.
A. After I talked to the postmaster.
Q. After you talked to the postmaster, you talked to Mr. Rigsby again?
A. Yes.
Q. Is this a conversation over the telephone --
A. Yes.
Q. -- or face to face?
A. No, it was on the phone.
Q. What did you say to Mr. Rigsby in this conversation?
A. I basically said -- I'm paraphrasing the conversation; I don't remember it verbatim. Basically it was I heard from the postmaster that that was going to be happening soon. And I just asked him, was that coming -- was my work order coming, and he said he wasn't going to issue me a work order; he had another contractor do the work. That's when I learned that Fernandez had bid the project. And subsequently in time after that, I found out all the facts of the matter, and that's what had happened.

Page 317

Q. In this conversation with Mr. Rigsby that you're telling me about, did Mr. Rigsby tell you that the postal service had already awarded a -- well, let me back up.
In the conversation with Mr. Rigsby that you're telling me about, did Mr. Rigsby tell you that the dock enclosure had been bid for Downers Grove?
A. No, he never said it was bid.
Q. Did he tell you whether or not the postal service had already awarded a contract for the dock enclosure at Downers Grove?
A. He implied it.
Q. He led you to conclude that?
A. Yes.
Q. Do you remember what he said that led you to conclude that?
A. He said that we have selected a contractor and he'd be doing the work. He never mentioned the name of the contractor, but just that they had picked a contractor to do the work.
Q. Did you ask who the contractor was at that time?
A. I don't recall because I didn't bid it,

Page 318

so I have no right to know the information. If I bid anything or I respond to an offer of solicitation, they're required to notify me because I was part of the process, but I was locked out of the process. I had no involvement in the process.
Q. Did you say anything further to Mr. Rigsby in this telephone call about the Downers Grove scope of work for a dock enclosure?
A. I received no notice of any type or any communication from anyone in the postal service regarding my scope of work for Downers Grove and no communication whatsoever from any of the project managers or the architect on the solicitation and awards of the project. I did not know any of that was going on, so I had no opportunity to protest.
Q. I'm just asking you about the conversation with Mr. Rigsby. Did you say anything else to him in that conversation that had to do with Downers Grove's scope of work for a dock enclosure?
A. I said to him if I would have known, I would have protested. And he said something to the effect that -- he kind of dismissed it, you know, just in normal parlance as if, "Well, there will be other work," just, you know, just politely brushed

Page 319

it off. At the time I was disappointed and at the time he didn't really care that I was disappointed.
Q. Did he tell you that he didn't care?
A. Just by his demeanor, just like, "Well, you know, I'm sorry."
Q. This is a telephone conversation, right?
A. Yes, just a phone conversation.
Q. Did he tell you anything else in this phone conversation?
A. That's it.
Q. When you told Mr. Rigsby that if you had known, you would have protested it, what did you mean by that?
A. Well, I would have formally protested the award, but I would have been untimely, because by the time I found out, it was too late.
Q. After you learned of this from Mr. Rigsby in this telephone call, did you take any other actions or have any other further conversations with him with regard to Downers Grove and the dock enclosure?
A. Not this particular project, no.
Q. Referring back to that conversation with Mr. Rigsby about the dock enclosure in Downers

A. Yes.
Q. What is Exhibit 86?
A. It's a claim -- let's see here. It's a letter sent from my attorney regarding the Downers Grove dock enclosure.
Q. Did you withdraw your claim with regard to the Downers Grove dock enclosure?
A. Yes.
Q. Isn't this the same Downers Grove dock enclosure that we've been talking about today, correct?
A. This document isn't specific, so I can't -- looking at this compared to this (indicating), it doesn't look to be specific.
Q. Okay. But would you agree, sir, that in 1996, you presented the claim to Mr. Rigsby with regard to the dock enclosure at Downers Grove and then in 1998 you presented the very same claim again to Mr. Rigsby?
MR. PROSEN: Objection, compound question and confusing.
BY THE WITNESS:
A. I'm not sure.
BY MS. KIRCHNER:



Q. Let's go through it again. Put in front of you Exhibit 81.
Do you remember you told me that Exhibit 81 is the scope of work which is the subject of the present lawsuit?
A. Yes.
Q. You have in front of you Exhibit 84. Could you put in front of you Exhibit 84?
Do you see that in Exhibit -- what I'd like you to look at together is Exhibit 81 and 84, sir. Can you look at 81 and 84 together? You need 81 and 84 in front of you.
A. Uh-huh.
Q. Now, Exhibit 81 is the subject of the present lawsuit, correct?
A. Yes.
Q. And if you look at Exhibit 84, which is your earlier document to Mr. Rigsby dated December 17th, 1996, does that deal with the very same matter at Downers Grove which is the subject of the present lawsuit?
A. I can only explain it in my terms.
Q. I'm asking you to look at Exhibits 81 and 84.



A. I'm not following you at all.
Q. Let me start again, then. Let me start the question again.
A. All right.
Q. I want you to put in front of you Exhibit 85. You need Exhibit 85 --
A. Uh-huh.
Q. -- and Exhibit 84. Okay, you have them both in front of you.
In Exhibit 85, I'm going to direct you back to the letter dated -- wait a second. I've got the wrong document. That's my fault.
What I need is Exhibit 83 and Exhibit 84.
A. Okay. I have that.
Q. Do you see in Exhibit 83 we have a copy of your claim dated March 3rd, 1986?
A. Yes.
Q. And do you --
A. '98.
Q. Yes, March 3rd, 1998. Thank you.
Do you see in your claim dated March 3rd, 1998, you have information with regard to Downers Grove?



A. Yes.
Q. And do you see that the claim amount for the Downers Grove dock enclosure is $36,564.99? Do you see that?
A. Yes.
Q. And that the profit, the lost profit sought is $10,000?
A. Correct.
Q. Now, can you look at Exhibit 84, which is a December 17th, 1996 letter.
A. Yes.
Q. And do you see that there, you're complaining about the very same matter at Downers Grove, the lost profits of $10,000, the site visit on or about August 1st, 1996, and the draft work order?
A. Yes.
Q. So is it correct that you pursued this matter with Mr. Rigsby through Exhibit 84?
A. Initially, yes.
Q. Initially. And then pursued it again in March of 1998, the very same matter?
A. Yes.
Q. And directing your attention to