A. We filled it in together at the site, yes, during the site visit.
Q. Whose handwriting is it in the quantity column?
A. I wrote it.
Q. And how did you go about getting that information to put in the quantity column?
A. I measured the site with the postal people and we determined the quantity and put the quantity down. Well, not all of them, but some of these on the back two pages say "to be determined," so that was something they were going to get back to me on.
It looks like it's related to electric. Yeah, most of these "to be determined," they were going to get back to me on whether we were going to do the electric work.
Q. What page are you on?
A. I'm on Page 4 and Page 5.
Q. Could you just show me, point to me the "to be determined." I'm afraid I'm not seeing it.
A. "To be determined," "to be determined."
Q. Oh, the DBO. Okay, I'm with you now.
A. TBD, actually. Pardon my printing.



Those are all to be determined, TBD.
MR. PROSEN: For the record, the witness is pointing to the quantity column on Pages 4 and 5.
BY MS. KIRCHNER:
Q. Now, after you finished filling in all the information on Exhibit 87, the scope of work for Hoopeston, what did you do with the scope of work?
A. I took the scope of work and the sketches and gave them to -- I don't recall if it was Paul or Lois, but they took it with them to go back to discuss this with Mr. Rigsby. And I was waiting for their response, whether this was going to -- or when this was going to happen or whatever plans they had for it.
Q. Is the date, 11/14/95, is that the date of the site visit?
A. Yes.
Q. You filled that in also?
A. Yes, I did.
Q. Why did you put the contract number 94-B-0097 on Exhibit 87?
A. It's just for my reference so that if I was -- just so you know, the postal service has multiple IQC contracts in various departments. And



some of the other entities have different line -- have different books. They're not all the same.
So at this time I had a couple of other IQCs not related to Mr. Rigsby but to other contracting officers, and I put this down so I wouldn't confuse line items or locations.
Q. So --
A. That's why that's there.
Q. The unit prices listed in the Exhibit 87, those are the unit prices from the price book for Indefinite Quantity Contract 94-B-0083, is that correct?
A. That would be correct.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 89 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. Showing you what we've marked as Exhibit 89. Does this look familiar to you?
A. I have no idea what this is.
Q. Does it appear to be a Xerox of some portion of a blueprint?
A. Yes, but it's meaningless to me.
Q. Okay. Let's go on.



Can you turn back to 87? Is this interior work and also the concrete handicap ramp in the scope of work?
A. No, this is strictly the interior.
Q. At the time of the site visit on November 14th, 1995, did you also scope out a handicap ramp at that time?
A. Yes. As Exhibit 88 would indicate, yes, we laid out or measured for a ramp.
Q. Is there anything that indicates when you prepared Exhibit 88?
A. Not to my knowledge, no.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 90 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. Please take a look at what we've marked as Exhibit 90 to your deposition.
A. Yes.
Q. Do you recognize Exhibit 90?
A. Yes, I do.
Q. What's Exhibit 90?
A. It's a scope of work for the concrete work at the Hoopeston Post Office.

Page 356

have extended prices, is that correct?
A. I do not recall.
Q. Well, directing your attention to Exhibit 87, that's the document you, in fact, gave the postal service with regard to the interior, is that correct?
A. That's correct.
Q. And you do not have the document that you gave the postal service with regard to the concrete ramp, correct?
A. No, I do not.
Q. But you believe it to have had in it the information in the item number column, the description column, the unit measure column, the unit price column and the quantity column, is that correct?
A. That's correct.
Q. After you did that at Hoopeston, did you follow up with the postal service with regard to the proposed work?
A. Yes, I did.
Q. And how did you do that, sir?
A. I telephoned, I don't recall if it was Lois or Paul, and just asked them what the status of

Page 357

the scope of work was and they told me to talk to Mr. Rigsby.
And then I subsequently -- I don't know if it was the same minute or hour, but I did call Mr. Rigsby and he advised me that Mr. Fernandez was going to produce construction documents. That's all he told me, and to stay tuned, so to speak, he will keep me apprised or something to that effect. So I just assumed that I was going to get better documents to -- or they were going to produce the work order based on his documents.
Q. In this telephone call, what documents did Mr. Rigsby tell you Mr. Fernandez was going to produce?
A. Construction documents.
Q. Was he any more specific in the telephone call?
A. No.
Q. Approximately when did the telephone call to Mr. Rigsby occur that you just told me about?
A. It would be around December, I think, somewhere around the holidays, if I had to guess.
Q. I'm not asking you to guess, sir.

Page 358

A. Well, I can't tell you then. I don't know. I can't recall.
Q. Did you then make any further site visits to the Hoopeston Post Office?
A. Not that I recall.
Q. So you only made one site visit on November 14th, 1995?
A. Well, yeah. You can only make one visit on one day. I didn't go back the same day.
Q. I'm not being clear then. You made a site visit on November 14th, 1995, correct?
A. Yes.
Q. After that date, did you make another site visit to the Hoopeston Post Office?
A. Not to produce the scope of work, no. I may have gone there again to mail a letter if I was in the area, but I didn't go to produce a scope of work.
Q. Is the Hoopeston Post Office the post office for your area?
A. Yes, it is, 609.
Q. It's the closest to your business?
A. No, this is furthest from my business, one of the farther ones.

Page 359

(WHEREUPON, a certain document was marked Battaglin Exhibit No. 91 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. Please take a look at what we've marked as Exhibit 91 to your deposition.
A. Yes.
Q. Do you recognize Exhibit 91?
A. Yes.
Q. What is Exhibit 91?
A. It's a scope of work for the Hoopeston Post Office.
Q. Who prepared Exhibit 91?
A. I did.
Q. How did you go about preparing Exhibit 91 -- first of all, tell me when did you prepare Exhibit 91?
A. It looks like August 1st, '96.
Q. Are you just reading that from the document, sir?
A. Yes.
Q. How did you go about preparing Exhibit 91?
A. Exhibit 91, with the exception of the

Page 364

different from the '94 contract, is that correct?
A. That's not correct. It was the same unit price, same line items. The only thing different was my multiplier, because I'm competing for a contract to get the contract.
My multiplier assures me of a contract, which is why we're here today because I competed for this geographic area under a specific contract with a special multiplier relating to the line items. The line items stay the same, but my multiplier against them change with wage rates and dumping fees and things that take for cost of business.
So what ends up happening is this document could end up being different than this document by nature of the fact that I have a different multiplier.
Q. So you're saying --
A. A contract is a contract, so...
Q. Just so I'm really clear, on Exhibit 91, the unit prices in that column, the unit price column on Exhibit 91 --
A. Uh-huh.
Q. -- do they reflect the unit prices for the 1996 Indefinite Quantity Contracts?

Page 365

A. To the best of my knowledge, they do.
Q. And are you telling us then that the reason why the unit price column is different in Exhibit 90 versus Exhibit 91 is because there were different multipliers for the two Indefinite Quantity contracts?
A. That could be, yes, that's exactly what it could be, or they could be the same. I don't have a calculator to crunch the number.
Q. I guess I'm not following you when you say "they could be the same." Let me just ask some more questions.
First off, I would like to ask you to compare the second page of Exhibit 90 and Exhibit 91. Those second pages, they look identical to me. Do they look identical to you?
A. Pretty much.
Q. Earlier you said that you knew exactly what Exhibit 91 is. What do you think Exhibit 91 is?
A. It's a replication for my contract for '96. See, I'm just going to say this for time sake, because I believe I'm educating everyone on something that it took me ten years to -- when I was

Page 366

doing this.
All you need is my contract number, go to the PACS system, pull up these items times the quantity and you'll get your extended price and you'll get the government price. You don't need to know I wrote different numbers down in my extended column or they seem to be different.
This exercise, frankly, is starting to be fruitless because these quantities, these unit prices are based against the quantity. This is a government generated thing. I can't generate this part. I can only put in the quantities.
To get the extended version, you just do the math and you'll get the exact number. And that can be done by anybody in the current postal system. And I'm getting a little frustrated in the sense that I'm educating on how a work order is put together and I don't see the purpose of it.
Q. Can you explain to me, sir, why it is in these two documents that you prepared there are different numbers in the unit price column on the first page?
A. Very simply. Maybe this page --
Q. When you're talking, you have to refer

Page 367

to the exhibit number of the document.
A. Exhibit 90, I took the time to run my multiplier against that number, which was $80. If, in fact, $68.72 is 15 percent less than 80, that will make the difference. It's possible that the new contract I changed the way I did the format, but the numbers don't change in regard to the end result, because the government's computer automatically takes my multiplier off against the unit price and the individual item number.
If I didn't write the description down in here or the unit measure, all I needed to put down, for example, is the first line on the item number and a quantity, and the postal service's work order would have produced everything else.
All this other information is completely moot, because all you need is an item number and a quantity and you can build a work order. Do you understand that?
Q. I have another question for you, sir. Do you see that on Exhibit 90 you have a total of $45,951.88, and on Exhibit 91 you have a total $45,472? Do you see that?
A. Yes.

RICHARD ANTHONY BATTAGLIN - JUNE 11, 2004



listed in 87 and the items listed in 91?
A. It's the amount that I have determined based on my calculations that I filed in my claim.
Q. And it's for the items of work listed in Exhibit 87 and Exhibit 91, is that correct?
A. It's -- the items that I believe are important to my claim is in those two exhibits, yes.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 92 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. Please take a look at what we've marked as Exhibit 92 to your deposition and tell me whether you recognize Exhibit 92.
A. Yes, I do.
Q. What's Exhibit 92?
A. Exhibit 92 is another contract with another price, and it's for $62,000.
Q. Did you prepare Exhibit 92?
A. With the exception of the quantities, yes, and -- yeah.
Q. Whose handwriting is on Exhibit 92?
A. My handwriting.
Q. Is all the handwriting your handwriting?



A. Yes, it is.
Q. When did you prepare Exhibit 92?
A. This would have been at the time I received that other contract that's shown up at the top.
Q. As I understand it, you received the Indefinite Quantity Contract 96-B-0098 in June of 1996, is that correct?
A. I believe so, on or about, yeah.
Q. Are you telling us that it was at or around that time that you prepared Exhibit 92?
A. I'm saying that I took the item number against the quantity that was derived, whether it be on Exhibits 92, 91, 90 or any of the exhibits shown, or 87, and I filed a claim for the amount of $62,000 and whatever my claim is for. Whether it be Exhibit 92, 91 or 90 or 87, I'm claiming the item number against the quantity that's listed on the document. I'm not claiming the extended price or the government's unit price or my multiplier.
Q. Are you claiming the quantity?
A. I'm claiming the item number and I'm claiming the quantities, and whatever that comes out to be is my claim.



Q. Well, as you sit here today, can you tell us what quantities you are claiming for Hoopeston with regard to the concrete handicap ramp?
A. I'm going to say that I'm claiming the quantities against the item number on document Exhibit 92.
Q. And you'll note, sir, that those quantities are different than the quantities in Exhibits 90 and 91, is that correct?
A. They might be, yes.
Q. Well, could you just satisfy yourself, sir?
A. Yes, they are different.
Q. How did you go about determining the quantities that you put in the quantity column of Exhibit 92?
A. The same way I did the others. I would get with the postal people and we would determine that this is the amount required. It's very possible that this document --
Q. Which one are you referring to?
A. Let me finish.
Q. Sorry.
A. I'd appreciate it.



Exhibit 92 is probably a take-off of Mr. Fernandez's drawings that I protested and was given by Mr. Rigsby, and I came up with a number of $62,000. And that's probably what document 92 is, which is the issue of the claim.
Q. Did you obtain Mr. Fernandez's drawings for the Hoopeston ramp?
A. Yes.
Q. And did you then do a take-off for those drawings of Mr. Fernandez?
A. Yes.
Q. And is that take-off of yours Exhibit 92?
A. Yes.
Q. And by "take-off," please tell us what you mean, for the record?
A. The government's item number, description, unit measure and unit price times the quantity as it related to the document provided by the government. And that's how I came up with my number against my multiplier of my contract.
Q. In the document that you had from the government was Mr. Fernandez's drawings for the Hoopeston ramp, is that correct?

as saying I'm willing to live with the official government postal service compilation, the item number times the quantity against my multiplier, and I'll live with that.
Q. Which document are you referring two?
A. Document 92.
Q. So we don't need to look at Exhibit 81?
A. Exhibit 81 would not -- no, not 81. That's the Downers Grove dock.
Q. Are you telling me that the $62,752 figure was solely for the handicap ramp and not the interior at Hoopeston?
A. I'm not saying that. I'm saying that Exhibit 92 was a result of Mr. Fernandez's drawing that Mr. Rigsby gave me, and that's what I'm claiming. I'm claiming that particular portion of the project. I don't believe I'm claiming the interior part insofar as for damages. So I don't believe that. Now, I might be wrong, but I'm just saying there's obviously a math error and it's something I made a mistake with.
Q. Putting aside the math, in terms of the scope of the work that you scoped out that relates to Hoopeston, is it solely the handicap ramp or the



is it the ramp plus the interior?
A. I'll let you know in a second.
The ramp.
Q. And only the ramp?
A. Yes, because only the ramp, I believe, was in my certified claim here. Yeah, only the ramp.
Yeah, Hoopeston ramp project.
Q. After you handed in your $62,752 price to Mr. Rigsby, did you have any conversations with Mr. Rigsby that related to Hoopeston and the handicap ramp?
A. Yes, I gave him the drawings back, as he requested, and I gave him my work order. And at the time he looked at it, he said it's late, and so I protested.
Q. But after that point, did you have any more oral conversations with Mr. Rigsby --
A. I might have.
Q. -- about the handicap ramp?
A. I may have. I don't recall.
Q. Do you recall any?
A. Not really, no.
Q. Can you tell me, did you do any damage



calculations to produce the profits part of your claim?
A. I did some form of percentage calculation based on the nature of the unit price. It's different than, you know, two plus two is four. It's a percentage issue, so I did do that calculation.
Q. This is back in 1998?
A. This is the time I put the claim in.
Q. Do you have those calculations that you did back in 1998?
A. I believe they were submitted by my attorney.
Q. But you don't have the pieces of paper or wherever you did the calculations back in 1998?
A. I would not have been concerned with saving that type of calculation because I have a unit price that I would take a multiplier against the government's unit price, and that's how I arrived at it. This is not a fixed price type of contract, so I have no reason to go in that direction.
Q. So you had this documentation at the time you submitted your claim, but you didn't save



it, is that correct?
A. I had no documentation.
Q. You had the calculations at that time?
A. Uh-huh. Well, there's no calculation. It's a math formula. It's not a calculation. You can call it a calculation. There are no raw numbers to say, like I say, two plus two is four. It's a percentage of the amount of the work order against --
Q. Well, can you just -- let's take one example of your claim and just tell me how you did it. Let's just take whatever example you want to take from the claim. Just take your work order amount as an example and then tell me how you did it for one and which one you're using so that I understand, sir.
A. I would have -- I'll just use the Exhibit 52, Aroma Park, work order amount, that lost profit would have been a percentage against the work order amount based on the multiplier that I use when I bid a unit price contract with the post office.
Q. For Aroma Park, did you do anything with your costs when you computed the profits?
A. My costs would have been in my

testified that the first page, the item number and description, unit measure and unit price were pre-filled out so that when you got to the site, you just filled in the quantity, is that correct?

A. That's correct.

Q. Whose idea was it that you, if you will, pre-fill out the item number, description, unit measure and unit price?

A. That was the postal service's.

Q. Who in particular at the postal service?

A. Mr. Rigsby.

Q. Mr. Rigsby instructed you to do that?

A. Yes.

Q. For what purpose?

A. Because of the volume of facilities we were looking at and the time it takes to go with personnel, measure everything, maybe provided sketches, maybe not, depending on the item, and to develop the scope of work, meet with the postmaster, it sped up the time required to do it over the 50 or so facilities we looked at. So it was -- that's what the intent was.

MR. PROSEN: I have nothing further.

MS. KIRCHNER: No questions.



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

L.P. CONSULTING GROUP, INC., )
Plaintiff, )
vs. ) Case No.
THE UNITED STATES POSTAL ) 98-868 C
SERVICE, ) (Judge Allegra)
Defendant. )

I hereby certify that I have read the foregoing transcript of my deposition given at the time and place aforesaid, consisting of pages 1 to 388, inclusive, and I do again subscribe and make oath that the same is a true, correct and complete transcript of my deposition so given, and includes changes, if any, so made by me.

RICHARD ANTHONY BATTAGLIN

SUBSCRIBED AND SWORN TO before me this day of , 2004.

Notary Public



STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

I, JANET L. ROBBINS, a Notary Public within and for the County of Cook, State of Illinois, and a Certified Shorthand Reporter of the said state, do hereby certify:

That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was reported stenographically by me, was thereafter reduced to typewriting under my personal direction and constitutes a true record of the testimony given and the proceedings had;

That the said deposition was taken before me at the time and place specified;

That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my hand



and affix my seal of office at Chicago, Illinois, this 18th day of June, 2004.

Notary Public,
Cook County, Illinois.
My commission expires 10/29/06.

C.S.R. Certificate No. 84-2207

4211

UNITED STATES POSTAL SERVICE.

# FACILITY AND FIXED MECHANIZATION PROJECT CONTRACT COMMITMENT ORDER

Date: 08/28/1999
Control Number: J099650

Installation Name
AROMA PARK - MAIN OFFICE (160300-001)
AROMA PARK, IL 60910-9998

Description of Work
Repair & Alteration-Cap

| Project Authorization Number | Contract Number | Change Code | B/A Finance Number | FMS Project Number |
|---|---|---|---|---|
| 9-4J-160300-C-922 | 162640-99-B-0209 | 00 | 161550 | J81492 |

| Item Description | Account Number | Index Code | Additional Amount Committed | Previous Amount Committed | Total Committed To Date |
|---|---|---|---|---|---|
| R&A Bldg Constr (5BC) | 86125 | 5BC | $154,719.00 | $0.00 | $154,719.00 |
| Total: | | | $154,719.00 | $0.00 | $154,719.00 |

| Contract Type | Contract Start Date | Contract End Date | Days Allowed for Payment by Prompt Payment Act |
|---|---|---|---|
| C Prime Construction | 07/23/1999 | 10/21/1999 | 14 |

Payee Name and Address:
PNL ENTERPRISES
194 KINGSTON LANE
BLOOMINGDALE IL 60108-1730

Contractor's Taxpayer ID No.
36-4003425

Parent Company Taxpayer ID No.

- [ ] Contractor Address Change
- [ ] Parent Co. Pays Tax
- [x] Small Business
- [ ] Minority Bus. Enterprise
- [ ] Women-owned Business
- [ ] Labor Surplus Area
- [ ] Educ./Non-Profit

Remarks
Contract Award
Committing $154,719.00 for the Lobby Renovations

Contracting Officer Name and Signature
LARRY L LINNENBURGER

Date Signed

Prepared By
TERI L WILCOX-DUBOIS
(630) 295-6274

Approving Official Title, Address, and Phone Number (630)295-6290
CONTRACTING OFFICER
GREAT LAKES FSO
62 STRATFORD DR
BLOOMINGDALE IL 60117-7000

Contact Person
LARRY L LINNENBURGER
GREAT LAKES FSO
62 STRATFORD DR
BLOOMINGDALE IL 60117-7000



PS Form 4211, October 1995 - 20260-6425, Rev 8.00