No. 98-868C
(Judge Allegra)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

L.P. CONSULTING GROUP, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

KATHRYN A. BLEECKER
Assistant Director

DOMENIQUE KIRCHNER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit,
8th Floor,
1100 L. St., N.W.
Washington, D.C. 20530
Tele: (202) 307-0290
Facsimile: (202) 514-8624

Attorneys for Defendant

OF COUNSEL:

STEPHEN D. LOBAUGH
United States Postal Service

January 14, 2005

# TABLE OF CONTENTS

DEFENDANT'S BRIEF ........................................ 1

STATEMENT OF THE ISSUES .................................. 1

STATEMENT OF THE CASE .................................... 2

I. The Nature Of The Case ................................ 2

II. Statement Of Facts ................................... 2

ARGUMENT ................................................. 7

I. Summary Judgment Should Be Granted For Defendant .... 7

II. LP Cannot Establish The Existence Of Any Implied Contracts ........................................... 9

A. Four Elements Are Required To Establish A Contract .................................................. 9

1. There Was No Mutual Intent ............... 12

2. There Was No Unambiguous Offer And Acceptance ............................... 19

3. There Was Not Sufficient Action By An Authorized Official ...................... 22

III. Even If LP Could Establish An Implied-Contract, LP Could Not Establish Breach With Regard To Six Projects ............................................ 23

IV. LP Also Cannot Establish Breaches For Two Other Projects ............................................ 27

V. Even If LP Established Breach Of An Implied Contract, LP Would Not Be Entitled To Its Anticipated Lost Profits ......................... 31

## TABLE OF AUTHORITIES

### FEDERAL CASES

Alvin, Ltd. v. U.S. Postal Service,
816 F.2d 1562 (Fed. Cir. 1987) .......................... 9

American General Leasing, Inc. v. United States,
218 Ct. Cl. 357,
587 F.2d 54 (1978) ................................... 12

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) ................................ 7, 8

Atlas Corp. v. United States,
895 F.2d 745 (Fed. Cir.), cert. denied,
498 U.S. 811 (1990) .......................... 11, 16, 17

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) .................................. 8

Chavez v. United States,
18 Cl. Ct. 540 (1990) ............................ 10, 11

Cienega Gardens v. United States,
194 F.3d 1231 (Fed. Cir. 1998) ......................... 8

City of El Centro v. United States,
922 F.2d 816 (Fed. Cir. 1990), cert. denied,
501 U.S. 1230 (1991) ............................. 10, 23

Clean Giant, Inc. v. United States,
19 Cl. Ct. 390 (1990) ................................ 10

Delco Electronics Corp. v. United States,
12 Cl. Ct. 367 (1987), aff'd,
909 F.2d 1495 (Fed. Cir. 1990) ........................ 11

Delta Data Systems Corp. v. Webster,
755 F.2d 938 (D.C. Cir. 1985) ......................... 32

Edwards v. United States,
22 Cl. Ct. 411 (1991) ................................ 10

Federal Crop Insurance Corp. v. Merrill,
332 U.S. 380 (1947) .................................... 22

Florida Power & Light Co. v. United States,
375 F.3d 1119 (Fed. Cir. 2004) ............................ 9

Hall v. Aqua Queen Manufacturing, Inc.,
93 F.3d 1548 (Fed. Cir. 1996) ............................. 8

Hamlin v. United States,
316 F.3d 1325 (Fed. Cir. 2003) ......................... 10

Harbert/Lummus Agrifuels Projects v. United States,
142 F.3d 1429 (Fed. Cir. 1998), cert. denied,
525 U.S. 1177 (1999) ............................ 12, 22, 23

ITT Federal Support Services v. United States,
209 Ct. Cl. 157,
531 F.2d 522 (1976) .................................... 16

Jay v. Sec'y of Department of Health and Human Services,
998 F.2d 979 (Fed. Cir. 1993) ............................. 8

J.F. Shea Co. v. United States,
10 Cl. Ct. 620 (1986) .................................. 32

Lichtefeld-Massaro, Inc. v. United States,
17 Cl. Ct. 67 (1989) ................................... 16

Maintenance Eng'rs v. United States,
50 Fed. Cl. 399 (2001) .................................. 8

Maintenance Engineers v. United States,
749 F.2d 724 (Fed. Cir. 1984) .......................... 19

Mason v. United States,
222 Ct. Cl. 436,
615 F.2d 1343 (1980) ............................... 18, 19

Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,
475 U.S. 574 (1986) ...................................... 8

Mega Construction Co. v. United States,
29 Fed. Cl. 396 (1993) ............................. 31, 32

Morgan v. United States,
12 Cl. Ct. 247 (1987) .................................. 10

New American Shipbuilders, Inc. v. United States,
871 F.2d 1077 (Fed. Cir. 1989) ...................... PASSIM

OAO Corp. v. United States,
17 Cl. Ct. 91 (1989) .................................. 10

Petrini v. United States,
19 Cl. Ct. 41 (1989) .............................. 10, 12

Porter v. United States,
204 Ct. Cl. 355,
496 F.2d 583 (1974), cert. denied,
420 U.S. 1004 (1975) .................................. 11

Prevado Village Partnership v. United States,
3 Cl. Ct. 219 (1983) .................................. 11

Prudential Insurance Co. v. United States,
801 F.2d 1295 (Fed. Cir. 1986), cert. denied,
479 U.S. 1086 (1987) .................................. 10

Rhen v. United States,
17 Cl. Ct. 140 (1989) .................................. 31

Ridge Runner Forestry v. Veneman,
287 F.3d 1058 (Fed. Cir. 2002) ........................ 20
Solar Turbines, Inc. v. United States,
23 Cl. Ct. 142 (1991) .............................. 10, 11

Trauma Service Group v. United States,
104 F.3d 1321 (Fed. Cir. 1997) .................... 10, 23

Travel Centre v. Barram,
236 F.3d 1316 (Fed. Cir. 2001) .................... 18, 19

Varilease Technology Group, Inc. v. United States,
289 F.3d 795 (Fed. Cir. 2002) ......................... 18

**FEDERAL STATUTES**

41 U.S.C. § 601 ........................................ 2

## Table Of Contents Of Appendix

Page

1. Declaration of Terri Jacobsen.............................1

2. Aug. 11, 1998 letter of LP...............................25

3. Apr. 13, 1998 letter of LP...............................29

4. Mar. 3, 1998 letter of LP................................32

5. Modification of IQC 162640-94-B-0083.....................37

6. Modification of IQC 162640-94-B-0083.....................40

7. May 17, 1994 Notice to proceed re IQC 162640-94-B-0083...41

8. Excerpts from IQC 162640-94-B-0083.......................41

9. June 6, 1996 Notice to proceed re IQC 162640-96-B-0094...52

10. Excerpts from IQC 162640-96-B-0094......................54

11. June 3, 1996 Notice to proceed re IQC 162640-96-B-0098.155

12. Excerpts from IQC 162640-96-B-0098.....................157

13. Excerpts from USPS Procurement Manual..................258

14. Excerpts from USPS Purchasing Manual...................265

15. Excerpts from USPS Design and Construction Handbook....274

16. Mar. 16, 1999 letter to Samuel Southern re contracting authority and warrant...................................282

AROMA PARK

17. June 15, 1999 Fax to Larry Linnenburger................285

18. June 10, 1999 bid of Ulbrich...........................286

19. June 11, 1999 bid of Phoenix...........................287

20. June 14, 1999 bid of PNL Enterprises...................288

21. Aug. 28, 1999 Notice to proceed to PNL Enterprises.....291

22. Excerpts from Aug. 1999 contract with PNL Enterprises..293

23. Aug. 28, 1999 letter to Phoenix........................299

24. Aug. 28, 1999 letter to Ulbrich........................300

BERWICK

25. Aug. 1996 bid of WM. Aupperle..........................302

26. Nov. 26, 1996 award to WM. Aupperle....................304

27. LP draft work order for Berwick, dated Sept. 17, 1996..305

BRADLEY

28. Aug. 28, 1996 bid of PNL Enterprises...................309

29. Aug. 28, 1996 bid of Ramcorp...........................310

30. Aug. 29, 1996 bid of Ulbrich...........................311

31. Aug. 30, 2996 bid of Phoenix...........................312

32. Sept. 5, 1996 PNL best and final offer ("BAFO")........313

33. Sept. 1996 Ulbrich BAFO................................314

34. Sept. 1996 Ramcorp BAFO................................315

35. Aug. 22, 1997 Notice of intent to award to Ramcorp.....316

36. Oct. 23, 1997 letter to Ramcorp........................317

37. Excerpt from Nov. 19, 1997 contract with Ramcorp.......318

BROOKFIELD DOCK ENCLOSURE

38. Excerpt from Aug. 2, 1996 contract with Janice.........324

39. July 12, 1996 bid of Janice............................325

40. June 1997 Modification of contract with Janice.........326

41. Feb. 5, 1997 letter of Janice..........................328

42. July 23, 1996 bid of Ulbrich...........................329

43. July 15, 1996 bid of Ramcorp...........................330

BROOKFIELD RAMP


44. Aug. 23, 1996 bid of Ulbrich.............................332

45. Aug. 26, 1996 bid of Janice..............................333

46. Aug. 26, 1996 bid of Waner...............................334

47. Excerpt from Sept. 1996 contract with Waner..............335

48. Sept. 18, 1996 Notice to proceed to Waner................339


DOWNERS GROVE


49. Nov. 20, 1996 bid of Ulbrich.............................341

50. Nov. 25, 1996 bid of Waner...............................342

51. Nov. 26, 1996 Notice of intent to award to Waner.........343

52. Excerpt from Jan. 1997 contract with Waner...............344

53. Dec. 3, 1996 letter of LP................................345

54. Dec. 17, 1996 letter of LP attorney......................346

55. Aug. 1, 1996 LP draft work order re Downers Grove dock..348

56. Jan. 31, 1997 letter of LP attorney......................351


HOOPESTON


57. Listing of proposals.....................................353

58. Abstract of proposals....................................354

59. Aug. 31, 1996 bid of Ramcorp.............................355

60. Sept. 3, 1996 bid of Phoenix.............................356

61. Aug. 28, 1996 bid of PNL Enterprises.....................357

62. Sept. 3, 1996 bid of Ulbrich.............................358

63. BAFO notes...............................................359

64. Phoenix BAFO.............................................360

65. Sept. 6, 1996 Ulbrich BAFO....................................362

66. Sept. 5, 1996 PNL Enterprises BAFO........................365

67. Sept. 1996 Ramcorp BAFO.....................................367

68. Sept. 20, 1996 letter of A.M. Fernandez..................369

69. May 21, 1997 letter of LP.....................................370

70. May 28, 1997 Notice of intent to award to Ulbrich.......370a

71. July 25, 1997 letter to Ulbrich...........................371

72. Excerpt from July 1997 contract with Ulbrich............372

73. July 25, 1997 bid protest letter of LP attorney.........373

74. Aug. 7, 1997 letter of USPS attorney.....................376

75. Sept. 10, 1997 letter of contracting officer Rigsby.....378

76. Index of attachments.........................................384

77. July 7, 1995 letter to Rigsby re contracting authority..385

78. July 11, 1994 letter to Rigsby re A.M. Fernandez IQC....387

79. July 11, 1994 letter to A.M. Fernandez re IQC...........388

80. Excerpt from July 1996 A.M. Fernandez IQC...............390

81. Handicap ramp survey.........................................391

82. Aug. 12, 1996 letter of A.M. Fernandez...................393

83. Aug. 13, 1996 letter of A.M. Fernandez...................395

84. Oct. 2, 1996 note of Sam Southern.........................397

85. Excerpt from IQC ramp survey contract with A.M. Fernandez..................................................398

86. Sept. 20, 1996 letter of A.M. Fernandez..................399

87. Excerpt from July 1997 contract with Ulbrich............401

88. Aug. 7, 1997 letter to Ulbrich..............................407

89. Aug. 12, 1997 letter to Ulbrich.........................408

90. Aug. 22, 1997 letter of contracting officer Rigsby.....409

91. USPS Detail list of PACS File Update Sept. 9, 1997.....410

92. May 29, 1997 letter of LP..............................436

93. June 4, 1997 letter of contracting officer Rigsby......437

94. Oct. 1, 1997 Decision on LP bid protest................438

MOMENCE

95. Aug. 28, 1998 Bid of PNL Enterprises...................442

96. Sept. 8, 1998 Bid of Ulbrich...........................443

97. Sept. 8, 1998 Bid of Somers............................444

98. Sept. 8, 1998 note of contracting officer Rigsby.......445

99. Informal solicitation worksheet........................446

100. Sept. 11, 1998 Notice of intent to award to Somers.....447

101. Oct. 5, 1998 letter to Somers..........................448

102. Excerpt from Sept. 1998 contract with Somers..........449

103. Oct. 5, 1998 letter to Ulbrich.........................455

104. Oct. 5, 1998 letter to PNL Enterprises.................456

105. Feb. 1999 Work order contract with Somers under its IQC....................................................457

ST. DAVID

106. Sept. 17, 1996 LP Sketch and draft work order.........466

107. Oct. 1996 bid of WM. Aupperle..........................470

108. Dec. 1996 work order contract with LP under its IQC...472

109. Dec. 17, 1997 letter to LP.............................478

110. Jan. 7, 1997 letter of LP..............................479

PAXTON

111. Aug. 28, 1996 Bid of PNL Enterprises....................481

112. Aug. 29, 1998 Bid of Ramcorp...........................483

113. Aug. 30, 1996 Bid of Ulbrich...........................484

114. Sept. 3, 1996 Bid of Phoenix...........................485

115. Sept. 5, 1996 PNL BAFO.................................486

116. Sept. 1996 Ulbrich BAFO................................487

117. Sept. 1996 Ramcorp BAFO................................488

118. April 20, 1997 letter of LP............................489

119. June 12, 1997 Notice of intent to award to LP..........490

120. Excerpt from June 1997 contract with LP................491

121. Jan. 13, 1997 claim of LP..............................492

122. Jan. 31, 1997 letter of LP attorney.....................504

123. Declaration of Robert Rigsby...........................505

LP DRAFT WORK ORDERS

124. Excerpts from the deposition of Richard Battaglin.....523

125. Battaglin Ex. 55, St. Anne draft work orders in the total amount of $41,691.00 ($28,697.00 plus $12,994.00)..........584

126. Battaglin Ex. 59, St. Anne draft work order concrete..591

127. Battaglin Ex. 60, St. Anne draft work order...........593

128. Battaglin Ex. 61, Momence draft work order............598

129. Battaglin Ex. 62, Momence draft work orders in the total amount of $28,533.40 plus $17,854.60 = $46,388.00..........604

130. Battaglin Ex. 63, Union Hill draft work order in the amount of $36,110.00..........................................612

131. Battaglin Ex. 66, Beaverville draft work order miscellaneous

renovations in the amount of $24,758.00....................615

132. Battaglin Ex. 68, Aroma Park draft work order in the amount of $62,000..................................................618

133. Battaglin Ex. 71, Papineau draft work order in the amount of $43,442.00..................................................626

134. Battaglin Ex. 72, Bradley draft work order, ramp and lobby, in the amount of $187,352.00...............................629

135. Battaglin Ex. 73, Berwick draft work order site prep and foundation work, 9/17/96, in the amount of $30,660.83......639

136. Battaglin Ex. 76, Brookfield draft work orders, ramp and dock enclosure, in the total amount of $89,168.28 ($63,120.00 plus $26,048.28).........................................643

137. Battaglin Ex. 81, Downers Grove draft work order, dock 8/1/96, in the amount of $36,564.99........................652

138. Battaglin Ex. 87, Hoopeston draft work order, 11/14/95.....................................................654

139. Battaglin Ex. 90, Hoopeston draft work order, 11/14/95, in the amount of $45,951.88..................................659

140. Battaglin Ex. 91, Hoopeston draft work order ramp, 8/1/96, in the amount of $45,472.00...............................661

141. Battaglin Ex. 92, Hoopeston draft work order, exterior ramp, in the amount of $62,000..................................663

142. Excerpts from the deposition of Larry Linnenberger....665

143. Southern Ex. 20, Aroma Park draft work order in the amount of $62,000.00.............................................669

144. Excerpts from the deposition of Robert Rigsby.........676

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| L.P. CONSULTING GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 98-868C |
| | ) | |
| THE UNITED STATES, | ) | (Judge Allegra) |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant respectfully requests that the Court enter summary judgment for defendant and dismiss the second amended complaint of L.P. Consulting Group, Inc. ("LP").

In support of our motion, we rely upon the following brief and appendix, and defendant's proposed findings of uncontroverted fact. The Government requests oral argument on its motion.

DEFENDANT'S BRIEF

STATEMENT OF THE ISSUES

1. Whether LP can demonstrate the existence of implied contracts to award it each of the 12 projects identified in its complaint.

2. Whether LP can demonstrate breach of the asserted implied contracts in circumstances where LP claims that the USPS breached by making an award to another offeror of the work contained in LP's scope of work or draft work order instead of

issuing LP a written final work order for that work pursuant to its IQC contracts.

3. Whether LP would be entitled to its anticipatory profits in the event it established both the existence of implied contracts for each of the 12 projects and breach of said contracts.

## STATEMENT OF THE CASE

### I. The Nature Of The Case

This action involves a contract dispute arising under the Contract Disputes Act (CDA), 41 U.S.C. §§ 601 et seq., between LP and the United States Postal Service ("Postal Service" or "USPS"). Second Amended Complaint ("Sec. Am. Compl.") ¶ 3.

### II. Statement Of Facts

LP, a construction contractor, alleges that the USPS breached 12 implied-in-fact contracts with LP. Sec. Am. Compl. ¶¶ 13-17. In May 1994, LP was awarded an Indefinite Quantity Contract with the USPS, contract no. 162640-94-B-0083, which lapsed in May 1996. Thereafter, LP had two Indefinite Quantity Contracts ("IQCs") with the USPS, contracts numbered 162640-96-B-0094 and 162640-96-B-0098. Sec. Am. Compl. ¶¶ 6-7. The USPS entered into these two IQCs on June 6, 1996, and June 3, 1996, respectively. Sec. Am. Compl. ¶¶ 6-7. Both IQCs had two-year terms and required a minimum of $10,000 in work during the term. Sec. Am. Compl. ¶¶ 8-9.

By letter to the contracting officer dated March 3, 1998, LP submitted a claim in connection with the (1) Berwick Modular Post Office, (2) Hoopeston handicap ramp, (3) Downers Grove dock enclosure, and (4) Brookfield ramp and dock enclosure. App. 32-34. This was resubmitted on April 13, 1998 with a certification. App. 26. By letter to the contracting officer dated April 13, 1998, LP submitted another claim in connection with (5) the Aroma Park interior lobbies and building renovation, (6) the Beaverville lobby and building renovation, (7) the Bradley concrete ramp, lobbies and building renovation, (8) the East Lynn building renovation, (9) the Momence concrete ramp and lobby and interior renovations, and (10) the Union Hill interior and exterior ramps. App. 29-31. By letter dated August 11, 1998, LP submitted to the contracting officer amended certifications to the claims previously submitted to the Postal Service. App. 26-28.

Before this Court, LP asserts 12 counts, together seeking a total of $135,337 in lost profits. The first four counts correspond to LP's first claim. In Count I, LP alleges that it made a site visit and prepared a draft work order in the amount of $30,660.83 for the Berwick Modular Post Office, at the request of Bruce Rothermel, and that "the contracting officer awarded the project to another contractor based on a fixed price contract."

Sec. Am. Compl. ¶¶ 33-35.[1/] In Count II, LP alleges that it submitted a draft work order in the amount of $62,752.00 for the installation of the handicap ramp at the Hoopeston Post Office, but the contract was "awarded to another offeror, at a higher price, based on a fixed price contract." Sec. Am. Compl. ¶¶ 39-41. In Count III, LP alleges that it submitted a draft work order in the amount of $36,564.99 for enclosure of the dock at the Downers Grove Post Office, "under the direction of Jesse McNabb," but the Postal Service awarded that work "to another contractor, at a higher price, based on a fixed price contract." Sec. Am. Compl. ¶¶ 45-47. In Count IV, LP alleges that, "under the direction of Jesse McNabb," it submitted a draft work order in the amount of $89,168.28 for the ramp and enclosure of the dock at the Brookfield Post Office, but the Postal Service awarded a contract to "another offeror, at a higher price, based on a fixed price contract." Sec. Am. Compl. ¶¶ 52-53.

The remaining counts arise out of LP's second claim. In Count V, LP alleges that, in September 1995, it submitted a draft work order in the amount of $62,000.00 for the interior lobbies and building renovation at the Aroma Park Post Office, but the Postal Service awarded that work to "another offeror based on a

---

[1/] In its complaint, LP refers to the documents prepared by Richard Battaglin as "draft work orders." In his deposition, Mr. Battaglin referred to those same documents as "scopes of work." The precise terminology used is not significant since the documents are one and the same.

fixed price contract." Sec. Am. Compl. ¶¶ 57-59. In Count VI, LP alleges that, in September 1995, it submitted a draft work order in the amount of $24,758.00 for the lobby and building renovation of the Beaverville Post Office, but the Postal Service awarded that work to "another offeror based on a fixed price contract." Sec. Am. Compl. ¶¶ 63-65. In Count VII, LP alleges that it submitted a draft work order in the amount of $187,352.00 for the concrete ramp, lobbies and building renovation at the Bradley Post Office, but the Postal Service awarded that work to "another offeror based on a fixed price contract." Sec. Am. Compl. ¶¶ 69-70. In Count VIII, LP alleges that, in October 1995, it submitted a draft work order in the amount of $32,775.00 for the building renovation at the East Lynn Post Office, but the Postal Service awarded that work to "another offeror based on a fixed price contract." Sec. Am. Compl. ¶¶ 74-76. In Count IX, LP alleges that it submitted a draft work order in the amount of $46,388.00 for the concrete ramp and lobby renovation at the Momence Post Office, but the Postal Service awarded that work "to another offeror based on a fixed price contract." Sec. Am. Compl. ¶¶ 80-81. In Count X, LP alleges that it submitted a draft work order in the amount of $46,388.00 for the interior renovation and concrete ramp at the Papineau Post Office, but the Postal Service awarded that work "to another offeror based on a fixed price contract." Sec. Am. Compl. ¶¶ 89-93. In Count XI,

LP alleges that it submitted a draft work order in the amount of $41,691.00 for asphalt work and interior renovations at the St. Anne Post Office, but the Postal Service awarded that work to "another offeror based on a fixed price contract." Sec. Am. Compl. ¶¶ 91-93. In Count XII, LP alleges that it submitted a draft work order in the amount of $36,110.00 for interior renovations and an exterior ramp at the Union Hill Post Office, but the Postal Service awarded that work to "another offeror based on a fixed price contract." Sec. Am. Compl. ¶¶ 97-99.

In his deposition, Richard Battaglin of LP asserted that he prepared and submitted to the USPS various scopes of work or draft work orders: (1) Berwick Modular Post Office, Battaglin Ex. 73, App. 639-42; (2) Hoopeston, Battaglin Exs. 87, 88, 80, 89, App. 654-64; (3) Downers Grove dock enclosure, Battaglin Ex. 81, App. 652-53; (4) Brookfield ramp and dock enclosure, Battaglin Ex. 76, App. 643-51; (5) the Aroma Park interior lobbies and building renovation, Battaglin Ex. 68, App. 618-25, 669-75; (6) the Beaverville lobby and building renovation, Battaglin Ex. 66, App. 615-17; (7) the Bradley concrete ramp, lobbies and building renovation, Battaglin Ex. 72, App. 629-38; (8) the East Lynn building renovation; (9) the Momence concrete ramp and lobby and interior renovations, Battaglin Exs. 61, 62, App. 598-611; and (10) the Union Hill interior and exterior ramps, Battaglin Ex. 63, App. 612-14.

The undisputed facts are detailed in defendant's proposed findings of uncontroverted fact and summarized here. For some of the 12 projects, the USPS solicited bids and awarded contracts to offerors other than LP. E.g., PFUF Nos. 23-26.[2/] In another case, the USPS awarded work to another contractor pursuant to its IQC. PFUF No. 61. In other cases, the USPS never awarded a contract or went forward with the project. PFUF Nos. 13-22. In other cases, the USPS went forward with only a portion of the project also described in a LP draft work order. PFUF Nos. 43-44. In still other cases, the projects that the USPS ultimately awarded differed significantly from those proposed by LP in its draft work order. PFUF Nos. 63-68. LP has failed to demonstrate the existence of any implied contracts as to the 12 projects and other necessary elements of its case, and its complaint should be dismissed.

## ARGUMENT

### I. Summary Judgment Should Be Granted For Defendant

As the Supreme Court made clear in Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986), "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." The summary judgment inquiry is similar to that on a motion for a directed verdict: "whether the evidence presents a sufficient

[2/] "PFUF" refers to "Defendant's Proposed Findings Of Undisputed Fact."

factual disagreement" to require trial or "whether the issues presented are so one-sided that one party must prevail as a matter of law." Liberty Lobby, 477 U.S. at 250-52; Jay v. Sec'y of Dep't of Health and Human Servs., 998 F.2d 979, 982 (Fed. Cir. 1993); Maintenance Eng'rs v. United States, 50 Fed. Cl. 399, 408 (2001). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. See, e.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Hall v. Aqua Queen Mfg., Inc., 93 F.3d 1548, 1553 n.3 (Fed. Cir. 1996). Whether a contract exists is a mixed question of law and fact. Cienega Gardens v. United States, 194 F.3d 1231, 1239 (Fed. Cir. 1998). As demonstrated below, LP cannot meet its burden of demonstrating the existence of implied contracts and the other elements of its case. Accordingly, summary judgment should be entered for the Government. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)("The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." (quoting Fed. R. Civ. P. 56(c))); Florida Power & Light Co. v. United States, 375 F.3d 1119, 1124 (Fed. Cir. 2004).

## II. LP Cannot Establish The Existence Of Any Implied Contracts

LP alleges that the USPS requested that LP make site visits and prepare draft work orders, also called scopes of work, for 12 projects, resulting in 12 implied-in-fact contracts between LP and the USPS. LP further alleges that the USPS's failure to enter into signed work orders or contracts with LP for these 12 projects coupled with the award of a fixed price contract to another offeror for that same project constitutes breach and entitles LP to its anticipated lost profits on each of the 12 projects. LP, however, is unable to establish the essential elements of a contract for any of the 12 projects: the offer, the acceptance, consideration, and a mutual intent to contract. Accordingly, the Court should enter summary judgment for the Government.

### A. Four Elements Are Required To Establish A Contract

When the Government enters into a contract, it is governed by the same common law of contracts that governs private persons. Alvin, Ltd. v. U.S. Postal Service, 816 F.2d 1562 (Fed. Cir. 1987). The requirements of both express and implied-in-fact contracts with the Government are proof of: (1) mutuality of intent to contract; (2) consideration; (3) lack of ambiguity in offer and acceptance; and (4) the Government representative whose conduct is relied upon must have actual authority to bind the Government in contract. Hamlin v. United States, 316 F.3d 1325,

1328 (Fed. Cir. 2003); Trauma Serv. Group v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997)("mutual intent to contract including an offer, an acceptance, and consideration"); City of El Centro v. United States, 922 F.2d 816, 820 (Fed. Cir. 1990), cert. denied, 501 U.S. 1230 (1991); Prudential Ins. Co. v. United States, 801 F.2d 1295, 1297 (Fed. Cir. 1986), cert. denied, 479 U.S. 1086 (1987); Solar Turbines, Inc. v. United States, 23 Cl. Ct. 142 (1991) (elements of express contract); Edwards v. United States, 22 Cl. Ct. 411 (1991); Clean Giant, Inc. v. United States, 19 Cl. Ct. 390 (1990); Petrini v. United States, 19 Cl. Ct. 41 (1989).

Implied-in-fact contracts require the same contractual elements as are required to establish an express contract; only the nature of the evidence differs. Chavez v. United States, 18 Cl. Ct. 540, 544 (1990); Morgan v. United States, 12 Cl. Ct. 247, 251 (1987). Although proof of an implied-in-fact contract is circumstantial, plaintiff must unambiguously show each of the elements of an express contract. OAO Corp. v. United States, 17 Cl. Ct. 91, 99 (1989).

> The general rule in government contract law is that a contract implied-in-fact is one "founded upon a meeting of minds which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstance, their tacit understanding."

Porter v. United States, 204 Ct. Cl. 355, 356, 496 F.2d 583, 590 (1974), cert. denied, 420 U.S. 1004 (1975), quoting Baltimore & Ohio R.R. v. United States, 261 U.S. 592 (1923). Accord, Atlas Corp. v. United States, 895 F.2d 745, 754 (Fed. Cir.), cert. denied, 498 U.S. 811 (1990); Prevado Village Partnership v. United States, 3 Cl. Ct. 219, 224 (1983).

A mutual intent to contract includes an offer, acceptance, and consideration. Solar Turbines, 23 Cl. Ct. at 149-50. The circumstances of a contract implied-in-fact must indicate that the parties have, in fact, taken upon themselves corresponding obligations and liabilities, and have come to a meeting of the minds. Chavez, 18 Cl. Ct. at 545. Plaintiff must show a definite offer by one party and an unconditional acceptance by the other. Delco Electronics Corp. v. United States, 12 Cl. Ct. 367, 370 (1987), aff'd, 909 F.2d 1495 (Fed. Cir. 1990)(Table); Prevado Village Partnership, 3 Cl. Ct. at 223-24.

Oral assurances are not enough to prove a meeting of the minds. In New American Shipbuilders, Inc. v. United States, 871 F.2d 1077 (Fed. Cir. 1989), the court stated:

> Oral assurances do not produce a contract implied-in-fact until all the steps have been taken that the agency procedure requires; until then, there is not intent to be bound. Thus it is irrelevant if the oral assurances emanate from the very official who will have authority at the proper time to sign the contract or grant.

Id. at 1080.[3/] Acceptance of an offer must be manifested by conduct that indicates assent to the proposed bargain. Petrini, 19 Cl. Ct. at 46.

1. There Was No Mutual Intent

There is no mutual intent to contract under the facts of this case. The USPS official with the authority to enter into a contract has disavowed any intent to enter into a contract with LP for any of the 12 projects at issue in this case. In his declaration, former contracting officer Robert Rigsby stated:

> 9. LP, upon its own initiative or at the request of the Postal Service, visited postal facilities and prepared draft work orders, also called scopes of work, and submitted them to the Postal Service. LP prepared those draft work orders utilizing the price schedule contained in its IQCs. However, the making of a site visit by LP and its preparation of a draft work order did not mean that the work proposed would be awarded to LP. The Postal Service, through its contracting officer, could contract for the same work that had been the subject of a draft work order through a fixed price contract or another contractual means. LP would be awarded work under its IQC only where the Postal Service contracting officer and LP first came to an agreement upon the work to be performed and the contracting officer signed and issued to LP a formal work order for that work. Further, no work was to be performed by the contractor until a written work order had been signed by the contracting officer and written Notice to Proceed with the work had been issued by the

[3/] Accord, Harbert/Lummus Agrifuels Projects v. United States, 142 F.3d 1429, 1433 (Fed. Cir. 1998), cert. denied, 525 U.S. 1177 (1999); American Gen. Leasing, Inc. v. United States, 218 Ct. Cl. 357, 587 F.2d 54, 57-58 (1978).

> contracting officer and received by the contractor. Any work performed by the contractor before receipt of the written Notice to Proceed for that work order was at the contractor's own risk.
>
> 10. Although LP had been awarded IQC contracts this did not mean that LP would be invited to bid on every project solicited by the Postal Service or that LP would be issued a work order by the Postal Service for every project in the area covered by the IQC. In the IQCs, the Postal Service reserved the right to undertake, by Postal Service sources or others, the same type of work or similar work as contracted for in the IQC contract, in the area covered by the contract, while the contract was in force.
>
> 11. I never stated to LP, orally or in writing, that it would receive a work order or contract from the Postal Service for any of the projects listed in its letters dated March 3, 1998 and April 13, 1998, referred to in paragraphs 5 and 6 above, if LP would visit the Post Office in question and prepare a draft work order or scope of work for that project.

App. 507-08. Similarly, at his deposition, Mr. Rigsby testifed:

> Q. On this particular case is fine, yeah.
>
> A. In the case of L.P. Consulting, we knew the background of Mr. Battaglin, as far as his ability to go out and produce scopes [of work]. So the postal service would say go out and produce a scope, but a postal service employee may be with him . . .
> So he would be allowed to do that in some cases, generate a scope of work upon request, when he was requested to do it. If you go out and do that bring the scope of work back; and if it was agreed upon, then it would be signed and we would proceed. But the ultimate scope [of work] is produced by the postal service.

> Q. You said the ultimate scope is what?
>
> A. The ultimate scope of work is produced by the postal service. It can only be generated by the postal service. What he may be supplying to us is a proposal; in other words, this is what he thinks needs to be done. . .
>
> Q. Okay. Did you ever make any statement or representation to L.P. that if they prepared a scope of work, submitted it, the resulting task order would be awarded to them, or the work order would be given to them under their IQC contract?
>
> A. No, I have not.
>
> Q. Never?
>
> A. Never ever have I done that. That would be illegal to do.
>
> Q. Under an existing IQC contract, that would be illegal.
>
> A. To promise someone something based on submitting a work order, illegal.

App. 678-79, 683 (Rigsby Dep. 24-25, 49-50).

Further, the provisions of IQCs, signed by LP and the USPS, demonstrate that the parties lacked a mutual intent to enter into an enforceable implied contract for any of the 12 projects at issue. The IQCs provided that "work will be done on work orders issued as required" and stated as follows:

> a. No work will be performed until a written work order has been signed by the contracting officer and written Notice to Proceed with the work under the work order has been issued by the contracting officer and received by the contractor. Any work performed by the contractor under a work order before receipt

> of the written Notice to Proceed for that work order will be at the contractor's own risk.
>
> b. Each work order will describe the extent of work to be removed and the extent and type of new work to be installed. Descriptions may be written, by sketch or by drawing. Each work order will give the location where work is to be performed, state whether work may be performed during regular working hours, and describe the requirements for submittals. Submittals may include certificates, shop drawings, manufacturer's literature, data, test reports, and/or other documents that provide required information on the material or equipment.

PFUF No. 9. Thus, final work orders signed by the contracting officer and LP constitute an agreement upon the work to be performed by LP, and the issuance of a final written work order signed by the contracting officer is an essential predicate before an IQC contractor may possess a contract for that work. PFUF No. 9.

This contractual language is wholly inimical with the formation of an implied contract to do the work that arises from the contractor's submission of a draft work order or scope of work. As the Federal Circuit held in <u>New America Shipbuilders</u>, 871 F.2d at 1080, "[o]ral assurances do not produce a contract implied-in-fact until all the steps have been taken that the agency procedure requires; until then, there is no intent to be bound." Here, LP's IQC provides that written work orders will be signed and issued by the contracting officer and, absent such a

definite work order, LP simply has no contract, express or implied, to perform the work.

LP also cannot demonstrate that it was the intent of the parties to enter into implied contracts for these 12 projects because "[t]he existence of an express contract precludes the existence of an implied contract dealing with the same subject, unless the implied contract is entirely unrelated to the express contract." Atlas Corp., 895 F.2d at 754-55; ITT Fed. Support Services v. United States, 209 Ct. Cl. 157, 531 F.2d 522, 528 n. 12 (1976); Lichtefeld-Massaro, Inc. v. United States, 17 Cl. Ct. 67, 72 (1989)(citing Klebe v. United States, 263 U.S. 188, 192 (1923)). LP admits that the alleged implied "contracts at issue in this action arose out of the IQCs," and that the draft work orders prepared by LP and submitted to the USPS "incorporat[ed] the fixed prices [] which L.P. Consulting was obligated to utilize under the applicable IQC." Sec. Am. Comp. ¶¶ 8, 15.[4/]

[4/] LP further admits that it "produced a draft work order for the Berwick Modular Post Office under the terms of IQC No. 0094." Sec. Am. Comp. ¶ 32. LP "followed the provisions of its IQC, and produced a work order . . . for the Hoopeston project." Sec. Am. Comp. ¶ 40. LP "followed the provisions of its IQC and produced a work order . . . for the Downers Grove Project." Sec. Am. Comp. ¶ 46. LP "following the provisions of its IQC No. 0094 [] produce[d] a work order . . .. for the Brookfield Project." Sec. Am. Comp. ¶ 52. LP "followed the provisions of its IQC and produced the requested work order" for Aroma Park. Sec. Am. Comp. ¶ 58. LP "followed the provisions of its IQC and produced a work order" for the Beaverville lobby and building renovation. Sec. Am. Comp. ¶ 64. LP "followed the provisions of its IQC and produced a work order for" Beaverville lobby and building renovation. Sec. Am. Comp. ¶ 64. LP "followed the provisions of (continued...)

The alleged implied contracts are not "entirely unrelated" to LP's IQCs. Therefore, there can be no implied contract to award the work set forth in the draft work orders to LP. Atlas Corp., 895 F.2d at 754-55 and cases cited above. Moreover, absent a final written work order signed by the contracting officer, LP could not have had any contract to perform the project.

The IQCs also stated:

> The Postal Service reserves the right to undertake, by Postal Service sources or others, the same type of work or similar work as contracted for in this contract, in the area covered by this contract, while this contract is in force.

PFUF No. 7. USPS IQCs, like all other indefinite quantity contracts, do not obligate the Government to purchase its requirements from the contractor. The Postal Service had the option of obtaining services from LP or any other source. A contract for indefinite quantities is one under which the buyer agrees to purchase, and the seller agrees to supply, whatever

---

[4/] (...continued)
its IQC and produced a work order for" Bradley concrete ramp, lobbies and building renovations project. Sec. Am. Comp. ¶ 69. LP "produced a draft work order pursuant to its IQC" for the East Lynn building renovation project. Sec. Am. Comp. ¶ 75. LP "followed the provisions of its IQC and produced a work order" for the Momence concrete ramp and lobby renovation project. Sec. Am. Comp. ¶ 80. LP "followed the provisions of its IQC and produced a work order" for the Papineau interior renovation and concrete ramp project. Sec. Am. Comp. ¶ 86. LP "followed the provisions of its IQC and produced a draft work order" for the St. Anne concrete asphalt and interior renovations. Sec. Am. Comp. ¶ 92. LP "followed the provisions of its IQC and produced a draft work order" for the Union Hill interior and exterior ramp project. Sec. Am. Comp. ¶ 98.

quantity of goods the buyer chooses to purchase from the seller. Varilease Technology Group, Inc. v. United States, 289 F.3d 795, 799 (Fed. Cir. 2002)("The contract was an ID/IQ contract with only a minimum purchase obligation."); Travel Centre v. Barram, 236 F.3d 1316, 1319 (Fed. Cir. 2001); Mason v. United States, 222 Ct. Cl. 436, 615 F.2d 1343, 1346 n.5 (1980). An indefinite quantities contract

> differs from a requirements contract in that under a requirements contract the buyer agrees to purchase all his requirements from the seller. Under an indefinite quantities contract, even if the buyer has requirements, he is not obligated to purchase from the seller. In an indefinite quantities contract, without more, the buyer's promise is illusory and the contract unenforceable against the seller. To make such a contract enforceable, the buyer must agree to purchase from the seller at least a guaranteed minimum quantity of goods or services. If the contract contains such a minimum quantity clause, the buyer is required to purchase at least this minimum amount, but this is the extent of his legal obligation.

Mason, 615 F.2d at 1346 n.5; accord Varilease Technology Group, 289 F.3d at 799; Travel Centre, 236 F.3d at 1319.

The Quantity Of Work (Indefinite-Quantity) clause of the IQCs in this case contained the essential elements of an indefinite quantities contract - (1) a statement that there is no assurance that the USPS will purchase the work set forth in the contract from the seller, and (2) a guaranteed minimum purchase amount of $10,000 ensuring mutuality of obligation. PFUF No. 7;

Mason, 615 F.2d at 1347; Maintenance Engineers v. United States, 749 F.2d 724, 726 (Fed. Cir. 1984). The clause further obligated the contractor to supply services only up to and including one million dollars ($1,000,000). PFUF No. 7. There is no commitment by the contractor to supply all of the USPS's requirements. Id.

The USPS ordered, and obtained, from LP far more than the $10,000 minimum under the IQCs. PFUF No. 11. As contracting officer Rigsby stated in his September 10, 1997 letter,

> Since June 7, 1996 to [September 10, 1997], a total of $525,609.28 in IQC work orders have been issued to L.P. Consulting Group, Inc. and $1,127,144.67 was issued prior to June 7, 1996. In addition, our records indicate that $119,235.67 was issued in simplified contracts for a grand total of $1,771,989.62.

PFUF Nos. 11, 37. "Purchases exceeding that minimum amount satisfy the government's legal obligations under the contract." Travel Centre, 236 F.3d at 1319. Moreover, based upon the language of the IQCs, LP could not have had "a reasonable expectation that any of the Government's needs beyond the minimum contract price would necessarily be satisfied under the" IQC. Id.

2. There Was No Unambiguous Offer And Acceptance

The facts also establish that there was no unambiguous offer and acceptance. The provisions of the IQCs indicate that the contractor and the USPS do not contemplate the formation of a

contract for work unless the contracting officer issues a written work order for that work. PFUF No. 9; App. 65, 169. The provisions of the IQCs thus allow the contracting officer to modify or reject any scope of work or draft work order provided by the contractor and require that any final work order must be issued in writing and signed by the contracting officer. PFUF No. 9; App. 65, 168. The contracting officer even has the option of obtaining those services from LP or any other source. PFUF No. 7; App. 57, 160. Thus, an LP scope of work or draft work order is not an unambiguous offer. A contract cannot be based upon such an illusory promise. Ridge Runner Forestry v. Veneman, 287 F.3d 1058, 1061-62 (Fed. Cir. 2002).

Conversely, there is not any definite agency action which constitutes an acceptance by the USPS for any of the 12 projects. As stated, the contracting officer was not required to adopt any scope of work or draft work order tendered by LP, and the contracting officer possessed discretion in deciding what work orders he would finally issue under the IQCs. PFUF No. 9. The contracting officer did not sign and issue any written work orders to LP with regard to any of the 12 projects. Moreover, the IQCs agreed to by LP expressly stated that work would be performed only upon written work orders signed and issued by the contracting officer. PFUF No. 9. Based upon the language of its IQCs, LP could not have had a reasonable expectation that any

conduct of the contracting officer short of signing and issuing a written work order constituted an acceptance.

Alternatively, LP may argue that the USPS made an oral statement to LP that, if LP would make a site visit and prepare a scope of work or draft work order for the project, the contracting officer would issue a formal written work order under LP's IQC for that work. Contracting officer Rigsby denies making any such oral or written statements to LP. App. 507-08, 678-79, 683 (Rigsby Dep. 24-25, 49-50). Mr. Rigsby also lacked the authority to make any such promise because the IQCs explicitly stated that all work orders would be signed and issued by the contracting officer in writing, and Mr. Rigsby's contracting authority was limited to work orders as provided for in the IQC. PFUF No. 9; App. 52, 65, 155, 168 ("Mr. Rigsby has been delegated Contracting Officer for work orders only."). In any event, any such oral statement would not have been sufficiently definite and unambiguous to constitute an offer that could result in the formation of a contract. Any draft work order tendered by LP to the USPS was subject to negotiation between the parties as to the items and quantities contained in that work order. PFUF No. 9. Thus, any LP draft work order promised nothing since it was still open for negotiation between the parties before the contracting officer signed and issued a work order. PFUF 9. Indeed, the contracting officer even had the option of obtaining those

services from LP or any other source. PFUF No. 7; App. 57, 160. Absent a formal written work order signed by the contracting officer, LP could not have had a reasonable expectation that it possessed a contract for such work. PFUF Nos. 7, 9.

3. There Was Not Sufficient Action By An Authorized Official

Another impediment to the existence of any implied contract concerns the lack of authority by the agency official to enter into a contract upon behalf of the Government. The Government is not bound by the acts of its agents beyond the scope of their actual authority. Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947); Harbert/Lummus Agrifuels Projects, 142 F.3d at 1432 (no contract was formed where official lacked authority to enter into a contract). A party dealing with the Government must inform itself of a representative's authority and the limits of that authority. Id. Moreover, "anyone entering into an agreement with the Government takes the risk of accurately ascertaining the authority of the agents who purport to act for the Government." Harbert/Lummus Agrifuels Projects, 142 F.3d at 1432 (quoting Trauma Serv. Group v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997)).

The Government representative must have actual authority to bind the Government contractually. Trauma Service Group, 104 F.3d at 1326; City of El Centro, 922 F.2d at 820. Where an official giving approval of a contract exceeds his authority, the

Government can disavow the official's words and is not bound by an implied contract. Harbert/Lummus Agrifuels Projects, 142 F.3d at 1432; New American Shipbuilders, 871 F.2d at 1080.

LP, through Richard Battaglin, claims that Mr. Battaglin met with Postal Service project managers at various Postal Service facilities, and that Mr. Battaglin prepared draft work orders of scopes of work and provided them to the Postal Service project managers. None of these individuals was a contracting officer, and none of them had actual authority to bind the Government contractually. PFUF No. 6. Accordingly, LP also cannot demonstrate the requisite action of a Postal Service official with contracting authority necessary to prove the existence of an implied-in-fact contract. In sum, LP cannot demonstrate the elements necessary to support the finding of an implied contract on any of the 12 projects.

## III. Even If LP Could Establish An Implied-Contract, LP Could Not Establish Breach With Regard To Six Projects

In its Second Amended Complaint, LP alleges that with respect to each of the 12 projects, the USPS breached its implied contracts with LP when it received a draft work order from LP but diverted the work by making an award of the work contained in LP's draft work order to another contractor. Sec. Am. Compl. ¶¶ 17, 28(a). LP, however, cannot establish its alleged breach for several projects because the Postal Service never went forward with those projects and has not made awards to any other

contractors for those projects. For example, in Count VI, LP alleges that contracting officer Rigsby breached an implied-in-fact contract with LP with respect to the Beaverville lobby and building renovation project when he made an award for this project "to another offeror based on a fixed price contract." Sec. Am. Compl. ¶¶ 65, 66. The USPS has not gone forward with this project and has not made an award to any other contractor for this project. PFUF No. 15. Accordingly, LP cannot demonstrate any breach of contract, even assuming that it demonstrated the existence of an implied-in-fact contract for that project.

In Count VIII, LP alleges that contracting officer Rigsby breached an implied contract with LP with respect to the East Lynn building renovation project when he made an award for this project "to another offeror based on a fixed price contract." Sec. Am. Compl. ¶¶ 76, 77. The USPS did not go forward with this project and has not made an award to any other contractor for this project. PFUF No. 13. Accordingly, LP cannot demonstrate any breach of contract, even assuming that it demonstrated the existence of an implied-in-fact contract for that project.

In Count X, LP alleges that contracting officer Rigsby breached an implied contract with LP with respect to the Papineau interior renovation and concrete ramp project when he made an award for this project "to another offeror based on a fixed price

contract." Sec. Am. Compl. ¶¶ 87, 88. The USPS did not go forward with this project and has not made an award to any other contractor for this project. PFUF No. 17. Accordingly, LP cannot demonstrate any breach of contract, even assuming that it demonstrated the existence of an implied-in-fact contract for that project.

In Count XI, LP alleges that contracting officer Rigsby breached an implied contract with LP with respect to the St. Anne concrete asphalt and interior renovations project when he made an award for this project "to another offeror based on a fixed price contract." Sec. Am. Compl. ¶¶ 93, 94. The USPS did not go forward with this project and has not made an award to any other contractor for this project. PFUF No. 19. Accordingly, LP cannot demonstrate any breach of contract, even assuming that it demonstrated the existence of an implied-in-fact contract for that project.

In Count XII, LP alleges that contracting officer Rigsby breached an implied contract with LP with respect to the Union Hill interior and exterior ramp project when he made an award for this project "to another offeror based on a fixed price contract." Sec. Am. Compt. ¶ 99, 100. The USPS did not go forward with this project and has not made an award to any other contractor for this project. PFUF No. 21. Accordingly, LP cannot demonstrate any breach of contract, even assuming that it

demonstrated the existence of an implied-in-fact contract for that project.

In Count VII, LP alleges that it prepared and submitted a draft work order in the amount of $187,352.00 for a concrete ramp, lobbies and building renovation project at the Bradley Post Office, App. 629-38 (Battaglin Ex. 72), and that contracting officer Rigsby breached an implied contract with LP when he made an award for this project "to another offeror based on a fixed price contract." Sec. Am. Compl. ¶¶ 69, 70, 71. The USPS did not make an award to another contractor for this project. PFUF No. 44. The USPS, through A.M. Fernandez, solicited bids for a handicap ramp at the Bradley Post Office and awarded a contract in the amount of $53,210.00 for the ramp. PFUF Nos. 40-43. Accordingly, LP cannot demonstrate any breach, even assuming that it demonstrated the existence of an implied-in-fact contract for the Bradley concrete ramp, lobbies and building renovation project.[5/]

Accordingly, the Court should grant summary judgment for defendant and dismiss Counts VIII (East Lynn), VI (Beaverville), X (Papineau), XI (St. Anne), XII (Union Hill), and VII (Bradley)

---

[5/] Contracting officer Rigsby's contracting authority was limited to $100,000, and he had no authority to issue a contract with regard to LP's draft work order in the amount of $187,352.00 for a concrete ramp, lobbies and building renovation project at the Bradley Post Office. PFUF No. 45; App. 509. Therefore, LP cannot demonstrate the existence of an implied contract for this reason also.

of LP's Second Amended Complaint. LP cannot establish any breach with regard to those projects, even assuming that implied contracts for each of those specific projects were demonstrated.

IV. LP Also Cannot Establish Breaches For Two Other Projects

In its Second Amended Complaint, LP contends that it prepared "draft work orders" for various projects "incorporating the fixed prices to which L.P. Consulting was obligated to utilize under the applicable IQC," that the implied "contracts at issue in this action arose out of the IQCs," and that "it was the understanding between the parties that if the Contracting Officer decided to go forward with the project, the USPS would issue a formal work order and Notice of Award to L.P. Consulting." Sec. Am. Comp. ¶¶ 8, 15, 16. Specifically, in Count IX, LP alleges that, for the Momence concrete ramp and lobby renovation project, LP in May 1996 prepared a draft work order in the amount of $46,388, which it submitted to the Postal Service. Sec. Am. Compl. ¶ 80. LP alleges that contracting officer Rigsby breached its implied contract for this project when he made an award for this project to "another offeror based on a fixed price contract." Sec. Am. ¶ 81, 82.

However, in September 1998, when contracting officer Rigsby made an award to Somers Co. Inc. for installation of the Momence ramp, both of LP's IQCs had lapsed, and Mr. Rigsby could no longer sign and issue a work order for the performance of any

work pursuant to LP's IQCs. PFUF No. 2. Specifically, by letter dated September 8, 1998, Ulbrich submitted its bid in the amount of $60,900.00 for installation of the handicap ramp at the Momence Post Office. PFUF No. 59. By letter dated August 28, 1998, PNL Enterprises submitted its bid in the amount of $64,990.00 for installation of the handicap ramp at the Momence Post Office. Id. On September 8, 1998, Somers submitted its bid in the amount of $35,932.38 for installation of the handicap ramp at the Momence Post Office. Id. As noted, at the time of the award of the handicap ramp contract at the Momence Post Office, LP's IQCs had lapsed. Mr. Rigsby no longer possessed any authority to issue LP a work order under either IQC. Accordingly, LP cannot demonstrate any alleged breach with regard to the Momence handicap ramp.

With regard to the Momence lobby renovation project, LP also cannot demonstrate any alleged breach of contract. On February 8, 1999, the USPS awarded a work order in the total amount of $34,895.63 to Somers for lobby renovation of the Momence Post Office under Somers's IQC with the USPS. PFUF No. 61. At the time of the award of the lobby renovation work for the Momence Post Office, LP's two IQCs had lapsed. PFUF Nos. 2, 61. Mr. Rigsby no longer possessed any authority to issue LP a formal work order under either IQC. Id. Accordingly, LP cannot

demonstrate any alleged breach with regard to the Momence lobby renovation project.

With regard to the Aroma Park Post Office (Count V), LP also cannot demonstrate any alleged breach of an implied contract. LP contends that, in September 1995, LP produced a draft work order for Aroma Park interior lobbies and building renovation project in the amount of $62,000 and submitted it to the Postal Service. Sec. Am. Compl. ¶ 58. LP also contends that contracting officer Rigsby breached LP's implied contract when he awarded a contract for this project to another offeror based on a fixed price contract. Sec. Am. Compl. ¶ 59. As in the case of the Momence Post Office, at the time that the USPS made an award with regard to the Aroma Park Post Office, LP's IQCs had lapsed, and the contracting officer no longer had authority to sign and issue a work order pursuant to LP's IQCs. PFUF No. 2, 66. Mr. Rigsby also retired in March 1999 and no longer was a contracting officer. App. 505.

Specifically, in May 1999, A.M. Fernandez supplied the USPS with drawings for the renovation of the Aroma Park Post Office, IL. PFUF No. 63. In June 1999, the USPS solicited bids for the renovation of the Aroma Park Post Office per the drawings prepared by A.M. Fernandez. PFUF No. 66. By letter dated June 10, 1999, Ulbrich submitted a bid in the amount of $163,900.00 for the renovation of the Aroma Park Post Office. Id. By letter

dated June 11, 1999, Phoenix submitted a bid in the amount of $169,725.00 for the renovation of the Aroma Park Post Office. Id. By letter dated June 14, 1999, PNL Enterprises submitted a bid in the amount of $154,719.00 for the renovation of the Aroma Park Post Office. Id.

On August 28, 1999, the USPS, through contracting officer Larry Linnenburger of the Great Lakes Facilities Service Office, awarded a contract in the amount of $154,719.00 to PNL Enterprises for renovations at the Aroma Park Post Office per the drawings prepared by A.M. Fernandez. PFUF No. 65. At that time, LP's IQCs had lapsed, and no work orders could be issued pursuant to either IQC. PFUF Nos. 2, 66.

Moreover, the amount of the contract award for the renovations at the Aroma Park Post Office - $154,719.00 - exceeded the level of contracting authority of the contracting officer at the Central Illinois District, and an award could not have been made by that office. PFUF No. 67. Thus, LP could not have been issued a work order in the amount of $154,719.00 for Aroma Park, even if its IQCs had not lapsed.

Finally, LP cannot establish any alleged breach also because the proposed work contained in its September 1995 draft work order in the amount of $62,000 was not the same project as the one awarded by the USPS in August 1999. PFUF No. 66. The bids solicited and obtained by the USPS, as well as the contract

awarded for the Aroma Park Post Office renovation, were based upon drawings prepared by A.M. Fernandez in May 1999. PFUF Nos. 63-65. LP's $62,000 draft work order, prepared in September 1995, was not based upon those drawings and was for a much more limited project. PFUF No. 68.

Accordingly, the Court should grant summary judgment for defendant and dismiss Counts IX (Momence) and V (Aroma Park) of LP's Second Amended Complaint, because LP cannot establish any breach with regard to those projects, even assuming that implied contracts for those specific projects were demonstrated.

## V. Even If LP Established Breach Of An Implied Contract, LP Would Not Be Entitled To Its Anticipated Lost Profits

Assuming arguendo that LP meets its burden of demonstrating 12 implied contracts and breach of each of those implied contracts, LP contends that the appropriate measure of damages is LP's anticipated lost profits on each of the 12 projects. LP has not performed any of these projects. In light of the termination for convenience clauses within its IQCs (App. 97-100, 200-02 (clause "H.5 Termination For Convenience")), LP is not entitled to profit on unperformed work. "Anticipated but unearned profit is not recoverable, even under a termination for the convenience of the Government." Mega Constr. Co. v. United States, 29 Fed. Cl. 396, 475 (1993)(citing Dairy Sales Corp. v. United States, 219 Ct. Cl. 431, 593 F.2d 1002, 1005 (1979)). Accord Rhen v. United States, 17 Cl. Ct. 140, 143 (1989). LP performed no work

on the alleged implied contracts and "thus it may not recover anticipated profits." Mega Constr., 29 Fed. Cl. at 475.

Further, an offeror for a contract, such as those awarded by the Postal Service to the other contractors in this case, has no legitimate claim to profit from the unperformed contract itself, even where it actually receives the contract award. Postal Service contracts, such as those awarded to other contractors in this case, must contain a clause permitting termination, at any time prior to completion, for the convenience of the Postal Service, with no liability except for actual work performed. PFUF No. 12; App. 7-8, 270, 272, 274, 275, 279. Accordingly, even if LP had been awarded fixed price contracts for the projects at issue, the appropriate measure of damages would be those that might be calculated pursuant to the termination for convenience clause, since no work was performed by LP. App. 297 (Aroma Park contract); 321 (Bradley contract); 337 (Brookfield ramp); 403, 405-06 (Hoopeston); 453 (Momence); Mega Constr., 29 Fed. Cl. at 475; see also Delta Data Systems Corp. v. Webster, 755 F.2d 938, 940 (D.C. Cir. 1985). LP cannot recover anything more here and cannot recover its anticipated lost profits.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Kathryn A. Bleecker
KATHRYN A. BLEECKER
Assistant Director

s/Domenique Kirchner
DOMENIQUE KIRCHNER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit,
8th Floor, 1100 L. St., N.W.
Washington, D.C. 20530
Tele: (202) 307-0290
Attorneys for Defendant

Of Counsel:
STEPHEN D. LOBAUGH
United States Postal Service

January 14, 2005

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 14th day of January 2005, a copy of the foregoing "DEFENDANT'S MOTION FOR SUMMARY JUDGMENT" and accompanying appendix was electronically filed. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

/s DOMENIQUE KIRCHNER