Friedman Sinar & Rohlfing
Attorneys at Law
200 West Madison Street, Suite 2500
Chicago Illinois 60606
(312) 855-5399
Fax (312) 368-5821

Kori M. Bazanos
(312) 855-3895

August 11, 1998

E-Mail Address
FSRLAW@AOL.com

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**RECEIPT NO. Z 070 603 889**
Mr. Robert Rigsby
Manager, Administrative Services
United States Postal Service
Central Illinois District
6801 West 73rd Street
Bedford Park, Illinois 60499-9991

**Re: L.P. Consulting, Inc.'s claims against the United States Postal Service ("USPS") of March 3, 1998 and April 13, 1998**

Dear Mr. Rigsby:

We represent L.P. Consulting Group Inc. ("L.P. Consulting"). We previously submitted claims against the United States Postal Service ("USPS") on behalf of our client. Claims were submitted by letter dated March 3, 1998 in connection with Berwick Modular Post Office, Hoopeston Ramp Project, Downers Grove Dock Enclosure and Brookfield Ramp & Dock Enclosure, and resubmitted on April 13, 1998 with a certification.

Additional claims in connection with Aroma Park Interior Lobbies and Building Renovation, Beaverville Lobby and Building Renovation, Bradley Concrete Ramp, Lobbies and Building Renovation, East Lynn Building Renovation, Momence Concrete Ramp and Lobby Renovation, Papineau Interior Renovation and Concrete Ramp, St. Anne Concrete and Asphalt and Interior Renovations, and Union Hill Interior and Exterior Ramp were submitted by letter dated April 13, 1998. L.P. Consulting's position is that the claims do not require certification. Notwithstanding our position, the aforementioned claims were submitted with certifications.

In July, 1998, Mr. Cary Katznelson, staff attorney with the USPS, advised the undersigned during a telephone conversation, that the USPS has taken a position that the certifications attached to L.P. Consulting's claims were defective.

Battaglia DEP. EX. NO. 83
FOR I.D., AS OF 6/11/04 K



R 8/17/98

In response to that conversation, without waiving our position that the claims do not require certification, we are submitting the enclosed amended certification to the claims previously submitted to the USPS by letter dated March 3, 1998 and April 13, 1998.

Sincerely,

Kori M. Bazanos

KMB:
cc: L.P. Consulting Group, Inc.
James T. Rohlfing, Esq.

# CERTIFICATION

I, Richard A. Battaglin, certify that the previously submitted claim listed below, a copy of which is attached hereto, and incorporated herein by reference, is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the contractor.

Claim submitted by letter dated March 3, 1998, to Contracting Officer Robert Rigsby, and received by Mr. Rigsby on March 11, 1998, a copy of which is attached hereto and incorporated herein by reference:

Berwick Modular Post Office
Hoopeston Ramp Project
Downers Grove Dock Enclosure
Brookfield Ramp & Dock Enclosure

Claim submitted by letter dated April 13, 1998, to Contracting Officer Robert Rigsby, and received by Mr. Rigsby on April 15, 1998, a copy of which is attached hereto and incorporated herein by reference:

Aroma Park Interior Lobbies and Building Renovation
Beaverville Lobby and Building Renovation
Bradley Concrete Ramp, Lobbies and Building Renovation
East Lynn Building Renovation
Momence Concrete Ramp and Lobby Renovation
Papineau Interior Renovation and Concrete Ramp
St. Anne Concrete and Asphalt and Interior Renovations
Union Hill Interior and Exterior Ramp

Richard A. Battaglin



C:\R\LPCONS\POST\P02CERTX.DOC\07/30/98\1:21 PM

(P) 1/7/9

Friedman Sinar & Rohlfing
Attorneys at Law
200 West Madison Street, Suite 2500
Chicago Illinois 60606
(312) 855-5399
Fax (312) 368-5821

James T. Rohlfing
(312) 855-5383

E-Mail Address
FSRLAW@AOL.com

April 13, 1998

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**RECEIPT NO. P 851 275 733**

Mr. Robert Rigsby
Manager, Administrative Services
United States Postal Service
Central Illinois District
6801 West 73rd Street
Bedford Park, Illinois 60499-9991

Re: **Claims by L.P. Consulting Group, Inc. against United States Postal Service**

Dear Mr. Rigsby:

On behalf of our client, L.P. Consulting Group, Inc. ("L.P. Consulting") we hereby submit to you, as contracting officer for the United States Postal Service ("USPS"), the following claims against the USPS in connection with damages sustained by L.P. Consulting resulting from the USPS's breach of implied contracts and failure to follow postal procurement procedures:

| Project Name | Work Order Amount | Lost Profit |
|---|---|---|
| Aroma Park Interior Lobbies and Building Renovation | $62,000.00 | $12,466.00 |
| Beaverville Lobby and Building Renovation | $24,758.00 | $4,736.00 |
| Bradley Concrete Ramp, Lobbies and Building Renovation | $187,352.00 | $31,449.00 |
| East Lynn Building Renovation | $32,775.00 | $5,280.00 |
| Momence Concrete Ramp and Lobby Renovation | $46,388.00 | $7,800.00 |
| Papineau Interior Renovation and Concrete Ramp | $43,442.00 | $6,311.00 |
| St. Anne Concrete and Asphalt and Interior Renovations | $41,691.00 | $7,360.00 |
| Union Hill Interior and Exterior Ramp | $36,110.00 | $5,608.00 |
| **Total** | **$474,516.00** | **$81,010.00** |

With respect to each of the above claims, L.P. Consulting was requested to provide a work order pursuant to its indefinite quantity contract, and it provided a work order after the applicable research and communication with your office. In each case, the work order was provided with the express or implied understanding that the work would be given to

L.P. Consulting. On information and belief, in at least some of the above cases, the work was awarded to another contractor. As a result of your office's failure to follow postal procurement procedures and breach of its implied contracts, L.P. Consulting has been damaged in the amount of $81,010.

Pursuant to the above, L.P. Consulting Group, Inc. hereby makes a claim or claims under the Contract Disputes Act of 1978, in the total amount of $81,010 to recover the losses sustained as described above.

We hereby request a decision within sixty calendar days of your receipt of this claim. Also, pursuant to the Freedom of Information Act, we request a copy of the written notice of award on each of the above eight projects. Incidentally, as we have pointed out before, L.P. Consulting is also entitled to receive the Notice of Award pursuant to section 4.4.3.a.15(b) of the USPS Purchasing Manual. Therefore, we request that the requested information be provided both under the Freedom of Information Act and postal procurement procedures.

We would appreciate your prompt response and invite you to call with any questions that you may have.

Truly yours,

James T. Rohlfing

JTR:kc
cc: L.P. Consulting Group, Inc.

## VERIFICATION

Richard A. Battaglin, a duly authorized officer of L.P. Consulting Group, Inc., being first duly sworn upon his oath, deposes and states that the above and foregoing claim of L.P. Consulting Group, Inc., dated this 7TH day of April, 1998, is true and correct in substance and in fact.

Richard A. Battaglin

SUBSCRIBED AND SWORN to
before me this 7th day
of april, 1998.

Anna E Wilma
Notary Public

OFFICIAL SEAL
ANNA E WILMA
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES:01/04/99

Friedman Sinar & Rohlfing
Attorneys at Law
200 West Madison Street, Suite 2500
Chicago Illinois 60606
(312) 855-5399
Fax (312) 368-5821

James T. Rohlfing
(312) 855-5383

E-Mail Address
FSRLAW@AOL.com

March 3, 1998

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**RECEIPT NO. Z 041 263 249**

Mr. Robert Rigsby
Manager, Administrative Services
United States Postal Service
Central Illinois District
6801 West 73rd Street
Bedford Park, Illinois 60499-9991

Re: **L.P. Consulting Group, Inc., Claims Concerning Berwick Modular Post Office, Hoopeston Ramp Project, Downers Grove Dock Enclosure and Brook field Ramp and Dock Enclosure**

Dear Mr. Rigsby:

We represent L.P. Consulting Group, Inc. ("L.P. Consulting") concerning its claims against the United States Postal Service ("USPS") in connection with damages sustained by L.P. Consulting resulting from the USPS's failure to follow postal procurement procedures with respect to each claim as follows:

1. Berwick Modular Post Office. On September 17, 1996, L.P. Consulting provided a site visit to produce a work order pursuant to its Indefinite Quantity Contract No. 162640-96-B-0094 with the USPS ("IQC"), pursuant to your instructions and under the direction of Bruce Rothermel of your office. L.P. Consulting followed the provisions of its IQC to produce a rough sketch of the site work requested, and a work order in the amount of $30,660.83 for the Berwick project. Pursuant to its IQC and the Contract Disputes Act of 1978 (41 USC §§ 601-613), L.P. Consulting claims damages against the USPS which it sustained as a result of your failure to follow postal procurement procedures with respect to the awarding of the contract, which was ultimately awarded to another offeror based on a fixed price contract. L.P. Consulting's claim is in the amount of its lost profits on this project, which would have been $7,665.00.

2. Hoopeston Ramp Project. On November 1, 1995 and August 1, 1996, L.P. Consulting provided a site visit to produce a work order pursuant to its Indefinite Quantity Contract No. 162640-96-B-0098 with the USPS ("IQC"),

pursuant to your instructions and under the direction of Paul Steiner and Lois Gunlogson of your office. L.P. Consulting followed the provisions of its IQC to produce a work order in the amount of $62,752.00 for the Hoopeston project. Pursuant to its IQC and the Contract Disputes Act of 1978 (41 USC §§ 601-613), L.P. Consulting claims damages against the USPS which it sustained as a result of your failure to follow postal procurement procedures with respect to the awarding of the contract, which was ultimately awarded to another offeror based on a fixed price contract. L.P. Consulting's claim is in the amount of its lost profits on this project, which would have been $14,433.00.

3. <u>Downers Grove Dock Enclosure</u>. On August 1, 1996, L.P. Consulting was provided architectural drawings to produce a work order pursuant to its Indefinite Quantity Contract No. 162640-96-B-0098 with the USPS ("IQC"), pursuant to your instructions and under the direction of Jesse McNabb of your office. L.P. Consulting followed the provisions of its IQC to produce a work order in the amount of $36,564.99 for the Downers Grove project. Pursuant to its IQC and the Contract Disputes Act of 1978 (41 USC §§ 601-613), L.P. Consulting claims damages against the USPS which it sustained as a result of your failure to follow postal procurement procedures with respect to the awarding of the contract, which was ultimately awarded to another offeror based on a fixed price contract. L.P. Consulting's claim is in the amount of its lost profits on this project, which would have been $10,000.00.

4. <u>Brookfield Ramp & Dock Enclosure</u>. On August 1, 1996, L.P. Consulting was provided architectural drawings to produce a work order pursuant to its Indefinite Quantity Contract No. 162640-96-B-0094 with the USPS ("IQC"), pursuant to your instructions and under the direction of Jesse McNabb of your office. L.P. Consulting followed the provisions of its IQC to produce a work order in the amount of $89,168.28 for the Brookfield project. Pursuant to its IQC and the Contract Disputes Act of 1978 (41 USC §§ 601-613), L.P. Consulting claims damages against the USPS which it sustained as a result of your failure to follow postal procurement procedures with respect to the awarding of the contract, which was ultimately awarded to another offeror based on a fixed price contract. L.P. Consulting's claim is in the amount of its lost profits on this project, which would have been $22,229.00.

Pursuant to the above, L.P. Consulting Group, Inc. hereby makes a claim under the Contract Disputes Act of 1978 in the total amount of $54,327.00 for losses sustained as set forth above.

Friedman Sinar & Rohlfing
Attorneys at Law

Mr. Robert Rigsby
March 3, 1998
Page 3

We request a decision within sixty (60) calendar days of receipt of this claim. Also, pursuant to the Freedom of Information Act, we request a copy of the written notice of award on each of the above four projects, stating the award amount, the date of award, the number of offerors, and to whom the award was made. Incidentally, L.P. Consulting is also entitled to receive that information pursuant to section 4.4.3.a.15(b) of the USPS Purchasing Manual.

We look forward to your prompt response.

Truly yours,

James T. Rohlfing

JTR:kc

cc: L.P. Consulting Group, Inc.



C:\R\LPCONS\POST\L02RIGSB.DOC\03/03/98\4:49 PM

## VERIFICATION

Richard A. Battaglin, a duly authorized officer of L.P. Consulting Group, Inc., being first duly sworn upon his oath, deposes and states that the above and foregoing claim of L.P. Consulting Group, Inc., dated this 7TH day of April, 1998, is true and correct in substance and in fact.

Richard A. Battaglin

SUBSCRIBED AND SWORN to
before me this 7th day
of April, 1998.

Notary Public

OFFICIAL SEAL
ANNA E WILMA
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES:01/04/99



C:\R\LPCONS\POST\L04RIGSB.DOC\04/03/98\4:26 PM

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

L.P. CONSULTING GROUP, INC., )
Plaintiff, )
vs. ) Case No.
THE UNITED STATES POSTAL ) 98-868 C
SERVICE, ) (Judge Allegra)
Defendant. )

The deposition of RICHARD ANTHONY BATTAGLIN, called for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions for the purpose of discovery, taken before Janet L. Robbins, CSR No. 84-2207, a Notary Public within and for the County of Cook, State of Illinois, and a Certified Shorthand Reporter of said state, at Suite 3300, Three First National Plaza, Chicago, Illinois, on the 10th day of June, A.D. 2004, at 1:36 p.m.

Page 2

PRESENT:
BELL, BOYD & LLOYD PLLC,
(1615 L Street, N.W., Suite 1200,
Washington, D.C. 20036-5610,
202-955-6830), by:
MR. LAWRENCE M. PROSEN,
appeared on behalf of the Plaintiff;
UNITED STATES DEPARTMENT OF JUSTICE,
CIVIL DIVISION-COMMERCIAL LITIGATION BRANCH,
(1100 L Street, N.W., 8th Floor,
Washington, D.C. 20530,
202-307-0290), by:
MS. DOMENIQUE KIRCHNER,
appeared on behalf of the Defendant
and the Deponent.

ALSO PRESENT:
MR. STEPHEN LOBAUGH, In-House Counsel,
United States Postal Service.

REPORTED BY: JANET L. ROBBINS, CSR, RPR,
CERTIFICATE NO. 84-2207

Page 3

(WHEREUPON, the witness was duly sworn.)

RICHARD ANTHONY BATTAGLIN,
called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. KIRCHNER:
Q. Please state your full name and address for the record.
A. Richard Anthony Battaglin, 10401 South 75th Avenue, Palos Hills, Illinois, 60465-2015.
Q. Mr. Battaglin, my name is Domenique Kirchner. I'm going to ask you some questions today. If I ask you a question you do not understand, please let me know. Please remember that we both can't talk at the same time.
Please remember, also, that you have to put oral -- you have to give us an oral response. If you shake your head, nod your head, that's not sufficient. We need an oral response on the record for the court reporter.
Have you ever been deposed before?
A. Never.
Q. Now, you're here pursuant to our request

Page 4

for a deposition of you in this lawsuit, correct?
A. Correct.
Q. This is a lawsuit brought by L.P. Consulting Group, Incorporated, correct?
A. Correct.
Q. What is your role with regard to L.P. Consulting Group, Incorporated?
A. The corporate record would show I'm the secretary/treasurer of the company in the State of Illinois, and my function is project superintendent for the company.
Q. Do you have any other titles for the company?
A. No.
Q. Who else is involved in the company?
A. Linda M. Battaglin, that's my wife. She's the president.
Q. Anybody else?
A. No.
Q. During the time frame 1995 through 1999, did the company -- did L.P. Consulting have any employees besides yourself and your wife?
A. No.
Q. Other than yourself and your wife, does

Page 61

Q. Do you recognize Exhibit 52?
A. Yes.
Q. What is Exhibit 52?
A. It's a claim to Mr. Rigsby for several post offices.
Q. Is this the second claim that's the subject of the litigation?
A. Yes, it is.
Q. Is that your signature on the third page of the claim?
A. Yes, it is.
Q. Did you certify that the claim was true and correct in substance and in fact?
MR. PROSEN: Objection. The document speaks for itself as best evidence.
BY THE WITNESS:
A. Yes.
BY MS. KIRCHNER:
Q. Was your certification attached to the claim at the time it was submitted to Mr. Rigsby?
A. Yes.
Q. Mr. Battaglin, what is L.P. Consulting's claim with regard to the East Lynn building renovation?

Page 62

A. My claim regarding the East Lynn building renovation is that this particular contract, this particular contract, specifically this work order, was -- I visited the site and produced the scope of work as directed and the work was never issued to me for any reason that I know of.
Q. Do you contend that another contractor did this work?
A. Yes.
MR. PROSEN: Objection, assumes facts not in evidence.
Give me an opportunity before you answer.
BY MS. KIRCHNER:
Q. Can you describe for me the work that you had proposed to do in the work order?
MR. PROSEN: Objection.
What work order?
BY MS. KIRCHNER:
Q. For East Lynn.
A. Off the top of my head, without seeing it, I can't.
Q. As you look at the document, Battaglin

Page 63

Exhibit 52, where it says "East Lynn Building Renovation," do you remember going out and making a site visit at East Lynn?
A. Yes.
Q. What did you do after you -- what did you do on that site visit?
A. I met with Sam Southern. We used our typical IQC documentation and generated a work order based on the visit, which could have included a lot of things. I mean, off the top of my head -- this says "building renovation," so I'm assuming -- you know, it's typical postal work.
Q. When did you make this site visit that you're referring to?
A. December 17th, 1995.
Q. Is there some reason that sticks in your mind?
A. Because I was with Mr. McNabb, and we visited three sites that day, and we were in East Lynn the day that O.J.'s verdict came in that he was found not guilty. That's why that stands out.
Q. So you're saying that it was on December 17th, 1995 that you were at East Lynn for the site visit?

Page 64

A. Correct.
Q. And you said three sites. What are the other two that you're referring to?
A. Goodwine and Claytonville.
Q. Are you making any allegations or any claims in the litigation regarding Goodwine?
A. No.
Q. Are you making any claims in the litigation regarding Clayton?
A. Claytonville.
Q. Claytonville, I'm sorry.
A. No.
Q. Now, you indicated that you were at -- clarify for me, when you were at Goodwine, were you with Mr. McNabb?
A. Yes.
Q. And when you were at Claytonville, were you with Mr. McNabb?
A. Yes.
Q. And when you went to East Lynn, were you also with Mr. McNabb?
A. Yes.
Q. Now, how did it come that you were at East Lynn and Mr. McNabb is at East Lynn? How did

Page 65

that come about?
A. I received a phone call from Mr. McNabb saying that we have three facilities left to visit in this particular geographic area, and it was those three that you just mentioned. And we got together on a date and time and met at the -- I can't remember which one was the first site, but we met at one of those sites first.
Q. And --
A. He drove either a postal vehicle or his own vehicle and I came in mine.
Q. So you met him there?
A. Yes.
Q. And the three of you then went to all three of those sites that you've identified, right?
A. Yes.
Q. Now, how does Mr. Southern fit into this? I'm not following that.
A. Mr. Southern was the one that made the phone call to say you got to get together with Mr. McNabb to come to the site.
Q. So you're not saying that Mr. Southern was at East Lynn with you?
A. No, no.

Page 66

Q. As I'm understanding what you're saying, Mr. Southern, he called you before you made these site visits with Mr. McNabb?
A. Correct.
Q. And he told you to get together with Mr. McNabb?
A. Correct.
Q. Did he tell you anything further in this telephone call?
A. Not that I recall.
Q. Did he tell you -- did Mr. Southern tell you why you were to get together with Mr. McNabb?
A. Other than visit the sites and see what work -- or produce a scope of work for each facility.
Q. In this telephone call with Mr. Southern, did he identify the three sites?
A. Yes, he did.
Q. Did he tell you what you were to do or what you were to look at at those three sites?
A. No.
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. No.

Page 67

BY MS. KIRCHNER:
Q. Just to go down to these three facilities and take a look?
A. Yes.
Q. Do you have any notes or any documents that relate to your site visit on December 17th, 1995 with Mr. McNabb?
A. I'm sorry, did I say December 17th or October 17th?
MR. LOBAUGH: I have December.
BY THE WITNESS:
A. I'm sorry, it's October.
BY MS. KIRCHNER:
Q. We both have December.
A. It's October.
Q. October 17th, 1995. We have that corrected now.
Do you have any documents or any notes that relate to your site visit on October 17th, 1995 with Mr. McNabb?
A. Other than the East Lynn work order, no.
Q. Did you take any photographs of East Lynn when you were out there with Mr. McNabb?
A. No.

Page 68

Q. Did you make any sketches or drawings when you were at East Lynn with Mr. McNabb?
MR. PROSEN: Objection.
BY THE WITNESS:
A. Yes.
MR. PROSEN: Asked and answered.
BY THE WITNESS:
A. Yes.
BY MS. KIRCHNER:
Q. You made some drawings?
A. Yes.
Q. What else happened during this site visit at East Lynn with Mr. McNabb?
A. We did what we usually would do in this situation, which was develop a scope of work.
Q. What was the scope of work that was developed?
A. Well, specifically, I don't know sitting here right now, but it was some sort of interior renovation. We were in the inside, I remember. More than likely lock boxes, but I'm guessing.
Q. Do you remember whether or not it involved countertops or counters?
A. Yes.

I would not have a copy, and they would take it back to produce the work order.
Q. Did you produce, when you were at East Lynn with Mr. McNabb and you were producing this document -- how did you refer to these documents?
A. Scopes of work.
Q. So I'm going to call it the scope of work.
A. All right.
Q. When you're at East Lynn with Mr. McNabb and you're producing the scope of work, did you produce only one copy of that scope of work or did you produce two copies of the scope of work so that you could have one and he can have one, meaning two handwritten copies so you have one and he has one?
A. At the site, he received the original and later I received a copy from him in the mail.
Q. Is that what happened at East Lynn --
A. Yes.
Q. -- that you got a copy later on --
A. Yes.
Q. -- from the postal service or Mr. McNabb?
A. Postal service, yes.



Q. Was that work order for East Lynn -- you're referring to them as scopes of work, right?
MR. PROSEN: Asked and answered, objection.
BY THE WITNESS:
A. I'm referring to them as scopes of work when we're in the field, yes.
BY MS. KIRCHNER:
Q. Okay. All right. To be accurate, the scope of work when you're in the field, was that scope of work --
A. It becomes a work order.
Q. The scope of work for East Lynn that you and Mr. McNabb produced in the field, did it have a price?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. I'm not sure if we calculated it, took the postal number times the quantity and put a price next to it. I don't know if we did it there or we did it later or if I got it back with the columns not filled and I did it. I don't remember that.
BY MS. KIRCHNER:
Q. Can you look at Battaglin Exhibit 52, and you see there, "East Lynn Building Renovation,



Work Order Amount, $46.388.00" Do you see that?
MR. PROSEN: You're looking at the wrong --
MS. KIRCHNER: I'm looking at it wrong. Give me a second.
Thank you.
BY MS. KIRCHNER:
Q. Let's start again. Directing your attention to Battaglin Exhibit 52, you see there "East Lynn Building Renovation, Work Order Amount, $32,775.00" do you see that, sir?
A. Yes.
Q. Now, seeing that, does that help you in remembering what the scope of work was that you and Mr. McNabb scoped out on or about October 17th, 1995?
MR. PROSEN: Objection, ambiguous.
BY THE WITNESS:
A. No, it doesn't.
MR. PROSEN: Confusing.
BY MS. KIRCHNER:
Q. Do you know what the $32,775 work order for East Lynn building renovation refers to?
MR. PROSEN: Objection, ambiguous, vague.
BY MS. KIRCHNER:



Q. Directing your attention to Battaglin Exhibit 52, you see there "East Lynn Building Renovation, Work Order Amount, $32,775.00" do you see that, sir?
A. Yes.
Q. Do you know what that refers to?
A. No, other than an amount that we developed in the field.
Q. Do you remember developing a scope of work with a price of $32,775 in the field with Mr. McNabb?
A. No.
Q. Do you know what work is referred to by the entry "East Lynn Building Renovation, $32,775" in Battaglin Exhibit 52?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. I remember meeting with him. I know we measured. I know we put the items on the work order. If Mr. McNabb or Mr. Southern or Mr. Rigsby chose to add to this, which they could, I don't know. All I know is what I got back in the mail was an East Lynn with that amount. So if they increased my quantities at their discretion, that's within

Page 77

their prerogative.
BY MS. KIRCHNER:
Q. You got a document from the postal service that was for East Lynn building renovation that had on it the amount $32,775, is that correct?
A. No, I had two documents. One was for an inside; one was for an outside, meaning interior/exterior.
Q. And are you telling me that each of those documents that you received from the post office for East Lynn building renovation had on it a price for the work in the work order?
A. Yes.
Q. And are you telling me that the sum of those two prices was $32,775?
A. Yes.
Q. Where is that document, sir, or those two documents?
A. I cannot find one. I do have the other.
MS. KIRCHNER: Counsel, it's not in the package you gave me.
MR. PROSEN: East Lynn?
MS. KIRCHNER: No.
MR. PROSEN: Keep going. I'll look for it.

Page 78

MS. KIRCHNER: We're off the record.
(WHEREUPON, a discussion was had off the record.)
BY MS. KIRCHNER:
Q. Mr. Battaglin, is it your testimony that you received from the government two work orders for East Lynn building renovation which, when we add together, the prices on those amount to $32,775?
MR. PROSEN: Objection, misconstrues testimony.
BY THE WITNESS:
A. I did not receive a work order from the postal service with that amount. I received a copy of my draft work order in the mail from them for this amount. I did not get an actual work order.
BY MS. KIRCHNER:
Q. I thought you were telling me there were two of them that they sent you.
A. Yes.
Q. And when you add the two of them together, you got the $32,775, is that correct?
A. Yes. There were two of my rough scopes of work that I submitted. And when he took it, he returned it.

Page 79

Q. And when they were returned to you or when copies were sent to you by the postal service, did they have prices on them with regard to the East Lynn --
A. Yes.
Q. -- project?
A. Yes.
Q. And did they have final total amounts on them?
A. Just this number that's listed on my 52.
Q. As I understand what you're telling me is there were two of them, and when you added them together, they together gave the $32,775 number, is that correct?
A. That's correct.
Q. Are you telling me that those two drafts scopes of work were, in fact, added together and the $32,775 was actually on the document?
A. No, because I think there were two PAs involved. I think one work order was an expense and one was a capital, so it wouldn't require them to send me one whole document. It would have to be two.
Q. You added them together and got the

Page 80

$32,775?
A. Yes.
Q. When you say "PA," could you tell me what that is for the record?
A. Postal service PA means pay authorization. It's either a C or an E, capital or expense.
Q. You said one was a pay authorization and one was a capital?
MR. PROSEN: Objection, misconstrues testimony.
BY THE WITNESS:
A. No. One is an expense PA and one is a CPA, capital.
BY MS. KIRCHNER:
Q. Let me back up. For East Lynn, the postal service sent you two documents, as I understand it, is that correct?
A. Yes.
Q. And these now had prices on them?
A. Yes.
Q. And were you telling me that one of those was a PA and one was a capital?
MR. PROSEN: Objection, misconstrues the

testimony.
BY THE WITNESS:
A. No. What I'm saying is -- you asked me, if I remember the question correctly, was I received a document that had this total on it. And I'm saying no, there were two. And it was probably -- I don't recall, because it wasn't an official document; it was my rough form. It's probable that they split it because one is an expense and one is a capital. And I can't get into their logic. But there are two distinct things here.
BY MS. KIRCHNER:
Q. Okay. I think I follow you now.
A. Yeah.
Q. Have you your own copies of these two documents for East Lynn that were sent to you by the postal service in your files as opposed to receiving them from the government?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. I cannot find those. I just have the one I have now.
BY MS. KIRCHNER:
Q. Do you have any other -- and that's the



one you got from the government in response to the FOIA request.
A. The one I submitted to you, if that's the same one, then that's the same one, yeah.
Q. Do you have anything else regarding your site visit to East Lynn other than the document that you got from the government, the one document?
A. No.
Q. No notes, no field notes --
A. No.
Q. -- no calendars?
A. No.
MS. KIRCHNER: Could you mark this, please.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 53 for identification, as of 6/10/04.)
BY MS. KIRCHNER:
Q. Please a look at what we've marked as Battaglin Exhibit 53. Tell me whether you recognize this document.
A. Yes, this document is a document that I went out with Mr. Paul Steiner, 11/14/95, on my old 94-B-0083 contract.
Q. So you didn't go there with Mr. McNabb?



A. I went there with Mr. Steiner, too. I visited the site with Mr. Steiner, but this is not what I'm alleging. This is different than this (indicating). This is a different contract.
Q. Okay. So Exhibit 53 has nothing to do with this lawsuit, is that correct?
A. I can't answer that.
Q. Well, tell me, is your handwriting on Exhibit 53?
A. Yes.
Q. Okay.
A. But this was provided by the government, not by me. It says "Exhibit 6."
Q. So this is not something that you would look to to support your claims in the lawsuit, is that correct?
A. This would probably be identical to what I did with Mr. Southern -- or Mr. McNabb.
Q. Do you know whether it is or isn't?
A. Sitting here looking at this, no.
Q. Tell me more about what this is, Exhibit 53. Who prepared Exhibit 53?
A. Well, looking at the handwriting, I did everything except the quantity and the extended



price. That's in somebody else's writing.
And then to add to it, somebody scribbled out -- made those scribble marks all over it.
Q. The cross-outs?
A. Yes.
Q. So that whole quantity column, you did not fill that in, is that correct?
A. Correct.
Q. And you didn't fill in the extended price column?
A. Correct.
Q. What's that last column called on this form? I can't quite read it. That's why I'm asking you.
A. Well, it says "Extended Price."
Q. Okay.
A. That's the cover document.
Q. Where did this form come from before it was filled out?
A. From myself.
Q. So you generate forms of this nature, the form itself?
A. Yes.

Q. On your computer?
A. No, this is handwritten.
Q. No, no. I'm trying to understand. The form itself, is the form itself in your computer?
A. This is postal supplied. This form is postal supplied.
Q. And you have copies of the blank forms that you could Xerox and then use?
A. That's correct.
Q. You said that this referred to the '94 contract. You're referring to your '94 Indefinite Quantity Contract?
A. Yeah. This probably is one of those carryover projects that I mentioned from '94 to '96. And Mr. McNabb picked up the baton after Mr. Steiner went back into retirement, now that I'm looking at it and recollecting. And we had to go back for a second visit for whatever reason.
Q. Did L.P. Consulting Group in the '94 to '98 time frame ever do work at the East Lynn Post Office?
A. No, I did not.
Q. And as you sit here and you look at Exhibit 53, can you tell me what type of work this



is addressing based on the document itself?
A. Well, looking at the document, now that I see the document, it reiterates what I said before. Up at the top says "Expense PA," so that tells me the other one was capital.
And looking at this, this looks like this was a lock box lobby renovation, let's see, putting a new postal furnished IRT. So this was what we would call a lock box lobby renovation with miscellaneous, it looks like, tile, just as the document reads, painting, electric.
Q. In whose handwriting is the upper portion of the document where you have the contract number, project description, location, project authorization number and the date?
A. The date, the project description and the project authorization number are not my writing, and I do not know whose that is.
Q. But you'll take the East Lynn?
A. East Lynn is not mine.
Q. Oh.
A. I'm going to guess it's Paul, but...
Q. Okay. But earlier you said that portions of this did have your handwriting on it.



A. Yes. Everything -- item number across here, this is all my writing.
Q. So even when we fill out the items themselves, that's your writing?
A. Those are my writings.
Q. How about this stamp? Was this a stamp?
A. Yeah. It's like what you put on your envelope return address. That's what that is.
Q. Can you explain to me, when you would go out to the sites, would you go out there with these forms that already had the L.P. Consulting stamp on it?
A. Yes, and they already had these line items laid out.
Q. With regard to Exhibit 53, as you sit here today, do you remember making a site visit in about November 1995 with Paul Steiner at East Lynn?
A. Yes.
Q. Do you remember how that site visit came about?
A. Typically, most visits were a call from either Sam Southern or Bob Rigsby to make a date with whoever they told me to make the date with. And in this case it was Mr. Steiner. And we talked,



"What's your schedule like?" And we would visit more than one job at a time, so this was probably in conjunction with another site visit. It's a long way to go to see just one little job like this.
Q. Now, do you have any draft work orders that relate to the $32,775 work order amount for the East Lynn building renovation that's in your claim, Exhibit 52?
A. No. Only the postal service can provide a draft work order.
Q. Remember you told me you went out with Mr. McNabb and you scoped out the work? Do you have any scopes of work, any documents, draft scopes of work that relate to the $32,775 East Lynn building renovation that's part of your claim, Battaglin Exhibit 52?
A. At the time of the claim, April 13th, 1998, we had these documents.
Q. Can you tell me where they are now, sir?
A. I don't know where they are.
Q. Did you get all of your documentation that you could obtain from the former law firm?
A. Yes. And all I had was Paul Steiner's, which I think I gave you, but I'm not sure. I think

so. But I'm not even sure of that. So whatever they sent back to me was what I used.
Q. And you don't have that today?
A. No, I don't.
Q. The site visit you remember having with Mr. McNabb at East Lynn that you told me about, did you prepare any drawings at the site -- at the time of the site visit?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. Yes.
BY MS. KIRCHNER:
Q. What type of drawings did you prepare?
A. Rough sketches, layouts, diagrams.
Q. Do you have any of those rough sketches?
A. All my original work went to the postal service to be converted into a draft work order that I would sign and return to them for signature and a notice to proceed to do the work.
Q. So as I understand it, you're telling us the process is this: There was a site visit, a scope of work is prepared, that goes back with the postal service, then something comes to you in the mail, a copy of it from the postal service?



A. A draft work order.
Q. How is that different from what is taken back out of the field from by the postal service?
A. It's a computerized document that the postal service generates and makes a financial commitment and award to.
Q. You never got anything like that for East Lynn?
A. No, just my copy of this back.
Q. So are you saying that when you scoped out work in the field with the postal service and they took the scope of work with them, that they would then send you a copy of it so that you had it for your files?
A. In East Lynn's case, yes.
Q. When you told me that you -- tell me more about East Lynn. You and Mr. McNabb scope it out, he takes it, then they send you back something. I'm not clear on whether they're sending you back the computerized document or they're just sending you back a Xerox copy of what you and Mr. McNabb generated in the field. What was it?
A. On East Lynn was my copy of the work that we performed at East Lynn .



Q. And that alone?
A. And that's all I got from them.
Q. So you never got a computerized generated work order?
A. No. That's why I filed the claim.
Q. Now, when you and Mr. McNabb completed the site visit at East Lynn, what did you think was going to happen next?
A. Typically, I get a draft work order in the mail from the postal service for me to review. If I agree with the final form that it's in, I sign my portion on the work order and return it to the contracting officer for signature and then the notice to proceed.
Q. Is that what you expected in the case of East Lynn itself?
A. Yes.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 54 for identification, as of 6/10/04.)
BY MS. KIRCHNER:
Q. Can you please take a look at what we've marked as Exhibit 54 to your deposition, Mr. Battaglin. This is a declaration of Sam



Southern. Do you see that, sir?
A. Uh-huh.
Q. And do you see in Paragraph 4, Mr. Southern is stating, "I have reviewed postal service files and records for information pertinent to the following construction projects," and he mentions the East Lynn building renovation. Do you see that?
A. Yes.
Q. And do you see below that he says that the postal service has not awarded contracts for the construction projects listed in Paragraph 4?
A. Yes, I do.
Q. So you see that?
A. Yes.
Q. Seeing that the postal service has not awarded a contract for the East Lynn building renovation, are you still pursuing the claim that the government violated some duty to you by failing to give you a contract for the East Lynn building renovation?
A. Yes.
Q. And why, sir?
MR. PROSEN: Objection, calls for a legal

Page 93

conclusion?
BY THE WITNESS:
A. Because I believe my contract -- I have an implied contract, that the postal service does not need my services unless they intend to do construction work.
BY MS. KIRCHNER:
Q. So you're not contending that somebody else got the work that you had scoped out with Mr. McNabb on your site visit at East Lynn, are you?
A. I'm contending that someone else may have gotten these. I don't have access to the computer to know who got what, and I definitely can't bother East Lynn to see if some other contractor showed up. But based on my previous claim, all those jobs went to other contractors. I presumed, accurately, I believe, that the system reflected that someone else after me was in line to get the work until I filed my claim, and then I think it didn't get awarded.
Q. Have you been back to the East Lynn Post Office since the time you scoped out with Mr. McNabb?
A. No.

Page 94

Q. Why not?
A. I believe because if the money was committed to me, it could still be in the postal service's files. They could issue it to me at any time, at least up until the -- obviously the date of the award expiration date.
Q. So you no longer have an Indefinite Quantity Contract with the postal service?
A. This particular contract has expired.
Q. Just so the record is clear, which one are you referring to now, sir?
A. I'm referring to --
Q. There's two Indefinite Quantity Contracts.
A. This would have been 96-B-98.
Q. That's Battaglin Exhibit 48 that we have portions of in front of you, correct?
A. Correct.
Q. And that expired sometime in 1998?
A. I don't know. I mean, I really don't know. Maybe.
Q. You don't recall?
A. No. If it was a two-year contract, then it would have expired sometime in '98.

Page 95

Q. Okay. Can you tell me what work is the subject of your claim regarding the East Lynn building renovation? What's the work that makes up the $32,775 that you were proposing to perform?
A. My understanding of the work that you're referring to would be the final documents sent by the postal service as to the work that they wanted to have done based on the site visit in the form of a draft work order.
Q. As I understand it, you never got such a document from the postal service, correct?
A. Correct.
Q. So can you tell me what the $32,775 refers to in terms of the work?
A. It reflects, in my opinion, that there were two, probably two, work orders, expense and capital, that totaled this amount that was not issued to my contract based on the work that I performed to produce the work. So whatever they ultimately decided would have come to me in the form of a legitimate work order, but what they sent me totaled this amount but was not in the form of my implied contract. They did not send me the result of my work, which is, as we read before, to do this

Page 96

work.
Q. In fact, all they sent you was Xerox copies of the scope of work you and Mr. McNabb developed in the field, correct?
A. Yes. And that was almost the next day, so it was just a courtesy, but I was still waiting for the issuance of a work order.
Q. And when it came to you, did it come to you with any cover letter?
A. No.
Q. Did it indicate -- did it come in an envelope?
A. Oh, yes.
Q. Did it indicate whether it came from Mr. McNabb personally or just whether it's coming from the postal service?
A. It just came -- the particular envelopes that they came in with were the 8 1/2 by 11 size with the typical franked postal, and the return address was South Suburban District. It's always the basic envelope.
Q. You don't have copies of those two documents that the postal service sent you back in 1995?

A. No, I don't.
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. I do not.
BY MS. KIRCHNER:
Q. Did you destroy them?
A. I don't recall where they went.
Q. Where have you looked for them?
A. I've looked in every conceivable place in my office during this time frame to look for those two documents.
Q. What is L.P. Consulting claiming with regard to the St. Anne Post Office in this litigation?
A. That I met in the field with the project manager from the postal service and I developed sketches and/or a scope of work accomplished in exchange for the work itself.
Q. So you went to the St. Anne Post Office?
A. Yes.
Q. When did you do this?
A. Sitting here, I don't recall.
Q. Do you have any notes?
A. Yes.



Q. What notes do you have, sir?
A. They're in the -- this document.
Q. Let me go on and ask you some more questions before we look at some notes.
When you were at the St. Anne Post Office, do you recall whether anyone was with you?
A. Yes.
Q. Who was with you?
A. Sam Southern.
Q. Approximately when was this?
A. I have the date, but it's not -- it's in this binder.
Q. So you don't remember right now?
A. Off the top of my head, no.
Q. Now, why did you go to the St. Anne Post Office?
A. To receive work.
Q. When you were at the St. Anne Post Office, what did you do there?
A. Sam and I measured the facility inside and out based on the scope of work developed with the postmaster.
Q. Which postmaster -- who are you referring to for St. Anne?



A. At the time, his first name was Bob, and I don't have his name off the top of my head. I'd have to think about it.
Q. At the time of this site visit with Sam Southern, was the postmaster there with you at that site visit?
A. Yes.
Q. Would you do the same thing as you described to me earlier with Mr. McNabb, that you and Sam pulled the tape measure and made the measurements together?
A. Yes.
Q. With regard to St. Anne, what were the important things you were measuring?
A. I believe we were doing a lock box lobby on the inside and what we would call the typical package inside. And on the outside we were measuring for concrete work for an accessibility facility in the front and rear.
Q. You mean handicap accessible?
A. Yes.
Q. And do you recall making measurements with regard to a handicap ramp with Sam?
A. Yes.



Q. So is it fair to say that there were two parts to the site visit, the handicap ramp measurements and work associated with that, and then also looking at the lock box for the lobby?
A. Yes.
Q. Now, other than these measurements that you took with Sam, what else did you do at the time of the site visit?
A. Just discussed the project, what we were going to do and the scope of work that would become my work order.
Q. Did you have with you at St. Anne at the time of this site visit your work form with your L.P. Consulting stamp on it? Did you have a blank form like that?
A. Yes.
Q. Did Sam also come with a blank form to this site visit of this nature --
A. No.
Q. -- meaning Battaglin Exhibit 53?
A. No.
Q. What did you and Sam do with regard to the blank form that you brought with you to the site visit at St. Anne?

A. I don't recall.
Q. What happened to that document?
MR. PROSEN: Objection, calls for conjecture.
BY MS. KIRCHNER:
Q. Let me be more specific, sir. You were there with Sam at the site visit, correct?
A. Yes.
Q. And there was a scope of work that was being prepared, is that correct?
A. Correct.
Q. What did you do with it at the time of the site visit?
A. Once the quantities were filled out, everything was given to Mr. Southern to take back to produce a draft work order for my signature.
Q. And I take it there was only one copy of this scope of work; there were not like two copies, one for you and one for him, that you together prepared in the field?
A. As I said before, if the facility had copying capabilities, which this one didn't either, to my recollection, we would make a copy in the field and I would have it on the spot. Otherwise, they would take it back and make a copy because they



wanted the originals so that there would be no additions on my part, going back to my office and slipping in something. It left right from the field in their government hands to be produced into a work order. Then they would send it back to me in whatever form it came back.
And maybe in a short amount of time later, I would get a work order, draft work order for my review so that I would agree with the quantities and time only. And then I would sign it if I agreed with it, or whatever needed to be done, and I'd send it back.
Q. Do you remember for St. Anne whether, in fact, there was the Xerox capacity in the field and you got your copy right then?
MR. PROSEN: Objection, asked and answered, conjecture.
BY THE WITNESS:
A. I really don't recall.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 55 for identification, as of 6/10/04.)
BY MS. KIRCHNER:
Q. Please take a look what we marked as



Exhibit 55 to your deposition, and let me know when you're ready.
A. Okay.
Q. Do you recognize Exhibit 55?
A. Yes.
Q. Now, I would like you to focus on the first four pages, okay?
A. Uh-huh.
Q. Excuse me, the first five pages. You see they're numbered 1 through 5 at the top --
A. Yes.
Q. -- with the little circles?
Focus first on the numbering in the little circles. Is that your numbering, sir?
A. Yes.
Q. So did you number these pages here, 1, 2, 3, 4, 5 that are at the beginning of this exhibit?
A. Yes.
Q. And when did you do that?
A. I don't remember.
Q. Well, did you do it at the time of the site visit?
MR. PROSEN: Objection, asked and answered.



BY THE WITNESS:
A. I don't know.
BY MS. KIRCHNER:
Q. You don't know whether you did it at a later time?
A. No, I don't know.
Q. Let's just look at the first five pages, okay, and then we'll look at the other pages.
Now, if we look at the first five pages, can you tell me what portions of the first five pages are your handwriting?
A. All of it.
Q. So Sam's handwriting is not on this document?
A. No.
Q. No date?
A. No.
Q. What work is being described here on the first five pages?
A. It looks like a lock box lobby renovation with counter work, IRT work stations, no vending machine, and the basic -- what we would call the basic interior package, floor tile, new doors, painting, electric.

Q. Now that you've looked at the first five pages of this, does this refresh your recollection with regard to the site visit to St. Anne that you've told us about?

MR. PROSEN: Refresh his recollection is a vague question.

BY THE WITNESS:

A. All I can say is what we were proposing to do. We were proposing to do some lock boxes, work stations. This is, for lack of a better expression, this is a typical boilerplate for doing the work that we were doing.

BY MS. KIRCHNER:

Q. Okay. Now, you prepared the first five pages, correct?

A. Yes.

Q. And you prepared all of the information on the first five pages, right?

A. Yes.

Q. Now, at what point did you fill in the line item numbers and the line items, just this portion and this portion (indicating)?

A. This portion here (indicating)?

Q. Yes, which is line item number and the substance of the line.



A. When was that filled out?

Q. Yes.

A. Right after I got the contract, I made these -- once we determined we were going to do the 609 zip code, once Mr. Rigsby said we're going to do all these facilities in 609, I came up with a standardized format so we can go in the field, come up with quantities and negotiate the construction time schedule with the postmaster. And extended price wasn't an issue because the computer at the post office produces that.

Q. Is this in your standard format? Referring to the line item numbers and then the substance of the next area where it says "rough carpentry and finish carpentry" and the items under that, that's your standard format?

A. Yes, that's what I would have typically -- this is typical. On 200 jobs, I did it this way.

Q. I take it you had in your office copies of this form with the first item number filled in and then the substance filled in?

A. At the time --



MR. PROSEN: Objection, asked and answered.

BY THE WITNESS:

A. At the time I had these contracts, I would have had this.

BY MS. KIRCHNER:

Q. How about "Unit Measure," do you see that column?

A. Uh-huh.

Q. What's the purpose of that column?

A. Units measurements.

Q. For St. Anne, before you went out to St. Anne for this site visit, had you already filled in that column also where it says "Unit Measure"?

A. Yes, you would have to.

Q. And before you went out for St. Anne for the site visit, had you already filled in the unit price column?

A. Yes, you would have to.

Q. And I take it the quantity column was blank and then extend price was blank before you went to the site visit, is that right?

A. Yes.

Q. What did you do at the site visit with regard to St. Anne and the quantity column?



A. I would hold the front end of the tape and Mr. Southern would take the final number end of the tape and tell me 60 linear feet and I would write it on the work order. Or in some cases, it would be reversed, he would have the work order and he would write the number and I'd be on the other end holding the front end of the tape.

Q. I gather that you filled out this whole one for St. Anne?

A. On this particular one, it looks like I did.

Q. If we just take as an example the first line, "various fasteners, self" -- is that tap?

A. Yes.

Q. You have quantity, 10. How was that arrived at?

A. On this project, I couldn't say.

Q. Is that a measurement?

A. That's a quantity, 10 each. If I'm reading my writing correctly, there's 10 self tap fasteners, yeah.

Q. If we go down that whole quantity column, are all of those entries quantities?

A. Yes.

Page 113

Q. So they're not measurements, right, they're quantities?
A. They're --
MR. PROSEN: Objection, misconstrues the exhibit.
BY THE WITNESS:
A. They're measurements, results of measurements. Linear feet is a measurement.
BY MS. KIRCHNER:
Q. Where do you see one for linear feet in this quantity column?
MR. PROSEN: Objection.
BY THE WITNESS:
A. Well, the third item down, 2 by 4 wood stud, 370 linear feet, stud.
BY MS. KIRCHNER:
Q. I see that, that's 370 linear feet, because the LF is in the unit measure?
A. Correct.
Q. Okay. And what does the EA stand for?
A. Each. SF is square foot.
Q. So where you have the unit measure and you have an EA, each, is it fair to say that that quantity is the number of the various items?

Page 114

A. Yeah.
Q. Now, at the time of the site visit at St. Anne, did you fill in this extend price column at the site visit?
A. Yes.
Q. How do you do that?
A. I'm sorry, no, I did not fill in the extended price. I filled in the quantity. I filled in the extended price later.
Q. When did you fill in the extended price?
A. When I had to file my claim so I can get to an amount so I can make a claim.
Q. So you received back from the postal service a copy of the St. Anne scope of work that did not have prices in the price column, and then you at this point sometime later put in those prices?
A. Correct.
Q. You did that so you could file your claim, is that correct?
A. Correct.
Q. So the document that came to you from the postal service for St. Anne was blank in the extend price column, correct?

Page 115

A. Yeah.
Q. Do you have that document, sir?
A. Well, it would have been this one and I filled in the number.
Q. So you didn't keep a copy of the document you got from the postal service in the condition that you got it?
A. They made a photocopy and I kept the photocopy, which became this original, which is what you're looking at.
Q. What I understand what you're telling me, they sent you a copy of the St. Anne scope of work that did not have prices in the extend price column, correct?
A. Yeah, it wasn't needed.
Q. You didn't keep a copy of that without you then putting in the numbers? You didn't keep a copy of it as it was sent to you by the postal service?
A. I had no reason to.
Q. So the answer is that you did not keep a copy as it was sent?
A. No, I didn't because the copy -- I did not make a copy of what they sent me. I used it in

Page 116

its original format and produced these numbers.
Q. I gather that you did that, for St. Anne, you filled in the numbers -- when did you fill in those numbers?
A. On or about --
MR. PROSEN: Asked and answered, objection.
BY THE WITNESS:
A. On or about the time I filed the claim. It was requested by my attorney.
BY MS. KIRCHNER:
Q. So in 1998?
A. Yes.
Q. So your attorney requested that you fill in the extend price column?
MR. PROSEN: Objection, privilege.
BY THE WITNESS:
A. Yes.
BY MS. KIRCHNER:
Q. Now, for St. Anne, now that you look at this, the first five pages of Exhibit 55 to your deposition, does that refresh your recollection concerning whether you and the postmaster talked about the schedule and arrived on any agreed upon schedule for St. Anne?

Page 117

A. As I said before, based on our conversations with the postmaster, he went ahead and ordered his equipment that was to be postal furnished so that it would be received in a timely fashion in conjunction to when we were going to start the work.
Q. But did you and the postmaster agree upon any date when L.P. Consulting would start the work at St. Anne?
A. That was not my call. That was between Mr. Southern and the postmaster. I had no conversation on that.
Q. Let's look at the second two pages -- I'm sorry, the last two pages of Exhibit 55 to your deposition.
A. Uh-huh.
Q. Do you recognize these pages?
A. Yeah.
Q. Can you tell us what these two pages are?
A. The last two?
Q. Right, the last two, the last two pages of the exhibit itself.
A. I'm sorry.

Page 118

Q. You're with me now?
A. Yes.
Q. You see it has contract number 94-B-0083 and it's crossed out.
A. Yes.
Q. Do you see that?
A. Yes.
Q. So we're all together now, can you tell me what those last two pages are?
A. Yes. This was apparently intended to be on my 94-B-83 contract and it was going to carry over to 96. And this is for exterior work, exterior concrete work.
Q. Is all the handwriting on these two pages your handwriting?
A. Yes.
Q. And you say "exterior concrete work." Can you be more specific, sir?
A. No. It's for concrete. Sidewalk, ramp work, that's concrete work.
Q. Do you recall how it came about that you prepared this document --
MR. PROSEN: Objection.
BY MS. KIRCHNER:

Page 119

Q. -- the two-page document?
MR. PROSEN: Ambiguous, objection, vague.
BY THE WITNESS:
A. At the same meeting with Mr. Southern, we developed this particular scope of work.
BY MS. KIRCHNER:
Q. And when was that?
A. The same visit as the first, when we did the first five pages.
Q. Do you recall what year?
A. As I said before, it's in this document, the binder. I can give you a date.
Q. Okay. So is all of the work set forth in the last two pages of Exhibit 55 work on the exterior of the post office?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. Yes.
BY MS. KIRCHNER:
Q. Do you know what this handwriting refers to, the handwriting above the "Term Construction Contract Work Order," this handwriting?
A. It's just some form of a calculation.
Q. What sort of calculation?

Page 120

A. Well, it looks like square footages, 8 by 50, 15 feet of curb. So it's some sort of linear foot of calculation or square foot of calculation.
Q. That you made?
A. Yeah, yeah, that's my writing.
Q. Did you arrive at the site visit with the form for this scope of work, with the two-page scope of work, with the item number column filled in, with the description column filled in, the unit measure filled in and the unit price column filled in before you begin the site visit?
A. Yes.
Q. How did you go about filling in the quantity column?
A. Mr. Southern held one end of the tape and I held the other, and when we calculated it, I would enter it on the quantity column.
Q. Are all the entries in the quantity column, is every one of those entries a result of a measurement?
A. Probably, yes.
Q. Do you see any that's not the result of actually making a measurement with the tape measure?

Page 121

A. Yes.
Q. Which one, sir?
A. The one that says "minimum charge for curb removal." It's a lump sum job and there's another one that says "lump sum," meaning, you know, lump sum. There's two there, it looks like, on that page.
Q. Where it has the extend price, did you fill that in at the time of this site visit?
A. No.
Q. Did you fill that in later at the time you were preparing your claim with regards to the St. Anne Post Office?
A. Yes.
Q. So this was in 1998 at the request of your attorney?
A. Yes.
Q. And I take it you did not save a copy of the scope order that was sent to you -- excuse me -- you did not save a copy of the scope of work sent to you by the postal service in the condition that they sent it to you?
A. Correct.
Q. Now, at the time you filled in this

Page 122

document, the extended prices, in 1998, did you check your math, make sure your numbers were right?
A. I did the best I could.
Q. Do you use a calculator?
A. I used a calculator with a tape. So if I'm off by a penny, that's possible, but I did do it that way.
Q. So for St. Anne, you arrived at $41,691 as a result of these two scopes of work that we have here in Exhibit 55, is that correct?
A. Correct.
Q. Why did you not date the scopes of work at the time that you were doing this with Sam and gave the scopes of work to Mr. Southern?
MR. PROSEN: Objection, misconstrues the exhibits.
BY THE WITNESS:
A. Sometimes I put them in; sometimes he'd put them in or whoever I was with; sometimes -- I can't answer for this work order.
BY MS. KIRCHNER:
Q. I'm focusing on St. Anne.
A. Yes.
Q. Did you date these two scopes of work

Page 123

that we have here in Exhibit 55?
MR. PROSEN: Objection, asked and answered. The documents speak for themselves.
BY THE WITNESS:
A. The answer is no.
BY MS. KIRCHNER:
Q. Did you make any drawings at this site visit at St. Anne? Did you make any sketches?
A. Yes.
Q. Do you have the sketches?
A. No, they all went -- all my original documentation goes to the postal service so they can generate the work order. And whatever came back with the work order would be either copies of the original work, sketches or something that they would have modified based on their internal conversations. And then it would come back to me to do my -- to fulfill my contract which is to do that work.
Q. When they sent you back a copy of what was developed in the field as a courtesy, did they include -- did the postal service include the sketches for St. Anne?
A. Oh, yes.
Q. Well, where are those sketches?

Page 124

A. I cannot find them. I just held on to what I have here.
Q. Have you looked for the sketches for St. Anne that you had?
A. Yes, and I cannot find the sketches.
Q. Did you destroy your copies?
A. Probably. It's possible they were put in something, and I can't find them.
Q. Have you moved your business since back in the 1995, '96 time frame?
A. No.
Q. Now, since the time of the site visit at St. Anne with Sam, have you been back to look at the St. Anne Post Office?
A. No.
Q. Why not?
A. I have no reason to.
Q. Are you contending that any other contractor got the work which is the subject of Exhibit 55 to your deposition?
A. Yes.
Q. Who are you contending got that work?
A. Well, someone the postal service through Bob Rigsby selected, whether it be an IQC or

the shape of the St. Anne Post Office, now that I look at the document.
Q. Okay. But you recognize it as the shape of the post office, but you're not really familiar with the sketch?
A. Correct.
Q. How about the next sketch right behind it. Whoops let me make sure I've got it here. Sorry.
I want you to look at the sketch, which is the second to the last page.
A. Uh-huh.
Q. Tell me whether you recognize that sketch.
A. No.
Q. Is that your handwriting?
A. No.
Q. If you could look at the last page of the document, do you recognize this?
A. No.
Q. And do you see it's dated -- "St. Anne Scope, Cont.," and then it has 2/1/94. Do you see that?
A. Yes.



Q. Let's move on.
Let me ask you this: This Exhibit 58, do you see anything inside this exhibit that in your mind relates to the site visit to St. Anne that you told us about, that you had a site visit with Sam Southern?
A. No.
Q. Okay. I'm going to move on.
Can you turn back to 56 for a moment, sir. It's a one-page sketch.
Could you clarify for me, did you make this sketch at the time of the site visit with Sam Southern?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. Yes.
BY MS. KIRCHNER:
Q. So during the very site visit itself?
A. Yes.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 59 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. Please take a look at what we've marked



as Exhibit 59 to your deposition and tell me whether you recognize this.
A. Yes.
Q. What is Exhibit 59?
A. It's a scope of work for the St. Anne Post Office.
Q. Can you tell me generally what sort of work?
A. Concrete.
Q. Did you prepare this document?
A. Yes.
Q. This is your handwriting?
A. Yes.
Q. Can we refer to this as a scope of work for concrete work at St. Anne?
A. Yes.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 60 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. Please take a look at what we've marked as Exhibit 60 to your deposition. Do you recognize Exhibit 60?
A. Yes.



Q. What is Exhibit 60?
A. A St. Anne scope of work.
Q. For what sort of work generally, sir?
A. Interior construction.
Q. Is this in your handwriting?
A. Yes.
Q. Did you prepare this document?
A. Yes.
Q. Now, if you could look at Exhibits 59 and 60, look at them together. You have both of them in front of you?
A. Uh-huh.
Q. You told us about your visit to St. Anne with Mr. Sam Southern.
A. Uh-huh.
Q. Do these documents, Exhibits 59 and 60, relate to that site visit?
A. Yes.
Q. And did you prepare Exhibits 59 and 60 at the time of the site visit with Sam Southern?
A. Yes.
Q. Did you go about preparing them in the same way you told us about yesterday where you and Sam measured the various distances and put the

measurements on the sheets?
A. Yes.
Q. Can we refer to these two documents as scopes of work for St. Anne?
A. Yes.
Q. Did you show these documents to Sam Southern at the time you were preparing them at the site visit?
A. I took these documents and my sketch, Exhibit 56, and I believe it was one more for the inside that is not here, and he took it back to his office to discuss with Mr. Rigsby to send back to me whatever changes that they did, they may have added, subtracted to the scope. And then I would get a work order for my review and signature to do the work.
Q. So at the time Sam Southern took these scopes of work for St. Anne back to the postal service, you had not yet filled in the extended price, is that correct?
A. That's true.
Q. Let's look, for example, on Exhibit 59. Let's take the first item, description. It says "demolition backhoe," is that correct?



A. Correct.
Q. And then you have here unit measures, hours. Do you see that?
A. Yes.
Q. And then what's the quantity?
A. Eight.
Q. Is that your handwriting, the eight?
A. Yes.
Q. How did you go about deciding that eight was the appropriate quantity for the demolition backhoe hours at St. Anne at the time of the site visit?
A. I don't recall the specifics, but I think we just determined that this service would have been required for a day.
Q. Is that a determination that you and Sam arrived at together, or was it your determination that it was eight hours a day for backhoe demolition?
A. Possibly both. I don't remember specifically talking about this particular item at this time, but it's possible.
Q. Is it also possible that it was just simply your judgment at the time and you put it in,



the eight hours?
A. No, because they could have made it zero when they sent the work order to me.
Q. No. I'm talking at the site visit itself, when the document is prepared at the time of the site visit, and I want to understand the procedure at the time of the site visit.
A. Everything in here would have been talked over with Sam. It wouldn't have just been arbitrary.
Q. So at the time of the site visit for St. Anne, the procedure was you and he would talk over the number of hours and then you write down the hours that the two of you had discussed?
A. Pretty much.
Q. Do you remember it ever being different during the site visit?
A. I'm sure possibly it could have been, sure.
Q. So sometimes you would just fill in the number of hours and then sometimes the two of you would discuss it and you'd put it in the number of hours?
MR. PROSEN: Objection, misconstrues the



testimony.
BY THE WITNESS:
A. I don't recall every meeting, but I would say you probably could say it happened. But at St. Anne, I know we went over item.
BY MS. KIRCHNER:
Q. So you remember going over every item with Sam at St. Anne?
A. Yes, pretty much.
Q. And that includes the number of hours for various items, is that correct?
A. Yes.
Q. Can we look at Exhibit 60 for St. Anne? I would like to direct your attention to the third page of the exhibit. And take, for example, the item, the third item down, it says "drywall." What's the rest of that line?
A. "Casing bead."
Q. And what does this refer to?
A. It's a product that you find or can buy for drywall.
Q. And there, what was determined for drywall casing bead for St. Anne?
A. If I'm looking at this correctly, none

Page 156

was required.
Q. Was that a judgment that you and Sam arrived at together or yourself?
A. Oh, no, that's a common decision that we would have made together.
Q. And make it together?
A. Right.
Q. I'm directing your attention to Exhibit 55 that we looked at yesterday, sir.
A. Uh-huh.
Q. And do you recall this, that we looked at Exhibit 55 yesterday?
A. Yes.
Q. And do you remember you told me this is all in your handwriting and you prepared Exhibit 55, is that correct?
A. Yes.
Q. But now we have the extend prices on the document, correct?
A. Yes.
Q. If we look at Exhibit 55, can you look at it, compare it with Exhibits 59 and 60, and then satisfy yourself that this includes both the scope of work for concrete at St. Anne and then the scope

Page 157

of work for interior work at St. Anne?
A. Yeah, it looks pretty similar. There might be some -- something different, but it looks pretty similar.
Q. You remember -- all right.
Can you put in front of you Exhibit 60 and Exhibit 55?
A. Uh-huh.
Q. As I understand it, what you're telling us is at the time of the site visit, Exhibit 60 was filled in and taken by -- you completed Exhibit 60, Sam Southern takes it back with him, and that at a later point in time, you get back Exhibit 60 from the postal service and then fill in the extended prices, is that correct?
A. No.
MR. PROSEN: Objection, misconstrues the testimony.
BY THE WITNESS:
A. That's not correct.
BY MS. KIRCHNER:
Q. Remember you told us about Exhibit 55 that has the extended prices filled in?
A. Yes.

Page 158

Q. When did you go about putting in the extended prices in Exhibit 55?
A. When I submitted my original copy to Mr. Southern, it was at his discretion to add or subtract any items in the quantity column and send it back to me. And then when I took it for my -- for my --
Q. Your claim?
A. -- my claim, then I had filled in the extended version. So whatever was in the quantity column when he sent it back to, I just carried it over to the extended price.
Q. In 1998, at the time of your claim, you were filling in the extend price column, is that correct?
A. Right, because I realized I wasn't going to get the work order, so I just took what he sent back to me and then extended it over.
Q. And what he took at the time of the site visit, as I understand from your testimony, is Exhibits 59 and 60, is that correct, the two without the extend prices?
A. Yes.
Q. Okay. Do you recall that earlier you

Page 159

told me that Exhibit -- yesterday you told me that all of Exhibit 55 was in your handwriting?
A. Yes.
Q. I would like to look at a particular item on Exhibit 55, sir.
A. Sure.
Q. Are you on the first page of Exhibit 55, please?
A. Yes. I'm sorry, 55 and 60?
Q. Yes. We can look first at Exhibit 55. And I'm on the first page, and I look down the description column and I see there the item, "Misc. hourly labor, carpenter finish." Do you see that?
A. Yes.
Q. And we have that same item on Exhibit 60, the first page. Do you see that?
A. Yes.
Q. And do you see that on Exhibit 60, there's 32 for the quantity hours, 32 hours, and that on Exhibit 55 -- I'm going a little too fast. I'm probably seeing this wrong. Sorry about that.
Do you see on Exhibit 60 that there's 32 hours for the item "Misc. hourly labor, carpenter finish"? Do you see that?

Page 160

A. Yes.
Q. And what does that refer to, that item?
A. That would be a line item that we would have determined to use for finishing. There's two types of carpenters, and this was a finishing carpenter or carpenters.
Q. And do you see that on Exhibit 55, the quantity is not 32 hours for that same item, but now it's 160 hours? Do you see that?
A. Yes.
Q. You told me that that's your handwriting on Exhibit 55, is that correct?
A. Yes.
Q. Can you explain to me why it's 32 hours for miscellaneous hourly labor carpenter finish on Exhibit 60 and then it's changed to 160 hours for miscellaneous hourly labor carpenter finish on Exhibit 55?
A. I don't actually recollect the conversation. But typically on these work orders, I would be told we're going to do certain things different, add certain hours or sometimes it would even be changed for me or I would receive a little sticky note, add or delete certain things, and then

Page 161

I would make my adjustments on the return copy.
Because this copy and this copy (indicating), with the exception of the writings on the top, are two different copies. So he must have, when he sent me this -- I'm only assuming that I had the typical Sam Southern, make your adjustments on these work orders based on his conversation with Mr. Rigsby or some other factor, maybe even with the post office.
It's possible they increased the hours because they weren't going to give me overtime. It's possible they gave me extra hours because the nature of the work was going to be different, depending on -- at the time when they issue the work order to me, that's when we go over the final -- the draft work order that they produce and we go over everything one more time. So that's possible that's what happened. There could be other quantities in here that changed, too, for that matter.
Q. Now, the 160 on Exhibit 55 is your handwriting, correct?
A. Yes.
Q. Do you remember at what point in time you made the change from 32 to 160?

Page 162

A. Probably within a few days of receiving the document back from Mr. Southern.
Q. Well, but do you remember that actually happening, sir?
A. Receiving this?
Q. No, making the change.
A. Not exactly for St. Anne, but I know typically that's how we did business. I mean, it would always be that way on all the work orders I ever did with him. That was typical, whether it would be Sam or any other gentleman.
Q. Let's look at the third page of Exhibit 60 and the third page of Exhibit 55 together. Do you see on Exhibit 60 for St. Anne there is zero as the quantity for drywall casing bead? Do you see that?
A. Yes.
Q. And do you see that on Exhibit 55, there is now 275 for the drywall casing bead linear feet? Do you see that?
A. Yes.
Q. And did you make that change from zero to 275?
A. Yes.

Page 163

Q. Do you remember at what point in time you made that change?
A. Typically within a few days after receiving the change requested by the government or the post office.
Q. But my question is: As you sit here today, do you remember at what point in time you made the change?
A. Yes, within a few days of getting this document and sending it back to him. I'm trying to get work, so I would have immediately responded to this and sent it back to him with my adjustment acknowledging it so he would produce a work order to me.
Q. So are you telling me that you and Sam together prepared Exhibit 60, he takes it back to the postal service, they mail it back to you so you have a copy identical to Exhibit 60, and then you make changes to it and send it to the postal service?
A. Yeah, if they request it. Sometimes they don't. Sometimes it's no change; sometimes add this; sometimes delete that. And then I send it back to them, and then they prepare their -- my work

Page 164

order.
Q. But do you remember in the case of St. Anne that actually happening, that Sam sent it to you back, Exhibit 60, then you made the changes, and do you remember making the changes and sending it back to Sam Southern?
A. Yes.
Q. Do you remember why you made those changes at that time?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. Yes. He requested me to make adjustments as per usual.
BY MS. KIRCHNER:
Q. Did he tell you what adjustments to make?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. Yes, add whatever was on his sticky pad, add or subtract. There may be items I removed from this as well that I didn't put quantities, too, that may be written on this document, that at one time we considered it and we just didn't include it but that don't even have numbers. It's very possible that if

Page 165

I took a minute to look through this, I would find something. That's how they conducted their business with me.
BY MS. KIRCHNER:
Q. So are you telling me that Sam told you to change the zero for drywall casing bead to -- specifically to 275 for drywall casing bead?
MR. PROSEN: Objection, misconstrues the testimony and asked and answered.
BY THE WITNESS:
A. Yes. Otherwise, I wouldn't have put 275.
BY MS. KIRCHNER:
Q. It wasn't a conversation of the nature, "Think about that. Put in what you think is advisable"? It was a specific instruction to put in a specific number?
A. Yes.
Q. Was this an oral conversation as opposed to a sticky, do you remember?
A. I remember it always was a sticky.
Q. Oh, so these are not conversations. Do you have any of these documents, these copies of the scopes of work with the stickies?

Page 166

A. No. The sticky would have been -- I would have made an immediate adjustment, as I said, to this. I would have peeled the sticky off and threw it away and I would have mailed this right back to him hoping to get the work order based on my adds and subtractions.
Q. Do you remember specifically doing that in the case of St. Anne?
A. Yeah.
Q. Let's look at Exhibit 55 and Exhibit 59 together. If you can make sure you have those two in front of you.
A. 55 and 59.
Q. 55 is the scope of work for St. Anne with the extend prices filled in and 59 does not have the extend price column filled in, is that correct?
A. Yes.
Q. What I'd like you to do is look at the second to the last page of Exhibit 55 and then the first page of Exhibit 59 together.
A. Yes.
MR. PROSEN: I think if you go back a page.
BY MS. KIRCHNER:

Page 167

Q. Do you see here -- I want to look at the demolition backhoe line on these two documents, the first line. And do you see that on Exhibit 59, the quantity for demolition backhoe is eight hours, and that when we look at --
MR. PROSEN: I think you have to go back a page.
There you go.
THE WITNESS: Okay.
MS. KIRCHNER: Thank you, Larry.
BY MS. KIRCHNER:
Q. (Continuing) -- and when we look at the second to the last page of Exhibit 55, we see that the quantity is 16 for demolition backhoe? Do you see that?
A. Yes.
Q. And on Exhibit 55, do you see that there's additional handwriting on that line, and can you tell me whose handwriting that is?
MR. PROSEN: Objection, ambiguous.
BY MS. KIRCHNER:
Q. Let me be more specific with you.
Mr. Battaglin, we're on Exhibit 55, the second to the last page. We're looking at

"demolition backhoe." And as you go across, there's handwriting on that same line. Can you read that to me?
A. You mean under "description"?
Q. Right.
A. Yeah, "two men at eight hours."
Q. Is that your handwriting?
A. Yes.
Q. When did you put that on the form?
A. When I got my note back that this was going to be probably two days instead of one day from Mr. Southern.
Q. So you're saying that Mr. Southern sent you a sticky or a note indicating that it was two men -- what exactly did he indicate to you on the note, if you recall?
A. Normally, it was just the line item, meaning the item number, as you see on this document, and he might just paraphrase it. Like in this case, say maybe this particular number backhoe, add eight hours.
Q. Well, do you remember specifically what the message was from Sam at this time?
A. No.



Q. Do you remember when you made the change from eight to 16 for demolition backhoe hours?
A. It would have been the same time I made the other changes on this document.
Q. Let's look at the last page of Exhibit 55 and the last page of Exhibit 59.
Do you see that there's an item there that's, "Negotiated, hauling truck driver"? Do you see that item?
A. Yes.
Q. And if we take first Exhibit 59, can you tell me what sort of work that's referring to?
MR. PROSEN: Objection, best evidence, speaks for itself.
BY THE WITNESS:
A. It's to accommodate the need for a driver that is going to obviously take this particular truck that's going to haul material in a truck.
BY MS. KIRCHNER:
Q. Do you remember whether or not you and Sam talked about that at the time of the site visit?
A. When we initially did the work order, yes.



Q. So did you and Sam talk about that it would be eight hours for a hauling truck driver at the time of the site visit?
A. Yes.
Q. Now, you'll see that that's changed -- did you change that to 16 --
A. Yes.
Q. -- on Exhibit 55?
A. Yes.
Q. Can you read for us -- if you look at that same line item on Exhibit 55, it says, "hauling truck driver." What does it say after that on that same line?
A. "Two men at eight hours each."
Q. Is that your handwriting?
A. Yes.
Q. When did you put that on the document?
A. When we received this back from the government saying make these adjustments. They added the backhoe, so you have to add for hauling.
Q. If we look at the first page of Exhibit 59, we had there the backhoe on as the first line item, is that correct?
A. Yes.



Q. What do you mean, they added the backhoe?
A. Well, if you're adding, as we did on Exhibit 55, if he told me to add eight hours for the backhoe, I would need to add eight hours for the truck driver.
Q. So that's the same work?
MR. PROSEN: Objection, misconstrues the testimony.
BY THE WITNESS:
A. It's not the same work.
BY MS. KIRCHNER:
Q. Explain to me how they're different.
A. A backhoe removes the material and he has to dump it in something. So if he's working for eight hours, you need a truck for eight hours. If the backhoe is working for 16 hours, you need a truck available for 16 hours.
Q. Okay.
A. So one would have related to the other.
Q. I'm following you.
Now, if we look at the last -- I want to continue looking at the last page of Exhibit 59 and the last page of Exhibit 55. Do you see that

original was sent in.
Q. No, I want you to -- I want to make this real clear, okay. Exhibit 55 with the extend column filled in, you filled in that extend column at the time of the claim in 1998, correct?
A. Yes.
MS. KIRCHNER: We need to see that document. That is his document that you have the original of. We need to see that.
THE WITNESS: Yeah, whatever you have --
MR. PROSEN: Let's go off the record for a second.
(WHEREUPON, a discussion was had off the record.)
MS. KIRCHNER: We've had a conversation between counsel and the witness, and I requested that the government see the original documents in the formal law firm's files. As I understand it, plaintiff's counsel is going to make arrangements to get those originals to Washington, D.C. so the government can see the original documents. And, of course, if there's privileged communications in the file, I'm not looking for the privileged communications. I'm just looking for the



non-privileged documents, the originals in the law firm's files. And we wish to see the originals. Let's go on.
BY MS. KIRCHNER:
Q. At the time the scopes of work were filled out during the site visits, when you were filling them out, what typically did you use? Did you use pen, pencil, how did you typically fill it out?
A. I don't remember.
Q. Directing your attention to the last page of Exhibit 55, is it possible, sir, that you filled in the "clause C-12 premium time, 25 percent" and the unit column, and then the $10,395.68, that you filled that information in in 1998 when you were working on the claim?
MR. PROSEN: Objection, asked and answered, misconstrues the testimony and compound.
BY THE WITNESS:
A. No.
BY MS. KIRCHNER:
Q. Okay. Now, as I understand the procedure for St. Anne, what you're telling us is you had the site visit, the scopes of work from the



site visit were taken by Sam Southern, you're telling us he sent them back to you with stickies or instructions or messages accompanying them, is that correct?
A. Yes.
Q. And then you then made changes in the scopes of work and sent them and did what with those?
MR. PROSEN: Asked and answered, objection.
BY THE WITNESS:
A. I sent everything back to the government, to the postal service.
BY MS. KIRCHNER:
Q. At the time, you understood that the government could make further changes in the scope of work for St. Anne and add line items or knock out line items and send it back to you?
A. Yes.
Q. Did you have any other conversations with Sam after the site visit where you say to him -- where you talk about the site visit after this has all gone on?
A. I think the record has shown that I have repeatedly sent letters and never got a response



from the government, the postal service, whether it be Sam or Mr. Rigsby, regarding the status of these work orders.
Q. So you sent letters.
Did you have any conversations with Sam regarding the site visit after the site visit itself?
A. It would be just a typical conversation that may have included St. Anne, but I don't think I ever specifically talked about St. Anne after I returned the originals, other than probably I asked him what's the status, and he said, you know, Mr. Rigsby -- because I basically started writing Mr. Rigsby giving updates, and I think that's what I've clearly demonstrated, that that's where the bottleneck came in.
Q. I understand you're telling me of what may have occurred. I'm asking you about your recollection.
As you sit here today, 2004, do you remember having conversations with Sam Southern after you sent back in the scopes of work with the changes made to them that we've gone over today? Do you remember a conversation with Sam after that?