Page 180

A. No.
Q. Let's go on. You told us that you went to the Momence Post Office and you had a site visit with Sam Southern, also.
A. Yes.
Q. Can you tell us about that particular site visit?
MR. PROSEN: Objection, vague.
BY MS. KIRCHNER:
Q. With Sam?
A. If I made a site visit with Mr. Southern, it would be --
Q. Okay. Let me just back up.
Remember you told us the same day that you went to St. Anne, you also went to Momence Post Office and you met there, again, with Sam Southern? Do you remember that?
A. Yes, I remember we went to Momence.
Q. And it was the same day?
A. Same day.
Q. Now, that particular site visit at Momence, tell me what happened during that site visit.
A. We would have typically measured

Page 181

everything to produce the scope of work, or the scope of work that's in question in my claim.
Q. Did you and Sam together produce the scope of work?
A. Yes.
Q. What was the work that was the subject of the scope of work?
A. Well, sitting here, off the top of my head, I don't recall. I'd be guessing.
MS. KIRCHNER: Would you mark this, please?
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 61 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. Please take a look at what we've marked as Exhibit 61 to your deposition, sir, and tell me whether you recognize Exhibit 61.
A. Yes.
Q. What's Exhibit 61?
A. A scope of work for the Momence Post Office.
Q. Is this all in your handwriting?
A. Yes.
Q. And does that include the sketch? Is

Page 182

that sketch on the last page your sketch?
A. Yes.
Q. Does that relate to the site visit with Sam Southern that you've been telling us about?
A. Yes.
Q. Does this refresh your recollection as to the nature of the work that was scoped out with Sam at this site visit?
A. Yes.
Q. Can you tell me, sir, what was the nature of the work?
A. This particular document shows a lock box lobby and lobby renovation.
Q. Now, what's shown in your sketch on the last page?
A. A line of counters.
Q. Did you make that at the time of the site visit?
A. Yes.
Q. Did you put all the entries in the quantity column of Exhibit 61? Did you make all those entries at the time of the site visit?
A. Yes.
Q. Did you go over those entries with

Page 183

Mr. Southern at the time of the site visit?
A. Yes.
Q. Did you go over all of the entries in the quantity column with Mr. Southern at the time of the site visit?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. Yes.
BY MS. KIRCHNER:
Q. I mean each and every one?
A. Yes.
Q. Now, at the time of the site visit to Momence with Sam Southern, did you and he also scope out a handicap ramp?
A. Yes.
Q. Is that reflected in Exhibit 61?
A. No.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 62 for identification, as of 6/11/04.)
BY MR. PROSEN:
Q. Please take a look at what we've marked as Exhibit 62 to your deposition, and please let me know when you're ready.

Page 184

A. Yeah, go ahead.
Q. Okay. This, again, is one of the documents that counsel, plaintiff's counsel, gave me before we started depositions this week.
Okay. Now, there appears to be two documents in Exhibit 62. Is that your understanding, sir?
A. Yes.
Q. And the first one is five pages and then the second document is three pages, is that correct?
A. Yes.
Q. Now, is all of Exhibit 62 in your handwriting?
A. Yes.
Q. Let's look first at the first five-page document in Exhibit 62. Can you tell me what that is?
A. The first five pages of Exhibit 62?
Q. Yes.
A. Is a work order, draft -- excuse me, it's a scope of work order for Momence.
Q. Is this for the same lock box lobby work that you were telling us about before when we were looking at Exhibit 61?

Page 185

A. It appears to be.
Q. And you see that the extend price column is filled in on the first five pages of Exhibit 62, is that correct?
A. Yes.
Q. When did you fill in that column?
A. Back in '98 when the time came to come up with the number for the claim.
Q. So this is the same as in the case of St. Anne?
A. Correct.
Q. If we could look at the first page of Exhibit 61 and the first page of Exhibit 62. Do you see there for the item "miscellaneous hourly labor carpenter," for that item, that that item is 24 hours on Exhibit 61 and then it's changed to 160 hours on Exhibit 62. Do you see that?
A. Yes.
Q. Did you make that change?
A. Yes.
Q. How did you make the change? Do you erase it and then put in the correct number? How did you make it?
A. I would have removed the original number

Page 186

and added this number at the request.
Q. By crossing it out, by erasing it? How did you make the change?
A. I don't recall how I did it on this one, but I made a change, yeah.
Q. Well, how generally did you make the changes? Did you cross them out? Did you erase? How generally would you make changes?
MR. PROSEN: Objection, vague.
BY MS. KIRCHNER:
Q. Let me restart again. When you changed the draft scopes of work that were the result of site visits with the postal service, when you made those changes, generally how did you make the changes?
A. I don't remember how I would have made those changes.
Q. Not even generally?
A. Could have, would have, should have. Generally, I don't know. I never kept the original document, so I don't know what the medium was when I originally sent them to them. These are all copies of copies of copies. The originals were sent to the government.

Page 187

Q. As I understand your testimony, with regard to Exhibit 62 that has on it the extend price column filled in, that document you filled in in 1998 and you retained that document?
MR. PROSEN: Objection, misconstrues the testimony.
BY THE WITNESS:
A. No, I did not.
BY MS. KIRCHNER:
Q. Didn't you just tell me that you filled in the extend price column in 1998 at the time of your claim?
A. The only reason I would have extended the price column was because I don't have the computer generation that the postal service does to generate this column. I don't need that column. I only did it for the sake of the claim.
If you could eliminate that extended column now, the quantities are all that's important here, not the extended price. So I only would have done it because -- at the advice to provide it for visual aid to get to the bottom number.
How it got there, I don't even remember if I used pen, pencil. I don't know, but it was

Page 188

extended sometime in early '98 because of the benefit of the claim.
Q. And that original document that has your marks on it in the extend price column, did you send that document, that original document to the postal service?
A. No. The postal service wouldn't have needed the extended. I sent -- I could have even faxed it to my attorney. And I probably -- if I didn't keep this document, which I don't think I did, I'd have to look, but I don't think I have it. Whatever I produced I produced, and if it's a copy, it was a copy. But back in '98, I could have thrown them away. I don't recall what I did with all these things. Again, it wasn't important to me. It's not important. What's important is the quantities and the item numbers. That's all.
Q. The extend price column was important for the claim, was it not?
A. No.
Q. Didn't you want to have an amount to put down in your claim?
A. But I don't need to extend it. I could just do it on a calculator or ribbon and write the

Page 189

final number in. That's all.
Q. As you sit here today, 2004, do you remember in the case of Momence why you changed the 24 hours for miscellaneous hourly labor carpenter to 160 for that same item?
A. At the request of the postal service.
Q. And you mean Sam Southern specifically?
A. In this project, Sam Southern.
Q. Let's look at the second page of Exhibit 61 and the second page of Exhibit 62.
A. Uh-huh.
Q. Do you see there that the last line item on those pages is "clause C-12 premium time"? Do you see that?
A. Yes.
Q. And do you see that at the time of the site visit with Mr. Southern, you had written zero for premium time, is that correct?
A. That's correct.
Q. And you then changed that, is that correct?
A. That's correct.
Q. And what did you change it to?
A. According to this, I changed it to the

Page 190

amount of items that were going to be covered under premium time.
Q. And what's that amount?
A. $9,356.16.
Q. Where did you get -- I'm not following you. What does that amount refer to?
A. It would reflect the specific items that Mr. Southern would have directed me to do or perform during the premium time or the premium hour time, as stated in my contract.
Q. Did he do that?
A. Yes.
MR. PROSEN: Objection, vague.
BY MS. KIRCHNER:
Q. Mr. Southern directed you to include specific items in the premium time line?
A. Yes.
Q. Which items did he tell you to include in that line?
A. Well, I wouldn't know because he would have put it on his sheet because it would relate to the work or the task that I was to perform at that particular time. So it could be a combination of all these items or some items. I wouldn't know.

Page 191

Q. What is premium time?
A. Premium time is anything over and above spelled out in the contract documents.
Q. Is it time and a half? Is that what premium time is?
A. Not for this contract.
Q. Does it relate to Sunday work, for example, as opposed to Monday through Friday?
MR. PROSEN: Objection, asked and answered. The contract speaks for itself.
BY THE WITNESS:
A. It's possible.
BY MS. KIRCHNER:
Q. You just don't recall?
A. I don't know his point of view at this time, what he was getting at, but those items that he asked me to perform on premium time would have been added into that quantity column.
Q. Which items did he ask you to perform on premium time?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. I don't have that sticky anymore, so I don't know.

BY MS. KIRCHNER:
Q. You're telling me he asked you to perform specific items on premium time. Did you then compute what that amounted to and arrive at the $9,356 for that figure?
A. Yes.
Q. How did you do that?
A. With a calculator.
Q. So -- well, referring to the document itself, Exhibit 62, how did you figure out that that was the amount?
A. Mr. --
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. Mr. Southern specifically asked me to perform overtime on certain projects or parts of the project that he put down on his piece of paper.
BY MS. KIRCHNER:
Q. In order to compute the $9,356, did you have to know the items and how much the amounts were for each of those items?
A. No.
Q. You didn't have to fill in the extend total column?



A. No.
Q. Can you explain to me why that is, sir?
A. All I would have needed is the item number. And then I would look at the work order and determine the existing quantity or whatever change he had made on a sticky, and that would then be -- become part of that particular item.
Q. Do you remember doing that in the case of Momence?
A. Sure. I mean -- not specifically, no, but, I mean, you're asking me kind of a vague question, so I'm answering it kind of like --
Q. We're sitting here, it's 2004.
A. Yeah.
Q. As you think back, do you remember for Momence making the computation and computing the 9,356 for premium time?
A. No.
Q. I take it you don't remember when you did that either?
MR. PROSEN: Objection, misconstrues the evidence -- or the testimony.
BY THE WITNESS:
A. Anytime I received one of my work orders



back from the postal service, I would immediately make the adjustments that they requested at the time and then return it to the postal service.
BY MS. KIRCHNER:
Q. Did you tell me yesterday that the postal service did not want you using premium time on these projects?
A. That was one of the arguments that I got as to why they didn't want to issue this.
Q. Now you're telling me that Mr. Southern specifically directed you to put certain items into the premium time line of Exhibit 61 --
MR. PROSEN: Objection, asked and answered.
BY MS. KIRCHNER:
Q. -- is that right?
A. Yes.
Q. So even though -- let's just go on.
Why did you put the check next to premium time on Exhibit 62, the second page?
MR. PROSEN: Objection, assumes facts not in evidence.
BY THE WITNESS:
A. I did not put that check there.
BY MS. KIRCHNER:



Q. Whose handwriting is that check?
A. Oh, I don't know.
Q. That mark, that check is not yours?
A. No.
Q. Do you see anything else on Exhibit 62 that is not your mark?
A. Just -- no, just that check and maybe some other checks or marks on the copy. I don't know. There's a lot of dots on this document, so...
Q. As you sit here, take whatever time you want, if there's anything else that you see in Exhibit 62 that's not your mark, would you let me know?
A. Yeah, there isn't any.
Q. Did you have any oral conversations with Sam Southern after you and he did the site visit at the Momence Post Office that we've been talking about?
MR. PROSEN: Objection, vague, ambiguous.
BY THE WITNESS:
A. Maybe. I don't recall.
BY MS. KIRCHNER:
Q. So as you sit here today, you don't remember specifically talking to Sam after the site

Page 196

visit and the scope of work has been completed, you don't remember checking up with him orally?

MR. PROSEN: Objection, asked and answered.

BY THE WITNESS:

A. I would talk to Sam, but to recollect specifically if I asked him about Momence, I can't answer that I did have that conversation. But as a rule of work, I talked to Sam regularly.

BY MS. KIRCHNER:

Q. Now, as we look at Exhibit 62, are there items in here that relate to a handicap ramp?

A. Yes.

Q. Could you tell me what portion of the Exhibit refers to a handicap ramp?

A. The last three pages.

Q. So is that a scope of work for a handicap ramp that you prepared?

A. Yes.

Q. As I understand your testimony, you filled in the extend price column at the time of the claim in 1998, is that correct?

A. This one may be sooner. I didn't always fill it out just for the claim. I mean, it's possible I did not fill it out as a rule of thumb

Page 197

just for the claim. It's possible in my life of doing hundreds of these that I filled out the extended price. To say did I specifically remember that I did this document for the claim, I can answer no.

Q. You filled in the extend price column, correct?

A. That is my writing.

Q. Okay. And after you filled in the extend price column, did you send a copy of the scope of work with the extend price column filled in to the postal service?

A. I don't remember on this one if I did or not.

Q. Is there anything that you know of that would help refresh your recollection on that point, sir?

A. Not really.

MR. PROSEN: Objection, vague.

Give me an opportunity.

THE WITNESS: All right.

BY MS. KIRCHNER:

Q. After the site visit that you and Sam Southern made at Momence, have you been back to the

Page 198

Momence Post Office?

A. No.

MS. KIRCHNER: You need to mark that.

(WHEREUPON, a certain document was marked Battaglin Exhibit No. 63 for identification, as of 6/11/04.)

BY MS. KIRCHNER:

Q. Would you please take a look at what we've marked as Exhibit 63 to your deposition? This, again, is one of the documents provided by counsel shortly before beginning these depositions.

Could you tell us, do you recognize Exhibit 63?

A. Yes.

Q. Is this all in your handwriting, sir?

A. Yes.

Q. What is Exhibit 63?

A. Scope of work for Union Hill.

Q. Did you make a site visit to Union Hill?

A. Yes.

Q. When did you do that?

A. I'd be guessing. I don't really recall.

Q. Who did you make the site visit with?

A. I think it was with Catherine Marks and

Page 199

Paul Steiner, off the top of my head.

Q. Do you remember the site visit to Union Hill?

A. No.

Q. Let me ask you a few more questions. Do you remember why you went there, to the Union Hill Post Office?

A. To complete the 609 zip code, the work that was to be performed in 609.

Q. Can you tell me what it means when you say "to complete the 609 zip code"? What does that mean?

A. Mr. Rigsby tasked us to do concrete work and lock box/lobby work at those facilities that he directed me to. This was one of them.

Q. Are you saying that Mr. Rigsby directed you to perform concrete work at Union Hill?

A. No. I don't have a work order, so he couldn't direct me to do any work.

MS. KIRCHNER: This is Exhibit 63, right?

MS. COURT REPORTER: Yes.

BY MS. KIRCHNER:

Q. When you look at Exhibit 63, does that refresh your recollection of the site visit -- of a

Page 200

site visit to Union Hill?
A. Not really. I know I was there. I remember the town, but I don't remember this visit specifically.
Q. Is the reason you know that you were there because you have Exhibit 63?
A. No. I remember going there with them. I just don't recall the visit per se.
Q. Do you remember scoping out work at Union Hill?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. I know we were there. I know typically what we would have done when we visited. But to specifically remember, no.
BY MS. KIRCHNER:
Q. So not looking at the document, not looking at Exhibit 63, are you able to tell me whether or not you scoped out work at Union Hill?
A. Yes, I know we went to Union Hill.
Q. And you scoped out work there?
A. Yes.
Q. Do you remember what work you scoped out?

Page 201

A. Without looking at the document, it would have been lock box remodeling or lobby renovation and concrete work.
Q. If we look at the document, can you tell me, looking at the document, what sort of work is being scoped out in this document?
A. Some lobby work and concrete work.
Q. Do you see any work in the document that refers to installation of a handicap ramp?
A. Yes.
Q. Can you point that out to me, sir?
A. The lower two items on Page 1.
Q. That's "slab on ramp" and "continuous footings." Is that what you're referring to?
A. Yes.
Q. Are there any other items that refer to installation of a handicap ramp?
A. Most of these items would refer to it, but the specific two would be those two, but all of these items refer to it.
Q. Okay. Now, Exhibit 63 has the extend price column filled in, correct?
A. Yes.
Q. When did you fill in that column?

Page 202

A. I don't recall.
Q. How did you go about filling in the extend price column?
A. The quantity times the unit.
Q. After you filled in the extend price column, did you come up with the grand total that's on the last page of $36,110?
A. Yes.
Q. Did you ever send a copy of Exhibit 63 with the extend price column filled in to the postal service?
A. I don't recall this document.
Q. Just to clarify, do you remember the document itself, Exhibit 63?
A. Yes, I remember doing -- or doing a scope of work for Union Hill. And typically I would have put the quantity in only and sent it back.
Did I specifically extend it on this particular one for this particular time? I don't recall. But typically the postal service would go back with their unit item number, their unit price and the quantity we arrived at to produce a work order. That's all. That's all I recall.
Q. Referring to the Union Hill Post Office,

Page 203

have you been back to the Union Hill Post Office after the time you made the site visit there?
A. No.
Q. After you made the site visit at Union Hill, did you have any oral conversations with postal service employees that related specifically to the work scoped at Union Hill?
A. Not that I recall.
Q. Let's go on.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 64 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. Please take a look at what we've marked as Exhibit 64 to your deposition. Tell me if you recognize Exhibit 64.
A. I only recognize it as a document regarding Beaverville.
Q. It's not in your handwriting, sir?
A. No.
Q. It's not your document?
A. No.
Q. Let's go on.
(WHEREUPON, a certain document was

document.
Q. And you don't remember right now?
A. I remember I had a construction contract for the '94 time, but specifically -- this thing says L.P. Consulting proposal of January of '94. So I would assume, and I'm only assuming, that that's when they received my proposal. I don't know. I'd be guessing.
Q. I don't want you to guess, sir. I'm just trying to understand the document.
A. I do know those were jobs I did perform.
Q. When you say "those are jobs I did perform," can you tell me specifically what you're referring to?
A. I did -- I was tasked with completing work in the 609 zip code by Mr. Rigsby. And all these facilities that are listed, we were to provide him a scope of work so he would produce a work order so that I would do the work. That was the task.
Q. What sort of scope of work were you tasked to draw up by Mr. Rigsby that you're referring to?
A. What we've been going over, the three, so far Union Hill, Exhibit 63; Exhibit 62, Momence;



61, Momence; St. Anne, which is Exhibit 60. Those are typical of every 609 project that I visited.
Q. Are all those, Union Hill, Momence, St. Anne, are all those 609 projects?
A. Yes.
Q. Tell me what you're claiming with regard to the Beaverville, Illinois Post Office.
A. Can you be more specific?
MR. PROSEN: Objection, vague.
BY MS. KIRCHNER:
Q. Sure. You filed a lawsuit against the government, against the postal service, correct?
A. Yes.
Q. What are you claiming in this lawsuit with regard to the Beaverville, Illinois postal service facility?
A. That I was tasked to visit the job and produce a work order, scope of work, which would lead to a work order or a draft work order and for me to accomplish my contract, which is do the work that they want me to work on.
Q. Did you conduct a site visit at the Beaverville, Illinois Post Office?
A. Yes.



Q. When did you do that?
A. I don't recall.
Q. Did any postal service employee meet you at the post office, the Beaverville Post Office at the time of the site visit?
A. Oh, yes.
Q. Who did?
A. I don't recall right now.
Q. What did you do at the time of the site visit at the Beaverville Post Office?
A. We would have measured the exterior/interior to produce a handicap ramp/accessible entryway and interior remodeling.
Q. Did you do both?
A. I don't recall.
Q. Do you remember anything more about the site visit at Beaverville?
A. It was cold, I remember that. We were freezing outside.
Q. Do you remember how long it took?
A. No. Long enough to get cold. That's all I remember.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 66 for



identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. Can you please take a look of what we've marked as 66 to your deposition. This is one of the documents that was provided shortly before the depositions.
Tell me if you recognize Exhibit 66.
A. Yes.
Q. Whose handwriting is on Exhibit 66?
A. That's mine.
Q. Is all of it your handwriting?
A. Yes.
Q. Do you see anything that's not your handwriting?
A. No.
Q. What is Exhibit 66?
A. It is a scope of work I produced to the postal service.
Q. I want to go through the columns here. You see there's an item number column and then the description column.
At what point in time did you fill in the item number column and the description column, referring only to that portion?

Page 212

A. Say that one more time.
Q. Okay. On the form, which is Exhibit 66, do you see that the item number column is filled in, the description is filled in, unit measure is filled in and the unit price is filled in? At what point in time did you fill in all that information?
A. Before the visit.
Q. At what point in time did you fill in the quantity column on Exhibit 66?
A. During the visit.
Q. At what point in time did you fill in the extend price column of Exhibit 66?
A. That could have been later or at the visit.
Q. You don't recall?
A. No. The extended price isn't the issue when you make these visits. The issue is the quantity and the line item.
Q. I see a number of items have zeros. There's some zeros in the quantity column.
A. Uh-huh.
Q. Do you see that?
A. Yes.
Q. Is it the case that you would take a

Page 213

scope of work form to the site visit with the item number and the description and the column and the unit measurement and unit price column, all those columns are filled in, and then you go out to the post office and you see, "Well, which items do we actually need"?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. Yes.
BY MS. KIRCHNER:
Q. So you could do the site visit and conclude you needed zero for a particular item and then you could fill that in?
A. Only if we visited the site.
Q. Yes. I'm understanding you. Okay.
Now, do you remember filling in the scope of work at Beaver Hill at the time of the site visit?
A. Yes, at Beaverville --
Q. Beaverville, excuse me.
A. -- yeah, we would have performed that task.
Q. What did you do with the scope of work that you filled in at the time of the site visit for

Page 214

Beaverville?
A. All the originals went back with the postal service to be produced so they could produce the work order so I could do this work.
Q. After the postal service took the scope of work from Beaverville, did you receive a copy in the mail of that scope of work back from the postal service?
A. I don't recall this specific one coming back and if there were adjustments made. I don't recall.
Q. Do you remember you indicated that sometimes there was Xerox capacity at the post office itself, so at the end of the site visit, you would have a copy of the scope of work and so would the post office? Do you remember that?
A. Yes.
Q. Do you remember what happened in the case of Beaverville?
A. Beaverville, I know, was a small office, so I doubt they had that capability. It's a very small town.
Q. Do you see on the top of Exhibit 66 there's some handwriting? Do you see that?

Page 215

A. Yes.
Q. Could you read that to me?
A. It says "Original."
Q. Is that your handwriting?
A. Yes.
Q. After the site visit at Beaverville where work was scoped out, did you ever go back to that post office?
A. No.
Q. The work that was scoped out at the Beaverville Post Office, did that include a handicap ramp?
A. No, it doesn't appear to.
Q. You're referring to Exhibit 66?
A. Yes.
MS. KIRCHNER: Let's take a break.
(WHEREUPON, a recess was had.)
BY MR. PROSEN:
Q. I'm going to ask you a couple of more questions about Beaverville.
You have in front of you Southern Exhibit 10. Looking at that document, does that refresh your recollection about the site visit that you made to Beaverville?

Page 216

A. Yes.
Q. If we put aside Exhibit 10, okay, if you could just turn over the document.
A. Uh-huh.
Q. Now, how is your memory refreshed? What do you remember about the visit to Beaverville?
A. I remember, like I've said, it was a cold day for that time we were there, and we measured as per usual. It was very uneventful, as I recall. That's all I really remember. I don't remember much.
Q. Do you remember who you were there with?
A. Well, now that I've looked at the document, it was with Paul Steiner.
Q. I mean, according to Exhibit 10, it was with Paul Steiner, is that correct?
A. Yeah.
Q. But as you sit here today, do you remember being at Beaverville with Paul Steiner?
A. Now that I recall, now I know who the gentleman was.
Q. So you do remember him being there?
A. Oh, yeah.
Q. After the site visit with Paul Steiner,

Page 217

did you have any follow-up conversations with him about the work scoped out at Beaverville?
A. Not specifically, because we talked about all the jobs we looked at, so I don't recall specifically a conversation about Beaverville.
Q. Without looking at Exhibit 10, do you remember when the site visit was approximately? I understand it was cold, but do you remember when it was?
A. Well, it was sometime in September, but I don't recall the date.
Q. Do you remember whether at the time of the site visit at Beaverville, whether you and Paul Steiner also scoped out work at other post offices that same day?
A. Probably.
Q. Do you remember whether you did or not?
A. I'm sure we did. We don't go all the way out to nowhere just for one site, so we probably did.
Q. Where else did you go at the time of the site visit at Beaverville?
A. That I don't remember specifically which facility.

Page 218

MS. KIRCHNER: Could you just mark this.
(WHEREUPON, certain documents were marked Battaglin Exhibits Nos. 67 through 70 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. Please take a look at what we've marked as Exhibit 67 to your deposition. Let me know when you're ready.
A. I'm ready.
Q. Do you recognize any of the handwriting in Exhibit 67?
A. No.
Q. So none of this is your handwriting?
A. No.
Q. How about if we could look at the fourth and the fifth pages, do they appear to be sketches?
A. They're somebody's sketches, yes.
Q. Are they your sketches?
A. No.
Q. Did you ever obtain a copy of this document from the postal service?
A. I don't recall.
Q. Did you make a site visit to Aroma Park?

Page 219

A. Yes.
Q. When was that?
A. I don't recall the date.
Q. What did you do at the time of the site visit?
A. We came up with a sketch for the interior portion and the exterior portion and worked on a scope of work.
Q. Did you meet any postal service employees at Aroma Park at the time of this site visit?
A. Yes, the postmaster and the project manager.
Q. Who was the project manager you're referring to?
A. I'd be guessing.
Q. Is Aroma Park in the 609 zip code?
A. Yes.
Q. Where is it in relations to the Beaverville Post Office?
A. Well, it's in Illinois, but...
Q. Is it close by to Beaverville?
A. It's in the geographic area, yes. But close by, I don't really know the mileage or

anything.
Q. Okay. All right. Let's go on.
Now, do you have any copies of -- did you, yourself, make sketches at Aroma Park?
A. I think on this one, and I'm guessing because I'm trying to recall, but I think on this one they made the sketch. There was something about this project that someone else did the sketch on the outside. I think I did the inside, for whatever reason. That's something that shoots in my mind, but I don't really remember.
Q. I'm not asking you to guess. I just need to know, do you remember making the sketch of the inside?
A. I'd have to say no then.
Q. Do you remember scoping out work at Aroma Park?
A. Yes.
Q. Do you remember whether or not the work scoped out included a handicap ramp?
A. There was concrete work. I'm not sure if it was a ramp. I know we measured for concrete.
Q. Do you have in front of you Southern Exhibit 10?



MR. PROSEN: That's the letter you had a minute ago.
BY MS. KIRCHNER:
Q. If you could just look at that. Are there any references here to Aroma Park?
A. Yes.
Q. You took a look at Exhibit 10. Can you turn over the document?
A. Uh-huh.
Q. Did that refresh your recollection about the site visit to Aroma Park?
A. Now I recall that it was Paul Steiner and Catherine Marks, yes.
Q. Catherine who, please?
A. Catherine Marks, M-A-R-K-S.
Q. Who was Catherine Marks?
A. Someone the postal service sent out with Paul Steiner.
Q. Was Paul Steiner the project manager you had referred to?
A. Yes.
Q. Approximately when was this site visit at Aroma Park?
A. It was in September of '95.



Q. Was it the same day as your site visit at Beaverville, do you remember?
A. No.
Q. Showing you what we have marked as Exhibit 68 to your deposition. Please take your time to review it and let me know when you're ready.
A. Okay.
Q. Do you recognize Exhibit 68?
A. Uh-huh.
Q. What is Exhibit 68?
A. It's a scope of work for the Aroma Park office.
Q. Who prepared Exhibit 68?
A. I did.
Q. Did you prepare all portions of the document?
A. Yes.
Q. In the case of Aroma Park, did you arrive at the site visit with a scope of work form with the item number filled in, the description filled in, the unit measure filled in and the unit price filled in?
A. Yes.
Q. Did you then, during the course of the



site visit, fill in the quantity column?
A. Yes.
Q. When did you fill in the extend price column for Aroma Park?
A. That I don't recall.
Q. Did you fill in the extend price column at the time of the site visit?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. I don't recall.
BY MS. KIRCHNER:
Q. Okay.
A. I really don't.
Q. When did it become important to you to know how much the work scoped out at Aroma Park amounted to?
MR. PROSEN: Objection, vague.
BY THE WITNESS:
A. Only when I received the work order from the government, once the post office gave me the draft work order for review.
BY MS. KIRCHNER:
Q. Do you see here on Exhibit 68 you filled in the extend price column?

Page 224

A. Uh-huh.
Q. And you filled in this $62,000, is that correct?
A. Uh-huh.
Q. Is that a yes, sir?
A. Yes, it is.
Q. I want to remind you, for the record, if it's a yes, we need a yes.
A. I appreciate it.
Q. In the case of the Aroma Park site visit, did you go over the quantity for each of the items in the scope of work with Paul Steiner?
A. Yes.
Q. What was Miss Marks' role at the site visit?
A. I really don't know. She came with Paul Steiner. I remember she's short. And I don't know what --
Q. Was she a trainee?
A. Could be. Could be.
Q. But you don't know?
A. I don't know.
Q. Did she make measurements at the time of the site visit?

Page 225

A. I don't think she did. But -- no, I don't even want to say that. She was there, and I don't know what capacity she was in, really.
Q. Now, at the end of the site visit, what happened to the scope of work that you had prepared for Aroma Park?
A. It went with Mr. Steiner or Miss Marks. The postal service took it back to, once again, review it, add or subtract what they wanted and direct me to make changes if they so desired or typically they'd send me the work order.
Q. Do you remember making any changes in the scope of work for Aroma Park?
A. I don't recall.
Q. After the site visit at Aroma Park, did you go back to the post office?
A. No.
Q. After the site visit at Aroma Park, did you have conversations with Paul Steiner where you checked up on what had happened to the scope of work that you had prepared for Aroma Park?
MR. PROSEN: Objection, vague, ambiguous.
BY THE WITNESS:
A. Probably.

Page 226

BY MS. KIRCHNER:
Q. Do you remember, as you sit here today, any such conversation?
A. Not specific conversation. I would have said, "What's the status of these," and that would have been it, and we would have talked about other things we were working on.
Q. But, I take it, you don't remember any specific conversations?
A. Not a specific conversation, no.
Q. Do you remember generally talking about Paul Steiner after the site visit to Aroma Park and asking him about the scope of work?
A. Not really.
Q. When did --
A. Other than when will it be coming. I'm sure we talked about that.
Q. Do you remember anything he said to you?
A. Not really.
Q. When did Paul Steiner leave the postal service?
MR. PROSEN: Objection, assumes facts not in evidence and lack of foundation.
BY THE WITNESS:

Page 227

A. I don't know.
BY MS. KIRCHNER:
Q. You were dealing with Paul Steiner when he was a project manager, correct?
A. Yes.
Q. In what time frame were you dealing with him when he was a project manager?
A. Only the jobs that he was specifically tasked to do with me.
Q. Did you ever do actual physical work at a post office where Paul Steiner was the program manager at that post office for your project?
A. Yes.
Q. Which post office?
A. Some of the 609. I don't recall specifically. I'd be guessing to say that one or this one.
Q. You worked on Paxton, right?
A. Yes.
Q. Is that in 609?
A. Yes.
Q. Was Paul Steiner the program manager for Paxton?
A. No.

Page 228

Q. Who was?
A. It wasn't Paul.
Q. What other post offices, other than Paxton, did you work on in the 609 zip code?
A. Ashkum, Bonfield, Buckingham, Buckley, Cabery, Campus, Chatsworth, Chebanse, Cissna Park, Clifton, Crescent City, Cullom, Danforth, Donovan, Elliott, Emington, Essex, Gilman, Herscher, Grant Park, Kempton, Ludlow, Loda, Martinton, Melvin, Manteno, Milford, Onarga, Rankin, Reddick, Paxton, Piper City, Roberts, Rossville, Sheldon, Thawville, Wellington and Woodland.
Q. During what time frame, what years are you talking that you did all this work, sir?
A. The same years in my claim, from somewhere in the calendar '95-ish to '97-ish.
Q. Was some of this work in 1994?
A. I don't recall. I'd have to check my records. Sitting here, I don't recall.
Q. How about Downers Grove? Is that in the 609 zip code?
A. 605.
Q. 605. I see.
Did Aroma Park at the time of the site

Page 229

visit have Xerox capacity, a Xerox machine?
A. No. It's a very rural town. It's on the corner, as I recall.
Q. After the site visit at Aroma Park with Paul Steiner and the work is scoped out, what did you expect was going to happen for that post office?
MR. PROSEN: Objection, vague.
BY THE WITNESS:
A. My role in it, is that what you're asking?
BY MS. KIRCHNER:
Q. Let me rephrase the question.
A. Yeah.
Q. You conducted a site visit at Aroma Park with Paul Steiner and work was scoped out, is that correct?
A. Correct.
Q. Are there particular items that reflect handicap ramps in Exhibit 68?
A. No.
Q. So you were not scoping out a handicap ramp?
A. Yes. That doesn't mean that they wanted me to do the concrete work. I scoped it and gave

Page 230

them the work order, but it's their discretion to keep it or deny it. I've only got the inside.
Q. I want to look at Exhibit 68. Are there particular line items in Exhibit 68 that relate to the handicap ramp?
MR. PROSEN: Asked and answered, objection.
BY THE WITNESS:
A. There are no ramp issues in this one.
BY MS. KIRCHNER:
Q. Okay. So you're not making any claims about Aroma Park with regard to a handicap ramp?
A. No.
Q. Was there already a handicap ramp at Aroma Park at the time of the site visit?
A. I can't explain why or why not we didn't do anything about it. I just know that it was...
Q. After the site visit at Aroma Park and the scope of work, you drew that up and Paul Steiner takes it back with him, what did you expect was going to happen next with regard to you're doing any work at Aroma Park?
MR. PROSEN: Objection, vague, ambiguous, asked and answered.
BY THE WITNESS:

Page 231

A. I expect a returned draft work order from the post office with full extended prices and a time to start, estimated completion dates for my review and acceptance. And if I accepted it, I would sign it and return it for the contracting office's signature and a notice to proceed.
BY MS. KIRCHNER:
Q. So the document you expected to receive back from the post office, it would have extended prices on it?
A. Oh, it always would.
Q. I take it that didn't happen, is that correct?
A. Not on the ones I'm claiming, no.
Q. And not for Aroma Park?
A. Not for Aroma Park.
Q. Those extended prices that you expected, were those the prices that were part of your Indefinite Quantity Contracts that you had at that time?
A. Yes.
Q. Let's go on.
Did you make a site visit to Papineau?
A. Yes.

Page 236

exhibit --
MR. PROSEN: Can you be more precise, please?
MS. KIRCHNER: All right.
MR. PROSEN: Which sketch?
MS. KIRCHNER: All right.
BY MS. KIRCHNER:
Q. Looking at the two sketches that are Pages 3 and 4 of Exhibit 69, were either of those sketches made at the time of your site visit at Papineau?
A. I don't recall.
Q. But, I take it, neither is your handwriting?
A. No, this is not my handwriting.
Q. Let's go on.
MS. KIRCHNER: Can you mark that?
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 71 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. Please take a look at what we've marked as Exhibit 71 to your deposition. Can you tell me whether you recognize this?
A. Yes. It's my document of Papineau,

Page 237

scope of work.
Q. Does this relate to the site visit that you made to that post office?
A. Yes.
Q. Can you tell me what work is reflected in Exhibit 71?
A. Some interior work and a concrete ramp.
Q. Is that a handicap ramp?
A. Yes.
Q. Is there any other work on the exterior of the post office other than the handicap ramp?
A. It doesn't look like it.
Q. Is all the handwriting on Exhibit 71 your handwriting?
A. Yes.
Q. Who is the postal service employee that you were with at Papineau?
A. I visited it with Paul Steiner.
Q. Why did you put Sam Southern's name on Exhibit 71?
A. They may have directed me to send it to Sam for review. He reviewed all of these, whether he was the project manager or not. So this may have been one that they wanted me to send in for review.

Page 238

I can't say specifically in Papineau's case, but that did happen on the other forty-some we did.
Q. You don't know why you put Sam's name on it?
A. No, not really, no.
Q. Do you remember at what point in time you put Sam's name on the document?
A. No.
Q. Now, when you arrived at Papineau for the site visit, did you have the item number column filled out and the description, the unit measurement and the unit price columns all filled out for the scope of work document?
A. Yes.
Q. How did you go about filling in the quantity column?
A. We would measure together or discuss together every item that we believed was required to make the job successful at the time.
Q. Did you do that at Papineau with Paul Steiner?
A. Yes.
Q. I direct your attention to the very last line where it says "clause C-12 premium time." Do

Page 239

you see that?
A. Yes.
Q. What are you indicating on that line?
A. I'm indicating that some of these work -- these work tasks, if you will, they wanted me to perform, if I were to get the work order, would have been done on premium time.
Q. Which tasks were to be done on premium time?
A. Whichever task they would have told me to do. This is probably why it went to Sam, because there was going to be some issues he would send back to me and tell me these are the items that are going to have to be done on premium time.
Q. Well, do you remember whether or not the postal service told you that there were specific items that had to be done on premium time?
A. Yes, they would have done it. I wouldn't have done it myself.
Q. And how did you go about computing the figure $8,762.48?
A. The line items that are to be covered under premium time become that quantity, and you add those together and put them in that category.

Page 244

A. I don't recall.
Q. The site visit to Bradley, did you make that site visit on the same day that you made a site visit to another postal service facility?
A. I don't recall, but probably.
Q. Is it in the 609 zip code?
A. Yes.
Q. Was work scoped out at Bradley?
A. Yes.
Q. What sort of work was scoped out?
A. I don't recall right now.
Q. Do you remember whether the work scoped out included a handicap ramp?
A. Yeah, that's what we did. We did a ramp.
Q. Do you remember whether you scoped out work on the interior?
A. Without seeing my work, I think we did, yes.
Q. Did you make any sketches at Bradley at the time of the site visit?
A. No, I didn't.
Q. Did anybody else make any sketches at Bradley at the time of the site visit?

Page 245

A. I don't recall.
Q. Why did you go to Bradley to perform a site visit?
MR. PROSEN: Objection, calls for speculation.
BY MS. KIRCHNER:
Q. Okay. Let me -- just give me a minute.
You performed a site visit at the Bradley Post Office, correct?
A. Yes.
Q. How did it come about that you were there and performed a site visit?
A. I would receive a phone call to complete the task assigned, which was let's visit Bradley in the 609 zip code and to perform whatever work we were going to scope at the time.
Q. Do you remember that actually occurring, that you actually received a phone call?
A. Oh, yeah.
Q. And who called you?
A. I think this phone call was from Paul Steiner.
Q. Did you fill out a scope of work document at Bradley?
A. Oh, sure.

Page 246

Q. What did you do with it?
A. Gave it to Mr. Steiner.
Q. What happened after that?
A. He would typically take it back to the office. And if there were any adjustments they made, they would send it back to me for adjustments, and then I'd resubmit it to him and then I would wait for my work order.
Q. What do you remember in the case of Bradley, what do you remember specifically happening with the work order that was scoped out?
A. I remember scoping, filling it out, and I remember sending it to him.
Q. What do you mean, "sending it to him"?
A. Mailing it to him with the others that I would have visited. I don't specifically remember every detail of that particular transaction, but I do know we measured it, we went to the site, met with the postmaster. I remember that. He's a tall gentleman.
Q. And then you mailed the scope of work to Paul?
A. If he sent it back to me for corrections, I would have returned it by mail. But

Page 247

I don't think I got that on this one. I don't recall getting one on this one, but I'm not really sure. I know he left with the original.
MS. KIRCHNER: Could you just mark that.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 72 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. I'm handing you what we have marked as Exhibit 72 to your deposition. Please take a look at that and let me know when you're ready.
A. Yes.
Q. Does Exhibit 72 include two documents, one that's eight pages, followed then by a two-page document?
A. Yes.
Q. Let's focus first on the first document, the eight-page document.
Is this all in your handwriting?
A. Yes.
Q. What is the first document in Exhibit 72?
A. It looks like an interior -- interior work.

Q. And the second document, that's the two-page document, is that all in your handwriting?
A. Yes.
Q. What does that relate to?
A. A concrete ramp.
Q. Is that the handicap ramp?
A. Yes.
Q. Do these two documents relate to the site visit to Bradley that you've been telling us about?
A. Yes.
Q. Did you arrive for that site visit with the scope of work form being filled in where it says item number and the description and the unit measure and then the unit price column?
A. Yes.
Q. Did you then fill in the quantity column during the site visit?
A. Yes.
Q. Did you discuss each of these items in the quantity column of Exhibit 72 with Paul Steiner?
A. Yes.
Q. When did you fill in the extend price column?



A. That I don't recall.
Q. Did you fill in the extend price column at the time in 1998 when you were preparing your claim?
A. I don't recall.
Q. At the time of your claim, at the time of submitting your claim, did you ascertain whether or not your scopes of work and the amounts set forth in the scopes of work, whether they matched the amount that you included in your claim?
A. I don't recall if I did the extension, what time I did. All I know is that it was done and that was my number.
The extended price is irrelevant to me when I make my scope of work because my contract is not for that. It's for the quantity and for time and everything else is negotiated after that.
Q. And the --
A. So I don't...
Q. At the time you submitted your claim to the postal service, did you make sure that your $187,352 for Bradley that's set forth in Exhibit 72, that that matched up with your claim numbers?
A. Yes.



Q. And you did that in 1998?
A. That I don't recall.
MR. PROSEN: Objection.
BY MS. KIRCHNER:
Q. You submitted your claim in 1998, correct?
A. Yes.
Q. So when you were submitting your claim, did you make sure your numbers matched up?
A. Are you saying did I add -- I don't know what you're saying.
Q. Let me clarify.
I'm directing your attention to Exhibit 52 and Exhibit 72 to your deposition. Do you have those both in front of you, sir?
A. Yes, I do.
Q. Do you see that Exhibit 52 is your April 13, 1998 claim? Do you see that?
A. Yes.
Q. Do you see that that includes the Bradley concrete ramp?
A. Yes.
Q. More specifically, it includes the Bradley concrete ramp, lobbies and building



renovation, is that correct?
A. Correct.
Q. At the time you submitted your claim in 1998, did you make sure that the work order amount you had for Beaverville was correct?
A. Absolutely. Not Beaverville. You mean Bradley?
Q. Excuse me, Bradley, yes.
How did you do that, sir?
A. I don't recall if I extended the prices then or if they were already extended.
Q. But you made sure that the -- your computations and your price for the scope of work at Bradley matched the numbers in the claim, correct?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. Well, yeah, I verified that $187,352, but I don't know when I did it, if I did it at the site, if I did it later at this request or that request. I know that it was calculated. I don't recall when.
BY MS. KIRCHNER:
Q. You don't recall filling in the extend price column at the time of the site visit to

site visit?
A. Yes.
Q. What, if any, measurements did you need to make?
A. Laying out the proper location for, say, the driveways and the orientation they would want the foundation to be installed with regard to the property lines, because I think the government had a plat of survey from the county or whoever.
Q. How long did the site visit at Berwick take?
A. I don't recall.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 73 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. Please take a look at what we marked as Exhibit 73 to your deposition and let me know when you're ready.
A. Yes.
Q. I want to direct your attention first to the last page of Exhibit 73. Do you recognize that?
A. Yes.
Q. What is the last page?



A. That's a sketch of -- excuse me.
That's a sketch of the Berwick Post Office layout.
Q. And did you make that sketch?
A. Yes, this is my writing.
Q. Did you make the sketch at the time of the site visit?
A. Yes.
Q. The remainder of Exhibit 73, is all the handwriting on there your handwriting?
A. Yes.
Q. Did you arrive at the site visit at Berwick with the item number, the description, the unit measure and the unit price column all filled out on the scope of work form, Exhibit 73?
A. Some of it I recall. It was my typical standard form that I created.
Q. Which portions?
A. I would say this, it looks like the first page, maybe a little bit into the second page, and then the rest was filled in the field.
Q. So referring to the third page, did you fill in all of the item numbers, descriptions, unit measures and unit prices for that third page in the



field?
A. Yes.
Q. How did you do that?
A. I carried my unit price -- what is this called again? Exhibit 50, not this particular one, but one that matched my contract. And I would carry this with me.
Q. You also had that in the truck or vehicle with you?
A. Always.
Q. Was there anything else that you always had in the field when you went on site visits?
A. Tape measure, my lunch.
Q. Any other contract documents that you would carry?
A. This unit price schedule.
Q. That's the unit price schedule for your Indefinite Quantity Contract?
A. Yes.
Q. Now, when did you fill in the extend price column for Exhibit 73?
A. I wouldn't know.
Q. You don't recall?
A. No.



Q. Is it your handwriting on Exhibit 73 where you have the contract number and the date?
A. Yes, this is all my handwriting.
Q. When did you fill in the date?
A. I would assume on this date. I filled it in the day we did this work.
Q. The date of the site visit?
A. Yes.
Q. On that same day, did you fill in during the site visit the -- let me start again.
When did you put the contract number entry in the form?
A. I don't recall. That could have been the day I did it or not. I don't recall.
Q. It could have been on the form already when you went out to the site visit?
A. That's possible.
Q. When did you typically -- this portion right here, is that a stamp? I'm referring to "L.P. Consulting Group."
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. Yes.
BY MS. KIRCHNER:

Page 260

Q. Did you typically keep copies of this scope of work form that were blank except for having your stamp, L.P. Consulting Group, on it?
A. I'm sorry, ask it again.
MR. PROSEN: Objection, the question is vague, ambiguous.
BY MS. KIRCHNER:
Q. I think you explained earlier that there was a scope of work form which would be like Exhibit 73 without anything filled in on it, is that correct?
A. Correct.
Q. Was it your practice to put your stamp, L.P. Consulting Group, Incorporated, on such forms?
A. Yes.
Q. Did you typically have that all filled out before you went out in the field?
A. Usually, the only thing would come out with me would be -- I would stamp that because I didn't bring the stamp with me. And then depending on the project and depending on the conversation I had with the project manager, I would have a pre-designed line item so we can move quicker.
Q. What I'm trying to understand, sir, is

Page 261

whether you typically went out for the site visit, the form gets filled in and then you put the stamp on it or when you go out, the stamp is already on the form?
A. The stamp is already on the form.
MS. KIRCHNER: Let's go off the record.
(WHEREUPON, a discussion was had off the record.)
BY MS. KIRCHNER:
Q. We've been talking about your site visit to the Berwick Post Office. That's the scope of work for the modular, correct?
A. Correct.
Q. Did you ever submit a bid to perform the modular post office work in Berwick?
A. No.
Q. Let me make sure. So you never put in a bid as to what your price would be to build the modular post office at Berwick?
MR. PROSEN: Objection, misconstrues the testimony and the evidence.
BY THE WITNESS:
A. I never responded to a solicitation request for an offer on this project.

Page 262

BY MS. KIRCHNER:
Q. Did you ever tell the postal service what your price would be to build the modular post office at Berwick?
A. Yes.
Q. And when did you do that?
A. When Mr. Rothermal took my original document scope of work back to the post office.
Q. Right after the site visit?
A. Right after the site visit.
Q. What price did you tell him right after the site visit?
A. I didn't tell him the price. He had the price based on the quantities.
Q. But referring to Exhibit 73, all those numbers in the extend price column --
A. Uh-huh.
Q. -- those were all numbers you filled in, correct?
A. Yes.
Q. And you filled in the subtotal on each of the sheets and then the total on Exhibit 73, is that correct?
A. Yes.

Page 263

Q. Did you do that sometime after the site visit?
A. I don't recall.
Q. Do you remember that it was a long site visit at Berwick where you actually checked and did all the math on the scope of work to compute the extended price?
A. No. The issue is always the line item and the quantity. The postal service's system always has this and produces the extended price. So when he goes back to his office, he matches his quantities with these line items and he produces a number.
Q. Did you, yourself, also match the line items with the quantities and produce the number for the extended price for Berwick?
A. Yes.
MR. PROSEN: Objection, asked and answered. The document speaks for itself.
BY THE WITNESS:
A. Yes.
BY MS. KIRCHNER:
Q. When you had your final price for Berwick, was that $30,660.83?

Page 264

A. Yes.
Q. Did you give that price to the postal service for the Berwick modular post office?
A. Well, yes. Not in the form that you see it, but in the form of the work order.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 74 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. Please take a look at what we've marked as Exhibit 74. Let me know whether you recognize this.
A. Yes.
Q. What is Exhibit 74?
A. It looks like a FOIA request by my company to Mr. Robert Rigsby through my attorney.
Q. This is dated April 13th, 1998?
A. Yes.
Q. And in your FOIA request, you requested information on the written notice of award and all bids received on the Berwick modular post office in addition to other facilities, is that correct?
A. That's correct.
Q. What did you hear back?

Page 265

MR. PROSEN: Objection, vague, ambiguous.
BY THE WITNESS:
A. Nothing from Mr. Rigsby.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 75 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. Please take a look at what we've marked as Exhibit 75 to your deposition. Let me know when you're ready.
A. Yes.
Q. Do you see that this is a response to your FOIA request --
MR. PROSEN: May I see this?
THE WITNESS: Uh-huh.
BY MS. KIRCHNER:
Q. You have in front of you Exhibit 75 to your deposition. Do you see that is a response to your FOIA request which we have as Exhibit 74? It was dated April 13th, 1998.
MR. PROSEN: Objection, misconstrues the exhibit.
BY THE WITNESS:
A. Yes, this document did not come to us

Page 266

from Mr. Rigsby.
MS. KIRCHNER: It was produced to me by your law firm.
BY MS. KIRCHNER:
Q. Let's go on. Let's look in Exhibit 75.
MR. PROSEN: I don't -- I don't believe that this was produced. I've never seen this before.
THE WITNESS: I think I have an answer.
MS. KIRCHNER: It's in my records as coming from your law firm.
MR. PROSEN: I've never seen this document. And for the record, it's addressed to the U.S. Postal Service's Joyce Blakley, paralegal specialist from Mr. Rigsby. It is not addressed to L.P. Consulting.
THE WITNESS: Or our attorney.
BY MS. KIRCHNER:
Q. Let's turn to the fifth page in Exhibit 75.
A. Not counting the cover page?
Q. No, I was counting it.
MR. PROSEN: You mean the fourth page? Did I miscount?
BY MS. KIRCHNER:

Page 267

Q. We're on the fifth page of Exhibit 75. Do you see it says "Term Construction Contract Work Order"?
A. Uh-huh.
Q. Is that a yes, sir?
A. Yes, it is.
Q. Could you take the time to look at that document which begins on Page 5 and compare it to Exhibit 73? Let me know when you're ready.
A. Yeah, I'm ready.
Q. Putting aside the sketch, which is the last page of Exhibit 73, do the first three pages of Exhibit 73 appear to be identical to the pages contained in Exhibit 75, which would be the fifth, sixth and seventh pages of the exhibit?
A. I'm sorry, you've got to ask that again.
Q. All right. You have both exhibits in front of you. You've got 73 and 75, correct?
A. Yes.
Q. Now, the first three pages of Exhibit 73 --
A. Without the last sheet?
Q. -- without the last sheet. do they appear to be identical to Pages 5, 6 and 7 of

Page 272

Q. How long did this site visit at Brookfield last?
A. It took a while. I think there was a lot of -- I think -- I do recall we spent some time there.
Q. Did you make measurements?
A. Oh, yes.
Q. Do you recall how much time you spent at Brookfield at the time of the site visit?
A. No, I don't.
Q. Do you recall what measurements you made at the Brookfield site visit?
A. Not -- I don't have the order. I don't recall the order, but we measured the rear for the dock enclosure. I remember measuring the front, but I don't remember which went first or that type of thing.
Q. Do you remember you and Jesse McNabb together making the measurements at the Brookfield Post Office?
A. Yes.
Q. Did you scope out the work on a scope of work form?
A. Yes.

Page 273

Q. What did you do with that scope of work form after you filled it in?
A. I gave it all to Mr. McNabb.
Q. What happened to the scope of work form after you gave it to Mr. McNabb?
MR. PROSEN: Objection, calls for speculation.
BY MS. KIRCHNER:
Q. You gave the scope of work form to Mr. McNabb, correct?
A. Yes.
Q. Did Brookfield have Xerox capacity?
A. Oh, sure.
Q. Did you get a copy of that scope of work form at the time you gave it to Mr. McNabb?
A. I do not recall that.
Q. After giving the scope of work form to Mr. McNabb, did you receive a copy of it back from him or get a copy of it somehow?
A. I don't recall. I do remember one phone call where we just discussed the issue of what would go first, the dock enclosure or the front, the customer service side or the handicap ramp. We discussed -- the postmaster was concerned because he didn't want, I think, both happening at once, impact

Page 274

the customer and impact mail delivery, because we were working in those two sensitive areas. I remember a conversation about that, but that was about it.
Q. And that conversation was sometime after the site visit, right?
A. Yeah, after I submitted my work order, after he took his scope of work back to the office.
Q. And that's what you're referring to, is your work order, right?
A. Yeah.
Q. Now, in this telephone call where you're discussing the schedule with Mr. McNabb, did you ever resolve what would go first in terms of the order of the work in that very telephone call?
A. No. That would have come with the work order.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 76 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. Please take a look at what we've marked as Exhibit 76 to your deposition and let me know when you're ready.

Page 275

A. Sure, I'm ready.
Q. Does Exhibit 76 appear to be two documents, first a two-page document then followed by a seven-page document?
A. Yes.
Q. Let's focus first on the first two pages. Is all the handwriting on the first two pages your handwriting?
A. Yes.
Q. What's the first two pages of Exhibit 76?
A. It looks like a scope for handicap -- well, let met rephrase that -- for a concrete ramp.
Q. Did you prepare the first two pages of Exhibit 76?
A. Yes.
Q. Now, did you arrive for the site visit at Brookfield with the item number column, the description column, the unit measure column and the price column all filled out on the scope of work form?
A. Yes.
Q. How did you go about filling in the quantity column on the scope of work form?

Page 276

A. It was determined in the field. We just measured it up again and put it in.
Q. So at the time of the site visit, you put all those numbers in the quantity column?
A. Yes.
Q. For Brookfield, when did you fill in the extend price column on the scope of work form?
A. I don't recall. I don't know.
Q. If we look at the second document in Exhibit 76, is all the handwriting there your handwriting?
A. Uh-huh, yes.
Q. Did you arrive at the site visit at Brookfield having this form, also, filled out in terms of the item number column, the description column, the unit measure and unit price columns?
A. I believe so, yes.
Q. And then did you fill in the quantity column at the time of the site visit at Brookfield?
A. Yes.
Q. When did you fill in the extend price column on the form?
A. I don't -- I really don't recall.
Q. Did you use your unit price book for

Page 277

your Indefinite Quantity Contract to fill in the unit prices on this form at Brookfield, which is Exhibit 76?
A. Yes, I did.
Q. Can you explain to me how it came about that you were able to fill in the extend price column on the form at Brookfield?
A. Well, you take the quantity times the unit price --
Q. Let me rephrase the question, because I'm not being clear enough.
You told me that you filled in the scope of work form at the time of the site visit for Brookfield with the quantities. You put the quantities in at that time.
Did you then give the original form to Mr. McNabb?
A. Yes.
Q. Did he take it with him?
A. Yes.
MR. PROSEN: Objection, calls for speculation.
BY MS. KIRCHNER:
Q. As far as you know?
A. As far as I know, he took it with him.

Page 278

Q. Now, did Brookfield have Xerox capacity at the time of your site visit?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. Sure. I'm sure it did.
BY MS. KIRCHNER:
Q. But you don't remember whether or not you took a copy of what you gave to Mr. McNabb at the time of the site visit?
A. Generally, no. Generally speaking, no.
Q. So even though there was a Xerox machine at the particular facility, you didn't usually bother to do that at the time of the site visit?
A. No, because -- no.
Q. So then after Mr. McNabb left with the scope of work form for Brookfield, the site visit was over, did you receive a copy of the scope of work form back from Mr. McNabb for Brookfield?
A. You know, I don't recall on this one if he sent it back with any adjustments on my quantities or not. I do know we discussed time, but I don't recall if he made any adjustments on this.
Q. You did fill in the extend price column, correct?

Page 279

A. Yes.
Q. And you did that at some point after the site visit, correct?
A. I don't know if it was after the site visit, during the site visit, but that is my writing and I did extend the price.
Q. Generally, wasn't your practice to fill in the extend price column after the site visit?
MR. PROSEN: Objection, assumes facts not in evidence and misconstrues the testimony.
BY THE WITNESS:
A. Not universally. To say that I did that in all 250 jobs I've ever done, I can't say that to be true, no, as a general saying, no.
BY MS. KIRCHNER:
Q. For the site visits that we're talking about for your claim, didn't you generally go out there, meet the postal service employee, look at the site, if measurements were needed, measurements were made, and then you filled in the quantity column? Isn't that what generally happened?
A. Yes.
Q. And generally, you gave your scope of work with the quantity column filled in to the