Page 280

postal service employee, is that correct?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. The quantity column would generally be filled in by either myself or the postal service at the time of the visit.
BY MS. KIRCHNER:
Q. So for all the ones that we've gone through, you filled in the quantity column, correct?
A. For these particular ones, yes, with one exception, and that would be East Lynn.
Q. We've already gone over East Lynn.
A. You said generally speaking. In general, every one but East Lynn.
Q. Explain to me why you're pointing out East Lynn at this time.
A. Because in general terms, I did all of them but, I think, East Lynn. I think that was by someone else.
MR. PROSEN: He testified to that already.
BY THE WITNESS:
A. I think that's --
MR. PROSEN: It's your Exhibit 53.
BY MS. KIRCHNER:

Page 281

Q. Can you put Exhibit 53 in front of you?
A. Uh-huh.
Q. You have Exhibit 53. If you look at the first page and you see the quantity column there, who filled out that quantity column on the first page?
A. That's Paul Steiner.
Q. And on the second page, who filled out the quantity column?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. Paul Steiner.
BY MS. KIRCHNER:
Q. And on the third, fourth and fifth pages, who filled out the quantity column?
A. Paul Steiner.
Q. With regard to Exhibit 53, whose handwriting is in the extend price column?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. That's Paul Steiner.
BY MS. KIRCHNER:
Q. So is there any handwriting on Exhibit 53 that's yours?

Page 282

MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. Yes.
BY MS. KIRCHNER:
Q. Just tell me where -- okay. All right.
So the quantity and extend column, extended price column, that's all Paul Steiner on Exhibit 53?
A. Correct.
Q. At the time of this site visit at East Lynn, did you go all over all those quantities with Paul Steiner?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. Yes.
BY MS. KIRCHNER:
Q. Did you and he agree that those numbers in the quantity column were the numbers that should be in that quantity column?
A. On this one, yes.
MR. PROSEN: Objection, asked and answered.
BY MS. KIRCHNER:
Q. After you made the site visit at Brookfield -- are you with me, Mr. Battaglin?

Page 283

A. Yes.
Q. You made the site visit at Brookfield and Jesse McNabb was there with you.
After that site visit, did you ever go back to that post office?
A. No.
Q. You told me about that conversation where Jesse McNabb and you discussed a schedule for work for Brookfield.
A. Yes.
Q. After that conversation, did you have other conversations with Mr. McNabb with regard to the work you had scoped out at Brookfield?
A. Yes.
Q. When did those conversations occur?
A. Sometime --
MR. PROSEN: Go ahead.
BY THE WITNESS:
A. -- after I submitted the work just to find out the status of the work order.
BY MS. KIRCHNER:
Q. Do you remember whether this is one conversation or two conversations? What do you remember?

Page 284

A. One conversation.
Q. Did you call him or did he call you?
A. I called him.
Q. What did you say to Mr. McNabb in this conversation?
A. We discussed a couple of other projects, and then I asked him specifically about the Brookfield project.
Q. And what did he tell you?
A. He told me that he had forwarded it to Mr. Rigsby and Mr. Rigsby would be making a decision on this work order.
Q. Did he tell you what Mr. Rigsby's decision was?
A. No.
Q. Do you remember what else you discussed with Mr. McNabb in the same telephone call that you told me about?
A. No. It was general about other things.
Q. So nothing in particular that would help us to date the telephone call?
A. No.
MS. KIRCHNER: Let's take a break.
(WHEREUPON, the deposition was

Page 285

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

L.P. CONSULTING GROUP, INC., )
Plaintiff, )
vs. ) Case No.
THE UNITED STATES POSTAL ) 98-868 C
SERVICE, ) (Judge Allegra)
Defendant. )

June 11, 2004
1:39 p.m.

The deposition of RICHARD ANTHONY BATTAGLIN resumed pursuant to recess at Suite 3300, Three First National Plaza, Chicago, Illinois.

Page 286

PRESENT:
BELL, BOYD & LLOYD PLLC,
(1615 L Street, N.W., Suite 1200,
Washington, D.C. 20036-5610,
202-955-6830), by:
MR. LAWRENCE M. PROSEN,
appeared on behalf of the Plaintiff;
UNITED STATES DEPARTMENT OF JUSTICE,
CIVIL DIVISION-COMMERCIAL LITIGATION BRANCH,
(1100 L Street, N.W., 8th Floor,
Washington, D.C. 20530,
202-307-0290), by:
MS. DOMENIQUE KIRCHNER,
appeared on behalf of the Defendant
and the Deponent.

ALSO PRESENT:
MR. STEPHEN LOBAUGH, In-House Counsel,
United States Postal Service.

REPORTED BY: JANET L. ROBBINS, CSR, RPR,
CERTIFICATE NO. 84-2207

Page 287

(WHEREUPON, a certain document was marked Battaglin Exhibit No. 77 for identification, as of 6/11/04.)
RICHARD ANTHONY BATTAGLIN,
called as a witness herein, having been previously duly sworn, was examined and testified as follows:
EXAMINATION (Resumed)
BY MS. KIRCHNER:
Q. Please take a look at what we've marked as Exhibit 77 to your deposition. Do you recognize Exhibit 77?
A. Yes.
Q. What is Exhibit 77?
A. It's a fax I sent to Jesse McNabb.
Q. Is this with relationship to the Brookfield job?
A. Yes.
Q. Did you send this fax on or about August 22nd, 1996?
A. Yes.
Q. What does this relate to, sir?
A. He said, and I'm not -- what's the word I'm looking for? I'm going to paraphrase. He basically said, "What would your price be for these

A. If you note the plan, those are my words, which were written in pencil or pen, whatever the medium, those are my words. We went over the job and corrected what was discussed probably, I can't say for sure, with the postal -- postmaster or someone related to the facility who is typically on-site when we're doing these things. I don't recall if this one, if it was maintenance or the postmaster, but there was always someone with us.

Q. You're referring to the first page of Exhibit 80. Which is your handwriting, if you could point that out to me, sir?

A. Sure. If you look starting in your right-hand corner, the upper right-hand corner, the word "insulated," where it says "furnish and install a 10 by 10 panel, flush panel overhead door." We determined it's better to have an insulated door if you're enclosing a dock. Then right below it, we added the 10 by 10 wire glass to a particular door, and that door was also to be, instead of hollow metal, it was to be insulated.

If you sweep down clockwise underneath, I have a little arrow going to a "3 by 7 insulated door with a vision wire kit," a typical postal



special. And then right below it, I also put "insulated for the flush panel overhead door."

And then sweeping back up, again, the word "insulated for flush panel overhead door." And just immediately above that, "insulated door with a 10 by 10 wire glass." Those are my words.

Q. Were those your observations at the site or is that as a result of a discussion with Mr. McNabb at the site as to what work should be done?

A. That was with the discussion.

Q. If you just look through the remaining three pages of Exhibit 80, did you make any marks at all on those pages?

A. Yes.

Q. Which page are you on where you have your handwriting?

A. I don't have any handwriting, but the mark I made was I put my stamp on all three.

Q. Okay.

A. That's all that's on there.

Q. All right. At the time of the second site visit at Downers Grove, did you scope out work and fill out a scope of work form?



A. For this dock enclosure, yes, we did.

(WHEREUPON, a certain document was marked Battaglin Exhibit No. 81 for identification, as of 6/11/04.)

BY MS. KIRCHNER:

Q. Please take a look at what we've marked as Exhibit 81 to your deposition, and if you could tell me what Exhibit 81 is.

A. It's a scope of work for the Downers Grove dock.

Q. Did you prepare this scope of work?

A. Yes, I did.

Q. If we focus now on the second site visit at Downers Grove that you performed, at the time of this site visit, had you already filled out the item number and the description and the unit measure and the unit price on the scope of work form that we have here on Exhibit 81?

A. Not on this one. This is the second work order, not the first.

Q. Do you have the first?

A. No. I gave everything to the post office. The first was related to this document called document 80. This is referring to the second



set of drawings that I'm filing as my claim.

If I can elaborate, this first document was calling for a wood partition. And if you look at the top of this, the very first line, this is for a steel tube. This is when we went to a steel framed construction.

So this document 81 is unrelated to document 80, and I can't tell you where the post office put that copy of that work order. This work order that you're referring to now as document 81 is related to another set of drawings. It hasn't been produced yet.

Q. So L.P. Consulting doesn't have that set of drawings?

A. No, they were postal drawings that I don't have.

Q. You don't have a copy of that?

A. No.

Q. Just to make sure I'm following you, at the time of the second site visit at Downers Grove, you're there with Jesse McNabb and you scope out the work.

A. Correct.

Q. It's for a wood frame dock enclosure, is

Page 308

remodeling at Downers Grove, right?
A. (Nodding.)
Q. In about August of 1996, are you still doing lock box remodeling at the Downers Grove Post Office?
A. Maybe, yes.
Q. How did you learn that you would be scoping out a steel dock enclosure for Downers Grove as opposed to the earlier wood one?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. Mr. McNabb contacted me and said the old print that he produced was null and void and we need to look at these other drawings, and I'm pretty sure they were A.M. Fernandez's drawings.
BY MS. KIRCHNER:
Q. Did you arrive for that site visit, the second site visit, with the scope of work form all filled out in terms of the line -- the item number column, the description column, the unit measure column, the unit price column?
A. This one I don't think was that way. I think this one I drew it up in the field completely with my book because it was a total -- that drawing

Page 309

was different than this drawing, so my old one was obsolete, if you will.
Q. The new drawing for the dock enclosure at Downers Grove that reflects steel in the construction, was that a blueprint?
A. Yes, it would have been a blueprint.
Q. Approximately what size?
A. The normal post -- whatever you want to call it, typical AE firm size. It might be -- I don't know sizes. I'm sorry. I can't gave you the dimension. It's pretty big. I used to know. 24 by 36 maybe.
Q. Just give me one second.
A. Sure.
MS. KIRCHNER: Go off the record for one second.
(WHEREUPON, there was a pause in the proceedings.)
BY MS. KIRCHNER:
Q. So you drew up the scope of work for the steel tube dock enclosure at Downers Grove, correct?
A. Yes.
Q. What did you do with your scope of work?
A. I gave it to Mr. McNabb.

Page 310

Q. And at the time you gave it to Mr. McNabb, had you filled in the extend price column on the scope of work form?
A. I don't recall.
Q. Had you put a total price on the scope of work form before you gave it to Mr. McNabb?
A. I don't recall.
Q. After you gave the scope of work form to Mr. McNabb, what happened next with regard to the steel tube dock enclosure for Downers Grove?
MR. PROSEN: Objection, calls for speculation on the witness' part.
BY MS. KIRCHNER:
Q. Let me rephrase. Did you have conversations with Mr. McNabb about your scope of work for the steel constructed dock enclosure at Downers Grove after that site visit?
A. The only conversation I had with him, that was simply -- it was a status update, "Hi, how's it going? What's going on with the Downers Grove dock?" At that point he told me that A.M. Fernandez was going to handle the job and I should talk to Bob Rigsby.
Q. What did you say in response to that

Page 311

statement from Mr. McNabb?
A. "I will look into it. Thank you very much," something like that probably. And we talked about other things we were working on. That was it.
Q. Did you look into it after that conversation with Mr. McNabb?
A. Yes.
Q. What did you do, sir?
A. I think I -- I didn't talk to Fernandez, but I did talk to Mr. Rigsby at some point in there, just asking what the status of this particular project was.
Q. Was it one conversation or more than one conversation with Mr. Rigsby?
A. I think it was just one that related to the dock. And he basically said that he'd let me know, get back to me, and that he just agreed, yes, it's with the architect. And that was all we talked about.
Q. With the architect --
A. We talked about other things, but, you know, specifically this project.
Q. So the two of you understood that the matter was with the architect at that point in time?

Page 312

A. I understood that the -- I guess the way you're wording it is probably accurate. The matter was between the post office and the architect and he would get back to me on it.
Q. Approximately when was it that you had this conversation with Mr. Rigsby that you're telling me about.
A. It would probably be still in August, because I didn't let these linger. Once I found out -- or once they tasked me, they said, "Hey, let's go do a scope," I followed up pretty quickly. Because without getting the information to produce the scope of work, I would never get a work order. So you have to be diligent in getting the quantities in and discussing time so that they could go back and do their computer work and give me a work order.
Q. So was this conversation with Mr. Rigsby in approximately August of 1996?
A. It would have to be, the first phone call, sure, to find out what's going on with the work order.
Q. After that conversation with Mr. Rigsby, did you have later conversations with Mr. Rigsby on the same topic?

Page 313

A. I don't know when, but probably, yes. I can't recall the time or date, but yes.
Q. Do you recall the substance of the telephone conversation?
A. It was probably -- I'd be speculating.
Q. I'm not asking you to speculate, sir. I'm just asking you about your recollections.
A. I'd be speculating. I know we talked. I just can't --
Q. You can't remember the substance of it?
A. No.
Q. During the time that you were working at the Downers Grove Post Office, you're doing construction work there because you got that interior work --
A. Yes.
Q. -- was any other contractor working on the dock enclosure?
A. No. Well, let's back up. I became aware that someone else was going to get the dock enclosure through -- I think it was the postmaster, in fact.
Q. You're remembering an oral conversation with the postmaster?

Page 314

A. Yeah. It had to do with --
Q. Let me just ask the questions.
A. I'm sorry.
Q. I just want to have a clear transcript.
A. I appreciate it.
Q. Who's this postmaster that you're remembering?
A. It was a woman. I don't know her name.
Q. What did you learn from this postmaster for Downers Grove?
A. Something to the effect that we -- we, my company, would move product from the dock through the facility, drywall, whatever, 2 by 4s. And it was at such point when I made a comment about, you know, "One of these days," something like, "this is going to get enclosed." And she said, "Yeah, I heard they're ready to give out a contract," or something to that effect. And that's when I first heard that some work was going to take place.
Q. Did the postmaster tell you that the post office had already awarded a contract for enclosure of the dock?
A. No.
Q. Can you tell me again --

Page 315

A. Well, she obviously, my opinion --
Q. What I want to do is understand your best recollection of what she said to you.
A. My best recollection was that she had heard or was told that the dock enclosure was either going to be let or was let, I don't remember the exact words, and that this would be -- this work would be starting soon. And that's what took me by surprise because I had thought I was going to be the guy, and I don't know what happened to the project. I just trusted that the powers that be are doing their usual paperwork to get me the work, so I was surprised.
Q. After you learned this from the postmaster, did you check up on your scope of work for the dock enclosure at Downers Grove?
A. Yes.
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. Yes, I contacted Mr. Rigsby.
BY MS. KIRCHNER:
Q. To clarify, is this the conversation where Mr. Rigsby tells you that the matter is with the architect?

A. No, this is now another conversation.
Q. Oh, another conversation.
A. After I talked to the postmaster.
Q. After you talked to the postmaster, you talked to Mr. Rigsby again?
A. Yes.
Q. Is this a conversation over the telephone --
A. Yes.
Q. -- or face to face?
A. No, it was on the phone.
Q. What did you say to Mr. Rigsby in this conversation?
A. I basically said -- I'm paraphrasing the conversation; I don't remember it verbatim. Basically it was I heard from the postmaster that that was going to be happening soon. And I just asked him, was that coming -- was my work order coming, and he said he wasn't going to issue me a work order; he had another contractor do the work. That's when I learned that Fernandez had bid the project. And subsequently in time after that, I found out all the facts of the matter, and that's what had happened.



Q. In this conversation with Mr. Rigsby that you're telling me about, did Mr. Rigsby tell you that the postal service had already awarded a -- well, let me back up.
In the conversation with Mr. Rigsby that you're telling me about, did Mr. Rigsby tell you that the dock enclosure had been bid for Downers Grove?
A. No, he never said it was bid.
Q. Did he tell you whether or not the postal service had already awarded a contract for the dock enclosure at Downers Grove?
A. He implied it.
Q. He led you to conclude that?
A. Yes.
Q. Do you remember what he said that led you to conclude that?
A. He said that we have selected a contractor and he'd be doing the work. He never mentioned the name of the contractor, but just that they had picked a contractor to do the work.
Q. Did you ask who the contractor was at that time?
A. I don't recall because I didn't bid it,



so I have no right to know the information. If I bid anything or I respond to an offer of solicitation, they're required to notify me because I was part of the process, but I was locked out of the process. I had no involvement in the process.
Q. Did you say anything further to Mr. Rigsby in this telephone call about the Downers Grove scope of work for a dock enclosure?
A. I received no notice of any type or any communication from anyone in the postal service regarding my scope of work for Downers Grove and no communication whatsoever from any of the project managers or the architect on the solicitation and awards of the project. I did not know any of that was going on, so I had no opportunity to protest.
Q. I'm just asking you about the conversation with Mr. Rigsby. Did you say anything else to him in that conversation that had to do with Downers Grove's scope of work for a dock enclosure?
A. I said to him if I would have known, I would have protested. And he said something to the effect that -- he kind of dismissed it, you know, just in normal parlance as if, "Well, there will be other work," just, you know, just politely brushed



it off. At the time I was disappointed and at the time he didn't really care that I was disappointed.
Q. Did he tell you that he didn't care?
A. Just by his demeanor, just like, "Well, you know, I'm sorry."
Q. This is a telephone conversation, right?
A. Yes, just a phone conversation.
Q. Did he tell you anything else in this phone conversation?
A. That's it.
Q. When you told Mr. Rigsby that if you had known, you would have protested it, what did you mean by that?
A. Well, I would have formally protested the award, but I would have been untimely, because by the time I found out, it was too late.
Q. After you learned of this from Mr. Rigsby in this telephone call, did you take any other actions or have any other further conversations with him with regard to Downers Grove and the dock enclosure?
A. Not this particular project, no.
Q. Referring back to that conversation with Mr. Rigsby about the dock enclosure in Downers

Grove, in the course of that conversation, did you ever tell Mr. Rigsby what your price would have been for Downers Grove had you had the opportunity to bid it?

A. It would have -- it didn't matter at the time. If I did, and I don't think I did -- he knew my price, so to speak, because he had my unit prices of what I would have done it for, but I never really formally bid the project.

This line item, unit price book, is a postal generated document. So the unit prices that I used to generate this are government furnished versus a bid or a solicitation is a compilation of various things that I was not part of that process. I was left out of the process. So all that he ever had was what I produced with the site visit with Mr. McNabb.

Q. So if you had bid Downers Grove dock enclosure, it could have been anything, not necessarily what you have in Exhibit 81?

A. That's very true for a lot of reasons.

(WHEREUPON, a certain document was marked Battaglin Exhibit No. 82 for identification, as of 6/11/04.)



BY MS. KIRCHNER:

Q. Please take a look at what we've marked as Exhibit 82 to your deposition and tell me if you recognize 82.

A. It's sent to Mr. Rigsby from me that -- and I sent a copy to my bonding agent -- that I'm trying to get the bid results in which our firm was a participant and writing at your earliest convenience, and we understand that this project may have recently been awarded. And what I'm referring to is my scope of work. I participated not in the solicitation, but I was a participant of the dock enclosure.

Q. So when you said you were a participant, you meant you had drafted a scope of work which we have here, at least one version of it as Exhibit 81, is that correct?

A. Correct. And the reason why I copied my bonding agent is because this is a legitimate postal contract that's bonded by an insurance company. And because this is bonded by an insurance company, they needed to know what the government was up to because the general liability Workmen's Compensation automobile coverage, I provide protection for the



government as required by the contract law.

He needed to know what had transpired with my scope of work and my work order because they're covering me for my work at Downers Grove inside the facility that I was already given a work order for, and they're covering my contract. So wherever I go in the name of this contract, he provides me all my insurance coverage, and he provides the coverage of the post office and the subcontractors to protect them from this type of activity. That's why he knew. He's the attorney for the bonding company.

So, yes, that's exactly what I said to him, "and we understand this may have recently been awarded." And, of course, I sent it certified and, of course, I got no response.

Q. The telephone conversation with Mr. Rigsby that you told me about, was that before or after your letter dated December 3rd, 1996, which we have as Exhibit 82?

A. Oh, that was long before this.

Q. Now, with regard to the proposed dock enclosure for Downers Grove in your scope of work, did the postal service ever direct you to go forward



and perform that work at Downers Grove?

A. Which work order?

Q. With regard to the scope of work that you drew up for Downers Grove and the steel dock enclosure, did the postal service ever direct you to go forward and perform that work at Downers Grove?

MR. PROSEN: Are you referring to Exhibit 81?

BY THE WITNESS:

A. I don't understand your question.

BY MS. KIRCHNER:

Q. Let me try to rephrase it.

You told me that you drew up a scope of work for a steel tube dock enclosure at Downers Grove, is that correct?

A. No.

Q. I'm probably just saying it wrong. You had a site visit with Mr. McNabb and you drew up a scope of work document for a dock enclosure at Downers Grove, right?

A. Yes.

Q. And that reflected steel in the construction, right?

A. Steel was in that work order.

Q. And after you did that and you gave that

A. Yes, at the time, yeah, by then I did.
Q. And this is when you were working out of that same facility, also, that you learned this?
A. I'm not sure of the sequence of events, but I ultimately saw some of the enclosure going up and I found out who ultimately was doing it.
Q. Who did you learn was doing the steel dock enclosure work?
A. I forget his name, but I'm sure I can find it. He had his trucks out there. I just don't recall the name of the guy right now.
Q. Now, was it in 1996 that you learned that somebody else was doing this work and that he began doing the work on the dock enclosure in Downers Grove?
A. I don't believe this project was awarded. I mean, I'm guessing, so I can't really answer.
Q. I'm not asking you to guess.
A. Yeah.
MS. KIRCHNER: Why don't we take a five-minute break.
(WHEREUPON, a recess was had.)
(WHEREUPON, a certain document was



marked Battaglin Exhibit No. 84 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. Please take a look at what we've marked as Exhibit 84 to your deposition. Let me know when you're ready.
A. Yes, go ahead.
Q. Do you recognize Exhibit 84?
A. Yes, I do.
Q. What's Exhibit 84?
A. It's a letter through my attorney to Mr. Rigsby filing a claim or -- I don't know the proper term, but it's concerning a claim against the Downers Grove Post Office dock enclosure.
Q. Does this relate to the same scope of work for the steel dock enclosure at the Downers Grove Post Office that we've been talking about?
A. The document in 84, Exhibit 84 is the identical as in Exhibit 81.
Q. So did you submit a claim, then, on or about December 17th, 1996 with regard to the Downers Grove dock enclosure to Mr. Rigsby?
MR. PROSEN: Objection, calls for a legal conclusion.



BY THE WITNESS:
A. I'm not going to answer that as you presented it. Ask it again.
BY MS. KIRCHNER:
Q. Did you understand my question, sir?
A. No, not really. Sorry.
Q. Did you present Exhibit 84 to Mr. Rigsby on or about December 17th, 1996?
A. It was sent, yes, certified mail. I didn't present it to him.
Q. Your attorney at your request presented it to him, is that correct, sir?
A. Yes, that's correct.
Q. And this is a claim with regard to the same matter that is in Exhibit 81, correct?
A. That's correct.
Q. So it's the very same matter that we now have before us in court, is that correct?
A. That's correct.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 85 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. Please take a look at we've marked as



Exhibit 85 to your deposition and let me know when you're ready.
A. Yes.
Q. Do you recognize Exhibit 85?
A. Yes.
Q. What's Exhibit 85?
A. It's a claim concerning the Paxton, Illinois Post Office.
Q. This is a post office where L.P. Consulting was performing work under its Indefinite Quantity Contract, is that correct, sir?
A. That's correct.
Q. Did you present that claim to Mr. Rigsby?
A. Through my attorney.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 86 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. Please take a look at what we've marked as Exhibit 86 to your deposition, and let me know when you're ready.
A. Yes, go ahead.
Q. Do you recognize Exhibit 86?

A. Yes.
Q. What is Exhibit 86?
A. It's a claim -- let's see here. It's a letter sent from my attorney regarding the Downers Grove dock enclosure.
Q. Did you withdraw your claim with regard to the Downers Grove dock enclosure?
A. Yes.
Q. Isn't this the same Downers Grove dock enclosure that we've been talking about today, correct?
A. This document isn't specific, so I can't -- looking at this compared to this (indicating), it doesn't look to be specific.
Q. Okay. But would you agree, sir, that in 1996, you presented the claim to Mr. Rigsby with regard to the dock enclosure at Downers Grove and then in 1998 you presented the very same claim again to Mr. Rigsby?
MR. PROSEN: Objection, compound question and confusing.
BY THE WITNESS:
A. I'm not sure.
BY MS. KIRCHNER:



Q. Let's go through it again. Put in front of you Exhibit 81.
Do you remember you told me that Exhibit 81 is the scope of work which is the subject of the present lawsuit?
A. Yes.
Q. You have in front of you Exhibit 84. Could you put in front of you Exhibit 84?
Do you see that in Exhibit -- what I'd like you to look at together is Exhibit 81 and 84, sir. Can you look at 81 and 84 together? You need 81 and 84 in front of you.
A. Uh-huh.
Q. Now, Exhibit 81 is the subject of the present lawsuit, correct?
A. Yes.
Q. And if you look at Exhibit 84, which is your earlier document to Mr. Rigsby dated December 17th, 1996, does that deal with the very same matter at Downers Grove which is the subject of the present lawsuit?
A. I can only explain it in my terms.
Q. I'm asking you to look at Exhibits 81 and 84.



A. I'm not following you at all.
Q. Let me start again, then. Let me start the question again.
A. All right.
Q. I want you to put in front of you Exhibit 85. You need Exhibit 85 --
A. Uh-huh.
Q. -- and Exhibit 84. Okay, you have them both in front of you.
In Exhibit 85, I'm going to direct you back to the letter dated -- wait a second. I've got the wrong document. That's my fault.
What I need is Exhibit 83 and Exhibit 84.
A. Okay. I have that.
Q. Do you see in Exhibit 83 we have a copy of your claim dated March 3rd, 1986?
A. Yes.
Q. And do you --
A. '98.
Q. Yes, March 3rd, 1998. Thank you.
Do you see in your claim dated March 3rd, 1998, you have information with regard to Downers Grove?



A. Yes.
Q. And do you see that the claim amount for the Downers Grove dock enclosure is $36,564.99? Do you see that?
A. Yes.
Q. And that the profit, the lost profit sought is $10,000?
A. Correct.
Q. Now, can you look at Exhibit 84, which is a December 17th, 1996 letter.
A. Yes.
Q. And do you see that there, you're complaining about the very same matter at Downers Grove, the lost profits of $10,000, the site visit on or about August 1st, 1996, and the draft work order?
A. Yes.
Q. So is it correct that you pursued this matter with Mr. Rigsby through Exhibit 84?
A. Initially, yes.
Q. Initially. And then pursued it again in March of 1998, the very same matter?
A. Yes.
Q. And directing your attention to

postal service employees that were there at the time of the site visit?
A. Yes, I did.
Q. What did you do with your sketches that you made at the time of the site visit?
A. This sketch would have gone back with my work order with Lois or Paul.
Q. Now, earlier you said that you believed that you had made -- that sketches were made that were given to Mr. Fernandez. Do I understand your testimony correctly?
A. Related to which project?
Q. Hoopeston.
A. Yes.
Q. And what sketches do you believe were given to Mr. Fernandez?
A. If they were going to be sketches of Hoopeston from me, it would be these sketches here (indicating).
Q. So we're talking about the sketches that are in Exhibit 88, is that correct?
A. To the best of my knowledge, yes.
Q. Well, did you make any other sketches for Hoopeston?



A. That's possible.
Q. As you sit here today, do you have any other document that is sketches you made for Hoopeston?
A. No, I do not. I don't have copies of this material. The post office had all the originals.
Q. Did Hoopeston have a Xerox machine at the time you were making this site visit?
A. I believe it did.
Q. Did you use the Xerox machine to make copies of what you were giving to the postal service employees at the time of the site visit?
A. I was never in charge of that type of thing, so I never would do that. That's at the discretion of the government employees or the people I met.
Q. You don't know whether or not they gave you copies at the time of the site visit?
A. No.
Q. Now, do you believe that Exhibit 88 was given to Mr. Fernandez?
A. Yes.
Q. Why do you believe that, sir?



A. I believe for two reasons; that, one, you have the document from the government, so they kept it for some reason, versus the other documents which you can't produce for something very similar I did on everything I'm claiming. And he probably used this to do a quick compilation for his own records of what shape and size and save himself a site visit initially to get an idea, a rough idea of what this would cost before he actually produced the drawings himself.
This information is enough here for him to provide enough information to have contractors give him a rough estimate before he produces an actual drawing for solicitation.
So if I visited the site on a certain date and he produced drawings after that, I would say it related to this. So that's my belief, anyway, of what transpired there with Hoopeston and these other ones related to him.
Q. Let's look at what's been marked as Exhibit 87 to your deposition -- excuse me -- yes, 87 to your deposition. Tell me whether you recognize Exhibit 87.
A. Yes, I do.



Q. What's Exhibit 87?
A. It's a five-page scope of work for the Hoopeston Post Office.
Q. Who prepared Exhibit 87?
A. With the exception of the quantities, I did.
Q. So I take it all the handwriting on Exhibit 87 is your handwriting except for the quantity column?
A. No. The question was who produced it. I didn't produce the quantity by myself. I produced it in conjunction with the government employees, but this other part I produced.
Q. So when you arrived for the site visit at Hoopeston, had you already filled out the item number column, the item description itself, unit measurement and unit price columns?
A. Only a few of these. Some of these were added because this was a different type of project.
Q. How was it different, sir?
A. It looks like there was more door work than I did on any of the other ones.
Q. And how was the -- was the quantity column filled in at the time of the site visit?

Page 348

A. We filled it in together at the site, yes, during the site visit.
Q. Whose handwriting is it in the quantity column?
A. I wrote it.
Q. And how did you go about getting that information to put in the quantity column?
A. I measured the site with the postal people and we determined the quantity and put the quantity down. Well, not all of them, but some of these on the back two pages say "to be determined," so that was something they were going to get back to me on.
It looks like it's related to electric. Yeah, most of these "to be determined," they were going to get back to me on whether we were going to do the electric work.
Q. What page are you on?
A. I'm on Page 4 and Page 5.
Q. Could you just show me, point to me the "to be determined." I'm afraid I'm not seeing it.
A. "To be determined," "to be determined."
Q. Oh, the DBO. Okay, I'm with you now.
A. TBD, actually. Pardon my printing.

Page 349

Those are all to be determined, TBD.
MR. PROSEN: For the record, the witness is pointing to the quantity column on Pages 4 and 5.
BY MS. KIRCHNER:
Q. Now, after you finished filling in all the information on Exhibit 87, the scope of work for Hoopeston, what did you do with the scope of work?
A. I took the scope of work and the sketches and gave them to -- I don't recall if it was Paul or Lois, but they took it with them to go back to discuss this with Mr. Rigsby. And I was waiting for their response, whether this was going to -- or when this was going to happen or whatever plans they had for it.
Q. Is the date, 11/14/95, is that the date of the site visit?
A. Yes.
Q. You filled that in also?
A. Yes, I did.
Q. Why did you put the contract number 94-B-0097 on Exhibit 87?
A. It's just for my reference so that if I was -- just so you know, the postal service has multiple IQC contracts in various departments. And

Page 350

some of the other entities have different line -- have different books. They're not all the same.
So at this time I had a couple of other IQCs not related to Mr. Rigsby but to other contracting officers, and I put this down so I wouldn't confuse line items or locations.
Q. So --
A. That's why that's there.
Q. The unit prices listed in the Exhibit 87, those are the unit prices from the price book for Indefinite Quantity Contract 94-B-0083, is that correct?
A. That would be correct.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 89 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. Showing you what we've marked as Exhibit 89. Does this look familiar to you?
A. I have no idea what this is.
Q. Does it appear to be a Xerox of some portion of a blueprint?
A. Yes, but it's meaningless to me.
Q. Okay. Let's go on.

Page 351

Can you turn back to 87? Is this interior work and also the concrete handicap ramp in the scope of work?
A. No, this is strictly the interior.
Q. At the time of the site visit on November 14th, 1995, did you also scope out a handicap ramp at that time?
A. Yes. As Exhibit 88 would indicate, yes, we laid out or measured for a ramp.
Q. Is there anything that indicates when you prepared Exhibit 88?
A. Not to my knowledge, no.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 90 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. Please take a look at what we've marked as Exhibit 90 to your deposition.
A. Yes.
Q. Do you recognize Exhibit 90?
A. Yes, I do.
Q. What's Exhibit 90?
A. It's a scope of work for the concrete work at the Hoopeston Post Office.

Page 352

Q. Is this the handicap ramp?
A. Yes, it would be.
Q. Whose handwriting is on Exhibit 90?
A. That's my handwriting.
Q. Is all the handwriting your handwriting?
A. All the handwriting is my handwriting.
Q. This is dated November 14th, 1995, correct?
A. Correct.
Q. That's the same date as we have on Exhibit 87, correct?
A. Correct.
Q. Now, does this relate to the very same site visit at Hoopeston that you've told me about?
A. Yes, it is.
Q. So is this the scope of work -- is Exhibit 90 the scope of work that you prepared for the handicap ramp at Hoopeston as a result of the site visit?
A. Yes, it is.
Q. At the time of the site visit, November 14th, 1995, at that time did you fill in the extend price column on the scope of work?
A. I don't recall when it would have

Page 353

happened, but I did. That's my writing.
Q. It's possible you filled in the extend price column at a later point in time after the site visit?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. When I give them this document, the extended price is blank. It's possible I filled in this later for whatever reason, but the extended price is irrelevant to me for my business.
All is important is the quantity, because you don't need to fill in each item. You can just do it on a tape with a calculator. If you needed to know -- if I had any reason to know this final number at that time, it would have been moot, because the postal service per my contract could just take everything else out and issue a work order for those little bits right there and tell me go do that work by my contract. So this is just the scope of work that can be produced without me being there at any time.
So the extended price is -- to me, it's there, and how it got there, I never paid any attention to it. All I always concentrated on were

Page 354

the quantities and time. That's all that mattered to me.
BY MS. KIRCHNER:
Q. And hours?
A. Time would be when the job would take place, how long it would take place.
Q. So you were not referring to the hours, the quantity, that part of the quantity column?
A. Not as part of the top part. Yes, in the quantity part, but time in the sense of start date, performance time and negotiating with the postal facility, when's the best time to come in and rip up his place.
Q. At the time of the site visit, November 14th, 1995, at Hoopeston, I take it you filled in two scopes of work, one for the interior, one for the concrete ramp, and they were both in the format of Exhibit 87 --
MR. PROSEN: Objection.
BY MS. KIRCHNER:
Q. -- is that correct?
MR. PROSEN: Objection, the document speaks for itself.
MS. KIRCHNER: I'm not asking about a

Page 355

document. I'm asking about his conduct. Would you please stop interrupting with your useless objections. Let's do this again.
MR. PROSEN: I have the right to object and I will continue to do so.
MS. KIRCHNER: That was a useless, misdirected objection --
MR. PROSEN: Thank you, your Honor.
MS. KIRCHNER: -- and it's really been holding me up.
MR. PROSEN: Stop wasting time. Move on.
MS. KIRCHNER: That's right. I wish you would.
BY MS. KIRCHNER:
Q. At the time of the site visit of November 14th, 1995 at the Hoopeston Post Office, is it correct that you filled in two scopes of work documents and gave them to the postal service?
A. Yes, it is.
Q. One was for the concrete ramp and one was for the interior, correct?
A. Yes, it was.
Q. And the form of these documents was in the format of Exhibit 87, meaning that they did not

Page 356

have extended prices, is that correct?
A. I do not recall.
Q. Well, directing your attention to Exhibit 87, that's the document you, in fact, gave the postal service with regard to the interior, is that correct?
A. That's correct.
Q. And you do not have the document that you gave the postal service with regard to the concrete ramp, correct?
A. No, I do not.
Q. But you believe it to have had in it the information in the item number column, the description column, the unit measure column, the unit price column and the quantity column, is that correct?
A. That's correct.
Q. After you did that at Hoopeston, did you follow up with the postal service with regard to the proposed work?
A. Yes, I did.
Q. And how did you do that, sir?
A. I telephoned, I don't recall if it was Lois or Paul, and just asked them what the status of

Page 357

the scope of work was and they told me to talk to Mr. Rigsby.
And then I subsequently -- I don't know if it was the same minute or hour, but I did call Mr. Rigsby and he advised me that Mr. Fernandez was going to produce construction documents. That's all he told me, and to stay tuned, so to speak, he will keep me apprised or something to that effect. So I just assumed that I was going to get better documents to -- or they were going to produce the work order based on his documents.
Q. In this telephone call, what documents did Mr. Rigsby tell you Mr. Fernandez was going to produce?
A. Construction documents.
Q. Was he any more specific in the telephone call?
A. No.
Q. Approximately when did the telephone call to Mr. Rigsby occur that you just told me about?
A. It would be around December, I think, somewhere around the holidays, if I had to guess.
Q. I'm not asking you to guess, sir.

Page 358

A. Well, I can't tell you then. I don't know. I can't recall.
Q. Did you then make any further site visits to the Hoopeston Post Office?
A. Not that I recall.
Q. So you only made one site visit on November 14th, 1995?
A. Well, yeah. You can only make one visit on one day. I didn't go back the same day.
Q. I'm not being clear then. You made a site visit on November 14th, 1995, correct?
A. Yes.
Q. After that date, did you make another site visit to the Hoopeston Post Office?
A. Not to produce the scope of work, no. I may have gone there again to mail a letter if I was in the area, but I didn't go to produce a scope of work.
Q. Is the Hoopeston Post Office the post office for your area?
A. Yes, it is, 609.
Q. It's the closest to your business?
A. No, this is furthest from my business, one of the farther ones.

Page 359

(WHEREUPON, a certain document was marked Battaglin Exhibit No. 91 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. Please take a look at what we've marked as Exhibit 91 to your deposition.
A. Yes.
Q. Do you recognize Exhibit 91?
A. Yes.
Q. What is Exhibit 91?
A. It's a scope of work for the Hoopeston Post Office.
Q. Who prepared Exhibit 91?
A. I did.
Q. How did you go about preparing Exhibit 91 -- first of all, tell me when did you prepare Exhibit 91?
A. It looks like August 1st, '96.
Q. Are you just reading that from the document, sir?
A. Yes.
Q. How did you go about preparing Exhibit 91?
A. Exhibit 91, with the exception of the

Page 360

quantity, would have been -- it looks like it's my
typical -- the description and line item, there's
only one provided in the book, so I just took that
and put it in this form again and put the unit
price. And we measured in the field and I got new
quantities.
Q. Did you make another site visit to
Hoopeston after the site visit on November 14th,
1995?
A. This date could be the date I sent it to
Ms. Gunlogson. This date could be a lot of things.
I know it's there. I do notice, though, it's
different than the first one because I wrote on here
"capital." So someone informed me that this was
going to be a capital expenditure. That would make
a difference, which could be why we did this again.
Q. What I'm asking you is: You remember
doing a site visit on or about November 14th, 1995,
is that correct?
A. Yes.
Q. And that's at Hoopeston, correct?
A. That's correct.
Q. Do you remember making another site
visit at Hoopeston?

Page 361

A. All I recall is I was with Paul or Lois,
and if there are two different times, I don't
recall. But I do know that this is my document and
I produced it.
Q. But you're not sure whether you made
another site visit?
A. No, I don't recall.
Q. Well, did you produce Exhibit 91 on or
about August 1st, 1996?
A. That date could be the date we visited
or it could be the date I put down when I sent it to
her. That I don't recall. It's possible.
Q. Okay.
A. I don't recall.
Q. Let's look further at Exhibit 91. How
did you arrive at the information you put in the
unit price column on Exhibit 91?
A. Say that one more time.
Q. There's a unit price column on
Exhibit 91, right?
A. Uh-huh.
Q. How did you determine what amounts to
put in the unit price column on Exhibit 91?
A. I know exactly what this is now. This

Page 362

is -- I have a different contract now. That's what
this is telling me now. Now that I look at it and
now that I recall, this one, if I put in here
94-B-0083, I may have submitted this and it was
expired and they requested me to supply them with a
new one, and that's what that date relates to.
So I what I did was send a second work
order, only because at this time this transpired
under one contract and this was under the new
contract. That's exactly what it is. Now I can
remember that. That's why I have the same document
because this one is for the expiring or maxed out
contract and this is for the other one. Yeah,
that's why there's two of them.
Q. I just want to make this a little bit
clear on the record.
A. I understand.
Q. Referring to Exhibit 90, do you have
Exhibit 90 in front of you?
A. Yes, I do.
Q. That's the one where you filled out the
scope of work using the unit prices from the
contract 94-B-0083, is that correct, sir?
A. That's correct.

Page 363

Q. That was the Indefinite Quantity
Contract that you had in November of 1995, is that
correct?
A. That's correct.
Q. Now, in August of 1996, you filled out
Exhibit 91, is that correct?
A. That's not correct. I could have filled
that out any time other than August 1st, '96.
Q. But at the time you filled out
Exhibit 91, you were operating under the Indefinite
Quantity Contract that you had in 1996, is that
correct?
A. I'm not sure of the dates, but it was a
different contract.
Q. A different Indefinite Quantity
Contract?
A. Than Exhibit 90.
Q. Just to get the chronology straight, is
it correct that back in 1994, you had an Indefinite
Quantity Contract; and then in June of 1996, you
were awarded two new Indefinite Quantity Contracts,
is that correct?
A. That's correct.
Q. And they had unit prices which were

Page 364

different from the '94 contract, is that correct?
A. That's not correct. It was the same unit price, same line items. The only thing different was my multiplier, because I'm competing for a contract to get the contract.
My multiplier assures me of a contract, which is why we're here today because I competed for this geographic area under a specific contract with a special multiplier relating to the line items. The line items stay the same, but my multiplier against them change with wage rates and dumping fees and things that take for cost of business.
So what ends up happening is this document could end up being different than this document by nature of the fact that I have a different multiplier.
Q. So you're saying --
A. A contract is a contract, so...
Q. Just so I'm really clear, on Exhibit 91, the unit prices in that column, the unit price column on Exhibit 91 --
A. Uh-huh.
Q. -- do they reflect the unit prices for the 1996 Indefinite Quantity Contracts?

Page 365

A. To the best of my knowledge, they do.
Q. And are you telling us then that the reason why the unit price column is different in Exhibit 90 versus Exhibit 91 is because there were different multipliers for the two Indefinite Quantity contracts?
A. That could be, yes, that's exactly what it could be, or they could be the same. I don't have a calculator to crunch the number.
Q. I guess I'm not following you when you say "they could be the same." Let me just ask some more questions.
First off, I would like to ask you to compare the second page of Exhibit 90 and Exhibit 91. Those second pages, they look identical to me. Do they look identical to you?
A. Pretty much.
Q. Earlier you said that you knew exactly what Exhibit 91 is. What do you think Exhibit 91 is?
A. It's a replication for my contract for '96. See, I'm just going to say this for time sake, because I believe I'm educating everyone on something that it took me ten years to -- when I was

Page 366

doing this.
All you need is my contract number, go to the PACS system, pull up these items times the quantity and you'll get your extended price and you'll get the government price. You don't need to know I wrote different numbers down in my extended column or they seem to be different.
This exercise, frankly, is starting to be fruitless because these quantities, these unit prices are based against the quantity. This is a government generated thing. I can't generate this part. I can only put in the quantities.
To get the extended version, you just do the math and you'll get the exact number. And that can be done by anybody in the current postal system. And I'm getting a little frustrated in the sense that I'm educating on how a work order is put together and I don't see the purpose of it.
Q. Can you explain to me, sir, why it is in these two documents that you prepared there are different numbers in the unit price column on the first page?
A. Very simply. Maybe this page --
Q. When you're talking, you have to refer

Page 367

to the exhibit number of the document.
A. Exhibit 90, I took the time to run my multiplier against that number, which was $80. If, in fact, $68.72 is 15 percent less than 80, that will make the difference. It's possible that the new contract I changed the way I did the format, but the numbers don't change in regard to the end result, because the government's computer automatically takes my multiplier off against the unit price and the individual item number.
If I didn't write the description down in here or the unit measure, all I needed to put down, for example, is the first line on the item number and a quantity, and the postal service's work order would have produced everything else.
All this other information is completely moot, because all you need is an item number and a quantity and you can build a work order. Do you understand that?
Q. I have another question for you, sir. Do you see that on Exhibit 90 you have a total of $45,951.88, and on Exhibit 91 you have a total $45,472? Do you see that?
A. Yes.

Page 368

Q. Did you compute both of those totals?
A. I may have made a mistake, yes. I observe that now. But as I've reiterated, and I'll reiterate it again, you can take this item number times this quantity and you'll get the end result for my contract for this particular work order.
Q. Do either --
A. And I would live with that final number.
Q. Do either Exhibit 90 or Exhibit 91 relate to your claim, which is the subject of the lawsuit?
A. I've got to find it first.
Document 83, Exhibit 83, No. 2 says, on October 1st and August 1st, on or about, L.P. provided a site visit and they produced these work orders, and the total amount is $62,752.
Q. So --
A. That would be for both work orders.
Q. Which two work orders?
A. The interior and exterior.
Q. Which two documents of the scopes of work for Hoopeston are you referring to?
A. I believe it to be 87 and -- well, either 90 or 91.

Page 369

Q. Can you tell us which one it is for the handicap ramp?
A. No, I cannot.
Q. So it's either 90 or 91 and you don't know which?
A. Now that you've pointed out the total in this extended price, I'd have to do some math. One of these two would equal what this one would equal in my claim.
MS. KIRCHNER: Does anybody have a calculator to find out which one it is?
(WHEREUPON, a recess was had.)
BY MS. KIRCHNER:
Q. With regard to the Hoopeston Post Office, does your claim relate to a scope of work which amounted to $62,752?
A. Yes.
Q. Have you looked at the documents and can you tell us which scopes of work are relevant to your claim?
A. Not really. I believe that this is a different multiplier --
Q. Again, when you --
A. Exhibit 91 is a different multiplier

Page 370

than Exhibit 90. Therefore, the concern that the government has is the written extended price, and that's the difference.
Q. That's not my question, sir. I want to know which documents are the documents on which you're basing your claim.
Which particular document relates to the scope of work in the amount of $62,752?
A. I'm going to say Exhibit 91.
Q. And that has on it an amount of $45,472?
A. Yes.
Q. Can you explain to me -- we have also this scope of work in Exhibit 87. Does that relate to your claim for Hoopeston, which has a scope of work amount of $62,752?
A. Yes, it would.
Q. So you're saying that the $62,752, that scope of work was for interior plus the handicap ramp?
A. I believe it was.
Q. Do you have any document that totals out the amount for the interior part of the scope of work for Hoopeston?
A. None that totals out on the document.

Page 371

Q. Have you ever sat down and totaled out the numbers on Exhibit 87?
A. Oh, yes.
Q. Do you have that someplace?
A. No. I would have thrown that away. It was just a mathematical. It's irrelevant to me.
Q. But was it important to you at the time you filed your claim?
A. Yes, but it's a government math number, not my number. Anybody can do the math.
Q. The number $62,752, that was in your claim, correct?
A. That's correct.
Q. Did you satisfy yourself at the time you filed the claim that that was a correct number?
A. Yes, it was.
Q. How did you satisfy yourself that it was correct?
A. I ran the computation as if my calculator was the government computer, and I determined on a tab what the amount would be. And I didn't feel the need to write that number on my scope of work.
Q. So the $62,752 is the sum of the items

Page 372

listed in 87 and the items listed in 91?
A. It's the amount that I have determined based on my calculations that I filed in my claim.
Q. And it's for the items of work listed in Exhibit 87 and Exhibit 91, is that correct?
A. It's -- the items that I believe are important to my claim is in those two exhibits, yes.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 92 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. Please take a look at what we've marked as Exhibit 92 to your deposition and tell me whether you recognize Exhibit 92.
A. Yes, I do.
Q. What's Exhibit 92?
A. Exhibit 92 is another contract with another price, and it's for $62,000.
Q. Did you prepare Exhibit 92?
A. With the exception of the quantities, yes, and -- yeah.
Q. Whose handwriting is on Exhibit 92?
A. My handwriting.
Q. Is all the handwriting your handwriting?

Page 373

A. Yes, it is.
Q. When did you prepare Exhibit 92?
A. This would have been at the time I received that other contract that's shown up at the top.
Q. As I understand it, you received the Indefinite Quantity Contract 96-B-0098 in June of 1996, is that correct?
A. I believe so, on or about, yeah.
Q. Are you telling us that it was at or around that time that you prepared Exhibit 92?
A. I'm saying that I took the item number against the quantity that was derived, whether it be on Exhibits 92, 91, 90 or any of the exhibits shown, or 87, and I filed a claim for the amount of $62,000 and whatever my claim is for. Whether it be Exhibit 92, 91 or 90 or 87, I'm claiming the item number against the quantity that's listed on the document. I'm not claiming the extended price or the government's unit price or my multiplier.
Q. Are you claiming the quantity?
A. I'm claiming the item number and I'm claiming the quantities, and whatever that comes out to be is my claim.

Page 374

Q. Well, as you sit here today, can you tell us what quantities you are claiming for Hoopeston with regard to the concrete handicap ramp?
A. I'm going to say that I'm claiming the quantities against the item number on document Exhibit 92.
Q. And you'll note, sir, that those quantities are different than the quantities in Exhibits 90 and 91, is that correct?
A. They might be, yes.
Q. Well, could you just satisfy yourself, sir?
A. Yes, they are different.
Q. How did you go about determining the quantities that you put in the quantity column of Exhibit 92?
A. The same way I did the others. I would get with the postal people and we would determine that this is the amount required. It's very possible that this document --
Q. Which one are you referring to?
A. Let me finish.
Q. Sorry.
A. I'd appreciate it.

Page 375

Exhibit 92 is probably a take-off of Mr. Fernandez's drawings that I protested and was given by Mr. Rigsby, and I came up with a number of $62,000. And that's probably what document 92 is, which is the issue of the claim.
Q. Did you obtain Mr. Fernandez's drawings for the Hoopeston ramp?
A. Yes.
Q. And did you then do a take-off for those drawings of Mr. Fernandez?
A. Yes.
Q. And is that take-off of yours Exhibit 92?
A. Yes.
Q. And by "take-off," please tell us what you mean, for the record?
A. The government's item number, description, unit measure and unit price times the quantity as it related to the document provided by the government. And that's how I came up with my number against my multiplier of my contract.
Q. In the document that you had from the government was Mr. Fernandez's drawings for the Hoopeston ramp, is that correct?

A. That's correct.
Q. From those drawings, in your experience, you came up with the quantity column on Exhibit 92, is that correct?
A. That's correct.
Q. And those amounts listed are different from the amounts -- quantities listed in Exhibits 90 and 91, is that correct?
A. That's correct.
Q. And you prepared Exhibit 92 sometime in 1996, is that correct?
A. That's correct.
Q. What did you do with Exhibit 92 after you prepared it in 1996 based on Mr. Fernandez's drawings?
A. I gave it to Mr. Rigsby.
Q. And you'll see that your total on Exhibit 92 is $62,000, is that correct?
A. That's correct.
Q. Yet your claim amount -- the amount of your scope of work for purposes of the claim is $62,752, is that correct?
A. If that's what's written, sure.
Q. Yes. How do you account for the



difference, sir?
A. Math error, maybe the multiplier, I used the wrong multiplier, that's possible. Because it's just unit prices against quantity with a multiplier, so it's possible it's a calculator mistake. I don't have the government, you know, system, so it's a very arduous task.
Q. I didn't hear you.
A. I don't have the government system to produce this in 30 seconds, so I have to produce it long hand.
Q. When you did Exhibit 92, when you prepared Exhibit 92 in 1996, did you do it long hand?
A. I would think, yeah. You could see it on the document.
Q. Now, after you gave your amount for the Hoopeston ramp to Mr. Rigsby, how did you do that? Did you do that orally? Did you give him a piece of paper?
A. I handed him the document that you're referring to as No. 92.
Q. Did you say anything when you handed it to him?



A. "Here's the Hoopeston exterior ramp."
Q. Did he say anything to you at the time you gave him the document?
A. Yes, he said it's too late.
Q. Did you respond to that?
A. Yeah, I formally protested to senior counsel in Washington.
Q. And what was the result of your formal protest?
A. It was dismissed because it was untimely.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 93 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. Please take a look at what we've marked as Exhibit 93 to your deposition, and let me know when you're ready.
A. I'm ready.
Q. Do you recognize Exhibit 93?
A. Uh-huh.
Q. What's Exhibit 93?
A. A letter to Mr. Sakrider in Chicago from my attorney at the time regarding Hoopeston and



other matters.
Q. Is this your formal protest regarding the Hoopeston matter?
A. No. My formal protest went to William Jones in Washington. This may be a copy of something. This is not the official protest.
MS. KIRCHNER: Go off the record.
(WHEREUPON, a discussion was had off the record.)
BY MS. KIRCHNER:
Q. So you got the drawings from Mr. Fernandez and did your take-off?
A. No, I got the drawings from Mr. Rigsby and did my take-off.
Q. Okay. You got Mr. Fernandez's drawings, you did your take-off, and the take-off is Exhibit -- is that Exhibit 92?
A. That's correct.
Q. You have no explanation for the difference between the $62,000 and the $62,752 in your claim amount?
A. My explanation is a possible difference in the multiplier that I failed to calculate right as a math error. And I'm willing -- going on record

as saying I'm willing to live with the official government postal service compilation, the item number times the quantity against my multiplier, and I'll live with that.

Q. Which document are you referring two?

A. Document 92.

Q. So we don't need to look at Exhibit 81?

A. Exhibit 81 would not -- no, not 81. That's the Downers Grove dock.

Q. Are you telling me that the $62,752 figure was solely for the handicap ramp and not the interior at Hoopeston?

A. I'm not saying that. I'm saying that Exhibit 92 was a result of Mr. Fernandez's drawing that Mr. Rigsby gave me, and that's what I'm claiming. I'm claiming that particular portion of the project. I don't believe I'm claiming the interior part insofar as for damages. So I don't believe that. Now, I might be wrong, but I'm just saying there's obviously a math error and it's something I made a mistake with.

Q. Putting aside the math, in terms of the scope of the work that you scoped out that relates to Hoopeston, is it solely the handicap ramp or the



is it the ramp plus the interior?

A. I'll let you know in a second.

The ramp.

Q. And only the ramp?

A. Yes, because only the ramp, I believe, was in my certified claim here. Yeah, only the ramp.

Yeah, Hoopeston ramp project.

Q. After you handed in your $62,752 price to Mr. Rigsby, did you have any conversations with Mr. Rigsby that related to Hoopeston and the handicap ramp?

A. Yes, I gave him the drawings back, as he requested, and I gave him my work order. And at the time he looked at it, he said it's late, and so I protested.

Q. But after that point, did you have any more oral conversations with Mr. Rigsby --

A. I might have.

Q. -- about the handicap ramp?

A. I may have. I don't recall.

Q. Do you recall any?

A. Not really, no.

Q. Can you tell me, did you do any damage



calculations to produce the profits part of your claim?

A. I did some form of percentage calculation based on the nature of the unit price. It's different than, you know, two plus two is four. It's a percentage issue, so I did do that calculation.

Q. This is back in 1998?

A. This is the time I put the claim in.

Q. Do you have those calculations that you did back in 1998?

A. I believe they were submitted by my attorney.

Q. But you don't have the pieces of paper or wherever you did the calculations back in 1998?

A. I would not have been concerned with saving that type of calculation because I have a unit price that I would take a multiplier against the government's unit price, and that's how I arrived at it. This is not a fixed price type of contract, so I have no reason to go in that direction.

Q. So you had this documentation at the time you submitted your claim, but you didn't save



it, is that correct?

A. I had no documentation.

Q. You had the calculations at that time?

A. Uh-huh. Well, there's no calculation. It's a math formula. It's not a calculation. You can call it a calculation. There are no raw numbers to say, like I say, two plus two is four. It's a percentage of the amount of the work order against --

Q. Well, can you just -- let's take one example of your claim and just tell me how you did it. Let's just take whatever example you want to take from the claim. Just take your work order amount as an example and then tell me how you did it for one and which one you're using so that I understand, sir.

A. I would have -- I'll just use the Exhibit 52, Aroma Park, work order amount, that lost profit would have been a percentage against the work order amount based on the multiplier that I use when I bid a unit price contract with the post office.

Q. For Aroma Park, did you do anything with your costs when you computed the profits?

A. My costs would have been in my

①

# TERM CONSTRUCTION CONTRACT WORK ORDER

| CONTRACT NO. | PROJECT MGR. | MULTIPLIER | WORK ORDER NO. | DATE |
|---|---|---|---|---|
| | | | | |

| PROJECT DESCRIPTION/LOCATION | START DATE | PERFORMANCE TIME |
|---|---|---|
| ST. ANNE P.O. | | |

| PROJECT AUTHORIZATION NO. | CHANGE CODE | FINANCE NO. | ACCOUNT NO. | INDEX NO. |
|---|---|---|---|---|
| | | | | |

| CONTRACTOR | U.S. POSTAL SERVICE |
|---|---|
| L.P. Consulting Group, Inc.<br>10401 S. 75th Ave.<br>Palos Hills, IL 60465-2015 | ADMIN. SERVICES<br>SAM SOUTHERN |

| AUTHORIZED SIGNATURE | DATE | CONTRACTING OFFICER | DATE |
|---|---|---|---|
| | | | |

| ITEM NUMBER | | | ROUGH CARPENTRY AND FINISH CARPENTRY | UNIT MEAS | UNIT PRICE | QTY. | EXTENT PRICE |
|---|---|---|---|---|---|---|---|
| 05.5 | 00 | 043 | VARIOUS FASTENERS SELF TAP | EA | .71 | 10. | 7.10 |
| 05.5 | 00 | 045 | VARIOUS FASTENERS POWER LOAD | EA | .67 | 15 | 10.05 |
| 06.1 | 00 | 001 | 2x4 WOOD STUD | LF | 2.90 | 370 | 1,073.00 |
| 06.1 | 00 | 005 | ADD FOR HEADER 2x8 | LF | .21 | -0- | |
| 06.1 | 00 | 024 | PLYWOOD SHEATHING 1/2" | SF | 2.23 | 96 | 214.08 |
| 06.1 | 00 | 026 | PLYWOOD SHEATHING 3/4" | SF | 2.81 | 96 | 269.76 |
| 06.1 | 00 | 049 | DEMO. OF STUD WALLS | LF | .22 | 63 | 13.86 |
| 06.1 | 00 | 067 | BLOCKING | BF | 1.27 | 10 | 12.70 |
| 06.1 | 00 | 071 | REMOVE EXIST. LOCK BOX BASE | LF | 6.49 | 35 | 227.15 |
| 06.1 | 00 | 072 | REMOVE EXIST. UNDERCOUNTER EQUIP. | LF | 7.15 | 10 | 71.50 |
| 06.1 | 00 | 077 | RELOCATE LETTER DROP | EA | 26.80 | 1 | 26.80 |
| 06.1 | 00 | 080 | MISC. HOURLY LABOR. CARPENTER FINISH | HR | 25.74 | 160 | 4118.40 |
| 06.2 | 00 | 062 | MOLDING MATERIAL | LF | 1.13 | 271 | 306.23 |
| 06.2 | 00 | 021 | MOLDING INSTALLATION | LF | .89 | 271 | 241.19 |
| 06.2 | 00 | 026 | 2900 SERIES BOXES | LF | 44.67 | 28 | 1250.76 |
| 06.2 | 00 | 035 | MIN. CHARGE MILLWORK TRIM REMOVAL | JOB | 44.67 | 1 | 44.67 |
| 06.2 | 00 | 050 | P.O. BOX BASE UNIT | LF | 11.67 | 35 | 408.45 |
| 06.2 | 00 | 003 | DEMO. BASEBOARDS, FASCIAS | LF | .35 | 130 | 45.50 |
| 06.2 | 00 | 077 | LOCK BOX LAMINATE MAIL DROP | EA | 89.34 | 1 | 89.34 |
| 06.2 | 00 | 078 | LOCK BOX LAMINATE VENDING MACHINE | EA | 44.67 | 0 | |
| 07.1 | 11 | 014 | CAULKING | LF | 1.64 | 54 | 88.56 |
| 12.1 | 15 | F01 | REMOVE EXIST. SERVICE COUNTERS & LOBBY DESKS | LF | 7.86 | 22 | 172.92 |
| 12.1 | 15 | F03 | INSTALL POSTAL FURNISHED COUNTER UNIT | EA | 368.51 | 2 | 737.02 |
| 06.2 | 00 | 024 | REMOVE BOXES ANY TYPE | LF | 22.33 | 35 | 781.55 |

| ATTACHMENTS: | | |
|---|---|---|
| | SUBTOTAL | |
| | MULTIPLIER | |
| ☐ CONTINUED ☐ TOTAL WORK ORDER AMOUNT | TOTAL | |

- 584 -

Battaglia DEP. EX. NO. 55
FOR I.D., AS OF 6/10/04 R