(7)

| ITEM NO | QTY. | UNIT | WORK DESCRIPTION | U.M. | UNIT $ | Q | TOTAL $ |
|---|---|---|---|---|---|---|---|
| 57 | 43 | F01 | RELOCATE EXIST. THERMOSTAT | EA | 143.00 | 1 | 143.00 |
| 58 | 24 | 002 | CEILING FAN | EA | 332.80 | 2 | 665.60 |
| 58 | 24 | 005 | SPEED CONTROLLER | EA | 36.40 | 2 | 72.80 |
| 59 | 10 | 006 | REMOVE & REINSTALL HVAC REGISTERS | EA | 4.00 | 5 | 20.00 |
| 59 | 36 | 017 | REGISTERS FLOOR. 18"x8" | EA | 65.52 | 0 | 0 |
| 60 | 00 | 036 | F & I SINGLE POLE BREAKER | EA | 31.20 | 2 | 62.40 |
| 60 | 00 | 038 | F & I 3 WIRE #12 | LF | .62 | 310 | 192.20 |
| 60 | 00 | 040 | F & I ½" CONDUIT | LF | 1.56 | 310 | 483.60 |
| 60 | 00 | 052 | REMOVE PENDANT FLOUR. FIXTURE | EA | 31.20 | 10 | 312.00 |
| 60 | 00 | 053 | REMOVE SURFACE FLOUR FIXTURE. | EA | 22.88 | 0 | 0 |
| 60 | 00 | 055 | REMOVE RECESSED INCAND. FIXTURE | EA | 26.00 | 0 | 0 |
| 60 | 00 | 053 | REMOVE WIRE MOLD | LF | .78 | 0 | 0 |
| 60 | 00 | 059 | F & I PHOTO CELL | EA | 93.60 | 0 | 0 |
| 60 | 00 | 019 | PLAYADE ELECT. SERVICE | EA | 466.26 | 1 | 466.26 |
| 60 | 00 | 012 | FURNISH DEDICATED OUTLET | LF | 13.20 | 85 | 1,122.00 |
| 60 | 10 | 011 | MISC. HOURLY LABOR. ELECTRICAL | HR | 34.46 | | |
| 60 | 20 | F01 | REMOVE #12 WIRE | LF | .18 | 1,100 | 198.00 |
| 60 | 20 | F04 | REMOVE ½" CONDUIT | LF | .66 | 400 | 264.00 |
| 62 | 30 | F01 | DUPLEX RECEPTACLE | EA | 69.78 | 2 | 139.56 |
| 62 | 30 | F05 | WALL SWITCH | EA | 58.34 | 1 | 58.34 |
| 62 | 30 | F12 | WALL JUNCTION BOX | EA | 54.91 | 4 | 219.64 |
| | | | SUBTOTAL THIS PAGE | | | | |
| | | | SUBTOTAL FROM PREVIOUS PAGE(S) | | | | |

CATES NON-WORKING HOUR PRICES

| | |
|---|---|
| SUBTOTAL | |
| MULTIPLIER | |
| TOTAL | |

☐ CONTINUED ☐ TOTAL WORK ORDER AMOUNT

(8)

| ITEM NO | QTY. | UNIT | WORK DESCRIPTION | U.M. | UNIT $ | | TOTAL $ |
|---|---|---|---|---|---|---|---|
| 62 | 30 | F26 | Remove Switch | EA | 13.58 | 1 | 13.58 |
| 2 | 30 | F27 | Remove Duplex Receptacle | EA | 16.29 | 2 | 32.58 |
| 62 | 30 | F28 | Remove J. Box | EA | 14.66 | 2 | 29.32 |
| 62 | 30 | F31 | Relocate Wall Switch | EA | 56.62 | 0 | 0 |
| 62 | 30 | F32 | Relocate Duplex Recept. | EA | 67.49 | 0 | 0 |
| 63 | 50 | C30 | Panel Board 3 wire 100 amp | EA | 795.08 | 1 | 795.08 |
| Negociated | | | Remove Exist. Panel Board | EA | 312.52 | 1 | 312.52 |
| 66 | 10 | F24 | Surface Flour. Fixture 1'x4' | EA | 147.57 | 10 | 1475.70 |
| 66 | 10 | F2 | Exit Lite | EA | 89.23 | 1 | 89.23 |
| 66 | 10 | F3 | Emergency Lite | EA | 558.27 | 1 | 558.27 |
| 66 | 10 | F18 | Remove Surface, Incandescent Fixture | EA | 21.23 | 0 | 0 |
| 66 | 10 | F27 | Recircuit Lights | EA | 20.00 | 0 | 0 |
| 66 | 50 | 115 | Exterior Lighting 55w: Sodium | EA | 338.00 | 0 | 0 |
| Negociated | | | Handicap Sign 9"x9" Entrance | EA | 52.00 | 1 | 52.00 |
| Negociated | | | Service Lobby Door Bell | EA | 55.00 | 1 | 55.00 |
| Negociated | | | Relocate Phone Outlet | EA | 60.70 | 1 | 60.70 |
| Negociated | | | New HVAC System | LS | 10,500 | 1 | 10,500 |

SUBTOTAL THIS PAGE

SUBTOTAL FROM PREVIOUS PAGE(S)

ICATES NON-WORKING HOUR PRICES

SUBTOTAL

MULTIPLIER

[ ] CONTINUED [X] TOTAL WORK ORDER AMOUNT

TOTAL 62,000

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

L.P. CONSULTING GROUP, INC., )
Plaintiff, )
vs. ) Case No.
THE UNITED STATES POSTAL ) 98-868 C
SERVICE, ) (Judge Allegra)
Defendant. )

The deposition of ROBERT A. RIGSBY, called for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions for the purpose of discovery, taken before Janet L. Robbins, CSR No. 84-2207, a Notary Public within and for the County of Cook, State of Illinois, and a Certified Shorthand Reporter of said state, at Suite 3300, Three First National Plaza, Chicago, Illinois, on the 9th day of June, A.D. 2004, at 2:24 p.m.



PRESENT:
BELL, BOYD & LLOYD PLLC,
(1615 L Street, N.W., Suite 1200,
Washington, D.C. 20036-5610,
202-955-6830), by:
MR. LAWRENCE M. PROSEN,
appeared on behalf of the Plaintiff;
UNITED STATES DEPARTMENT OF JUSTICE,
CIVIL DIVISION-COMMERCIAL LITIGATION BRANCH,
(1100 L Street, N.W., 8th Floor,
Washington, D.C. 20530,
202-307-0290), by:
MS. DOMENIQUE KIRCHNER,
appeared on behalf of the Defendant
and the Deponent.

ALSO PRESENT:
MR. RICHARD BATTAGLIN,
L.P. Consulting Group, Inc.;
MR. STEPHEN LOBAUGH, In-House Counsel,
United States Postal Service.

REPORTED BY: JANET L. ROBBINS, CSR, RPR,
CERTIFICATE NO. 84-2207



(WHEREUPON, the witness was duly sworn.)

ROBERT A. RIGSBY,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. Prosen:
Q. Please state your name and address for the record.
A. Robert A. Rigsby, 1655 East 91st Street, Chicago, 60617.
Q. Do you have a work address or phone number, as well?
A. Yes.
Q. Can you put that on the record, please, too?
A. It's the same address.
Q. Oh, it's the same address. I'm sorry.
Sir, my name is Lawrence Prosen, and I'm counsel to L.P. Consulting. I presume you know Mr. Battaglin?
A. Uh-huh.
Q. We're here regarding the claims that were submitted to you and then were appealed to the



Court of Federal Appeals some years ago now, March 3rd and April 13th, 1998.
For ease of reference, there's a list in front of you there which is marked as Southern Exhibit 1. These are the 12 projects which are involved in the current litigation. Given the time, I thought it would be possibly a good tool to use. And we'll be making reference to that, and you can refresh your recollection using those, as well.
Excuse me just a second here.
Can you just give a brief background of your educational background?
A. Starting from when?
Q. Let's say high school on.
A. Okay. I'm a high school graduate. I'm also a post college graduate.
Q. What are your degrees in? You have an undergrad and graduate?
A. I have an undergrad degree in business, and I have a graduate degree in urban sociology.
Q. Where were your degrees obtained?
A. Governor State University.
Q. Which is?
A. Illinois.

more pages back.
A. Are we under the same tab?
Q. Yes, sir.
Do you recognize this document, sir, or can you identify what it is?
A. This looks like a document that's been supplied to the prospective bidders, and I guess it's for them to return to the contracting officer, in this case, unless it is a document that awards the contract? It's one of the two.
Q. Now, if you go back four more pages where it says 075 at the bottom right-hand corner.
A. Uh-huh.
Q. Generally speaking, how does the postal service prepare a work order, a scope of work or a work order under an IQC contract such as this?
A. Okay. Under an IQC contract, the postal service has a document, it's a book that they produce, with all of the cost items in it, all of the possible items that could be applied to a construction in the process of constructing a renovation or anything.
And they're items -- each item has a cost attached to it as to what the postal service is



willing to pay to get the item done. The postal service is saying, "We'll pay you a dollar to do -- put in a square foot of tile out there."
If you go back and look at this document that you asked me to look at here --
Q. That's the Page 072 a the bottom?
A. -- Page 072, Mr. Battaglin and his group is saying, "We'll do that for 85 cents."
Q. That's the multiplier you're talking about?
A. Yes. If the postal service says, "We'll pay you a dollar to do it," L.P. Consulting says, "No, we'll take 85 cents to do it."
Q. And they competed with other offerors based on the multiplier?
A. That's correct.
Q. Is it fair to say that the .85 was probably the lowest multiplier?
A. I have no idea, because I have seen some lower than that.
Q. And it's based on best and final, so you look at the whole --
A. No, I've seen some multipliers as low as 79 cents.



Q. For the same kind of work?
A. Yes.
Q. Now, my understanding is under an IQC, once an award has been made, the contracting officer will issue work orders to perform defined scope of work, is that correct?
A. You asked me how the work orders are generated. Now, a work order for an IQC can be generated by the postal service and supplied to the IQC telling him what it is that we want to accomplish, what items we want to accomplish. Putting lights in, putting in two by two ceiling tile, putting in the grid, hanging lights such as this, there's a dollar amount associated with each item. How many of them you want determines the cost.
We can do that from the postal service side or the contractor can also do that because if he has a computer that generates the cost for the items based on what's in the book itself -- some contractors -- and I think that L.P. Consulting may have had that. I'm certain they did, because they could come back and give you the line item exactly the way it was stated in the IQC cost breakdown book



showing you how many items they were going to do and the resulting cost.
Now, the postal service person could take that and either the contracting officer or the contract technician or the project manager could look at it and determine if these things were needed as a result of making a visit to the facility. And if they weren't, some of the things may or may not be needed, then you would extract those things or delete them, and if other things were needed, you would add them.
So that's how the work order is generated. It's an agreement between the contracting officer ultimately and the contractor --
Q. Okay.
A. -- to accomplish that work.
After the work order is generated, only and after the work order is generated and then signed by the two parties should any work start.
Q. So you do recall receiving proposed scopes of work or task orders from L.P. Consulting?
A. That's in general, yes, I do.
Q. I'm sorry?
A. You're not being specific. In general,

yes.
Q. In general, yes --
A. Yes.
Q. -- you remember receiving them?
A. Yes.
Q. Do you recall what these documents, these scopes of work that you received from L.P. Consulting looked like? Were they typed or handwritten?
A. I think the majority of them might have been generated by a computer or something.
Q. By computer?
A. Yeah. Not all of them. I'm saying the majority of them.
Q. I understand.
If the U.S. Postal Service developed on its own a scope of work for a work order, in these IQC contracts, who would have been the person normally to do that task?
A. A project manager would go out and determine what work was -- scope of work was to be done. And they could bring it back and give it to a contract technician and the technician could sit down and go into the computer system and generate



based on the numbers, on the shear numbers that are associated with that particular item.
Q. That's the FMS Win, when you're talking about the computer?
A. I think it may have been, yes.
Q. Did there come a time in the course of your dealings with L.P. Consulting with these IQC contracts where you requested L.P. Consulting to travel to various postal facilities to do, I guess you would call them, a facility survey or site survey?
A. Are you speaking in general terms?
Q. Yes, for now we're talking general.
A. There may have been a time. Because you wouldn't require all -- that would apply to any IQC, you would require them to go and look at the facility.
Q. Even if the government -- even if the U.S. Postal Service had internally developed the scope of work?
A. They do it for every IQC. Mr. Battaglin and his group was not the only IQC that was assigned to that zip code area. There were other IQCs also operating at the same time.



Q. Were they the only IQC contractor in those areas for this scope or area of work, this type of work?
A. IQC contractors? I'm certain there might have been two, maybe three.
Q. Do you recall who else, other than L.P.?
A. I think St. Louis Design and Construction. I think St. Louis Design and Construction.
Q. What would be the purpose of awarding IQC contracts for the same type of work in the same area to multiple contractors?
MS. KIRCHNER: Objection, hypothetical, ambiguous.
BY MR. PROSEN:
Q. You can answer.
MS. KIRCHNER: You can answer the question.
BY THE WITNESS:
A. Would you repeat the question, please?
BY MR. PROSEN:
Q. Sure. Why would the postal service award multiple IQC contracts to various contractors for the same defined geographic area or zip code or whatever for the same work? What does that



accomplish?
A. First of all, we have a right to do it. Secondly, the reason that we really do it is because -- we really did do it, I'm no longer a part of it, was because you want to have the opportunity that in the event you would call on one contractor to do something and you needed to get it done in a hurry and he was busy doing something else, you would be able to call on another contractor to do that.
Q. Under these IQC contracts, when I say "these," I'm referring Tabs 2 and 3 which are Southern Exhibits 3 and 4, the two contracts between the postal service and L.P. Consulting, how are the scopes of work and the work orders generally developed on those two projects -- on those two contracts? I'm sorry.
A. It depends -- you mean in this particular case or in general or what?
Q. On this particular case is fine, yeah.
A. In the case of L.P. Consulting, we knew the background of Mr. Battaglin, as far as his ability to go out and produce scopes. So the postal service would say go out and produce a scope, but a

Page 25

postal service employee may be with him, but there was not a need to duplicate the work order generation portion of it.

So he would be allowed to do that in some cases, generate a scope of work upon request, when he was requested to do it. If you go out and do that, bring the scope of work back; and if it was agreed upon, then it would be signed and we would proceed. But the ultimate scope is produced by the postal service.

Q. You said the ultimate scope is what?

A. The ultimate scope of work is produced by the postal service. It can only be generated by the postal service. What he may be supplying to us is a proposal; in other words, this is what he thinks needs to be done. In a lot of cases, it's just repetitive work. We use the same color in every post office, which is white, the same kind of counter. When you walk up to a counter in one office, it's the same as it is in another, so you know what you've got to do.

Q. Kind of like a corporate image so --

A. Corporate image. We use the same kind of tile on the floor.

Page 26

Q. -- every post office looks the same to a certain extent?

A. It's the same kind of tile on the floor. It's the same kind of door you come through all the time. So it wasn't rocket science, okay?

Q. So the two IQC contracts that we have here, L.P. was requested by you to go out and perform site surveys and submit a draft scope of work?

A. For specific projects.

Q. Okay. Okay.

A. So were other contractors, so were other IQC contractors.

Q. Who?

A. St. Louis Design and Construction.

Q. Anyone else you can recall, any other IQC contractors?

A. I can't think of the name of the guy out of Wisconsin.

Q. Summer?

A. Summers, right, Summers Construction.

Q. You would send them to the same projects or to different projects?

A. Never an IQC and an IQC to the same

Page 27

project.

Q. Okay. I just want to make sure we're clear.

Was there any -- I don't know how to quite -- system in place to decide which IQC was sent to which projects?

A. You try to cluster the projects and keep them in some proximity so you wouldn't have an IQC running all over from west to east.

Q. For example, in this IQC, 96-B-0098, it says for zip codes -- and I'm referring to Page 078 -- zip codes 604, 605 and 609.

There were other IQC contractors under separate IQC contracts that also were assigned to those same zip codes?

A. I'm almost certain there were other contractors in there.

Q. I'm just trying to make sure it's clear.

A. Yeah. I would say I'm 99 percent sure there were.

Q. Where an IQC contractor such as L.P. submitted a draft scope of work to you, did the government perform any sort of independent estimate or have anything to compare with the scope of work

Page 28

to make sure, in fact, the quantities on there were reasonable and accurate?

A. We have the same book -- we produce the book that we gave him to do the cost estimations, so we have the same source as he has.

Q. Right. But once -- those costs are the same, is that a fair statement?

A. Yes.

Q. The costs in there are the same. They competed -- the multiplier we saw was .85 percent in Southern Exhibit 5.

A. Uh-huh.

Q. So that cost is a fixed cost per unit, right? It's the quantities that's the variable?

A. That's absolutely right.

Q. How does the postal service verify that the quantities in an IQC contractor proposed scope of work are reasonable and accurate?

A. You have to have a project manager or someone visit the site. If he says he's going to put in 200 pieces of tile, you have to assume he's going to do it until you get a person out there to visit.

Q. And if it only fits 20 pieces of tile or

something like that, you know something is off, right?

A. Yes, you would.

Q. I got you.

Is there any way to commit money to an IQC contract without having a formal work order in place; as I understand, a computer generated or FMS Win generated work order?

A. You have to produce the work order in order to make funds, I would think.

Q. Make the funds, okay.

A. I think. You would have to certainly have a contract number assigned to that particular project.

Q. If you're going to send an IQC contractor out to perform -- if we could use site or field survey for what we've been talking about, is it fair to assume that by your sending them out there, that there's work to be done at that project site?

A. It's fair to assume that there's an interest in having work done at that site. And everyone knows that by virtue of your going to visit and look to see if there's work that needs to be



done does not guaranty that you're going to get it done.

Q. So it's their cost to eat, the contractor's?

A. At the time that that contract was being administered, that is the case, that was the case. Now, under the new contracts, that's when I was leaving, I know that we were proposing under the new contracts they would give the contractor some -- $50 or something for making the visit.

Q. Like just a flat fee?

A. Yes. If a guy goes and makes a site visit, he would get something for gas or whatever. It was a flat sum. It was being proposed. I don't know whether it went through or not.

Q. Was there ever a time where you committed work to L.P.'s IQC contracts and then subsequently decommitted that work?

A. I don't know. It may have, depending on what circumstances that were involved. I don't know. That would be the contracting officer's right to do that.

Q. Do you recall in Paxton, the Paxton, Illinois project, that you issued a signed work



order to L.P. and then made an award to a company called, I think, PNL and retracted L.P.'s work order?

A. I don't recall any specifics on that.

Q. Do you know a Jesse McNabb?

A. Yes, I do.

Q. Who is Mr. McNabb?

A. Mr. McNabb used to work with me.

Q. In what capacity?

A. He was a project manager.

Q. How about a Paul Steiner, S-T-E-I-N-E-R?

A. He worked for me.

Q. Catherine Marks?

A. She worked for me.

Q. What were their duties, Mr. Steiner first?

A. Mr. Steiner was a project manager.

Q. Ms. Marks?

A. Ms. Marks was also a project manager, but the duties and responsibilities were commensurate with the person's ability to do that type of work. In other words, some people would have more complex projects to supervise than others.

Q. Based on their knowledge, experience,



age, and all those sorts of things?

A. Yes.

Q. How about a Lois Gunlogson?

A. Same thing.

Q. She was also a project manager?

A. Yes.

Q. Mary Yates?

A. (No response.)

Q. You don't recall her?

A. No.

Q. A Robert Gibbons, G-I-B-B-O-N-S?

A. No.

Q. How about Samuel Southern?

A. Yes.

Q. Who was Mr. Southern?

A. Mr. Southern was a facility specialist. He worked for me.

Q. Do you recall whether or not any of the individuals who you recall, obviously not Ms. Yates or Mr. Gibbons, did you ever send them out on site visits with L.P. Consulting?

A. I'm sure I did.

Q. And do you know what the purpose of those site visits were?

A. To determine if work needed to be done.
Q. Do you recall the project?
A. Not specific, no.
Q. Turn to Southern Exhibit 7. It's under Tab 6, please. It's a letter to Ms. Gunlogson, dated 20, September 1996 from Mr. Battaglin.
Do you recall seeing this letter?
A. I don't recall it at this time.
Q. Do you recall any site visits that L.P. would have had with Mr. Steiner regarding, among other projects, the Hoopeston project?
A. All I know is at this point, Mr. Steiner did go out on visits with Mr. Battaglin.
Q. How about with Mr. Southern with regard to either St. Anne or Momence?
A. I don't recall any specific projects they may have visited, but I do know in general he has gone out with him.
Q. If we could turn to the next page, Southern Exhibit No. 8. It's Tab 7.
Do you recognize this handwriting or know who the author of this document is?
A. No.
Q. Do you know a Wayne Miller?



A. Yes.
Q. Who is Mr. Miller?
A. Mr. Miller, I think he still is, I think he's a field manager or something for maintenance.
Q. What would his duties involve?
A. He was detailed to my office for a while, and his duties at that time would have been project manager.
Q. Like Mr. McNabb and Mr. Steiner?
A. Yeah. Everybody who has the name project manager had different levels of responsibility. I keep emphasizing that.
Q. It says under 3, "Post office with a scope of work approved by Mr. Rigsby," and it identifies under "B" St. Anne and "I," Aroma Park.
Do you recall approving any scopes of work for St. Anne or Aroma Park on behalf of L.P. Consulting?
A. No, no, I don't recall having approved any.
Q. Do you remember rejecting any scopes of work for L.P. for St. Anne and Aroma Park or denying the scope, however you want to call it?
A. Aroma Park was a project that was not



under my supervision.
Q. Whose supervision was it under?
A. It was under Larry Linnenburger's, I'm certain.
Q. Was it the same type of work as the other projects that were being performed by L.P. Consulting?
A. I think the scope of work may have been a little greater than what the level of responsibility that we had at the district level. And I think at that time it may have been $100,000. And this project exceeded $100,000, so it would have gone back to Larry Linnenburger.
Q. What is your understanding of what the work orders that L.P. was to perform under these IQC contracts, generally what kind of work was L.P. to perform?
A. Under the IQC contract?
Q. Under the two IQC contracts, yeah. Not specific to a project, but overall what kind of work did they perform?
A. All the work that was included in the solicitation, the type of work that was done -- included in the solicitation package. He would have



had to have qualified to do that kind of work. So that's what I would have expected him to do.
Q. And what kind of work was that, do you recall?
A. In general, it's renovations and improvements in postal facilities.
Q. Look at the next document, please, sir, under Tab 8, Southern Exhibit 9. It's a letter to you dated February 28th, 1995 from L.P. Consulting.
Have you seen this letter, sir? While you're reading, I'm going to direct your attention to the last little bit on Page 1, top of Page 2, which says the following have been visited and have a scope of work approval by yourself. It references St. Anne and Aroma Park. The top of the next page, "The following have been visited and have pending scope of work approval, Papineau, Bradley, Momence." There's a listing of several others, but I'm just focusing on the projects for here.
And then it says a little further down, "The following have not been visited to the best of our knowledge, East Lynn and Hoopeston."
Do you recall receiving and approving from L.P. Consulting scopes of work for St. Anne and

Aroma Park?
A. No, I don't.
Q. You don't recall?
A. I don't recall.
Q. Do you recall L.P. having visited Papineau, Bradley and Momence?
A. No, I don't.
Q. Do you recall receiving a scope of work for those three projects?
A. No, I don't.
Q. Let's go on. Bear with me for a second here.
If you go to -- I guess this is going to be Exhibit 25. If you go to Tab 11, please.
At certain exhibits, the court reporter is going to put a stamp on there. This is one of them. I think you're one document -- let me see here. On yours it's Tab 10.
MR. PROSEN: Let's go off the record.
No, okay, let's just go. My tabs may be off.
(WHEREUPON, a certain document was marked Rigsby Exhibit No. 25 for identification, as of 6/9/04.)



BY MR. PROSEN:
Q. Have you seen this document before, sir? There's no date on it.
A. I can't recall having seen that.
Q. Let's walk through it just a little bit here. Starting on the second page, there's a paragraph in there that says in part, "The survey team did not feel it was within our realm of knowledge to survey and logically denote the renovation required of these facilities. We observed that extensive building modification, in our opinion, would be required and decided that persons, such as yourself, could make a more useful and timely estimate," end quote.
Did you ask a Mary Yates who, as I understand, is the Piper City Postmaster, and Mr. Gibbons, who is the Cissna, C-I-S-S-N-A, Park Postmaster, to perform this work priority survey?
A. I don't recall.
MS. KIRCHNER: Objection, ambiguous.
BY MR. PROSEN:
Q. I'm sorry?
A. I don't recall doing that.
Q. You don't recall?



A. No.
Q. Do you know who developed the scopes -- now -- strike that.
There's a number of projects listed on here, including East Lynn, Papineau, Union Hill, and on the top of the second page, Hoopeston, St. Anne.
Do you know who developed the scope of work that Ms. Yates and Mr. Gibbons did not feel, I guess the term, confident enough to develop those scopes of work?
A. I don't recall.
Q. Let's go to Exhibit 10, which would be my Tab 12. It's an L.P. Consulting letter dated May 29, 1997. Mr. Southern is copied on it.
Have you seen this document, sir? Do you recall seeing this?
A. No, I don't recall seeing this.
Q. Do you have any reason to doubt that L.P. Consulting, along with USPS personnel -- well, strike that.
Do you have any reason to believe that L.P. Consulting submitted a draft work order with sketches on the Hoopeston, Momence, St. Anne and East Lynn projects?



Do you recall -- strike that.
Do you recall receiving a draft work order with sketches prepared by L.P. Consulting as a result of site visits that they had with U.S. Postal Service personnel in Hoopeston?
MS. KIRCHNER: Objection, compound.
BY THE WITNESS:
A. No.
BY MR. PROSEN:
Q. Momence?
A. No.
Q. St. Anne?
A. No.
Q. East Lynn?
A. No.
Q. Did you ever request that L.P. Consulting do a site visit and prepare a scope of work for Hoopeston?
A. Not to my knowledge.
Q. Momence?
A. I don't recall.
Q. St. Anne?
A. I don't recall that.
Q. East Lynn?

Q. The second column at the top, it says, "Handicap Survey Rich," and there's an "A" above it. And then you move three columns over, and there's a "B," and it says, "L.P. Consulting Proposal." And it's got other columns, "L.P. Consulting Drawings," "USPS Contract," et cetera.
Is "Rich" Rich Battaglin, you think?
MS. KIRCHNER: Objection. He already told you he doesn't recognize this document.
BY THE WITNESS:
A. I have no idea.
BY MR. PROSEN:
Q. Okay. Did you ever make any statement or representation to L.P. that if they prepared a scope of work, submitted it, the resulting task order would be awarded to them or the work order would be given to them under their IQC contract?
A. No, I have not.
Q. Never?
A. Never ever have I done that. That would be illegal to do.
Q. Under an existing IQC contract, that would be illegal?
A. To promise someone something based on



submitting a work order, illegal.
Q. Did you ever take an L.P. developed statement of work for a work order and provide it to other non-U.S. Postal Service persons, individuals or companies?
A. To answer your question, no. And I would have no need to do that because the documents that Mr. -- that L.P. Consulting would utilize to develop the scope of work, we generate those documents and give them to them, so why would I have to use his estimates to do that?
If I generate a document telling you that I'm going to pay you $5 to put that light in and there's a proposal telling me you're going to charge me $5 to put that light in, in this case it's the 85 cents -- I mean, $4 and whatever, why would I need to turn around and use that to give it to someone else? I already know what it's going to cost.
Q. You know what the cost is going to be; you don't know what the actual work that's needed to be performed is?
A. Yes, we do, because I have to approve it one way or the other.



Q. If L.P. under its IQC contract does not submit a scope of work for a given project that you would send him out to, does the postal service have any other document or mechanism to know what the work is that has to be performed?
A. Sure.
Q. What is that?
A. We can go out and do a survey ourselves and develop the scope.
Q. So the government develops its own scopes of work?
A. Of course. That's how you solicit.
Q. I'm sorry. That's solicited under other contracts for competition?
A. You do the same thing under the work order. You can produce a work order, send it to the contractor and say, "Here's the work to be performed."
Q. Right.
A. You go out and verify quantities before you sign it and send it back.
Q. But in this case, what if a contractor is asked by you to go develop a scope of work and submit it to you?



A. That does not -- that does not in any case indicate to a contractor that you're going to get this work, that we're going to give you this work or that you're going to perform this work.
Q. That's not what I asked. The question I've asked is: On a given project, if L.P. Consulting is asked by you to go out to Momence, or whatever the project is, develop a scope of work, submit it to you, if that scope of work is not submitted by L.P., does the U.S. Postal Service have any other documentation or an independent estimate prepared to determine what work needs to be performed on that project, on that postal facility?
MS. KIRCHNER: Objection, ambiguous, hypothetical.
BY THE WITNESS:
A. Yes, there are other means for producing a scope of work. We can do it ourselves, generate the document and send it to him.
BY MR. PROSEN:
Q. Then why have the contractor go out and perform the work, do the site visit and the scope?
A. We have contractors do things depending on the expertise of the contractor. By no means was

Page 65

can commit it against the contract.
I'll take the liberty to note, the contract and the contract number that's associated here on 0726 is exactly the same contract number that's associated with this sheet numbered 0728. Those are one and the same, so you're not committing it to one person and ultimately awarding it to someone else. Those are the same people.
BY MR. PROSEN:
Q. I'm sorry, sir, can you walk me through that again? I'm trying to follow with the numbers. Maybe because I'm not a contracting officer, I'm not following. Can you walk me through it?
A. I think it's three, four columns down on the offer, the fixed mechanization --
Q. Uh-huh.
A. -- project contract payment authorization.
Q. It's 728, 0728, yeah.
A. Yes. The contract number itself --
Q. Yes.
A. -- it is the same number on the commitment form that you see.
Q. So you assign money to a non-existing

Page 66

contract?
A. No, but I'm telling you that the contract itself, the number is produced. That's the number that's produced by the system.
Q. But can you produce that number without having a contract solicited and an award made? A solicitation gets a number and then the number gets switched when an award is made to a contract number?
A. No, it's not switched. The contract and -- the contract number on this page and the contract number back here are exactly same.
Q. Sir, I think we're talking across each other.
MS. KIRCHNER: I think you're also interrupting a lot. I think you should let him finish.
MR. PROSEN: That's fine.
MS. KIRCHNER: And maybe it will be clearer.
BY MR. PROSEN:
Q. I understand what you're saying about the contract number here and there. The solicitation number here, the 97 solicitation number, are you telling me that this 97 solicitation number --

Page 67

A. First of all, the solicitation -- this solicitation number, I recall this. It was a solicitation that was generated by the contract technician who was preparing the file for the project. And this solicitation and the solicitation number is just for the file itself.
This was a simplified purchase. And for a simplified purchase, you don't necessarily have to have a solicitation, a formal solicitation.
Q. Right.
A. You can call three people on the telephone and send them drawings for the project, meet them at the site with project drawings and say, "Now give me bids each one of you." You don't necessarily need a solicitation as formal as this is here.
So this piece of paper, it means nothing. It was just generated for the file after the fact.
Q. So this solicitation was never --
A. It didn't go out to anybody.
Q. -- issued?
MS. KIRCHNER: You're interrupting, please.
THE COURT REPORTER: I can't get two people at

Page 68

once.
BY MR. PROSEN:
Q. Go ahead sir.
A. To my knowledge, this solicitation never went out to any contractors. There would be no need at this point. It was simply for the files, to complete the files. And I think that if you go back and look at the original in the file itself, it probably has a note right on it saying that.
Q. I'd like to see a copy of that, please, if that exists, because I've never seen it.
A. I said probably, probably has a note on it.
Q. Are you familiar with -- that reminds me.
A. May I point out, also, that this project was -- I guess that corporation counsel, was it, reviewed this in a protest earlier based on the fact that this very thing in here, the administration of the contracting officer was -- the administration of this project was wrong. They found absolutely nothing wrong with the way the project was solicited, nothing wrong with the project, the way the project was accomplished. And you should have a

copy of that decision, also.
So whatever needs to be said and done about this project was already said and done, that it was nothing illegal about this solicitation, nor the administration of the paperwork, nor the payment on this project. If you need that, I've got it for you.
Q. I've seen it, sir.
MS. COURT REPORTER: Can we take about five minutes?
MR. PROSEN: Sure.
(WHEREUPON, a recess was had.)
BY MR. PROSEN:
Q. Let's go to Tab 27, sir, Exhibit -- it's Sam Southern Exhibit 18. It's a two-page Term Construction Contract Work Order, dated 8/1/96, and it's got what appears to be four pages of drawings and handwritten notes afterwards. It says "Door Specs."
Do you recall ever receiving this document?
A. I don't recall it.
Q. The drawings beginning at Page 3, do you know who prepared -- who would have prepared these



drawings?
A. No, I don't.
Q. Let's skip forward to Southern Exhibit 19 on Tab 31, Brookfield ramp and dock enclosure. There's no date on it, but it consists of one two-page and one seven-page document.
Do you recall ever receiving these, sir, or seeing these?
A. No, sir.
Q. Let's go to the next document. It's going to be 29, under Tab 32.
(WHEREUPON, a certain document was marked Rigsby Exhibit No. 29 for identification, as of 6/9/04.)
BY MR. PROSEN:
Q. Can you identify this document, sir?
A. This is a typical postal service letter that's generated to tell a contractor that he should proceed with the work under that contract.
Q. And if you flip back another page there --
A. Which way, back?
Q. Backwards, yes. Oh, I'm sorry. I'm sorry.



MS. KIRCHNER: Every time you say --
BY MR. PROSEN:
Q. Right to left. Go backwards one more page, so --
A. What tab are you under?
MS. KIRCHNER: I think you mean forward.
BY MR. PROSEN:
Q. I mean go forward one more page. That page right there, sir, that you just flipped over, can you identify that page, that document?
A. It looks like a contract award.
Q. Do you ever recall making the determination to not use an IQC contract or issue a work order after your project managers have returned from a field visit with a draft statement of work or draft work order and instead using like a simplified purchase method?
A. I don't recall, but it could have been done, because the postal service has a perfect right to do that.
Q. But you don't recall any specific --
A. I don't recall any specifics.
Q. If you'd go up to No. 35, Tab 35. This will be Exhibit 30.



(WHEREUPON, a certain document was marked Rigsby Exhibit No. 30 for identification, as of 6/9/04.)
BY MR. PROSEN:
Q. Do you know who A.M. Fernandez & Associates is?
A. This was an architecture firm that was under contract with the postal service to perform IQC work.
Q. Andy Fernandez who signed this letter at the bottom, this is the same firm that I think you stated you worked for after you retired from the postal service?
A. Briefly, yes.
Q. How long is briefly? How long did you work for them?
A. It may have been three, four months.
Q. What was your salary at the time of your retirement with the postal service, do you recall?
A. It was $80,000 plus.
Q. What was your salary when you worked for Mr. Fernandez?
MS. KIRCHNER: Objection, ambiguous.
BY THE WITNESS:

A. I don't recall. I think that was an agreement that we would work by like projects or something, you know.
BY MR. PROSEN:
Q. A fixed price per contract?
A. Per project --
Q. I'm sorry.
A. -- depending on the scope of work or how much time I spent on a project.
Q. Do you recall what -- was it based on a per project negotiation? In other words, Mr. Fernandez would work on a project and you and he would then negotiate your compensation?
A. That's the way it was supposed to have been, but actually I only worked on one project where I got paid.
Q. What project was that?
A. I would have to look at my notes. I worked on more than one project, but one where I got paid, maybe two.
Q. What notes are those?
A. I may have notes at home.
Q. Do you have any other project files or documents during the time when you were at the



postal service in your possession?
A. No.
Q. With regard to this report here, September 16th, 1996, it says, "Brookfield, Illinois Handicap Ramp." There's three pages. It looks like they call it construction oversight reports.
Isn't it a fact that Mr. Fernandez worked on a number of these handicap ramp projects other than Brookfield?
A. That's correct.
Q. What was the general scope of his responsibilities under his IQC contract with the government, with the postal service?
A. The general scope was to prepare drawings, I would think. I'd have to see the solicitation. And then I would assume if he was awarded the contract, he could perform those duties within the solicitation.
Q. You say you assume. You don't recall what his duties were?
A. I don't recall specifically what all of the duties were of a contracted architect at this point.
Q. Did Mr. Fernandez, I'm referring back to



Exhibit 1, work on any of those 12 projects, which are the 12 projects that this case is about?
A. I don't know at this point. My memory would have to be refreshed.
Q. Would construction oversight reports, such as the one in front of you now, be developed -- I'm sorry -- be prepared and submitted by Mr. Fernandez on the other handicap ramp projects which he performed for the postal service?
A. Should have been, yes.
Q. Where would those documents be located?
A. Should be in the project files.
Q. Would it be unusual if those documents were not there?
A. They should be there.
Q. So that's a yes, it would be unusual if they weren't in there?
MS. KIRCHNER: Objection, ambiguous, misconstrues testimony.
BY THE WITNESS:
A. I would think that they should be there. Unless they were misfiled or something, they should be there.
BY MR. PROSEN:



Q. Let's go to Tab 36. It's Exhibit 20, Southern Exhibit 20. That's an Aroma Park Term Construction Contract Work Order.
Sir, do you recall ever receiving this document?
A. No, I don't. I think you asked me this before, but I don't.
Q. If I did, I apologize. Let's go to a different one.
Let's skip over one and we'll go to Tab 38, which will be a new exhibit, 31.
(WHEREUPON, a certain document was marked Rigsby Exhibit No. 31 for identification, as of 6/9/04.)
BY MR. PROSEN:
Q. Do you recall receiving this document ever, sir? It's Beaverville, Illinois, miscellaneous renovations to help you identify. There's no date.
A. I don't recall this.
Q. Skip over one and we'll go to Tab 40. It will be Exhibit 32.
(WHEREUPON, a certain document was marked Rigsby Exhibit No. 32 for

Page 77

identification, as of 6/9/04.)
BY MR. PROSEN:
Q. This consists of actually two documents, both identified as -- well, Bradley ramp and lobby, eight pages, and the second one, Bradley, Illinois ramp and lobby, two pages.
Do you recall ever receiving these documents, sir?
A. No, I do not.
Q. You don't recall ever seeing any of these documents ever?
A. I don't recall.
Q. And the next document under 41, Exhibit 33.
(WHEREUPON, a certain document was marked Rigsby Exhibit No. 33 for identification, as of 6/9/04.)
BY MR. PROSEN:
Q. It's the installation of handicap ramp, Bradley, Illinois.
The second page, is that your signature at the bottom, sir?
A. That's correct.
Q. That's a notice of intent to award to

Page 78

Ramcorp, R-A-M-C-O-R-P, Inc. for installation of a handicap ramp, correct?
A. Right.
Q. Why did you compete this project?
A. Because apparently we felt it was in the best interest of the postal service to do that.
Q. Do you do a justification, a J&A -- I'm not sure what you'd call it internally -- a written justification?
A. As to?
Q. A decision as to what contract mechanism, whether or not it's under an IQC or a term fixed price or whatever you want to call it. Is there a written document that justifies what contract tool, if you will, you're using?
A. It's a judgment call on the contracting officer and also advice from the staff and also from previous experience at having done this.
In the case of a ramp, you look at the IQC documents that you have to utilize to generate line items; in other words, unit cost. It's not always easy to determine whatever goes in and what doesn't go in. It's much easier to give a contractor drawings and say, "Bid and tell me what

Page 79

it's going to cost you to produce this document" -- I mean, "to do this ramp." So that was a judgment call of the contracting officer.
Q. But there's nothing in writing that would support your decision to compete this project?
A. I don't understand the question.
Q. There's nothing -- no written justification or written decision or written report or memorandum to the file that says, "Here's the reasons that I, contracting officer, am competing this project," as opposed to giving it to the IQC?
A. If it's in the best interest of the postal service and the contracting officer feels that it's in the best interest of the postal service to do that, then that's when it's normally done?
Q. Is that determination of best interest, though, ever put down in writing anywhere?
A. Yes, it is. It's in writing in the purchasing manual. It's in the front part of the purchasing manual.
Q. I'm sorry, sir, I don't mean the purchasing manual. I mean for a given contract, you said you look at this -- if for some reason you decide to compete this, whatever those reasons are,

Page 80

do you ever put those reasons down on paper, put them in the contract file or anything? Is that normally what happens, or is it just that you sit down with your staff and make a decision and it's a verbal decision and that's the end of it?
A. In the case of the ramps, it was not just one ramp involved. I think there may have been 20-plus ramps involved. So the decision was to do all the ramps at one time and get all the justifications out at one time on the ramps, not to piecemeal it together.
And you need to get adequate competition. I think we had four contractors bidding on all of these ramps that were to be installed.
The purchasing guidelines permit the contractor -- the contracting officer, rather, to solicit projects outside of utilizing IQCs. In so doing, you don't have to invite the IQC to bid on the project under the simplified purchasing process, because the contracting officer is mandated by the postal guidelines to always seek to broaden the base of contractors that are used within the postal service. So it's a common general knowledge that

Page 93

record.
BY THE WITNESS:
A. You're asking me to pass judgment on someone. You know, I regarded him very highly until today. When I worked with Mr. Battaglin, I regarded him very highly, also.
BY MR. PROSEN:
Q. Who is Dave Schiffman? I believe it's S-C-H-I-F-F-M-A-N?
A. Dave Schiffman was detailed to my office for a while.
Q. What were his duties under your watch?
A. What was he doing? Dave had a variety of duties. One of them may have been some project management. It could have been.
Q. Did he ever change the locks in all the file cabinets of the contract files?
A. He had may have.
Q. Why?
A. Because we're required by law to have all contract files locked.
Q. And they weren't before?
A. They may or may not have been, but the locks were determined to be inadequate, and they

Page 94

were locked in such a way that no one could get in after we were gone home for the night. Because the cabinets were in an open area. People would just walk pass them.
Q. Early on in these IQC contracts, it appears that L.P. got a pretty decent amount of work from you. And then, for lack of a better term, the well dried up. Why is that?
MS. KIRCHNER: Objection, ambiguous, compound.
BY MR. PROSEN:
Q. Why did you stop making awards to L.P. or issuing task orders?
MS. KIRCHNER: Objection, ambiguous, compound.
BY THE WITNESS:
A. I don't recall that we stopped.
BY MR. PROSEN:
Q. So they kept getting work orders and were included -- well, strike that.
So they would receive work orders, continue to receive work orders from you?
A. To my knowledge, he continued to get work.
Q. And he would be included in any -- well, not necessarily any, in some portion of the

Page 95

competitively let contracts that came out of your office?
MS. KIRCHNER: Objection, ambiguous, compound.
BY THE WITNESS:
A. When you say "competitively let," you mean --
BY MR. PROSEN:
Q. You had the IQC and then you also competitively awarded other contracts.
A. Right.
Q. And you said -- your testimony was that he continued to get work. I asked about the IQC. Now I'm asking the same question except about the competitive contracts, not the IQCs, the other stuff, the other contracts, the competitively let ones. He was included in the bid lists and sent all the proposals, sent the solicitations?
MS. KIRCHNER: Objection, ambiguous, compound, confusing.
BY THE WITNESS:
A. When you say sent all the proposals --
BY MR. PROSEN:
Q. Not all.
A. -- I don't think anyone was sent all the

Page 96

proposals.
Q. Some portion.
MS. KIRCHNER: Objection, ambiguous, compound.
BY THE WITNESS:
A. To my knowledge, I don't recall having excluded anyone, any contractor. And any contractor would be called when his services were needed.
BY MR. PROSEN:
Q. So you didn't make a formal determination that L.P. was not responsible?
A. Oh, certainly not.
Q. You never excluded them from any offer or bidder list?
A. No.
Q. You never initiated formal debarment proceedings, did you?
A. No.
Q. What about their past performance? What kind of quality work -- in your opinion, based on your observations and all, what kind of work quality did they provide the government?
MS. KIRCHNER: Objection, ambiguous, compound.
BY THE WITNESS:
A. Mr. Battaglin and his group, the work

Q. Where did that list come from?
A. I generated it.
Q. From what source or sources?
A. From contractors that had done work for us before and who had the expertise to do ramp work.
Q. Why wouldn't L.P. Consulting be included?
A. Because this was enough competition right here.
Q. Would there be any harm in including L.P.?
A. You can include the whole world, but he was not excluded for any particular reason. We just had enough competition.
Q. So you included five contractors with a prior track record with the USPS but just for no particular reason excluded L.P.?
MS. KIRCHNER: Objection, misconstrues testimony.
BY THE WITNESS:
A. Under the guidelines, we don't need reasons to exclude anyone. If you've got enough competition, you have enough competition. I don't want to put ten contractors here.



BY MR. PROSEN:
Q. Wouldn't that be possibly a basis for getting a better price?
A. Adequate competition is what the guidelines call for.
Q. But you don't want to do anymore than adequate?
A. There's no need to.
Q. On the second page, Mr. Fernandez says he's adding Phoenix Construction Company on his own. I guess Mr. Fernandez thought it would be fun to add another one.
Did you authorize him subsequently or advise him if they could participate as he asked?
A. I sure did.
Q. So maybe five wasn't enough; maybe six was?
A. No, no, that wasn't the point. The point was if this person had contacted him and asked to be added to the ramps, I honored that request.
Q. Let's go two more exhibits to 56, Exhibit 41.
(WHEREUPON, a certain document was marked Rigsby Exhibit No. 41 for



identification, as of 6/9/04.)
BY MR. PROSEN:
Q. So Mr. Fernandez in the last exhibit we just mentioned or were discussing, Exhibit 40, wanted to add someone else, and you said that's fine.
But what does this letter say? This letter makes a similar request directly to you, doesn't it? April 30, 1997, L.P. Consulting, "Mr. Rigsby: Our firm is interested in being placed on A.M. Fernandez, architect solicitation bid list for the facilities in your jurisdiction."
MS. KIRCHNER: What's the question?
BY MR. PROSEN:
Q. Do you see the letter? Do you recall seeing this letter or receiving this letter?
A. I think I do remember seeing this letter.
Q. Do you ever respond to this letter in writing or verbally?
A. I don't recall having responded to it.
Q. Can you explain to me why Mr. Fernandez's suggestion for a contractor or Mr. Fernandez's request to add a contractor is



granted and Mr. Battaglin's was not?
A. Are you speaking about the ramps?
Q. Yeah, "Our firm is interested in being placed on A.M. Fernandez's architectural solicitation bid list for the facilities in your jurisdiction." It references exterior concrete on these two projects.
Did Mr. Fernandez have scopes of work of any significance outside of the handicap ramps?
MS. KIRCHNER: Objection, ambiguous, confusing.
BY THE WITNESS:
A. I thought what we were discussing here is the ramps, and I think this is referencing the ramps. And if it is referencing the ramps, those -- the decision had been made on that a year before this letter was written.
BY MR. PROSEN:
Q. What about interior remodeling? Let's put aside the ramps for a second. What about interior remodeling?
A. A.M. Fernandez was not soliciting for interior remodeling on anything that I know of.
Q. So they just did handicap ramps,