**No. 98-868C**
**(Judge Allegra)**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**L.P. CONSULTING GROUP, INC.**

**Plaintiff,**

**v.**

**THE UNITED STATES**

**Defendant.**

# PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT

Brian Cohen, Esq.
BELL, BOYD & LLOYD PLLC
1615 L Street, N.W., Suite 1200
Washington, DC 20036
(202) 955-6836 tel.
(202) 835-4117 fax.
Attorney of Record for Plaintiff
L.P. Consulting Group, Inc. Intervenor

Of Counsel:

Lawrence M. Prosen, Esq.
BELL, BOYD & LLOYD PLLC
1615 L Street, N.W., Suite 1200
Washington, DC 20036
(202) 955-6830 tel.
(202) 835-4127 fax

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **L.P. CONSULTING GROUP, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 98-868C** |
| | ) | |
| **THE UNITED STATES,** | ) | **(Judge Allegra)** |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Plaintiff, L.P. Consulting Group, Inc. ("LP"), pursuant to RCFC 56 (1) hereby submits its Proposed Findings of Uncontroverted Fact, as follows:

1. In lieu of reiterating each of the statements of fact set forth in Defendant's Proposed Findings of Uncontroverted Fact which LP admits and/or agrees to, Plaintiff instead incorporates those agreed and admitted to proposed findings of uncontroverted fact herein by reference.

2. LP's secretary/treasurer Mr. Richard Battaglin ("Battaglin") has extensive experience in building construction as well as United States Postal Service ("USPS") construction contracts having worked for the USPS as a contract employee for the USPS at the Field Real Estate and Building Office, Illinois Central Region between 1985 and 1988. In that capacity, Mr. Battaglin's job description included developing scopes of work to be issued to IQC contractors, and developing the unit items/prices for solicitation at various facilities. During the course of Mr. Battaglin's employment with the USPS as project manager/architect/engineer, he was involved in approximately twenty (20) indefinite quantity contracts, involving at least 300 individual work orders. In fact, the work that he performed for the USPS involved contracts in

which work such as that alleged in the underlying IQC contracts was performed. LP App. 1, Battaglin Aff. ¶¶ 2-3.[1]

3. In 1993, after Battaglin had resigned from the USPS, he formed Plaintiff, L.P. Consulting Group, Inc. with his wife, Linda Battaglin. LP is a licensed Illinois corporation which performs general construction contracting services in, among other places, Illinois, Wisconsin, Michigan, and Indiana. LP App. 2, Battaglin Aff. ¶ 4.

4. Since its inception, one of LP's primary sources of business has been the bidding on and receipt of awards for USPS renovation, repair and Americans with Disabilities Act–compliance contracts. LP has been awarded no less than twelve (12) indefinite quantity contracts by the USPS since approximately 1993, for the USPS region known as the Great Lakes Area. LP App. 2, Battaglin Aff. ¶ 5.

5. In total, LP has performed close to 200 work orders under those 12 IQC contracts, including the award of numerous repair and alteration type projects covering the last 12 years, similar in nature to the 12 work orders (the "WOs") which constitute the basis of this law suit as identified in Plaintiff's Proposed Uncontroverted Fact 10, *infra*. LP App. 2, Battaglin Aff. ¶ 6.

6. In May 1994, the USPS awarded LP an indefinite quantity contract (No. 162640-94-B-0083) which initially contained a two-year performance term (the "94 IQC"). App. 41-49.

7. LP's 94-B-0083 contract was subsequently extended through modification for an additional one-year period of time. LP App. 2, Battaglin Aff. ¶ 7.

8. Subsequently, LP competed for, and was awarded two indefinite quantity contracts (the "IQCs") by the USPS, numbered 162640-96-B-0094 and 162640-96-B-0098,

---

[1] All references to "App." refer to the documents contained in the Government's Appendix as part of its Motion for Summary Judgment. All references to "LP App. ____" refer to LP Consulting Group's Appendix as part of its Opposition and Cross Motion for Summary Judgment, of which this Declaration is a part.

respectively. App. 52-153, 155-256. These contracts were executed and entered into by the USPS on June 6, 1996, and June 3, 1996, respectively. App. 52, 54, 155, 157. LP App. 2, Battaglin Aff. ¶ 9.

9. The 94 IQC was the predecessor to the 1996 IQCs. In fact, Battaglin was verbally told by contracting officer Robert Rigsby and one of his Architect/Engineer, Project Managers, Samuel Southern, to perform site visits and submit work orders on a number of projects at the end of the 94 IQC's term with the verbal understanding that those work orders would be performed under the follow-on IQCs. LP App. 3, Battaglin Aff. ¶ 10; LP App. 119, Battag. Depo. at 54.

10. The current lawsuit seeks recovery of damages sustained by LP for, among other things, the Government's breaches of implied-in-fact contracts. More particularly, and as discussed further below, LP filed two claims, one dated March 3, 1998, and one dated April 13, 1998, seeking a total recovery of $135,377.00. The first claim addressed the following projects:

1. The Berwick Modular Post Office;
2. The Hoopeston handicapped ramp;
3. The Downers Grove dock enclosure; and
4. The Brookfield ramp and dock enclosure.

App. 32-34. LP App. 3-4, Battaglin Aff. ¶ 11. That claim was subsequently resubmitted with a Contract Disputes Act certification on April 13, 1998. App. 26; *Id*.

The second, April 13, 1998, claim sought recovery for the following projects:

5. Aroma Park interior lobbies and building renovation;
6. Beaverville lobby and building renovation;
7. Bradley concrete ramp, lobby and building renovation;

8. East Lynn building renovation

9. Momence concrete ramp and lobby renovation

10. Papineau interior renovation and concrete ramp;

11. St. Anne concrete, asphalt and interior renovations; and

12. Union Hill interior and exterior ramps.

App. 29-31. Amended certifications were submitted with the claims to the contracting officer, Mr. Robert Rigsby, by letter dated August 11, 1998. App. 26-28. LP App. 4, Battaglin Aff. ¶11.

11. The current action seeks recovery of damages based upon the formation of a series of implied-in-fact contracts arising out of an ongoing course of dealing between LP and the USPS extending over the course of several years. LP App. 4, Battaglin Aff. ¶ 12.

12. The 12 WOs located in the Government's appendix at 584 *et seq*., constitute the 12 WOs which are the subject of the current litigation. LP App. 4, Battaglin Aff. ¶ 13.

13. During the more than 10 years during which LP has performed indefinite quantity contracts for the USPS, it was LP's experience that it was routine for the USPS, either through the contracting officer on a given contract, or his subordinates, whether they be architects/engineers or project managers, to contact LP, direct LP to travel to a given rural postal facility, meet with either the postmaster and/or project manager/A/E and for LP to self-perform a detailed field survey and develop a scope of work/work order for that project. LP App. 4, Battaglin Aff. ¶ 14. Thereafter, the work order would be submitted either during the course of the site visit or immediately thereafter by LP to the USPS for its review and issuance of a formal/final work order. *Id.*; *see also*, LP App. 138, Battag. Depo. at 110:19; 201, Rigsby Depo. at 29:21.

14. It has always been LP's, and for that matter Battaglin's, understanding and interpretation of both the two 1996 IQCs and their predecessor 1994 IQC contracts, that these contracts did not require LP to self-perform or otherwise develop scopes of work, pricing or work orders. LP App. 138, Battag. Depo. at 110:6. Instead, all of the language in the IQCs is couched in terms that the Government will develop and provide scopes of work to the contractor. LP App. 4, Battaglin Aff. ¶ 15.

15. That notwithstanding, and despite the total lack of an express contractual requirement for LP to perform such work, on the two 1996 and one 1994 IQC contracts (which 1994 contract was the predecessor and was continued in the 1996 contracts by the parties' course of conduct), and in addition to the twelve subject WOs, LP was directed to perform approximately 96 site visits and submit 96 work orders to the Government. LP App. 4-6, Battaglin Aff. ¶ 16. On only two projects which LP performed under the IQCs, those being the La Salle roof and the Princeton floor replacement, did the USPS self-develop a scope of work. *Id*. With those two exceptions, on every other project which LP performed under the IQCs, every single work order which LP received arose out of the USPS personnel contacting LP and instructing LP to perform a site visit and develop a work order. *Id., see also*, LP App. 227, Southern Depo at 28:18. Such work order was then submitted and approved by the contracting officer/USPS. *Id*.

16. With the exception of the 12 WOs which are the subject of the current action, on every other occasion under the IQCs, the course of conduct was clear: The Government would contact LP, direct LP to perform a field survey at a given facility, and direct LP to self-prepare and submit a work order. LP App. 6, Battaglin Aff. ¶ 17. On each of those occasions, including the 12 subject WOs, LP would perform the site visit, typically with a USPS project manager or

other subordinate of Mr. Rigsby, the contracting officer, and the USPS would thereafter take the LP scope of work and issue a "formal" work order in response thereto. *Id.*; *see also*, LP App. 18-19, 26, 29, 32-33; LP App. 239 *et seq.*, Southern Depo. at 91:18 *et seq.*

17. More particularly, during this time LP was contacted either directly by contracting officer Robert Rigsby or his subordinate USPS Project Managers, including Mr. Samuel Southern, Bruce Rothermel, Paul Steiner, Jesse McNabb and Ms. Lois Gunlogson (the "Project Managers"), directing LP to visit USPS facilities that contracting officer Rigsby directed LP to visit. LP App. 6, Battaglin Aff. ¶ 18; LP App. 29.

18. Each time LP received such a directive from one of the Project Managers, directing LP to perform facility site visits, it was LP's reasonable understanding that that USPS Project Manager was either directly authorized by Mr. Rigsby to make such a direction to LP, that the project manager was acting with actual authority or that their actions were otherwise being ratified by Mr. Rigsby. LP App. 6, Battaglin Aff. ¶ 19.

19. These Project Managers assisted LP in obtaining access to the facility and acted as mediators between LP and the facility Post Masters. LP App. 7, Battaglin Aff. ¶ 20.

20. As a result of the Project Manager's and/or Mr. Rigsby's instructions, LP would develop a scope of work, provide sketches, negotiate quantities, unit items and construction completion time at or immediately after the subject site visit, produce a draft work order, and submit it to the Project Manager and/or the facility Postmaster. LP App. 7, Battaglin Aff. ¶ 21; *see generally*, App. 584-664.

21. When Battaglin received each of these telephone calls and was instructed by Mr. Rigsby or the USPS Project Managers to perform these site visits and develop and submit a WO,

Battaglin expected and understood that LP would thereafter be given the work for which LP developed the WO. LP App. 7, Battaglin Aff. ¶ 22; LP App 29, 114-115.

22. As relates to the current action, this was the routine for 96 work orders under the subject IQC contracts and the predecessor 1994 IQC contract. LP App. 7, Battaglin Aff. ¶ 23. Out of a total of 98 work orders issued under the IQCs, only two were produced solely by Mr. Rigsby's office themselves, both by Mr. McNabb, for the LaSalle Roof and Princeton Floor Replacement. *Id*. All other work orders awarded to LP, as well as the subject 12 WOs in this law suit, were prepared by LP at the direction of USPS authorized personnel. *Id*.

23. With particular regard to the 12 WOs, when LP was directed by the USPS to meet at the 12 facilities in the subject claim, LP, the Project Managers and the Postmasters went through the usual routine of having LP produce the scope of work. LP App. 7, Battaglin Aff. ¶24.

24. Based upon the ongoing, continuous procedure established on the previous 96 facilities, LP reasonably anticipated issuance of each WO. LP App. 7, Battaglin Aff. ¶ 25.

25. LP was contacted by authorized USPS personnel on each and every one of the subject 12 projects to perform a site visit with USPS personnel at each of the facilities, and tasked with developing a scope of work, preparing a work order and submitting that work order for approval to the USPS. LP App. 7-8, Battaglin Aff. ¶ 26; LP App. 65, 66, 70, 87. The following chart synopsizes the applicable information for each of the subject projects:

| POST OFFICE NAME | DATE OF SITE VISIT | USPS ORDERED LP TO PERFORM SITE VISIT? | USPS PERSONNEL WHO MET LP AT FACILITY | LP WORK ORDER PREPARED (APP. NO) |
|---|---|---|---|---|
| Hoopeston | 11/14/95 | Yes | Paul Steiner | Yes (App. 654) |
| Momence | 5/24/96 | Yes | Sam Southern | Yes (App. 598) |
| St. Anne | 5/24/96 | Yes | Sam Southern | Yes (App. 584) |
| East Lynn | 10/17/95 | Yes | Paul | Yes |

| | | | | |
|---|---|---|---|---|
| | | | Steiner/Jesse McNabb | |
| Aroma Park | 9/95 | Yes | Paul Steiner/Catherine Marks | Yes (App. 618) |
| Papineau | 9/95 | Yes | Paul Steiner/Catherine Marks | Yes (App. 626) |
| Beaverville | 9/95 | Yes | Paul Steiner | Yes (App. 615) |
| Union Hill | 8/15/95 | Yes | Paul Steiner/Catherine Marks | Yes (App. 612) |
| Bradley | 9/95 | Yes | Paul Steiner | Yes (App. 629) |
| Berwick | 9/16/96 | Yes | Bruce Rothermal | Yes (App. 639) |
| Downers Grove | | Yes | Jesse McNabb | Yes (App. 652) |
| Brookfield | 8/96 | Yes | Jesse McNabb | Yes (App. 643) |

The majority of this information is further reflected in the document (Southern Depo. Ex. 10) appended as LP App. 29, LP App. 143 *et seq.*, Battaglin Depo. at 129-134. The Notes contained thereon, were made by Battaglin in 1997, while his recollection of these site visits was still clear, and denote the date of the site visit and the initials of the USPS personnel with whom Battaglin met. *Id. See also*, LP App. 120, 127 (East Lynn); 131-34, 150-52 (St. Anne); 140 *et seq.* (Union Hill); 148 (Aroma Park, Papineau, Beaverville, Union Hill & Bradley); 154-55 (Momence); 155-56; 157-58 (Union Hill); 163 (referencing LP App. 32-33); 165-67 (Aroma Park); 168 (Bradley); 169-73 (Berwick); 174-75, 177 (Brookfield); 178-79 (Downers Grove); 185-87 (Hoopeston); LP App. 228, 246, Southern Depo. at 29:23, 103:16.

26. Curiously during this same time several other work orders were issued to LP through the same process, including the following projects: Rossville, Sugar Grove, Millbrook, Wellington, and South Holland. LP App. 8, ¶ 27.

27. When Battaglin followed-up with the USPS on the 12 subject facilities, he was informed by Mr. Rigsby that Mr. Fernandez A/E was suddenly in the process of soliciting them competitively. App. 395-96.

28. LP made repeated attempts to be included in that competitive process. LP App. 9, Battaglin Aff. ¶ 29.

29. For reasons never explained by USPS, LP was summarily excluded from the solicitation process for those 12 projects. LP App. 9, Battaglin Aff. ¶ 30.

30. Apparently, only the contractors handpicked by Mr. Rigsby were permitted to bid. LP App. 9, Battaglin Aff. ¶ 31.

31. In late April 1997 for reasons unknown to LP, Mr. Rigsby permitted LP to bid the Paxton facility, apparently after having already gone through a best and final offer phase to determine the successful offeror. LP App. 9, Battaglin Aff. ¶ 32. Thereafter, Mr. Rigsby awarded the project to LP. *Id.*

32. Based upon the Paxton award, LP asked Mr. Rigsby for, and received, the bid package for the Hoopeston project. LP App. 9, Battaglin Aff. ¶ 33.

33. LP provided an offer, as was the practice on Paxton before, which came in substantially lower than the next lowest bidder. LP App. 9, Battaglin Aff. ¶ 34. Again for reasons unknown to LP, Mr. Rigsby summarily rejected LP's bid on this project. *Id.*

34. When LP became aware that several of the subject facilities had been solicited, LP protested to Mr. Rigsby. LP App. 9, Battaglin Aff. ¶ 35, LP App. 28.

35. Thereafter, LP was no longer contacted by the USPS to produce scopes of work or perform work under its IQCs, without the USPS providing any explanation, excuse or reason. LP App. 9, Battaglin Aff. ¶ 36.

36. This sudden change in the USPS's contract administration and conduct led LP to believe that there was something different happening in the USPS's regional solicitation process. LP App. 9, Battaglin Aff. ¶ 37.

37. LP was contacted and interviewed by an USPS Office of Inspector General Agent Mr. Carl Purichelli to discuss possible irregularities with Mr. Rigsby and the A/E Mr. Fernandez. LP App. 10, Battaglin Aff. ¶ 38. This OIG investigation resulted in the government's repeated requests that the Court of Federal Claims stay this case citing, among other things, Grand Jury privilege. *Id.*, LP App. 37 *et seq.*

38. The testimony of Messrs. Fernandez, McNabb, Southern, and Rigsby reveal that only Mr. Fernandez ever met with the Grand Jury or was interviewed by the OIG. LP App. 10, Battaglin Aff. ¶ 39, LP App. 208, Rigsby Depo. 84, LP App. 237, Southern Depo. 81, LP App. 258A, McNabb Depo 44-45.

39. LP's lost profit damages calculation is based upon LP's historical and reasonably anticipated profit on projects of like size and complexity. LP App. 10, Battaglin Aff. ¶ 40. LP has performed over 200 work orders, most of which were comparable to the 12 WOs which are the subject of this litigation. *Id*. These percentages of profit are based upon that historical data and LP's experience in this field, for this type of work, and represent reasonable estimates of what profits LP could have reasonably expected to receive minus what its reasonable costs would have been but for the USPS's breaches of the implied-in-fact contracts. *Id*. LP will produce at trial documentation which supports these percentages of profit. *Id.* In addition, LP based its multiplier upon which it successfully competed for, and was awarded the IQCs, upon that historical analysis, such that LP could perform the work (based upon the USPS-prepared and provided unit prices) and still earn a reasonable profit. *Id*.

40. LP has never received any notice of termination for default or convenience on any USPS project, including the 94 IQC or 1996 IQCs. LP App. 10, Battaglin Aff. ¶ 41.

41. It was always Battaglin's understanding and expectation that the USPS Procurement Manual and Purchasing Manual and their applicable regulations would require that LP be provided with at least the opportunity to compete for the subject work orders and for comparable work which was formally competed. LP App. 10, Battaglin Aff. ¶ 42.

42. During the course of dealing between the parties, LP and United States Postal Service ("USPS"), it was standard practice for the USPS on both the subject IQC contracts as well as other, unrelated, indefinite quantity contracts, for the Government to have the contractor perform an on-site visit and self-prepare a price proposal or work order. LP App. 195, Rigsby Depo. at 19 *et seq*.

43. Given the time that has passed since this action, the USPS's contracting officer, Robert A. Rigsby, has no current direct recollection of the projects in question and he is not familiar with any with the exception of Aroma Park. LP App. 194A, Rigsby Depo. at 11.

44. Mr. Rigsby received scopes of work/work orders from LP, some being computer generated and others handwritten. LP App. 196, Rigsby Depo. at 20 *et seq*.

45. The USPS, including Mr. Rigsby, routinely requested LP to travel to USPS facilities under LP's IQCs and perform field surveys. LP App. 197, Rigsby Depo. at 22. *See also*, LP App. 120, 127 (East Lynn); 131-34, 150-52 (St. Anne); 140 *et seq*. (Union Hill); 148 (Aroma Park, Papineau, Beaverville, Union Hill & Bradley); 154-55 (Momence); 155-56; 157-58 (Union Hill); 163 (referencing LP App. 32-33); 165-67 (Aroma Park); 168 (Bradley); 169-73 (Berwick); 174-75, 177 (Brookfield); 178-79 (Downers Grove); 185-87 (Hoopeston); LP App. 228, 246, Southern Depo. at 29:23, 103:16.

46. As contracting officer, Rigsby and/or his subordinates regularly directed LP to travel to USPS facilities, perform site surveys, typically with USPS personnel, and generate work orders upon and at the USPS's request. LP App. 198 *et seq*, Rigsby Depo. at 24:18, 26:10.

47. The USPS through its authorized personnel would likewise regularly ask other IQC contractors, including St. Louis Design and Construction, and Summers Construction, to also self-perform such tasks. LP App. 200, Rigsby Depo. at 26:15.

48. On other contracts such as the A.M. Fernandez A/E IQC contract, Rigsby would direct that contractor, A.M. Fernandez, to prepare scopes of work and submit them for review and approval by Rigsby. LP App. 211, Rigsby Depo. at 109.

49. Except for the Princeton and La Salle properties, the entire balance of LP's work orders under the IQCs, each and every one, was initiated by a telephone call or other communication from USPS authorized personnel to LP, directing LP to perform a site visit to the relevant facility, perform a detailed field survey and self-develop and submit a draft work order. LP App. 5-6, Battaglin Aff. ¶ 16-17.

50. With the exception of the 12 work orders (the "WOs") which are the subject of this litigation, on each and every other occasion the USPS promptly issued a "formal" work order to LP to perform such work, which work LP performed and was paid by, the USPS. LP App. 6, Battaglin Aff. ¶ 17.

51. It was against USPS policy to send two IQC contractors to the same project. LP App. 200, Rigsby Depo. at 26:22.

52. If the USPS sent an IQC contractor to perform a USPS facility field survey, it was reasonable for them to assume that there was work to be done at that facility and there was interest in having that contractor perform such work. LP App. 201, Rigsby Depo. at 29:21.

53. Robert Rigsby was authorized to direct LP to perform site visits. LP App. 202A, Rigsby Depo. at 22:13, 44:11.

54. Mr. Rigsby's subordinates, including Messrs. Southern, Rothermal and McNabb, were directed by Mr. Rigsby and authorized by Mr. Rigsby to contact, *inter alia*, LP to perform site visits and direct LP to self-develop, prepare and submit work orders. LP App. 227 *et seq.*, Southern Depo. at 28, 32, 37, 38:2; LP App. 294 *et seq.*, McNabb Depo. at 20:21-21:1, 36:6.

55. The USPS and Rigsby utilized LP and Richard Battaglin's expertise to develop scopes of work. LP App. 198, 203, Rigsby Depo. at 24:21, 52:23. *See also*, LP App. 120, 127 (East Lynn); 131-34, 150-52 (St. Anne); 140 *et seq.* (Union Hill); 148 (Aroma Park, Papineau, Beaverville, Union Hill & Bradley); 154-55 (Momence); 155-56; 157-58 (Union Hill); 163 (referencing LP App. 32-33); 165-67 (Aroma Park); 168 (Bradley); 169-73 (Berwick); 174-75, 177 (Brookfield); 178-79 (Downers Grove); 185-87 (Hoopeston); LP App. 228, 246, Southern Depo. at 29:23, 103:16.

56. The USPS received handwritten work orders from LP on several occasions. LP App. 196, 210, Rigsby Depo. at 20:22, 108:5, LP App. 222, Southern Depo. at 19; *see generally*, App. 523 *et seq.*.

57. The USPS is not permitted to compete work to be performed under an IQC contract. LP App. 212, Rigsby Depo. at 110:21.

58. LP Consulting was not included in the bidders selected by Rigsby to bid upon the following projects: Aroma Park, Berwick, Bradley, Brookfield dock enclosure, Brookfield ramp, Downers Grove, Hoopeston, and Paxton. *See generally*, App. 285-288, 302, 309-315, 325, 329-334, 341-342, 353-367, 442-444, 481-488. *See also*, App. 395-96 (Fernandez letter of bidders).

5. LP was not excluded for any particular reason by Mr. Rigsby, except that Mr. Rigsby believed that LP had gotten enough work. LP App. 214, Rigsby Depo. at 113.

Respectfully submitted,

BELL, BOYD & LLOYD, PLLC

By __/s/ Brian Cohen___________________

Brian Cohen
1615 L Street, N.W., Suite 1200
Washington, D.C. 20036
(202) 466-6300
(202) 463-0678 Facsimile
Attorney for Plaintiff

Of Counsel:
Lawrence M. Prosen, Esq.
Bell, Boyd, & Lloyd PLLC
1615 L Street, N.W.
Suite 1200
Washington, D.C. 20036
(202) 955-6830 tel.
(202) 835-4127 fax

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 18th day of February 2005, a copy of the foregoing "PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT" and accompanying appendix was electronically filed. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

/s/ Brian Cohen