statement relate to my work in the capacity as employed by the contract with the USPS.

With respect to gross receipts, I understand that tax returns as indicated from the years 1995 – 1998, were not accurate. To the best of my knowledge, all business expenses indicated were true and accurate. There are no additional business expenses that were not included in the tax returns. I was responsible for computing my gross receipts, business expenses and tax return items. I provided the above figures on the return to my accountant and he relied on (end of page 3) those figures for being accurate. At the time of filing each of the returns for the years 1995 – 1998, I knew that I had income that I did not report.

**UNITED STATES POSTAL SERVICE**
**OFFICE OF INSPECTOR GENERAL**
77 WEST PORT PLAZA
ST. LOUIS, MO 63146-3124

**APPROVED BY: CMP**

**DATE: December 19, 2000**

**CASE NUMBER: 97RI007BI000**
**DATE OPENED: August 29, 1997**
**REPORTING OFFICE: ST. LOUIS**

**TITLE: A. M. FERNANDEZ AND ASSOC**
**CROSS REFERENCE #:**
**CASE AGENT: PURICELLI**

**ACTIVITY REPORT - INTERVIEW**

**DATE OF INTERVIEW:** December 19, 2000

**PERSON INTERVIEWED:** ANDREW M. FERNANDEZ

**LOCATION OF INTERVIEW:** BEDFORD PARK, IL

**INTERVIEWED BY:** CARL PURICELLI, DAVE GUEST IRS, GENE MARCHESE USPIS

**WITNESSES:** KEVIN CLONINGER (LATER PORTION ONLY)

---

On December 19, 2000, Andrew M. Fernandez was interviewed at the USPS administrative services office (ASO), Bedford Park, IL. At the beginning of the interview, Fernandez was provided the identity of the interviewing agents/inspector and the nature of the interview was explained to him. Fernandez was told that he was not under arrest and that he was free to leave at any time. Fernandez was also told, that although the USPS ASO manager invited him over to discuss additional work opportunities, the real purpose of the invitation was to allow the agents/inspector to talk to him.

As background information, Fernandez stated that he was born on May 24, 1951. He is a United States citizen and he resides at 826 Lincoln Lane, Lagrange Highlands, IL. He



**ESTRICTED INFORMATION**

This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

000058

is married and has five children, the oldest of whom currently attends Princeton University. Fernandez related that he has a high school diploma and he attended two years at Morton College in Illinois. Fernandez advised that he has never been arrested and he has never filed for bankruptcy. Fernandez claimed to be a member of the U.S. Marine Corps Reserves in or around 1971. According to Fernandez, he does not have any mental illnesses or conditions but he does claim to have hepatitis.

[redacted]

Fernandez stated that he maintains the books and records for Andrew M. Fernandez and Associates, but claimed more than once that he does not have the "greatest" bookkeeping. Fernandez stated that he calculates the individual line item amounts for his tax returns including gross receipts and business expenses. Fernandez stated that he sends documentation of his calculations to his accountant to be used in preparing his income tax returns. Fernandez stated that his wife, Cynthia, does not meaningfully participate in his business, however she occasionally tracks utility expenses and conducts banking transactions on behalf of the business at his direction. Fernandez summarized that maintaining the business books and records and providing tax return totals to the accountant are primarily his responsibility.

Fernandez stated that he reported all of his business expenses on each of his tax returns since 1995. Fernandez stated that he pays business expenses out of the business account. Fernandez stated that no personal expenses are paid out of the business account. Fernandez stated that he does not pay any business expenses in cash and generally does not pay business expenses out of his personal account.

Fernandez stated that A.M. Fernandez and Associates has the following business expenses: cell phone, one business vehicle, some computer equipment, blue print machine, occasional blue print services, subcontractors such as engineering consultants, and a fraction of such home operating expenses as utilities and depreciation. Fernandez stated that the percentage of the home operating expenses that he can deduct as business expenses relates to the percent of his home that was used for business. Fernandez did not recall the annual amounts paid for subcontractors.



RESTRICTED INFORMATION

This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

Fernandez stated that all deposits to his business accounts represent income to the business. Fernandez stated that he calculates gross income for his tax return based on the checks that he receives during the year for work that he performed. Fernandez stated that he receives very little cash business income, "maybe $100 here or there". Fernandez stated that he does not maintain a ledger or record of payments that he receives.

Special Agent Guest showed Fernandez a copy of the [redacted] Fernandez stated that all checks paid to him or to A.M. Fernandez and Associates by the U.S. Postal Service represent income to him for work that he performed for the U.S. Postal Service. [redacted] Fernandez stated that he might have made a typographical error. Fernandez added that it would be "stupid" to omit income from his tax return and he knows it is wrong to purposely omit income. Fernandez stated that he never received a 1099 from the U.S. Postal Service [redacted].

Special Agent Guest showed Fernandez a copy of [redacted] Special Agent Guest asked Fernandez to identify whether [redacted] Fernandez reviewed [redacted]

[redacted]

[redacted]



RESTRICTED INFORMATION

This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

[redacted]

[redacted]

[redacted]

Fernandez stated that he is familiar with his income tax requirements and is fairly comfortable with income tax law. Fernandez stated that he does not recall when he filed his first income tax return, but he has filed on time every year that he has been required to file. Fernandez stated that he "pretty much" retains copies of returns that he files and related work papers for several years.

Fernandez stated that Leonard Metzyl has been preparing his income tax returns for many years. Fernandez stated that each year he sends to Metzyl an information packet spelling out income and individual expense item totals. Fernandez stated that Metzyl uses the information provided by him to prepare his income tax returns. Fernandez stated that Metzyl calls him if he has any questions or needs additional information. Fernandez stated that upon completing the returns, Metzyl mails the returns, along with Fernandez's original information packet back to Fernandez. Fernandez stated that he does not know if Metzyl keeps a copy of the information packet or work papers. Fernandez stated that Metzyl is not involved in the bookkeeping for A.M. Fernandez and Associates. Fernandez stated that Metzyl does not compute any line items such as income or expenses, and that Metzyl only does the tax return calculations and the tax return schedules. Fernandez stated that Metzyl asks him each year if he has disclosed all of his income and expenses.

Fernandez stated that he has not given Metzyl any special instructions and Metzyl has not given him any special instructions regarding his tax returns. Fernandez stated that Metzyl has never instructed him to omit certain items of income or expenses from his



RESTRICTED INFORMATION

This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

tax returns. Fernandez initially stated that the IRS prior to this interview had never contacted him. However, Fernandez recalled that he received a letter from the IRS a couple of months ago regarding [redacted] Fernandez stated that Metzyl sent a letter to the IRS explaining the situation and the issue was resolved with no additional tax due.

Fernandez stated that he has not owned any other businesses or been on the payroll of any other businesses in the last five years. Fernandez stated that his wife, Cynthia, started a craft-type business in the last year or so, but that her business has not had significant income.

Fernandez stated that his business has not had any employees since 1995. Fernandez stated that he has not paid himself a salary from A.M. Fernandez and Associates, rather when he needed money, he just withdrew funds from the business account. Fernandez stated that he does not keep a written record of the amount of money that he draws from the business other than what is reflected in the "bank book". Fernandez stated that he has operated his own architecture business since about 1983. Fernandez stated that he officially began using the name A.M. Fernandez and Associates in approximately 1990 or 1991. Fernandez stated that by adding the term "and Associates", he could legally use other architects to do contracted work.

Fernandez stated that he maintains his business and personal checking accounts [redacted] Fernandez stated that he does not own any foreign bank accounts or other foreign financial interests. Fernandez stated that he does not hold any safe deposit box accounts, but that he does keep a fireproof safe at his house. Fernandez stated that none of his family members are the beneficiaries, donors, or trustees of any trusts other than the trust comprised of their residence. Fernandez stated that he does not own any stock, commodity or mutual fund accounts. Fernandez stated that he has occasionally used currency exchanges for his license plates, but not for other services. Fernandez stated that he probably has not used cashier's check, money orders, bank drafts, or traveler's checks in the last five years. Fernandez stated that other than the aforementioned State Farm insurance proceeds, during the last five years, he has not received any significant amounts of money as a result of loans, gifts, inheritances, insurance claims, damages from legal actions, or other sources.

Fernandez stated that his assets consisted of a house, two vans, two cars, and some jewelry that was not very valuable. Fernandez stated that one of the two cars was his son's car. Fernandez stated that he did not typically keep large sums of cash on hand and that the most cash that he ever had at one time was approximately $5,000 to $6,000. Fernandez stated that in the last five years, the most cash that he may have had at one time, after cashing a check, was approximately $3,000 to $4,000.



RESTRICTED INFORMATION

This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

SA Puricelli asked Fernandez about a check he [redacted] Fernandez stated he performed construction oversight at the Tinley Park job. He said Kago performed landscaping and installed a sprinkler system. Fernandez stated he worked for the USPS, not Kago.

Fernandez was asked about the personnel and contractors who had performed postal work through the Central Illinois District office. These contractors included, but were not limited to, Ulbrich & Associates, PNL Incorporated, Kago, Ramcorp, RJ Custom Builders and Concrete by Wagner. Fernandez was also asked to explain the nature and circumstances surrounding additional checks he received from other contractors who also did work for the USPS.

Fernandez stated Sam Southern was a project manager at the Central Illinois District. At one time, Southern had contracting officer authority up to $100,000. Fernandez related that Southern would primarily perform paperwork and handle customer questions. Although Southern would occasionally conduct site visits, Fernandez could not say how Southern filled his day. Curtis Collins was another employee in the Administration office. He said Collins was a rung below project manager, and would occasionally perform site visits. Fernandez was unsure of Collins title or authority and he may have performed work on two projects with him. Fernandez stated that he occasionally interacted with Bruce Rothermill, who was in charge of real estate acquisitions, Michelle last name unknown, who performed clerical work, Linda Barker, who was learning the project manager duties, Lois Gunlockson, now the retail manager at Carol Stream and Dennis Menascalci, former project manager (all names spelled phonetically). Fernandez noted that Menascalci actually checked on the contracts that he was overseeing and he was much more detail orientated than Southern. According to Fernandez, Menascalci did not like him because he beat Menascalci in the local school board election.

Fernandez stated that he knew of Ulbrich because the company was a general contractor for the USPS. He related that he also knew the company because he did consulting work for Ulbrich. Fernandez advised during the past five years he consulted on approximately 5-10 large, non-postal jobs for Ulbrich. He indicated there exists no paperwork to document his work for Ulbrich. He said the work consisted of reviewing drawings, making notations on drawings and basic computations. Fernandez explained the work was performed at Ulbrich's office and he denied ever going to Ulbrich's residence. According to Fernandez, the last job with Ulbrich was approximately 1998.

Fernandez stated Phoenix Construction was an affiliate of Ulbrich. Fernandez related that he has never spoken to anyone at Phoenix and he has never sent any bid materials to the company. All bids submitted by Phoenix were done by and/or through Ulbrich.



RESTRICTED INFORMATION

This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

Fernandez stated be performed consultation and design work for Ramcorp. He said the work related to a proposed expansion of Ramcorp's building in Wilmington, IL. He claimed to have kicked around some ideas and discussed the relative feasibility of the expansion. He was uncertain if he prepared any sketches. Fernandez said that he charged by the hour and his fee was $75 per hour. Fernandez advised that he might charge more depending on the complexity of the job and depending on whether he had to prepare drawings.

Fernandez stated that R.J. Custom is a homebuilder specializing in additions. Fernandez related that he has performed preliminary design work for R.J. Custom Builders. Fernandez stated he assisted RJ with approximately six non-postal jobs in the last five years, the last time of which was a couple of years ago. He said R.J. has only worked on two or three small postal jobs.

Fernandez stated that there were two other contractors who performed work for the Central Illinois District but neither was very successful in bidding on the handicap ramp projects. They were Waner Enterprises, who was too busy, and Concrete by Wagner, who was not competitive enough. Fernandez noted that he performed design work for Concrete by Wagner on approximately six occasions since 1995 and this work was completed at his home/office.

At this point in the interview, SA Puricelli stated there were several problems with Fernandez and other postal employees in the district Administration office. Puricelli asked Fernandez to assist with the investigation. Fernandez stated he was not opposed to answer questions. He said he had nothing to hide, he had been "there" for ten years, and was willing to discuss the postal employees and contracts.

Fernandez was asked to explain the system in which he operated as architect/engineer for the USPS. Fernandez stated he performed the design function for postal facility additions. On about twenty five percent of his contracts he also performed construction oversight/administration. He stated Robert Rigsby, former manager, Administrative Services, gave him a list of vendors (contractors) to solicit for work. Fernandez stated he would send his drawings to the specified contractors, meet them at the work site, and instruct them to prepare bids, and forward them to Rigsby. He stated usually Ulbrich, and sometimes PNL would actually visit the worksite, and that many bids were based primarily on the initial drawings. He stated Rigsby would decide who was capable of completing the project. He said Rigsby would occasionally ask for his input on which contractors should be on the bidding list and which contractor he thought was capable of completing the job. He stated Rigsby did not ask his advice on who should be awarded a job. He said all proposals were evaluated and awarded by Rigsby who signed the "Intent to Award" documents.



RESTRICTED INFORMATION

This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

Fernandez stated in August 1996 he had been given the responsibility for preliminary design on 28 handicapped ramps jobs on postal facilities throughout Illinois. He stated he prepared the drawings, contacted contractors, compiled bid information and submitted it to the district office before the end of the fiscal year. Fernandez stated that he viewed the handicapped ramp jobs as one large project. He stated his contract work-order stipulated that contractor bids be solicited by him. He said it was not within the scope of his work to award jobs, but he did recommend contractors for the jobs.

Fernandez stated there were no formal solicitations for the handicapped ramp jobs. He claimed he did not send out any solicitations, but he did receive the bids. He believed that copies of the bids were also sent to the district administration office. He stated all bid information had to be compiled and submitted to the USPS by September 4, 1996, in order to be committed before the close of the fiscal year on September 11, 1996. Fernandez told the contractors about the USPS deadline.

Fernandez stated during a two-week period in August 1996, he sent copies of initial drawings for each of the 28 jobs to Ulbrich, PNL and Ramcorp. He verbally instructed the contractors on when their bids had to be returned. Fernandez said that his work order required that the bids be submitted to him and the Central Illinois District. He commented that the contractors sent him their bids for the jobs and he faxed and mailed these bids to the USPS. He said formal drawings were not completed until the next year.

Fernandez was shown a copy of the USPS contracting file for the Bradley, IL project. The contract was awarded to Ramcorp for approximately $53,210, which appeared to be a higher bid than three other bidders. When asked to explain how this occurred, Fernandez stated that Ulbrich might have been the lowest bidder on all of the USPS projects but Rigsby believed it would look funny if all of the contracts were awarded to Ulbrich. Fernandez believed that Rigsby felt obligated to award some of the contracts to other contractors in good faith for their efforts in preparing bids.

Fernandez was shown a copy of the Bushnell, IL contract file. It was awarded to Ulbrich and Fernandez said it looked right. He was then shown a copy of the Brookfield, IL contract file and asked why it was awarded to Waner, when earlier in the interview he commented that Waner was too busy. Fernandez responded by saying that this was not one of the ramp jobs and Waner agreed to do this one job in spite of the large number of projects he already had under contract.

The Carlinville project contract file was briefly shown to Fernandez; however, SA Puricelli withdrew it before Fernandez made any meaningful comments. When the Pana, IL project contract file was shown to Fernandez, he commented that this was a very large ramp, possibly sixty or seventy-two feet in length and the building materials had to match the existing building. He thought that it cost the USPS over $100,000.



000065

RESTRICTED INFORMATION

This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

Fernandez expressed an opinion that the contracting authority for the Central Illinois District was limited to $100,000 and this project could only be approved locally via a change order. He claimed to have not been involved in the change order process.

Fernandez stated that he performed administrative oversight for the following projects: Brookfield, Paxton, Streetor, and LaGrange. He commented that the Streetor project might have exceeded the $100,000 contracting authority for the Central Illinois District, but he was not involved in the modification process.

Fernandez stated the USPS is very inefficient in contract administration. He said he often did not wait for signed paperwork, and added that there is "plenty of irregularity in terms of contract administration."

Fernandez stated he had no concrete evidence of anyone taking money at the administration office. He claimed he never saw a check payable to anyone. He commented that there was one irregularity that the USPS might be interested in: Fernandez stated that Steve Rizbasin who lives in Indiana and works for Sycamore Construction Company continually causes problems and has always been a thorn in everyone's side (all names spelled phonetically). He related Steve was working on the LaGrange and Momence projects at the same time and did not complete both projects. In spite of this, Southern authorized payment to Steve as if he completed both. Fernandez believed that the loss to the USPS might be around $1,500.

At this point in the interview, approximately 1:35 PM, Fernandez was offered a break and refreshments, which he refused.

Fernandez was then asked about discrepancies in his overhead rate calculations. He retorted that he was not that familiar with the particular forms used in calculating overhead rates. Fernandez explained that he simply transferred his payroll figures and overhead rates from his tax returns to the Postal forms. SA Puricelli informed Fernandez [redacted] he did not account for and include all of his income. As a result of understating his payroll, Fernandez was told that his overhead multiplier was excessive and all of his claims for payment were therefore false. Fernandez commented that the multiplier for his 1990, 1994 and 1999 contracts were all prepared the same way.

Fernandez was asked if he carried professional liability insurance and he replied affirmatively, noting that it was sold to him by an insurance agency in Elmhurst and underwritten by Continental or Aetna.

Fernandez was again asked about the [redacted] payment he received from Kago in September 1995. He stated that he has known Phil Kasik, owner of Kago for a long time. Fernandez claimed that he did some consulting work for Kago concerning a porch



RESTRICTED INFORMATION

This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

at Kago's residence in Western Springs. He said there was no paperwork or invoice detailing his work. When asked how much consulting he did, Fernandez admitted he did not perform [redacted] worth of work for Kago. He said the actual consulting work was little more than a couple of hours.

Fernandez stated he recommended to Rigsby that Kago be considered for postal work. He stated he told Kago I'll submit your name, "don't forget me" or "remember me later". He admitted he was expecting cash in return for the recommendation. Fernandez stated he knew the money was a kickback, but preferred to view it as a "logical spin-off." He stated he never guaranteed anyone postal work, but was in a position of influence to recommend contractors for postal work.

Fernandez was asked about other contractors who paid him money in exchange for postal work. He stated he accepted approximately $25,000 from Ulbrich & Associates between 1995-1997, in consideration for postal contracts. He denied the payments were based on a percentage of the contract amount. He said the kickbacks were paid after the USPS paid Ulbrich and his kickback agreement was with Rick Ulbrich. He stated all payments were checks drawn on Ulbrich's account. He admitted that he generally cashed the checks at Ulbrich's bank. At first, Fernandez claimed that Ulbrich initiated the kickback activity. Later, Fernandez claimed to have initiated the kickback activities.

Fernandez stated that aside from the $25,000 in illicit payments from Ulbrich, he also received additional checks totaling approximately $5-10,000 for legitimate consulting work from Ulbrich.

Fernandez admitted he accepted approximately $20,000 - $25,000 from Rick Rosenow, of Hans Rosenow Roofing, aka Janice Building Corp in exchange for postal work. All payments were made by check and generally the checks were cashed at the source bank. He said the majority of this work was related to repair and alteration work performed for the USPS and it generally did not relate to the handicapped ramp jobs. Fernandez commented that he did not perform any legitimate work for Rosenow or Janice Building.

Fernandez admitted he accepted approximately $10,000 from Larry Rampa of Ramcorp Construction in exchange for postal work between approximately 1996-97. All payments were made by check and generally the checks were cashed at the source bank. In addition to these payments, Fernandez explained that he received about $2,000 for legitimate work he performed for Ramcorp.

Fernandez stated he accepted approximately $10-15,000 from Bob Wagner of Concrete by Wagner in exchange for postal work between 1995-98. All payments were made by check and generally the checks were cashed at the source bank. In addition to these



RESTRICTED INFORMATION

This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

payments, Fernandez explained that he received about $5,000 for legitimate work he performed for Wagner.

Fernandez stated he accepted approximately $2-3,000 from Robert Pitroski (phonetic) of R.J. Custom Builders in exchange for postal work. Fernandez explained that neither he nor Cynthia Fernandez, his wife, did any legitimate work for R.J. Custom Builders. Fernandez advised that all payments were by check but he was unsure if he cashed the checks at the source bank.

When questioned about the purchase of a Pontiac Grand Am on 10/19/95 with $18,000 in cash, Fernandez stated that he doesn't think that he paid the cash all at once. Fernandez stated that he did not knowingly pay in increments below $10,000 to avoid any transaction reporting requirements. Fernandez stated that all the cash used to purchase the Grand Am came from illicit payments from these contractors.

Fernandez stated he knowingly and intentionally under-reported his gross income and filed false tax returns since he did not report the kickback money he received from these contractors as income on his taxes. Fernandez denied having any ledger or list detailing the kickbacks received.

Fernandez stated that he has known Robert Rigsby since approximately 1992. Base upon his experience and interaction, he did not think Rigsby was involved in any bribery or kickback activities. He clarified his comment by saying that he only knew Rigsby professionally and he has never been to Rigsby's residence and he has never been out with Rigsby or Rigsby's wife socially. Fernandez denied any knowledge of other USPS employees accepting bribes/kickbacks.

Fernandez stated that his brother and nephew were in prison for alleged corruption at the Lyons, IL Township. He felt their convictions were wrong and politically motivated. He commented that his father is deceased. It was explained to Fenandez that the instant investigation was independently generated and had nothing to due with the case against his brother and nephew. The investigators did point out that they were aware of the case against his family members, however this would not be held against him.

At this point in the interview, Fernandez was read a warning of his Constitutional rights. He agreed to fully cooperate in the investigation. Fernandez agreed to prepare a written, sworn statement detailing the aforementioned activities. Before beginning the statement, he took a break from the interview room and used the restroom.

Fernandez was given a preprinted sworn statement form, which detailed his rights. He read his rights and initialed and dated each one. He proceeded to write a detailed statement. Fernandez reviewed his written statement, corrected and initialed errors, and was sworn to his statement.



RESTRICTED INFORMATION

This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

At the conclusion of the sworn statement, SA Puricelli offered Fernandez one more opportunity to discuss any additional details that may have been left out. Fernandez stated that in approximately 1994, possibly on a weekday, he placed a potted plant next to the front door of [redacted] He said that it was meant as a Christmas gift. In the potted plant was a cardholder and in the cardholder Fernandez placed ten $100 bills ($1,000 total). Fernandez explained that, at the time, [redacted] was the USPS [redacted] in charge of handing out and overseeing work assignments. Fernandez felt that by giving [redacted] a $1,000 gift it might become beneficial for him in the future. Fernandez noted that [redacted] was in a position to [redacted]

Fernandez stated that he did not watch to see if [redacted] actually picked up the plant/cash. Fernandez denied ever asking [redacted] whether he received the potted plant/cash and further denied that [redacted] ever acknowledged receiving it.

[redacted]

Fernandez was told that the United States Attorney controls the prosecution portion of this matter. No promises related to the ultimate outcome could be made by the investigators. It was explained that the interviewing agents/inspector would provide the results of the investigation to the United States Attorney's Office. As part of those results, it would be made known that Fernandez was cooperative.

Prior to departing, Fernandez provided a home telephone number of 708 579-5191 and a cell phone number of 630 363-5191. He reiterated a willingness to continue cooperating with the investigative portion of this matter. He asked that his wife not be notified at this time. Fernandez spent some time reflecting out loud about how he was going to tell his wife and family about this. He said that he did not want to go to jail and he wanted to do what he could to protect his family from the impact. He asked if there would be a public disclosure of this matter and the investigators explained that they did not have total control over it. The investigators also explained that the sentencing guidelines controlled whether he would go to jail, however his cooperation would be made known to the United States Attorney's Office.



RESTRICTED INFORMATION

This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

UNITED STATES POSTAL SERVICE
OFFICE OF INSPECTOR GENERAL
77 WEST PORT PLAZA
ST. LOUIS, MO 63146-3124

APPROVED BY:

DATE: December 19, 2000

CASE NUMBER: 97RI007RP000
DATE OPENED: August 29, 1997
REPORTING OFFICE: ST. LOUIS

TITLE: A M FERNANDEZ AND ASSOCIATES
CROSS REFERENCE #:
CASE AGENT: SA CARL PURICELLI

# ACTIVITY REPORT - INTERVIEW

**DATE OF INTERVIEW:** December 19, 2000

**PERSON INTERVIEWED:** ROBERT WAGNER

**LOCATION OF INTERVIEW:** CONCRETE BY WAGNER, INC.

**INTERVIEWED BY:** INSPECTOR TERRY MCKEOWN AND SA KEVIN CLONINGER

**WITNESSES:** JOHN ANTONOPOULOS, ATTORNEY AT LAW

---

**SERVICE OF [redacted] TO ROBERT WAGNER:** On December 19, 2000, US Postal Inspector Terry McKeown and SA Kevin Cloninger served a [redacted] to Robert Wagner (815) 838-9218, President, Concrete By Wagner, Inc. Physical service took place at the office of Concrete By Wagner, Inc., 13808 High Road, Lockport, IL 60441.

Wagner was interviewed by Inspector McKeown and SA Cloninger following the [redacted] John Antonopoulos (630) 257-5816, attorney for Wagner, was present for the entire interview.



RESTRICTED INFORMATION

This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

Wagner has been an associate of Andrew Fernandez since the early 1980's when they began working on construction projects together. Wagner began working on construction contracts with the USPS, specifically contracted through Fernandez, in 1995.

Wagner related that he was notified of upcoming USPS contracts from Fernandez directly. Fernandez would meet Wagner at the facility where the work needed to be completed and inform Wagner of what the construction contract entailed. Wagner stated that he would then prepare the bid for the contract and submit it to the USPS Bedford Park office. According to Wagner, he never received a solicitation or award notice from the USPS and that Fernandez notified him when he was awarded a contract.

When questioned if he was asked to give kickbacks to anyone related to USPS contracts, Wagner responded by stating that he paid "finders fees" to Fernandez when he was awarded USPS contracts. Wagner stated that some of the "finders fees" were paid to Fernandez without being asked by Fernandez. Wagner also stated that some of the "finders fees" were paid when requested by Fernandez. Wagner explained that he would inflate his bid to include the $2,000 "finders fee" for Fernandez. Wagner related that at some of the meetings to discuss the potential bid, Fernandez would tell him to "make sure we have a couple in there". According to Wagner, he did not include "finders fees" for all his USPS contracts. Wagner explained that "finders fees" are common in the construction industry today. Wagner was aware that Fernandez was a contractor with the USPS and said he knew that Fernandez was paid for his services as an architectural engineer. When asked whether he thought it was right to charge the USPS extra money to provide Fernandez with money above and beyond the amount that he was paid by contract, Wagner stated he knew it was wrong but that is the way things are done in the concrete business. Wagner related that he runs a large business and that he did not want to cause any trouble by covering anything up. Wagner estimates that he paid Fernandez over $10,000 in "finders fees" since 1995 and would usually pay by check. Wagner stated he paid a $2,000 "finders fee" for his most recent USPS contract at the LaGrange, IL Post Office, which carried a contract price of $60,000 to $70,000.

Inspector McKeown showed Wagner a [redacted] check [redacted]. Wagner explained that the check was either for a "finders fee" to Fernandez or architectural fees for structural designs from Fernandez. Wagner stated that Fernandez provided the architectural designs for Wagner's personal residence and the Concrete By Wagner office. Wagner claims that he paid for Fernandez's architectural services. [redacted]



RESTRICTED INFORMATION

This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

Wagner stated he bid on approximately five to seven USPS contracts a year. He estimated he was awarded two or three a year. Wagner estimated the contracts with the USPS for Concrete By Wagner to be $40,000 to $100,000 per contract.

**ADDITIONAL INFORMATION**

Wagner stated he will continue to provide cooperation in support of the investigation.

Prepared by SA Kevin Cloninger, USPS-OIG, St. Louis, MO



RESTRICTED INFORMATION

This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

**UNITED STATES POSTAL SERVICE**
**OFFICE OF INSPECTOR GENERAL**
77 WEST PORT PLAZA
ST. LOUIS, MO 63146-3124

APPROVED BY:

**DATE: December 19, 2000**

| | |
|---|---|
| **CASE NUMBER: 97RI007RP000** | **TITLE: A M FERNANDEZ AND ASSOCIATES** |
| **DATE OPENED: August 29, 1997** | **CROSS REFERENCE #:** |
| **REPORTING OFFICE: ST. LOUIS** | **CASE AGENT: SA CARL PURICELLI** |

ACTIVITY REPORT - INTERVIEW

**DATE OF INTERVIEW:** December 19, 2000

**PERSON INTERVIEWED:** LARRY RAMPA

**LOCATION OF INTERVIEW:** RAMPCORP, INC.

**INTERVIEWED BY:** INSPECTOR TERRY MCKEOWN AND SA KEVIN CLONINGER

**WITNESSES:** N/A

---

[redacted] TO LAWRENCE RAMPA: On December 19, 2000, US Postal Inspector Terry McKeown and SA Kevin Cloninger served [redacted] to Lawrence E. Rampa, Owner, Ramcorp, Inc. at the office of Ramcorp, 421 North Water Street, Wilmington, IL 60481.

Rampa was interviewed by Inspector McKeown and SA Cloninger following the service of the subpoena.

Rampa explained that his first contract with the USPS was construction on the Wilmington, IL Post Office around 1980. Rampa has known Andrew Fernandez since 1986 when they worked on a construction project together. Construction work on the





RESTRICTED INFORMATION

This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior co[illegible] Office of Inspector General. Unauthorized release may result in criminal pr[illegible]

Inspection Service Exhibit 14

Naperville, IL Post Office was Rampa's first contract with the USPS involving Fernandez.

Rampa stated that he has bid on approximately 10 to 15 USPS contracts involving Fernandez and has been awarded about seven of those. Rampa related that Fernandez would call him about an upcoming contract and would ask if he wanted to be on the bidder list. According to Rampa, Fernandez would meet Rampa at the location that needed the work and provide the contract specifications and then Rampa would submit his bid. Rampa stated that he submitted his bid to the USPS Bedford Park, IL office. Rampa was sent a purchase order from the USPS to notify him if awarded the contract.

Rampa was shown a [redacted] Rampa could not recall what the check was for. Rampa denied ever paying kickbacks or gratuities to anyone in relation to USPS contracts.

Rampa stated that he did some work on Fernandez's personal residence. The work involved leveling the concrete base of a backyard shed. Rampa estimated the work took about one to two hours and he did not charge Fernandez. Rampa also stated that he reviewed and gave an estimate on a masonry project for one of Fernandez's associates for no charge.

Rampa also stated, at the request of Fernandez, he reviewed and gave an estimate on a construction project at the personal residence of [redacted], USPS employee, for no charge [redacted]

Prepared by SA Kevin Cloninger, USPS-OIG, St. Louis, MO



RESTRICTED INFORMATION

This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

# MEMORANDUM OF TELEPHONE CONVERSATION

| | |
|---|---|
| Date: | December 20, 2000 |
| Time: | 2:05 PM |
| Subject: | Robert F. Wagner |
| Contact: | Telephone Call by Wagner |
| Case No: | 565-1222885-EI(1) |

On this date, Robert F. Wagner, President of Concrete by Wagner, contacted Inspector Marchese by telephone. {Wagner had been interviewed by agents on December 19, 2000. During the 12/19/00 interview, Wagner admitted to making several payments to Andrew M. Fernandez in return for postal work. Wagner called these payments "finders fees". He also stated he would pad his bid by the amount of the fee.}

Wagner stated in 1999, his firm did approximately $14 million in business, of which approximately $100,000 was postal related. He stated he did not have a contract with the postal service. He said Fernandez would routinely call him to discuss postal jobs. He said he would look at Fernandez's drawings and submit a bid. He stated his work was primarily new construction and sidewalk replacement.

Wagner stated he has known Fernandez for a long time. He stated Fernandez worked on various non-postal projects for his firm and was paid accordingly, adding, "Andy is not cheap." He claimed he never paid Fernandez any money in return for postal work. When asked about "finders fees" he replied he would do some work on Fernandez's house, or give him leads for other jobs. He said there was no cash involved.

Wagner stated he was never asked for a bribe or kickback from any postal official. He stated he met Robert Rigsby several times at new facility sites. Wagner stated he has worked on several postal jobs where Fernandez was not involved. He mentioned one general contractor in particular, Tarcom, with whom he has performed postal work in the past.

When pressed about the statements he made to agents on December 19, 2000, Wagner stated it was all a misunderstanding. He declared the "finders fees" applied to getting leads for other jobs, claiming, "We do it for all our guys." Wagner was asked if he ever padded his bids in order to cover the cost of "finders fees". He stated he builds in a "cushion" on his bids to cover to cost of over-runs.

Wagner was asked if his attorney was present with him when he spoke to the agents on



Inspection Service Exhibit 23

December 19, 2000. Wagner said his accountant was present at that time. Wagner agreed to meet with agents in person to clarify his earlier statements and discuss the subpoena. The conversation ended at approximately 2:30 PM.

Gene Marchese
Postal Inspector
Prepared on December 20, 2000

# MEMORANDUM OF INTERVIEW

| | |
|---|---|
| Person Interviewed: | Robert J. Pietrowski |
| Date of Interview: | December 27, 2000 |
| Location: | 5515 Wolf Road, La Grange IL 60525 |
| Time: | 4:05 PM |
| Interviewed By: | G. Marchese, Postal Inspector<br>C. Puricelli, S.A., USPS OIG |
| Witness: | Francine J. Pietrowski |
| Case No. | 565-1222885-EI(1) |

Robert J. Pietrowski (RJP) was interviewed on this date concerning his association with the Postal Service and Andrew M. Fernandez. The interview was conducted at his residence. Pietrowski's wife was also present for the interview. RJP was told investigators were looking into irregularities in the administration of postal facility contracts. He agreed to answer questions.

RJP stated he owns and operates R.J. Custom Builders. He stated his specialty is residential carpentry, primarily additions. RJP stated he worked on approximately three post office construction jobs. These jobs included Homewood, Chicago Ridge, and Downers Grove. RJP stated these were not handicap ramps jobs, but consisted of retail lobby renovations.

RJP was asked about his relationship with Andrew M. Fernandez. He stated Fernandez lived "in the neighborhood" and knew him for many years. He said he knew Fernandez was an architect for the Postal Service.

RJP was asked how he bid on postal jobs. He stated he received a telephone call from Fernandez, who inquired if he was interested in postal work. He stated he submitted bids on the Homewood and Chicago Ridge jobs. He said he did not bid on the Downers Grove job.

RJP denied making any payments to any postal official, including Fernandez. RJP stated he never employed Fernandez and could not recall making any payments to him. RJP was shown [redacted]

[redacted]

RJP admitted he wrote the checks to Fernandez in exchange for the award of the Homewood job. He stated the Homewood job "was a big screw-up", and Fernandez needed him to fix it. RJP stated he reviewed the site and estimated approximately $14,000 to complete the job. He said Fernandez told him the inflate the bid to approximately $23,000. RJP said he received notification of the award for Homewood. He said after he was paid by the Postal Service, he made four payments totaling approximately $2,400 to Fernandez. RJP stated in addition to [redacted], he made two payments to Fernandez's children. He said the payments were intentionally made in increments of less than $600 to avoid filing IRS Form 1099. He stated he told Fernandez about making the payments in increments of less than $600. He said Fernandez replied, "Nobody else does that."

RJP stated he instructed his accountant to prepare the checks. He said he retrieved to checks from the accountant and mailed them to Fernandez. He said he did not get an acknowledgment from Fernandez about the payments. He claimed he did not know what Fernandez did with the money.

RJP was asked whether he initially offered the payments to Fernandez or whether Fernandez approached him about payments. He said Fernandez initiated the scheme. RJP declared he never liked the idea of making the payments to Fernandez and knew it was wrong. He said it was the choice of getting the job or not. He stated the payments were built into his bid price. He said he expected more postal work from Fernandez as a result of the payments, however it never materialized. RJP speculated the Postal Service was paying more than necessary for facility construction.

RJP stated his normal profit margin is approximately 10-15% on jobs of $100,000 or more. He said for lesser jobs, the margin is approximately 30%. He stated he was never asked by Fernandez to submit complimentary bids on postal jobs. He said he was not aware who his competitors were for the postal jobs he bid on.

Special Agent Puricelli briefly explained the legal process to RJP. RJP was not asked to prepared a written statement at this time. [redacted]

Gene Marchese
Postal Inspector
Prepared on December 28, 2000

UNITED STATES POSTAL SERVICE
OFFICE OF INSPECTOR GENERAL
77 WEST PORT PLAZA
ST. LOUIS, MO 63146-3124

APPROVED BY: CMP

DATE: December 29, 2000

CASE NUMBER: 97RI007RP000
DATE OPENED: August 29, 1997
REPORTING OFFICE: ST. LOUIS

TITLE: A. M. FERNANDEZ AND ASSOC
CROSS REFERENCE #: 565-1222885-EI(1)
CASE AGENT: PURICELLI

## ACTIVITY REPORT - INTERVIEW

**DATE OF INTERVIEW:** December 27, 2000

**PERSON INTERVIEWED:** ROBERT J. PIETROWSKI

**LOCATION OF INTERVIEW:** LA GRANGE, IL

**INTERVIEWED BY:** SA CARL PURICELLI AND INSPECTOR GENE MARCHESE

**WITNESSES:** FRANCINE PIETROWSKI

---

On December 27, 2000, Robert J. Pietrowski, owner of R. J. Custom Builders, was interviewed in the presence of his wife, Francine Pietrowski, at his residence 5515 Wolf Road, La Grange, IL 60525. After being apprised of the identity of the interviewing agent/inspector and the nature of the interview, he provided the following information.

Pietrowski stated that prior to performing work for the United States Postal Service (USPS), R. J. Custom Builders primarily conducted residential repair and alteration work, such as putting up drywall, taping and installing doors. The company has had several employees over the years but none have stayed the entire time period because



RESTRICTED INFORMATION

This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

he did not have enough work to keep them steadily employed. Pietrowski noted that he has never advertised his business and he has relied on word of mouth and good workmanship to secure new work.

Pietrowski stated that R. J. Custom Builders worked as an USPS subcontractor approximately four or five years ago. He related that all of the Postal work was conducted through Andrew Fernandez, owner of A. M. Fernandez and Associates who was acting as the USPS contract architect and engineer. Pietrowski advised that he did not build handicap ramps for the Postal Service, rather he performed carpentry and other remodeling services at the postal facilities in Homewood, Chicago Ridge, and the main post office on 87th street. Pietrowski commented that at the Homewood facility, his effort consisted of fixing up the mistakes of another contractor. He estimated that the Homewood contract was for about $17-18,000. Pietrowski noted that he heard about a job at the Hinsdale post office and he looked at a job at the Downers Grove facility, but he could not get in the door to bid the jobs.

Pietrowski stated that he looked forward to working for the Postal Service because it paid well. He related Andrew Fernandez was his point of contact with the Postal Service and he never talked to Bob Rigsby, USPS contracting officer, about obtaining more work. Pietrowski advised that he got along with Rigsby who reviewed the work he did at the Homewood and 87th street facilities. Pietrowski stated his normal profit margin is approximately 10-15% on jobs of $100,000 or more. He said for lesser jobs, the margin is approximately 30%. Pietrowski stated he was never asked by Fernandez to submit complimentary bids on postal jobs. He was not aware of who his competitors were, if any, for the postal jobs he bid on.

Pietrowski stated that Fernandez lived in his neighborhood and knew him for many years. When Fernandez would develop remodeling opportunities, he would contact R. J. Custom Builders and solicit a quote. In the beginning of the relationship, Fernandez would solicit quotes for private jobs. After seeing R. J. Custom Builder's workmanship on the private jobs, Fernandez asked him to bid on Postal work. Fernandez explained to Pietrowski that he was tied in with the Postal Service and he could obtain jobs for R. J. Custom Builders to bid on. Pietrowski noted that the Postal Service work was more paper intensive than the private jobs. According to Pietrowski, when work was slow he would call Fernandez and inquire about potential remodeling opportunities.

Pietrowski stated that Fernandez has never done any work for R. J. Custom Builders and he has never paid any money to Fernandez. Likewise, he denied making payments to any Postal employee. Pietrowski commented that he has recommended Fernandez to other individuals and he believed that Fernandez might have recommended R. J. Custom Builders to others. Pietrowski stated that there was one occasion when he fixed a hole in Fernandez's house, which was apparently caused by a woodpecker. He viewed this work as a gratuity. Pietrowski commented that the last



RESTRICTED INFORMATION

This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

time he saw Fernandez was about one to two years ago when another neighbor was selling his house. Fernandez told him that the Postal Service would be contacting him about additional USPS projects. At that time, Pietrowski asked Fernandez if it would be okay to call him to decipher the Postal Service paperwork should R. J. Custom Builders obtain additional USPS projects.

Pietrowski stated that he has not received any Postal Service jobs other than those mentioned herein. He related that his lack of success might have, in part, been linked to a Postal Service employee who lived in his neighborhood. This Postal Service employee allegedly worked with Fernandez and did not like Pietrowski.

Inspector Marchese showed Pietrowski copies of [redacted] Pietrowski was asked to explain why R. J. Custom Builders paid money to Fernandez. Pietrowski reviewed the checks, [redacted]. At first, he stated that he could not recall if these checks were made payable when the Postal Service work was being performed. Later, Pietrowski stated that the above checks plus two others were mailed to Fernandez in exchange for the Homewood Postal work.

Pietrowski stated that as part of the Homewood effort he prepared an informal written draft with a work description and a price and submitted this to Fernandez. He explained that R. J. Custom Builder's initial bid for the Homewood project was about $14-15,000. Fernandez commented that the job could be bid up to $23,000 and Fernandez told him to figure in a little extra. Fernandez thereafter directed him to increase his bid to cover the cost of Fernandez's cut.

Pietrowski stated that Fernandez wanted a lump sum payment of his cut after R. J. Custom Builders received payment from the USPS. Pietrowski related that he told Fernandez that a 1099 tax form would accompany any payments over $600 because that is what the tax law requires. Fernandez responded to him that no one else did it that way. Pietrowski advised that to avoid the tax form problem, he instructed his accountant to prepare separate checks. Pietrowski mailed to Fernandez four separate checks all $600 or less payable to Andrew Fernandez, his wife, and to two of his children. The total payments to Fernandez for the Homewood project were approximately $2370.

Pietrowski stated that he did not know what Fernandez did with the money. He was unaware of any foreign bank accounts that Fernandez might have. Pietrowski related that at the time of payment he did not receive an acknowledgement from Fernandez



RESTRICTED INFORMATION

This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

that he received the checks. Pietrowski however confirmed through his cancelled checks that Fernandez cashed/deposited the money. Pietrowski stated that Fernandez initiated the scheme and he never liked the idea of making payments to secure work. He said it was a choice between paying the money or not receiving the award. He expected to receive more postal work as a result of the payments but this did not materialize. He commented that the inflated portion of the Homewood effort came out of the price of stamps.

Special Agent Puricelli briefly explained to Pietrowski that as a result of the payments to Fernandez, he may be subjected to court proceeding and he may be asked to prepare a written statement. It was further explained that the United States Attorney's Office controls the judicial part of the proceedings. Pietrowski related that he understood and he was willing to provide a written statement if required. [redacted]



RESTRICTED INFORMATION

This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

**UNITED STATES POSTAL SERVICE**
**OFFICE OF INSPECTOR GENERAL**
77 WEST PORT PLAZA
ST. LOUIS, MO 63146-3124

APPROVED BY: CMP

DATE: December 29, 2000

CASE NUMBER: 97RI007RP000
DATE OPENED: August 29, 1997
REPORTING OFFICE: ST. LOUIS

TITLE: A. M. FERNANDEZ AND ASSOC
CROSS REFERENCE #:
CASE AGENT: PURICELLI

## ACTIVITY REPORT - INTERVIEW

**DATE OF INTERVIEW:** December 28, 2000

**PERSON INTERVIEWED:** RICH ULBRICH

**LOCATION OF INTERVIEW:** CHICAGO, IL

**INTERVIEWED BY:** SA CARL PURICELLI AND INSPECTOR GENE MARCHESE

**WITNESSES:** NONE

---

On December 28, 2000, Rich Ulbrich, owner of Ulbrich and Associates, was interviewed at his temporary place of business, 1061 E. Main Street, 1060 E. Main Street, E. Dundee, IL. After being apprised of the identity of the interviewing agent/inspector and the nature of the interview, he provided the following information.

Ulbrich stated that he formed Ulbrich and Associates approximately 4 or 5 years ago. He then commented that he is the "worlds worst with dates". He related that the company is out of business. Ulbrich advised that he was evicted from his former office space and all of his business records are stored in a warehouse and/or in his temporary office space. He noted that he currently has problems with the Internal Revenue Service over his business dealings.



RESTRICTED INFORMATION

This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

Ulbrich stated that 1996 or 1997 represented the year(s) that his company received the majority of its Postal Service business. The majority of this work related to the construction of handicap ramps at post offices. Shortly thereafter the work tailed off. Ulbrich felt that the work tailed off because Sam Southern, USPS project manager, was "after" him to fix up certain portions of the ramp jobs and he refused to do it because he did not feel it was his responsibility to do the work. He cited an example of a post office that was built using ornate granite that became damaged by external factors and Southern wanted him to fix it. Ulbrich commented that he also had a problem with one of his carpenters, whom he did not pay, and that carpenter complained to Southern further straining his relationship.

Ulbrich stated that he first started bidding on USPS contracts when Andrew Fernandez, USPS contract architect, called him on short notice and asked that Ulbrich visit some postal sites. Ulbrich related that he visited several post office sites where handicap ramps were to be built. He advised that several other bidders were also asked to visit the postal sites but he was the only one that went at that time. When asked if he had ever received a solicitation for this work, Ulbrich initially said that he did. Later he clarified his statement by saying that he received a notice to proceed or similar document and not a solicitation. Ulbrich stated that he was 99% sure that the formal bidding process went through the USPS directly. Ulbrich noted that he always felt that his bids were "good".

Ulbrich stated that he met Robert Rigsby on two or three occasions, generally when there was a problem with one of the jobs that Ulbrich and Associates was working on. Ulbrich related that he saw Southern many times. He commented that Southern had a lot of problems with his paperwork and because of this they had to meet a lot. Ulbrich noted that he also met with Jesse McNabb but he never did any jobs for him.

Ulbrich stated that Fernandez performed some architectural work for him in the mid 1990's on a spec home. Ulbrich bought some land and wanted to build a spec home for resale. The home was located near Lagrange, IL and was part of the Pacific Sacota (phonetic) development. Ulbrich related that Fernandez sent him a bill and he paid approximately $5,000 to $10,000 for Fernandez's services. When asked what was the total amount of all payments ever paid to Fernandez, Ulbrich stated that he never paid Fernandez more than $10,000.

Ulbrich stated that he never paid any money to secure postal work. He related that he would walk away from the business rather than paying for it. Ulbrich advised that on a previous occasion, he was asked to pay for business and he refused. Ulbrich denied making payments to Fernandez in exchange for postal business. He further denied that Fernandez solicited a kickback or made statements to the effect of remember me if you are awarded this contract.



RESTRICTED INFORMATION

This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

Ulbrich was shown a copy of [redacted] Ulbrich stated that he did not know what the payment was for. Inspector Marchese asked Ulbrich what he would say if I told you that Fernandez says that you are paying him off. Ulbrich replied that he did not believe it. Inspector Marchese explained to Ulbrich that he was in trouble because the Government was in possession of evidence that Ulbrich was paying off Fernandez for postal work and that Ulbrich was being afforded this opportunity to explain his side. At this point, Ulbrich stated that he would not answer any more questions without his attorney. The interview was terminated and Ulbrich was asked to have his attorney contact the reporting agents as soon as possible.



RESTRICTED INFORMATION

This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.