# MEMORANDUM OF INTERVIEW

| | |
|---|---|
| **Person Interviewed:** | **Robert F. Wagner** |
| **Date:** | **January 09, 2001** |
| **Time:** | **9:00 AM** |
| **Location:** | **13808 High Road, Lockport IL** |
| **Interviewed By:** | **G. Marchese, T. McKeown, Postal Inspectors** |
| **Case No:** | **565-1222885-EI(1)** |

On this date, Robert F. Wagner, President of Concrete by Wagner, was interviewed at his office in Lockport, IL. The purpose of the interview was to clarify conflicting statements made by Wagner to agents on December 19, 2000 and December 20, 2000.

Wagner was asked about services provided by Andrew M. Fernandez & Associates on behalf of Concrete by Wagner. Wagner stated Fernandez worked on several non-postal jobs with Concrete by Wagner. He stated Fernandez would sketch out drawings for bidding purposes.

Wagner was asked about payments made from his business account to Fernandez. Wagner stated Fernandez would charge him for non-postal work when Wagner was awarded a postal job. He stated everyone was looking for work. Wagner stated he paid Fernandez approximately $20,000. He stated approximately $10,000 was in return for the award of postal jobs. He said the "finders fee" was built into the bid amount. He stated a portion of the $10,000 in "finders fees" was compensation for legitimate work performed by Fernandez. Wagner was asked to produce copies of job jackets, work orders or invoices to reflect services provided by Fernandez. Wagner stated he had no records to reflect any services or work provided by Fernandez.

Wagner was asked to discuss any projects for which Fernandez provided services and was compensated. He stated Fernandez may have worked on the "Astron Gear job." He stated Fernandez may have sketched that job out, but he was not sure. Wagner stated he had no records of the job.

Wagner produced [redacted] Wagner also produced [redacted] The [redacted]

[redacted] to Fernandez for the period 1995-1999.

Wagner was asked if he contracted postal work with any other contractors. He said he worked with a firm called TARCOM. He said the postal job was in Willowbrook, IL. Wagner stated there was not a finders fee associated with the TARCOM job.

Gene Marchese

Gene Marchese
Postal Inspector
Prepared on January 09, 2001

# MEMORANDUM OF TELEPHONE CONVERSATION

| | | |
|---|---|---|
| CASE NUMBER | : | 565-1222885-EI(1) |
| PERSON INTERVIEWED | : | Phil Kasik |
| PLACE OF INTERVIEW | : | Northern Illinois District, Rm 5083 |
| DATE OF INTERVIEW | : | January 18, 2001 |
| TIME OF INTERVIEW | : | 2:30 PM |
| INTERVIEWED BY | : | G. Marchese, Postal Inspector |

On January 18, 2001 Phil Kasik contacted Postal Inspector G. Marchese. The purpose of Kasik's telephone call was to discuss a subpoena that was served on by Inspector Lloyd on December 19, 2000. Kasik stated he had been in Florida for approximately six weeks and had just recently reviewed the subpoena.

Kasik stated he worked on four postal jobs, including Tinley Park and Calumet City. Kasik stated the postal jobs were performed around 1994 during which, he explained, was a slow business period. He stated Andrew M. Fernandez was the general contractor on these jobs. He stated the extent of his work included landscaping and installation of a sprinkler system and general clean-up duties.

Kasik was asked about the nature of [redacted] Kasik initially stated he could not remember the nature of the check. Kasik was asked if he was ever pressured by Fernandez or any other postal official to pay a "fee" in exchange for postal work. Kasik replied Fernandez had always been good to him. He asked if Fernandez was in trouble. Kasik was told that agents had already interviewed Fernandez, and that Fernandez confessed to accepting $4,500 form Kago Incorporated in return for postal work. Kasik was asked if he initially offered the $4,500 to Fernandez in return for postal work, or whether the payment was solicited by Fernandez. Kasik stated the payment was solicited by Fernandez. He said he had to give Fernandez a "discount" on work he performed. He stated the $4,500 was the only payment he made. He said it was in return for the four postal jobs he worked. He stated he paid $1,000 for each of three jobs and $1,500 for the fourth job. He added that Fernandez had a physically handicapped child and speculated that Fernandez had significant medical bills.

000088



Inspection Service Exhibit 35

Kasik stated he was planning to return to Florida in two days. He said he would try to assemble the documents described in the [redacted] He stated his house suffered roof damage recently and many of his records had been destroyed.

Gene Marchese
Postal Inspector
Northern Illinois Division

Internal Revenue Service
Criminal Investigation

# Memorandum of Interview

| | | | |
|---|---|---|---|
| **In Re:** | Andrew Fernandez | **Location:** | 5515 Wolf Road<br>LaGrange, IL 60525 |
| **Investigation #:** | 360030173 | | |
| **Date:** | April 27, 2001 | | |
| **Time:** | Approximately 8:00-8:10 a.m. | | |
| **Participant(s):** | Robert Pietrowski, Taxpayer<br>Francine Pietrowski, Taxpayer<br>Gene Marchese, Postal Inspector, USPS<br>Dave Guest, Special Agent, IRS-CI | | |

1. At the above time and date, Postal Inspector Marchese and I, Special Agent Guest, went to the home of Robert and Francine Pietrowski for a prearranged interview. Inspector Marchese introduced me and explained that I had some follow-up questions relating to a prior interview of Robert Pietrowski. I presented my credentials for Robert Pietrowski's inspection. In response to my questions, Robert Pietrowski stated substantially the following:

2. Andrew Fernandez initially requested cash from Pietrowski in exchange for Pietrowksi being awarded a postal construction contract. Pietrowski told Fernandez that he could not pay Fernandez cash and that he had to pay with a business check. Pietrowski also told Fernandez that he would have to file a 1099 for the payment to Fernandez. Fernandez stated that he did not want a 1099 or any other record of the payment.

3. To circumvent the requirement to file a Form 1099, Pietrowski suggested that he make separate payments in amounts under $600 to Andrew Fernandez, his wife, and each of Andrew's five children. Fernandez agreed to this method of payment and was aware that the payments were being structured in such a way to avoid the Form 1099 reporting requirement.

4. Pietrowski received a telephone call from Fernandez within the past couple of months. Fernandez asked if his "friends" have visited Pietrowski. Pietrowski, in turn, asked Fernandez if he was in prison. Fernandez called to see if Pietrowski was interested in building a house.

5. We thanked the Pietrowskis for their time and concluded the interview.

David L Guest
Special Agent

I prepared this memorandum on April 27, 2001 after refreshing my memory from notes made during the interview with Robert Pietrowski.

David L Guest
Special Agent



Inspection Service
Exhibit
22

# MEMORANDUM OF INTERVIEW

PERSON INTERVIEWED: LARRY RAMPA

DATE: NOVEMBER 21, 2001

LOCATION: U.S. ATTORNEY'S OFFICE, RM 3005

INTERVIEWED BY: BART HUFF, AUSA

WITNESSES: JEFF STEINBECK, ESQ.
GENE MARCHESE, POSTAL INSPECTOR
CAROLYN LNU

Larry Rampa, d/b/a Ramcorp Inc., was interviewed in the presence of his attorney, Jeff Steinbeck, on this date.

Rampa was asked about his association with Andrew M. Fernandez. Mr. Steinbeck volunteered a statement on Mr. Rampa's behalf. Steinbeck stated Rampa had known Fernandez since the mid 1980s. Steinbeck stated Fernandez, when discussing United States Postal Service (USPS) construction jobs with Rampa, told Rampa to add $1,500 to $2,000 onto his bids. Steinbeck stated Rampa agreed to do this. Steinbeck stated when Rampa was eventually paid for USPS construction jobs, Fernandez would show up and demand cash for the inflated bid amounts. Steinbeck stated Rampa refused to give cash to Fernandez, and requested an invoice to document the payments. Steinbeck stated Rampa wrote checks to Fernandez to kickback the inflated bid amount on several USPS construction contracts.

Rampa was questioned about several USPS construction jobs in which he worked. Rampa produced billing documents which indicated he performed work on at least eleven USPS construction jobs. He stated Fernandez was involved in four of the jobs; Momence, Bradley, and Downers Grove (twice).

**Momence IL:** Rampa stated this job concerned the replacement of windows and frames. Rampa stated Fernandez provided a rough sketch of the work to be performed, but did not provide blueprints. He stated Fernandez provided structural advice. Rampa stated he prepared a bid for the work, and inflated the bid by $2,000 as per Fernandez's instructions. He stated he submitted the bid directly to Dennis Manescalchi, project manager at the USPS Central Illinois District Administration Office. Rampa stated soon after he submitted his bid, he received an Intent to Award notice from the District office. Rampa stated he billed the USPS approximately $15,829 for the Momence job. He stated he paid Fernandez $2,000.

**Mendota, IL & Bradley, IL:** Rampa stated he was contacted by Fernandez in 1996 concerning the construction of several handicap ramp jobs at Post Offices. He stated Fernandez had 16 jobs available for bid, including Mendota and Bradley. He stated Fernandez managed the jobs. He said Fernandez contacted him and inquired if he was interested in the ramp jobs. Rampa stated he told Fernandez he wasn't interested in handicap ramp jobs. He stated Fernandez said, "We can't give it all to the same guy." According to Rampa, Fernandez asked him to submit complimentary bids. He said Fernandez offered to send him copies of another contractor's bid on the Mendota and Bradley jobs. Rampa stated he agreed to accept the bids, mark up the bids by 10% and then resubmit them on his letterhead. He said he submitted the bid to Fernandez. He stated the 10% mark-up consisted of 2% for the bond and 8% profit for Ramcorp. Rampa stated approximately 18 months later, he received a Intent to Award Notice for the Mendota and Bradley jobs from the USPS Central Illinois District Administration Office. Rampa stated he did not want the jobs and sub-contracted the jobs to the original contractor whose bid he had marked up. Rampa initially stated he could not remember the name of the contractor. Upon further questioning, Rampa stated the contractor was Ulbrich & Associates. Rampa stated he did not kickback any money to Fernandez for the Mendota or Bradley jobs.

A review of USPS contract files indicated that three contractors sent bids to Fernandez for the Mendota handicap ramp job.

| | Contractor | Date of Bid | Bid Amount |
|---|---|---|---|
| 1. | Ramcorp | 8/29/96 | $57,875 |
| 2. | Phoenix Const. | 9/03/86 | $61,200 |
| 3. | Ulbrich & Assoc. | 8/30/96 | $51,900 |

According to contract records, the USPS issued Rampa, d/b/a Ramcorp, a Notice to Proceed for the Mendota IL handicap ramp job on July 25, 1997. The notice was signed by Rampa and dated August 1, 1997.

**Downers Grove, IL:** Rampa stated the original work at Downers Grove was for tuck-point restoration, in 1995. Rampa stated he sub-contracted the job. He stated he met with Fernandez to discuss the scope of the work. He stated he then met with a sub-contractor. After he received the bid from the sub-contractor, he added 10% for his profit and submitted the bid to Fernandez. Rampa stated Fernandez told him to add an additional $4,500 onto the bid amount. Rampa stated his original bid was for $62,000.

Rampa stated after the tuck-point job, Fernandez requested a roof modification. Rampa stated he submitted a bid, and Fernandez told him to inflate it by another $4,000. Rampa stated he agreed to inflate his bid. He stated he submitted the bid and was awarded the job. Rampa stated he did not think it was unusual for an architect/engineer to build cost over-runs into bid amounts.

Rampa stated within one day of receiving payment for the Downers Grove jobs, he was contacted by Fernandez. He said Fernandez wanted $8,500 in cash. Rampa stated he refused to give Fernandez cash and told he wanted an invoice to reflect any payments. Rampa stated Fernandez arrived at his office with two invoices totaling $8,500. Rampa stated at this point he knew Fernandez was working a scam. He stated Fernandez did not provide any work or services to him for the Downers Grove jobs.

A review of payments from Rampa to Fernandez indicated the following;

| DRAWN ON | ACCOUNT NO. | CHECK NO. | DATE | PAYEE | AMOUNT |
|---|---|---|---|---|---|
| [redacted] | | | | | |

Rampa agreed to cooperate in the investigation and supply any documents as needed.

Gene Marchese
Postal Inspector
312/983-7916

# MEMORANDUM OF INTERVIEW

| | | |
|---|---|---|
| CASE NUMBER | : | 565-1222885-EI(1) |
| PERSON INTERVIEWED | : | Robert F. Wagner |
| PLACE OF INTERVIEW | : | at the office of Attorney John Antonopoulos<br>15419 127th Street, Lemont, IL 60439 |
| DATE OF INTERVIEW | : | Monday, March 24, 2003 |
| TIME OF INTERVIEW | : | 1:30 p.m. to 2:30 p.m. |
| INTERVIEWED BY | : | Bart Huff, Assistant U. S. Attorney |
| WITNESSED BY | : | Gene Marchese, Postal Inspector<br>Katrina Dawkins, Postal Inspector |

---

Robert Wagner (Wagner) was interviewed at his attorney's office in Lemont, Illinois. The interviewers properly introduced themselves to Wagner and his attorney. Wagner was informed that this interview was a follow up to statements that he had made in earlier interviews regarding payments he made to Andrew Fernandez (Fernandez) in exchange for U. S. Postal Service (postal) work.

Wagner declared that there was no money given up front for anything. Wagner explained that he knew Fernandez before he bided on any postal work. Wagner stated he met a client of Fernandez. Wagner commented that he and Fernandez worked on a couple of jobs together for a general contractor. Sometime in the mid 1990's Wagner stated that Fernandez asked him if he wanted to bid on postal work. Wagner recounted that when he started working with Fernandez it was for "bid" work. Wagner also stated that he would usually find out about postal work through Fernandez or through another general contractor. Wagner explained he did approximately 6 million to 10 million dollars of work during the questioned time period.

Wagner stated his first postal work was the Tinley Park job and his first non-postal job was on the south side of Chicago. Wagner was asked about his record keeping procedures. Wagner replied he keep better records when he is working on a nice size job. As for postal jobs, Wagner stated he usually keep records for a year because that is how long the warranty is for. The plans he only keeps for six months. Wagner stated he has the check registers going back five years and he has the cancelled checks. Wagner stated that Diamond & Huels located at 125 West Boeger Drive in Arlington Heights, IL prepares his tax returns.

Wagner was asked about [redacted] He stated the [redacted] shows everybody he did work for and how much he was paid for his work or payment he was to receive. Wagner recalls doing smaller jobs for Fernandez. He also recalled that Fernandez did drawings for Wagner's business office. The vast majority of the work on the [redacted] was for postal work. Wagner explained that the [redacted] shows the payments he made to others that did work for him.

Wagner was specifically asked about a [redacted] Wagner again stated Fernandez did some small work for him and this particular check was probably payment for that work in addition to Wagner showing his appreciation. Wagner declared he was always bidding against other men for postal work. He continued to

000094

MEMORANDUM OF INTERVIEW

say that if he got a postal work through Fernandez, he would see how he did and if he did well, he would cut Fernandez a check. According to Wagner this check was for his appreciation for the job. Wagner was asked if he was required to give something back to Fernandez. Wagner stated there was nothing said that required him to give something back to Fernandez and Fernandez never told Wagner that if he did not put something in for him, he would not get any more postal work.

Wagner was questioned about how he would put a bid together. He answered that the bids were always tough. He went on to say that he always included "slop" in his bid to cover his own rear-end. Wagner stated that any payments to Fernandez were included in the "slop" category. During the period in question, Wagner mentioned that he did the estimating for the bids. Wagner was asked again about the payments he made to Fernandez. Wagner said one check could be payment for both actual work Fernandez did for him and a finders fee.

Wagner recounted that he would figure out a job's cost by estimating labor hours, material and a profit. Anything over and above was his expected profit. Wagner stated that payments to Fernandez could be an odd dollar amount. Wagner mentioned that Fernandez would work by the hour and that there were only a few jobs Fernandez did for him. Wagner stated the work Fernandez did for him was sometime in 1995 and 1996 for the interior construction. Wagner reviewed a spreadsheet that listed [redacted] payable to Fernandez. Wagner was asked about the [redacted] checks dated [redacted] respectively. Wagner stated that the [redacted] check could have been a fund raiser for Fernandez kids. Wagner stated a portion of the larger checks did include a finder's fee; and probably about half was finder's fee payments to Fernandez.

Wagner was asked about any work Fernandez did for him in 1999. Wagner replied he could not remember what Fernandez did for him that year. Wagner explained that he would usually pay the finder's fee to Fernandez at the back end or when the postal job was completed even if he had not received payment from the postal service. Wagner went on to say, the postal job was finished and he knew the check was coming. Wagner also stated he never included a finder's fee for two jobs. Wagner remarked "there were jobs that I did not make out well and I did not pay Fernandez a finder's fee". Wagner was asked if Fernandez ever called him and asked how he made out on a job and Wagner replied, yes.

Wagner was asked if he was currently doing any work with Fernandez. Wagner stated no. Wagner could not remember if he cut any checks to Fernandez after June 1999. He stated he would have to look at the [redacted] for years 2000 and 2001. Wagner concluded by saying that Fernandez has called him a few times and left messages, but Wagner did not return Fernandez telephone calls.

The AUSA explained [redacted]

K. D. Dawkins
U. S. Postal Inspector

Date: March 26, 2003

UNITED STATES POSTAL SERVICE
OFFICE OF INSPECTOR GENERAL
77 WEST PORT PLAZA
ST. LOUIS, MO 63146-3124

DATE: April 1, 2003 PREPARED BY: PURICELLI

CASE #: 97RI007RP000 CROSS REFERENCE #: 565-1222885-EI(1)

TITLE: A. M. FERNANDEZ AND ASSOC

CASE AGENT (if different from prepared by):

ACTIVITY REPORT - INTERVIEW

**DATE OF INTERVIEW:** March 27, 2003

**PERSON INTERVIEWED:** RICHARD C. ROSENOW

**LOCATION OF INTERVIEW:** 216 WEST HIGGINS, PARK RIDGE, IL

**INTERVIEWED BY:** PURICELLI and K. D. Dawkins, USPIS, Chicago Division

**WITNESSES:**

---

On March 27, 2003, Richard "Rick" C. Rosenow, former owner of Hans Rosenow Company was interviewed pursuant to a proffer agreement in the presence of his attorney Chester A. Lizak. After being provided the identity of the interviewing agent and the nature of the interview, he provided the following information:

As background information, Rosenow stated that he was born on June 13, 1945, his home address is 1865 Huntington Drive, Lake Geneva, WI 53147, and his telephone number is 262 249-9775. He claimed to be the current owner of Rosenow Company and the former owner of Hans Rosenow Roofing Company, Ramm Disposal Company, Janice Building Corporation, and the joint owner of U. S. Exterior with Steve Brengman and his brother Mark Brengman (the brothers were minority owners). All business names and the names of individuals are spelled phonetically.

Rosenow stated that he first met Andy Fernandez approximately 20 or 30 years ago while working for Teutsch Company in Rosemont, IL. At that time, Fernandez was a



RESTRICTED INFORMATION

This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

draftsman. Teutsch went out of business approximately 20 years ago. Rosenow lost track of Fernandez and did not speak to him until approximately 10 years ago. At that time, Fernandez contacted Rosenow and sought his help on plans to remodel postal facilities in IL. Rosenow indicated that he did not bid this job, but the conversation led to future bidding opportunities. Rosenow claimed that the last time he spoke to Fernandez was in the late 1990's.

Rosenow considered Hans Rosenow Company, a family owned business, to be the premier roofing contractor and sheet metal vendor in Northern Illinois. All of the company stock was family owned. He related that the company had between 250 and 375 employees during its prime. Company revenues ranged between $25 and $40 million annually. Rosenow claimed to be the focal point for all business and he personally had to approve all bids and all outgoing checks. Company estimators developed some of the bids but all bids were subject to his review and approval. He commented that he generally signed all checks, although Greg Sobcziak (phonetic), company comptroller and the number 2 person in the company, also signed some of the checks (Greg might be working at John's Plumbing, Chicago, IL). Rosenow provided the names of other individuals in the company as Tom Wormley, estimator, Tom Bollnow, estimator, and Ron Schag, vice president. Schag was described as the number 3 man in the company (all names are spelled phonetically and all positions are the belief of Rosenow).

Rosenow stated that Fernandez might have provided architect and engineering services to Janice Building Company related to a renovation at the Elk Grove facility. The facility was built in 1991 and the renovation would have occurred between 1991 and 1996 or 1997. The value of Fernandez' services would have been less than $5,000, according to Rosenow, and Fernandez did not conduct any other work for Rosenow. The payments for this work would have been from the Janice building bank account.

Rosenow stated that only did a couple of jobs for the Postal Service and the only job that he could recall by name was the Morris, IL effort. He described the work completed for the Postal Service as roofing jobs, concrete jobs, and carpentry work. Rosenow complained that he had a hard time receiving payment for the postal jobs.

Rosenow stated the companies he owned and/or controlled had a banking relationship with three financial institutions. He named Columbia Bank, Cole Taylor bank and another institution in Buffalo Grove whose name that he could not recall (all names spelled phonetically). He advised that each company had one bank account. Rosenow claimed to have personal accounts at Columbia Bank and Bank One in Park Ridge.

Rosenow stated that his companies received the Postal Service bid packages from the Postal Service through Fernandez, who was his point man for Postal Service work. Generally, Fernandez would tell Rosenow when jobs were coming up and sometime thereafter the Postal Service would send him a bid package. Once received, he would



RESTRICTED INFORMATION

This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

review the bid specifications and submit the bid form to directly to the Postal Service. He did not recall sending bids directly to Fernandez. The bid estimate would include labor, material, profit, overhead, and a miscellaneous category. He recalled bidding approximately 8 to 10 jobs and was awarded 2 or 3 of the jobs that he bid. Rosenow stated that he never provided a complimentary bid, never provided Fernandez with blank stationary, and never authorized Fernandez to provide a bid on his behalf. He could not explain why some of the bids were submitted using a fax machine bearing Fernandez phone number.

Rosenow claimed to have met some Postal Service employees at a Postal Service facility "down south" but could not recall their name(s). He recalled the name Bob Rigsby but indicated that he never met him and did not recall any telephone conversations with Rigsby. Rosenow indicated that there were conflicts between some of the Postal Service employees, but he could not recall the names of the people involved.

Rosenow elucidated that Fernandez asked to be taken care of if Rosenow was awarded Postal Service contracts. He interpreted Fernandez' request to be taken care of as a solicitation for money related to the award of Postal Service contracts. Rosenow related that if payoffs were made to Fernandez they would have been made after the job was completed and he received payment from the Postal Service. He advised that since he only saw Fernandez about 4 times a year, if there were payments, they would have been by check mailed to Fernandez. He could not recall if he actually wrote a check to Fernandez, but he denied paying Fernandez in cash or in kind. He claimed that the payoffs were not a set amount or percentage and said payments would have been for getting him in the door or introducing Rosenow to the Postal Service. He noted that Fernandez never told him that he would receive more contracts if he gave kickbacks to Fernandez. The payoffs would have been an even dollar amount and would have been recorded in the company ledgers as a "gift" or under another account whose name he could not recall. He commented that often times he would write a note on the check so that he would know what it was for. If checks were written to a subcontractor, he often times would put the job name and job number on the check.

Rosenow stated that if he gave Fernandez a payoff, Fernandez would have called him to thank him for the payment. He did not recall Fernandez calling him to say thanks. Rosenow advised Fernandez never asked him to make payments to a third party on his behalf. Specifically, Rosenow denied making payments to Lalita Company.

Rosenow commented that prior to this incident, he did not know payoffs like the one(s) that might have been made to Fernandez were illegal. He related that such payoffs occur a couple of times a year and have been made to other individuals, but none of them were government employees, union officials, or related to government work. Although he did not provide names, he indicated that payments were made to project managers and suppliers from other companies. Rosenow estimated that the amount of



RESTRICTED INFORMATION

This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

these payoffs would not exceed $5,000 to $10,000 annually. He noted that it is industry standard in Chicago to make these types of payoffs for repair, alteration and roofing jobs. He refused to identify other companies that he believed were also making payoffs. When Rosenow was told that Fernandez provided information that Rosenow paid approximately $20 - $25 thousand in kickbacks/payoffs, Rosenow stated that he could not recall making such payments.

Rosenow stated that his companies went out of business in June of 1998, when they were taken over by ABC Supply, Beloit, WI. He worked with ABC for a couple of months following this take over and claims to have witnessed ABC throwing the Rosenow company records in the trash. Rosenow advised that as a result of this there are no company records to turn over. John Cox was identified as the accountant for ABC, and Rosenow commented that Cox should be able to confirm the destruction of the records.

Rosenow stated that Jim Stefo of Stefo CPA firm was the accountant for the last 10 years who prepared the tax returns for his companies. Stefo is located at 700 Nicolas Boulevard Elk Grove, IL and Stefo shared office space with Rosenow.



RESTRICTED INFORMATION

This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
MAR 0 9 2004
Judge Suzanne B. Conlon
United States District Court

UNITED STATES OF AMERICA )
 )
vs. ) No. 04 CR 153
 )
ANDREW FERNANDEZ ) Judge Suzanne B. Conlon

PLEA AGREEMENT

This Plea Agreement between the United States Attorney for the Northern District of Illinois, PATRICK J. FITZGERALD, and the defendant, ANDREW FERNANDEZ, and his attorney, PATRICK A. TUITE, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure.

This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 04 CR 153.

This Plea Agreement concerns criminal liability only, and nothing herein shall limit or in any way waive or release any administrative or judicial civil claim, demand or cause of action, whatsoever, of the United States or its agencies. Moreover, this Agreement is limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities except as expressly set forth in this Agreement.

By this Plea Agreement, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, and the defendant, ANDREW FERNANDEZ, and his attorney, PATRICK A. TUITE, have agreed upon the following:

1. Defendant acknowledges that he has been charged in the information in this case with making a false statement on an income tax return, in violation of Title 26, United States Code, Section 7206(1).



3

2. Defendant has read the charge against him contained in the information, and that charge has been fully explained to him by his attorney.

3. Defendant fully understands the nature and elements of the crime with which he has been charged.

4. Defendant will enter a voluntary plea of guilty to the information in this case.

5. Defendant will plead guilty because he is in fact guilty of the charge contained in the information. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt.

On or about April 14, 1998, in the Northern District of Illinois, Eastern Division, defendant, who during the calendar year 1997 was a resident of LaGrange, Illinois, willfully did make and subscribe, and cause to be made and subscribed, a United States Individual Income Tax Return (Form 1040 and accompanying schedules) for the calendar year 1997, on behalf of himself and his wife, which return was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service, which return he did not believe to be true and correct as to every material matter, in that it was stated in that return that his gross income was $43,207, when, in fact, as defendant well knew and believed, his gross income was at least $110,023, in violation of Title 26, United States Code, Section 7206(1).

Specifically, since approximately 1983, defendant operated a Schedule C sole proprietorship providing architecture services. Defendant's business was named A.M. Fernandez and Associates. On or about July 7, 1994, defendant, through his business, entered into an "Indefinite Quantity Contract" with the United States Postal Service (USPS) pursuant to which defendant was to provide

engineering, architecture and construction management services to the USPS for various construction projects, including the installation of handicapped ramps, at USPS facilities.

Beginning in approximately 1995 and continuing through approximately 1999, the defendant obtained payments from contractors who received USPS construction projects on which Fernandez worked. In total, the defendant received approximately $81,000 in payments from such contractors. Among this total, the defendant received the following payments from Contractor A: a check dated September 25, 1995, for $4000; a check dated September 26, 1995, for $4500; a check dated January 10, 1996, $2000; and a check dated June 12, 1996, for $2000. The defendant received the following payments from Contractor B: a check dated May 5, 1997, for $580; a check dated May 5, 1997, $570; two checks dated May 12, 1997, for $570 each; two checks dated May 20, 1997, for $570 each; and a check dated May 27, 1997, for $570. The defendant received the following payments from Contractor C: a check dated September 22, 1995, for $4500. The defendant received the following payments from Contractor D: a check dated December 28, 1995, for $7000; a check dated June 21, 1996, for $100; a check dated October 22, 1996, for $5126; a check dated November 20, 1996, for $2508.60; a check dated April 22, 1997, for $5010.45; a check dated March 19, 1998, for $500; and a check dated June 30, 1999, for $5025.35. The defendant received the following payments from Contractor E: a check dated March 12, 1996, for $2000; a check dated March 12, 1996, for $2500; two checks dated December 6, 1996, for $5000 each; three checks dated March 2, 1998, for $5200, $4800, and $5000, respectively; and a check dated December 10, 1998, for $6000.

Often checks from the contractors to defendant, representing the above-described payments, included notations falsely claiming that such funds were in exchange for consulting or other services allegedly provided by defendant to the contractor. In addition, the payments often were divided into

checks of smaller amounts to avoid reporting requirements and the issuance of IRS Form 1099s. Moreover, on some occasions, the contractors made the checks representing the payments payable to Fernandez' family members in an attempt to hide the payments. Moreover, to conceal the existence, source, and purpose of the payments that he received, defendant did not report the income from the payments on his federal income tax returns. Specifically, defendant willfully did not report on his federal income tax return the contractor payments he received during 1997, totaling approximately $9,010.45. In addition, the defendant willfully failed to report all of his other income he received during the year, including under reporting his income from the USPS by approximately $58,362.19. Defendant reported $39,650 in gross receipts from his business, when in fact his gross receipts were at least $110,022.64. Such under-reporting resulted in a tax loss of $17,803.

6. The defendant also acknowledges that for the purpose of computing his sentence under the U.S. Sentencing Guidelines, the following conduct, to which he stipulates, constitutes relevant conduct under Section 1B1.3 of the Guidelines:

In tax years 1996, 1998 and 1999, defendant willfully under-reported his income from numerous sources, including the USPS and the contractor payments described above, by approximately $61,732, $45,244, and $41,699 respectively. Such under-reporting resulted in a tax loss of $15,925, $11,990 and $11,348, respectively, for a total tax loss due and owing from 1996 through 1999 of $57,066.

7. For purposes of applying the guidelines promulgated by the United States Sentencing Commission pursuant to Title 28, United States Code, Section 994, the parties agree on the following points:

a. The Sentencing Guidelines Manual effective November 1, 1997, is applicable to this case.

b. Pursuant to Guideline §§2T1.1(a)(1) and 2T4.1(H), the base offense level for the offense of conviction and the stipulated conduct is level 13 because the total tax loss is $57,066.

c. Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if the defendant continues to accept responsibility for his actions, within the meaning of Guideline § 3E1.1, a two-level reduction in the offense level is appropriate.

d. Defendant has notified the government timely of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently, within the meaning of Guideline § 3E1.1(b); an additional one-point reduction in the offense level is therefore appropriate, provided the Court determines the offense level to be 16 or greater prior to the operation of Guideline § 3E1.1(a).

e. Based on the facts known to the government, the defendant's criminal history points equal 0 and the defendant's criminal history category is I; and

f. The defendant and his attorney and the government acknowledge that the above calculations are preliminary in nature and based on facts known to the government as of the time of this Agreement. The defendant understands that the Probation Department will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Sentencing Guidelines calculation. Accordingly,

the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations.

8. Errors in calculations or interpretation of any of the guidelines may be corrected by either party prior to sentencing. The parties may correct these errors or misinterpretations either by stipulation or by a statement to the probation office and/or the Court setting forth the disagreement as to the correct guidelines and their application. The validity of this Agreement will not be affected by such corrections, and the defendant shall not have a right to withdraw his plea on the basis of such corrections.

9. Defendant understands the count to which he will plead guilty carries a maximum penalty of 3 years' imprisonment, a maximum fine of $100,000, a term of supervised release of one year, and costs of prosecution, estimated to be $500.

10. The defendant understands that in accord with federal law, Title 18, United States Code, Section 3013, upon entry of judgment of conviction, the defendant will be assessed $100 on the count to which he has pled guilty, in addition to any other penalty imposed. The defendant agrees to pay the special assessment of $100 at the time of sentencing with a check or money order made payable to the Clerk of the U. S. District Court.

11. Defendant understands that by pleading guilty he surrenders certain rights, including the following:

a. If defendant persisted in a plea of not guilty to the charges against him, he would have the right to a public and speedy trial. The trial could be either a jury trial or a trial by the judge sitting without a jury. The defendant has a right to a jury trial. However, in order that the

trial be conducted by the judge sitting without a jury, the defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

b. If the trial is a jury trial, the jury would be composed of twelve laypersons selected at random. Defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising so-called peremptory challenges. The jury would have to agree unanimously before it could return a verdict of either guilty or not guilty. The jury would be instructed that defendant is presumed innocent, and that it could not convict him unless, after hearing all the evidence, it was persuaded of defendant's guilt beyond a reasonable doubt.

c. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, whether or not the judge was persuaded of defendant's guilt beyond a reasonable doubt.

d. At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them. In turn, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the court.

e. At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

f. Defendant understands that he has a right to have the charges prosecuted by an indictment returned by a concurrence of twelve or more members of a legally constituted grand jury consisting of not less than sixteen and not more than twenty-three members. By signing this Agreement, defendant knowingly waives his right to be prosecuted by indictment and to assert at trial or on appeal any defects or errors arising from the information, the information process, or the fact that he has been prosecuted by way of information.

12. Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraph. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights. Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial.

13. The defendant is also aware that Title 18, United States Code, Section 3742 affords a defendant the right to appeal the sentence imposed. Acknowledging this, the defendant knowingly waives the right to appeal any sentence within the maximum provided in the statute of conviction (or the manner in which that sentence was determined), in exchange for the concessions made by the United States in this Plea Agreement. The defendant also waives his right to challenge his sentence or the manner in which it was determined in any collateral attack, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel, which relates directly to this waiver or to its negotiation.

14. Nothing in this Agreement shall limit the Internal Revenue Service in its collection of any taxes, interest or penalties from the defendant and his wife. The defendant understands that

the amount of tax as calculated by the Internal Revenue Service may exceed the amount of tax due as calculated for the criminal case.

a. Defendant agrees to transmit his original records, or copies thereof, and any additional books and records which may be helpful, to the Examination Division of the Internal Revenue Service so that the Internal Revenue Service can complete its civil audit of defendant and his wife for the years 1996 through 1999.

b. Preliminary to or in connection with any judicial proceeding, as that term is used in F.R.Cr. P. 6(e), defendant will interpose no objection to the entry of an order under Rule 6(e) authorizing disclosure of those documents, testimony and related investigative materials which may constitute grand jury material. Defendant will not object to the government soliciting consent from third parties, who provided information to the grand jury pursuant to grand jury subpoena, to turn those materials over to the Civil Division, appropriate federal or state administrative agency or the Internal Revenue Service, for use in civil or administrative proceedings or investigations, rather than returning them to such third party for later summons or subpoena in connection with the civil case or collection of taxes from defendant.

15. Defendant agrees not to seek or perform work under any contract with the United States Postal Service.

16. Defendant understands that the information and this Plea Agreement are matters of public record and may be disclosed to any party.

17. Defendant understands that the United States Attorney's Office will fully apprise the District Court and the United States Probation Office of the nature, scope and extent of defendant's

conduct regarding the charges against him, and related matters, including all matters in aggravation and mitigation relevant to the issue of sentencing.

18. At the time of sentencing, each party shall be free to recommend any sentence that it deems appropriate within the applicable guideline range. Thus, both parties agree not to seek a departure from the applicable guideline range.

19. It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and, subject to the limitations of the sentencing guidelines, may impose the maximum penalties as set forth in paragraph 9 above. The defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, the defendant will have no right to withdraw his guilty plea.

20. The United States agrees not to seek additional criminal charges for receipt of payments discussed in paragraph 5 above. However, nothing in this Plea Agreement limits the United States in prosecution of defendant in other districts or for crimes other than the acts expressly specified in this paragraph.

21. Defendant understands that his compliance with each part of this Plea Agreement extends throughout and beyond the period of his sentence, and failure to abide by any term of the Plea Agreement is a violation of the Agreement. He further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Plea Agreement, rendering it null and void, and thereafter prosecute the defendant not subject to any of the limits set forth in this Agreement, or to resentence the defendant. The defendant understands and agrees that in the event that this Plea Agreement is breached by the defendant, and the Government elects to void the Plea Agreement and prosecute the defendant, any prosecutions that are not time-barred by the

applicable statute of limitations on the date of the signing of this Agreement may be commenced against the defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

22. Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

23. Defendant agrees this Plea Agreement shall be filed and become a part of the record in this case.

24. Should the Court refuse to accept the defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound thereto.

25. Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: 3/9/04

PATRICK J. FITZGERALD
United States Attorney

ANDREW FERNANDEZ
Defendant

BART HUFF
Assistant United States Attorney

PATRICK A. TUITE
Attorney for Defendant

# DEPOSITION EXCERPTS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

L.P. CONSULTING GROUP, INC., )
Plaintiff, )
vs. ) Case No.
THE UNITED STATES POSTAL ) 98-868 C
SERVICE, ) (Judge Allegra)
Defendant. )

The deposition of RICHARD ANTHONY BATTAGLIN, called for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions for the purpose of discovery, taken before Janet L. Robbins, CSR No. 84-2207, a Notary Public within and for the County of Cook, State of Illinois, and a Certified Shorthand Reporter of said state, at Suite 3300, Three First National Plaza, Chicago, Illinois, on the 10th day of June, A.D. 2004, at 1:36 p.m.

COPY

14:14 include all materials, labor and equipment required to perform the work described in the attached specification."

14:14 Q. And --

14:14 A. So my conjecture is the work to be performed was construction work.

14:14 Q. Can you explain to me when you say your conjecture?

14:14 A. Well, it says -- this statement says, includes -- "The price per unit of each proposal will include all material, labor and equipment required to perform the work described in the attached specification."

14:15 So I'm providing ceiling tile, the personnel to install it and the scaffold to help the worker install the ceiling tile. That's the work I was supposed to be performing per the attached specification.

14:15 Q. Are you contending that the government violated that provision?

14:15 A. Yes.

14:15 Q. Please tell me how you're contending that we violated that provision?

14:15 A. I'm contending that because the postal

14:15 service tasked me to do the scope of work for them,
14:15 I could not recoup my price per unit because I did
14:15 not get awarded that particular project.
14:16 Q. In answering, you just used the phrase
14:16 "scope of work." When you use that phrase, what was
14:16 your -- what were you intending to convey in your
14:16 answer?
14:16 MR. PROSEN: Objection, vague, ambiguous.
BY MS. KIRCHNER:
14:16 Q. In the answer you just gave me?
14:16 A. The scope of work is determined on my
14:16 contract by the postal supplied unit price and the
14:16 unit line items as described in the specifications.
14:16 So I would have to develop a scope of work using
14:16 postal supplied unit prices and postal supplied line
14:17 items describing the task in each item.
14:17 Q. Are you referring to a list of line
14:17 items for work to be performed and quantities for
14:17 those line items and then prices?
14:17 A. Say that one more time. I'm sorry.
14:17 Q. When you refer to developing the scope
14:17 of work, are you referring to a list of line items
14:17 with the respective quantities and the respective
14:17 prices for each of those line items?

14:17 MR. PROSEN: Objection, ambiguous and
14:17 misconstrues the testimony.
BY THE WITNESS:
14:17 A. I will -- the way you phrased the
14:17 question, I have to say no.
BY MS. KIRCHNER:
14:17 Q. Can you explain what you're referring
14:17 to?
14:17 A. A scope of work gets developed by myself
14:17 with the postal service employee and the postmaster.
14:18 And I will use this room as a reference. We would
14:18 count how many ceiling tiles are here to be replaced
14:18 and maybe how many light fixtures were to be
14:18 replaced, and then we would refer to their -- to the
14:18 postal service's unit price book to determine the
14:18 proper line item or line items and then use that
14:18 unit price as the basis for the dollar amount of the
14:18 work order.
14:18 Q. And what's the formal name of the book
14:18 that you referred to? Is it the unit price book?
14:18 THE WITNESS: Can you go off the record?
BY MS. KIRCHNER:
14:18 Q. No, she can't do that.
14:18 A. I was going to say, Sam Southern, if you

14:34 A. If you look at C.13 on Page 11, item F, "Schedule," meaning the price schedule, I'm assuming, "will be negotiated for each work order before the work order is issued, provided, however, that the cost of work not covered by the price schedule may not exceed 25 percent of the total amount of any work order."

14:35 Q. Let's go on. Let's look at C.11, Work Orders, of Battaglin Exhibit 48 on Page 11 of 99.

14:35 MR. PROSEN: You mean C.13.

BY MS. KIRCHNER:

14:35 Q. Sorry, C.13, Work Orders, Page 11 of 99.

14:35 Are you contending that the government violated Section A?

14:35 A. Yes.

14:35 Q. And without reading this whole section into the record, which we really don't need to do, Mr. Battaglin --

14:35 A. Okay.

14:35 Q. -- can you just tell me how you're contending that the government violated Section A of C.13, Work Orders?

14:35 A. Sure. Mr. Rigsby's contention has been that I have proceeded to do, quote, "unauthorized

14:35 work," unquote, on several of the items that I'm
14:36 claiming. And this is -- this particular clause is
14:36 talking about construction work. And I did no
14:36 unauthorized construction work.
14:36 I'm claiming that I provided a scope of
14:36 work or an AE-type work so the postal service can
14:36 gain the knowledge of the value of the project and
14:36 have in front of them a number by which they can now
14:36 conclude to proceed with the work or not to proceed
14:36 with the work. And that is not what this clause is
14:36 for.
14:36 And so my contention is that the postal
14:36 service benefited by not having to use, say,
14:36 A.M. Fernandez and a scope of work from him that
14:36 they would have paid for. They utilized my
14:37 experience as a former postal employee, contract
14:37 employee, they used my experience as someone who
14:37 developed the IQC contracts for the postal service
14:37 to go out and scope work and they took that and
14:37 either gave it to someone else, as I believe the
14:37 record shows, or they summarily dismissed me for
14:37 whatever unknown reason. But I did perform work
14:37 that I could not recuperate. I would have preferred
14:37 to do the job than sit here and have to go through

14:58 I was -- it was mentioned to me that, by Mr. Rigsby and Mr. Southern, as my old contract was expiring, the 94-B contract, that new contracts, when they came about, that we would add the -- add the work not finished on that contract, we would put it on the new contract.

14:59 Q. You've referred to this -- the '94 contract. Are you comfortable if we refer to it as the '94 contract?

14:59 A. Sure.

14:59 Q. For what zip codes was that '94 contract?

14:59 A. 604, 5 and 9.

14:59 Q. Those only?

14:59 A. Yes. To the best of my recollection, those are the locations.

14:59 Q. So there was no overlap for the zip code areas between your '94 contract and then the 96-B-0094 contract?

14:59 A. I don't think there was overlap, no.

14:59 Q. Now, at or about -- was the '94 contract a two-year contract?

14:59 A. Yes.

15:00 Q. So it was expiring sometime in '96?

Exhibit 52, where it says "East Lynn Building Renovation," do you remember going out and making a site visit at East Lynn?

A. Yes.

Q. What did you do after you -- what did you do on that site visit?

A. I met with Sam Southern. We used our typical IQC documentation and generated a work order based on the visit, which could have included a lot of things. I mean, off the top of my head -- this says "building renovation," so I'm assuming -- you know, it's typical postal work.

Q. When did you make this site visit that you're referring to?

A. December 17th, 1995.

Q. Is there some reason that sticks in your mind?

A. Because I was with Mr. McNabb, and we visited three sites that day, and we were in East Lynn the day that O.J.'s verdict came in that he was found not guilty. That's why that stands out.

Q. So you're saying that it was on December 17th, 1995 that you were at East Lynn for the site visit?

15:20 that come about?
15:20 A. I received a phone call from Mr. McNabb saying that we have three facilities left to visit in this particular geographic area, and it was those three that you just mentioned. And we got together on a date and time and met at the -- I can't remember which one was the first site, but we met at one of those sites first.

15:21 Q. And --
15:21 A. He drove either a postal vehicle or his own vehicle and I came in mine.
15:21 Q. So you met him there?
15:21 A. Yes.
15:21 Q. And the three of you then went to all three of those sites that you've identified, right?
15:21 A. Yes.
15:21 Q. Now, how does Mr. Southern fit into this? I'm not following that.
15:21 A. Mr. Southern was the one that made the phone call to say you got to get together with Mr. McNabb to come to the site.
15:21 Q. So you're not saying that Mr. Southern was at East Lynn with you?
15:21 A. No, no.

15:21 Q. As I'm understanding what you're saying, Mr. Southern, he called you before you made these site visits with Mr. McNabb?

15:22 A. Correct.

15:22 Q. And he told you to get together with Mr. McNabb?

15:22 A. Correct.

15:22 Q. Did he tell you anything further in this telephone call?

15:22 A. Not that I recall.

15:22 Q. Did he tell you -- did Mr. Southern tell you why you were to get together with Mr. McNabb?

15:22 A. Other than visit the sites and see what work -- or produce a scope of work for each facility.

15:22 Q. In this telephone call with Mr. Southern, did he identify the three sites?

15:22 A. Yes, he did.

15:22 Q. Did he tell you what you were to do or what you were to look at at those three sites?

15:22 A. No.

15:22 MR. PROSEN: Objection, asked and answered.

BY THE WITNESS:

15:22 A. No.

15:24 Q. Did you make any sketches or drawings when you were at East Lynn with Mr. McNabb?
15:24 MR. PROSEN: Objection.
BY THE WITNESS:
15:24 A. Yes.
15:24 MR. PROSEN: Asked and answered.
BY THE WITNESS:
15:24 A. Yes.
BY MS. KIRCHNER:
15:24 Q. You made some drawings?
15:24 A. Yes.
15:24 Q. What else happened during this site visit at East Lynn with Mr. McNabb?
15:24 A. We did what we usually would do in this situation, which was develop a scope of work.
15:24 Q. What was the scope of work that was developed?
15:24 A. Well, specifically, I don't know sitting here right now, but it was some sort of interior renovation. We were in the inside, I remember. More than likely lock boxes, but I'm guessing.
15:25 Q. Do you remember whether or not it involved countertops or counters?
15:25 A. Yes.

15:25 MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
15:25 A. It would have.
15:25 MR. PROSEN: Let me --
15:25 THE WITNESS: I'm sorry. I'm sorry.
BY MS. KIRCHNER:
15:25 Q. It did involve countertops?
15:25 A. It would have involved a lock box lobby renovation. That comes complete, in a complete package.
15:25 Q. Including the counters?
15:25 A. Usually.
15:25 Q. When you were at East Lynn with Mr. McNabb on or about October 17th, 1995, did you make any measurements?
15:26 A. Yes.
15:26 Q. What measurements did you personally make?
15:26 A. Without seeing the work order, I don't remember.
15:26 Q. When you were at East Lynn with Mr. McNabb on or about October 17th, 1995, did Mr. McNabb make any measurements?
15:26 A. Yes.

15:26 Q. What did he measure?
15:26 A. He would hold the end of the tape that
15:26 gives the measurement. I would pull it and he'd
15:26 hold it and write down.
15:26 Q. So I take it the two of you together
15:26 made the measurements and he would write down the
15:26 measurements?
15:26 A. He would write down dimensions, sure.
15:26 Q. And when you say "dimensions," are you
15:26 referring to the dimensions of the post office?
15:26 A. Length by width, right --
15:26 Q. Now --
15:26 A. -- heighth.
15:26 Q. -- were you involved with any proposed
15:27 handicap ramp for East Lynn?
15:27 A. It was discussed, but I don't recall
15:27 what happened with the concrete part.
15:27 Q. During this site visit on or about
15:27 October 17th, 1995 with Mr. McNabb, did you have any
15:27 negotiations with Mr. McNabb with regard to the
15:27 scope of work for the post office?
15:27 A. Yes.
15:27 Q. What negotiations did you have with him?
15:27 A. Usually the quantity and time, how long

15:27 is it going to take to do this and that and how many
15:27 linear feet, square feet of whatever we were working
15:27 on.
15:27 Q. Now, after you're doing your
15:28 measurements at East Lynn with Mr. McNabb, after
15:28 you're doing your measurements, did you produce any
15:28 document at the site other than the notes of these
15:28 measurements?
15:28 MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
15:28 A. All was produced was the work order, my
15:28 copy of the results of the measurements.
BY MS. KIRCHNER:
15:28 Q. Did you produce that document at the
15:28 site of East Lynn at the very time you were making
15:28 the site visit?
15:28 A. Yes.
15:28 Q. And then -- well, who made that
15:28 document?
15:28 A. In this particular time, I think I did
15:28 the document, or maybe it wasn't me, but usually one
15:28 of us would fill in the blanks. I would produce the
15:28 work order itself typically, and then we would --
15:29 one of us would take turns or whoever had it at the

15:29 time would put the number in.
15:29 Q. When you say "put the number in," what
15:29 are you referring to?
15:29 A. The result of the measurements.
15:29 Q. Are you referring to quantities?
15:29 A. Yes.
15:29 Q. For line items?
15:29 A. Yes.
15:29 Q. Now, did you produce a work order at
15:29 East Lynn with Mr. McNabb?
15:29 A. Yes.
15:29 Q. Did it consist of various line items and
15:29 various quantities?
15:29 A. Yes.
15:29 Q. Did you also put in there prices for the
15:29 various line items and quantities at the very time
15:29 you're at the site?
15:29 A. I don't remember.
15:29 Q. Now, what happened to that document?
15:29 A. If the facility we'd visit --
15:29 Q. I'm asking about East Lynn.
15:30 A. Right. If the facility we visited, in
15:30 this case, East Lynn, it did not have a copy
15:30 machine, the government would take the original and

15:30 I would not have a copy, and they would take it back to produce the work order.

15:30 Q. Did you produce, when you were at East Lynn with Mr. McNabb and you were producing this document -- how did you refer to these documents?

15:30 A. Scopes of work.

15:30 Q. So I'm going to call it the scope of work.

15:30 A. All right.

15:30 Q. When you're at East Lynn with Mr. McNabb and you're producing the scope of work, did you produce only one copy of that scope of work or did you produce two copies of the scope of work so that you could have one and he can have one, meaning two handwritten copies so you have one and he has one?

15:30 A. At the site, he received the original and later I received a copy from him in the mail.

15:30 Q. Is that what happened at East Lynn --

15:30 A. Yes.

15:30 Q. -- that you got a copy later on --

15:31 A. Yes.

15:31 Q. -- from the postal service or Mr. McNabb?

15:31 A. Postal service, yes.