A. Yes. Everything -- item number across here, this is all my writing.

Q. So even when we fill out the items themselves, that's your writing?

A. Those are my writings.

Q. How about this stamp? Was this a stamp?

A. Yeah. It's like what you put on your envelope return address. That's what that is.

Q. Can you explain to me, when you would go out to the sites, would you go out there with these forms that already had the L.P. Consulting stamp on it?

A. Yes, and they already had these line items laid out.

Q. With regard to Exhibit 53, as you sit here today, do you remember making a site visit in about November 1995 with Paul Steiner at East Lynn?

A. Yes.

Q. Do you remember how that site visit came about?

A. Typically, most visits were a call from either Sam Southern or Bob Rigsby to make a date with whoever they told me to make the date with. And in this case it was Mr. Steiner. And we talked,

"What's your schedule like?" And we would visit more than one job at a time, so this was probably in conjunction with another site visit. It's a long way to go to see just one little job like this.

Q. Now, do you have any draft work orders that relate to the $32,775 work order amount for the East Lynn building renovation that's in your claim, Exhibit 52?

A. No. Only the postal service can provide a draft work order.

Q. Remember you told me you went out with Mr. McNabb and you scoped out the work? Do you have any scopes of work, any documents, draft scopes of work that relate to the $32,775 East Lynn building renovation that's part of your claim, Battaglin Exhibit 52?

A. At the time of the claim, April 13th, 1998, we had these documents.

Q. Can you tell me where they are now, sir?

A. I don't know where they are.

Q. Did you get all of your documentation that you could obtain from the former law firm?

A. Yes. And all I had was Paul Steiner's, which I think I gave you, but I'm not sure. I think

16:03 A. No, I don't.
16:03 MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
16:03 A. I do not.
BY MS. KIRCHNER:
16:03 Q. Did you destroy them?
16:03 A. I don't recall where they went.
16:03 Q. Where have you looked for them?
16:03 A. I've looked in every conceivable place in my office during this time frame to look for those two documents.
16:04 Q. What is L.P. Consulting claiming with regard to the St. Anne Post Office in this litigation?
16:04 A. That I met in the field with the project manager from the postal service and I developed sketches and/or a scope of work accomplished in exchange for the work itself.
16:04 Q. So you went to the St. Anne Post Office?
16:04 A. Yes.
16:04 Q. When did you do this?
16:05 A. Sitting here, I don't recall.
16:05 Q. Do you have any notes?
16:05 A. Yes.

16:05 Q. What notes do you have, sir?
16:05 A. They're in the -- this document.
16:05 Q. Let me go on and ask you some more questions before we look at some notes.
16:05 When you were at the St. Anne Post Office, do you recall whether anyone was with you?
16:05 A. Yes.
16:05 Q. Who was with you?
16:05 A. Sam Southern.
16:05 Q. Approximately when was this?
16:05 A. I have the date, but it's not -- it's in this binder.
16:05 Q. So you don't remember right now?
16:05 A. Off the top of my head, no.
16:05 Q. Now, why did you go to the St. Anne Post Office?
16:05 A. To receive work.
16:06 Q. When you were at the St. Anne Post Office, what did you do there?
16:06 A. Sam and I measured the facility inside and out based on the scope of work developed with the postmaster.
16:06 Q. Which postmaster -- who are you referring to for St. Anne?

A. At the time, his first name was Bob, and I don't have his name off the top of my head. I'd have to think about it.

Q. At the time of this site visit with Sam Southern, was the postmaster there with you at that site visit?

A. Yes.

Q. Would you do the same thing as you described to me earlier with Mr. McNabb, that you and Sam pulled the tape measure and made the measurements together?

A. Yes.

Q. With regard to St. Anne, what were the important things you were measuring?

A. I believe we were doing a lock box lobby on the inside and what we would call the typical package inside. And on the outside we were measuring for concrete work for an accessibility facility in the front and rear.

Q. You mean handicap accessible?

A. Yes.

Q. And do you recall making measurements with regard to a handicap ramp with Sam?

A. Yes.

16:07 Q. So is it fair to say that there were two parts to the site visit, the handicap ramp measurements and work associated with that, and then also looking at the lock box for the lobby?

16:07 A. Yes.

16:07 Q. Now, other than these measurements that you took with Sam, what else did you do at the time of the site visit?

16:07 A. Just discussed the project, what we were going to do and the scope of work that would become my work order.

16:07 Q. Did you have with you at St. Anne at the time of this site visit your work form with your L.P. Consulting stamp on it? Did you have a blank form like that?

16:08 A. Yes.

16:08 Q. Did Sam also come with a blank form to this site visit of this nature --

16:08 A. No.

16:08 Q. -- meaning Battaglin Exhibit 53?

16:08 A. No.

16:08 Q. What did you and Sam do with regard to the blank form that you brought with you to the site visit at St. Anne?

16:08 A. My form was not blank. It included all the line items that would have been needed per previous conversations with Mr. Rigsby to expedite producing a work order.

16:09 The object was to develop the scope of work in the field so that they could bring it back to their office and generate the work order. So it was simplified so that all we needed to do was put the quantities in the form and negotiate the time and the schedule with the postmaster, and then I would receive a work order contract and a notice to proceed.

16:09 Q. With regard to St. Anne, when you came to the St. Anne site visit, did you have your form? You've got the line items filled in there. Did you fill in those line items by hand or is this a Xerox of some other form you have in the office and you just always go out with that?

16:09 A. I always go out with an unfilled quantity and extended price form. All the line items that we believe are important to the work we're doing have already been prefilled in, and I would just make photocopies of the same document and bring it to the field with me. It would usually be

16:12 A. The type of work we were going to do, how we would get it done, how it would impact his customer service, e-mail delivery, the important things that would affect him, and then his input on what -- you could call it a wish list of what he would like to see done and that would be added to the work order.

16:12 Q. In the conversations with the postmaster or Sam at the time of the site visit with regard to St. Anne, did you arrive at an agreed upon schedule?

16:12 A. That I couldn't answer because I don't remember what we finally decided as far as -- I do know that the postmaster initiated a 7381 to purchase his equipment for the project.

16:13 Q. When you say "his equipment for the project," can you explain what you're referring to?

16:13 A. The postal service supplies the lock boxes and the post office furnishes their work stations or IRT work stations. And he initiated his requisition to get that in a timely fashion before we would start.

16:13 Q. Now, the scope of work that was put together at St. Anne at the time of the site visit, did Sam do any of the writing on that document?

16:14 A. I don't recall.

16:14 Q. What happened to that document?

16:14 MR. PROSEN: Objection, calls for conjecture.

BY MS. KIRCHNER:

16:14 Q. Let me be more specific, sir. You were there with Sam at the site visit, correct?

16:14 A. Yes.

16:14 Q. And there was a scope of work that was being prepared, is that correct?

16:14 A. Correct.

16:14 Q. What did you do with it at the time of the site visit?

16:14 A. Once the quantities were filled out, everything was given to Mr. Southern to take back to produce a draft work order for my signature.

16:14 Q. And I take it there was only one copy of this scope of work; there were not like two copies, one for you and one for him, that you together prepared in the field?

16:14 A. As I said before, if the facility had copying capabilities, which this one didn't either, to my recollection, we would make a copy in the field and I would have it on the spot. Otherwise, they would take it back and make a copy because they

16:21 substance of the line.

16:21 A. When was that filled out?

16:21 Q. Yes.

16:21 A. Right after I got the contract, I made these -- once we determined we were going to do the 609 zip code, once Mr. Rigsby said we're going to do all these facilities in 609, I came up with a standardized format so we can go in the field, come up with quantities and negotiate the construction time schedule with the postmaster. And extended price wasn't an issue because the computer at the post office produces that.

16:21 Q. Is this in your standard format? Referring to the line item numbers and then the substance of the next area where it says "rough carpentry and finish carpentry" and the items under that, that's your standard format?

16:22 A. Yes, that's what I would have typically -- this is typical. On 200 jobs, I did it this way.

16:22 Q. I take it you had in your office copies of this form with the first item number filled in and then the substance filled in?

16:22 A. At the time --

16:36 that we have here in Exhibit 55?

16:36 MR. PROSEN: Objection, asked and answered.
16:36 The documents speak for themselves.

BY THE WITNESS:

16:36 A. The answer is no.

BY MS. KIRCHNER:

16:36 Q. Did you make any drawings at this site
16:36 visit at St. Anne? Did you make any sketches?

16:36 A. Yes.

16:37 Q. Do you have the sketches?

16:37 A. No, they all went -- all my original
16:37 documentation goes to the postal service so they can
16:37 generate the work order. And whatever came back
16:37 with the work order would be either copies of the
16:37 original work, sketches or something that they would
16:37 have modified based on their internal conversations.
16:37 And then it would come back to me to do my -- to
16:37 fulfill my contract which is to do that work.

16:37 Q. When they sent you back a copy of what
16:37 was developed in the field as a courtesy, did they
16:37 include -- did the postal service include the
16:37 sketches for St. Anne?

16:37 A. Oh, yes.

16:37 Q. Well, where are those sketches?

16:39 simplified purchase, however his contracting method was. Someone else did the work.

16:39 Q. Do you have any facts on which you're basing the contention that the government let the work which is the subject of Exhibit 55?

16:39 A. Yes. I believe the binder shows that after the '98 claim and after Mr. Southern's affidavit to such, it shows somebody did some work and work has been done there.

16:40 Q. Can you tell me what work you believe was done at St. Anne?

16:40 A. I believe the interior and exterior was accomplished. I think everything I measured originally was accomplished by someone else.

16:40 Q. You think the work set forth in Exhibit 55 was accomplished at St. Anne?

16:40 A. Yes.

16:41 Q. What is L.P. Consulting contending regarding the Union Hill post office?

16:41 A. I was -- I went to the site with a project manager to determine what work would be done at Union Hill, and according to this, it was interior and exterior.

16:41 Q. You said that there was some document

16:42 for St. Anne, some note that you had in the notebook. Do you think you can take a few minutes, sir, and show me which exhibit you're referring to?

16:42 A. Yes.

16:42 MR. PROSEN: You opened right to it.

BY THE WITNESS:

16:42 A. Wow, Tab 12.

BY MS. KIRCHNER:

16:42 Q. Let me just see that.

16:42 MR. PROSEN: For the record, Tab 12 is Southern Exhibit 10.

BY MS. KIRCHNER:

16:42 Q. Tell us what is Southern Exhibit 10 that you have in front of you.

16:42 A. This was a letter I sent to Mr. Rigsby discussing -- or following up -- let's see. Let me read it.

16:43 MR. PROSEN: Take your time and read it.

BY THE WITNESS:

16:43 A. Yeah, this letter I sent to Mr. Rigsby referring to a phone call I had with him regarding the status of the work on these sites that I list here. And I make reference to the draft work order and the sketch furnished for contract issuance.

16:43 BY MS. KIRCHNER:
16:43 Q. Okay. Is all the handwriting on this document your handwriting?
16:43 A. Correct.
16:43 Q. That's your signature down there at the bottom of the document, correct?
16:43 A. Correct.
16:43 Q. When you sent the document to Mr. Rigsby, did you send it to him on or about May 29th, 1997?
16:43 A. Yes.
16:43 Q. And at the time you sent it to him, did it have all your notes on it there?
16:44 A. No.
16:44 Q. When did you put the notes on it?
16:44 A. I put the notes on it when I copied my attorney at the bottom and Mr. Southern at the bottom. I made my notes after my attorney contacted --
16:44 MR. PROSEN: That's privileged.
16:44 THE WITNESS: Okay.
16:44 MS. KIRCHNER: He was just saying when he did something.
16:44 MR. PROSEN: He was starting to get into when

16:45 MR. PROSEN: Objection, misconstrues the
16:45 testimony.
BY THE WITNESS:
16:45 A. Correct.
BY MS. KIRCHNER:
16:45 Q. You made the notes on Southern Exhibit
16:45 10 at the request of your attorney, is that correct?
16:45 A. Correct.
16:45 Q. Now, at the time you made these notes on
16:45 this exhibit, tell me how you went about making
16:45 these notes here.
16:45 MR. PROSEN: Objection, vague.
BY THE WITNESS:
16:46 A. I called everybody that's listed and
16:46 asked them when did we visit it, if I did not
16:46 already have the date myself on my -- in my work
16:46 order, if I didn't write it up at the top. In some
16:46 cases, like I said, I have East Lynn down and others
16:46 I didn't. I contacted every one of these.
BY MS. KIRCHNER:
16:46 Q. So the ones where you had the work order
16:46 and it had the date in it, you used that date, is
16:46 that correct?
16:46 A. Yes.

16:46 Q. And the others you made a telephone call?
16:46 A. Correct.
16:46 Q. And what did you do for Hoopeston?
16:46 A. Hoopeston, it was on the work order.
16:46 Q. What did you do for St. Anne?
16:46 A. St. Anne and Momence, I called Sam Southern back up, and he looked in his phone record and said we were there -- or his calendar and he said it was May 24th, '96.
16:46 Q. May 24th, '96 was for St. Anne?
16:46 A. And Momence.
16:46 Q. I see. That date is for two?
16:47 A. Correct.
16:47 Q. You didn't remember in 1998 when you were at St. Anne and Momence?
16:47 A. I specifically wanted the exact date for reasons of pursuing the claim, postal documents, per diem, all that that applies to it so I can exactly have a date so I can pursue getting all that information when the time came.
16:47 Q. So you put on the document the date Sam gave you for St. Anne and Momence, right?
16:47 A. Correct.

16:47 Q. How did you get the information for East Lynn?
16:47 A. Paul Steiner, I think it's on Exhibit 53, 11/14/95 for him. And that was the same time we visited Hoopeston, if you look at the top. And then with Jesse, it was 10/17/95, where I visited East Lynn, Goodwine and Claytonville.
16:48 Q. Explain to me, for East Lynn, are you telling me you called up Jesse McNabb or you're telling me you remember it?
16:48 A. I talked to Jesse and just said, "Do you recollect this?" "Yeah," and he gave me the date, 10/17/95.
16:48 Q. You put the date that Jesse gave you on this document, right?
16:48 A. Yes.
16:48 Q. At the time you were making these notes in 1998, did you, yourself, have a recollection of being at East Lynn on 10/17/95?
16:48 A. I knew it was in October because -- that particular date because it was -- as I said before, that was the date O.J. -- the decision on O.J. came and that was significant at that time in '95.
16:49 Q. At the time you made these notes in

16:52 you made this notation in '98?
16:52 A. It was from my note that we visited more than just these sites in September. We visited quite a few sites in September of '95. But this particular one, I didn't remember the exact date and neither did Paul when I talked to him, because we had visited quite a few sites.
16:52 Q. Do you recall talking to Paul --
16:52 A. Sure.
16:52 Q. -- in 1998 for the purpose of making your notes here on this exhibit?
16:52 A. I talked to him in late '97.
16:52 Q. You said you had some notes that you used to make the notes on Southern Exhibit 10 with regard to Aroma Park.
16:52 A. Yeah.
16:52 Q. What notes are you referring to?
16:52 A. I'm referring to work orders that I had received.
16:52 Q. Can you be any more specific?
16:53 A. Well, when you get issued a work order and you start work -- we were in that area, and Paul and Catherine Marks, that's who "CM" is, said, "If you're in that area, let's visit Aroma Park," so we

16:53 visited Aroma Park.
16:53 Q. Do you recall what work you were
16:53 performing in the area of Aroma Park in September of
16:53 1995?
16:53 A. No.
16:53 Q. Directing your attention to your notes
16:53 on Exhibit 10 with regard to Beaverville, what are
16:53 you indicating there?
16:53 A. In September of '95, I visited it with
16:53 Mr. Steiner.
16:54 Q. How did you come to make that note in
16:54 1998 on Exhibit 10?
16:54 A. I visited Aroma Park -- no, I'm sorry.
16:54 I visited -- I visited Aroma Park and Papineau with
16:54 Paul Steiner and Catherine Marks and Beaverville and
16:54 Bradley with Paul Steiner by himself in September of
16:54 '95. And how I came to that was just recollection
16:54 of when we did that, asking Paul, and he said it was
16:54 on or about -- sometime in September.
16:54 Q. How did you get -- come to make the
16:54 reference here to Bradley on these notes in 1998?
16:54 A. The same way, talking to Paul and my
16:55 recollection.
16:55 Q. So it was a combination of recollection

16:55 and a telephone call for Beaverville and Bradley, is
16:55 that correct?
16:55 A. Correct.
16:55 Q. Is that a combination of memory and a
16:55 telephone call for Papineau?
16:55 A. Yes.
16:55 Q. Were you doing any work in the area of
16:55 the Bradley Post Office in September of 1995?
16:55 A. Yes. I was driving past there going
16:55 south on all of these sites.
16:55 Q. When you say "all of these," which ones
16:55 are you referring to, sir?
16:55 A. The ones you're referring to, Aroma
16:56 Park, Papineau, Beaverville, Union Hill and Bradley.
16:56 Q. So were you on your way to other work?
16:56 A. They're all geographically clustered.
16:56 So if they knew I was in the area, they'd say,
16:56 "Let's make a site visit. Since you're down there,
16:56 let's have a site visit."
16:56 Q. Other than these notes on Exhibit 10, do
16:56 you have any other notes that bear on the dates of
16:56 site visits?
16:56 A. Me personally, no.
16:57 MR. PROSEN: This is a good time to stop.

08:54 as Exhibit 59 to your deposition and tell me whether
08:54 you recognize this.
08:54 A. Yes.
08:54 Q. What is Exhibit 59?
08:54 A. It's a scope of work for the St. Anne
08:54 Post Office.
08:54 Q. Can you tell me generally what sort of
08:54 work?
08:54 A. Concrete.
08:54 Q. Did you prepare this document?
08:55 A. Yes.
08:55 Q. This is your handwriting?
08:55 A. Yes.
08:55 Q. Can we refer to this as a scope of work
08:55 for concrete work at St. Anne?
08:55 A. Yes.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 60 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
08:55 Q. Please take a look at what we've marked
08:55 as Exhibit 60 to your deposition. Do you recognize
08:55 Exhibit 60?
08:55 A. Yes.

08:55 Q. What is Exhibit 60?
08:55 A. A St. Anne scope of work.
08:55 Q. For what sort of work generally, sir?
08:55 A. Interior construction.
08:56 Q. Is this in your handwriting?
08:56 A. Yes.
08:56 Q. Did you prepare this document?
08:56 A. Yes.
08:56 Q. Now, if you could look at Exhibits 59 and 60, look at them together. You have both of them in front of you?
08:56 A. Uh-huh.
08:56 Q. You told us about your visit to St. Anne with Mr. Sam Southern.
08:56 A. Uh-huh.
08:56 Q. Do these documents, Exhibits 59 and 60, relate to that site visit?
08:56 A. Yes.
08:56 Q. And did you prepare Exhibits 59 and 60 at the time of the site visit with Sam Southern?
08:56 A. Yes.
08:56 Q. Did you go about preparing them in the same way you told us about yesterday where you and Sam measured the various distances and put the

08:56 measurements on the sheets?
08:56 A. Yes.
08:56 Q. Can we refer to these two documents as
08:56 scopes of work for St. Anne?
08:56 A. Yes.
08:57 Q. Did you show these documents to Sam
08:57 Southern at the time you were preparing them at the
08:57 site visit?
08:57 A. I took these documents and my sketch,
08:57 Exhibit 56, and I believe it was one more for the
08:57 inside that is not here, and he took it back to his
08:57 office to discuss with Mr. Rigsby to send back to me
08:57 whatever changes that they did, they may have added,
08:57 subtracted to the scope. And then I would get a
08:57 work order for my review and signature to do the
08:57 work.
08:57 Q. So at the time Sam Southern took these
08:58 scopes of work for St. Anne back to the postal
08:58 service, you had not yet filled in the extended
08:58 price, is that correct?
08:58 A. That's true.
08:58 Q. Let's look, for example, on Exhibit 59.
08:58 Let's take the first item, description. It says
08:58 "demolition backhoe," is that correct?

09:01 was required.

09:01 Q. Was that a judgment that you and Sam

09:01 arrived at together or yourself?

09:01 A. Oh, no, that's a common decision that we

09:01 would have made together.

09:01 Q. And make it together?

09:01 A. Right.

09:02 Q. I'm directing your attention to

09:02 Exhibit 55 that we looked at yesterday, sir.

09:02 A. Uh-huh.

09:02 Q. And do you recall this, that we looked

09:02 at Exhibit 55 yesterday?

09:02 A. Yes.

09:02 Q. And do you remember you told me this is

09:02 all in your handwriting and you prepared Exhibit 55,

09:02 is that correct?

09:02 A. Yes.

09:02 Q. But now we have the extend prices on the

09:02 document, correct?

09:02 A. Yes.

09:02 Q. If we look at Exhibit 55, can you look

09:02 at it, compare it with Exhibits 59 and 60, and then

09:03 satisfy yourself that this includes both the scope

09:03 of work for concrete at St. Anne and then the scope

09:10 A. Probably within a few days of receiving the document back from Mr. Southern.
09:10 Q. Well, but do you remember that actually happening, sir?
09:10 A. Receiving this?
09:10 Q. No, making the change.
09:10 A. Not exactly for St. Anne, but I know typically that's how we did business. I mean, it would always be that way on all the work orders I ever did with him. That was typical, whether it would be Sam or any other gentleman.
09:11 Q. Let's look at the third page of Exhibit 60 and the third page of Exhibit 55 together. Do you see on Exhibit 60 for St. Anne there is zero as the quantity for drywall casing bead? Do you see that?
09:11 A. Yes.
09:11 Q. And do you see that on Exhibit 55, there is now 275 for the drywall casing bead linear feet? Do you see that?
09:12 A. Yes.
09:12 Q. And did you make that change from zero to 275?
09:12 A. Yes.

09:34 everything to produce the scope of work, or the scope of work that's in question in my claim.

09:34 Q. Did you and Sam together produce the scope of work?

09:34 A. Yes.

09:34 Q. What was the work that was the subject of the scope of work?

09:34 A. Well, sitting here, off the top of my head, I don't recall. I'd be guessing.

09:35 MS. KIRCHNER: Would you mark this, please?

(WHEREUPON, a certain document was marked Battaglin Exhibit No. 61 for identification, as of 6/11/04.)

09:35 BY MS. KIRCHNER:

09:35 Q. Please take a look at what we've marked as Exhibit 61 to your deposition, sir, and tell me whether you recognize Exhibit 61.

09:36 A. Yes.

09:36 Q. What's Exhibit 61?

09:36 A. A scope of work for the Momence Post Office.

09:36 Q. Is this all in your handwriting?

09:36 A. Yes.

09:36 Q. And does that include the sketch? Is

09:36 that sketch on the last page your sketch?
09:36 A. Yes.
09:36 Q. Does that relate to the site visit with
09:36 Sam Southern that you've been telling us about?
09:36 A. Yes.
09:36 Q. Does this refresh your recollection as
09:36 to the nature of the work that was scoped out with
09:36 Sam at this site visit?
09:36 A. Yes.
09:36 Q. Can you tell me, sir, what was the
09:36 nature of the work?
09:36 A. This particular document shows a lock
09:36 box lobby and lobby renovation.
09:37 Q. Now, what's shown in your sketch on the
09:37 last page?
09:37 A. A line of counters.
09:37 Q. Did you make that at the time of the
09:37 site visit?
09:37 A. Yes.
09:37 Q. Did you put all the entries in the
09:37 quantity column of Exhibit 61? Did you make all
09:37 those entries at the time of the site visit?
09:37 A. Yes.
09:37 Q. Did you go over those entries with

09:37 Mr. Southern at the time of the site visit?

09:37 A. Yes.

09:37 Q. Did you go over all of the entries in

09:37 the quantity column with Mr. Southern at the time of

09:37 the site visit?

09:37 MR. PROSEN: Objection, asked and answered.

BY THE WITNESS:

09:37 A. Yes.

BY MS. KIRCHNER:

09:37 Q. I mean each and every one?

09:37 A. Yes.

09:38 Q. Now, at the time of the site visit to

09:38 Momence with Sam Southern, did you and he also scope

09:38 out a handicap ramp?

09:38 A. Yes.

09:38 Q. Is that reflected in Exhibit 61?

09:38 A. No.

(WHEREUPON, a certain document was marked Battaglin Exhibit No. 62 for

09:39 identification, as of 6/11/04.)

BY MR. PROSEN:

09:39 Q. Please take a look at what we've marked

09:39 as Exhibit 62 to your deposition, and please let me

09:39 know when you're ready.

09:56 Momence Post Office?
09:56 A. No.
09:57 MS. KIRCHNER: You need to mark that.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 63 for
09:57 identification, as of 6/11/04.)
BY MS. KIRCHNER:
09:57 Q. Would you please take a look at what
09:57 we've marked as Exhibit 63 to your deposition?
09:57 This, again, is one of the documents provided by
09:57 counsel shortly before beginning these depositions.
09:57 Could you tell us, do you recognize
09:57 Exhibit 63?
09:57 A. Yes.
09:57 Q. Is this all in your handwriting, sir?
09:57 A. Yes.
09:57 Q. What is Exhibit 63?
09:57 A. Scope of work for Union Hill.
09:57 Q. Did you make a site visit to Union Hill?
09:57 A. Yes.
09:57 Q. When did you do that?
09:58 A. I'd be guessing. I don't really recall.
09:58 Q. Who did you make the site visit with?
09:58 A. I think it was with Catherine Marks and

09:58 Paul Steiner, off the top of my head.
09:58 Q. Do you remember the site visit to Union
09:58 Hill?
09:58 A. No.
09:58 Q. Let me ask you a few more questions. Do
09:58 you remember why you went there, to the Union Hill
09:58 Post Office?
09:58 A. To complete the 609 zip code, the work
09:58 that was to be performed in 609.
09:58 Q. Can you tell me what it means when you
09:58 say "to complete the 609 zip code"? What does that
09:58 mean?
09:58 A. Mr. Rigsby tasked us to do concrete work
09:58 and lock box/lobby work at those facilities that he
09:59 directed me to. This was one of them.
09:59 Q. Are you saying that Mr. Rigsby directed
09:59 you to perform concrete work at Union Hill?
09:59 A. No. I don't have a work order, so he
09:59 couldn't direct me to do any work.
09:59 MS. KIRCHNER: This is Exhibit 63, right?
09:59 MS. COURT REPORTER: Yes.
BY MS. KIRCHNER:
09:59 Q. When you look at Exhibit 63, does that
09:59 refresh your recollection of the site visit -- of a

marked Battaglin Exhibit No. 65 for
identification, as of 6/11/04.)

BY MS. KIRCHNER:

10:07 Q. Please take a look at what we've marked as Exhibit 65. Do you recognize Exhibit 65?

10:08 A. Yes.

10:08 Q. Is Exhibit 65 in your handwriting?

10:08 A. Only the numbers on the outside far column and the letters A and B up at the top of the document.

10:08 Q. So is that true of both the first and second pages of the exhibit?

10:08 A. That's correct.

10:08 Q. So that we're all clear, it's this column, that's your handwriting?

10:08 A. Yes.

10:08 Q. The A and the B?

10:08 MR. PROSEN: For the record, the witness is referring to the column all the way on the left, the first column of numbers.

BY MS. KIRCHNER:

10:08 Q. If we're on the first page of Exhibit 65, it looks like some sort of mark down here. What is that?

10:08 A. I don't know.
10:08 Q. It's not your initials?
10:08 A. This mark here (indicating)?
10:08 Q. Yes.
10:08 A. No.
10:08 Q. Where did you get the document before you put on it the A and the B and then the column of numbers all the way on the left?
10:09 A. I received this from the postal service.
10:09 Q. From who at the postal service?
10:09 A. If I knew who that was, I'd tell you who wrote it, but I don't know who wrote it, but it came from the postal service.
10:09 Q. And how did you receive it from the postal service?
10:09 A. It was in one of the typical correspondence that we would have on a regular basis, and this was included.
10:09 Q. Do you remember when you got it?
10:09 A. Not specifically.
10:09 Q. What does the A and the B refer to that you put on the document?
10:09 A. I don't recall.
10:09 Q. You don't remember why you put A and B

10:09 on it?

10:09 A. No.

10:09 Q. I want to point out to you, sir, in the column that says "L.P. Consulting proposal," there are various dates. Do you see there that the dates are -- it appears to be 1/3/94?

10:10 A. Yes.

10:10 Q. Do you see that?

10:10 What was going on around 1/3/94?

10:10 MR. PROSEN: Objection, vague, ambiguous.

BY THE WITNESS:

10:10 A. Well, looking -- corresponding these dates was the project to the left under the 609 post offices. All the 609 post offices are listed in this document that I recall, and it looks as if those are projects that I received.

BY MS. KIRCHNER:

10:10 Q. When you say "the 609 post offices," are you referring to the post offices that are located in the 609 zip code?

10:11 A. Correct.

10:11 Q. What do you think this document is?

10:11 MR. PROSEN: Objection, calls for conjecture.

BY THE WITNESS:

10:11 A. I'd be guessing.
BY MS. KIRCHNER:
10:11 Q. Okay. When you put these numbers on the far left-hand column of the document, what were you doing?
10:11 A. My guess is, I was numbering them in grouping order geographically.
10:11 Q. So all the 5s are near each other?
10:11 A. Something like that. Just from my memory, it looks like that's what this is.
10:11 Q. If we look on the second page of Exhibit 65, do you see that there's handwriting on the bottom. It begins -- can you read that to me?
10:12 A. It looks like the word "Dwight."
10:12 Q. And there's a 604?
10:12 A. It looks like the word "Elwood."
10:12 Q. Do you recognize the handwriting that begins with the portion that you just read?
10:12 A. No.
10:12 Q. That's not your handwriting?
10:12 A. No.
10:12 Q. Were you doing work in the 609 zip code area in approximately January of '94?
10:12 A. I would not know that from this

10:12 document.

10:12 Q. And you don't remember right now?

10:12 A. I remember I had a construction contract
10:13 for the '94 time, but specifically -- this thing
10:13 says L.P. Consulting proposal of January of '94. So
10:13 I would assume, and I'm only assuming, that that's
10:13 when they received my proposal. I don't know. I'd
10:13 be guessing.

10:13 Q. I don't want you to guess, sir. I'm
10:13 just trying to understand the document.

10:13 A. I do know those were jobs I did perform.

10:13 Q. When you say "those are jobs I did
10:13 perform," can you tell me specifically what you're
10:13 referring to?

10:13 A. I did -- I was tasked with completing
10:13 work in the 609 zip code by Mr. Rigsby. And all
10:13 these facilities that are listed, we were to provide
10:13 him a scope of work so he would produce a work order
10:13 so that I would do the work. That was the task.

10:13 Q. What sort of scope of work were you
10:14 tasked to draw up by Mr. Rigsby that you're
10:14 referring to?

10:14 A. What we've been going over, the three,
10:14 so far Union Hill, Exhibit 63; Exhibit 62, Momence;

identification, as of 6/11/04.)

BY MS. KIRCHNER:

Q. Can you please take a look of what we've marked as 66 to your deposition. This is one of the documents that was provided shortly before the depositions.

Tell me if you recognize Exhibit 66.

A. Yes.

Q. Whose handwriting is on Exhibit 66?

A. That's mine.

Q. Is all of it your handwriting?

A. Yes.

Q. Do you see anything that's not your handwriting?

A. No.

Q. What is Exhibit 66?

A. It is a scope of work I produced to the postal service.

Q. I want to go through the columns here. You see there's an item number column and then the description column.

At what point in time did you fill in the item number column and the description column, referring only to that portion?

10:47 Q. Was it the same day as your site visit
10:47 at Beaverville, do you remember?
10:48 A. No.
10:48 Q. Showing you what we have marked as
10:48 Exhibit 68 to your deposition. Please take your
10:48 time to review it and let me know when you're ready.
10:48 A. Okay.
10:48 Q. Do you recognize Exhibit 68?
10:49 A. Uh-huh.
10:49 Q. What is Exhibit 68?
10:49 A. It's a scope of work for the Aroma Park
10:49 office.
10:49 Q. Who prepared Exhibit 68?
10:49 A. I did.
10:49 Q. Did you prepare all portions of the
10:49 document?
10:49 A. Yes.
10:49 Q. In the case of Aroma Park, did you
10:49 arrive at the site visit with a scope of work form
10:49 with the item number filled in, the description
10:49 filled in, the unit measure filled in and the unit
10:49 price filled in?
10:49 A. Yes.
10:49 Q. Did you then, during the course of the

A. Uh-huh.

Q. And you filled in this $62,000, is that correct?

A. Uh-huh.

Q. Is that a yes, sir?

A. Yes, it is.

Q. I want to remind you, for the record, if it's a yes, we need a yes.

A. I appreciate it.

Q. In the case of the Aroma Park site visit, did you go over the quantity for each of the items in the scope of work with Paul Steiner?

A. Yes.

Q. What was Miss Marks' role at the site visit?

A. I really don't know. She came with Paul Steiner. I remember she's short. And I don't know what --

Q. Was she a trainee?

A. Could be. Could be.

Q. But you don't know?

A. I don't know.

Q. Did she make measurements at the time of the site visit?

10:51 A. I don't think she did. But -- no, I don't even want to say that. She was there, and I don't know what capacity she was in, really.
10:51 Q. Now, at the end of the site visit, what happened to the scope of work that you had prepared for Aroma Park?
10:51 A. It went with Mr. Steiner or Miss Marks. The postal service took it back to, once again, review it, add or subtract what they wanted and direct me to make changes if they so desired or typically they'd send me the work order.
10:52 Q. Do you remember making any changes in the scope of work for Aroma Park?
10:52 A. I don't recall.
10:52 Q. After the site visit at Aroma Park, did you go back to the post office?
10:52 A. No.
10:52 Q. After the site visit at Aroma Park, did you have conversations with Paul Steiner where you checked up on what had happened to the scope of work that you had prepared for Aroma Park?
10:53 MR. PROSEN: Objection, vague, ambiguous.
BY THE WITNESS:
10:53 A. Probably.

11:22 A. I don't recall.
11:22 Q. Why did you go to Bradley to perform a site visit?
11:22 MR. PROSEN: Objection, calls for speculation.
BY MS. KIRCHNER:
11:22 Q. Okay. Let me -- just give me a minute.
11:22 You performed a site visit at the Bradley Post Office, correct?
11:22 A. Yes.
11:22 Q. How did it come about that you were there and performed a site visit?
11:22 A. I would receive a phone call to complete the task assigned, which was let's visit Bradley in the 609 zip code and to perform whatever work we were going to scope at the time.
11:23 Q. Do you remember that actually occurring, that you actually received a phone call?
11:23 A. Oh, yeah.
11:23 Q. And who called you?
11:23 A. I think this phone call was from Paul Steiner.
11:23 Q. Did you fill out a scope of work document at Bradley?
11:23 A. Oh, sure.

11:32 Bradley, do you?

11:32 A. No.

11:32 MR. PROSEN: Objection, asked and answered.

11:32 Just give me a second.

BY MS. KIRCHNER:

11:32 Q. Did you go back to the Bradley Post Office after your site visit with Paul Steiner?

11:32 A. No.

11:32 Q. Did anybody accompany Paul Steiner from the postal service at the time of that site visit?

11:32 MR. PROSEN: Objection, asked and answered.

BY THE WITNESS:

11:32 A. I really don't recall.

BY MS. KIRCHNER:

11:33 Q. Did you make a site visit to the Berwick Post Office?

11:33 A. Yes.

11:33 Q. When did you do that?

11:33 A. I don't recall the date.

11:33 Q. Did anybody from the postal service meet you at that post office?

11:33 A. Yes, Bruce Rothermal.

11:33 Q. How did it come about that you made that site visit?

11:33 MR. PROSEN: Objection, vague, assumes facts not in evidence.

BY MS. KIRCHNER:

11:34 Q. Did you, yourself, make a site visit at Berwick?

11:34 MR. PROSEN: Objection, asked and answered.

BY THE WITNESS:

11:34 A. Never. By myself, no.

BY MS. KIRCHNER:

11:34 Q. Whether you were with somebody else or by yourself, did you make a site visit at Berwick?

11:34 A. Oh, yes.

11:34 MR. PROSEN: Objection, asked and answered.

BY MS. KIRCHNER:

11:34 Q. How did it come that you made the site visit to Berwick?

11:34 MR. PROSEN: Objection, vague, ambiguous.

BY THE WITNESS:

11:34 A. I drove there.

BY MS. KIRCHNER:

11:34 Q. What led to you driving to the post office to make a site visit?

11:34 A. I received -- I received a phone call from Bruce Rothermal to meet him at the site to

11:34 develop the scope of work.
11:34 Q. What did you and Bruce do at the site?
11:34 A. We discussed a site layout for a modular
11:35 building.
11:35 Q. Did you do anything else?
11:35 A. Yes, we scoped the work.
11:35 Q. Did you make any measurements?
11:35 A. Yes.
11:35 Q. Did you make any sketches?
11:35 A. I recall there was something. Whether
11:35 it was a drawing or sketch, I don't recall.
11:35 Q. Did you, yourself, make a drawing or
11:35 sketch as opposed to Bruce?
11:35 A. If I did, I don't recall sitting here.
11:35 Q. Did you have any -- you say there was
11:35 something. Do you have any copies of this
11:35 something, whether it's a drawing or a sketch?
11:35 A. No.
11:36 Q. Approximately when did you meet Bruce
11:36 Rothermal for this site visit at Berwick?
11:36 A. I really don't -- I really don't recall.
11:36 Q. When you were making these various site
11:36 visits, was it your habit or practice to carry any
11:36 sort of little notepad or anything like that where