12:03 Exhibit 75?
12:03 A. Yes.
12:04 Q. Did you submit a bid to perform the
12:04 modular post office at Berwick?
12:04 MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
12:04 A. No, just this scope of work.
BY MS. KIRCHNER:
12:04 Q. Okay. And you're pointing to the
12:04 document that's included in both Exhibit 75 and
12:04 Exhibit 73?
12:04 A. Yes, I am.
12:04 Q. So did you give your scope of work for
12:04 the Berwick modular post office with your price of
12:04 $30,660.83 to the postal service?
12:04 MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
12:04 A. I gave this work order or this scope of
12:04 work with the quantities against my multiplier of my
12:04 contract based on the unit prices provided in my
12:05 contract by the postal service. I did not give them
12:05 a price in response to a request for this project.
12:05 I just gave them my scope of work based on the
12:05 information that I met with Mr. Rothermal in the

12:05 field. That was all the information that I was
12:05 given to produce this work order.
BY MS. KIRCHNER:
12:05 Q. But to be absolutely clear, did you give
12:05 the post office a copy of Exhibit 73 as it is, minus
12:05 the sketch?
12:05 A. Yes.
12:05 Q. And when did you do that?
12:05 A. At the site visit.
12:05 Q. Are you telling me that at the time of
12:05 the site visit, you gave the post office the scope
12:05 of work with the extend price column filled in?
12:05 A. No. I don't recall when I extended it.
12:05 The issue isn't that it's extended or not. The
12:05 issue is the quantities versus the items that we
12:06 discuss and the time, because that's all my contract
12:06 is provided for. My contract only provides me to
12:06 provide quantity and time. I'm not bidding
12:06 anything. I already bid the contract. I have a
12:06 contract.
12:07 Q. Did you make a site visit at the
12:07 Brookfield Post Office?
12:07 A. Yes, I did.
12:07 Q. When did you make that site visit?

12:07 A. I don't recall the date.
12:07 Q. Did you meet anybody from the postal service at the post office at the time of that site visit?
12:07 A. Yes, I did.
12:07 Q. Who did you meet?
12:07 A. Mr. Jesse McNabb and the postmaster.
12:07 Q. How did it come about that you went to the Brookfield Post Office and made this site visit?
12:07 MR. PROSEN: Objection, vague, ambiguous.
BY THE WITNESS:
12:07 A. I was contacted by Mr. McNabb to please visit the Brookfield Post Office with himself to develop a scope of work.
BY MS. KIRCHNER:
12:08 Q. Did Mr. McNabb tell you when to be there at the post office?
12:08 A. Well, we picked a date, yeah, and picked a convenient date and time for both of us.
12:08 Q. Did you pick a time?
12:08 A. I'm sure we picked the time for the three of us to meet.
12:08 Q. What did you do at the time of the site visit at Brookfield?

12:10 Q. What did you do with that scope of work form after you filled it in?
12:10 A. I gave it all to Mr. McNabb.
12:10 Q. What happened to the scope of work form after you gave it to Mr. McNabb?
12:10 MR. PROSEN: Objection, calls for speculation.
BY MS. KIRCHNER:
12:10 Q. You gave the scope of work form to Mr. McNabb, correct?
12:10 A. Yes.
12:10 Q. Did Brookfield have Xerox capacity?
12:11 A. Oh, sure.
12:11 Q. Did you get a copy of that scope of work form at the time you gave it to Mr. McNabb?
12:11 A. I do not recall that.
12:11 Q. After giving the scope of work form to Mr. McNabb, did you receive a copy of it back from him or get a copy of it somehow?
12:11 A. I don't recall. I do remember one phone call where we just discussed the issue of what would go first, the dock enclosure or the front, the customer service side or the handicap ramp. We discussed -- the postmaster was concerned because he didn't want, I think, both happening at once, impact

12:11 the customer and impact mail delivery, because we
12:11 were working in those two sensitive areas. I
12:11 remember a conversation about that, but that was
12:11 about it.

12:11 Q. And that conversation was sometime after
12:11 the site visit, right?

12:11 A. Yeah, after I submitted my work order,
12:12 after he took his scope of work back to the office.

12:12 Q. And that's what you're referring to, is
12:12 your work order, right?

12:12 A. Yeah.

12:12 Q. Now, in this telephone call where you're
12:12 discussing the schedule with Mr. McNabb, did you
12:12 ever resolve what would go first in terms of the
12:12 order of the work in that very telephone call?

12:12 A. No. That would have come with the work
12:12 order.

(WHEREUPON, a certain document was
marked Battaglin Exhibit No. 76 for
12:13 identification, as of 6/11/04.)

BY MS. KIRCHNER:

12:13 Q. Please take a look at what we've marked
12:13 as Exhibit 76 to your deposition and let me know
12:13 when you're ready.

your Indefinite Quantity Contract to fill in the unit prices on this form at Brookfield, which is Exhibit 76?

A. Yes, I did.

Q. Can you explain to me how it came about that you were able to fill in the extend price column on the form at Brookfield?

A. Well, you take the quantity times the unit price --

Q. Let me rephrase the question, because I'm not being clear enough.

You told me that you filled in the scope of work form at the time of the site visit for Brookfield with the quantities. You put the quantities in at that time.

Did you then give the original form to Mr. McNabb?

A. Yes.

Q. Did he take it with him?

A. Yes.

MR. PROSEN: Objection, calls for speculation.

BY MS. KIRCHNER:

Q. As far as you know?

A. As far as I know, he took it with him.

13:59 A. For this dock enclosure, yes, we did.

(WHEREUPON, a certain document was marked Battaglin Exhibit No. 81 for identification, as of 6/11/04.)

14:00 BY MS. KIRCHNER:

14:00 Q. Please take a look at what we've marked as Exhibit 81 to your deposition, and if you could tell me what Exhibit 81 is.

14:00 A. It's a scope of work for the Downers Grove dock.

14:00 Q. Did you prepare this scope of work?

14:00 A. Yes, I did.

14:00 Q. If we focus now on the second site visit at Downers Grove that you performed, at the time of this site visit, had you already filled out the item number and the description and the unit measure and the unit price on the scope of work form that we have here on Exhibit 81?

14:01 A. Not on this one. This is the second work order, not the first.

14:01 Q. Do you have the first?

14:01 A. No. I gave everything to the post office. The first was related to this document called document 80. This is referring to the second

set of drawings that I'm filing as my claim.

If I can elaborate, this first document was calling for a wood partition. And if you look at the top of this, the very first line, this is for a steel tube. This is when we went to a steel framed construction.

So this document 81 is unrelated to document 80, and I can't tell you where the post office put that copy of that work order. This work order that you're referring to now as document 81 is related to another set of drawings. It hasn't been produced yet.

Q. So L.P. Consulting doesn't have that set of drawings?

A. No, they were postal drawings that I don't have.

Q. You don't have a copy of that?

A. No.

Q. Just to make sure I'm following you, at the time of the second site visit at Downers Grove, you're there with Jesse McNabb and you scope out the work.

A. Correct.

Q. It's for a wood frame dock enclosure, is

14:02 that correct?
14:02 A. Correct, document 80.
14:02 Q. I take it after looking through all the
14:03 documentation that's been produced by
14:03 L.P. Consulting and the government, you have not
14:03 seen the scope of work that you prepared for the
14:03 wood frame dock enclosure, is that correct?
14:03 A. Right.
14:03 Q. And you've looked for it in your own
14:03 records?
14:03 A. I have had no need to. I'm not claiming
14:03 that project. I don't have a copy of that and I'm
14:03 not claiming that particular scope of work. The
14:03 scope of work I'm claiming in my lawsuit is
14:03 document 81.
14:03 Q. How did it come about that you prepared
14:03 that second scope of work?
14:03 A. The same site visit with Mr. McNabb and
14:03 different drawings.
14:03 Q. The very same site visit?
14:03 A. No, it couldn't be the same site visit.
14:03 He had different drawings. Why would I give him a
14:03 proposal for this?
14:03 Q. I just want to clarify, okay?

14:04 You have a site visit with Mr. McNabb. You have the drawings that are in Exhibit 80 and you prepare a scope of work for Exhibit 80 that we don't have that scope of work?

14:04 A. Correct.

14:04 Q. Then do you do another site visit at Downers Grove with Mr. McNabb?

14:04 A. Yes.

14:04 Q. And you have another set of drawings at the time of that site visit?

14:04 A. I believe they were postal furnished through A.M. Fernandez that I didn't get a copy of that I reviewed on-site with Mr. McNabb only for the portion of work that was in addition to what we originally discussed, which is eliminating all the wood and replacing it with steel. So it's just a math thing; it's not a scientific -- anything scientific. It's just simply taking out one thing and adding another.

14:05 So when he took back, as I've said many times, when he took this document back with what we discussed in the field, he added it to Mr. Fernandez's drawing and came back to me, and I produced another scope of work taking out what was

14:12 statement from Mr. McNabb?

14:12 A. "I will look into it. Thank you very
14:12 much," something like that probably. And we talked
14:12 about other things we were working on. That was it.

14:12 Q. Did you look into it after that
14:13 conversation with Mr. McNabb?

14:13 A. Yes.

14:13 Q. What did you do, sir?

14:13 A. I think I -- I didn't talk to Fernandez,
14:13 but I did talk to Mr. Rigsby at some point in there,
14:13 just asking what the status of this particular
14:13 project was.

14:13 Q. Was it one conversation or more than one
14:13 conversation with Mr. Rigsby?

14:13 A. I think it was just one that related to
14:13 the dock. And he basically said that he'd let me
14:13 know, get back to me, and that he just agreed, yes,
14:13 it's with the architect. And that was all we talked
14:13 about.

14:13 Q. With the architect --

14:13 A. We talked about other things, but, you
14:13 know, specifically this project.

14:13 Q. So the two of you understood that the
14:13 matter was with the architect at that point in time?

14:13 A. I understood that the -- I guess the way you're wording it is probably accurate. The matter was between the post office and the architect and he would get back to me on it.

14:14 Q. Approximately when was it that you had this conversation with Mr. Rigsby that you're telling me about.

14:14 A. It would probably be still in August, because I didn't let these linger. Once I found out -- or once they tasked me, they said, "Hey, let's go do a scope," I followed up pretty quickly. Because without getting the information to produce the scope of work, I would never get a work order. So you have to be diligent in getting the quantities in and discussing time so that they could go back and do their computer work and give me a work order.

14:14 Q. So was this conversation with Mr. Rigsby in approximately August of 1996?

14:14 A. It would have to be, the first phone call, sure, to find out what's going on with the work order.

14:14 Q. After that conversation with Mr. Rigsby, did you have later conversations with Mr. Rigsby on the same topic?

15:00 Q. That's where I'm not following you. What do you mean you can't withdraw a claim that didn't already happen?

15:00 A. If you'd refer to the document that you're referring to, it says pretty clear, "Withdraw its claim dated September 17, 1996." And I didn't visit the site -- my first visit regarding this particular work order wasn't until August of '96.

15:01 Q. Yeah, but that's prior to.

15:01 A. Yeah, I couldn't have filed this claim and not have -- and not know -- this claim is unrelated to these documents.

15:01 Q. Do you have a copy of this claim, sir, that you're referring to?

15:01 A. Not in my possession.

15:01 Q. Well, in the files that you got from your former legal counsel?

15:01 A. I wouldn't know that. I never searched for this.

15:01 Q. We'll be seeing those files and we can look through those files amongst all the other matters.

15:02 What is L.P. Consulting claiming with regard to the Hoopeston Post Office?

15:02 A. My claim is I presented a scope of work to the post office with postal personnel helping provide that scope, assisting or directing me with the postmaster, and I submitted the work order. And summarily it was given to Mr. Fernandez who produced a drawing, and he advertised it, and I was excluded from the process, from my work order. I never received my work order under my implied contract.

15:03 Q. Did you perform a site visit at Hoopeston?

15:03 A. Yes.

15:03 Q. Did you scope out work?

15:03 A. Yes.

15:03 Q. What was the work that was scoped out?

15:03 A. A handicap ramp and a lock box interior renovation.

15:03 Q. Did you meet postal service employees at the time of the site visit?

15:03 A. Yes.

15:03 Q. Who did you meet?

15:03 A. Paul Steiner and Lois Gunlogson.

15:03 Q. Were you already doing work at the Hoopeston Post Office at the time of the site visit?

15:03 A. No, I was not.

15:03 Q. So how did you --
15:03 A. They contacted me and said, "You need to go visit the site to do a scope of work, and you're going to do the work at the site, and let's meet." And we picked a date that was convenient for all parties and we'd go out there.
15:04 Q. Did you make measurements during the site visit?
15:04 A. Yes.
15:04 Q. Did you fill out your scope of work form?
15:04 A. Yes, I did.
15:04 Q. Did you make drawings during the site visit?
15:04 A. I think we did, a sketch, yes.
15:04 Q. Did you, yourself, ever make drawings during the site visit?
15:04 A. I think I did.

(WHEREUPON, certain documents were marked Battaglin Exhibit Nos. 87 and 88 for identification, as of 6/11/04.)

15:05 BY MS. KIRCHNER:

15:05 Q. Please take a look at what we've marked

15:05 as Exhibit 88 to your deposition. Let me know when
15:05 you're ready.
15:05 A. I'm ready.
15:05 Q. Do you recognize any handwriting in
15:06 Exhibit 88?
15:06 A. Yes, I do.
15:06 Q. Is all the handwriting within Exhibit 88
15:06 your handwriting?
15:06 A. Yes, it is.
15:06 Q. All the sketches, all these marks are
15:06 your marks?
15:06 A. Yes, they are.
15:06 Q. What is Exhibit 88?
15:06 A. A sketch, three pages, of a concrete
15:06 ramp, one page of interior remodeling.
15:06 Q. Is the interior remodeling the last page
15:06 of the exhibit?
15:06 A. Yes, it is.
15:06 Q. When did you make these sketches?
15:07 A. At the time of the site visit.
15:07 Q. Do the sketches also reflect
15:07 measurements that were made?
15:07 A. That's correct.
15:07 Q. Did you make those measurements with the

15:07 postal service employees that were there at the time of the site visit?

15:07 A. Yes, I did.

15:07 Q. What did you do with your sketches that you made at the time of the site visit?

15:07 A. This sketch would have gone back with my work order with Lois or Paul.

15:07 Q. Now, earlier you said that you believed that you had made -- that sketches were made that were given to Mr. Fernandez. Do I understand your testimony correctly?

15:07 A. Related to which project?

15:07 Q. Hoopeston.

15:07 A. Yes.

15:07 Q. And what sketches do you believe were given to Mr. Fernandez?

15:08 A. If they were going to be sketches of Hoopeston from me, it would be these sketches here (indicating).

15:08 Q. So we're talking about the sketches that are in Exhibit 88, is that correct?

15:08 A. To the best of my knowledge, yes.

15:08 Q. Well, did you make any other sketches for Hoopeston?

A. All I recall is I was with Paul or Lois, and if there are two different times, I don't recall. But I do know that this is my document and I produced it.

Q. But you're not sure whether you made another site visit?

A. No, I don't recall.

Q. Well, did you produce Exhibit 91 on or about August 1st, 1996?

A. That date could be the date we visited or it could be the date I put down when I sent it to her. That I don't recall. It's possible.

Q. Okay.

A. I don't recall.

Q. Let's look further at Exhibit 91. How did you arrive at the information you put in the unit price column on Exhibit 91?

A. Say that one more time.

Q. There's a unit price column on Exhibit 91, right?

A. Uh-huh.

Q. How did you determine what amounts to put in the unit price column on Exhibit 91?

A. I know exactly what this is now. This

15:31 is -- I have a different contract now. That's what this is telling me now. Now that I look at it and now that I recall, this one, if I put in here 94-B-0083, I may have submitted this and it was expired and they requested me to supply them with a new one, and that's what that date relates to.

15:33 So I what I did was send a second work order, only because at this time this transpired under one contract and this was under the new contract. That's exactly what it is. Now I can remember that. That's why I have the same document because this one is for the expiring or maxed out contract and this is for the other one. Yeah, that's why there's two of them.

15:34 Q. I just want to make this a little bit clear on the record.

15:34 A. I understand.

15:34 Q. Referring to Exhibit 90, do you have Exhibit 90 in front of you?

15:34 A. Yes, I do.

15:34 Q. That's the one where you filled out the scope of work using the unit prices from the contract 94-B-0083, is that correct, sir?

15:34 A. That's correct.

16:23 testified that the first page, the item number and description, unit measure and unit price were pre-filled out so that when you got to the site, you just filled in the quantity, is that correct?
16:23 A. That's correct.
16:23 Q. Whose idea was it that you, if you will, pre-fill out the item number, description, unit measure and unit price?
16:23 A. That was the postal service's.
16:23 Q. Who in particular at the postal service?
16:23 A. Mr. Rigsby.
16:23 Q. Mr. Rigsby instructed you to do that?
16:23 A. Yes.
16:23 Q. For what purpose?
16:23 A. Because of the volume of facilities we were looking at and the time it takes to go with personnel, measure everything, maybe provided sketches, maybe not, depending on the item, and to develop the scope of work, meet with the postmaster, it sped up the time required to do it over the 50 or so facilities we looked at. So it was -- that's what the intent was.
16:24 MR. PROSEN: I have nothing further.
16:24 MS. KIRCHNER: No questions.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

L.P. CONSULTING GROUP, INC., )
Plaintiff, )
vs. ) Case No.
THE UNITED STATES POSTAL ) 98-868 C
SERVICE, ) (Judge Allegra)
Defendant. )

I hereby certify that I have read the foregoing transcript of my deposition given at the time and place aforesaid, consisting of pages 1 to 388, inclusive, and I do again subscribe and make oath that the same is a true, correct and complete transcript of my deposition so given, and includes changes, if any, so made by me.

Richard Anthony Battaglin

RICHARD ANTHONY BATTAGLIN

SUBSCRIBED AND SWORN TO before me this 9th day of August, 2004.

Notary Public

MARILYN W. DUNSTON
Notary Public, District of Columbia
My Commission Expires March 31, 2006

Marilyn W. Dunston

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

L.P. CONSULTING GROUP, INC., )
Plaintiff, )
vs. ) Case No.
THE UNITED STATES POSTAL ) 98-868 C
SERVICE, ) (Judge Allegra)
Defendant. )

The deposition of ROBERT A. RIGSBY, called for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions for the purpose of discovery, taken before Janet L. Robbins, CSR No. 84-2207, a Notary Public within and for the County of Cook, State of Illinois, and a Certified Shorthand Reporter of said state, at Suite 3300, Three First National Plaza, Chicago, Illinois, on the 9th day of June, A.D. 2004, at 2:24 p.m.

ORIGINAL

14:34 A. No.
14:34 Q. Bradley?
14:34 A. I don't know what happened. I don't know any details on that.
14:34 Q. East Lynn, Momence?
14:34 A. I don't recall any details on that.
14:34 Q. Papineau?
14:34 A. I don't recall any details.
14:34 Q. St. Anne, Union Hill?
14:34 A. No.
14:34 Q. Do you recall whether or not any of these projects fell underneath your responsibilities as contracting officer?
14:34 A. They may have. I don't know. I'm certain that Aroma Park did not, though.
14:34 Q. Did not fall underneath your --
14:34 A. Yes. The others may have.
14:35 Q. Let's go back to Tab 1. You said you -- I believe you said you didn't recall seeing this document before.
14:35 A. I don't think I said I didn't recall seeing it. I think I said I don't remember whether I saw it or not. I said I may have seen it.
14:35 Q. You may have seen it. Okay. I thought



194A

14:46 Q. For the same kind of work?
14:46 A. Yes.
14:46 Q. Now, my understanding is under an IQC, once an award has been made, the contracting officer will issue work orders to perform defined scope of work, is that correct?
14:46 A. You asked me how the work orders are generated. Now, a work order for an IQC can be generated by the postal service and supplied to the IQC telling him what it is that we want to accomplish, what items we want to accomplish. Putting lights in, putting in two by two ceiling tile, putting in the grid, hanging lights such as this, there's a dollar amount associated with each item. How many of them you want determines the cost.
14:46 We can do that from the postal service side or the contractor can also do that because if he has a computer that generates the cost for the items based on what's in the book itself -- some contractors -- and I think that L.P. Consulting may have had that. I'm certain they did, because they could come back and give you the line item exactly the way it was stated in the IQC cost breakdown book

14:47 showing you how many items they were going to do and the resulting cost.

14:47 Now, the postal service person could take that and either the contracting officer or the contract technician or the project manager could look at it and determine if these things were needed as a result of making a visit to the facility. And if they weren't, some of the things may or may not be needed, then you would extract those things or delete them, and if other things were needed, you would add them.

14:47 So that's how the work order is generated. It's an agreement between the contracting officer ultimately and the contractor --

14:47 Q. Okay.

14:47 A. -- to accomplish that work.

14:47 After the work order is generated, only and after the work order is generated and then signed by the two parties should any work start.

14:48 Q. So you do recall receiving proposed scopes of work or task orders from L.P. Consulting?

14:48 A. That's in general, yes, I do.

14:48 Q. I'm sorry?

14:48 A. You're not being specific. In general,

14:49 based on the numbers, on the shear numbers that are associated with that particular item.

14:49 Q. That's the FMS Win, when you're talking about the computer?

14:49 A. I think it may have been, yes.

14:49 Q. Did there come a time in the course of your dealings with L.P. Consulting with these IQC contracts where you requested L.P. Consulting to travel to various postal facilities to do, I guess you would call them, a facility survey or site survey?

14:50 A. Are you speaking in general terms?

14:50 Q. Yes, for now we're talking general.

14:50 A. There may have been a time. Because you wouldn't require all -- that would apply to any IQC, you would require them to go and look at the facility.

14:50 Q. Even if the government -- even if the U.S. Postal Service had internally developed the scope of work?

14:50 A. They do it for every IQC. Mr. Battaglin and his group was not the only IQC that was assigned to that zip code area. There were other IQCs also operating at the same time.

14:52 accomplish?
14:52 A. First of all, we have a right to do it. Secondly, the reason that we really do it is because -- we really did do it, I'm no longer a part of it, was because you want to have the opportunity that in the event you would call on one contractor to do something and you needed to get it done in a hurry and he was busy doing something else, you would be able to call on another contractor to do that.
14:52 Q. Under these IQC contracts, when I say "these," I'm referring Tabs 2 and 3 which are Southern Exhibits 3 and 4, the two contracts between the postal service and L.P. Consulting, how are the scopes of work and the work orders generally developed on those two projects -- on those two contracts? I'm sorry.
14:53 A. It depends -- you mean in this particular case or in general or what?
14:53 Q. On this particular case is fine, yeah.
14:53 A. In the case of L.P. Consulting, we knew the background of Mr. Battaglin, as far as his ability to go out and produce scopes. So the postal service would say go out and produce a scope, but a

14:53 postal service employee may be with him, but there was not a need to duplicate the work order generation portion of it.

14:54 So he would be allowed to do that in some cases, generate a scope of work upon request, when he was requested to do it. If you go out and do that, bring the scope of work back; and if it was agreed upon, then it would be signed and we would proceed. But the ultimate scope is produced by the postal service.

14:54 Q. You said the ultimate scope is what?

14:54 A. The ultimate scope of work is produced by the postal service. It can only be generated by the postal service. What he may be supplying to us is a proposal; in other words, this is what he thinks needs to be done. In a lot of cases, it's just repetitive work. We use the same color in every post office, which is white, the same kind of counter. When you walk up to a counter in one office, it's the same as it is in another, so you know what you've got to do.

14:55 Q. Kind of like a corporate image so --

14:55 A. Corporate image. We use the same kind of tile on the floor.

14:55 Q. -- every post office looks the same to a certain extent?
14:55 A. It's the same kind of tile on the floor. It's the same kind of door you come through all the time. So it wasn't rocket science, okay?
14:55 Q. So the two IQC contracts that we have here, L.P. was requested by you to go out and perform site surveys and submit a draft scope of work?
14:55 A. For specific projects.
14:55 Q. Okay. Okay.
14:55 A. So were other contractors, so were other IQC contractors.
14:55 Q. Who?
14:55 A. St. Louis Design and Construction.
14:55 Q. Anyone else you can recall, any other IQC contractors?
14:56 A. I can't think of the name of the guy out of Wisconsin.
14:56 Q. Summer?
14:56 A. Summers, right, Summers Construction.
14:56 Q. You would send them to the same projects or to different projects?
14:56 A. Never an IQC and an IQC to the same

14:58 something like that, you know something is off, right?

14:58 A. Yes, you would.

14:58 Q. I got you.

14:58 Is there any way to commit money to an IQC contract without having a formal work order in place; as I understand, a computer generated or FMS Win generated work order?

14:59 A. You have to produce the work order in order to make funds, I would think.

Q. Make the funds, okay.

14:59 A. I think. You would have to certainly have a contract number assigned to that particular project.

14:59 Q. If you're going to send an IQC contractor out to perform -- if we could use site or field survey for what we've been talking about, is it fair to assume that by your sending them out there, that there's work to be done at that project site?

14:59 A. It's fair to assume that there's an interest in having work done at that site. And everyone knows that by virtue of your going to visit and look to see if there's work that needs to be

15:00 done does not guaranty that you're going to get it done.

15:00 Q. So it's their cost to eat, the contractor's?

15:00 A. At the time that that contract was being administered, that is the case, that was the case. Now, under the new contracts, that's when I was leaving, I know that we were proposing under the new contracts they would give the contractor some -- $50 or something for making the visit.

15:00 Q. Like just a flat fee?

15:00 A. Yes. If a guy goes and makes a site visit, he would get something for gas or whatever. It was a flat sum. It was being proposed. I don't know whether it went through or not.

15:00 Q. Was there ever a time where you committed work to L.P.'s IQC contracts and then subsequently decommitted that work?

15:01 A. I don't know. It may have, depending on what circumstances that were involved. I don't know. That would be the contracting officer's right to do that.

15:01 Q. Do you recall in Paxton, the Paxton, Illinois project, that you issued a signed work

just have to wait until he's done coughing. If you could just repeat what you said.

BY THE WITNESS:

A. He made unauthorized visits and generated unauthorized scopes of work, none solicited scopes of work.

BY MR. PROSEN:

Q. Would an unauthorized site visit include meeting a U.S. Postal Service employee at the site from your office?

A. If I didn't sanction it, it would.

Q. Why would somebody from your office go out to a site visit and do a site visit with L.P. if you didn't sanction it?

A. Because I directed my employees to go and do whatever work was to be done, not -- they didn't go out on their own to do it. They just didn't go out helter skelter and decide that they were going to visit a facility with Mr. Battaglin. If they did, they both were unauthorized to do it.

Q. If you can go to Tab 15, Southern Exhibit 11. If you go to the second page, actually.

Do you recognize the handwriting, sir?

A. No, I don't.

15:32 A. That does not -- that does not in any case indicate to a contractor that you're going to get this work, that we're going to give you this work or that you're going to perform this work.

15:32 Q. That's not what I asked. The question I've asked is: On a given project, if L.P. Consulting is asked by you to go out to Momence, or whatever the project is, develop a scope of work, submit it to you, if that scope of work is not submitted by L.P., does the U.S. Postal Service have any other documentation or an independent estimate prepared to determine what work needs to be performed on that project, on that postal facility?

15:33 MS. KIRCHNER: Objection, ambiguous, hypothetical.

15:33 BY THE WITNESS:

15:33 A. Yes, there are other means for producing a scope of work. We can do it ourselves, generate the document and send it to him.

BY MR. PROSEN:

15:33 Q. Then why have the contractor go out and perform the work, do the site visit and the scope?

15:33 A. We have contractors do things depending on the expertise of the contractor. By no means was

Mr. Battaglin a bad contractor. He was very knowledgeable as to what to do. He was, and he still is, I assume. It was just a matter of procedure.

Q. If you don't intend to issue a work order to L.P. in this case, why do you need a SOW, a statement of work, from them anyway?

MS. KIRCHNER: Objection, ambiguous, hypothetical.

BY THE WITNESS:

A. It's quite often that what would happen -- you know, you've asked me the question that can't be answered with a yes or no.

It was quite often that in the case of Mr. Battaglin, Mr. Battaglin would be working on Post Office A, and in the process of getting to that destination, he would pass by Post Office B, C and D.

Q. Just traveling, you mean, going out there?

A. Getting to the destination of Post Office A where he would have a contract to work, he's bypassing Post Office B, C and D, and he would take it upon himself to stop in that office and

15:35 generate a scope of work for that office, by virtue of the fact on the letter that was written back to him on 4th of April, I think it was I saw here, telling him not to do that, make no visits to the office.

15:35 So when you're saying he generates scopes of work, sometimes you would ask him to generate a scope of work, but a lot of times he would generate scopes of work that were unsolicited, yet he expected them to be awarded. It doesn't work that way.

15:35 Q. So the 12 projects, and we're referencing Exhibit 1 here, is it your testimony that Mr. Battaglin traveled to each and every one of these 12 projects on his own without authorization and developed and submitted scopes of work?

15:36 A. No, that's not my testimony.

15:36 Q. On any of these projects, did Mr. Battaglin travel without your authorization and/or -- strike that.

15:36 Did Mr. Battaglin on any of these 12 projects travel to and prepare and submit a scope of work without your authorization?

15:36 MS. KIRCHNER: Objection, ambiguous, compound.

BY THE WITNESS:

A. I don't recall that. Specifically I can't recall.

BY MR. PROSEN:

Q. Did he travel to any of these 12 projects without a U.S. Postal Service employee under your authority, I guess?

A. Without referencing some notes of some sort, I don't know. I can't recall.

Q. Would there be any sort of travel reimbursement materials that the postal service maintains that would show, for example, if one of your employees traveled to, say, Aroma Park on a given day or in a given month and was seeking mileage reimbursement or something like that?

A. Most of the times, postal employees would utilize the government vehicle to do that and they would not be reimbursed.

Q. Is there a log that's maintained or anything as to when people travel?

A. Not unless they're staying overnight or something.

Q. There's no mileage log in the car?

Let's go to Southern Exhibit 13. It's

(WHEREUPON, a certain document was marked Rigsby Exhibit No. 30 for identification, as of 6/9/04.)

BY MR. PROSEN:

16:12 Q. Do you know who A.M. Fernandez & Associates is?

16:12 A. This was an architecture firm that was under contract with the postal service to perform IQC work.

16:12 Q. Andy Fernandez who signed this letter at the bottom, this is the same firm that I think you stated you worked for after you retired from the postal service?

16:12 A. Briefly, yes.

16:12 Q. How long is briefly? How long did you work for them?

16:13 A. It may have been three, four months.

16:13 Q. What was your salary at the time of your retirement with the postal service, do you recall?

16:13 A. It was $80,000 plus.

16:13 Q. What was your salary when you worked for Mr. Fernandez?

16:13 MS. KIRCHNER: Objection, ambiguous.

BY THE WITNESS:

16:13 A. I don't recall. I think that was an agreement that we would work by like projects or something, you know.

BY MR. PROSEN:

16:13 Q. A fixed price per contract?

16:13 A. Per project --

16:13 Q. I'm sorry.

16:13 A. -- depending on the scope of work or how much time I spent on a project.

16:13 Q. Do you recall what -- was it based on a per project negotiation? In other words, Mr. Fernandez would work on a project and you and he would then negotiate your compensation?

16:14 A. That's the way it was supposed to have been, but actually I only worked on one project where I got paid.

16:14 Q. What project was that?

16:14 A. I would have to look at my notes. I worked on more than one project, but one where I got paid, maybe two.

16:14 Q. What notes are those?

16:14 A. I may have notes at home.

16:14 Q. Do you have any other project files or documents during the time when you were at the

16:27 Q. I don't know if it's ongoing.
16:27 A. No, I don't know. I have no idea.
16:27 Q. Are you aware that Mr. Fernandez pled
16:27 guilty to tax evasion -- well, it's perjury, but
16:28 basically for him taking upwards of 80, $90,000 in
16:28 kickbacks from Ulbrich & Associates, Ramcorp Inc.,
16:28 Concrete by Wagner and R.J. Custom Builders?
16:28 A. No, I'm not.
16:28 Q. Are you aware that he's about to be
16:28 sentenced to four months in prison --
16:28 A. No.
16:28 Q. -- in a federal penitentiary?
16:28 A. No, I'm not. What are you telling me,
16:28 I'll never get paid?
16:28 MR. BATTAGLIN: It looks like it.
BY MR. PROSEN:
Q. Apparently, he'll be someplace where you
16:28 can find him, although I'm not sure which prison
16:28 it's at yet.
16:28 MR. BATTAGLIN: Terre Haute.
16:28 MR. PROSEN: Terre Haute?
BY MR. PROSEN:
16:28 Q. So this is the first you've heard; you
16:28 didn't participate in any Grand Jury investigation?

16:28 MS. KIRCHNER: Grand Jury --
16:28 BY THE WITNESS:
16:28 A. No.
16:28 MS. KIRCHNER: -- proceedings are secret.
16:28 MR. PROSEN: It's his privilege to leak.
16:28 MS. KIRCHNER: No, it's not his privilege to leak. If a witness testifies in front of a Grand Jury, they're not supposed to testify. We can go on.
16:29 MR. PROSEN: It doesn't matter.
BY THE WITNESS:
16:29 A. I've never been contacted, and I don't mind saying that.
BY MR. PROSEN:
Q. Okay. That's fine.
16:29 Is there ever a need -- strike that.
16:29 On these contracts that you competed for the handicap roof -- I'm sorry, handicap ramp projects, did you ever find that there was a need for the postal service, where there was unusual urgency that you couldn't accept -- you couldn't permit an unacceptable delay in fulfilling the ramp needs?
16:29 MS. KIRCHNER: Objection, ambiguous.

16:58 identification, as of 6/9/04.)
16:58 MR. PROSEN: Let's take a break.
17:07 (WHEREUPON, a recess was had.)
BY MR. PROSEN:
17:07 Q. This is Papineau, P-A-P-I-N-E-A-U, Term Construction Contract Work Order. It says it's to Mr. Southern, Exhibit 38.
17:07 Sir, do you ever recall seeing this document?
17:07 A. No, I don't.
17:07 Q. You don't recall ever receiving it?
17:08 A. No.
17:08 Q. Go to the next document, which is Southern Exhibit 6, Tab 48, St. Anne Post Office, also to Mr. Southern. It consists of a five-page and a two-page document. The second one is not addressed to Mr. Southern.
17:08 Do you recall seeing either of these documents?
17:08 A. No, sir.
17:08 Q. All of these documents that I'm showing you, these handwritten Term Construction Contract Work Orders, do you recall receiving documents, not necessarily these, but similar ones, the same type

of format, handwritten on similar forms from L.P. Consulting Group?

A. Not this many, no.

Q. Not this many?

A. No. Sometimes, yes.

Q. How else would you receive draft scopes of work from L.P. Consulting, if it wasn't in this format?

A. I'm thinking that I've seen some that were computer generated.

Q. Let's skip down to Tab 50. This will be Exhibit 39.

(WHEREUPON, a certain document was marked Rigsby Exhibit No. 39 for identification, as of 6/9/04.)

BY MR. PROSEN:

Q. As it happens, this is the last one of these things for you to look at. Union Hill, Illinois, Exhibit 39, Tab 50. It's a three-page document.

Do you recall receiving this document, sir?

A. No, I don't.

Q. You don't recall seeing it either?

17:10 A. No, I don't recall seeing it.
17:10 Q. Were you the contracting officer for the
17:10 IQC contract between the postal service and
17:10 A.M. Fernandez & Associates?
17:10 A. I was the contracting officer assigned
17:10 to administer the contract for work orders.
17:10 Q. So you oversaw the work orders that were
17:10 issued to Mr. Fernandez?
17:10 A. That's correct.
17:10 Q. Did Mr. Fernandez normally prepare a
17:10 scope of work and submit it to you for review and
17:11 processing, I guess you could say, as a work order?
17:11 A. Sometimes, yes.
17:11 Q. Sometimes. What other times did he do
17:11 or --
17:11 A. Sometimes the postal service would
17:11 generate scope of work and give it to the AE.
17:11 Q. Would Mr. Fernandez -- were there
17:11 other -- strike that.
17:11 Were there other architects who had IQC
17:11 contracts similar or identical to Mr. Fernandez?
17:11 A. That's correct.
17:11 Q. Do you recall who or what the name of
17:11 those other architecture firms were?

17:11 A. Upchurch & Associates.
17:11 Q. And they were in the same zip code
17:11 areas?
17:11 A. I don't recall. Also, Renaissance.
17:12 Q. Was there ever a time where
17:12 Mr. Fernandez would submit a scope of work, and
17:12 instead of giving him the scope of work, whatever
17:12 that task was, you would compete it?
17:12 A. For architecture work?
17:12 Q. Yes.
17:12 A. We were not allowed to compete it.
17:12 Q. Why? Is that in the manual?
17:12 A. Yes.
17:12 Q. So you can't compete architectural work,
17:12 but you can compete -- strike that.
17:12 You are not allowed to compete
17:12 architectural IQC work, but you are allowed to
17:12 compete construction IQC work?
17:12 MS. KIRCHNER: Objection, ambiguous, compound.
BY THE WITNESS:
17:12 A. You're saying compete IQC work. No, no,
17:13 we cannot.
BY MR. PROSEN:
17:13 Q. Let's go to Southern Exhibit 23. It's

17:14 BY MR. PROSEN:

17:15 Q. It's a letter from -- Exhibit 40 is an exhibit from -- a letter from A.M. Fernandez & Associates, August 13, 1996. It's addressed to you, sir.

17:15 Do you recall receiving this letter?

17:15 A. Yes.

17:15 Q. This letter states that Mr. Fernandez has contracted the five contractors listed on that document to perform 32 locations addressed in the "re" line, is that correct?

17:15 MS. KIRCHNER: Objection. The document speaks for itself, ambiguous.

BY THE WITNESS:

17:15 A. Can you repeat the question, please?

BY MR. PROSEN:

17:15 Q. What is Mr. Fernandez telling you in this letter?

17:15 A. He's telling me that I told him to solicit from these contractors -- I think that's what he's telling me here. I supplied him with a list of contractors and said solicit these contractors for prices.

BY MR. PROSEN:

17:16 Q. Where did that list come from?
17:16 A. I generated it.
17:16 Q. From what source or sources?
17:16 A. From contractors that had done work for us before and who had the expertise to do ramp work.
17:16 Q. Why wouldn't L.P. Consulting be included?
17:16 A. Because this was enough competition right here.
17:16 Q. Would there be any harm in including L.P.?
17:16 A. You can include the whole world, but he was not excluded for any particular reason. We just had enough competition.
17:16 Q. So you included five contractors with a prior track record with the USPS but just for no particular reason excluded L.P.?
17:16 MS. KIRCHNER: Objection, misconstrues testimony.
BY THE WITNESS:
17:17 A. Under the guidelines, we don't need reasons to exclude anyone. If you've got enough competition, you have enough competition. I don't want to put ten contractors here.

BY MR. PROSEN:

Q. Wouldn't that be possibly a basis for getting a better price?

A. Adequate competition is what the guidelines call for.

Q. But you don't want to do anymore than adequate?

A. There's no need to.

Q. On the second page, Mr. Fernandez says he's adding Phoenix Construction Company on his own. I guess Mr. Fernandez thought it would be fun to add another one.

Did you authorize him subsequently or advise him if they could participate as he asked?

A. I sure did.

Q. So maybe five wasn't enough; maybe six was?

A. No, no, that wasn't the point. The point was if this person had contacted him and asked to be added to the ramps, I honored that request.

Q. Let's go two more exhibits to 56, Exhibit 41.

(WHEREUPON, a certain document was marked Rigsby Exhibit No. 41 for

17:34 are you retired?

17:34 A. Yes.

17:34 Q. Full-time retired?

17:34 A. No, not full-time.

17:34 MR. PROSEN: Off the record for a second.

(WHEREUPON, there was a pause

17:34 in the proceedings.)

17:34 MR. PROSEN: Back on the record. I've got

17:34 nothing else.

17:34 MS. KIRCHNER: We have no questions. He will

17:34 review and sign.

FURTHER DEPONENT SAITH NAUGHT.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

L.P. CONSULTING GROUP, INC., )
Plaintiff, )
vs. ) Case No.
THE UNITED STATES POSTAL ) 98-868 C
SERVICE, ) (Judge Allegra)
Defendant. )

The deposition of SAMUEL W. SOUTHERN, called for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions purpose of discovery, taken before Janet L. Robbins, CSR No. 84-2207, a Notary Public within and for the County of Cook, State of Illinois, and a Certified Shorthand Reporter of said state, at Suite 3300, Three First National Plaza, Chicago, Illinois, on the 9th day of June, A.D. 2004, at 10:47 a.m.

ORIGINAL

Q. You've been involved with contracts that involved work orders?

A. Yes.

Q. What is your understanding of what a work order is?

A. A work order -- my understanding of a work order is, it's a contract. It's a binding agreement between the contractor and the United States Postal Service.

Q. Is a work order competed for amongst private contractors?

A. Not under IQC.

Q. How would it work? Could you explain what the IQC is, how that works, what that mechanism is? What is an IQC?

A. I would have to refer back to your previous document, and that explains what an IQC is here.

Q. You're referring to Exhibit 3?

MS. KIRCHNER: Exhibit 4 he's looking at.

BY MR. PROSEN:

Q. Exhibit 4?

A. And this document -- reviewing this document, Exhibit 4, it explains Indefinite Quantity

11:09 Q. Markups, profit?
11:09 A. For that particular line item.
11:09 Q. I'm talking generically now, not L.P. Consulting specifically. Is a work order or a scope of work under a work order, is that normally developed by the contractor or by the U.S. Postal Service? Who develops that?
11:09 MS. KIRCHNER: Objection, ambiguous, compound.
BY THE WITNESS:
11:09 A. Could you repeat the question?
11:09 MR. PROSEN: Can you read it back?
(WHEREUPON, the record was read by the reporter.)
11:10 MS. KIRCHNER: Please note my objection, compound, ambiguous.
BY THE WITNESS:
11:10 A. That -- it depends on the situation. Sometimes it's done by the contractor in conjunction with the project manager. Sometimes the project manager will go out to the field and develop it on his own.
BY MR. PROSEN:
11:10 Q. Where the contractor develops a work order or scope of work, I presume that scope of work

that they develop is handed in to the project manager or the contracting officer, whatever. Would that be an accurate statement?

A. It may be if it's so requested.

Q. If it's requested by the contracting officer?

A. Right, if it's requested by the contracting officer.

Q. What is the procedure then once the contracting officer, who is the U.S. Postal Service individual, receives the document, what's the procedure? What happens then to that scope of work?

A. Well, it depends on the contracting officer. So I can't speak for other contracting officers, how they conduct -- how they conduct the procedures. So I couldn't generically say that this is the process, this is what goes on.

Q. Do you know Robert Rigsby?

A. Yes.

Q. Who is Mr. Rigsby?

A. He was the former contracting officer for the Central Illinois District.

Q. Did you work with him?

A. I worked for him.

11:11 Q. You worked for him?
11:11 A. Yes.
11:11 Q. Did you work for him on the L.P. Consulting IQC contracts?
11:11 A. Yes.
11:11 Q. Did there ever come a time where L.P. Consulting would submit handwritten or draft scopes of work to either yourself or Mr. Rigsby or somebody else for -- under these IQC contracts?
11:12 MS. KIRCHNER: Objection, ambiguous, compound.
BY THE WITNESS:
11:12 A. There were work orders that were submitted.
BY MR. PROSEN:
11:12 Q. So in Mr. Rigsby's case -- before, you testified you couldn't answer my question because it depended on the contracting officer.
11:12 In Mr. Rigsby's case -- you said you worked with him -- what would be the procedure if L.P. Consulting submitted a draft scope of work or a work order to Mr. Rigsby? What would be the steps that followed internally at the U.S. Postal Service?
11:12 MS. KIRCHNER: Objection, compound, ambiguous.
BY THE WITNESS:

11:12 A. Well, first of all, there may be too many draft work orders, so I can't say generically this is the procedure. There may have been different procedures for different work orders at the request of the contracting officer, so I can't speak on his behalf. And I don't recall exactly how the work orders were handled.

BY MR. PROSEN:

11:13 Q. To your knowledge, did Mr. Rigsby ever request L.P. Consulting to draft scopes of work, and I'll refer you to Exhibit 1, on any of those projects?

11:13 MS. KIRCHNER: Objection, ambiguous, compound.

BY THE WITNESS:

11:13 A. I could really say for certain if I saw the actual draft document.

BY MR. PROSEN:

11:13 Q. Okay. Before we get there, let's walk through -- if you turn to Exhibit 4, it's Page 1 of 2 -- let me see. I guess it's the ninth page into the exhibit.

11:14 A. On Tab 4?

11:14 Q. On Tab 3, referring to Exhibit 4. Just for identity purposes, it says at the top, "United

11:16 testimony.

BY THE WITNESS:

11:16 A. Not quite.

BY MR. PROSEN:

11:16 Q. Where was I wrong with what I just said?

11:17 A. The contracting officer is the one that determines how the scopes of work will come in, whether or not the project manager is going to go out and develop the scope of work.

11:17 Q. With the contractor or whomever?

11:17 A. Yes. It depends on the contracting officer, as I think I testified earlier.

11:17 Q. Right. What I'm asking for is the next step, where a contracting officer has asked the contractor to develop the scope of work and submit it to the agency, to the U.S. Postal Service. Are we on the same page here?

11:17 A. Yes.

11:17 Q. Can that contractor who submitted the proposal have a reasonable expectation to be awarded the work order to perform that work which he has developed the scope of work for?

11:17 MS. KIRCHNER: Objection, ambiguous, compound.

BY THE WITNESS: