11:17 A. I don't know if you could say
11:17 "reasonable."
BY MR. PROSEN:
11:17 Q. So if a contracting officer requests --
11:17 we'll say Mr. Rigsby requests that L.P. Consulting
11:17 prepare and submit a scope of work for a work order.
11:18 A. Okay.
11:18 Q. It would be -- would it be reasonable
11:18 for L.P. Consulting to expect to then receive back a
11:18 formal work order to perform the work which they had
11:18 scoped out?
11:18 MS. KIRCHNER: Objection, ambiguous, compound,
11:18 hypothetical.
BY MR. PROSEN:
11:18 Q. In your experience?
11:18 MS. KIRCHNER: Objection, ambiguous, compound,
11:18 hypothetical.
BY THE WITNESS:
11:18 A. Could you repeat the question?
BY MR. PROSEN:
11:18 Q. Let's see if we can go from a different
11:18 angle here.
11:18 Assume for argument sake a contracting
11:18 officer has requested that the contractor under an

11:18 IQC contract develop a scope of work and submit it to him or her, okay?

11:18 When that scope of work is submitted, should the contractor who prepared the scope of work under his or her IQC contract expect to then receive back from the contracting officer a formal work order to perform that work?

11:19 MS. KIRCHNER: Objection, ambiguous, compound, hypothetical.

BY THE WITNESS:

11:19 A. Again, I can't speak for another contracting officer and, you know, what their procedure would be. You stated a contracting officer, so --

11:19 Q. Let's say you. You testified you're a contracting officer. If you requested a contractor, under your authority, under an IQC contract to prepare and submit to you a scope of work for a task order, could that contractor expect to get back from you a work order to perform that work?

11:19 MS. KIRCHNER: Objection, ambiguous, compound, hypothetical.

BY THE WITNESS:

11:19 A. He may. He may expect that.

L.P. Consulting a draft contract work order on the St. Anne Post Office?

MS. KIRCHNER: Objection, ambiguous, compound.

BY THE WITNESS:

A. I can't say I personally received it.

BY MR. PROSEN:

Q. Can you go to Tab 48, please?

(WHEREUPON, a certain document was marked Southern Exhibit No. 6 for identification, as of 6/9/04.)

BY MR. PROSEN:

Q. Mr. Southern, if you call an IQC contractor to develop a scope, doesn't that mean there's normally work to do under that IQC contract?

MS. KIRCHNER: Objection, ambiguous, compound, hypothetical.

BY THE WITNESS:

A. Yes.

BY MR. PROSEN:

Q. Referring to this Exhibit 6 under Tab 48, does this document -- have you seen this document before?

MS. KIRCHNER: How much are you referring to, the whole thing?

11:24 MR. PROSEN: Yes.
11:24 MS. KIRCHNER: The whole exhibit?
11:24 MR. PROSEN: The whole six or seven pages,
11:24 whatever it is.
11:24 MS. KIRCHNER: To be accurate, I've got seven.
BY MR. PROSEN:
11:25 Q. Have you seen this document, sir?
11:25 A. I believe I have seen this document?
11:25 Q. I'm sorry?
11:25 A. I believe I've seen this document.
11:25 Q. You have.
11:25 Can you identify the originator or the
11:25 source, the author of this document?
11:25 MS. KIRCHNER: Objection, ambiguous.
11:25 BY THE WITNESS:
11:25 A. Well, it has from the contractor,
11:25 L.P. Consulting Group, on it.
BY MR. PROSEN:
11:25 Q. Did there ever come a time when you
11:25 performed certain -- I'll call them site visits --
11:25 visits to postal service facilities with
11:25 Mr. Battaglin?
11:25 A. Yes.
11:25 Q. Do you recall what those facilities were

11:25 or what are those facilities?
11:26 A. There were a number of facilities that we visited.
11:26 Q. Would St. Anne be one of them?
11:26 A. I believe St. Anne would have been one of the facilities I visited.
11:26 Q. What was the purpose of the visits with Mr. Battaglin or with L.P.?
11:26 MS. KIRCHNER: Objection, ambiguous, compound.
BY THE WITNESS:
11:26 A. Well, without actually seeing the prepared work order from the U.S. Postal Service, I'm not sure what the actual scope of the work would have been at that time.
BY MR. PROSEN:
11:27 Q. If Mr. -- in your experience as contracting officer, if L.P. Consulting prepared and submitted a work order, such as what's before you as Exhibit 6, would L.P. Consulting -- should L.P. Consulting have reasonably expected to receive the work -- a work order for performance of this work?
11:27 MS. KIRCHNER: Objection, ambiguous, compound, hypothetical.

St. Anne Post Office? What was the purpose your visit out there?

MS. KIRCHNER: Objection, mischaracterizes testimony. He said it may have been.

BY THE WITNESS:

A. Could you repeat that?

BY MR. PROSEN:

Q. Sure. If you met Mr. Battaglin at St. Anne, since I understand time has run and everything and it's difficult to remember, if you met Mr. Battaglin at St. Anne or at any of the site visits which you said you do recall, what was the purpose of those site visits? Why were you meeting Mr. Battaglin at whatever post office -- or L.P. Consulting at whatever post office that you were going out to?

MS. KIRCHNER: Objection, ambiguous, compound, hypothetical.

BY THE WITNESS:

A. To do work -- possibly to do work at that facility.

BY MR. PROSEN:

Q. Do you know what a take-off is in construction lingo?

11:33 Q. How about a Ms. Catherine -- I may get
11:33 this wrong -- Marks, Catherine Marks?
11:34 MS. KIRCHNER: Objection, ambiguous.
BY THE WITNESS:
11:34 A. Could you repeat that?
BY MR. PROSEN:
11:34 Q. Do you know a Ms. Catherine Marks?
11:34 A. Yes.
11:34 Q. Who is she?
11:34 A. Postmaster.
11:34 Q. For what facility or facilities? I'm
11:34 not sure how that works.
11:34 A. I don't recall what facility she is at.
11:34 Q. Do you know if she had any involvement
11:34 with L.P. Consulting?
11:34 A. I don't know.
11:34 Q. How about a Lois Gunlogson,
11:34 G-U-N-L-O-G-S-O-N, do you know her?
11:34 A. Yes.
11:34 Q. Who is she?
11:34 A. She is a postal employee that worked --
11:34 I can't remember the department she came from, but
11:34 she worked in our department for a while.
11:34 Q. Did she have any involvement with L.P.?

11:34 A. Yes.
11:34 Q. What was her involvement with L.P.?
11:35 A. Making site visits with L.P. Consulting.
11:35 Q. Site visits similar to site visits you
11:35 recall having with L.P.?
A. Yes.
11:35 Q. What would those site visits involve?
11:35 What were the tasks or activities that you would
11:35 perform or participate in at these site visits?
11:35 A. What would I --
11:35 Q. You, or -- yes, what would you do?
11:35 A. I can't speak for Miss Gunlogson.
11:35 Q. I'm asking you.
A. Okay. You're asking --
11:35 Q. What did you do? You performed a site
11:35 visit. What activities took place while you were
11:35 there? What did you do?
11:35 A. If I was meeting -- when I would meet
11:35 the contractor out on-site, we would discuss the
11:35 scope of work and various things that the post
11:35 office -- that needed to be repaired. And
11:36 collectively, we would make some measurements and
11:36 discuss what needed to be done at the facility.
11:36 Q. Was your attending these site visits at

11:36 the direction of Mr. Rigsby?

11:36 A. Yes.

11:36 MS. KIRCHNER: Objection, compound.

BY MR. PROSEN:

11:36 Q. Do you know a Mary Yates, Y-A-T-E-S, Yates?

11:36 A. No, I don't. I don't recall.

11:36 Q. Robert Gibbons?

11:36 A. I believe Robert Gibbons is a postmaster.

11:36 Q. You don't know where or what facility?

11:36 A. No.

11:36 Q. Do you have any recollection of L.P. Consulting meeting with Mr. Steiner and Ms. Gunlogson on at least two separate facilities for site visits?

11:36 MS. KIRCHNER: Objection, ambiguous, compound.

BY THE WITNESS:

11:37 A. I don't recall any site visits that they made collectively.

BY MR. PROSEN:

11:37 Q. To the best of your recollection and knowledge, did you ever develop a task order scope of work and submit it or issue it to

11:37 L.P. Consulting?
11:37 MS. KIRCHNER: Objection, ambiguous, compound.
BY THE WITNESS:
11:37 A. Could you rephrase that?
BY MR. PROSEN:
11:37 Q. You performed site visits with
11:37 L.P. Consulting?
11:37 A. That's correct.
11:37 Q. And you testified to -- and this may not
11:37 be exact, but to discuss scopes of -- possible
11:37 scopes of work, would that be a fair -- or repairs
11:37 that needed to be -- happen or renovation work?
11:37 A. Yes.
11:37 Q. After those site visits, on however many
11:38 occasions -- I know you don't recall -- on how many
11:38 site visits you had, did you go back to your office
11:38 and put pen to paper and write out a work order or a
11:38 scope of work for L.P. Consulting to perform the
11:38 work which you just had discussed?
11:38 MS. KIRCHNER: Objection, ambiguous, compound.
BY THE WITNESS:
11:38 A. That would depend on what the
11:38 contracting officer wanted to do.
BY MR. PROSEN:

11:39 A. Yes, I would have to input those into the computer in order to produce a work order.

11:39 Q. Would those work orders still be in the FMS system, to your knowledge?

11:39 MS. KIRCHNER: Objection, ambiguous, compound.

BY THE WITNESS:

11:39 A. Well, I can't answer that because I have not been at the facility for over 13 months.

BY MR. PROSEN:

11:40 Q. Do you have any recollection of ever receiving a draft work order or scope of work from L.P. Consulting?

11:40 MS. KIRCHNER: Objection, ambiguous, compound.

BY THE WITNESS:

11:40 A. I have received a draft work order from L.P. Consulting.

BY MR. PROSEN:

11:40 Q. Do you recall what the -- what happened after you received it? Did it go to Mr. Rigsby?

11:40 MS. KIRCHNER: Objection, ambiguous, compound.

BY THE WITNESS:

11:40 A. You would have to be more specific.

BY MR. PROSEN:

11:40 Q. Well, you said you received drafts scope

11:54 A. I --

BY MR. PROSEN:

11:55 Q. I mean, you would have --

11:55 MR. PROSEN: Why don't we take a break here.
11:55 The witness needs to rest, anyway.

12:04 (WHEREUPON, a recess was had.)

BY MR. PROSEN:

12:04 Q. Between the contractor and the U.S.
12:04 Postal Service, who is responsible to prepare a
12:04 scope of work?

12:04 MS. KIRCHNER: Objection, ambiguous, compound.

BY THE WITNESS:

12:04 A. That's up to the -- up to the
12:04 contracting officer.

BY MR. PROSEN:

12:04 Q. If an IQC contract is silent as to who's
12:05 responsible, does that change your answer at all?

12:05 MS. KIRCHNER: Objection, ambiguous, compound,
12:05 hypothetical.

BY THE WITNESS:

12:05 A. Could you repeat that?

BY MR. PROSEN:

12:05 Q. If the contract does not expressly state
12:05 that the contractor is obligated to prepare or draft

12:45 A. Architect engineer that worked for the postal service.
12:46 Q. Have you had any recent discussions with Mr. Fernandez?
12:46 A. No.
12:46 Q. Have you ever been employed by Mr. Fernandez?
12:46 A. No.
12:46 Q. Are you aware of a Grand Jury investigation involving kickbacks regarding certain U.S. Postal Service handicap ramps that Mr. Fernandez was involved?
12:46 A. I heard talk.
12:46 Q. You didn't participate in any Grand Jury?
12:46 A. No.
12:46 Q. Do you know that Mr. Fernandez has pled guilty, been sentenced to prison and fines?
12:46 A. No, no knowledge of that at all.
12:46 Q. Did you know that Mr. Fernandez took kickbacks from various contractors in return for him awarding them contract -- I'm sorry -- awarding them handicap ramp contracts, several of which are on that list in front of you as Exhibit 1?

13:04 document, Term Construction Contract Work Order for
13:04 Aroma Park, Illinois? It consists of, I think,
13:05 eight pages. Have you seen this document?
13:05 A. It's been a long time. I'm not sure.
13:05 Q. With the exception -- I think we went
13:05 through the St. Anne handwritten Term Construction
13:05 Contract Work Order before, Exhibit 6.
13:05 Do you recall seeing other handwritten
13:05 Term Construction Contract Work Orders from
13:05 L.P. Consulting Group on any project?
13:05 A. Yes, I do recall seeing handwritten
13:05 construction projects, yes.
13:05 Q. Do you remember any specific project for
13:05 which one of those would have been submitted?
13:05 MS. KIRCHNER: Objection, ambiguous.
BY THE WITNESS:
13:05 A. It's been a long time. I can't say for
13:05 certain a specific project. I can't say a specific
13:06 project.
BY MR. PROSEN:
13:06 Q. Do you recall, were any of the ones you
13:06 did see these Term Construction Contract Work
13:06 Orders, the handwritten ones, were they approved or
13:06 accepted by Mr. Rigsby and resulted in the issuance

13:06 of a formal work order to L.P. Consulting? Did that happen?

13:06 A. You are correct, that did happen. There have been work orders that I have seen and produced in the system for Mr. Rigsby's signature for L.P. Consulting.

13:06 Q. To the best of your recollection, on all these various projects that L.P. did under these handicap ramp IQC -- these IQC contracts, to the best of your guess, what percentage of the -- strike that.

13:07 Would you say the majority of the time the work order was initiated by L.P. Consulting being requested to and then, in turn, submitted a handwritten work order like this?

13:07 MS. KIRCHNER: Objection, ambiguous, compound.

BY THE WITNESS:

13:07 A. I would say that there were many handwritten work orders that were submitted by L.P. Consulting and actual work orders and work was produced, yes.

BY MR. PROSEN:

13:07 Q. It was produced?

13:07 A. Yes.

13:07 Q. Again, to the best of your recollection, I know it's been a long time, has -- if the government initiates or issues a work order on its own, in other words, the contractor doesn't submit something, but the government does it, would the government have developed its own independent scope of work?

13:08 MS. KIRCHNER: Objection, ambiguous, hypothetical.

BY THE WITNESS:

13:08 A. I cannot recall a specific incident, but I do know that the postal service has developed a scope of work and given it to the contractor under the IQCs.

BY MR. PROSEN:

13:08 Q. Do you know if that happened under these IQC contracts?

13:08 A. I have no recollection of that. It's a possibility.

13:08 Q. So if it did happen, those documents would be in the government's files?

13:08 A. I don't know how you would determine whether or not -- by looking at the file whether or not the government or the United States Postal

13:11 MS. KIRCHNER: Objection, mischaracterizes testimony. He said he saw it, not that he himself personally received it.

BY THE WITNESS:

13:11 A. I'm sorry.

BY MR. PROSEN:

13:11 Q. Sure. Exhibit 6, you said in some form or shape or another, that you had seen a copy of this document, you testified earlier. You performed a site visit, I believe, and then --

13:11 A. I believe I said I performed a site visit to this facility, yes, St. Anne.

13:12 Q. I believe your testimony was that you had seen a copy of this document. We went through it earlier. They all kind of look the same.

13:12 MS. KIRCHNER: Just for the record, there's several documents in Exhibit 6.

BY THE WITNESS:

13:12 A. There's a possibility, yes, that I reviewed -- had seen the St. Anne.

BY MR. PROSEN:

13:12 Q. What would you have done if you saw this to have verified the accuracy of the quantities? Obviously the cost, I think you said, is fixed based

on the postal service unit price list or something.

So the price is fixed; it's really the quantity that's the variable?

A. That's correct.

Q. What would you do to verify that the quantities are accurate?

MS. KIRCHNER: Objection, hypothetical.

BY THE WITNESS:

A. If I met with L.P. Consulting out on the job for this particular job, we would do this together, as far as the quantities and what would be required for the job for most of these.

BY MR. PROSEN:

Q. Would this document have been prepared in the field with you there and the quantities would basically be inserted right then and there?

MS. KIRCHNER: Objection, hypothetical.

BY THE WITNESS:

A. This looks quite extensive. There are probably -- I probably had notes and the contractor had notes. And from those notes and drawings, this was probably prepared.

BY MR. PROSEN:

Q. Were there drawings prepared for all

13:16 I'm not following your line of question.

BY MR. PROSEN:

13:16 Q. Tell me if I'm wrong here. An IQC
13:16 contract, really the only thing that's competed is
13:16 the multiplier; everyone submits their price, but
13:16 the price is really the multiplier, isn't that
13:16 correct?

13:16 MS. KIRCHNER: Objection, ambiguous, compound,
13:16 hypothetical.

BY MR. PROSEN:

13:16 Q. Once the award is made, whether it's to
13:16 L.P. or anyone else, they are basically the sole
13:16 holder of the contract; no one else -- unit prices
13:17 are fixed by the government, right, the U.S. Postal
13:17 Service? They're pre-established by the postal
13:17 service, these IQC contracts?

13:17 A. They're pre-established in the
13:17 solicitation.

13:17 Q. So the only thing that's left, then, if
13:17 you picture the calculation, is the multiplier and
13:17 quantity for a given line item, is that correct?

13:17 MS. KIRCHNER: Objection, ambiguous, compound,
13:17 hypothetical.

BY THE WITNESS:

13:17 A. You would have to be more specific
13:17 during the process. At what time during the
13:17 process?
BY MR. PROSEN:
13:17 Q. The award has been made. In this case,
13:17 L.P. was given one with a multiplier of .85; in
13:17 other words, 85 percent of whatever the government's
13:18 list price for a unit item is, that's what
13:18 L.P. Consulting charged, is that correct?
13:18 MS. KIRCHNER: Objection, ambiguous, compound.
BY MR. PROSEN:
13:18 Q. It's a fixed cost?
13:18 A. Yes.
13:18 Q. The only variable is the quantity, then,
13:18 right?
13:18 MS. KIRCHNER: Objection, ambiguous, compound,
13:18 hypothetical.
BY MR. PROSEN:
13:18 Q. For every dollar that the postal service
13:18 has in its manual -- if a one foot square tile costs
13:18 a dollar, L.P. can only charge 85 cents, is that an
13:18 accurate statement, under their IQC contract because
13:18 their multiplier is .85?
13:18 A. That's accurate for the example that you

13:18 gave.

13:18 Q. It's a fixed cost. So the only variable
13:18 then is the quantity, how many of these 85 cent
13:18 tiles, right?

13:18 A. That's correct.

13:18 Q. What is the postal service -- how does
13:18 the postal service make sure that the quantity that
13:18 the contractor is requesting payment on is an
13:19 accurate quantity?

13:19 MS. KIRCHNER: Objection, hypothetical.

BY MR. PROSEN:

13:19 Q. L.P. submits the Beaverville -- I'm
13:19 sorry, strike that.

13:19 We'll use St. Anne, Exhibit 6. We'll
13:19 use the first thing here. It says, "Various
13:19 fasteners, self tap; unit measurement, each; unit
13:19 price, .71," which is that 71 cents each?

13:19 MS. KIRCHNER: Objection, ambiguous,
13:19 hypothetical.

BY THE WITNESS:

13:19 A. That's correct.

BY MR. PROSEN:

13:19 Q. Quantity, 10. So 10 times .71 is $7.10,
13:19 correct?

13:21 determine independently or otherwise what the cost
13:21 for L.P. Consulting would be to perform this work?
13:21 MS. KIRCHNER: Objection, ambiguous,
13:21 hypothetical.
BY THE WITNESS:
13:21 A. There's no way to determine that unless
13:21 a project manager or architect engineer goes out to
13:21 the field and draws up some kind of schematic as to
13:21 what's going to be required at the job.
BY MR. PROSEN:
13:21 Q. And in the case of L.P., was that
13:21 normally done with L.P. Consulting being present?
13:21 MS. KIRCHNER: Objection, ambiguous, compound,
13:21 lack of foundation.
BY THE WITNESS:
13:21 A. In reference to the projects that I
13:21 recall with L.P. Consulting, when we went out into
13:21 the field, we took measurements and utilized the
13:22 specifications that were in the IQC to determine the
13:22 type of work that needed to be done at the facility.
BY MR. PROSEN:
13:22 Q. Let's go to 60, Tab 60, please,
13:23 Exhibit 21.
(WHEREUPON, a certain document was

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

L.P. CONSULTING GROUP, INC., )
Plaintiff, )
vs. ) Case No.
THE UNITED STATES POSTAL ) 98-868 C
SERVICE, ) (Judge Allegra)
Defendant. )

The deposition of JESSE McNABB, called for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions for the purpose of discovery, taken before Janet L. Robbins, CSR No. 84-2207, a Notary Public within and for the County of Cook, State of Illinois, and a Certified Shorthand Reporter of said state, at Suite 3300, Three First National Plaza, Chicago, Illinois, on the 10th day of June, A.D. 2004, at 9:17 a.m.

ORIGINAL

09:37 the field and self-develop a scope of work?

09:37 MS. KIRCHNER: Objection, ambiguous, lack of
09:37 foundation.

BY THE WITNESS:

09:37 A. Could you repeat that?

BY MR. PROSEN:

09:37 Q. Sure. Was it common practice at the
09:37 U.S. Postal Service to ask a contractor, an IQC
09:37 contractor, to go out in the field and self-develop
09:38 a scope of work for a work order?

09:38 MS. KIRCHNER: Objection, ambiguous, lack of
09:38 foundation.

BY THE WITNESS:

09:38 A. Do I have to answer?

BY MR. PROSEN:

09:38 Q. Yes. She objects and then you can
09:38 answer.

09:38 A. It wasn't usual for me to do that. I
09:38 don't know what the rest of the project managers
09:38 did.

09:38 Q. Were you authorized to, if you wanted to
09:38 under your duties, were you authorized to ask a
09:38 contractor, an IQC contractor to go out and scope
09:38 one of your projects?

09:38 A. Yes.
09:38 Q. You didn't need Mr. Rigsby's permission to go do that?
09:38 A. No.
09:38 Q. So it was up to the project manager, your decision, whether or not you would go scope out a given task order or the contractor would?
09:38 A. Could you repeat that?
09:38 Q. So it was up to you as the project manager to decide whether a given project scope of work would be developed or prepared by the contractor or by the project manager?
09:39 MS. KIRCHNER: Objection, ambiguous, compound.
BY THE WITNESS:
09:39 A. Well, I'm not quite sure I'm getting at what you're asking me.
BY MR. PROSEN:
09:39 Q. I think you testified just a second ago that the project manager would send out the IQC contractor, if he or she so desired, to prepare a scope of work, and that Mr. Rigsby didn't have to authorize that, is that correct?
09:39 A. Right.
09:39 MS. KIRCHNER: Objection, misconstrues

09:39 testimony.

BY MR. PROSEN:

09:39 Q. So my next question was: If that's the case, then it's up to the project manager to decide whether or not he or she, as the project manager, will develop the scope of work or he or she is going to send out the IQC contractor to develop the scope of work?

09:40 A. Right. They'll --

09:40 MS. KIRCHNER: Objection, ambiguous, compound.

09:40 Sir, what you have to do, if I want to make an objection, I have to make my objection and you need to wait.

09:40 MR. PROSEN: Just pause a second.

09:40 THE WITNESS: Oh, I'm sorry.

09:40 MS. KIRCHNER: He asks you a question, and then you shouldn't launch in immediately like a conversation.

09:40 MR. PROSEN: He can do what he wants. You're not representing him, so please don't coach him on it. Thank you.

09:40 MS. KIRCHNER: I can advise him of how a deposition is conducted. I noted that you have failed to do that, Counsel.

So when he asks the question, you should be a little bit -- so if I need to make an objection, I can make the objection, and then you should answer. This is important so that she can take down everybody's voices.

MR. PROSEN: She can't do two people at once.

MS. KIRCHNER: This way, nobody overlaps.

THE WITNESS: Sorry.

MS. KIRCHNER: It's fine.

BY MR. PROSEN:

Q. I'm sorry, could you repeat your answer again?

A. Usually -- you know, I can't explain or give anyone else's actions --

Q. Oh, sure.

A. -- to the way things are done.

I did things a certain way from the way I was taught in the Chicago District from working with them back in the '80s.

Usually when there was a job to be done, I would get with the general contractor, and we would go out on a job and pull the work order together for the work to be done. What the other guys did, I'm not really up on that. I always tried

09:41 to provide some type of a record for myself. That's where preparing the drawings came in and then getting with the contractor to go out to the job site and then to prepare a work order from that, from that visit.

09:41 Q. So you would take notes on the site visits and use those to finalize your scope of work when you did a site visit?

09:42 A. Yes.

09:42 Q. Where would those notes be placed when you were done with them?

09:42 A. In the file.

09:42 Q. The contract file?

09:42 A. Yes.

09:42 Q. Do you have copies of any of those documents?

09:42 A. Well, I looked in some of the boxes that I had, you know, from the office. I couldn't find anything.

09:42 Q. So as far as you know, the only copies or the originals would be in the postal service's own files?

09:42 A. Yes.

09:42 Q. Were work orders ever competed?

09:47 MS. KIRCHNER: Objection, lack of foundation,
09:47 calls for speculation, calls for opinion, compound.
BY THE WITNESS:
09:48 A. Yes, they could have been.
BY MR. PROSEN:
09:48 Q. And if you can flip to Tab 31, Southern
09:48 Exhibit 19.
09:48 A. 21?
09:48 Q. 31, sir. Just flip back. It's a
09:48 Brookfield dock and ramp enclosure work order. One
09:48 document is two pages and the other one is seven
09:48 pages.
09:48 Do you see your name, Jesse McNabb, on
the first --
A. Yeah.
Q. -- and if you flip back two pages, then
on the second document?
09:49 Do you recall ever seeing or receiving
09:49 either of these documents, sir?
09:49 A. It's possible. It's been a long time.
09:49 I mean -- like I say, as we talk, some of the things
09:49 kind of comes back a little bit, and I'm not sure.
09:49 It's possible.
09:49 Q. Is a document such as this the type of

09:49 scope of work that you could expect to receive from
09:49 drawings like the ones we talked about a minute ago
09:49 that you produced?
09:49 A. Yes, it's very possible.
09:50 Q. Do you recall ever receiving any
09:50 document such as this from L.P. Consulting for any
09:50 of the projects which you worked on with L.P.?
09:50 A. It's possible. Like I said, it's been a
09:50 long time.
09:50 Q. Was there ever a time when Mr. Rigsby
09:50 directed you to not send a solicitation package to
09:50 L.P. Consulting?
09:50 A. No.
09:51 Q. Are you aware of any site visits that
09:51 L.P. would have performed with any U.S. Postal
09:51 Service employees under these IQC contracts?
09:51 MS. KIRCHNER: Objection, ambiguous, lack of
foundation.
BY THE WITNESS:
09:51 A. That's kind of broad because --
BY MR. PROSEN:
09:51 Q. Well, do you know a Lois Gunlogson?
09:51 A. Yes.
09:51 Q. Do you know a Paul Steiner?

A. Yes.

Q. Who is Mr. Steiner?

A. He was formerly the contracting officer that I worked for.

Q. And Ms. Gunlogson, who is she at the time we're talking about, '96?

A. At the time? At the time, Paul was a project manager, if I'm not mistaken.

Q. A comparable position to what you were, a project manager?

A. Right. And Lois Gunlogson, she was also a project manager.

Q. How about a Catherine Marks?

A. I believe she was a manager or a supervisor at one of the post offices.

Q. Do you know a Sam Southern?

A. Yes.

Q. Who is Mr. Southern?

A. At the time, he was a project manager when I worked for them.

Q. Based on your experience working with Mr. Southern, did Mr. Southern understand how construction projects were performed?

A. Well, at the time when I worked, he was

09:56 Q. Sure. I'll try to break it down a little bit.
09:56 When you called an IQC contractor and asked him or her to go out to a facility, develop a scope of work and submit it to you --
09:56 A. Right.
09:56 Q. -- could that contractor expect, some time after they submit that scope of work, to receive from you a work order?
09:56 MS. KIRCHNER: Objection, ambiguous, compound, calls for speculation.
BY THE WITNESS:
09:56 A. Well, it's possible, it's possible.
09:56 May I add one thing?
BY MR. PROSEN:
09:56 Q. Sure.
09:56 A. Normally, that would be the case, but, you know, sometimes there would be conditions where a project wouldn't be issued to the contractor; you know, say, for instance, if there wasn't money available and they couldn't get funding for it or a number of other conditions where the project was put on hold.
09:57 Q. If a contractor was requested to go out

09:57 to develop the scope of work, who made the decision
09:57 to -- strike that -- would that decision to scope
09:57 out that work come from you or Mr. Rigsby?
09:57 MS. KIRCHNER: Objection, ambiguous, compound.
BY THE WITNESS:
09:57 A. It could come from either.
BY MR. PROSEN:
09:57 Q. In deciding whether or not to use an IQC
09:57 contractor as opposed to competing a bid and
09:57 project, who made the decision whether or not to go
09:58 IQC or formally advertised and competed?
09:58 MS. KIRCHNER: Objection, lack of foundation,
09:58 ambiguous, compound.
BY THE WITNESS:
09:58 A. Under the system, like I said, that I
09:58 learned under, that would be the choice of either
09:58 the project manager or the CO.
BY MR. PROSEN:
09:58 Q. So it could either come from you as a
09:58 project manager or from Mr. Rigsby?
09:58 A. Right.
09:58 Q. Are there any postal guidelines on
09:58 selecting the method of construction, again, IQC
09:58 versus formal solicitation?

10:06 across the radio and you were joking around about it
10:06 with the postmaster there?
10:06 A. No.
10:06 Q. Are you aware that Mr. Fernandez has
10:07 pled guilty to receiving kickbacks from a number of
10:07 contractors on these handicap ramp projects?
10:07 A. I've heard --
10:07 MS. KIRCHNER: Objection, misconstrues the
10:07 record.
BY THE WITNESS:
10:07 A. I've heard the rumor.
BY MR. PROSEN:
10:07 Q. What else have you heard? What other
10:07 rumors have you heard about that?
10:07 A. That's basically it.
10:07 Q. Are you aware that he's been sentenced
10:07 to prison and fined?
10:07 A. Like I said, basically I heard something
10:07 like that.
10:07 Q. Were you aware of any -- at the time you
10:07 worked for the postal service, were you aware of any
10:07 collusion or kickbacks going on at the time?
A. No.
10:07 Q. You're not aware of any postal service

10:07 employee receiving any kickbacks?
10:07 A. No.
10:07 Q. Have you ever talked with Carl
10:07 Puricelli, who's an investigator for the Postal
10:07 Service Office of Inspector General?
10:08 A. That name sounds familiar.
10:08 Q. Could you flip to -- I guess it's the
10:08 last tab, 73, in the binder, sir.
(WHEREUPON, a certain document was
marked McNabb Exhibit No. 43 for
10:08 identification, as of 6/10/04.)
BY MR. PROSEN:
10:08 Q. It's an L.P. Consulting document dated
10:08 8/22/96.
10:08 Is that your name there, sir, at the
10:08 top?
10:08 A. Yes, Jesse, I guess.
Q. Jesse McNabb?
10:09 Do you recall ever receiving this
10:09 document?
10:09 A. No, I don't recall it. I mean, it's
10:09 possible that I could have.
10:09 Q. Okay.
10:09 A. On those two projects, it's possible.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

L.P. CONSULTING GROUP, INC., )
Plaintiff, )
vs. ) Case No.
THE UNITED STATES POSTAL ) 98-868 C
SERVICE, ) (Judge Allegra)
Defendant. )

The deposition of ANDREW M. FERNANDEZ, called for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions for the purpose of discovery, taken before Janet L. Robbins, CSR No. 84-2207, a Notary Public within and for the County of Cook, State of Illinois, and a Certified Shorthand Reporter of said state, at Suite 3300, Three First National Plaza, Chicago, Illinois, on the 10th day of June, A.D. 2004, at 11:02 a.m.

ORIGINAL

11:18 Q. Did you retain logs or daily diaries of your site visits when you did perform them?

11:19 A. Again, if they were required, yes, we would have to retain a site visitation report, yes.

11:19 Q. Do you have any of those documents in your possession, custody or control?

11:19 A. No.

11:19 Q. Those are also with the postal service?

11:19 A. Yes.

11:19 Q. If you open to document -- if you open to Tab 27 there, it's Southern Exhibit 18. It's a document entitled "Downers Grove" -- it's, actually, "Downers Grove P.O. Dock, Term Construction Contract Work Order," and then it's got two pages and then four pages of drawings.

11:20 Have you ever seen -- starting with the top couple of pages, have you ever seen this document?

11:20 A. This one?

11:20 Q. Yes.

A. No.

11:20 Q. Have you ever seen a document -- not necessarily for Downers Grove, but any project on this type of a format?

11:20 A. Yes.

11:20 Q. Handwritten from L.P. Consulting?

11:20 A. I don't know if in specific for L.P. Consulting, but I have seen this type of form before.

11:20 Q. Flipping back to the third page, it says -- it's got a dock floor plan, Downers Grove P.O., Sheet 1 of 4, and then it's got some details afterwards.

11:21 Do you know who prepared this drawing?

11:21 MS. KIRCHNER: Are you asking just about the drawing, Counsel?

11:21 MR. PROSEN: The drawing, yes, Sheet 1 of 4.

BY THE WITNESS:

11:21 A. No, I do not.

BY MR. PROSEN:

11:21 Q. Do you know if you prepared it?

11:21 A. I know I did not prepare it.

11:21 Q. You did not prepare it?

11:21 A. No.

11:21 Q. Would the same go for the -- there's a detailed, the next page called "Typical Section Thru Wall," Sheet 2 of 4?

11:21 A. I did not prepare that.

11:25 given project, a given project, part of my task
11:25 would be, yes, to investigate and survey the
11:25 facility for the work to be performed for
11:25 feasibility, et cetera. And then upon that,
11:25 prepare -- the next portion of the work would be the
11:25 actual preparation of the documents, specifications,
11:25 drawings.

11:25 Q. Construction documents?

11:25 A. Yes.

11:25 Q. The CDs?

11:25 A. Right. That would pretty much encompass
11:25 that portion of the work, as you would call it,
11:25 scope of work. That would define the work to be
11:26 performed at that particular location, whatever it
11:26 may have been.

11:26 Q. When you got a task order, did it -- was
11:26 it specific in that it said -- I'm just going to
11:26 pick at random -- Brookfield dock enclosure, and was
11:26 it specific in that it told you exactly what the
11:26 postal service wanted the scope of work to be, or
11:26 did you develop the scope of work after your site
11:26 visit?

11:26 A. Well, the postal service never said in
11:26 specific what needs to be done. They would say, "We

need this dock enclosed, so go see what is necessary to achieve that."

Q. And you would develop --

A. And I would then go visit the site and then determine the solution for whatever it is that they were requiring, and the drawings and specs would then reflect that solution.

Q. So they would give you a very broad, basic, generic description of what the work was that they needed to get done? In other words, a dock enclosure, they didn't get into specific quantities, materials, those types of things?

A. No.

Q. You defined the details?

A. I never defined quantities. What I defined was what it took to get from Point A to Point B.

Q. But you would decide what the materials to be used were, and you would decide the design or in this case the dock enclosure, is that correct?

A. Correct. Now, there were, depending on the project -- let's just say the dock enclosure, and I don't recall offhand if that had an exterior lift, but if there were certain requirements that

been no work on the boards at all and they would still have to make the decision of whether or not they wanted to extend.

Q. Okay. I understand.

At the time, '96 to '98 again, did the postal service have the capability in-house to do all the design and bid packages, the work that you actually did under your contract?

A. No.

Q. What were they lacking internally that required them basically -- that required them to hire you?

A. Well, they don't have -- nor -- well, I don't know whether or not they do now. They may have.

Q. At the time?

A. At the time, there were no registered architects that were actually licensed to perform any of this kind of work on board.

Q. As federal property, are these projects subject to local building codes and licensing requirements and whatnot?

MS. KIRCHNER: Objection, lack of foundation, compound.