**No. 98-868C**
**(Judge Allegra)**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**L.P. CONSULTING GROUP, INC.**

**Plaintiff,**

**v.**

**THE UNITED STATES**

**Defendant.**

# PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

Brian Cohen, Esq.
BELL, BOYD & LLOYD PLLC
1615 L Street, N.W., Suite 1200
Washington, DC 20036
(202) 955-6836 tel.
(202) 835-4117 fax.
Attorney of Record for Plaintiff
L.P. Consulting Group, Inc. Intervenor

<u>Of Counsel:</u>

Lawrence M. Prosen, Esq.
BELL, BOYD & LLOYD PLLC
1615 L Street, N.W., Suite 1200
Washington, DC 20036
(202) 955-6830 tel.
(202) 835-4127 fax

February 18, 2005

# TABLE OF CONTENTS

Page

I. STATEMENT OF THE ISSUES ........ 1

II. STATEMENT OF THE CASE ........ 2

A. The Nature of the Case ........ 2

B. Statement of Facts ........ 2

1. The Background & History of Plaintiff. ........ 2

2. LP's Claims and Causes of Action. ........ 3

3. The Parties' Course of Dealing. ........ 4

III. ARGUMENT ........ 8

A. Standard for Summary Judgment & Cross-Motion for Summary Judgment ........ 8

B. The Government's Motion for Summary Judgment Should Be Denied. ........ 8

C. Summary Judgment Should be Granted to LP. ........ 9

D. L.P. Has Established The Existence Of Implied-In-Fact Contracts For The 12 ........ 9

1. The Parties' Course Of Dealing Establishes The Mutuality Of Intent To Contract. ........ 10

2. LP Was Directed to Perform the Site Visits, Prepare and Submit the WOs By Authorized USPS Personnel. Alternatively, the USPS's Actions Should Be Imputed to the Contracting Officer. ........ 14

3. There Is No Ambiguity As To An Offer And Acceptance. ........ 16

E. The USPS Bre.ached Its Duty To Give LP a Fair Opportunity To Be Considered for All 12 Work Orders ........ 17

F. The USPS Breached Its Implied Duty of Good Faith and Fair Dealing ........ 22

G. LP Is Entitled To Recover Its Lost Profits Based Upon The Government's Breach ........ 23

Page

H. The Breaches of Contract Can Be Established for Each and Every One of the 12 WOs/Implied-In-Fact Contracts Prepared by LP ............................26

1. The Six Projects – Beaverville, East Lynn, Papineau, St. Anne, Union Hill, Bradley. ........................................................................26

2. The Two Projects – Momence & Aroma Park..........................................27

IV. CONCLUSION ..........................................................................................................27

# TABLE OF AUTHORITIES

Page(s)

## COURT CASES

*Adickes v. Kress and Co.*, 398 U.S. 144 (1970) .... 8

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .... 8

*Barrett Refining Corp. v. U.S.*, 242 F.3d 1055 (Fed.Cir. 2001) .... 10

*Big Chief Drilling Co. v. United States*, 26 Cl.Ct. 1276 (1992) .... 23

*Bluebonnet Saving Bank, F.S.B. v. United States*, 266 F.3d 1348, 1355 (Fed.Cir. 2001) .... 24

*Century 21 Real Estate Corp. v. Meraj International Investment Corp.*, 315 F.3d 1271 (10th Cir. 2003) .... 25

*Chain Bell Co. v. U.S.*, 127 Ct.Cl. 38 (1953) .... 24

*Energy Capital Corp. v. U.S.* 47 Fed.Cl. 382 (2000) *affd. in part, revd. in part on other grounds*, 302 F.3d 1314 (Fed.Cir. 2002) .... 24

*Erco Industries, Ltd. v. Seaboard Cost Line Railroad Co.*, 644 F.2d 424 (5th Cir. 1981) .... 8

*Folden v. U.S.*, 56 Fed. Cl. 43 (2003) .... 10

*Glenn Distributors Corp. v. Carlisle Plastics, Inc.*, 297 F.3d 294 (3d Cir. 2002) .... 25

*Gresham & Co. v. United States*, 470 F.2d 425 (Ct.Cl. 1972) .... 12, 15

*Hanlin v. U.S.*, 50 Fed. Cl. 697 (2001), *affd.* 316 F.3d 1325 (2003) .... 10

*Hubbard v. U.S.*, 52 Fed.Cl. 192 (1992) .... 23

*LaSalle Talman v. United States*, 45 Fed.Cl. 64 (1999) .... 24

*Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3rd Cir. 1993) .... 25

*Locke v. United States*, 151 Ct.Cl. 262F.2d 521 (Ct.Cl. 1960) .... 26

*Maxima Corp. v. United States*, 847 F.2d 1549 (Fed. Cir. 1988) .... 22

*Mega Construction Co., Inc. v. United States*, 29 Fed.Cl. 398 (1993) .... 25

*Mingus Constructors, Inc. v. United States*, 812 F.2d 1387 (Fed.Cir. 1987) .... 8

*Mississippi Chemical Corp. v. Dresser-Rand Co.*, 287 F.3d 359 (5th Cir. 2002) .... 25

*N.R. Acquisition Corp. v. United States*, 52 Fed.Cl. 490 (2002) .... 8

*OAO Corp. v. United States*,, 17 Cl.Ct. 91 (1989) .... 10

*P.R. Burke Corp. v. United States*, 277 F.3d 1346 (Fed. Cir. 2002) .... 22

*Penn-Ohio Steel Corp. v. United States*, 354 F.2d 254 (Ct.Cl. 1965) .... 16

Page(s)

*Porter v. United States*, 204 Ct.Cl. 355 F.2d 583 (1974), *cert. denied*, 420 U.S. 1004 (1975) .......... 10

*Pullman v. Land O'Lakes, Inc*., 262 F.3d 759 (8th Cir. 2001) .......... 25

*Rhen v. United States*, 17 Cl.Ct. 140 (1989) .......... 25

*Rumsfeld v. Applied Companies, Inc.*, 325 F.3d 1328 (Fed. Cir. 2003) .......... 24

*Russell Corp. v. United States*, 354 F.2d 474 (Ct.Cl. 1976) *cert. denied* 429 U.S. 1073 (1977) .......... 16

*Securitron Magnalock Corp. v. Schnobolk*, 65 F.3d 256 (2d Cir. 1995) .......... 25

*Town of North Bonneville v. United States*, 11 Cl.Ct. 694, *affd. in part, reversed in part* 833 F.2d 1024 (1987) *cert. denied* 485 U.S. 1007 (1988) .......... 23

*Travel Centre v. Barram*, 236 F.3d 1316 (Fed.Cir. 2001) .......... 18

STATUTES

2nd Am.Compl. §§ 6-7 .......... 3

41 U.S.C. § 253j(b) .......... 19

41 USC §§ 601 .......... 2

42 U.S.C. § 12101 .......... 3

BOARD OF CONTRACT APPEALS

*Burke Court Reporting Company*, DOT BCA No. 3058, 97-2 BCA ¶ 29,323 .......... 18, 19, 22, 23

*City Window & Construction Company*, PSBCA No. 4563, Dec. 14, 2001, 02-1 BCA ¶31,706 .......... 11, 15

*Community Consulting International*, ASBCA No. 53489, 02-2 BCA ¶ 31,940 .......... 18, 19, 21

*David Finley*, PSBCA No. 3922, 98-2 BCA ¶29,989 .......... 12, 15

*Glenda R. Whitaker*, PSBCA No. 3443, 94-2 BCA ¶26,643 .......... 15

*Howard Nettleton*, PSBCA No. 3454, June 28, 1994, 94-3 BCA ¶27,038 .......... 16

*Monarch Enterprises, Inc.*, ASBCA No. 31375, 86-3 BCA ¶ 19,227 at 97,224 .......... 22

*Overflo Public Warehouse, Inc.*, PSBCA No. 4531, 4550, 4649, Dec. 18, 2003, 04-1 BCA ¶32,488 .......... 14

Robert E. Davis, PSBCA No. 3400, 94-3 BCA ¶27,164 .......... 12

USPS PURCHASING MANUAL

Purchasing Manual Chapter 4, § 4.2.5b .......... 23

Purchasing Manual Chapter 6, § 6.1.2a4 .......... 18

TREATISES

Restatement (Second) of Contracts § 223 (1979) .......... 10

Page(s)

Restatement (Second) of Contracts Sect. 344(a) (1981)................................................................ 24

Restatement (Second) of Contracts, Section 4 cmt. a (1979) ........................................................ 10

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **L.P. CONSULTING GROUP, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 98-868C** |
| | ) | **(Judge Allegra)** |
| **THE UNITED STATES** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the United States Court of Federal Claims ("RCFC"), Plaintiff, L.P. Consulting Group, Inc. ("LP"), respectfully requests that the Court deny the Government's ("Government" or "USPS") motion for summary judgment, and grant plaintiff's cross-motion for summary judgment; or, alternatively, set a trial date in this matter.

LP requests oral argument on its opposition to the Government's motion and LP's cross-motion for summary judgment.

## I. STATEMENT OF THE ISSUES

LP submits that the Government has failed to address material dispositive issues of fact and law. LP also disputes the arguments and conclusions contained in defendant's motion. The weaknesses inherent in the Government's arguments are so great that the Court should deny the Government's motion and grant Plaintiff's cross-motion for summary judgment.

## II. STATEMENT OF THE CASE

### A. The Nature of the Case

LP agrees with the Government that this is an action involving contract disputes arising out of the Contract Disputes Act of 1978, as amended, 41 USC §§ 601, *et seq*, (the "CDA") between LP and the United States Postal Service. USPS Motion at 2.

### B. Statement of Facts

The Government's motion appears to present a simple case of the "jilted" contractor, one who was not entitled to receive the WOs which form the basis of the underlying complaint, and was never so entitled. This is entirely incorrect. In fact, the Government's Motion reveals what has been readily apparent to LP and should have been obvious to the Government for the almost seven tortured years of this on-going case: the Government simply does not understand the applicable law.

The Government couches its entire argument upon the premise that LP (1) performed "work" prior to issuance of a formal, final work order in violation of the IQCs' terms; (2) that LP was never issued a "formal" or "final" WO by the USPS, thereby precluding LP's recovery or entitlement; and (3) none of the elements necessary to establish implied in fact contracts have been met. The Government is wrong on all three points.

#### 1. Plaintiff's Background and History

LP is a construction contractor specializing in performing USPS work orders or Indefinite Quantity construction contracts for, *inter alia*, the renovation, repair and upkeep of USPS facilities located in the Midwest, particularly in Illinois, Indiana, Missouri, Michigan and

Wisconsin (also known as the USPS Great Lakes Region). PSUF 2 *et seq.*[1] LP has also performed many projects for the USPS in support of the USPS's efforts to bring its facilities into compliance with the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*. *Id.*

Since LP's formation in 1993, LP has been awarded no less than twelve (12) indefinite quantity contracts by the USPS, including Contract Nos. 162640-94-B-0083 (which lapsed in May 1997, following a one-year time extension) (App. 36-153) (the "94 IQC"), as well as the two follow-on IQC contracts which are the subject of the current litigation, numbered 162640-96-B-0094 and 162640-96-B-0098 (App. 155-256) (the "IQCs"). 2nd Am.Compl. §§ 6-7; PSUF 4-8. These two IQC contracts were entered between LP and the USPS on June 6, 1996 and June 3, 1996, respectively. *Id.* Each IQC had a two-year term with an initial minimum requirement of $10,000.00 during said term. *Id*. As discussed herein, the IQCs were effectively treated by the USPS and its personnel as a follow-on to the 94 IQC. PSUF 9.

**2. LP's Claims and Causes of Action.**

Without "rehashing" the full statement of the claims which resulted in the current case, LP submitted claims on March 3, 1998 on: (1) Berwick Modular Post Office; (2) Hoopeston Handicap Ramp; (3) Downers Grove Dock Enclosure; and (4) Brookfield Ramp and Dock Enclosure. App. 32-35, PSUF 10. That first claim was subsequently resubmitted as a certified claim on April 13, 1998. App. 26, PSUF 10. Another claim, which is also the subject matter of this case, was filed on April 13, 1998 on the following additional projects: (5) Aroma Park Interior Lobby and Building Renovation; (6) Beaverville Lobby and Building Renovation; (7) Bradley Concrete Ramp, Lobby and Building Renovation; (8) East Lynn Building

---

[1] The term "PSUF" references Plaintiff's Proposed Findings of Uncontroverted Fact, filed simultaneously with this Brief. References to the Government's Appendix are identified as "App. ___"; references to LP's Appendix are referenced as "LP App. __".

Renovation; (9) Momence Concrete Ramp; (10) Papineau interior renovation and Ramp; (11) St. Anne concrete & asphalt, with interior renovations; and (12) Union Hill Interior and Exterior Ramps. App. 29-31; *see also*, PSUF 10.

This underlying action involves LP's entitlement to damages based upon the formation of a series of 12 implied-in-fact contracts which arose out of the parties' course of conduct as related to, *inter alia*, the 12 scopes of work or work orders (the "WOs") which were prepared by LP in response to the direction and instruction of authorized USPS personnel.[2] PSUF 10 *et seq*. More particularly, and as established by the appended Plaintiff's Statement of Uncontroverted Fact (which is incorporated herein by reference), nowhere in the two IQCs or the predecessor 94 IQC contract, was LP expressly required to perform site visits, self-perform or develop scopes of work, pricing or work orders, submit those work orders, or other documents which would thereafter result in the formalization of a work order. PSUF 14-15; App. 41, 54, 157. Instead, under the 94 IQC and IQCs language, the WOs were to be prepared internally by the USPS. *Id.*, PSUF 14-15. However, the parties' course of dealing demonstrates that the parties had a different arrangement under all three contracts.

### 3. The Parties' Course of Dealing.

The deposition testimony of LP's Richard Battaglin, as well as the USPS's contracting officer, Mr. Rigsby and USPS project managers, Messrs. Southern and McNabb, reveals that there was an on-going, consistent course of dealing on not only the subject 12 WOs, but also the more than 90 WOs issued under the IQCs and the 94 IQC. *See generally*, PSUF. This course of conduct, distilled down to its basics, consisted of the following:

---

[2] Those 12 WOs are generally located at App. 584 *et seq.*

(1) On each and every WO issued under the IQCs (save two) – numbering a total of 98 separate WOs – as well as the 12 WOs which form the basis of the pending complaint, Mr. Battaglin would be *directed* by Mr. Rigsby, or with Mr. Rigsby's knowledge and assent, the USPS Project Managers under his direct control and direction, to perform numerous site visits throughout the applicable postal geographic area. PSUF 15 *et seq.*

(2) The USPS's directions compelled LP to perform site visits at LP's up-front cost and time to meet with the applicable postmaster and/or project manager; perform detailed site/field surveys of each project (which included measurement of the work items needed to be repaired, demolished and/or installed); and self-prepare and submit to the USPS at least 96 written work orders, in addition to the subject WOs (located at App. 584, *et seq.*). *Id.*

(3) Other than the 12 WOs involved in this case, on virtually every other occasion when LP submitted a written WO in response to the USPS direction to perform the various site visits, LP was subsequently awarded a "formal" work order. *Id.* Those "formal" work orders, for the most part, simply took LP's work product and placed it in a computerized format issued by the USPS's FMSWin System. *Id.*

(4) USPS personnel directed LP to visit the 12 projects involved in the current case as the following chart demonstrates:

| POST OFFICE NAME | DATE OF SITE VISIT | USPS ORDERED LP TO PERFORM SITE VISIT? | USPS PERSONNEL WHO MET LP AT FACILITY | LP WORK ORDER PREPARED (APP. NO) |
|---|---|---|---|---|
| Hoopeston | 11/14/95 | Yes | Paul Steiner | Yes (App. 654) |
| Momence | 5/24/96 | Yes | Sam Southern | Yes (App. 598) |
| St. Anne | 5/24/96 | Yes | Sam Southern | Yes (App. 584) |
| East Lynn | 10/17/95 | Yes | Paul Steiner/Jesse McNabb | Yes |
| Aroma Park | 9/95 | Yes | Paul Steiner/Catherine | Yes (App. 618) |

| | | | | |
|---|---|---|---|---|
| | | | Marks | |
| Papineau | 9/95 | Yes | Paul Steiner/Catherine Marks | Yes (App. 626) |
| Beaverville | 9/95 | Yes | Paul Steiner | Yes (App. 615) |
| Union Hill | 8/15/95 | Yes | Paul Steiner/Catherine Marks | Yes (App. 612) |
| Bradley | 9/95 | Yes | Paul Steiner | Yes (App. 629) |
| Berwick | 9/16/96 | Yes | Bruce Rothermal | Yes (App. 639) |
| Downers Grove | | Yes | Jesse McNabb | Yes (App. 652) |
| Brookfield | 8/96 | Yes | Jesse McNabb | Yes (App. 643) |

As testified to by Mr. Battaglin, the document at LP App. 29 (Southern Depo. Ex. 10), was a contemporaneous record of a number of the subject site visits, reflecting the facility, the initials of the USPS representative who met with Mr. Battaglin at the site and the date that USPS personnel met with Mr. Battaglin at the respective USPS facilities. PSUF 25.

A critical defect with the Government's Motion is the total absence in the record of any contemporaneous document prepared or presented by the USPS refuting that these site visits happened, that USPS personnel were not there, that those site visits were not USPS-authorized, or that the subject WOs were rejected or not otherwise accepted. To the contrary, while the Government's witnesses have difficulty recalling specifics, they admit that many site visits with LP occurred. LP App. 197, 228, 254; *see generally*, LP App. 113 *et seq.*

(5) The USPS's directions constituted authorized directions from the USPS, either coming directly from Mr. Rigsby, the contracting officer, or his subordinate Project Managers, who testified that they were directed and authorized to act on Mr. Rigsby's behalf and direct LP to perform such site visits. LP App. 232-233; 249-250; *see also*, LP App. 202A.

(6) As a direct and proximate result of the USPS's breaches of the twelve implied-in-fact contracts, LP has been damaged.

The IQCs did not require LP to self-prepare and submit work orders to the USPS, and nowhere has the USPS in its Motion directed the Court to such language. App. 36 *et seq.*; App. 52 *et seq.*, App. 154 *et seq.* Despite this, the parties' actual course of conduct in performing and administering these IQC contracts, including the 12 WOs which are the subject of the current litigation, created the current situation.

In response to the Government's direction, LP was required by the USPS (either expressly or constructively) to incur its own costs and risks to travel to USPS facilities; prepare and submit work orders. PSUF 13, 17-24. The record further establishes that on each of those occasions, including the 12 WOs at issue in this case, LP had a reasonable expectation that it would thereafter receive that work and as a result thereof would earn, *inter alia*, a reasonable profit on that work. PSUF 13 *et seq.*

Despite the Government's claims to the contrary, there are a number of disputed material facts which plaintiff has addressed in its response to Defendant's Proposed Findings of Uncontroverted Fact. Moreover, LP submits that its undisputed material facts support Plaintiff's claims for breach of implied-in-fact contract as well as breach of the implied duty of good faith and fair dealing and breach of the USPS's duty to provide LP a fair opportunity to be considered for the subject 12 WOs. The implied-in-fact contracts were formed upon the Government's directing LP to travel to the various 12 projects, LP performing the field surveys, and when LP thereafter submitted the WOs to the USPS. It was at that point in time that these contracts were formed; and thereafter the USPS breached the contracts preventing LP from realizing its expected profit.

## III. ARGUMENT

### A. Standard for Summary Judgment & Cross-Motion for Summary Judgment

Summary judgment may be properly granted only where "there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law." *N.R. Acquisition Corp. v. United States*, 52 Fed.Cl. 490, 494 (2002). Similarly, "[s]ummary judgment is not appropriate where there are disputes over facts that might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Thus, summary judgment will not be granted if 'the dispute about a material fact is 'genuine.''" *Id.* Where the opponent to a motion for summary judgment points to "an evidentiary conflict created on the record by at least a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant," summary judgment may not be granted. *Id.*

Likewise, where there are counter-motions for summary judgment pending before the Court, the Court should "'evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Id.* at 495 (*quoting, Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir. 1987)).

Finally, any doubt as to whether summary judgment is appropriate should be resolved against the moving party. *Erco Industries, Ltd. v. Seaboard Cost Line Railroad Co.*, 644 F.2d 424 (5th Cir. 1981). Also, the moving party shoulders the burden of proving that no question of material fact exists, *Adickes v. Kress and Co.*, 398 U.S. 144, 157 (1970).

### B. The Government's Motion for Summary Judgment Should Be Denied.

Interestingly, the Government's Motion relies heavily upon a massive appendix consisting of 689 pages. The sheer volume of the appendix suggests that issues of material fact

exist, precluding the Court's granting of the Government's motion. At the very least, this Opposition, LP's responses to the Defendant's Proposed Statement of Uncontroverted Fact, LP's PSUF and Appendix, identify serious disputes of material fact as to the Government's defenses. The documents appended to LP's Appendix as well as its responses to the material, substantive issues raised in the Government's purported statement of uncontroverted facts reveals that, in actuality, those substantive facts are "controverted," thereby requiring a denial of the Government's Motion for Summary Judgment.

**C. Summary Judgment Should be Granted to LP.**

LP's Proposed Statement of Uncontroverted Facts, this Memorandum of Points and Authorities and LP's Appendix collectively establish that LP is entitled to entry of Summary Judgment. When taken as a whole, it is indisputable that over the life of the IQCs, and the predecessor 1994 IQC, the parties' course of conduct waived any requirement for a formal, written work order; the USPS's conduct either through Mr. Rigsby or his authorized subordinates resulted in an enforceable course of dealing such that LP would perform site visits and self-develop WOs on over 90 separate projects, including the subject 12 WOs; and LP reasonably could expect to receive those WOs and earn a reasonable profit.

For the reasons discussed below the Court should grant LP's Cross-Motion for Summary Judgment.

**D. LP Has Established The Existence Of Implied-In-Fact Contracts For The 12 Disputed Work Orders.**

The requirements for an implied-in-fact contract are well established:

(1) Mutuality of intent to contract

(2) Consideration

(3) Lack of ambiguity in offer and acceptance; and

(4) A government representative whose conduct is relied upon must have actual authority to bind the government in contract.

*Folden v. U.S.*, 56 Fed. Cl. 43, 52 (2003) (*citing*, *Barrett Refining Corp. v. U.S.*, 242 F.3d 1055, 1060 (Fed.Cir. 2001)).

L.P. submits that all four requirements are met. Alternatively, there exist several triable issues that require denial of USPS's Motion for Summary Judgment.

**1. The Parties' Course Of Dealing Establishes The Mutuality Of Intent To Contract.**

The Court of Claims has repeatedly recognized that an implied-in-fact contract is similar to a "formal", traditional contract, with the sole material difference being the fact that "proof of an implied-in-fact contract is circumstantial", *OAO Corp. v. United States,*, 17 Cl.Ct. 91, 99 (1989); which arise not from "an express contract, [but] is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *USPS Motion* at 10-11 (*quoting*, *Porter v. United States*, 204 Ct.Cl. 355, 356, 496 F.2d 583, 590 (1974), *cert. denied*, 420 U.S. 1004 (1975)); (remaining citations omitted).

It is also well established that intention to make a promise may be manifested in language or by implication from other circumstances, including course of dealing, usage of trade or course of performance. *Hanlin v. U.S.*, 50 Fed. Cl. 697, 699 (2001), *affd.* 316 F.3d 1325 (2003); Restatement (Second) of Contracts, § 4 cmt. a (1979).

A course of dealing is a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct. Restatement (Second) of Contracts § 223 (1979). As noted in comment (b) to Restatement Section 223, there is no requirement that an agreement be ambiguous before evidence of a course of dealing can be shown, nor is it required

that the course of dealing be consistent with the meaning the agreement would have apart from the course of dealing.

While not precisely identical to the facts of the case-at-bar, the Postal Service Board of Contract Appeals has found under like circumstances that the course of conduct of a contracting officer and his subordinates, can result in a waiver of USPS contract requirements for, *inter alia*, the issuance and receipt of written authorization to perform work, including issuance of a "formal" USPS work order.

*City Window & Construction Company*, PSBCA No. 4563, Dec. 14, 2001, 02-1 BCA ¶31,706, was such a case, involving a very similar IQC contract with substantially identical terms to those in the subject IQCs (including having a two year term, USPS-determined unit prices, and a contactor multiplier), as well as a mandate that all work orders and changes be issued in writing. Over the course of the 31 work orders issued by the USPS to the contractor, "[a] practice developed between Appellant and Respondent in performing these 31 work orders in which oral directions for additional work were issued by Respondent's employees, with the paperwork to reflect the oral instruction prepared at a later date." *Id.* at Finding 4. At the verbal direction of the contracting officer's subordinate, an architect, the appellant was verbally directed to perform additional work. *Id.* The USPS took the position (as it does here) that the failure to receive the contracting officer's written authorization prior to proceeding with the work in question barred recovery. Appellant claimed that the USPS's conduct on the prior work orders issued under the contract created a course of dealing between the parties which "acted to waive the contract's requirement that written authorization from the contracting officer was necessary before Appellant could proceed with additional or changed work under the work order." The Board agreed, finding:

> We agree with Appellant. Throughout Appellant's performance on 31 previous work orders under the same contract, a course of dealing was established between the parties in which Appellant was orally authorized to proceed with additional work, and was later allowed to submit a change order request and be fully compensated for the additional work . . . some instances, a partial work order was issued to Appellant with the understanding that additional work necessary to complete the project in accordance with the original design would be added to the project after award of the work order. . . . Thus, Appellant reasonably complied when it was instructed by [USPS]'s architect, . . . , to delete from Appellant's proposed work order numerous line items . . . .

*Id.*

The Board further found that the contractor repeatedly submitted documentation memorializing the various oral instructions that it received from the USPS personnel, but that

> [n]either the contracting officer [nor the architect] ever responded to, or acknowledged these transmittals. However, by virtue of their prior course of dealing, the contracting officer[']s instruction to Appellant to take directions on the project from [the Architect] and [USPS]'s failure to take any contrary actions when notified of instances of extra work, [USPS] waived the contract's requirement that additional work must be authorized in advance by the contracting officer in writing. . . .

*Id.* (*citing*, *Gresham & Co. v. United States*, 470 F.2d 425, 554 (Ct.Cl. 1972); *David Finley,* PSBCA No. 3922, 98-2 BCA ¶29,989; *Robert E. Davis*, PSBCA No. 3400, 94-3 BCA ¶27,164). The Board further found that ". . . the waived requirement for written authorization before proceeding with additional work may not be revived to the prejudice of Appellant after it has changed its position in reliance on the supposed waiver." *Id.* at 13-14 (*citing*; *Gresham & Co. v. United States*, *supra* at 555).

In the case at bar, LP performed over 90 work orders under the 1996 IQCs and the 94 IQC. PSUF 15 *et seq.* On each of the 90-plus work orders issued under the 1994 and 1996 IQC contracts, the USPS directed and instructed LP to travel to the various facilities, to perform detailed field surveys, and to determine what work was required, including meeting with USPS

Post Masters and/or Project Managers at the various facilities. PSUF 15 *et seq.* Based thereon LP was then instructed to prepare and submit work orders, including the 12 WOs. PSUF 16, 18, 20 *et seq.* Thereafter, for each and every one of those submitted work orders, with the exception of those in dispute in this case, the USPS would review, approve and issue "formal" work orders to LP. The "formal" work orders were a mere formality. PSUF 13, 15.

Thus, a consistently applied, longstanding course of dealing was established between the parties with respect to the over 90 previous work orders issued under the same contracts. *Id.* Namely, in response to the Government's direction LP was required by the USPS to incur its own costs, time and risks to travel to, prepare and submit work orders. Mr. Battaglin's affidavit further establishes that on each of those occasions work orders were issued, as a formality, the work was performed and LP was paid. PSUF 16, LP App. 6, ¶ 17.

This same course of dealing was employed with respect to the disputed WOs. LP submits that the prior course of dealing, substantially stronger than that present in *City Window*, satisfies the mutuality of intent to contract requirement.

The Government claims that LP performed these 12 site visits of LP's own volition, purportedly without the consent and/or approval of the Government. Nothing can be further from the truth. On each occasion, the site visits were with USPS personnel, at mutually agreed upon times and locations. PSUF 16. Likewise, on each occasion, LP submitted the WOs to the USPS with no opposition or dispute at the time. Amazingly, within a short time after LP prepared and submitted these 12 WOs, the USPS admits that it went out and decided to formally compete the almost identical work for many of the same facilities (all to the exclusion of LP). This is, to say the least, a most curious coincidence. *See generally*, USPS App. 291, 304, 317-18, 324, 339, 344, 372, 449.

Messrs. Rigsby, Southern and McNabb acknowledged in their depositions that once the USPS decided that work should be performed under an IQC (whether it be LP's or another IQC) the competition was over. LP App. at 212:21; 219:12. Once the USPS decided to use LPs IQC contracts to perform work at a given facility, there was no further discretion in the USPS personnel nor any need for competition. *Id.* The competition was long since over. By directing LP to prepare the 12 WOs, the USPS determined that the work in question was to be IQC performed, and to be performed by LP. Only later, after LP submitted its WOs, was this determination mysteriously reversed and competed, again with LP excluded from those competitions.

LP submits that this lengthy, consistent course of dealing by the parties, establishes the necessary mutuality of intent to contract on the subject 12 WOs.

**2. LP Was Directed to Perform the Site Visits, Prepare and Submit the WOs By Authorized USPS Personnel. Alternatively, the USPS's Actions Should Be Imputed to the Contracting Officer.**

In interpreting and applying the USPS procurement regulations and procedures, the PSBCA has routinely held the contracting officer to a relatively high standard, while also holding him (or her) responsible for their subordinates' actions.

For example, in *Overflo Public Warehouse, Inc.*, PSBCA No. 4531, 4550, 4649, Dec. 18, 2003, 04-1 BCA ¶32,488, the Board discussed the fact that the contracting officer's representatives were not expressly authorized under the contract to require the respondent to provide services or purchase supplies:

> for which payment was not required. [] Nevertheless, invoices plainly reflecting the nature and amount of these charges were regularly and repeatedly submitted by Appellant, approved by the CORs and paid by Respondent through the three years of this contract, until October 1999, and for at least four years of the predecessor contract. . . . Furthermore, . . . senior officials of [the

> USPS] . . . knew that [USPS] was being charged for and paying for supplies and dumpsters under this and its other . . . contracts. . . . *Given this long and universal practice of [USPS] in paying these expenses and the widespread knowledge thereof among postal officials, if the contracting officer did not know of the practice, he should have, and such knowledge will be imputed to him.*

*Id.* at 160,710 (citing, *Gresham v. United States*, 200 Ct.Cl. 97, 120, 470 F.2d 542, 556 (1972); *City Window*, *supra*; *David Finley*, *supra*; *Glenda R. Whitaker*, PSBCA No. 3443, 94-2 BCA ¶26,643) (emphasis added).

Given this finding, the Board concluded that the parties' conduct acted to modify the contract provisions and permit Appellant to recover the damages claimed.

In this case, as discussed in detail above, Mr. Rigsby routinely requested LP to perform site visits and submit work orders (which with the exception of the current twelve WOs, were consistently approved by him). Likewise, Mr. Rigsby as contracting officer, authorized and/or directed his subordinate Project Managers Southern, McNabb, Steiner, Rothermal and/or Marks to also order LP to take such actions. PSUF 17, 20, 25, 53, 54. As in *Overflo*, given the on-going, consistent course of conduct between the USPS and LP, Mr. Rigsby knew or "should have known" that his subordinates had been taking these actions both under the IQCs, and the predecessor 94 IQC contracts over an extended period of time. Under these circumstances, the USPS's conduct and that of its employees/project managers is imputed to Mr. Rigsby, and thus the USPS. As a result, in addition to Mr. Rigsby acting within his actual authority, USPS is also bound by the actions of his subordinates.

**3. There Is No Ambiguity As To The Offer And Acceptance.**

Similarly, there can be no question that the parties' conduct and the on-going course of dealing precludes any finding that the "offer and acceptance" in these twelve implied-in-fact contracts contains any hint of ambiguity.

The creation of a legally enforceable contract through a "meeting of the minds depends upon the totality of the factual circumstances." *Howard Nettleton*, PSBCA No. 3454, June 28, 1994, 94-3 BCA ¶27,038 (citations omitted). In that case, the USPS argued that because no written lease was signed, the claimant could not recover damages for building improvements which claimant made which the parties verbally agreed would be reimbursed through a lease. "That no lease was entered into and that the parties contemplated that the lease document would provide for payment for the improvements does not preclude a finding of a meeting of the minds is the parties intended that the lease would only memorialize the agreement previously reached." *Id.* (*citing*, *Russell Corp. v. United States*, 354 F.2d 474, 482 (Ct.Cl. 1976) *cert. denied* 429 U.S. 1073 (1977); *Penn-Ohio Steel Corp. v. United States*, 354 F.2d 254, 266-67 (Ct.Cl. 1965) (remaining citations omitted). Likewise, the board concluded that the mere "absence of an express agreement on the price of the improvements does not necessarily establish as a matter of law that there was no meeting of the minds." *Id.* (citations omitted). The USPS also argued in that case that absent a written contract and given the postal regulations requiring a written lease, recovery was precluded. The Board rejected that argument, finding as a matter of law that the USPS had failed to establish this writing requirement. *Id.*

*Nettleton* involved but one contract or event which permitted the possible finding of an implied-in-fact contract. The current case involves two IQCs (App. 52, 157), their predecessor IQC (App. 36) and 98 separate work orders. There are undisputed facts in the record allowing the

Court to find that there was a meeting of the minds and that there was no ambiguity as to the parties' intentions. In exchange for LP's submission of the WOs (at the USPS's direction), LP would be awarded those WOs and earn the profits to which it was reasonably entitled. PSUF 16, 21, 41, 42, 46, 47, 50, *et seq*. Given the totality of the circumstances, the parties' agreements were unambiguous.

The parties' clear actions and course of conduct throughout these IQCs establish the offer and the resulting acceptance in a clear, unambiguous and consistent manner. This course of conduct leading up to LP's submission of the 12 WOs allows the Court, as a matter of law, to find the existence of the claimed twelve implied-in-fact contracts.

In conclusion, LP has met all four requirements. Accordingly, LP submits that the Court should find as a matter of law that LP and the USPS entered into implied-in-fact contracts for the twelve disputed work orders.

**E. The USPS Breached Its Duty To Give LP a Fair Opportunity To Be Considered for All 12 Work Orders.**

Plaintiff's Second Amended Complaint (as well as its Original and First Amended Complaints) specifically allege that LP has not been treated "fairly." (2nd Amend. Compl. ¶ 12). In the "Facts Common to All Counts" section of the Second Amended Complaint LP specifically alleged that it had "not been treat fairly" by virtue of the specific actions of USPS, including the fundamental allegation in this case that the USPS would take LP's draft work order, seek bids from contractors not bound by an IQC, and thereafter grant a notice of award to another contractor on a fixed price contract. (¶ 21). *See also*, ¶¶ 20 and 25 each of which alleges that LP Consulting was not treated fairly. The Second Amended Complaint also alleges for each of the 12 counts that the USPS breached its duty to treat LP fairly. (*Id*. at ¶¶ 36, 43, 49, 55, 61, 67, 72, 78, 83, 89, 95 and 101).

In addition, the obligation to treat LP fairly is mandated by the applicable USPS regulations. Specifically, Purchasing Manual Chapter 6, § 6.1.2a4 states that the contracting officer is responsible for "making decisions and determinations that affect contract performance fairly, impartially, and in accordance with Postal Service policy and applicable law . . . ." LP App. 15 (emphasis added).

LP reasonably understood that this regulation required at a minimum, that it would be provided an opportunity to compete for the subject task orders. PSUF 41.

Moreover, the USPS's obligations under its own regulations do not state a point at which they will no longer apply to its contractors. If the requirement is ignored simply because the USPS ordered the guaranteed minimum from a contractor, the clause becomes meaningless.

In both *Community Consulting International,* ASBCA No. 53489, 02-2 BCA ¶ 31,940 and *Burke Court Reporting Company*, DOT BCA No. 3058, 97-2 BCA ¶ 29,323, the ASBCA and DOT Boards of Contract Appeal considered fact patterns similar to the case at bar. The Board in *Burke* rejected the argument that the government's duty of good faith and fair dealing ends when an IDIQ's guaranteed minimum has been ordered from a contractor.

*Community Consulting* is of particular interest since that case deals specifically with the duty to consider the contractor "fairly," rather than the implied duty of good faith and fair dealing. Significantly, in distinguishing *Travel Centre v. Barram*, 236 F.3d 1316, 1319 (Fed.Cir. 2001), a case relied upon by the Government, the Board observed: "While the minimum quantity represents the extent of the government's purchasing obligation, however, it does not constitute the outer limit of all of the government's legal obligations under an indefinite quantity contract." *Id.* at 157, 789.

Interestingly, the facts in *Community Consulting* were significantly more extreme than those present in the case at bar. In that case the appellant had received 34 times the $50,000 minimum guaranteed in the contract. In spite of that, the Board denied the government's motion relying on a provision in the contract stating that each contractor had the opportunity to compete for awards up to the ceiling and a provision which implemented the fair opportunity requirement under the FAR.[3] In doing so the Board observed:

> While the indefinite quantities clause of the contract only obligates respondent to order a specified dollar amount of services, a bidder has a right to rely on other contract provisions implying that it will be fairly considered for additional work, if required by the government.

*Id.* at 157, 789. The Board further noted that "whether the contracting officer considered appellant fairly for task orders . . . raises factual issues that cannot be resolve by summary judgment." *Id.* at 157, 790 (*quoting, Burke Reporting, supra*, 97-2 BCA. at 145,801).

It is also pertinent to note that Community Consulting's fundamental factual allegation was essentially the same as that posited by LP. Specifically, Community alleged that it was given the opportunity to bid on only 26 of a total of 51 orders awarded. The board considered that to be a sufficient allegation to create a triable issue with respect to whether or not the contracting officer considered appellant fairly for task orders.

Here, LP's allegations are substantially more formidable than those in *Community Consulting*. LP first makes a similar allegation, namely that it was prevented from competing for the subject work orders. *See generally*, 2nd Amend. Compl. The evidence will show that with respect to each of the 12 work orders LP was not treated fairly in that it was not given the

---

3 While not directly applicable to USPS, 41 U.S.C. § 253j(b) requires that all contractors holding a multiple award task order contract be provided with a "fair opportunity" to be considered for each task order except in four circumstances none of which are present in this case. The implementation of this statutory requirement is found at 48 C.F.R. 16.505.

opportunity to compete for the work. In addition, as the Government's own appendix shows,[4] the contracting officer simply decided, to the detriment of LP's legitimate economic and financial interests, that LP had received enough work and that it would not be allowed to compete on future work orders. LP App. 214 *et seq.*, Rigsby Depo. 113. In spite of that unfair and unreasonable determination, USPS continued to avail itself of the established course of dealing between the parties. As alleged in detail in the Second Amended Complaint, the USPS repeatedly requested, either through the contracting officer or his duly authorized representatives that LP travel to numerous rural postal facilities, meet with either the Post Master and/or the Project Manager/AE, perform a detailed field survey and develop and submit a work order for each project. *See generally,* PSUF.

However, unlike the prior 96 work orders when LP followed-up with the USPS, on the disputed 12 WOs it was informed by Mr. Rigsby that Mr. Fernandez, the architect/engineer was "suddenly in the process of soliciting them competitively." PSUF 27-30. LP attempted to be included in the competitive process. *Id.* But for reasons not reflected in the record LP was excluded from the solicitation process for all competed projects. *Id.* [5]

---

[4] *See, e.g.*, App. 11 at ¶¶ 32, 40, 45, 60.

[5] It should be noted that Mr. Fernandez's participation in the various formally competed projects which are included in the Government's appendix, include Aroma Park, Berwick, Bradley, Brookfield dock enclosure, Brookfield ramp, Downers Grove, Hoopeston, Momence, and Paxton. Mr. Fernandez subsequently pled guilty and served a prison sentence at Terre Haute Federal penitentiary, for perjury on his tax returns. More particularly, and as addressed in LP App. 37-110, Mr. Fernandez received payments or "kickbacks" from various contractors, including several which bid on and/or received award on certain of these projects. LP App. 42. The general time frame in which Mr. Fernandez received these monies was between 1995 and 1998, the same time frame involving this suit. Also of note is that these monies were received from the following contractors: Ulbrich & Associates; Hans Rosenow Roofing; Ram Corp., Inc.; Concrete By Wagner, Inc.; and R.J. Custom Builders, a number of whom received the formally competed contracts from which LP was excluded. *Id.* Mr. . Fernandez also "admitted paying $1,000 to a Postal Service official in an effort to buy influence." *Id.*

Finally, the facts show that when LP became aware that several of the subject work orders had been solicited it protested to Mr. Rigsby, the contracting officer. Thereafter, LP was no longer contacted by the USPS to produce scopes of work or perform work under its IQCs, although the USPS never provided any explanation, excuse or reason. PSUF 33-36.

Thus, in *Community Consulting* the Board denied a government motion to dismiss, which it treated as a motion for summary judgment, based on the sole allegation that appellant had not been allowed to compete on certain work orders. Here, the facts as alleged, and as supported by the evidence of record, are significantly stronger. LP was not allowed to compete for the 12 disputed WOs. *Id.* In addition the contracting officer, for reasons which LP submits are pretextual, made a determination that LP had received enough work and would not be allowed to compete on either the 12 disputed work orders or any future work orders. LP App. 214. The egregiousness of the USPS' actions is exacerbated by the fact that the USPS continued to conduct itself as it had in its well established course of dealing and requested and obtained LP's work effort in the form of the draft WOs at considerable expense to LP. However, contrary to the established practice, USPS did not award those WOs to LP, and even prevented LP from participating in the competitive bid process for the work orders.

LP submits that these allegations are considerably stronger than those in *Community Development* and warrant granting LP's Cross-Motion for Summary Judgment. Alternatively, at a minimum triable issues of material fact exist as to whether or not the USPS complied with its obligation to give LP a fair opportunity to compete.

---

Of further note is the fact that shortly after his retirement from the USPS, Contracting Officer Rigsby worked as an employee/contract employee for Mr. Fernandez. LP App. 206A, Rigsby Depo. at 72-73.

### F. The USPS Breached Its Implied Duty of Good Faith and Fair Dealing.

Every contract carries with it an implied promise that the parties will act in good faith and will deal fairly during the administration of that contract. Restatement (Second) of Contracts § 205 (1981); *P.R. Burke Corp. v. United States,* 277 F.3d 1346 (Fed. Cir. 2002). "The need for mutual fair dealing is no less required in contracts to which the government is a party, then any other commercial arrangement." *Maxima Corp. v. United States*, 847 F.2d 1549, 1556 (Fed. Cir. 1988). As a party to the IQC contracts USPS owed LP a duty of good faith and fair dealing.[6]

Although indefinite quantity contracts, such as those at issue, give broad discretionary rights to the government, such rights are not unlimited and the discretion must be exercised consistent with the government's duty of good faith and fair dealing. *Burke, supra*. Indeed, in many contexts where a contract appears to confer upon the government unfettered discretion the courts and boards of contract appeals have found an implied obligation of the government not to abuse its discretion and to act in good faith. *Monarch Enterprises, Inc.,* ASBCA No. 31375, 86-3 BCA ¶19,227 at 97,224.

*Burke Court Reporting Co.,* 97-2 BCA ¶29,323, is instructive. In that case, the Department of Justice entered into a multiple award IDIQ contract with two contractors to provide court reporting and deposition services. Appellant was awarded an amount almost double the guaranteed minimum, but received only a small fraction of the total work. The Board denied the government's motion for summary judgment finding that whether the contracting officer fairly considered Burke for orders in accordance with the terms of the contract raised factual issues with regard to whether the Government breached its duty of good faith and fair dealing that could not be resolved by summary judgment.

---

6 The Second Amended Complaint ¶ 12 specifically alleges that "the USPS breached the covenant of good faith and fair dealing with LP Consulting."

Interestingly, the provision in the solicitation that the Board based its decision on gave only very general guidance as to how a contractor would be selected. The USPS's Regulations similarly provide at 4.2.5b (LP App. 13A) that a contract will be awarded to the offeror whose proposal offers the best value to the Postal Service, considering the price and other evaluation factors identified in the solicitations. As noted above, the USPS regulations also contain an explicit requirement that the USPS treat its contractors fairly.

The facts show that the USPS (1) made a conscious decision to <u>exclude</u> LP from consideration for any of the 12 WOs and future contracts; (2) obtained free services from LP in connection with the preparation of the WOs; and (3) without explanation failed to award LP the WOs as it had consistently done 96 times previously. PSUF 15, 16.

These facts are substantially stronger than those which were deemed sufficient to result in the denial of the government's summary judgment motion in *Burke Court Reporting Company*. Accordingly, LP has alleged more than sufficient facts to create a triable issue as to the government's breach of its implied duty of good faith and fair dealing.[7]

**G. LP Is Entitled To Recover Its Lost Profits Caused by The Government's Breach.**

Contrary to USPS' assertion, this Court has clearly stated that when a "breach of contract is proven, damages may include compensation for pecuniary loss, such as profits that could have been realized but for the breach, that are a consequence of the breach." *Town of North Bonneville v. United States*, 11 Cl.Ct. 694, 726, *affd. in part, reversed in part* 833 F.2d 1024 (1987) *cert. denied* 485 U.S. 1007 (1988); *see, Big Chief Drilling Co. v. United States*, 26 Cl.Ct. 1276 (1992). Lost profits are properly viewed as a form of expectancy damages which protect a

[7] *See also, Hubbard v. U.S.*, 52 Fed.Cl. 192 (1992) (government's explanations were pretextual and its conduct was held to breach both the implied duty to make reasonable decisions and the implied duty of good faith and fair dealing).

plaintiff's interest to be placed in as good a position as he would have been in had the contract been performed. Restatement (Second) of Contracts Sect. 344(a) (1981). *Accord*, *Bluebonnet Saving Bank, F.S.B. v. United States*, 266 F.3d 1348, 1355 (Fed.Cir. 2001).

The requirements for obtaining lost profits in a breach situation were summarized in *LaSalle Talman v. United States*, 45 Fed.Cl. 64 (1999) as follows:

> In order to recover lost profits as damages for breach of contract, it must first appear that such loss is the immediate and proximate result of the breach. It must also be established that loss of profits in the event of breach was within the contemplation of the contracting parties either (1) because the loss was natural and inevitable upon the breach so that the defaulting party may be presumed from all the circumstances to have foreseen it; or (2) if the breach resulted in lost profits because of some special circumstances, those circumstances must have been known to the defaulting party at the time the contract was entered into. Finally, there must be established a sufficient basis for estimating the amount of profits lost with reasonable certainty.

*Id.* at 87-88 (*citing*, *Chain Bell Co. v. U.S.*, 127 Ct.Cl. 38, 58 (1953)). Thus, there are three requirements for recovery of lost profits: (1) causation, (2) foreseeability, and (3) reasonable certainty. *Energy Capital Corp. v. U.S.* 47 Fed.Cl. 382, 393 (2000) *affd. in part, revd. in part on other grounds*, 302 F.3d 1314 (Fed.Cir. 2002). *Accord*, *Rumsfeld v. Applied Companies, Inc.*, 325 F.3d 1328 (Fed. Cir. 2003).

LP has satisfied these requirements. Mr. Battaglin's affidavit establishes that if the Postal Service had not breached the implied-in-fact contracts LP would have earned a profit of $135,377. LP App. 10, Battaglin Aff. ¶ 40. Clearly, the loss of that profit was the natural and inevitable result of the USPS's breach of the implied in fact contracts, such that USPS must from all the circumstances have foreseen it.

Further, given LP's and Mr. Battaglin's lengthy involvement with the USPS, both as a contract employee and contractor, coupled with his extensive experience of preparing and

performing over 200 USPS work orders of similar type and scope as the subject WOs, LP has provided a sufficient basis for proving its damages. Also, Mr. Battaglin has provided a sufficient basis for estimating the amount of profits which would have been earned with reasonable certainty. This is established by LP's historic profitability in performing over $1.5 million of similar USPS work on the current and prior USPS IQC contracts, as well as other comparable USPS contracts. *Id.*

Plaintiff's testimony of the profit it expected to make is more than sufficient proof of lost profits. *See generally*, *Century 21 Real Estate Corp. v. Meraj International Investment Corp.*, 315 F.3d 1271, 1282 (10th Cir. 2003); *Mississippi Chemical Corp. v. Dresser-Rand Co.*, 287 F.3d 359, 373-374 (5th Cir. 2002); *Glenn Distributors Corp. v. Carlisle Plastics, Inc.*, 297 F.3d 294, 304 (3d Cir. 2002); *Pullman v. Land O'Lakes, Inc*., 262 F.3d 759 (8th Cir. 2001); *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1176-78 (3rd Cir. 1993); *Securitron Magnalock Corp. v. Schnobolk*, 65 F.3d 256, 265 (2d Cir. 1995) (President of company had personal knowledge of his business sufficient to make him eligible to testify as to how lost profits could be calculated).

LP also notes that the Government's reliance on *Mega Construction Co., Inc. v. United States*, 29 Fed.Cl. 398, 475 (1993) is misplaced. *Mega* involved a case in which the claimant/appellant was properly terminated for default and sought recovery of lost profits due to its inability to gain further rework due to its bonding capacity being "tied-up" in the defaulted project. *Id.* at 474. Furthermore, the *Mega* court found that Plaintiff failed to provide proof that it had lost income and/or profits as a result of the default. Likewise, the court found that plaintiff's claim to be "too remote, consequential and speculative." *Id.* at 474 (discussing *Rhen v. United States*, 17 Cl.Ct. 140 (1989)).

In this case, the lost profits sought do not arise out of a default termination (or as suggested by the USPS in its Motion at 32-33) a termination for convenience. Instead, there was no termination. LP App. 10, Battaglin Aff. ¶ 41. In addition, the lost profits sought by LP are directly related to the subject IQCs, and therefore clearly not remote or speculative. *Locke v. United States*, 151 Ct.Cl. 262, 283 F.2d 521 (Ct.Cl. 1960) (lost profits neither speculative nor remote where caused directly by Government's material breach of contract).

Finally, the Government's attempt to quote *Mega* for the proposition that "[a]nticipated but unearned profit is not recoverable, even under a termination for convenience of the Government. . .." is also unconvincing. Motion at 31 (*quoting*, *Mega*, *supra*, at 475). The Government again takes this quote out of context. In *Mega*, this quote was utilized by the Court in discussing the fact that a termination ends a contactor's "association with the project on which it was terminated." *Mega* at 475. As noted, this discussion was in the context of a terminated contract, a situation which does not exist in the case at bar.

## H. The Breaches of Contract Can Be Established for Each and Every One of the 12 Implied-In-Fact Contracts Prepared by LP

### 1. The Six Projects – Beaverville, East Lynn, Papineau, St. Anne, Union Hill, Bradley.

The Government takes the unusual position of claiming that simply because the Government never awarded contracts on Beaverville, East Lynn, Papineau, St. Anne, Union Hill and Bradley, for the types of work scoped and submitted by LP, that somehow the USPS did not breach its implied-in-fact contracts on those six projects. The Government provides no citation to legal authority for this conclusion. Instead, the Government pulls this argument out of thin air, somehow trying to create a defense or excuse of its not allowing LP to go forward with performing these six projects.

Whether the Government elected to award that work to others is of no substance to LP's claims. The USPS breached the implied-in-fact contracts whether it decided to proceed or award the subject work to others.

**2. The Two Projects – Momence & Aroma Park**

The Government claims that the Momence and Aroma Park counts are based upon a claim that at the time those contracts were actually awarded to third-party contractors, LP's IQCs had lapsed or expired. This fact is, however, of no relevance. The implied-in-fact contracts involved in this action and the Government's breach of contracts thereunder, were formed prior to the expiration of the IQCs, thus rendering the Government's "lapse" argument of no consequence.

## IV. CONCLUSION

Based upon the foregoing, the Defendant has failed to meet its burden of proof. Not only has the Government failed to meet its summary judgment burden, but LP is entitled to summary judgment as a matter of law.

WHEREFORE, Plaintiff L.P. Consulting Group, Inc., moves the Court to Deny the Defendant, United States Postal Service's Motion for Summary Judgment and

GRANT Plaintiff's Cross Motion for Summary Judgment; and that the Court grant such other and further relief as it deems just and proper.

Respectfully submitted,

s/ Brian Cohen
Brian Cohen, Esq.
BELL, BOYD & LLOYD PLLC
1615 L Street, N.W., Suite 1200
Washington, DC 20036
(202) 955-6836 tel.
(202) 835-4117 fax.
Attorney of Record for Plaintiff
LP Consulting Group, Inc. Intervenor

Of Counsel:

Lawrence M. Prosen, Esq.
BELL, BOYD & LLOYD PLLC
1615 L Street, N.W., Suite 1200
Washington, DC 20036
(202) 955-6830 tel.
(202) 835-4127 fax

February 18, 2005

**Certificate of Service**

I hereby certify that on this 18th day of February 2005, a copy of the foregoing "Plaintiff's Consolidated Opposition to Defendant's Motion for Summary Judgment and Memorandum of Points and Authorities in Support of Plaintiff's Cross-Motion for Summary Judgment" was electronically filed. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

s/ Brian Cohen