No. 98-868C
(Judge Allegra)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

L.P. CONSULTING GROUP, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Kathryn A. Bleecker
KATHRYN A. BLEECKER
Assistant Director

s/Domenique Kirchner
DOMENIQUE KIRCHNER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit,
8th Floor, 1100 L. St., N.W.
Washington, D.C. 20530
Tele: (202) 307-0290
Attorneys for Defendant

OF COUNSEL:

STEPHEN D. LOBAUGH
United States Postal Sesrvice

April 6, 2005

## TABLE OF CONTENTS


I. The IQCs Required Issuance Of Written USPS Work Orders Before There Was A Contract For Work At A Facility .......... 3

II. LP Has Failed To Demonstrate A Waiver .......... 5

III. LP Has Failed To Demonstrate The Prerequisites Of An Implied-In-Fact Contract .......... 6

A. There Was No Offer .......... 7

B. There Was No Acceptance .......... 11

C. There Was No Acceptance By Silence .......... 14

D. The IQCs Contemplated Site Visits and Preparation of Proposals By IQC Contractors .......... 16

E. There Was No Acceptance By LP's Conduct .......... 17

IV. There Was Fatal Ambiguity As To The Terms .......... 18

V. There Was No Consideration .......... 20

VI. There Was Not Sufficient Action By An Official With Contracting Authority .......... 21

VII. LP Has Failed To Produce Evidence Of A Breach Of The IQCs .......... 22

VIII. Even If LP Established Breach, It Would Not Be Entitled To Its Anticipated Lost Profits .......... 29

## TABLE OF AUTHORITIES

### FEDERAL CASES

A-Transport Northwest Co. v. United States,
27 Fed. Cl. 206 (1992) .......... 28

Am-Pro Protective Agency, Inc. v. United States,
281 F.3d 1234 (Fed. Cir. 2002) .......... 28

American Capital Corp. v. United States,
58 Fed. Cl. 398 (2003) .......... PASSIM

Anderson v. United States,
344 F.3d 1343 (Fed. Cir. 2003) .......... 7, 13

Atlas Corp. v. United States,
895 F.2d 745 (Fed. Cir.), cert. denied,
498 U.S. 811 (1990) .......... 4, 5

Aviation Contractor Employees, Inc. v. United States,
945 F.2d 1568 (Fed. Cir. 1991) .......... 18

Banknote Corp. of America, Inc. v. United States,
365 F.3d 1345 (Fed. Cir. 2004) .......... 23

Boehm v. United States,
22 Cl. Ct. 511 (1991) .......... 28

Burke Court Reporting Co.,
97-2BCA ¶ 29,323 .......... 22

City Window & Const. Co., PSBCA No. 4563,
02-1 B.C.A. ¶ 31,706 (2001) .......... 6

Colonial Metals Co. v. United States,
204 Ct. Cl. 320,
494 F.2d 1355 (1974) .......... 11, 12

Community Consulting International, ASBCA No. 53489,
02-2 B.C.A. ¶ 31,940 .......... 22, 23

Cutler-Hammer v. United States,
194 Ct. Cl. 788,
441 F.2d 1179 (1971) .......... 7, 10, 11

Dairy Sales Corp. v. United States,
219 Ct. Cl. 431,
593 F.2d 1002 (1979) ........................................ 29

Federal Crop Insurance Corp. v. Merrill,
332 U.S. 380 (1947) ........................................ 21

Fuller Co. v. United States,
108 Ct. Cl. 70,
69 F. Supp. 409 (1947) ........................................ 28

Galen Medical Associates, Inc. v. United States,
369 F.3d 1324 (Fed. Cir. 2004) ........................................ 28

Gregory Lumber Co., Inc. v. United States,
11 Cl. Ct. 489 (1986) ........................................ 28

Gresham & Co. v. United States,
200 Ct. Cl. 97,
470 F.2d 542 (1972) ........................................ 5

H.F. Allen Orchards v. United States,
749 F.2d 1571 (Fed. Cir. 1984) ........................................ 6, 7

Haney v. United States,
230 Ct.Cl. 148,
676 F.2d 584 (1982) ........................................ 28

Hanlin v. United States,
316 F.3d 1325 (Fed. Cir. 2003) ........................................ 6

Howard Nettleton, PSBCA No. 3453,
94-3 B.C.A. ¶ 27,038 ........................................ 19

Huna Totem Corp. v. United States,
35 Fed. Cl. 603 (1996) ........................................ 28

ITT Federal Support Services v. United States,
209 Ct. Cl. 157,
531 F.2d 522 (1976) ........................................ 4

International Resource Recovery, Inc. v. United States,
60 Fed. Cl. 428 (2004) ........................................ 5

Kalvar Corp. v. United States,
211 Ct. Cl. 192,
543 F.2d 1298 (1976), cert. denied,
434 U.S. 830 (1977) ........................................ 27

Klebe v. United States,
263 U.S. 188 (1923) ........................................ 4

Librach v. United States,
147 Ct. Cl. 605 (1959) ........................................ 27

Lichtefeld-Massaro, Inc. v. United States,
17 Cl. Ct. 67 (1989) ........................................ 4

Massie v. United States,
166 F.3d 1184 (Fed. Cir. 1999) ........................................ 5, 7

Mega Construction Co. v. United States,
29 Fed. Cl. 396 (1993) ........................................ 29

Modern System Tech. Corp. v. United States,
979 F.2d 200 (Fed. Cir. 1992) ........................................ 18

New America Shipbuilders v. United States,
871 F.2d 1077 (Fed. Cir. 1989) ........................................ 3, 4

P. Francini & Co. v. United States,
2 Cl. Ct. 7 (1983) ........................................ 28

Rhen v. United States,
17 Cl. Ct. 140 (1989) ........................................ 29

Ridge Runner Forestry v. Veneman,
287 F.3d 1058 (Fed. Cir. 2002) ........................................ 20

Russell Corp. v. United States,
210 Ct. Cl. 596,
537 F.2d 474 (1976) ........................................ 12

Smith v. United States,
34 Fed. Cl. 313 (1995) ........................................ 28

SMS Data Products Group, Inc. v. United States,
19 Cl. Ct. 612 (1990) ........................................ 28

Spezzaferro v. Federal Aviation Administration,
807 F.2d 169 (Fed. Cir. 1986) .......... 28

Tornecello & Soledad Enterprises, Inc. v. United States,
231 Ct.Cl. 20,
681 F.2d 756 (1982) .......... 27, 28

Travel Centre v. United States,
236 F.3d 1316 (Fed. Cir. 2001) .......... 26, 27

United States Department of State v. Ray,
502 U.S. 164 (1991) .......... 27

United States v. Armstrong,
517 U.S. 456 (1996) .......... 27

Table of Contents Of Appendix

1. Declaration of Terri Jacobsen .......... 690

2. FMS Documents Re St. Anne Post Office .......... 693

3. Excerpts from IQC 162640-94-B-0083 .......... 700

4. LP USPS Work Order 31.00 for Sugar Grove .......... 772

5. LP USPS Work Order 31.01 for Sugar Grove .......... 779

6. LP USPS Work Order 49.00 for Millbrook .......... 785

7. LP draft work order/scope of work for Millbrook, 10/18/95 .......... 794

8. LP USPS Work Order 48.01 for Goodwine, 3/13/96 .......... 799

9. LP USPS Work Order 48.00 for Goodwine, 1/24/96 .......... 805

10. LP draft work order/scope of work for Goodwine, 10/13/95 .......... 811

11. LP USPS Work Order 41.01 for Claytonville .......... 815

12. LP USPS Work Order 41.00 for Claytonville .......... 816

13. LP USPS Work Order 10.00 for Millbrook .......... 817

14. LP USPS Work Order 49.01 for Millbrook, 3/26/97 .......... 818

15. LP USPS Work Order 49.02 for Millbrook, 3/26/97 .......... 819

16. LP USPS Work Order 3.00 for Thawville, 5/1/97 .......... 820

17. LP draft work order for Thawville, 4/28/97 .......... 831

18. LP USPS Work Order 4.00 for Roberts, 5/1997 .......... 839

19. LP USPS Work Order 7.00 for Rossville, 7/28/97 .......... 849

20. LP draft work order/scope of work for Rossville, 7/8/97 .......... 860

21. LP USPS Work Order 5.00 for Wellington, 10/21/97 .......... 868

22. LP draft work order/scope of work for Wellington, 9/5/97 .......... 877

23. LP Wellington Project Payment Authorization, 12/1/97 . . . . . . . . . . . . . . . . . . . . . . . . . . . 855

24. LP USPS Work Order 2.01 for St. David, 11/25/97 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 886

25. LP draft work order/scope of work for St. David, 8/25/97 . . . . . . . . . . . . . . . . . . . . . . . . . 890

26. LP draft work order/scope of work for St. David, 10/15/97 . . . . . . . . . . . . . . . . . . . . . . . . 891

27. LP St. David Contract Project Payment Authorization, 7/2/97 . . . . . . . . . . . . . . . . . . . . . 893

28. LP St. David Contract Project Payment Authorization, 12/15/97 . . . . . . . . . . . . . . . . . . . 894

29. LP St. David Contract Project Payment Authorization, 1/9/98 . . . . . . . . . . . . . . . . . . . . . 895

30. LP St. David Contract Project Payment Authorization, 6/4/98 . . . . . . . . . . . . . . . . . . . . . 896

31. LP USPS Work Order 1.00 for South Holland, 9/3/99 . . . . . . . . . . . . . . . . . . . . . . . . . . . 897

Downers Grove Lobby Renovation Documents

32. September 1996 USPS letter to LP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 899

33. Sept. 9, 1996 USPS letter to LP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 900

34. Sept. 9, 1996 USPS letter to LP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 901

35. LP USPS Work Order 20.00 for Downers Grove, 9/9/96 . . . . . . . . . . . . . . . . . . . . . . . . . 902

36. Site Visit Report, 10/2/96 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 912

37. Site Visit Report, 10/3/96 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 913

38. Oct. 3, 1996 LP letter to USPS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 914

39. LP Downers Grove Project Contract Payment Authorization, 10/4/96 . . . . . . . . . . . . . . . . 917

40. Oct. 4, 1996 USPS letter to LP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 918

41. Oct. 9, 1996 Report of Structural Engineer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 919

42. Site Visit Report, 10/10/96 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 920

43. Site Visit Report, 10/11/96 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 921

44. Site Visit Report, 10/14/96 .......... 922

45. Nov. 4, 1996 LP letter to USPS .......... 923

46. Nov. 5, 1996 USPS letter to LP .......... 924

47. LP Downers Grove Project Contract Payment Authorization, 11/7/96 .......... 925

48. LP draft work order/scope of work for Downers Grove, 11/13/96 .......... 926

49. LP draft work order/scope of work for Downers Grove, 11/13/96 .......... 928

50. Nov. 14, 1996 USPS letter to LP .......... 935

51. Nov. 15, 1996 LP letter to USPS .......... 936

52. Site Visit Report, 11/18/96 .......... 937

53. Site Visit Report, 11/19/96 .......... 938

54. Nov. 20, 1996 USPS letter to LP .......... 939

55. Site Visit Report, 11/25/97 .......... 940

56. Dec. 19, 1996 USPS letter to LP .......... 941

57. LP USPS Work Order 20.02 for Downers Grove, 12/18/96 .......... 942

58. LP Downers Grove Project Contract Payment Authorization, 12/18/96 .......... 950

59. Site Visit Report, 12/26/96 .......... 951

60. Jan. 7, 1997 LP letter to USPS .......... 952

61. LP Downers Grove Project Contract Payment Authorization, 1/10/97 .......... 953

62. Site Visit Report, 1/9/07 .......... 954

63. Site Visit Report, 1/14/97 .......... 955

64. Site Visit Report, 1/23/97 .......... 956

65. LP Downers Grove Project Contract Payment Authorization, 1/31/97 .......... 957

66. Site Visit Report, 1/29/97 . . . . . . . . . . 958

67. LP Downers Grove Final Project Contract Payment Authorization, 2/27/97 . . . . . . . . . . 959

Other Documents

68. Oct. 7, 1998 CO Rigsby Letter . . . . . . . . . . 960

69. A.M. Fernandez Brookfield Drawings, June 1996 . . . . . . . . . . 961

70. Somers USPS Work Order 4.00 for Momence, 2/26/99 966

71. Excerpt from Robert Rigsby Deposition . . . . . . . . . . 974

72. Declaration of Robert Rigsby . . . . . . . . . . 976

73. May 19, 1997 LP Financial Statement . . . . . . . . . . 1003

74. April 26, 1998 LP Financial Statement . . . . . . . . . . 1008

75. April 16, 1999 LP Financial Statement . . . . . . . . . . 1013

76. May 17, 1996 LP letter to USPS . . . . . . . . . . 1018

77. Declaration of John Buchholz . . . . . . . . . . 1019

78. Declaration of Paul Steiner . . . . . . . . . . 1025

79. LP draft work order/scope of work for East Lynn, 11/14/95 . . . . . . . . . . 1028

80. Declaration of Samuel W. Southern . . . . . . . . . . 1033

81. Excerpts from 1996 Diary of Samuel W. Southern . . . . . . . . . . 1038

82. LP draft work order/scope of work for St. Anne-lobby . . . . . . . . . . 1047

83. LP draft work order/scope of work for St. Anne-handicap ramp . . . . . . . . . . 1053

84. Excerpt from A.M. Fernandez Momence Drawings, August 1998 . . . . . . . . . . 1057

85. Excerpts from the Deposition of Richard Battaglin . . . . . . . . . . 1058

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| L.P. CONSULTING GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 98-868C |
| | ) | |
| THE UNITED STATES, | ) | (Judge Allegra) |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff L.P. Consulting Group, Inc. ("LP") claims that the United States Postal Service ("USPS") breached 12 alleged implied-in-fact contracts and seeks alleged lost profits. LP alleges that the 12 implied contracts arose out of three indefinite quantity contracts ("IQCs") between LP and the USPS. Despite explicit contract provisions governing this case, LP argues that the USPS waived the provision contained in all three IQCs providing for the issuance of a written USPS work order signed by the contracting officer. LP argues that the parties' course of conduct somehow superceded the written language of the IQCs and created the 12 implied contracts.

LP argues that, under its IQCs, there was a course of conduct in which the USPS would direct LP to make a site visit to a postal facility with a USPS program manager, LP would make the site visit and prepare a draft work order/scope of work and provide it to the USPS, and LP usually would receive a USPS work order for the project. LP argues that, based upon this habitual conduct, LP had a reasonable expectation that, if it made a site visit and prepared a scope of work with a USPS project manager and provided the document to the USPS, then LP would receive a USPS work order for the project. LP essentially argues that, because it received numerous USPS work orders on projects that LP had scoped with USPS project managers, LP

expected to receive a USPS work order contract whenever LP was contacted to prepare a draft work order/scope of work with a USPS project manager and did so.

Remarkably, LP adopts a new theory, directly contrary to the allegations of its amended complaint. According to its new theory, each of the 12 implied contracts sprang into existence once LP was directed to make a site visit to a postal facility and provide a draft work order/scope of work and did so, and the USPS breached the implied contract simply by failing to issue LP a USPS work order for the project. For example, according to LP, implied contracts to award USPS work orders were made in the fall of 1995 for the Hoopeston, East Lynn, Aroma Park, Papineau, Beaverville, and Union Hill Post Offices, and in August 1995 for the Bradley Post Office, once LP had completed its site visits with Project Manager Paul Steiner and prepared the draft work orders/scopes of work for those projects. According to LP, "in exchange for LP's submission of the WOs (at the USPS's direction), LP would be awarded those WOs and earn the profits to which it was reasonably entitled." Br. 17.

LP argues that it is not required to demonstrate that the USPS awarded the work contained in LP's draft work order/scope of work to a third party, and that breach consists simply of the USPS's failure to award the work to LP in a USPS work order. Br. 17. However, in its amended complaint, LP asserted that the breach was the USPS's awarding the same work to another offeror. Sec. Am. Compl. ¶¶ 33-35, 39-41, 45-47, 52-53, 57-59, 63-65, 69-70, 74-76, 80-81, 89-93, 91-93, 97-99. LP apparently has changed its legal theory because the record evidence undisputedly demonstrates that LP cannot establish the breach allegations of its complaint for a number of projects.

In the alternative, LP argues that the USPS breached the implied duty of good faith and fair dealing implicit in the IQCs. LP argues that the IQCs themselves required that LP's 12 draft

work orders/scopes of work or proposals be given consideration, and that the USPS failed to consider them in its solicitations for the 12 projects.

I. The IQCs Required Issuance Of Written USPS Work Orders Before There Was A Contract For Work At A Facility

In clause FB-251, "Work Orders," the IQCs required that "work will be done on work orders issued" by the contracting officer and stated as follows:

> a. No work will be performed until a written work order has been signed by the contracting officer and written Notice to Proceed with the work under the work order has been issued by the contracting officer and received by the contractor. Any work performed by the contractor under a work order before receipt of the written Notice to Proceed for that work order will be at the contractor's own risk.
>
> b. Each work order will describe the extent of work to be removed and the extent and type of new work to be installed. Descriptions may be written, by sketch or by drawing. Each work order will give the location where work is to be performed, state whether work may be performed during regular working hours, and describe the requirements for submittals. Submittals may include certificates, shop drawings, manufacturer's literature, data, test reports, and/or other documents that provide required information on the material or equipment.

Gov. PFUF No. 9. Pursuant to the IQCs, final work orders signed by the contracting officer and the contractor constituted an agreement upon the work to be performed, and the issuance of a final written work order signed by the contracting officer was an essential predicate before an IQC contractor possessed a contract for that work. Id.

As demonstrated in our motion, this contract language is wholly inimical with the formation of an implied contract to award LP a final USPS work order for a project that arises upon the contractor's submission of a proposal or draft work order/scope of work to the USPS. As the Federal Circuit held in New America Shipbuilders v. United States, 871 F.2d 1077, 1080 (Fed. Cir. 1989), "[o]ral assurances do not produce a contract implied-in-fact until all the steps have been taken that the agency procedure requires; until then, there is no intent to be bound."

The IQCs provide that written work orders will be signed and issued by the contracting officer and, absent such a definite work order, LP simply had no contract, express or implied. Gov. PFUF No. 9. LP has failed to rebut our argument that oral assurances cannot produce an implied contract until all of the steps in the process have been taken; "until then, there is no intent to be bound." New America Shipbuilders, 871 F.2d at 1080. It is undisputed that all the steps were not taken in the process to issue USPS work orders for the 12 projects. The USPS is entitled to summary judgment as a matter of law.

LP also has failed to respond to our argument that "[t]he existence of an express contract precludes the existence of an implied contract dealing with the same subject, unless the implied contract is entirely unrelated to the express contract."[1/] According to LP, the alleged implied contracts arose out of the IQCs, which contained explicit provisions governing the issuance of USPS work orders. There could not as a matter of law be an implied contract dealing with the same subject matter, i.e., the issuance of IQC work orders. LP admits that the alleged implied "contracts at issue in this action arose out of the IQCs," and that the draft work orders prepared "incorporat[ed] the fixed prices [] which L.P. Consulting was obligated to utilize under the applicable IQC." Sec. Am. Comp. ¶¶ 8, 15, 32, 40, 46, 52, 58, 64, 69, 75, 80, 86, 92, 98. The alleged implied contracts are not "entirely unrelated" to LP's IQCs; indeed, LP's claim of breach is that the USPS failed to issue LP work orders for the projects under its IQCs. Therefore, there can be no implied contract covering the same subject matter. Accordingly, the Government is

---

[1/] Atlas Corp. v. United States, 895 F.2d 745, 754-55 (Fed. Cir.), cert. denied, 498 U.S. 811 (1990); ITT Fed. Support Services v. United States, 209 Ct. Cl. 157, 531 F.2d 522, 528 n. 12 (1976); Lichtefeld-Massaro, Inc. v. United States, 17 Cl. Ct. 67, 72 (1989)(citing Klebe v. United States, 263 U.S. 188, 192 (1923)).

entitled to summary judgment as a matter of law based upon Atlas Corp. and the cases cited in footnote 1.

II. LP Has Failed To Demonstrate A Waiver

LP's lone attempt to avoid the governing precedent is its argument that the USPS waived the contract requirement that "work would be done on [signed] work orders issued by the contracting officer." Waiver is "an intentional relinquishment or abandonment of a known right." Massie v. United States, 166 F.3d 1184, 1190 note (Fed. Cir. 1999). LP makes an ineffective argument that the USPS waived the requirement for issuance of a written work order signed by the contracting officer. See Br. 9, 11, 13. LP does not set forth evidence to support its legal argument and does not even set out or attempt to demonstrate the factual or legal prerequisites for a waiver. LP has not shown a relinquishment or abandonment by contracting officer Robert Rigsby ("Rigsby") of the contract requirement for written USPS work orders. The record evidence overwhelming demonstrates that the parties' course of dealing was that the USPS issued numerous written work orders to LP, signed by both LP and Rigsby, for work at postal facilities.[2/]

---

[2/]This is not a situation in which "a contract requirement for the benefit of a party becomes dead if that party knowingly fails to exact its performance, over such an extended period, that the other side reasonably believes the requirement to be dead." Gresham & Co. v. United States, 200 Ct. Cl. 97, 470 F.2d 542, 554 (1972). "Rather, in order to establish a waiver of a contractual requirement a party must establish an extended course of conduct, such as that found in Gresham, which involved the waiver of a specific contract requirement in 36 contracts with the same party." Int'l Resource Recovery, Inc. v. United States, 60 Fed. Cl. 428, 431 (2004). Here, LP has not shown a waiver of the requirement for a written USPS work order; it has shown the opposite, i.e., that the USPS issues written work orders for work on IQCs and LP did not receive such written USPS work orders for the 12 projects. LP plainly knew that it could not work on any such projects without a written USPS work order and a Notice to Proceed. There is also substantial doubt about whether waiver of a contract requirement could even be applied to issues of contract formation. Id.

Many of these work orders are contained in the Government's appendix, and numerous others could be filed but that appears to be superfluous.[3]

III. LP Has Failed To Demonstrate The Prerequisites Of An Implied-In-Fact Contract

It is established that in order to avoid summary judgment upon the issue of the existence of an implied-in-fact contract, LP must introduce sufficient evidence "to show that there was mutuality of intent to contract, offer and acceptance, and that the officer whose conduct is relied upon had actual authority to bind the government in contract." H.F. Allen Orchards v. United States, 749 F.2d 1571, 1575 (Fed. Cir. 1984) (affirming summary judgment for Government on existence of implied contract). LP has the burden of proof to demonstrate the existence of an implied contract. Id.; Hanlin v. United States, 316 F.3d 1325, 1329 (Fed. Cir. 2003) (affirming summary judgment for Government on existence of implied contract). Moreover, the contract must be stated "in the form of an undertaking, not as a mere prediction or statement of opinion or

---

[3] LP's reliance upon City Window & Const. Co., PSBCA No. 4563, 02-1 BCA ¶ 31,706 (2001), for its waiver argument is misplaced, and the case is readily distinguished from the facts alleged by LP. Br. 11-12. In City Window, the IQC contractor had been awarded a work order for construction of a USPS retail store, and that work order did not include all of the work necessary to construct a complete and usable facility. The contractor performed additional construction work pursuant to oral instructions from the USPS architect and documented the extra work in its letters to the USPS. The IQC's "Changes" clause provided that "the contracting officer, by written order, may make changes in the work" and that "any other written or oral order from that contracting officer that causes a change will be treated as a change order provided the contractor gives the contracting officer written notice of the change." City Window provided the written notice of changes contemplated by the Changes clause, and the requirement for a written order from the contracting officer directing those changes was deemed to have been waived. In those circumstances, the contractor was entitled to an equitable adjustment for the extra work it had performed in constructing the retail store.

LP does not claim that it received a USPS work order to perform any construction work at the 12 facilities. LP's claim is directly the opposite. LP alleges that the USPS breached by failing to issue LP written work orders for these 12 projects. This is not a case where a contractor performed extra work on a work order that was issued by the USPS.

intention." H.F. Allen, 749 F.2d at 1575 (quoting Cutler-Hammer v. United States, 194 Ct. Cl. 788, 441 F.2d 1179, 1182 (1971)).

"To satisfy its burden to prove ... mutuality of intent, a plaintiff must show, by objective evidence, the existence of an offer and a reciprocal acceptance." Anderson v. United States, 344 F.3d 1343, 1353 (Fed. Cir. 2003); American Capital Corp. v. United States, 58 Fed. Cl. 398, 407 (2003); see also Restatement (Second) of Contracts § 18 (1981)("Restatement"). "There must be a definite offer and an unconditional acceptance." Massie, 166 F.3d at 188.

A. There Was No Offer

The testimony of Richard Battaglin ("Battaglin") and the evidence introduced by LP amply demonstrate that there never was any offer with respect to the 12 projects contained in LP's claims. As stated in the Restatement:

> An offer is the manifestation of willingness to enter into a bargain so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.

Restatement at § 24. Battaglin described the process or the parties' practice or course of dealing concerning the issue of work orders for USPS facilities as follows:

1. Battaglin would make a site visit with a USPS project manager and prepare a draft work order/scope of work and provide the document to the USPS,
2. The USPS provides LP with a computer generated draft work order,
3. LP reviews and signs the USPS draft work order and returns it, and
4. The USPS contracting officer signs the USPS work order, thereby finalizing it, and issues it to LP and also issues a Notice to Proceed to LP.

For example, with regard to the East Lynn Post Office, which was the first project upon which he was questioned, Battaglin testified as follows:

> Q. Do you have any of those rough sketches?
> A. All my original work [referring to the scopes of work and sketches that he prepared] went to the postal service to be converted into a draft work order that I

would sign and return to them for signature and a notice to proceed to do the work.
Q. So as I understand it you're telling us the process is this: There was a site visit, a scope of work is prepared, that goes back with the postal service, then something comes to you in the mail, a copy of it from the postal service?
A. A draft work order.
Q. How is that different from what is taken back out of the field [] by the postal service?
A. It's a computerized document that the postal service generates and makes a financial commitment and award to.
Q. You never got anything like that for East Lynn?
A. No, just got my copy of this back [referring to a draft work order/scope of work prepared by LP].

App. 1062 (Dep. 89-90). Battaglin affirmed that he expected to receive a draft work order from the USPS and that he never received that document. He stated:

A. And that's all I got from them.
Q. So you never got a computerized generated work order.
A. No, that's why I filed the claim.
Q. Now, when you and Mr. McNabb completed the site visit at East Lynn, what did you think was going to happen next?
A. Typically, I get a draft work order in the mail from the postal service for me to review. If I agree with the final form that it's in, I sign my portion on the work order and return it to the contracting officer for signature and then the notice to proceed.
Q. Is that what you expected in the case of East Lynn itself?
A. Yes.

App. 1062 (Dep. 91). Battaglin's testimony establishes that this was the process regarding the issuance of IQC work orders and there was not an offer with respect to 12 projects. Battaglin further testified that, when the USPS mails LP the draft USPS work order for his review and signature, he reviews "everything one more time" with the USPS. Battaglin stated "at the time when they [the USPS] issue the work order to me, that's when we go over the final – the draft work order that they produce and we go over everything one more time." App. 1069 (Dep. 161). Battaglin again affirmed that, after his submittal of a draft work order/scope of work, the USPS "would produce the document called a draft work order for my review." App. 1070, 1073 (Dep.

173; see also Dep. 230-31). The process regarding the issuance of IQC work orders or course of dealing is demonstrated in the record.

The testimony of another contractor is similar and further establishes that this was the process for the issuance of USPS IQC work orders. John Buchholtz, a USPS IQC contractor since 1982, has stated:

> 3. As an IQC contractor for the USPS, I often made site visits to USPS facilities to scope out work with USPS Project Managers. At these site visits, the USPS Project Manager and I together would estimate quantities and consider what various items of work would be needed to accomplish a project. I would prepare a draft scope of work, which I call a proposed pricing sheet. I would prepare our proposed pricing sheets using our computer, which has all the various line items of work and prices for an IQC stored in its memory. Shortly after my site visit with the USPS Project Manager, I would provide our proposed pricing sheet to the USPS Project Manager. I have made such site visits with USPS Project Managers and have prepared proposed pricing sheets pursuant to our IQCs countless times, and it was routine for St. Louis Design to do so on its USPS IQCs. The vast majority of the time, I made the site visits and prepared the proposed pricing sheets for St. Louis Design myself, and, only occasionally, did I have an employee of St. Louis Design make such site visits with the USPS Project Managers. The site visits and preparation of the proposed pricing sheets with the USPS Project Manager are a cost of doing business with the USPS under its IQCs.
>
> 4. In order for St. Louis Design to receive work orders under its USPS IQCs, I would have to make these site visits and prepare proposed pricing sheets with the USPS Project Managers; the USPS and St. Louis Design would have to agree upon the quantities and the line items of work necessary for each project; the USPS contracting officer would forward to St. Louis Design a written USPS work order, which I would sign and return to the USPS, and the USPS contracting officer would sign the USPS work order beside my signature, making a work order contract for that individual project. Each USPS work order signed by both St. Louis Design and the USPS contracting officer was a contract for the line items of work contained in the work order.

App. 1020.

Even assuming that Battaglin made the alleged site visits with USPS project managers and prepared the alleged draft work orders/scopes of work, his expectation in such circumstances is plainly established by the record, i.e. he expected to receive a draft USPS work order for his

review. If he agreed, he would sign it and return it to the USPS. He did not expect to receive an acceptance from the USPS, and he had not made the USPS an offer. The next step in the process for all of the 12 projects was the USPS's provision of a draft work order. LP never received such USPS draft work orders for any of the 12 projects.

Moreover, at the stage when Battaglin submitted a draft work order/scope of work to the USPS, there was no undertaking by LP. Battaglin's draft work order/scope of work was "merely a prediction or statement of opinion or intention." Cutler-Hammer, 441 F.2d at 1183. LP's draft work order/scope of work did not constitute any promise to the USPS and was not stated "in the form of an undertaking." Id. There was no intent upon Battaglin's or LP's part to be bound by the draft work order/scope of work that LP submitted to the USPS. Battaglin expected that the USPS would next provide a draft work order for his review and he would "go over everything one more time" with the USPS. App.1069 (Dep. 161). Consequently, there was never any offer by LP with regard to the 12 projects.

There also was never any offer by the USPS. Rigsby and his project managers have testified that they never told Battaglin that LP would receive the work or a USPS work order for the projects if LP made a site visit and prepared a draft work order/scope of work. App. 1034, 1037 (Southern), 1025-26 (Steiner), 678-79, 683 (Rigsby Dep. 24-25, 49-50). They further testified that Battaglin was informed that there was no guarantee that LP would receive a final USPS work order for projects that it scoped, and LP knew that there was never any guarantee by the USPS that LP would receive a final USPS work order for projects that LP scoped and prepared a draft work order/scope of work. Id . LP does not base its contract argument upon alleged oral statements by Rigsby or his project managers promising LP a USPS final work order if LP would make a site visit and prepare a draft work order/scope of work for any of the 12

projects. There never was "an undertaking" with regard to the 12 projects, and mere predictions or statements of intentions are insufficient. Cutler-Hammer, 441 F.2d at 1183.

Moreover, "so long as it is reasonably apparent that some further act of the offeror is necessary, the offeree has no power to create contractual relations by an act of his own, and there is as yet no operative offer." 1 Corbin on Contracts 11 at 25 (1963), quoted in Colonial Metals Co. v. United States, 204 Ct. Cl. 320, 494 F.2d 1355, 1358 (1974). After submission of LP's draft work orders/scopes of work, LP expected to receive draft USPS work orders for his review and to "go over everything" with the USPS, and LP never received such draft work orders for any of the 12 projects. App. 1069, 1073 (Battaglin Dep. 161, 230-31). LP knew that further actions by the USPS were necessary before a contract could come into being, and LP could not create a contract because there had been no offer by the USPS. Because there were never any offers, there were never any implied contracts for the 12 projects.

B. There Was No Acceptance

The record establishes that the USPS, not the contractor, decides what work will be done at postal facilities, and that any draft work orders/scopes of work submitted by IQC contractors may be modified by the USPS, and LP's draft work orders/scopes of work were modified by the USPS before final USPS work orders were issued. App. 536-27 ("So if they increased my quantities at their discretion, that's within their prerogative.") (Battaglin Dep. 76-77).. The decision as to what, if any, work is to be done at the facility belongs to the USPS and, more specifically, it is the sole responsibility and authority of the USPS contracting officer. Id. LP has not introduced evidence to demonstrate that its draft work orders/scopes of work were accepted by the USPS.

LP provides evidence of only the first step in a process that might, or might not, result in the formation of an IQC work order. The record establishes that, following LP's submission of a draft work order/scope of work, LP expected to receive a draft USPS work order for its review and to "go over everything" with the USPS; that, if LP agreed it would sign the document and return it to the USPS contracting officer; and that the contracting officer would then sign it, thereby finalizing the IQC work order. Even assuming that LP made site visits and submitted draft work orders/scopes of work for all 12 projects, LP never received draft USPS work orders from the USPS for any of the projects. App. 1073 (Battaglin Dep. 230-31). At this stage, both parties knew that additional actions had to be completed before an IQC work order contract could come into being. Id. As in Russell Corp. v. United States, 210 Ct. Cl. 596, 537 F.2d 474, 481-82 (1976), the agency's process contemplated that additional steps had to be taken before there was an intent to be bound. Like LP, Russell Corp. argued that the steps in the agency process were "mere formalities," and the Court of Claims held that there was no implied contract because there was no "conduct that indicated the assent to the proposed bargain." Id. at 482. The parties knew that additional steps had to be completed before a contract came into existence, and the Government officials "changed their minds and withdrew their previously granted assent" and refused to execute the contract. Id. at 481. Despite Russell's argument that the procedures were "mere formalities," the Court of Claims held that there was no contract because the Government's conduct did not "manifest an intent to accept plaintiff's" proposed bargain. Id. at 484. Here the process regarding the issuance of IQC work orders and course of dealing contemplated that additional steps were to be taken before there was an intent to be bound, and LP has failed to demonstrate conduct manifesting an intent to accept any proposed bargain.

Acceptance of an offer is manifested by "assent to the terms thereof made by the offeree in a manner invited or required by the offer." Restatement at § 50(1). See Anderson, 344 F.3d at 1353; American Capital Corp., 58 Fed. Cl. at 407. The USPS never took any action or made any oral promise indicating that it assented to the terms of LP's draft work order/scopes of work. LP never even received a USPS draft work order in response to Battaglin's draft work orders/scopes of work. App. 1073 (Battaglin Dep. 230-31). There was never a meeting of the minds between the parties.

IQC contractors were aware that there was no guarantee that they would receive a USPS work order for projects that they scoped and prepared a proposal, and that providing a proposal to the USPS did not entitle the contractor to a work order. In Clause FB-248 "Quantity of Work," the IQCs themselves stated:

> The Postal Service reserves the right to undertake, by Postal Service sources or others, the same type of work or similar work as contracted for in this contract, in the area covered by this contract, while this contract is in force.

App. 57, 160. IQC contractor Buchholtz further stated:

> 5. When I made a site visit and prepared a proposed pricing sheet with the USPS Project Manager under our IQCs, it was my expectation that St. Louis Design would receive the work if the USPS had the funds available and went forward with the project. However, I was never promised by any USPS official, including Mr. Rigsby and his Project Managers, that St. Louis Design would get the work if it made such site visits and prepared such proposed pricing sheets. I also understood that St. Louis Design was not entitled to the work because it had made the site visit and prepared a proposed pricing sheet for the USPS. In this respect, our IQCs contained the standard contract clause that provided as follows:
>
> > The Postal Service reserves the right to undertake, by Postal Service sources or others, the same type of work or similar work as contracted for in this contract, in the area covered by this contract, while this contract is in force.
>
> I understood that the USPS could use other sources for the same type of work in circumstances where St. Louis Design had made a site visit and prepared a

> proposed pricing sheet with the USPS Project Manager for the project. On infrequent occasions, St. Louis Design would make site visits and prepare proposed pricing sheets with the USPS Project Manager, but the USPS would not award St. Louis Design a signed USPS work order for the project.

App. 1021.

C. There Was No Acceptance By Silence

LP's motion is confusing as to what, if anything, constitutes the offer and what, if anything, constitutes the acceptance, according to LP. LP appears to argue that the USPS accepted LP's draft work orders/scopes of work by silence because LP contends that the USPS failed to show "that the subject WOs were rejected or not otherwise accepted." Br. 6. However, that argument directly contradicts LP's argument that the implied contracts were formed once the USPS directed LP to travel to the site and perform a field survey, and LP performed the survey and submitted the draft work order/scope of work. Br. 7. For example, for Hoopeston, East Lynn, Aroma Park, Papineau, and Beaverville, LP claims that its implied contracts all were formed in the fall of 1995, once LP had made site visits with Paul Steiner and provided the USPS with draft work orders/scopes of work for those facilities. According to this theory, LP's submission of the draft work orders/scopes of work constituted the acceptance, and the USPS's breach was its failure to issue LP USPS work order contracts for those projects. Br. 17, 26-27.

We address LP's inconsistent legal arguments. First, there was no acceptance by silence. The USPS was not silent. LP knew that there was no guarantee that LP would receive a USPS work order for any work that it scoped. App. 1034, 1037 (Southern), 1025-26 (Steiner), 678-79, 683 (Rigsby Dep. 24-25, 49-50). There never was any written or oral statement to LP that it would get the work if it scoped any of the 12 projects. Id. LP knew that there was no guarantee

that LP would receive a USPS work order for work that it scoped, and Battaglin scoped work knowing that LP might not receive a USPS work order. Id. For example, Paul Steiner stated:

> 2. As a Program Manager, I made site visits with contractors which had Indefinite Quantity Contracts ("IQCs"), including L.P. Consulting Group, Inc. ("LP"), for the purpose of preparing draft work order/scopes of work with the IQC contractor. This was a combined effort where the IQC contractor and I together would estimate the quantities of each item. As a program manager, I made various site visits with Mr. Battaglin of LP for the purpose of scoping out work that might be done at the site. I never told Mr. Battaglin that LP would get the work if it made site visits and assisted in preparing draft work orders/scopes of work. I told Mr. Battaglin that there was no guarantee that LP would get the work that we were scoping, and Mr. Bataglin knew that there was no guarantee. He suggested and welcomed the opportunity to scope the work in hope of getting a work order at a future date, but no guarantee was ever indicated.
>
> . . .
>
> 4. I remember making a site visit with Mr. Battaglin to the Hoopeston Post Office. I told Mr. Battaglin that there was no guarantee that LP would get any work that was scoped.

App. 1025-26 (emphasis added). Samuel Southern, a USPS Facilities Specialist, also scoped work with Battaglin and told him that there was no guarantee that LP would get any work that it scoped. App. 1034, 1037. LP was aware that scoping work did not entitle LP to a USPS work order for the project.

"Ordinarily an offeror does not have power to cause the silence of the offeree to operate as acceptance." Restatement at § 69 & comment a. Cf. 1 E. Allan Farnsworth, Farnsworth on Contracts § 3.15 at 237 ("The seller cannot turn the buyer's silence into acceptance by adding to the offer, 'If I do not hear from you in a week, I will take it that you have accepted my offer.'"); Corbin on Contracts, Vol. 1, § 72 (under ordinary circumstances silence cannot be relied on to establish an acceptance of an offer to enter into a contract). The law ordinarily treats silence as

rejection, not acceptance, of an offer, and acceptance cannot be presumed from the mere failure to decline an offer. Id.[4/]

D. The IQCs Contemplated Site Visits and Preparation of Proposals By IQC Contractors

LP has not shown that LP in making site visits and preparing draft work orders/scopes of work rendered any services to the USPS with the expectation of receiving compensation for such services. See Restatement § 69(1)(a) (silence may be acceptance in exceptional cases where offeree takes the offered services "with reason to know that they were offered with the expectation of compensation"). The IQCs contemplated that contractors would prepare proposals or draft work orders/scopes of work and submit them. The IQCs, in clause FB-249 "Indefinite-Quantity Contract," recognized that contractors would prepare proposals and stated that "[t]he price per unit of each proposal item in this contract will include all materials, labor, and equipment required to perform the work described in the attached specification," and further explained that work would be done only on written work orders issued by the USPS. App. 64, 167. IQC contractors were on notice as to the prices of most of the items that could be incorporated in their proposals or the USPS's work orders.. Id. In clause 11-1 "Conditions Affecting The Work," the IQCs further directed that:

> The contractor is responsible for having taken steps reasonably necessary to ascertain the nature and location of the work, and the general and local conditions that can affect the work or its cost.

---

[4/] LP argues, without supporting evidence and contrary to the record, that the 12 projects were the only LP draft work orders/scopes of work that were not approved by Rigsby. Br. 15. The record demonstrates and Battaglin testified to the contrary. See Defendant's Response to LP's PFUF No. 16.

App. 81, 184. IQC contractors therefore should have reasonably inspected the facility before signing a USPS work order for a project. The IQCs contained a related clause FB-260, "Inspection Of Site Or Building," stating:

> It shall be the contractor's responsibility to inspect conditions at each site, including such things as elevator size and capacities, existing building materials and components, and the like, before finalizing work orders (see Clause 11-1).

App. 93, 196. The IQCs thus contemplated that contractors would make site visits and become familiar with the nature of the work before they agreed to and signed USPS work orders.[5/] IQC contractors generally became familiar with proposed projects by making site visits and preparing proposals or draft work orders/scopes of work and submitting them to the USPS. See LP's PFUF No. 47 and Defendant's Response thereto. Thus, IQC contractors generally made site visits and prepared proposals or draft work orders/scopes of work with the understanding that such proposal costs were, as stated by IQC contractor St. Louis Design, "a cost of doing business with the USPS under its IQCs." App. 1020 (Buchholtz). As stated by LP's counsel and assented to by Rigsby, proposal costs were the contractor's "cost to eat." App. 680 (Dep. 30).

E. There Was No Acceptance By LP's Conduct

LP might be attempting to argue that its site visit and submission of a draft work order/scope of work constituted an acceptance in exchange for the USPS's oral promise to award LP a signed final USPS work order for the project if it made a site visit and prepared a scope of work. However, LP has not introduced any evidence that Rigsby or his project managers promised or stated to Battaglin that LP would receive a USPS work order for any of the 12

[5/] Accordingly, there is no merit in LP's assertions that the IQCs did not require LP to perform site visits or prepare proposals or draft work orders/scopes of work. Br. 4, 7.

projects if Battaglin made a site visit and prepared a scope of work. The record evidence is to the contrary. As Rigsby stated:

> I never stated to LP, orally or in writing, that it would receive a work order or contract from the Postal Service for any of the projects listed in its letters dated March 3, 1998 and April 13, 1998, ..., if LP would visit the Post Office in question and prepare a draft work order or scope of work for that project.

App. 508. Accord App. 1025-26, 1034, 1037 (Southern, Steiner). Further, the process for issuing work orders and course of dealing demonstrates that, upon submitting draft work orders/scopes of work, LP expected to receive a draft USPS work order for its review and to "go over everything" with the USPS. App.1069 (Battaglin Dep. 161). The parties' course of dealing does not demonstrate an acceptance.

IV. There Was Fatal Ambiguity As To The Terms

LP also has failed to demonstrate that there was no ambiguity as to the offer and the acceptance. Br. 16. The material terms of an agreement must be definite before a contract may be established. Modern Sys. Tech. Corp. v. United States, 979 F.2d 200, 202 (Fed. Cir. 1992) ("In the absence of ... sufficiently definite terms, no contractual obligations arise."). Certainty serves two purposes: first, to evidence that parties intended to contract; and second, to assist the court in determining whether a breach has occurred. Aviation Contractor Employees, Inc. v. United States, 945 F.2d 1568, 1572 (Fed. Cir. 1991); Restatement at § 33.

At the stage when the IQC contractor provided a draft work order/scope of work and the USPS has not provided the contractor with a draft USPS work order for the project, there is no indication that the contracting officer has decided to go forward with the project. As Battaglin acknowledged, at this stage, the USPS has not prepared commitment documents making funds available for such a project. App. 1062 (financial commitment prepared when USPS prepares its

computerized draft work order)(Dep. 90). Moreover, LP was informed that there was no guarantee that the USPS would issue it a work order for projects that it scoped and provided draft work orders/scopes of work.[6/]

The terms of the alleged implied contracts also were not clear and definite, especially with regard to the line items of work, the quantities of the line items, and the schedule for accomplishing the work. At the stage when the IQC contractor has submitted its proposal, and the USPS has not provided the contractor with a draft work order for the project, there is fatal ambiguity as to material terms. There could well be disagreements and misunderstandings between the parties on numerous issues, including the quantity of various line items, whether various line items were necessary at all, how and where various work items would be installed or accomplished, what the schedule would be, whether premium time could be used, and all sorts of other matters.[7/]

---

[6/] Howard Nettleton, PSBCA No. 3453, 94-3 BCA ¶ 27,038 is not pertinent. Br. 16. There, the record demonstrated that there was a meeting of minds wherein the USPS had agreed to reimburse the contractor for building improvements, and the contractor had performed work by making the building improvements that the USPS had agreed to reimburse. LP has not demonstrated that there was a meeting of minds with respect to any of the 12 projects. LP did not receive either a draft or final USPS work order for any of the 12 projects, and LP did not perform work on any of the 12 projects.

[7/] Fatal indefiniteness is further demonstrated by the record. According to Battaglin, he prepared two different draft work orders for a ramp at St. Anne. Compare Gov. Appendix pages 589-90 (with different quantities for some items and allowing premium time) to pages 591-92 (no premium time). According to Battaglin, he prepared two different draft work orders for the interior work at St. Anne. Compare Gov. Appendix pages 584-88 to pages 593-97. Mr. Southern's documents that were prepared at the St. Anne site visit are different from Battaglin's documents. App.1035-36, 1047-56. According to Battaglin, he prepared two different draft work orders for Momence. Compare Gov. Appendix pages 598-602 to pages 604-608. According to Battaglin, he prepared a number of different draft work orders/scopes of work for Hoopeston. App. 654-64. LP no longer has the draft work order/scope of work for East Lynn that it allegedly prepared, so nobody knows what work LP contemplated at East Lynn. App. 528

(continued...)

V. There Was No Consideration

"To constitute consideration, a performance or a return promise must be bargained for." Restatement § 71(1), quoted in Ridge Runner Forestry v. Veneman, 287 F.3d 1058, 1061 (Fed. Cir. 2002). And the "promise or apparent promise is not consideration if by its terms the promisor or purported promisor reserves a choice of alternative performances...." Id. at sec. 77. "Whatever may be the character of the thing promised, as a general rule it cannot serve as consideration unless it is binding...." Williston on Contracts § 7:6 at 77-79, 87.

There was never any bargain with LP for its performance of a site visit. As Battaglin testified, "the contracting officer refused ... to negotiate ... for my time and effort to visit the site." App. 1060 (Dep. 37). The making of the site visits, scoping work and submission of draft work orders/scopes of work by LP also was not consideration because it was not given by LP in exchange for any promise by the USPS that LP would be awarded a work order for that project. LP has not demonstrated that there was any statement by the USPS that LP would be awarded a USPS work order for the 12 projects, if LP would make a site visit, scope the work, and submit a draft work order/scope of work. Because there was never any offer by the USPS or any bargain regarding site visits, the making of site visits and preparation of draft work orders/scopes of work by LP were not consideration. Moreover, the IQCs contemplated that contractors would make site visits and prepare and submit proposals and IQC contractors, including LP, routinely did so. See discussion p. 16. The making of a site visit, and preparation and submission of a proposal are not consideration also for that reason.

---

[7/] (...continued)
("I cannot find those.") (Battaglin Dep. 81).

VI. There Was Not Sufficient Action By An Official With Contracting Authority

The project managers of USPS who allegedly made site visits with Battaglin did not have authority to make a contract for the Government. Therefore, their acts and any statements they may have made could not bind the Government in contract. Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380 (1947). LP has not provided any evidence that the project managers orally promised LP that it would receive a work order if it made a site visit and prepared a draft work order/scope of work for any of the 12 projects.

Only Rigsby possessed contracting authority for IQC work orders during the relevant time period. His project managers did not have contracting authority for work orders and LP was so informed. App. 52, 65, 155, 168. LP has failed to show sufficient action by Rigsby upon which to base its alleged 12 implied contracts. LP has failed to demonstrate that Rigsby made LP any offers with regard to the 12 projects or that he gave LP any acceptances with regard to the 12 projects.[8/]

---

[8/]Rigsby's contract authority also was limited in several ways. His warrant was for $100,000.00. App. 386. The 1994 IQC contract explicitly provided that the contract maximum was $1,000,000.00, and that contract maximum was exceeded. App. 691(Jacobsen ¶ 5). Therefore, Rigsby lacked authority to issue LP additional work orders pursuant to the 1994 IQC. This lack of authority is fatal for seven of the projects contained in LP's claim. Specifically, LP claims to have scoped the following projects with Paul Steiner under the 1994 IQC: Hoopeston, East Lynn, Aroma Park, Papineau, Beaverville, Union Hill, and Bradley. LP has failed to demonstrate that the contracting officer possessed authority to make any implied contract to award additional work orders under the 1994 IQC.

LP apparently contends that, since the 1994 IQC contract maximum was exceeded, the USPS should have issued LP work orders for the projects it scoped with Steiner under IQC 162640-96-B-0098, but there was never any implied contract to do so. As Steiner testified, he told Battaglin that there was not any guarantee that LP would receive a work order for projects that it scoped. App. 1025-26. Further, LP's multiplier for the 1994 IQC was different from its multiplier for the 1996 IQC. App. 37-38, 40, 43, 157 (compare the multiplier of 0.859 for the 1994 IQC with the multiplier of 0.850 for the 1996 IQC). Proposals that LP prepared based upon any site visits with Steiner incorporated LP's multiplier for the 1994 IQC. App. 1082 (Battaglin

(continued...)

VII. LP Has Failed To Produce Evidence Of A Breach Of The IQCs

LP argues that the USPS breached the implied duty of good faith and fair dealing implicit in the IQCs because the IQCs themselves required that LP's 12 draft work orders/scopes of work be given consideration in the USPS's solicitations for the 12 projects, and that USPS failed to consider them in its solicitations. LP relies primarily upon language contained in the USPS Purchasing Manual 6.1.2a4, that contracting officers make decisions and determinations fairly. Br. 18.[9/]

---

[8/] (...continued)
De. 362)(Ex. 90 is "the one were we filled out the scope of work using the unit prices from the contract 94-B-0083"). Such proposals were different from proposals that LP might prepare for the same or similar project under the 1996 IQC. For example, compare Ex. 90, Battaglin's draft work order for Hoopeston, dated November 14, 1995 allegedly submitted under the 1994 IQC (App. 659-60), with Ex. 91, his draft work order for Hoopeston, dated August 1, 1996, allegedly filled out under the 1996 IQC (App. 661-62). The prices for some of the items differ. App. 1080-81 (Battaglin Dep. 363-64). Thus, there also is fatal ambiguity as to material terms of any alleged contract to award LP work orders under the 1996 IQC for projects that LP scoped and prepared draft work orders with Steiner.

[9/] Burke Court Reporting Co., 97-2BCA ¶ 29,323 is not pertinent. Br. 22-23. There, two contractors had IQCs for the same services, and Burke received only a small fraction of the total work that was awarded to the two contractors. LP has not introduced any evidence to demonstrate that another IQC contractor received the vast majority of the work orders for the same zip code areas that were covered by LP's contract.

Community Consulting Int'l, ASBCA No. 53489, 02-2 BCA ¶ 31,940 also is not pertinent. Br. 18. There, the board focused on FAR requirements and contract provisions providing that contractors "be fairly considered for additional work." The FAR does not apply to the USPS, and USPS IQCs explicitly notify the contractor that the USPS retained its right to contract by other means "for the same type of work or similar work as contracted for in this contract, in the area covered by this contract, while this contract is in force." App. 57, 160. There is no requirement in USPS IQCs that an IQC contractor be given consideration for projects that the USPS chooses to contract for with another contractor. There also is no requirement in the IQCs that the IQC contractor be considered for projects that the USPS chooses to contract for via a fixed price contract made through an oral solicitation of bids. Indeed, such notions would undercut the usefulness of IQCs. See footnote 12.

LP's argument depends upon the correct interpretation of the IQCs. There is no language in the IQCs that requires that the contracting officer consider draft work orders/scopes of work submitted by an IQC contractor when the contracting officer enters into contracts through an oral solicitation with third parties for work that could have been done by the IQC contractor. To the contrary, the IQCs stated:

> The Postal Service reserves the right to undertake, by Postal Service sources or others, the same type of work or similar work as contracted for in this contract, in the area covered by this contract, while this contract is in force.

App. 57, 160 (Clause FB-248). As Rigsby stated, "the making of a site visit by LP and its preparation of a draft work order did not mean that the work proposed would be awarded to LP. The Postal Service, through its contracting officer, could contract for the same work that had been the subject of a draft work order through a fixed price contract or another contractual means." App. 507. A contracting officer was not required to consider a draft work order/scope of work submitted by an IQC contractor when considering bids submitted by third parties in response to the USPS's oral solicitations, and the contracting officer also was not required to invite the IQC contractor to bid in response to such oral solicitations. Id. USPS procedures require that there be "adequate competition." App.7, 260, 267. As the IQCs recognized, the contracting officer possessed the discretion to contract for the same work by other means.

LP argues, however, that a contracting officer loses his discretion to contract for a project by other means once he directed an IQC contractor to make a site visit and prepare a draft work order/scope of work and the contractor did so. Br. 14-15. There is no support in the law or the IQC for this argument. LP's argument is contrary to the established legal principle that "contracting officers have a great deal of discretion in making contract award decisions, particularly when ... the contract is to be awarded to the bidder or bidders that will provide the

agency with the best value." Banknote Corp. of America, Inc. v. United States, 365 F.3d 1345, 1355 (Fed. Cir. 2004) (affirming USPS contract award). USPS procedures explicitly provided that contracting officers could use simplified procurement procedures, orally solicit bids from contractors, and make their awards based upon the "best value" to the USPS. App. 7, 260, 267. There is no indication that the IQC eliminates or lessens the well-established discretion of contracting officers.[10]

LP's argument is not supported by the process for issuing work orders or the parties' course of dealing under the IQCs. The next step in the process after the IQC contractor's site visit and preparation of a draft work order/scope of work was the USPS's provision of a draft work order for the contractor's review. Negotiations also were contemplated at this stage also and Battaglin would "go over everything" with the USPS. App. 1069 (Dep. 161).[11] The contractor and the USPS might or might not reach an agreement regarding the scope of work required to accomplish a project, or the contracting officer at this stage might decide that the

---

[10] LP argues that Rigsby, Southern and McNabb admitted that once the USPS decides that work should be performed at a facility under a contractor's IQC, "the competition was over" and the contracting officer has no further discretion as to what procurement method to use or by whom the work will be accomplished. Br. 14-15. Rigsby, Southern and McNabb never made that statement. As Rigsby stated, the USPS would not send two IQC contractors to the same facility to scope out the same project. App. 679 (Rigsby Dep.26-27)("Never an IQC and an IQC to the same project."). Neither Rigsby, Southern, nor McNabb stated that the contracting officer could not change his mind and, after he had directed or requested an IQC contractor to scope out work, he was precluded from contracting for the project through another procurement method such as a fixed price contract. As Rigsby stated, "the making of a site visit by LP and its preparation of a draft work order did not mean that the work proposed would be awarded to LP. The Postal Service, through its contracting officer, could contract for the same work that had been the subject of a draft work order through a fixed price contract or another contractual means." App. 507.

[11] Battaglin's testimony and the record evidence rebuts LP's unsupported argument that USPS simply took LP's work order and put it in the computer and no changes were ever made. Br. 5. See Defendant's Response to LP's PFUF No. 13.

work would be more effectively accomplished by soliciting bids for a fixed price contract. App. 507 (Rigsby). LP's argument would effectively preclude a contracting officer from soliciting bids for a project once he receives a draft work order/scope of work from the IQC contractor, as requested or directed. Nothing in the law or the IQC so restricts the contracting officer's broad discretion in procurement matters. Contracting officers have the discretion to change their minds and chose other methods of procuring services.[12/]

Moreover, IQC contractors understood that there was no guarantee that they would receive a USPS work order for projects that they scoped with the USPS project manager. As IQC contractor St. Louis Design stated:

> I understood that the USPS could use other sources for the same type of work in circumstances where St. Louis Design had made a site visit and prepared a proposed pricing sheet with the USPS Project Manager for the project.

App.1021. Therefore, there is no merit in LP's legal argument that the contracting officer lacked discretion to solicit bids for projects that had been scoped by IQC contractors, at his request or direction.

There also is no factual basis for LP's assertion that it was treated unfairly. The 1 million dollar maximum of the 1994 IQC was exceeded, and no additional work orders could have been issued to LP under that IQC. LP's assertion that it was treated unfairly is dependent upon its

---

[12/] LP's argument would reduce the usefulness of IQC contracts. If a contracting officer were precluded from going forward with a procurement by another method once he had requested or directed that an IQC contractor make a site visit and prepare a draft work order/scope of work and the contractor did so, contracting officers likely would forego requesting or directing IQC contractors to make site visits and prepare proposals, thereby undercutting the usefulness and effectiveness of IQC contracts. The IQC contractors would not be adequately informed about proposed projects where they failed to make site visits and prepare proposals for projects. It is surprising that LP makes this argument because its adoption would be anticipated to result in a decline of the usefulness of IQC contracts as a vehicle for accomplishing work.

unsupported assertion that Rigsby unfairly excluded LP from consideration in the USPS's solicitations for the 12 projects. Up until Rigsby's retirement in March 1999, the USPS did not even solicit bids for six of the 12 projects and LP was not excluded from any solicitation for those six projects: (1) the Beaverville Post Office lobby and building renovation; (2) the East Lynn Post Office building renovation; (3) the Papineau Post Office interior renovation and concrete ramp; (4) the St. Anne Post Office concrete and asphalt and interior renovation; (5) the Union Hill Post Office interior and exterior ramp; and (6) the Aroma Park interior lobbies and building renovation.

Further, the USPS requested LP to submit its prices for the Berwick and St. David Modular Post Offices. LP did so in the form of draft work orders/scopes of work, and LP's prices were considered. This consideration resulted in Rigsby's award of the St. David contract to LP and his award of the Berwick contract to another offeror, that had a lower price than LP's. App. 985, 302-07, 466-71.

With regard to other projects for which USPS orally solicited bids from other contractors, the record establishes that the USPS had "adequate competition" to award those projects and the USPS was not required to solicit a bid from LP for those projects. Nothing in the IQC or the USPS regulations required that the contracting officer invite LP to submit a bid for these projects.

What the IQC contemplated was that the USPS would order a minimum of $10,000 in work. "Purchases exceeding that minimum amount satisfy the government's legal obligations under the contract." Travel Centre v. United States, 236 F.3d 1316, 1319 (Fed. Cir. 2001). The USPS and Rigsby far exceeded that contract requirement and fairly issued work orders to LP. LP has not presented a triable issue that Rigsby was unfair in the issuance of work orders to LP.

LP fails to substantiate its accusation that Rigsby decided not to award LP any more work after LP protested to him on about April 30, 1997. Rigsby denies making such a decision. App. 993; see Defendant's Response to LP's PFUF Nos. 34-36. Rigsby issued the following IQC work orders and LP continued to perform work:

> May 1997, work order 4.0 in the amount of $22,274.40 for lobby/interior painting at the Roberts Post Office
>
> May 1, 1997, work order 3.00 in the amount of $21,666.51 for lobby renovation work at the Thawville Post Office
>
> July 1997, work order 7.00 in the amount of $30,990.20 for interior renovation work at the Rossville Post Office
>
> October 1997, work order 5.00 in the amount of $19,998.85 for lockbox renovation work at the Wellington Post Office
>
> November 1997, work order 2.01 in the amount of $39,932.63 for St. David Modular Post Office

Id. On June 28, 1997, Rigsby also awarded LP a simplified purchase contract in the amount of $42,000.00 for the Paxton Post Office handicap ramp. App. 491. In September 1999, the USPS, through another contracting officer, issued LP work order 1.00 for work at the South Holland Post Office. App. 897 (IQC 162640-99-B-0039).

There are no triable issues of good faith and fair dealing. LP has failed to introduce any irrefragable proof that Rigsby acted in bad faith with regard to issuing IQC work orders to LP. Plaintiffs asserting bad faith must overcome the strong presumption that in the absence of clear, contrary evidence, public officials act conscientiously in the discharge of their duties. Tornecello & Soledad Enterprises, Inc. v. United States, 231 Ct.Cl. 20, 45, 681 F.2d 756, 770 (1982); Librach v. United States, 147 Ct. Cl. 605, 612 (1959). "We generally accord ... official conduct a presumption of legitimacy." United States Dep't of State v. Ray, 502 U.S. 164, 178-79 (1991).

Accord United States v. Armstrong, 517 U.S. 456, 464 (1996). To establish bad faith, plaintiffs must provide "well nigh irrefragable proof" of an intent to injure the plaintiff. Kalvar Corp. v. United States, 211 Ct.Cl. 192, 198-99, 543 F.2d 1298, 1301-02 (1976), cert. denied, 434 U.S. 830 (1977).[13/] "Unsubstantiated suspicions and allegations of bad faith actions are not enough. The proof must be almost irrefragable." Spezzaferro v. Federal Aviation Administration, 807 F.2d 169, 173 (Fed. Cir. 1986). Accord Galen Medical Associates, Inc. v. United States, 369 F.3d 1324, 1330-31, 1336 (Fed. Cir. 2004). There is a presumption that both parties have fulfilled their duties of good faith and fair dealing. Fuller Co. v. United States, 108 Ct. Cl. 70, 94, 69 F. Supp. 409, 411 (1947); Huna Totem Corp., 35 Fed. Cl. at 613. Violations of this duty occur only when it is demonstrated that a party's actions are motivated by malice or the specific intent to injure. Id.; SMS Data Products Group, Inc., 19 Cl. Ct. at 617. LP has not demonstrated any irrefragable proof of bad faith on the part of Rigsby. LP has failed to submit evidence that creates a genuine issue of material fact because it has not demonstrated that "a reasonable fact finder could find, by clear and convincing evidence, " that Rigsby acted in bad faith. Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1241 (Fed. Cir. 2002) (affirming summary judgment for Government on bad faith issue).

LP's good faith theory also is inconsistent with, and contrary to, LP's implied contract theory. Under that theory, the implied contracts were created and breached in the fall of 1995

---

[13/] Accord Tornecello & Soledad Enterprises, 231 Ct.Cl. at 45, 681 F.2d at 770; Haney v. United States, 230 Ct.Cl. 148, 152, 676 F.2d 584, 586 (1982); Huna Totem Corp. v. United States, 35 Fed. Cl. 603, 613 (1996) (applying well nigh irrefragable proof standard of bad faith in a breach of contract action); Smith v. United States, 34 Fed. Cl. 313, 321 (1995); A-Transport Northwest Co. v. United States, 27 Fed. Cl. 206 (1992); Boehm v. United States, 22 Cl. Ct. 511, 518-19 (1991); SMS Data Products Group, Inc. v. United States, 19 Cl. Ct. 612, 617-18 (1990) (contract termination action); Gregory Lumber Co., Inc. v. United States, 11 Cl. Ct. 489, 501-02 (1986); P. Francini & Co. v. United States, 2 Cl. Ct. 7, 11 (1983).

and in 1996 when LP provided draft work orders/scopes of work and the USPS failed to issue it a final work order for the projects. According to LP, the breaches occurred in 1995 and 1996, not in 1997. In light of the magnitude of work that was awarded to LP, it is hard to comprehend why LP would complain about not receiving more work orders from Rigsby.[14/]

VIII. Even If LP Established Breach, It Would Not Be Entitled To Its Anticipated Lost Profits

As demonstrated in our motion, even if LP had been awarded contracts for the 12 projects, the appropriate measure of damages would be those that could be calculated pursuant to the termination for convenience clause, since no work was performed by LP. "Anticipated but unearned profit is not recoverable, even under a termination for the convenience of the Government." Mega Constr. Co. v. United States, 29 Fed. Cl. 396, 475 (1993)(citing Dairy Sales Corp. v. United States, 219 Ct. Cl. 431, 593 F.2d 1002, 1005 (1979)). Accord Rhen v. United States, 17 Cl. Ct. 140, 143 (1989). LP performed no work and "thus it may not recover anticipated profits." Mega Constr., 29 Fed. Cl. at 475.

[14/] LP cannot establish its prima facie case for other reasons. See Gov. Motion pp. 25-34. LP contends that it prepared "draft work orders" for various projects "incorporating the fixed prices to which L.P. Consulting was obligated to utilize under the applicable IQC." Sec. Am. Comp. ¶¶ 8, 15, 16. LP argues that Rigsby breached the obligation of fair dealing implicit in the 1996 IQCs when he made contract awards to third parties for the same work that LP had been scoped. However, there could be no breach of the 1996 IQCs by any USPS awards to third parties for Aroma Park, the Momence ramp, or the Momence lobby renovation projects because the 1996 IQCs had expired by the time the USPS made awards for Aroma Park, and a ramp and a lobby renovation at Momence. See Defendant's PFUF No. 39-68. Further, the Momence ramp contract awarded to Somers was based upon the architect's drawings that were prepared in 1998 and was different from the work allegedly scoped by LP in May 1996. Id. Similarly, LP's $62,000 draft work order for Momence lobby renovations, allegedly prepared in September 1995, was for a different project than the one awarded by the USPS in 1999. Id. Further, the Aroma Park project awarded by the USPS in August 1999 also was different from the work scoped by LP for Aroma Park. Id.

LP claims that its damages are not limited by the termination for convenience clause because the USPS never issued a termination for convenience. Br. 26. There was no necessity for USPS to issue a termination for convenience. The IQCs themselves provided:

> The contractor is required to perform all work under a work order for which a Notice to Proceed has been issued and received before the expiration date of the contract. If the Notice to Proceed under a work order is not received by the contractor before the expiration date of the contract, the work order will be considered terminated for the convenience of the Postal Service.

App. 66, 169. Assuming, as LP contends, that the USPS was obligated to issue LP USPS work orders for the 12 projects, no Notice to Proceed was ever issued before IQC's expiration date, and thus, the work orders "will be considered terminated for the convenience of the Postal Service," and it was not necessary to issue a notice of termination for convenience. LP cannot recover anything more here and cannot recover its anticipated lost profits.

The USPS also disputes the amount of lost profits alleged by LP. LP states that it "will produce at trial documentation which supports its percentages of profit." LP PFUF No. 39. Having not presented such evidence and historical data in its motion and having reserved it for trial, LP has not effectively moved for summary judgment on the amount of any lost profits.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Kathryn A. Bleecker
KATHRYN A. BLEECKER
Assistant Director

s/Domenique Kirchner
DOMENIQUE KIRCHNER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit,
8th Floor, 1100 L. St., N.W.
Washington, D.C. 20530
Tele: (202) 307-0290
Attorneys for Defendant

Of Counsel:
STEPHEN D. LOBAUGH
United States Postal Service

April 6, 2005

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 6th day of April 2005, a copy of the foregoing "DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT" and accompanying appendix was electronically filed. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

/s DOMENIQUE KIRCHNER