IN THE UNITED STATES COURT OF FEDERAL CLAIMS

L.P. CONSULTING GROUP, INC., )
Plaintiff, )
vs. ) Case No.
THE UNITED STATES POSTAL ) 98-868 C
SERVICE, ) (Judge Allegra)
Defendant. )

The deposition of ROBERT A. RIGSBY, called for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions for the purpose of discovery, taken before Janet L. Robbins, CSR No. 84-2207, a Notary Public within and for the County of Cook, State of Illinois, and a Certified Shorthand Reporter of said state, at Suite 3300, Three First National Plaza, Chicago, Illinois, on the 9th day of June, A.D. 2004, at 2:24 p.m.



PRESENT:
BELL, BOYD & LLOYD PLLC,
(1615 L Street, N.W., Suite 1200,
Washington, D.C. 20036-5610,
202-955-6830), by:
MR. LAWRENCE M. PROSEN,
appeared on behalf of the Plaintiff;
UNITED STATES DEPARTMENT OF JUSTICE,
CIVIL DIVISION-COMMERCIAL LITIGATION BRANCH,
(1100 L Street, N.W., 8th Floor,
Washington, D.C. 20530,
202-307-0290), by:
MS. DOMENIQUE KIRCHNER,
appeared on behalf of the Defendant
and the Deponent.

ALSO PRESENT:
MR. RICHARD BATTAGLIN,
L.P. Consulting Group, Inc.;
MR. STEPHEN LOBAUGH, In-House Counsel,
United States Postal Service.

REPORTED BY: JANET L. ROBBINS, CSR, RPR,
CERTIFICATE NO. 84-2207



(WHEREUPON, the witness was duly sworn.)

ROBERT A. RIGSBY,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. Prosen:
Q. Please state your name and address for the record.
A. Robert A. Rigsby, 1655 East 91st Street, Chicago, 60617.
Q. Do you have a work address or phone number, as well?
A. Yes.
Q. Can you put that on the record, please, too?
A. It's the same address.
Q. Oh, it's the same address. I'm sorry.
Sir, my name is Lawrence Prosen, and I'm counsel to L.P. Consulting. I presume you know Mr. Battaglin?
A. Uh-huh.
Q. We're here regarding the claims that were submitted to you and then were appealed to the



Court of Federal Appeals some years ago now, March 3rd and April 13th, 1998.
For ease of reference, there's a list in front of you there which is marked as Southern Exhibit 1. These are the 12 projects which are involved in the current litigation. Given the time, I thought it would be possibly a good tool to use. And we'll be making reference to that, and you can refresh your recollection using those, as well.
Excuse me just a second here.
Can you just give a brief background of your educational background?
A. Starting from when?
Q. Let's say high school on.
A. Okay. I'm a high school graduate. I'm also a post college graduate.
Q. What are your degrees in? You have an undergrad and graduate?
A. I have an undergrad degree in business, and I have a graduate degree in urban sociology.
Q. Where were your degrees obtained?
A. Governor State University.
Q. Which is?
A. Illinois.

for you and report back to you on postal service construction projects?
A. What are you saying, when I was -- during the time I was a manager?
Q. While you were at the postal service.
A. Oh, yes, yes.
Q. You actually did site visits?
A. I did site visits myself, and I also did have people who did that, yes.
Q. The majority of the time, though, was it you in the field or one of your -- I don't know the title -- project managers or technical representatives who were out in the field?
A. It depended on the project itself. I can't recall. Sometimes when a project is more difficult, the contracting officer could make a visit out to make sure he was satisfied with what was going on. Other times, he would have postal employees going out to make sure that the project was progressing the way it should.
Q. I'm going to reference you to Southern Exhibits 2 and 3. It's under Tabs 1 and 2 in your binders. Let's go to the March 3rd, 1998.
A. Which tab is that?



Q. Tab 1, Southern Exhibit 2.
Have you seen this document before, sir?
A. I may have.
Q. How about under Tab 2, Southern Exhibit 3, an April 13th, 1998 letter to you?
A. This looks more familiar. I think I have seen this.
Q. What is your understanding of what these two documents -- certainly the second one, what is your understanding of what this document, the second one, April 13th one is?
A. From what I can -- from what it looks like to me is L.P. Consulting is claiming here that they didn't get awarded these projects. I'm looking just from what I see he's saying the loss of lost profit. So it would mean that he lost the profit that he would have gotten, I guess, had he gotten the project.
Q. Do any of the projects listed on there, are you familiar with any of these projects? There's eight projects listed on this letter.
A. I can remember something about Aroma Park, I think.
Q. How about Beaverville?



A. No.
Q. Bradley?
A. I don't know what happened. I don't know any details on that.
Q. East Lynn, Momence?
A. I don't recall any details on that.
Q. Papineau?
A. I don't recall any details.
Q. St. Anne, Union Hill?
A. No.
Q. Do you recall whether or not any of these projects fell underneath your responsibilities as contracting officer?
A. They may have. I don't know. I'm certain that Aroma Park did not, though.
Q. Did not fall underneath your --
A. Yes. The others may have.
Q. Let's go back to Tab 1. You said you -- I believe you said you didn't recall seeing this document before.
A. I don't think I said I didn't recall seeing it. I think I said I don't remember whether I saw it or not. I said I may have seen it.
Q. You may have seen it. Okay. I thought



that was the second one.
Do you recall the Berwick modular post office project?
A. No details.
Q. Hoopeston?
A. The Hoopeston ramp, I do remember that.
Q. Downers Grove?
A. I don't know any details about that project in Downers Grove.
Q. How about Brookfield?
A. I don't know any of the details about that one.
Q. Do you recall that you awarded L.P. Consulting two IQC contracts in the time frame of '96 to '98?
A. The awards would not have been made by me. They would have been made by the Facility Service Center, not by the contracting officer. The contracting officer just administers the contract itself.
Q. So you don't know about the contract -- I understand.
Is that someone, one of your superiors, that makes the award?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| L.P. CONSULTING GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 98-868C |
| | ) | |
| THE UNITED STATES, | ) | (Judge Allegra) |
| | ) | |
| Defendant. | ) | |

DECLARATION OF ROBERT RIGSBY

I, Robert Rigsby, under penalty of perjury, do hereby state that the following statement is true and correct:

1. I previously provided a declaration in this matter dated January 12, 2005.

2. I have read the declaration of Richard Battaglin, dated February 18, 2005, and Plaintiffs' Proposed Findings Of Uncontroverted Fact, dated February 18, 2005, and am submitting this declaration in response.

3. I am not familiar with most of the facts alleged in paragraph 2 of Plaintiff's Proposed Findings Of Uncontroverted Fact and in paragraph 3 of Mr. Battaglin's declaration. I am aware that Mr. Battaglin previously worked as a contract employee for the USPS. Architects and engineers are licensed professionals. Mr. Battaglin was not an architect or an engineer, and it is incorrect to state that Mr. Battaglin was an architect or engineer for the USPS.

4. I do not disagree with paragraph 3 of Plaintiff's Proposed Findings of Uncontroverted Fact or paragraph 4 of Mr. Battaglin's declaration.

5. With regard to paragraphs 4 and 5 of Plaintiff's Proposed Findings of Uncontroverted Fact and paragraphs 5 and 6 of Mr. Battaglin's declaration, I became the Manager of Administrative Services for the USPS Central Illinois District Office in about December 1992

and served in that position until my retirement effective March 4, 1999 (March 3, 1999 was my last day of work). During my service as the Manager of Administrative Services, LP had various indefinite quantity contracts ("IQCs") with the USPS for various areas, generally described below, within the Great Lakes Region; those IQCs were as follows:

> 162640-99-B-0039, awarded about January 28, 1999, Central IL area, zip codes 604, 605, 609, 613 through 619, 625 through 627;
>
> 162640-96-B-0096, awarded about June 7, 1996, for Springfield, IL area, zip codes 618, 619, 625 through 627;
>
> 162640-96-B-0098, awarded June 3, 1996, for North Central IL area, zip codes 604, 605, 609;
>
> 162640-96-B-0094, awarded June 6, 1996, for Peoria, IL area, zip codes 613, 614, 615, 616, 617;
>
> 162640-94-B-0083, awarded May 18, 1994, for North Central IL area, zip codes 604, 605, 609.

App. 43, 52-54, 155-57.[1] I was the contracting officer for these IQCs.

6. Paragraphs 6 and 7 of Plaintiff's Proposed Findings of Uncontroverted Fact and paragraphs 7 and 8 of Mr. Battaglin's declaration are incorrect in stating that the two-year term of IQC 162640-94-B-0083 was extended through a modification for an additional one-year period of time. As stated in the contract modifications signed by LP and the USPS (through Contracting Officer Larry Linnenburger), LP's IQC 162640-94-B-0083 was modified in May 1995 to increase its limit to $600,000.00, and was modified again in November 1995 to increase its limit to $1,000,000.00. App. 37, 40. The contract modifications also stated: "The contract completion date of May 18, 1996, will remain unchanged." App. 37, 40. The IQC provided that work would

1 "App." refers to pages of the Government's appendix. "LP App." refers to LP's Appendix.

be "ordered during the 24-month period beginning on the day following the date" on which the IQC was signed. App. 716. After May 18, 1996, new work orders could not be issued pursuant to the 1994 IQC. The IQC further provided:

> The contractor is required to perform all work under a work order for which a Notice to Proceed has been issued and received before the expiration date of the contract. If the Notice to Proceed under a work order is not received by the contractor before the expiration date of the contract, the work order will be considered terminated for the convenience of the Postal Service.

App. 718.

7. I agree with paragraph 8 of Plaintiff's Proposed Findings of Uncontroverted Fact and paragraph 9 of Mr. Battaglin's declaration. App. 52, 54, 155, 157.

8. Paragraph 9 of Plaintiff's Proposed Findings of Uncontroverted Fact and paragraph 10 of Mr. Battaglin's declaration are incorrect. I never told Mr. Battaglin to perform site visits and submit draft work orders on projects at the end of the term of the IQC 162640-94-B-0083 "with the verbal understanding that those work orders would be performed under the follow on IQCs." I never told Mr. Battaglin that he would be issued work orders for projects under IQCs, if he performed site visits and submitted work orders for those projects. There was never any promise or guarantee to LP that it would receive a USPS work order if it made a site visit and prepared a draft scope of work.

9. With regard to paragraphs 10 and 11 of Plaintiff's Proposed Findings of Uncontroverted Fact and paragraphs 11 and 12 of Mr. Battaglin's declaration, it is my understanding that LP is claiming damages in this lawsuit based solely upon asserted breaches of 12 alleged implied contracts as set forth in its letters dated March 3, 1998 and April 13, 1998, which were resubmitted by letter dated August 11, 1998, as stated in my earlier declaration.

10. Paragraph 12 of Plaintiff's Proposed Findings of Uncontroverted Fact and paragraph 13 of Mr. Battaglin's declaration are incorrect. The Government's appendix does not contain all 12 of LP's alleged draft work orders/scopes of work that pertain to the litigation. LP's alleged draft work order for the East Lynn building renovation is not contained in the Government's appendix.

11. Paragraphs 13 through 16 and the other paragraphs of Plaintiff's Proposed Findings of Uncontroverted Fact and paragraphs 14 through 17 and the other paragraphs of Mr. Battaglin's declaration do not correctly reflect the practice or course of dealing under LP's IQCs during the time I served as Administrative Services Manager for the Central IL District.

The IQCs provided that the USPS contracting officer would decide what work would be done at postal facilities. The IQC contractor could not decide what work would be done at a postal facility. Thus, the IQCs stated that "work will be done on work orders issued as required for various amounts and types of work covered by the specification," that "written work orders" would be "signed by the contracting officer," and that no work would be performed without a written work order signed by the contracting officer and a written Notice to Proceed with that work. App. 64-65, 167-68. The IQC contractor could not dictate the work that would be done at a postal facility. Pursuant to the IQC, the contracting officer was the person who would decide what work would be done at postal facilities, and the IQC contractor was obligated to perform the work contained in written work orders signed by the contracting officer.

LP, upon its own initiative or at the request of the USPS, visited postal facilities and prepared draft work orders, also called scopes of work, and submitted them to the USPS. However, the making of a site visit by LP and its preparation of a draft work order/scope of work

did not guarantee that LP would be awarded the proposed work. The USPS, through its contracting officer, could contract for the same work that had been the subject of a draft work order/scope of work through a fixed price contract or another contractual means.

LP would be awarded work under its IQC when (1) the USPS and LP came to an agreement upon the work to be performed, (2) the USPS provided LP with a USPS work order for signature, which Mr. Battaglin signed and returned to the USPS, and (3) the contracting officer signed that same work order. The USPS followed this practice during the time that I served as Administrative Services Manager for the Central IL District. Mr. Battaglin knew that this was the process, and that LP did not have a contract for the work until the contracting officer signed a work order and issued it to LP. Mr. Battaglin would ask me to issue written USPS work orders to LP, indicating that he understood that, without a signed USPS work order, LP did not have a contract to perform work at the facility.

LP would submit draft work orders/scopes of work prepared with the USPS project manager, and the USPS would review them and made changes in the work to be performed at the facility. The draft work order/scope of work was only a guide. A draft work order/scope of work often underwent changes before LP and the USPS contracting officer agreed on the work to be done at the facility.

LP's making of a site visit and the preparing of a draft work order/scope of work with a USPS project manager did not guarantee that LP would receive a signed USPS work order or that the USPS would go forward with the proposed work. LP sometimes submitted draft work orders/scopes of work, and the USPS did not issue LP a work order for that work. The making of a site visit and the preparing of a draft work order/scope of work by an IQC contractor did not

result in a contract to perform the work. There was never any promise or guarantee that LP would receive the work if it made a site visit and prepared a draft work order/scope of work with a USPS project manager.

Mr. Battaglin also made unauthorized site visits to USPS facilities and submitted unsolicited draft work orders/scopes of work to the USPS. These actions resulted in my issuance of a letter dated, June 4, 1997, instructing LP as follows:

> No site visits will be permitted under any circumstances unless directed by the Contracting Officer through the USPS project manager. This includes sending subcontractors to sites to do preliminary surveys without an issued work order/contract. Again, this means no unauthorized visits will be made to postal facilities by contractors. Your full cooperation in this matter is appreciated.

App. 437. In that same letter, I informed LP that it would be considered for projects when the USPS "determines your services are needed." App. 437. Mr. Battaglin was informed that there was never any guarantee that LP would receive a USPS work order if it made a site visit and prepared a draft work order/scope of work.

The IQCs contemplated that the IQC contractor would submit proposals or draft work orders/scopes of work. It also was important for the IQC contractor and the USPS project manager to make a site visit and reasonably estimate the quantities of each item for the proposed work. Each work order that was signed and issued by the USPS contracting officer was a line item contract for the work contained in that work order. The USPS would inspect the work and determine whether the line items of work had been performed and whether the quantities included in the work order had been used. If the contractor did not use all of the quantity of an item in the work order, the USPS would adjust the work order to reflect the quantity actually

used.

12. With regard to paragraphs 17 and 18 of Plaintiff's Proposed Findings of Fact and paragraphs 18 and 19 of Mr. Battaglin's declaration, I never told Mr. Battaglin to make a site visit at a USPS facility and that, if he did so, LP would receive a work order for that facility. There was never any understanding or any statements by me to LP or Mr. Battaglin to the effect that LP would be issued a work order, if it would make a site visit and prepare a draft work order/scope of work. My project managers, including Sam Southern, Bruce Rothermel, Paul Steiner, Jesse McNabb, and Lois Gunlogson, knew that the making of a site visit and the preparation of draft work orders/scopes of work with an IQC contractor did not guarantee that the USPS would issue a work order to the contractor, and they also knew that only the contracting officer possessed the authority to issue a USPS work order. App. 50. USPS project managers did not have any authority to issue work orders pursuant to IQCs. App. 50. Only the contracting officer was designated as having the authority to issue work orders. App. 50. By letters dated May 17, 1994, June 3, 1996, and June 6, 1996, LP was informed that only the contracting officer had authority to issue work orders, and was notified that USPS project managers did not have authority to issue work orders. App. 41, 52, 155.

I gave directions to the project managers concerning the facilities that they were to visit and the types of work that they were to scope out at the facility. Project mangers had to work through me and they did not have the authority to decide unilaterally whether they would direct an IQC contractor to make a site visit for the purpose of preparing a draft work order/scope of work. Project managers had no actual authority and I did not ratify their actions with regard to giving directions to IQC contractors to make site visits for the purpose of preparing draft work

orders/scopes of work.

13. In paragraph 19 of Plaintiff's Proposed Findings of Uncontroverted Fact and paragraph 20 of Mr. Battaglin's declaration, LP asserts that "project managers assisted LP in obtaining access to the facility and acted as mediators between LP and the facility Post Master." USPS project managers did not act as mediators between LP and the facility postmasters. LP was not supposed to negotiate with the USPS postmasters and was not supposed to provide postmasters with draft work orders/scopes of work. However, LP got into arguments with postmasters, and I repeatedly received complaints from postmasters relating to LP's actions.

14. Paragraphs 20 through 22 of Plaintiff's Proposed Findings of Uncontroverted Fact and paragraphs 21 through 23 of Mr. Battaglin's declaration do not correctly state the practice under LP's IQCs. In my paragraphs 11 through 12 above, I described the practice under LP's IQCs. It also was improper for LP to submit draft work orders/scopes of work to the facility postmaster. LP was allowed to make site visits and prepare draft work orders/scopes of work together with the USPS project manager. However, Mr. Battaglin also made unauthorized site visits to USPS facilities and submitted unsolicited draft work orders/scopes of work.

In paragraph 21 of Plaintiff's Proposed Findings of Uncontroverted Fact, LP asserts that, if Mr. Battaglin was directed to make a site visit and develop a draft work order, "Mr. Battaglin expected and understood that LP would thereafter be given the work for which LP had developed" the draft work order. Mr. Battaglin could not have reasonably expected or understood that LP would receive the work if LP was instructed to perform a site visit and prepare a draft work order, and did so. There was never any promise or guarantee by the USPS that LP would receive the work if LP made a site visit and scoped the work. I never promised or

stated to Mr. Battaglin that LP would receive the work if it made a site visit and scoped the work.

Mr. Battaglin's letters also acknowledged that the USPS could contract with other sources for work that LP had scoped or prepared a draft work order. In his letter dated April 30, 1997, Mr. Battaglin requested that LP be placed on Mr. Fernandez's "solicitation bid list" and acknowledged that the USPS might contract with other sources for projects that LP allegedly had scoped. LP App. 28. In his letter dated September 20, 1996, Mr. Battaglin requested that the USPS schedule another site visit at facilities that, according to Mr. Battaglin, already had been scoped by LP. LP App. 26. The IQCs themselves stated that the USPS could contract for such work through other sources. App. 57, 60.

In paragraph 22 of Plaintiff's Proposed Findings of Uncontroverted Fact and paragraph 23 of Mr. Battaglin's declaration, LP refers to 98 work orders. I am informed that LP's reference to 98 work orders refers to the list of 98 projects at pages 410-435 of the Government's appendix. However, the list of 98 projects in the Government's appendix includes the fixed price contracts that were awarded to LP. App. 423-35. Thus, LP is incorrect in referring to "a total of 98 work orders issued under the IQCs" because the 98 projects listed include LP's fixed price contracts, and those fixed price contracts were not issued under any IQCs. The process for awarding fixed price contracts, including those issued to LP, was different from the process for issuing work orders under an IQC.

15. Paragraphs 23-24 of Plaintiff's Proposed Findings Of Uncontroverted Fact and paragraphs 24-25 of Mr. Battaglin's declaration do not correctly describe the practice under LP's IQCs, and I have described the practice under LP's IQCs in my paragraphs 11 through 12 above. LP and Mr. Battaglin did not reasonably anticipate the issuance of a signed USPS work order for

the 12 projects. The practice was that (1) LP and the USPS would agree on the work to be done, including the line items and quantities of each line item, (2) the USPS would provide a written work order to LP, (3) Mr. Battaglin would sign the USPS work order and return it, and (4) the contracting officer would sign the USPS work order and issue it to LP. The contracting officer also would sign and issue a Notice to Proceed with the work. App. 65, 168. Absent such actions by the contracting officer, there was never any contract for work at a facility. I have addressed the 12 alleged draft work orders/scopes of work at issue below.

16. Paragraph 25 of Plaintiff's Proposed Findings Of Uncontroverted Fact and paragraph 26 of Mr. Battaglin's declaration make allegations with regard to the alleged 12 draft work orders/scopes of work. I have reviewed the records for the Berwick Modular Post Office together with the records for the St. Davids Modular Post Office. These were two sites where the USPS wanted to install a trailer or modular post office. The USPS requested and received bids from WM Aupperle for site preparation work at both sites. App. 302-03, 470-71. LP was invited to submit bids for site preparation work at both sites. LP submitted draft work orders for site preparation work at both sites. App. 305-07, 466-69. I awarded the work to the lowest bidder, awarding the Berwick Modular site preparation work to WM Aupperle as a fixed price contract (App. 304), and the St. Davids Modular site preparation work to LP as a work order under its IQC (App. 472). LP's price for Berwick was considered, but WM Aupperle's bid for Berwick was lower.

I decided to award the Downers Grove dock enclosure work through a simplified acquisition process, rather than an IQC. App. 343. By letter dated November 26, 1996, I notified Waner Enterprises of our intention to award it a contract for the Downers Grove dock enclosure.

App. 343. In January 1997, I awarded Waner Enterprises the Downers Grove dock enclosure contract, in the amount of $46,890.00, after adequate competition. App. 344, 341-42. I received LP's letter dated December 3, 1996, inquiring about the USPS's solicitation of bids for the Downers Grove dock enclosure. App. 345. I also received the letter of LP's attorney, dated December 17, 1996, regarding the bid results for the Downers Grove dock enclosure and requesting a final decision on its claim concerning LP's not being awarded the Downers Grove dock enclosure. App. 346. In February 1997, I received a January 31, 1997 letter from LP's attorney withdrawing LP's claim regarding the Downers Grove dock enclosure. App. 351.

There also were difficulties with LP's work at the Downers Grove Post Office. The USPS issued LP work order number 20.00, dated September 9, 1996, in the amount of $77,070.92, for lobby renovation work at the Downers Grove Post Office. App. 901-11. There was a concern about the structural integrity of an interior partition wall which was to be removed. App. 913, 918. That concern was resolved through an inspection and report of a structural engineer, dated October 9, 1996. App. 919. There were days that LP did not perform work at the facility. App. 922, 937-38. By letter dated November 15, 1996, LP stated that it would suspend work at the site. App. 931. At a meeting on November 20, 1996, I directed LP to immediately proceed with the work at Downers Grove, and issued a letter so directing. App. 939. On December 19, 1996, the USPS issued work order 20.01, deleting certain items of work from the Downers Grove project and reducing the prior work order by $16,572.07. App. 941-49.

With regard to LP's claim that it submitted a draft work order for the Hoopeston handicap ramp, LP did not provide me with a draft work order. Rather, in May 1997, in a letter referencing the "Hoopeston Post Office; Concrete Ramp," LP stated as follows:

> As we previously discussed, and outlined in our April 30th letter to you, we are pleased to submit a price to accomplish the subject work as shown per A.M. Fernandez, Arch., drawings. Total cost: $62,752.00.

App. 370. LP did not submit the draft work order in the amount of $62,000 for the Hoopeston ramp, that is contained in the Government's appendix at pages 663-65. Instead, LP provided an unsolicited bid in the amount of $62,752.00 in its May 1997 letter. App. 370, 379. I provided a detailed response to LP's July 25, 1997 bid protest in my memorandum dated September 10, 1997, which addresses other allegations related to this matter. App 378-83.

In late April 1997, Mr. Battaglin had visited my office and noticed the drawing for the Hoopeston ramp out on a table and asked to take a copy. App. 379. I replied that it was "too late to bid, all decisions had been made." App. 379. Mr. Battaglin responded, "Oh that's okay, I just want to see the difference between this and Paxton." App. 379. I permitted him to take the drawing, and in May 1997, I received LP's letter containing an unsolicited bid in the amount of $62,752 for the Hoopeston handicap ramp. App. 379. I later saw Mr. Battaglin and again explained that LP's bid "was too late" and he responded, "I know, I just wanted you to have it anyway." App. 379.

The notes contained on Mr. Battaglin's letter dated May 29, 1997, were not on the letter when I received it. LP App. 29. I have no knowledge regarding those notes.

17. With regard to paragraph 26 of Plaintiff's Proposed Findings of Uncontroverted Fact and paragraph 27 of Mr. Battaglin's declaration, the USPS issued the following work orders to LP:

Rossville work order 7.00 (July 1997)(App. 849-59);
Sugar Grove work order 31.00 (August 1995)(App. 772-78);

Sugar Grove work order 31.01 (October 1995, a modification)(App. 779-84);
Millbrook work order 10.00 (September 1996)(App. 817);
Millbrook work order 49.00 (December 1995)(App. 785-93);
Millbrook work order 49.01 (March 1997, a modification)(App. 818);
Millbrook work order 49.02 (March 1997, another modification)(App. 819);
Wellington work order 5.00 (October 1997)(App. 868-76).

The USPS also issued South Holland work order 1.00 (September 1999, under IQC 162640-99-B-0039), after I left the USPS. App. 897. The process for issuance of work orders was as described in my paragraphs 11 through 12 above, and not as described in Plaintiff's Proposed Findings of Uncontroverted Fact or Mr. Battaglin's declaration.

18. In paragraph 27 of Plaintiff's Proposed Findings of Uncontroverted Fact and paragraph 28 of Mr. Battaglin's declaration, LP asserts that I informed Mr. Battaglin that Mr. Fernandez was in the process of soliciting competitively for the 12 projects at issue in LP's lawsuit. That is incorrect, and I did not make the alleged statement to Mr. Battaglin.

Further, Mr. Fernandez was not involved with a number of the 12 projects listed in LP's claim letters. With regard to the Berwick Modular Post Office and the St. David Modular Post Office, Mr. Fernandez did not serve as the architect and was not involved in the procurement. I never told Mr. Battaglin that Mr. Fernandez was soliciting bids for the Berwick Modular Post Office. On November 26, 1996, I awarded WM Aupperle a contract for site preparation work for the Berwick Modular Post Office. App. 304.

Up until my retirement in March 1999, the USPS did not solicit bids for: (1) the Beaverville Post Office lobby and building renovation, (2) the East Lynn Post Office building renovation, (3) the Papineau Post Office interior renovation and concrete ramp, (4) the St. Anne Post Office concrete and asphalt and interior renovation, (5) the Union Hill Post Office interior

and exterior ramp, and (6) the Aroma Park interior lobbies and building renovation. App. 960. I never told Mr. Battaglin that Mr. Fernandez was soliciting bids for any of those six projects.

With regard to the Momence handicap ramp, the USPS solicited bids for that project in the summer of 1998. App. 442-45. As indicated in my September 8, 1998 note to Samuel Southern, I decided to award the Momence handicap ramp to Somers Company, Inc., which submitted the lowest bid. App. 445-46. In August 1998, Mr. Fernandez prepared drawings for the Momence handicap ramp, but did not solicit bids for that procurement. App. 442-44. The bids were submitted to the contracting officer. App. 442-44. I never told Mr. Battaglin that Mr. Fernandez was soliciting bids for the Momence handicap ramp.

Also, with regard to the Momence Post Office, in January 1999, Mr. Fernandez prepared drawings for the USPS detailing the lobby renovation work to be completed at Momence. In February 1999, I awarded work order 4.0 to IQC contractor Somers Company, Inc. for the lobby renovation work at Momence. App. 966-73. Any draft work order/scope of work that Mr. Battaglin may have prepared in 1996 for Momence could not have been based upon the detailed drawings that Mr. Fernandez provided to the USPS in 1999.

19. With regard to paragraph 28 of Plaintiff's Proposed Findings of Uncontroverted Fact and paragraph 29 of Mr. Battaglin's declaration, I received LP's letter dated April 30, 1997. LP App. 28. LP refers to this letter as LP's "attempts to be included in that competitive process" regarding the handicap ramps for which Mr. Fernandez solicited bids. As I informed LP in my letter dated June 4, 1997, the Hoopeston handicap ramp already had been decided. LP App. 30. Bids already had been solicited for various handicap ramps in August and September of 1996. App. 309-15 (Bradley ramp), 332-39 (Brookfield ramp); 353-67 (Hoopeston ramp).

20. In paragraph 29 of Plaintiff's Proposed Findings of Uncontroverted Fact and paragraph 30 of Mr. Battaglin's declaration, LP asserts that, "[f]or reasons never explained by the USPS, LP was summarily excluded from the solicitation process" for the 12 projects. That is incorrect.

As explained in my paragraph 16, LP was invited to submit a bid for the Berwick Modular Post Office, and provided a draft work order. LP's price was higher than the price of the awardee, WM Aupperle. App. 302-07.

Up until my retirement in March 1999, the USPS did not solicit bids for six of the 12 projects and LP was not excluded from any solicitation for those six projects: (1) the Beaverville Post Office lobby and building renovation; (2) the East Lynn Post Office building renovation; (3) the Papineau Post Office interior renovation and concrete ramp; (4) the St. Anne Post Office concrete and asphalt and interior renovation; (5) the Union Hill Post Office interior and exterior ramp; and (6) the Aroma Park interior lobbies and building renovation.

With regard to the Hoopeston handicap ramp, LP was provided with my letter, dated September 10, 1997, and supporting documents, which addressed the solicitations for handicap ramps in August and September of 1996. App. 378 (my letter); App. 309-15 (Bradley ramp), 332-39 (Brookfield ramp); 353-67 (Hoopeston ramp). The USPS had adequate competition for the projects that it solicited competitively, and it was not necessary or advisable to invite all potential contractors to submit bids for those projects, i.e., the Hoopeston handicap ramp, Bradley Post Office handicap ramp, Brookfield Post Office dock enclosure, Brookfield Post Office handicap ramp, Downers Grove Post Office dock enclosure, and Momence Post Office handicap ramp. Contractors that were not invited to bid were not "summarily excluded;" the

USPS had adequate competition.

21. In paragraph 30 of Plaintiff's Proposed Findings of Uncontroverted Fact and paragraph 31 of Mr. Battaglin's declaration, LP asserts that I "handpicked" the contractors that were permitted to bid the 12 projects. That assertion is incorrect.

Up until my retirement in March 1999, the USPS did not solicit bids for six of the 12 projects, i.e., (1) the Beaverville Post Office lobby and building renovation, (2) the East Lynn Post Office building renovation, (3) the Papineau Post Office interior renovation and concrete ramp, (4) the St. Anne Post Office concrete and asphalt and interior renovation, (5) the Union Hill Post Office interior and exterior ramp, and (6) the Aroma Park interior lobbies and building renovation.

With regard to the Hoopeston handicap ramp, the Bradley handicap ramp, and the Brookfield handicap ramp, bids were solicited in August and September 1996. App. 309-15 (Bradley), 332-39 (Brookfield); 353-67 (Hoopeston). Mr. Fernandez was provided with a list of five contractors to solicit bids. App. 395 (Fernandez letter to Rigsby dated August 13, 1996). Those contractors had done work for the USPS before and "had the expertise to do ramp work." App. 689 (Rigsby Dep. 113). Mr. Fernandez added Phoenix Construction Company to the list, and I agreed to that addition. App. 395.

22. With regard to paragraph 31 of Plaintiff's Proposed Findings of Uncontroverted Fact and paragraph 32 of Mr. Battaglin's declaration, by letter dated April 30, 1997, LP submitted a bid in the amount of $42,000 for the handicap ramp at the Paxton Post Office. App. 489. On June 28, 1997, I awarded LP a simplified purchase contract in the amount of $42,000 for the Paxton handicap ramp. App. 491.

23. In paragraphs 32 and 33 of Plaintiff's Proposed Findings of Uncontroverted Fact and paragraphs 33 and 34 of Mr. Battaglin's declaration, LP asserts that Mr. Battaglin asked for and received the bid package for the Hoopeston handicap ramp, and that LP provided an offer, which for reasons unknown to LP, was rejected. LP's assertions are incorrect. I addressed the Hoopeston handicap ramp in my paragraph 16 above. Mr. Battaglin asked if he could take a drawing for the Hoopeston handicap ramp, and he took the drawing. App. 379. Mr. Battaglin did not ask for a bid package for the Hoopeston handicap ramp and did not receive a bid package. App. 379. As stated in my September 10, 1997 memorandum,

> in late April 1997, Mr. Battaglin visited by office to drop off some documents and as he was leaving he noticed a drawing for the Hoopeston Ramp on a table near the door and said, "Can I take one of these," and I replied, "It is too late to bid, all decisions have been made," and he said, "Oh that's okay, I just want to see the difference between this and Paxton." In the spirit of cooperation I permitted him to take the drawing, and on May 19, 1997 I received a ($62,752) bid for the project. I later saw Mr. Battaglin and again explained to him that his bid was "too late" and he replied, "I know, I just wanted you to have it anyway."

App. 379.

Mr. Battaglin knew why LP's unsolicited bid for the Hoopeston ramp was rejected. Before LP provided its bid, I told Mr. Battaglin that it was "too late" for LP to bid the Hoopeston ramp and that "all decisions had been made." App. 379. After receipt of LP's unsolicited bid contained in its May 1997 letter, I again told Mr. Battaglin that LP's bid was too late and he replied, "I know, I just wanted you to have it anyway." App. 379. LP also filed a bid protest and received my September 10, 1997 letter (App. 378) and supporting documentation, as well as the USPS's October 1, 1997 decision denying the bid protest. App. 438.

24. In paragraph 34 of Plaintiff's Proposed Findings Of Uncontroverted Fact and paragraph 35 of Mr. Battaglin's declaration, LP asserts that "when LP became aware that several of the subject facilities had been solicited, LP protested," and cites to its April 30, 1997 letter contained in its appendix at page 28. I received the April 30, 1997 LP letter. It is unclear what solicitations LP claims to have known about. Bids had been solicited for various handicap ramps in August and September 1996, including the Hoopeston ramp (App. 353-68), the Bradley ramp (App. 309-11), and the Brookfield ramp. App. 332-39.

25. In paragraphs 35 and 36 of Plaintiff's Proposed Findings Of Uncontroverted Fact and paragraphs 36 and 37 of Mr. Battaglin's declaration, LP asserts that, after its April 30, 1997 letter "protesting" to the USPS, LP was not contacted to produce scopes of work or perform work under its IQC. These statements are incorrect. The USPS continued to issue work orders to LP, and LP continued to perform work under its IQCs.

For example, with regard to the St. David Modular Post Office, on December 9, 1996, the USPS had issued LP work order 2.0 in the amount of $31,932.72.00. App. 472. On about August 25, 1997, LP submitted a draft work order in the amount of $17,308.27. App. 890. On about October 15, 1997, LP submitted another draft work order in the amount of $45,130.33. App. 891-92. In November 1997, the USPS issued LP work order 2.01 in the amount of $39,932.63 for the St. David Modular Post Office. App. 886-89. On July 2, 1997, LP submitted a request for payment for work performed at St. David in the amount of $21,412.72. App. 893. On May 28, 1998, LP submitted its final request for payment for work performed at St. David. App. 896.

In May 1997, the USPS issued LP work order 4.0 for lobby/interior painting at the

Roberts Post Office. App. 839. On May 1, 1997, the USPS issued LP work order 3.00 in the amount of $21,666.51 for lobby renovation work at the Thawville Post Office. App. 820. On July 28, 1997, the USPS issued LP work order 7.00 in the amount of $30,990.20 for interior renovation work at the Rossville Post Office. App. 849. On October 25, 1997, the USPS issued LP work order 5.00 in the amount of $19,998.85 for lockbox renovation work at the Wellington Post Office. App. 868.

In addition, LP was issued fixed price contracts after April 30, 1997. On June 28, 1997, I awarded LP a simplified purchase contract in the amount of $42,000 for the Paxton Post Office handicap ramp. App. 491.

26. With regard to paragraphs 37 and 38 of Plaintiff's Proposed Findings of Uncontroverted Fact and paragraphs 38 and 39 of Mr. Battaglin's declaration, I have no knowledge of these activities of the Office of Inspector General ("OIG") and the OIG did not contact me with regard to Andrew Fernandez.

27. With regard to paragraph 39 of Plaintiff's Proposed Findings Of Uncontroverted Fact and paragraph 40 of Mr. Battaglin's declaration, I do not have knowledge regarding those allegations.

28. I agree with paragraph 40 of Plaintiff's Proposed Findings Of Uncontroverted Fact and paragraph 41 of Mr. Battaglin's declaration for the period of time that I served as Manager of Administrative Services for the Central Illinois District Office.

29. In paragraph 41 of Plaintiff's Proposed Findings Of Uncontroverted Fact and paragraph 42 of Mr. Battaglin's declaration, LP asserts that it was Mr. "Battaglin's understanding and expectation that the USPS Procurement Manual and Purchasing Manual and their applicable

regulations would require that LP be provided with at least the opportunity to compete for the" 12 projects and "for comparable work which was formally competed." LP's alleged understanding and expectation are not supported by any provisions of the USPS Procurement Manual, the Purchasing Manual or regulations. The USPS Procurement Manual and the USPS Purchasing Manual did not require that the USPS solicit bids from all interested contractors. The USPS Procurement Manual, in the provisions for simplified purchases, provided: "Proposals or quotations must be solicited from a sufficient number of qualified sources (normally at least three) to ensure that the price is fair and reasonable." App. 260. The USPS Purchasing Manual (effective January 31, 1997) provides: "Proposals or quotations must be solicited from a sufficient number of qualified sources to ensure adequate competition." App. 265, 267. Also LP's IQCs stated, in their Quantity of Work clause, as follows:

> The Postal Service reserves the right to undertake, by Postal Service sources or others, the same type of work or similar work as contracted for in this contract, in the area covered by this contract, while this contract is in force.

App. 4, 57, 160.

30. With regard to paragraph 42 of Plaintiff's Proposed Finding Of Uncontroverted Fact and paragraph 43 of Mr. Battaglin's declaration, it was standard practice for the USPS to have its project managers meet with IQC contractors for site visits and together estimate quantities of items and prepare draft work orders/scopes of work or price proposals. As explained in my paragraphs 11 through 12 above, LP's practice was different, however, in that Mr. Battaglin also would scope out work at USPS facilities, without being directed or requested to do so by the USPS.

31. In paragraph 43 of Plaintiff's Proposed Findings Of Uncontroverted Fact, LP asserts that I have "no current direct recollection of the [12] projects in question," and that I am "not familiar with any with the exception of Aroma Park." That is incorrect. At my deposition, I stated: "The Hoopeston ramp, I do remember that." App. 975 (Rigsby Dep. 12). I also addressed other handicap ramp projects. For example, I stated that we competed the Bradley Post Office handicap ramp because "we felt it was in the best interest of the postal service to do that." App. 687 (Rigsby Dep. 78). I explained that "in the case of the ramps, it was not just one ramp involved ... there may have been 20-plus ramps involved.... So the decision was to do all the ramps at one time." App. 687 (Rigsby Dep. 80). I also stated that there was "adequate competition" because the USPS had "four contractors bidding," and that "you don't have to invite the IQC [contractor] to bid on the project under the simplified purchasing process." App. 687 (Rigsby Dep. 80).

I retired in March 1999, and much time has passed since the events at issue, much of which relates to the 1995 to 1997 timeframe. Many of the relevant facts are set forth in my letter dated September 10, 1997, App. 378-84, which was supported by documentation. I do need to see the relevant documents, and I have relied upon them to refresh my recollections.

32. I agree with paragraph 44 of Plaintiffs' Proposed Finding Of Uncontroverted Fact. However, some of the draft work orders/scopes of work that the USPS received from LP were not requested by the USPS.

33. With regard to paragraphs 45 and 46 of Plaintiff's Proposed Findings Of Uncontroverted Fact, LP asserts that the USPS, including the contracting officer, routinely and regularly directed LP to go to USPS facilities and perform site surveys or field surveys, typically

with USPS personnel, and generate work orders at USPS's request. This is not wholly correct. LP was requested to go and look at the facility with the USPS project manager, and the USPS manager and LP together would estimate the quantities of line items of work and prepare a draft work order/scope of work for a particular project. LP was to look at only those items or areas pertinent to the proposed project, and was not requested to make a general survey of the facility to suggest deficiencies or recommend possible improvements.

34. In paragraph 47 of Plaintiff's Proposed Findings Of Uncontroverted Fact, LP asserts that the USPS would also regularly ask other IQC contractors, including St. Louis Design and Construction and Somers Company, Inc., to "self-perform such tasks." What the USPS asked of its IQC contractors, including St. Louis Design and Construction and Somers, was to go and look at USPS facilities with USPS project managers and estimate the quantities of work items for a proposed project, and submit a proposal.

35. With regard to paragraph 48 of Plaintiffs' Proposed Findings of Uncontroverted Fact, A.M. Fernandez had an IQC contract for architectural services with the USPS. App. 388. Sometimes Mr. Fernandez prepared draft scopes of work for that contract and submitted them to the USPS, and sometimes the USPS prepared the scopes of work and issued them to A.M. Fernandez.

36. Paragraphs 49 and 50 of Plaintiff's Proposed Findings Of Uncontroverted Fact do not correctly describe the process under LP's IQCs. As explained in my paragraphs 11 through 12 above, LP was not directed to perform detailed field surveys of a facility to determine possible improvements. Mr. Battaglin and the USPS project manager together would look at the site and estimate the quantities of various line items of work and prepare a draft work order/scope of

work. As explained in my paragraph 16 above, LP was invited to submit bids for the site preparation work for the Berwick Modular Post Office and the St. David Modular Post Office, and provided draft work orders/scopes of work with its prices.

37. In paragraph 51 of Plaintiff's Proposed Findings Of Uncontroverted Fact, LP states that "it was against USPS policy to send two IQC contractors to the same project." It was the practice of the USPS not to request or direct that two IQC contractors scope out the same project at a facility, but this practice was not a written policy. App. 679 (Rigsby Dep. 26-27). The USPS could request that different IQC contractors scope out different projects at the same facility.

38. In paragraph 52 of Plaintiff's Proposed Findings Of Uncontroverted Fact, LP asserts "if the USPS sent an IQC contractor to perform a USPS facility field survey, it was reasonable for them to assume that there was work to be done at that facility," and "there was an interest in having that contractor perform such work." As I stated, if we requested an IQC contractor to make a site visit, "it's fair to assume that there's an interest in having work done at that site." App. 680 (Rigsby Dep. 29-30). I also stated that everyone knows that by "virtue of your going to visit and look to see if there's work that needs to be done does not guaranty (sic) that you're going to get it done." App. 680 (Rigsby Dep. 29-30). There was never any guarantee that the contractor that made the site visit would receive a USPS work order for the project. I also was asked: "So, it's their cost [of the site visit] to eat, the contractor's?" and I answered: "At the time that that contract was being administered, . . . that was the case." App. 680 (Rigsby Dep. 30).

39. I agree with paragraph 53 of Plaintiff's Proposed Findings Of Uncontroverted Fact.

40. In paragraph 54 of Plaintiff's Proposed Findings Of Uncontroverted Fact, LP asserts

that my subordinates, including Messrs. Southern, Rothermel and McNabb, were directed and authorized to contact LP to perform site visits and direct LP to self-develop, prepare and submit work orders. LP has not correctly described the responsibilities of my subordinates or the process wherein LP and the USPS project manager together developed a draft work order/scope of work. In my paragraphs 11 through 12 above, I described the process under LP's IQCs. With regard to my subordinates, different individuals would be directed to do different things depending upon their abilities and their levels of expertise. At times, I directed Messrs. Southern, Rothermel, and McNabb to make site visits to certain facilities for the purpose of scoping out certain types of work. As explained in my paragraphs 11 through 12 above, my project managers did not have actual authority to decide what type of work they would scope out at postal facilities. My project managers were instructed to follow my directions with regard to the type of work to be scoped at postal facilities. Some of my subordinates were seldom, if ever, directed to scope out work at postal facilities.

41. In paragraph 55 of Plaintiff's Proposed Findings Of Uncontroverted Fact, LP claims that the USPS "utilized . . . Mr. Battaglin's expertise to develop scopes of work." This is incorrect. Mr. Battaglin together with USPS project managers would develop draft work orders/scopes of work. The USPS knew of Mr. Battaglin's ability to go out and produce a proposed scope of work and he was allowed to do that upon request. App. 678-79 (Rigsby Dep. 24-25).

42. I agree with paragraph 56 of Plaintiff's Proposed Findings Of Uncontroverted Fact.

43. In paragraph 57 of Plaintiff's Proposed Findings Of Uncontroverted Fact, LP asserts that "the USPS is not permitted to compete work to be performed under an IQC contract." This

is incorrect in that there is no particular project that is "to be performed under an IQC contract." The USPS IQCs state as follows:

> The Postal Service reserves the right to undertake, by Postal Service sources or others, the same type of work or similar work as contracted for in this contract, in the area covered by this contract, while this contract is in force.

App. 4, 57, 160.

It was not the USPS's practice to compete IQC work in the sense that the USPS would not request or direct two IQC contractors to scope out the same project at a facility. App. 679 (Rigsby Dep. 26-27). Two IQC contractors could be requested to make site visits at the same facility to scope out different work.

44. In paragraphs 58 and 59 of Plaintiff's Proposed Findings Of Uncontroverted Fact, LP asserts that "LP was not included in the bidders selected by Mr. Rigsby to bid upon the following projects: Aroma Park, Berwick, Bradley [ramp], Brookfield dock enclosure, Brookfield ramp, Downers Grove [dock enclosure], Hoopeston ramp, and Paxton [ramp]" and that "LP was not excluded for any particular reason" from these solicitations, "except that Mr. Rigsby believed that LP had gotten enough work." These statements are incorrect.

As explained in my paragraph 18 above, there was no solicitation for Aroma Park before my retirement, and I did not select the contractors that were invited to bid for Aroma Park.

As explained in my paragraph 16 above, LP was invited to submit a bid for the Berwick Modular Post Office site preparation work, and submitted a draft work order/scope of work with its price. LP's price was considered, but the awardee's price was lower than LP's price. App. 302-07.

With regard to the handicap ramp projects, it was in the USPS's interest to compete the ramp projects, and "in the case of the ramps, it was not just one ramp involved ... there may have been 20-plus ramps involved. . . . So the decision was to do all the ramps at one time." App. 687 (Rigsby Dep. 80). I also stated that the USPS had "adequate competition" because we had "four contractors bidding," and that "you don't have to invite the IQC [contractor] to bid on the project under the simplified purchasing process." App. 687 (Rigsby Dep. 80). I also explained that the list of contractors for the ramps came "from contractors that had done work for us before and who had the expertise to do ramp work." App. 689 (Rigsby Dep. 113). LP's attorney asked why LP was not on the list, and I responded "because this [referring to the list of contractors for the ramps] was enough competition right here" and LP "was not excluded for any particular reason. We just had enough competition." App. 689 (Rigsby Dep. 113). As I stated, "if you've got enough competition, you have enough competition. I don't want to put ten contractors [on the list]." App. 689 (Rigsby Dep.113). The USPS had adequate competition to award contracts for the Bradley handicap ramp (309-15), the Brookfield ramp (App. 332-34), and the Hoopeston handicap ramp. App. 353-67, 378-83 (my Sept. 10, 1997 letter).

The USPS also had adequate competition to award the contracts for the Brookfield dock enclosure and the Downers Grove dock enclosure. App. 325, 329-30.

As explained in my paragraph 22 above, LP submitted a bid for the handicap ramp at the Paxton Post Office, and, in June 1997, I awarded LP a simplified purchase contract for the Paxton ramp. App. 489-91.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on
03-31-05

Robert Rigsby

GEORGE S. SMITH, P.C.
CERTIFIED PUBLIC ACCOUNTANT
16958 DIXIE HIGHWAY
HAZEL CREST, ILLINOIS 60429

(708) 335-0900

May 19, 1997

Board of Directors
L. P. Consulting Group, Inc.
10401 South 75th Avenue
Palos Hills, IL 60465-2015

We have reviewed the accompanying balance sheet of L. P. Consulting Group, Inc. as of December 31, 1996 and 1995 and the related statements of income and retained earnings, and statement of cash flow for the years then ended, in accordance with generally accepted review standards. All information included in these financial statements is the representation of the management of L. P. Consulting Group, Inc.

A review consists principally of inquiries of company personnel and analytical procedures applied to financial data. It is substantially less in scope than an examination in accordance with generally accepted auditing standards, the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

Based on our review, we are not aware of any material modifications that should be made to the accompanying financial statements in order for them to be in conformity with generally accepted accounting principles.

George S. Smith

GEORGE S. SMITH
Certified Public Accountant

EXHIBIT 1

L. P. CONSULTING GROUP, INC.

BALANCE SHEET
(Reviewed without Audit)

ASSETS

| | For the Years Ended December 31, 1996 | 1995 |
|---|---|---|
| CURRENT ASSETS: | | |
| Cash | $ 26,440. | $ 5,768. |
| Receivables | 17,884. | 111,184. |
| Deposit | 375. | 375. |
| Inventory | - | 1,648. |
| Recoverable income taxes | 5,194. | 11,398. |
| Note and account due from shareholder | 16,102. | - |
| TOTAL CURRENT ASSETS | $ 65,995. | $130,373. |
| EQUIPMENT AND VEHICLES at cost, less depreciation | 6,563. | 6,842. |
| OTHER ASSETS: | | |
| Non-current portion of installment note due from shareholder | 38,828. | - |
| Investment in coins | 3,769. | 3,769. |
| Organization expense, less amortization | 280. | 420. |
| TOTAL OTHER ASSETS | $ 42,877. | $ 4,189. |
| | $115,435. | $141,404. |

LIABILITIES

| | 1996 | 1995 |
|---|---|---|
| CURRENT LIABILITIES: | | |
| Short-term portion of note payable | - | $ 2,965. |
| Accounts payable | - | 10,272. |
| Accrued payroll taxes | 11,402. | 1,214. |
| Retirement liability | 17,750. | 11,375. |
| Dues to officer | - | 13,149. |
| TOTAL CURRENT LIABILITIES | $ 29,152. | $ 38,975. |
| INSTALLMENT NOTES - less maturities shown above | - | 4,246. |
| STOCKHOLDERS' EQUITY: | | |
| Capital stock | 100. | 100. |
| Additional paid-in capital | 8,239. | 8,239. |
| Retained earnings | 77,944. | 89,844. |
| TOTAL STOCKHOLDERS' EQUITY | $ 86,283. | $ 98,183. |
| | $115,435. | $141,404. |



The accompanying notes to the financial statements and the auditor's review report are an integral part of this unaudited

EXHIBIT 2

L. P. CONSULTING GROUP, INC.
STATEMENT OF INCOME AND RETAINED EARNINGS
(Reviewed without Audit)

| | For the Years Ended December 31, 1996 | 1995 |
|---|---|---|
| NET REVENUE | $680,737. | $610,476. |
| COST OF JOBS | | |
| Materials | 183,359. | $204,620. |
| Sub-Contractors | 314,340. | 256,175. |
| TOTAL COST OF SALES | 497,699. | 460,795. |
| GROSS PROFIT | 183,038. | 149,681. |
| OPERATING EXPENSES | 177,077. | 119,082. |
| INCOME FROM OPERATIONS | 5,961. | 30,599. |
| OTHER INCOME OR (DEDUCTIONS) | | |
| Retirement expense | (17,750.) | (11,375.) |
| Interest income | 463. | 159. |
| Interest expense | (274.) | (954.) |
| Miscellaneous expense | (300.) | (1,867.) |
| TOTAL OTHER INCOME OR (DEDUCTIONS) | (17,861.) | (14,037.) |
| NET INCOME OR (LOSS) BEFORE TAXES | (11,900.) | 16,652. |
| Income taxes | - | 3,691. |
| NET INCOME OR (LOSS) AFTER TAXES | (11,900.) | 12,871. |
| RETAINED EARNINGS | | |
| - at Beginning of Year | 89,844. | 76,973. |
| - at End of Year | $ 77,944. | $ 89,844. |

The accompanying notes to the financial statements and the Auditor's review report are an integral part of this unaudited statement.

EXHIBIT 3
Page 1 of 2

L. P. CONSULTING GROUP, INC.
STATEMENT OF CASH FLOWS
(Reviewed without Audit)

| | For the Years Ended December 31, 1996 | | 1995 | |
|---|---|---|---|---|
| INCREASE OR (DECREASE) IN CASH AND CASH EQUIVALENTS | | | | |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | | | |
| Net income or (loss) | | $(11,900.) | | $ 12,871. |
| Adjustments to reconcile net income to cash provided by operating activities: | | | | |
| Depreciation | $ 3,001. | | $ 4,563. | |
| Amortization | 140. | | 140. | |
| (Increase) or decrease in - | | | | |
| Accounts receivable | 93,300. | | (88,172.) | |
| Deposits | - | | (375.) | |
| Inventory | 1,648. | | 235. | |
| Recoverable income taxes | 6,204. | | (12,313.) | |
| Prepaid expenses | - | | 5,514. | |
| Increase or (decrease) in - | | | | |
| Accounts payable | (10,272.) | | 4,061. | |
| Accrued payroll taxes | 10,188. | | (1,422.) | |
| Retirement contributions | 6,375. | | 1,922. | |
| Accrued expenses, other | - | | (2,038.) | |
| Total adjustments | | 110,584. | | (87,885.) |
| NET CASH CONSUMED BY OPERATING ACTIVITIES | | 98,684. | | (75,014.) |
| CASH FLOW FROM INVESTING ACTIVITIES: | | | | |
| Investment in coins | - | | (1,054.) | |
| Purchased equipment | (2,722.) | | - | |
| CASH CONSUMED BY INVESTING ACTIVITIES | | (2,722.) | | (1,054.) |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | | | |
| Proceeds from officer loans | 648. | | 21,000. | |
| Advances to officers, notes and accounts | (68,727.) | | (7,851.) | |
| Payment of installment note | (7,211.) | | (2,764.) | |
| NET CASH FROM FINANCING ACTIVITIES | | (75,290.) | | 10,385. |
| NET (DECREASE) IN CASH AND CASH EQUIVALENT | | 20,672. | | (65,683.) |
| CASH AND CASH EQUIVALENTS | | | | |
| - at beginning of year | | 5,768. | | 71,451. |
| - at end of year | | $26,440. | | $ 5,768. |

EXHIBIT 3
Page 2 of 2

L. P. CONSULTING GROUP, INC.
STATEMENT OF CASH FLOWS
(Reviewed without Audit)

SUPPLEMENTARY DISCLOSURES OF CASH FLOW INFORMATION
FOR THE YEARS ENDED DECEMBER 31,

| | 1996 | 1995 |
|---|---|---|
| Cash payments during the year: | | |
| Interest expense | $ 274. | $ 1,012. |
| Income taxes | - | $15,268. |

DISCLOSURE OF ACCOUNTING POLICY

For the purpose of the statement of cash flows, the Company considers its bank checking account, any certificates of deposit and money market accounts as its total cash and cash equivalents.

The accompanying notes to the financial statements and the Auditor's review report are an integral part of this unaudited statement.

GEORGE S. SMITH, P.C.
CERTIFIED PUBLIC ACCOUNTANT
16958 DIXIE HIGHWAY
HAZEL CREST, ILLINOIS 60429

(708) 335-0900

April 26, 1998

Board of Directors
L. P. Consulting Group, Inc.
10401 South 75th Avenue
Palos Hills, IL 60465-2015

We have reviewed the accompanying balance sheet of L. P. Consulting Group, Inc. as of December 31, 1997 and 1996 and the related statements of income and retained earnings, and statement of cash flow for the years then ended, in accordance with generally accepted review standards. All information included in these financial statements is the representation of the management of L. P. Consulting Group, Inc.

A review consists principally of inquiries of company personnel and analytical procedures applied to financial data. It is substantially less in scope than an examination in accordance with generally accepted auditing standards, the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

Based on our review, we are not aware of any material modifications that should be made to the accompanying financial statements in order for them to be in conformity with generally accepted accounting principles.

George S. Smith

GEORGE S. SMITH
Certified Public Accountant

EXHIBIT 1

L. P. CONSULTING GROUP, INC.

BALANCE SHEET
(Reviewed without Audit)

ASSETS

| | For the Years Ended December 31, 1997 | 1996 |
|---|---|---|
| CURRENT ASSETS: | | |
| Cash | $ 26,864. | $ 26,440. |
| Receivables | 39,500. | 17,884. |
| Deposit | 375. | 375. |
| Prepaid income taxes | 2,425. | 5,194. |
| Note and account due from shareholder | 16,558. | 16,102. |
| TOTAL CURRENT ASSETS | $ 85,722. | $ 65,995. |
| EQUIPMENT AND VEHICLES at cost, less depreciation | 4,495. | 6,563. |
| OTHER ASSETS: | | |
| Non-current portion of installment note due from shareholder | 31,556. | 38,828. |
| Investment in coins | 6,367. | 3,769. |
| Organization expense, less amortization | 140. | 280. |
| TOTAL OTHER ASSETS | $ 38,063. | $ 42,877. |
| | $128,280. | $115,435. |

LIABILITIES

| | 1997 | 1996 |
|---|---|---|
| CURRENT LIABILITIES: | | |
| Accounts payable | 21,124. | - |
| Accrued payroll taxes | 1,214. | 11,402. |
| Retirement liability | 10,000. | 17,750. |
| TOTAL CURRENT LIABILITIES | $ 32,338. | $ 29,152. |
| STOCKHOLDERS' EQUITY: | | |
| Capital stock | 100. | 100. |
| Additional paid-in capital | 8,239. | 8,239. |
| Retained earnings | 87,603. | 77,944. |
| TOTAL STOCKHOLDERS' EQUITY | $ 95,942. | $ 86,283. |
| | $128,280. | $115,435. |

1009

The accompanying notes to the financial statements and the accountant's review report are an integral part of this unaudited statement.

EXHIBIT 2

L. P. CONSULTING GROUP, INC.
STATEMENT OF INCOME AND RETAINED EARNINGS
(Reviewed without Audit)

| | For the Years Ended December 31, 1997 | 1996 |
|---|---|---|
| NET REVENUE | $658,902. | $680,737. |
| COST OF JOBS | | |
| Materials | 36,681. | $183,359. |
| Sub-Contractors | 475,458. | 314,340. |
| TOTAL COST OF SALES | 512,139. | 497,699. |
| GROSS PROFIT | 146,763. | 183,038. |
| OPERATING EXPENSES | 127,809. | 177,077. |
| INCOME FROM OPERATIONS | 18,954. | 5,961. |
| OTHER INCOME OR (DEDUCTIONS) | | |
| Retirement expense | (10,000.) | (17,750.) |
| Interest income | 3,500. | 463. |
| Interest expense | (26.) | (274.) |
| Miscellaneous expense | - .) | (300.) |
| TOTAL OTHER INCOME OR (DEDUCTIONS) | ( 6,526.) | (17,861.) |
| NET INCOME OR (LOSS) BEFORE TAXES | 12,428. | (11,900.) |
| Income taxes | 2,769. | - . |
| NET INCOME OR (LOSS) AFTER TAXES | 9,659. | (11,900.) |
| RETAINED EARNINGS | | |
| - at Beginning of Year | 77,944. | 89,844. |
| - at End of Year | $ 87,603. | $ 77,944. |

The accompanying notes to the financial statements and the accountant's review report are an integral part of this unaudited statement.

EXHIBIT 3
Page 1 of 2

L. P. CONSULTING GROUP, INC.
STATEMENT OF CASH FLOWS
(Reviewed without Audit)

| | For the Years Ended December 31, 1997 | | 1996 | |
|---|---|---|---|---|
| INCREASE OR (DECREASE) IN CASH AND CASH EQUIVALENTS | | | | |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | | | |
| Net income or (loss) | | $ 9,659. | | $(11,900.) |
| Adjustments to reconcile net income to cash provided by operating activities: | | | | |
| Depreciation | $ 2,068. | | $ 3,001. | |
| Amortization | 140. | | 140. | |
| (Increase) or decrease in - | | | | |
| Accounts receivable | (21,616.) | | 93,300. | |
| Inventory | - | | 1,648. | |
| Recoverable income taxes | 2,769. | | 6,204. | |
| Increase or (decrease) in - | | | | |
| Accounts payable | 21,124. | | (10,272.) | |
| Accrued payroll taxes | (10,188.) | | 10,188. | |
| Retirement contributions | (7,750.) | | 6,375. | |
| Total adjustments | | (13,453.) | | 110,584. |
| NET CASH CONSUMED BY OPERATING ACTIVITIES | | (3,794.) | | 98,684. |
| CASH FLOW FROM INVESTING ACTIVITIES: | | | | |
| Investment in coins | (2,598.) | | - | |
| Purchased equipment | - | | (2,722.) | |
| CASH CONSUMED BY INVESTING ACTIVITIES | | (2,598.) | | (2,722.) |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | | | |
| Proceeds from officer loans | 6,816. | | 648. | |
| Advances to officers, notes and accounts | - | | (68,727.) | |
| Payment of installment note | - | | (7,211.) | |
| NET CASH FROM FINANCING ACTIVITIES | | 6,816. | | (75,290.) |
| NET (DECREASE) IN CASH AND CASH EQUIVALENT | | 424. | | 20,672. |
| CASH AND CASH EQUIVALENTS | | | | |
| - at beginning of year | | 26,440. | | 5,768. |
| - at end of year | | $26,864. | | $26,440. |

EXHIBIT 3
Page 2 of 2

L. P. CONSULTING GROUP, INC.
STATEMENT OF CASH FLOWS
(Reviewed without Audit)

SUPPLEMENTARY DISCLOSURES OF CASH FLOW INFORMATION
FOR THE YEARS ENDED DECEMBER 31,

| | 1997 | 1996 |
|---|---|---|
| Cash payments during the year: | | |
| Interest expense | $ 26. | $274. |
| Income taxes | - | - |

DISCLOSURE OF ACCOUNTING POLICY

For the purpose of the statement of cash flows, the Company considers its bank checking account, any certificates of deposit and money market accounts as its total cash and cash equivalents.

The accompanying notes to the financial statements and the accountant's review report are an integral part of this unaudited statement.

GEORGE S. SMITH, P.C.
CERTIFIED PUBLIC ACCOUNTANT
16958 DIXIE HIGHWAY
HAZEL CREST, ILLINOIS 60429

(708) 335-0900

April 16, 1999

Board of Directors
L. P. Consulting Group, Inc.
10401 South 75th Avenue
Palos Hills, IL 60465-2015

We have reviewed the accompanying balance sheet of L. P. Consulting Group, Inc. as of December 31, 1998 and 1997 and the related statements of income and retained earnings, and statement of cash flow for the years then ended, in accordance with generally accepted review standards. All information included in these financial statements is the representation of the management of L. P. Consulting Group, Inc.

A review consists principally of inquiries of company personnel and analytical procedures applied to financial data. It is substantially less in scope than an examination in accordance with generally accepted auditing standards, the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

Based on our review, we are not aware of any material modifications that should be made to the accompanying financial statements in order for them to be in conformity with generally accepted accounting principles.

George S Smith

GEORGE S. SMITH
Certified Public Accountant

L. P. CONSULTING GROUP, INC.

BALANCE SHEET
(Reviewed without Audit)

ASSETS

| | For the Years Ended December 31, 1998 | 1997 |
|---|---|---|
| CURRENT ASSETS: | | |
| Cash | $ 66,186. | $ 26,864. |
| Receivables | 23,665. | 39,500. |
| Deposit | 375. | 375. |
| Prepaid income taxes | 2,804. | 2,425. |
| Note and account due from shareholder | - | 16,558. |
| TOTAL CURRENT ASSETS | $ 93,030. | $ 85,722. |
| EQUIPMENT AND VEHICLES at cost, less depreciation | 34,189. | 4,495. |
| OTHER ASSETS: | | |
| Non-current portion of installment note due from shareholder | - | 31,556. |
| Investment in coins | 6,367. | 6,367. |
| Organization expense, less amortization | - | 140. |
| TOTAL OTHER ASSETS | $ 6,367. | $ 38,063. |
| | $133,586. | $128,280. |

LIABILITIES

| | 1998 | 1997 |
|---|---|---|
| CURRENT LIABILITIES: | | |
| Accounts payable | 16,889. | 21,124. |
| Accrued payroll taxes | 1,542. | 1,214. |
| Retirement liability | 18,000. | 10,000. |
| TOTAL CURRENT LIABILITIES | $ 36,431. | $ 32,338. |
| STOCKHOLDERS' EQUITY: | | |
| Capital stock | 100. | 100. |
| Additional paid-in capital | 8,239. | 8,239. |
| Retained earnings | 88,816. | 87,603. |
| TOTAL STOCKHOLDERS' EQUITY | $ 97,155. | $ 95,942. |
| | $133,586. | $128,280. |

The accompanying notes to the financial statements and the accountant's review report are an integral part of this unaudited statement.

EXHIBIT 2

# L. P. CONSULTING GROUP, INC.
## STATEMENT OF INCOME AND RETAINED EARNINGS
(Reviewed without Audit)

| | For the Years Ended December 31, 1998 | 1997 |
|---|---|---|
| NET REVENUE | $979,213. | $658,902. |
| COST OF JOBS | | |
| Materials | 217,775. | 36,681. |
| Sub-Contractors | 552,565. | 475,458. |
| TOTAL COST OF SALES | 770,340. | 512,139. |
| GROSS PROFIT | 208,873. | 146,763. |
| OPERATING EXPENSES | 190,642. | 127,809. |
| INCOME FROM OPERATIONS | 18,231. | 18,954. |
| OTHER INCOME OR (DEDUCTIONS) | | |
| Retirement expense | (18,000.) | (10,000.) |
| Interest income | 1,811. | 3,500. |
| Interest expense | (32.) | (26.) |
| TOTAL OTHER INCOME OR (DEDUCTIONS) | (16,221.) | (6,526.) |
| NET INCOME OR (LOSS) BEFORE TAXES | 2,010. | 12,428. |
| Income taxes | 797. | 2,769. |
| NET INCOME OR (LOSS) AFTER TAXES | 1,213. | 9,659. |
| RETAINED EARNINGS | | |
| - At Beginning of Year | 87,603. | 77,944. |
| - At End of Year | $ 88,816. | $ 87,603. |

The accompanying notes to the financial statements and the accountant's review report are an integral part of this unaudited statement.

L. P. CONSULTING GROUP, INC.
STATEMENT OF CASH FLOWS
(Reviewed without Audit)

| | For the Years Ended December 31, 1998 | | 1997 | |
|---|---|---|---|---|
| INCREASE OR (DECREASE) IN CASH AND CASH EQUIVALENTS | | | | |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | | | |
| Net income or (loss) | | $ 1,213. | | $ 9,659. |
| Adjustments to reconcile net income to cash provided by operating activities: | | | | |
| Depreciation | $ 9,880. | | $ 2,068. | |
| Amortization | 140. | | 140. | |
| (Increase) or decrease in - | | | | |
| Accounts receivable | 15,835. | | (21,616.) | |
| Recoverable income taxes | (379.) | | 2,769. | |
| Increase or (decrease) in - | | | | |
| Accounts payable | (4,235.) | | 21,124. | |
| Accrued payroll taxes | 328. | | (10,188.) | |
| Retirement contributions | 8,000. | | (7,750.) | |
| Total adjustments | | 29,569. | | (13,453.) |
| NET CASH PROVIDED OR CONSUMED BY OPERATING ACTIVITIES | | 30,782. | | (3,794.) |
| CASH FLOW FROM INVESTING ACTIVITIES: | | | | |
| Investment in coins | - | | (2,598.) | |
| Purchased equipment | (39,574.) | | - | |
| CASH CONSUMED BY INVESTING ACTIVITIES | | (39,574.) | | (2,598.) |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | | | |
| Proceeds from officer loans | - | | 6,816. | |
| Collections of installment note | 48,114. | | - | |
| NET CASH FROM FINANCING ACTIVITIES | | 48,114. | | 6,816. |
| NET (DECREASE) IN CASH AND CASH EQUIVALENT | | 39,322. | | 424. |
| CASH AND CASH EQUIVALENTS | | | | |
| - at beginning of year | | 26,864. | | 26,440. |
| - at end of year | | $66,186. | | $26,864. |

EXHIBIT 3
Page 2 of 2

L. P. CONSULTING GROUP, INC.
STATEMENT OF CASH FLOWS
(Reviewed without Audit)

SUPPLEMENTARY DISCLOSURES OF CASH FLOW INFORMATION
FOR THE YEARS ENDED DECEMBER 31,

| | 1998 | 1997 |
|---|---|---|
| Cash payments during the year: | | |
| Interest expense | $ 32. | $26. |
| Income taxes | 1,175. | - |

DISCLOSURE OF ACCOUNTING POLICY

For the purpose of the statement of cash flows, the Company considers its bank checking account, any certificates of deposit and money market accounts as its total cash and cash equivalents.

The accompanying notes to the financial statements and the accountant's review report are an integral part of this unaudited statement.

**L. P. Consulting Group, Inc.**

*Construction Services*

*FBE/WBE*

17 May 1996

Mr. Larry Linnenburger
U.S.P.S.
Facilities Service Office
222 S. Riverside Plaza, Suite 1200
Chicago, Illinois 60606-6150

Dear Mr. Linnenburger,

As discussed today we are notifying you of the computer problems experienced in producing IQC contracts at So. Suburban District. This morning we were notified by the District that my contract had expired and their system would not accept additional work order contracts. Yet our contract reads a completion date of 5-18-96. Therefore we are notifying you which facilities should have made this deadline: Paxton, Woodland, Elliott, & Rankin.

Also the system shows our contract amount to be $1,063,521.60 (?). PACS shows the correct amount. ( approx. $ 805,000.00 )

The error appears to be in "double charging" on various projects. Attached is a sample of our contract listing, tho it is incomplete. As you know this is also prohibiting proper commitments from taking place. These facilities are : Ludlow, Thawville, & Roberts.

Therefore, we request that these projects be added to our contract # 162640-96-A-0283 as soon as the system is corrected or site scoping compensation. Should you have any questions please contact us at 708-599-9407. Thanks !

Sincerely,

Richard Battaglin
V. President

cc: Bob Rigsby Manager, Admin Svcs.

10401 South 75th Avenue ▪ Palos Hills, IL 60465 ▪ Phone (708) 599-9407 ▪
Fax (708) 598-1898

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| L.P. CONSULTING GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 98-868C |
| | ) | |
| THE UNITED STATES, | ) | (Judge Allegra) |
| | ) | |
| Defendant. | ) | |

DECLARATION OF JOHN BUCHHOLZ

I, John Buchholz, under penalty of perjury, do hereby state that the following statement is true and correct:

1. I have been the owner and president of St. Louis Design and Construction Inc. since 1974.

2. I am making this declaration with regard to the Indefinite Quantity Contracts ("IQCs") that St. Louis Design and Construction Inc. has had with the United States Postal Service ("USPS"). St. Louis Design has had IQCs with the USPS from 1982 to the present. Our IQCs have covered work in seven states, including Missouri, Illinois, and Indiana. Information from the USPS Financial Management System ("FMS") identifying some of our IQCs is attached to my declaration. Our IQCs included contract 162640-94-B-0084, for the North Central IL area, zip codes 604, 605, and 609. The IQCs that St. Louis Design has had with the USPS Central Illinois District were administered by USPS contracting officer Robert Rigsby from about 1993 until his retirement in 1999. Prior to that time, other USPS contracting officers administered our IQCs and, after Mr. Rigsby left the USPS, other USPS contracting officers administered our IQCs. I understand that my declaration will be filed with the Court in a lawsuit brought against the USPS by another IQC contractor, L.P. Consulting Group, Inc. and Mr. Battaglin.

3. As an IQC contractor for the USPS, I often made site visits to USPS facilities to scope out work with USPS Project Managers. At these site visits, the USPS Project Manager and I together would estimate quantities and consider what various items of work would be needed to accomplish a project. I would prepare a draft scope of work, which I call a proposed pricing sheet. I would prepare our proposed pricing sheets using our computer, which has all the various line items of work and prices for an IQC stored in its memory. Shortly after my site visit with the USPS Project Manager, I would provide our proposed pricing sheet to the USPS Project Manager. I have made such site visits with USPS Project Managers and have prepared proposed pricing sheets pursuant to our IQCs countless times, and it was routine for St. Louis Design to do so on its USPS IQCs. The vast majority of the time, I made the site visits and prepared the proposed pricing sheets for St. Louis Design myself, and, only occasionally, did I have an employee of St. Louis Design make such site visits with the USPS Project Managers. The site visits and preparation of the proposed pricing sheets with the USPS Project Manager are a cost of doing business with the USPS under its IQCs.

4. In order for St. Louis Design to receive work orders under its USPS IQCs, I would have to make these site visits and prepare proposed pricing sheets with the USPS Project Managers; the USPS and St. Louis Design would have to agree upon the quantities and the line items of work necessary for each project; the USPS contracting officer would forward to St. Louis Design a written USPS work order, which I would sign and return to the USPS, and the USPS contracting officer would sign the USPS work order beside my signature, making a work order contract for that individual project. Each USPS work order signed by both St. Louis Design and the USPS contracting officer was a contract for the line items of work contained in the work order. In addition, the USPS would

inspect the work after it was completed and, if the quantities of a line item used in the project were less, the USPS would issue a modification in the form of a modified work order consistent with the quantities actually used in the project.

5. When I made a site visit and prepared a proposed pricing sheet with the USPS Project Manager under our IQCs, it was my expectation that St. Louis Design would receive the work if the USPS had the funds available and went forward with the project. However, I was never promised by any USPS official, including Mr. Rigsby and his Project Managers, that St. Louis Design would get the work if it made such site visits and prepared such proposed pricing sheets. I also understood that St. Louis Design was not entitled to the work because it had made the site visit and prepared a proposed pricing sheet for the USPS. In this respect, our IQCs contained the standard contract clause that provided as follows:

> The Postal Service reserves the right to undertake, by Postal Service sources or others, the same type of work or similar work as contracted for in this contract, in the area covered by this contract, while this contract is in force.

I understood that the USPS could use other sources for the same type of work in circumstances where St. Louis Design had made a site visit and prepared a proposed pricing sheet with the USPS Project Manager for the project. On infrequent occasions, St. Louis Design would make site visits and prepare proposed pricing sheets with the USPS Project Manager, but the USPS would not award St. Louis Design a signed USPS work order for the project.

6. Sometimes the work contained in a USPS work order, signed by St. Louis Design and the USPS, was only a portion of the work that I initially had scoped and included in my proposed pricing

sheet. However, sometimes the scope of work had been increased in that the signed USPS work order contained more work than had contained in my proposed pricing sheet. My proposed pricing sheet was only a guide, and it did not determine what work the USPS would contract for in a signed work order contract.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on MARCH 15, 2005

John D. Buchholz President

John Buchholz