④

| ITEM NO | QTY. | UNIT | WORK DESCRIPTION | U.NIL | UNIT $ | Qty | TOTAL $ |
|---|---|---|---|---|---|---|---|
| 09.9 | 00 | 053 | PAINTING BRUSHWORK | SF | .43 | 680 | |
| 09.9 | 00 | 055 | PAINTING CEILING, 3 COATS ROLLER WORK | SF | .29 | -0- | |
| 09.9 | 00 | 057 | PAINTING WOOD TRIM | LF | .57 | 271 | |
| 09.9 | 00 | 060 | PAINTING MASONRY | SF | .47 | 1,842 | |
| 09.9 | 00 | 074 | VARNISH wicket door/ | SF | .26 | 138 | |
| 09.9 | 00 | 077 | SANDING PREP ~~2 COATS~~ | SF | .49 | 138 | |
| 09.9 | 00 | 079 | STAIN WOOD SURFACES | SF | .15 | 138 | |
| 099 | 00 | 051 | PAINT WINDOWS | SF | .35 | -0- | |
| 15.8 | 24 | 002 | CEILING FAN | EA | 285.88 | 3 | |
| 15.9 | 10 | 008 | REMOVE & RE-INSTALL HVAC REGISTERS | EA | 3.44 | 3 | |
| 02.0 | 12 | 016 | MIN. CHARGE, CORE DRILL Dedicated LINE elec | JOB | 128.85 | 1 | |
| NEGOCIATED | | | REMOVE & REINSTALL BULLETIN BOARDS | SF | 3.57 | 68 | |
| 16.0 | 00 | 036 | FURNISH & INSTALL SINGLE POLE BREAKER | EA | 26.80 | -0- | |
| 16.0 | 00 | 053 | REMOVE SURFACE FLOUR FIXTURE | EA | 19.65 | -0- | |
| 16.0 | 00 | 055 | REMOVE RECESSED INCANDESCENT | EA | 22.33 | -0- | |
| 16.0 | 00 | 056 | REMOVE SURFACE FIXTURE | EA | 13.40 | -0- | |
| 16.0 | 00 | 033 | F & I FIXTURE "Y" | EA | 268.01 | -0- | |
| 16.0 | 00 | 069 | F & I PHOTO CELL | EA | 80.40 | -0- | |
| 16.0 | 00 | 082 | DEDICATED OUTLET | LF | 11.34 | 77 | |
| 16.0 | 10 | 001 | MISC. HOURLY LABOR ELECTRICAL DISCUSS | HR | 29.60 | 16 | |
| 16.2 | 30 | F01 | DUPLEX OUTLET | EA | 59.94 | -0- | |
| 16.2 | 30 | F05 | WALL SWITCH. | EA | 50.11 | -0- | |

16.6 | 10 | F13 | EMERGENCY LIGHTS 2EA

SUBTOTAL FROM PREVIOUS PAGE(S)

INDICATES NON-WORKING HOUR PRICES

SUBTOTAL

MULTIPLIER

☐ CONTINUED ☐ TOTAL WORK ORDER AMOUNT

TOTAL

5

| ITEM NO | QTY. | UNIT | WORK DESCRIPTION | U.M. | UNIT $ | # | TOTAL $ |
|---|---|---|---|---|---|---|---|
| 16.2 | 30 | F09 | WALL JUNCTION BOX | EA | 52.08 | 4 | |
| 16.0 | 00 | 038 | F & I #12 WIRE | LF | .53 | 68 | |
| 16.0 | 00 | 040 | CONDUIT 1/2" | LF | 1.34 | 78 | |
| 16.2 | 30 | F26 | REMOVE SWITCH | EA | 11.67 | 2 | |
| 16.2 | 30 | F27 | REMOVE DUPLEX | EA | 13.99 | 3 | |
| 16.2 | 30 | F28 | REMOVE J. BOX | EA | 12.59 | 2 | |
| 16.2 | 30 | F33 | RELOCATE EXIST. THERMOSTAT | EA | 50.11 | -0- | |
| 16.0 | 20 | F04 | REMOVE 1/2" CONDUIT | LF | .57 | 10 | |
| 16.6 | 10 | F04 | INTERIOR FIXTURE 1X4 FLUORESCENT | EA | 126.76 | 0 | |
| 16.6 | 50 | 115 | EXTERIOR LIGHT HPS | EA | 290.34 | 0 | |
| NEGOCIATED | | | SERVICE LOBBY DOOR BELL | EA | 55.00 | 1 | |
| NEGOCIATED | | | HANDICAP SIGN 9"x9" ACCESSIBLE ENTRANCE | EA | 52.00 | 1 | |
| NEGOCIATED | | | SIGN "THIS DOOR REMAINS OPEN" | EA | 40.00 | -0- | |
| NEGOCIATED | | | ASSEMBLE POSTAL FURNISHED LOBBY DESKS | EA | 429.00 | 2 | |
| 16.2 | 30 | F31 | RELOCATE WALL SWITCH | EA | 48.64 | 2 | |
| 06.2 | 00 | 005 | OPTIONAL LOBBY DESK | LF | 111.67 | -0- | |
| 16.2 | 30 | F32 | RELOCATE DUPLEX | EA | 57.97 | 1 | |
| 16.2 | 30 | 260 | WIRING DEVICES WALL PLATES | EA | 4.34 | -0- | |
| 16.2 | 30 | 130 | DIMMER SWITCH | EA | 21.61 | 3 | |
| 16.0 | 00 | 079 | PROVIDE ELECTRIC SERVICE | EA | 400.52 | -0- | |
| 16.0 | 00 | 083 | MIN. CHARGE REMOVE EXIST. BREAKER BOX | JOB | 67.00 | 0 | |
| 16.3 | 50 | 030 | PANEL BOARD 3WIRE 100AMP. | EA | 682.97 | -0- | |
| NEGOCIATED | | | RELOCATE PHONE OUTLET | JOB | 57.95 | -0- | |

INDICATES NON-WORKING HOUR PRICES

| | |
|---|---|
| SUBTOTAL | |
| MULTIPLIER | |
| TOTAL | |

☐ CONTINUED ☐ TOTAL WORK ORDER AMOUNT

25
16
41

12X18

4 @ 12
5 @ 8'
5 @ 8'
16 @ 8'
3 @ 12'

38' 2x4
20'
16'
4'
370 LIN FT STUD

PLATE & SILL

Demo
4x12 = 48
3x5 = 15
63

Demo
21 x 10 = 210
12 x 10 = 120
7 x 10 = 70
400 SqFt

Box
5 x 14 = 70
5 x 10 = 50
5 x 6 = 30
GRATES
1 x 3(x3) = 9
DOOR
7x3 = 21
180 SqF

Demolition
220 SqFt

FACIA
4
13
14
7
38

5
4
17
3
5
10
3
13
7
25
130 Lin FT

MISC HOURS INCLUDED
Machine
Moving Fur

Breakout
37x10 = 370
48x10 = 480 - 89 = 391
21x4 = 84
24x10 = 240 - 32 = 208
10x10(x2) = 460 SqFT office
10x13(x2) =

10x11 = 
10x10 = 100 - 21 = 79
25x10 = 250 #

1,842

976 SqFT DRYWALL

976 / 32 = 30.5 SHEETS

Paint
220
220
448
888 DRYWALL PAINT

Built in BOARD
4 @ 3x4
1 @ 1x4
2 @ 2x4

168 SqFT

# TERM CONSTRUCTION CONTRACT WORK ORDER

| CONTRACT NO. | PROJECT MGR. | MULTIPLIER | WORK ORDER NO. | DATE |
|---|---|---|---|---|
| 94-B-0083 | | | | |

| PROJECT DESCRIPTION/LOCATION | START DATE | PERFORMANCE TIME |
|---|---|---|
| ST. ANNE - HANDICAP RAMP | | |

| PROJECT AUTHORIZATION NO. | CHANGE CODE | FINANCE NO. | ACCOUNT NO. | INDEX NO. |
|---|---|---|---|---|
| | | | | |

| CONTRACTOR | U.S. POSTAL SERVICE |
|---|---|
| L.P. Consulting Group, Inc.<br>10401 S. 75th Ave.<br>Palos Hills, IL 60465-2015 | |

| AUTHORIZED SIGNATURE | DATE | CONTRACTING OFFICER | DATE |
|---|---|---|---|
| | | | |

| ITEM NUMBER | | | DESCRIPTION | UNIT MEAS | UNIT PRICE | QTY. | EXTENDED PRICE |
|---|---|---|---|---|---|---|---|
| 00.0 | 00 | A19 | DEMOLITION BACKHOE | HR. | 68.72 | 8 | |
| 02.2 | 00 | 002 | EXCAVATE | YDS | 8.04 | 67 | |
| 02.2 | 00 | 010 | BACKFILL | YDS | 8.93 | 67 | |
| 02.2 | 00 | 019 | BASE MATERIAL | YDS | 15.19 | 67 | |
| 02.2 | 00 | 029 | SURFACE GRADING + 9x7=63 41x8=328 SF | SF | .04 | 607 | |
| 02.5 | 15 | 001 | SAWCUT 10 X (3" DEEP) | LF | .58 | 30 | |
| 00.0 | 01 | A11 | HAUL AWAY DEBRIS | LS | 85.90 | 1 | |
| 00.0 | 00 | A13 | SIDEWALK REMOVAL | SF | 1.55 | 607 | |
| 02.5 | 15 | 012 | EXPANSION JT. | LF | .80 | 74 | |
| 02.5 | 15 | 014 | CONC. SIDEWALK | SF | 3.13 | 391 | |
| 02.5 | 15 | 019 | CONC. PAVING | SF | 3.80 | 216 | |
| 02.5 | 15 | 007 | ADD FOR OVER 6" THICK REMOVAL | SF | .13 | 216 | |
| 02.5 | 15 | 024 | REINFORCING MESH | SF | .39 | 607 | |
| 10.1 | 77 | F01 | TRAFFIC CONTROL SIGN & POST | EA | 117.92 | -0- | |
| 10.1 | 77 | 061 | FURNISH & INSTALL HCP PARKING SIGN TO POST | EA | 53.26 | -0- | |
| 02.5 | 77 | 004 | PAVEMENT MARKING | JOB | 85.90 | -0- | |
| 02.5 | 77 | 003 | HCP LOGO | EA | 21.48 | -0- | |
| 02.5 | 15 | 039 | MIN. CHARGE CURB REMOVAL | JOB | 116.14 | 1 | |
| 03.3 | 00 | 014 | ROD REINF. #4 ? | LB | .53 | 20 | |
| 03.4 | 17 | 013 | MISC. HOURLY LABOR MASON 2MEN @ 5EACH | HR | 29.81 | 10 | |
| 03.3 | 00 | 033 | NON. SHRINK GROUT USED | LB | 1.51 | 25 | |
| 06.1 | 00 | 080 | MISC. HOURLY LABOR CARPENTER 2MEN @ 4EACH | HR | 25.74 | 8 | |
| 03.3 | 00 | 013 | SLAB ON RAMP | SF | 4.47 | 0 ~~08~~ | |
| 03.3 | 00 | 015 | CONTINOUS FOOTINGS | LF | 9.83 | -0- | |

ATTACHMENTS:

| | |
|---|---|
| SUBTOTAL | |
| MULTIPLIER | |
| TOTAL | |

1053

☐ CONTINUED ☐ TOTAL WORK ORDER AMOUNT

94-B-0083

| ITEM NO | QTY. | UNIT | WORK DESCRIPTION | U.M. | UNIT $ | # | TOTAL $ |
|---|---|---|---|---|---|---|---|
| 03.3 | 00 | 017 | FOUNDATION WALLS | SF | 10.72 | -0- | |
| NEGOCIATED | | | HAULING; TRUCK, DRIVER | HR | 59.67 | 8 | |
| 05.5 | 00 | 005 | HANDRAIL PIPE RAIL | LF | 26.80 | -0- | |
| 05.5 | 00 | 007 | HANDRAIL 1½" | LF | 10.72 | -0- | |
| 02.0 | 12 | 002 | CORE DRILL DOWEL IN SLAB | EA. | 24.12 | 20 | |
| 03.3 | 00 | 030 | EPOXY BONDING AGENT | GAL | 26.80 | -0- | |
| 05.5 | 80 | 035 | ¼" WELD | LF | 4.47 | -0- | |
| 05.5 | 00 | 052 | MIN. CHARGE METAL FABRICATION (RAIL RETURNS) | JOB | 120.60 | -0- | |
| 09.9 | 00 | 063 | PAINT RAILS, POST ETC. | LF. | .94 | -0- | |

SUBTOTAL THIS PAGE

SUBTOTAL FROM PREVIOUS PAGE(S)

INDICATES NON-WORKING HOUR PRICES

SUBTOTAL

MULTIPLIER

☐ CONTINUED ☐ TOTAL WORK ORDER AMOUNT

TOTAL

ST. ANNE P.O.



114
20
38
3
96
---
271

803/15

LEROY - L & BC contractors
PROPOSAL ON BLUE
708/461-9080 -PAGER

# A1.1

**ADA ACCESS HANDICAP RAMP FOR MOMENCE ILLINOIS**

Scale: 1/4" = 1'-0" Date: 8/25/98

Project: NEW IHANDICAPPED RAMP

USPS File Number:

MOMRAMP1

Revisions:

*Administrative Service*

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

L.P. CONSULTING GROUP, INC., )
Plaintiff, )
vs. ) Case No.
THE UNITED STATES POSTAL ) 98-868 C
SERVICE, ) (Judge Allegra)
Defendant. )

The deposition of RICHARD ANTHONY BATTAGLIN, called for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions for the purpose of discovery, taken before Janet L. Robbins, CSR No. 84-2207, a Notary Public within and for the County of Cook, State of Illinois, and a Certified Shorthand Reporter of said state, at Suite 3300, Three First National Plaza, Chicago, Illinois, on the 10th day of June, A.D. 2004, at 1:36 p.m.

Page 2

PRESENT:
BELL, BOYD & LLOYD PLLC,
(1615 L Street, N.W., Suite 1200,
Washington, D.C. 20036-5610,
202-955-6830), by:
MR. LAWRENCE M. PROSEN,
appeared on behalf of the Plaintiff;
UNITED STATES DEPARTMENT OF JUSTICE,
CIVIL DIVISION-COMMERCIAL LITIGATION BRANCH,
(1100 L Street, N.W., 8th Floor,
Washington, D.C. 20530,
202-307-0290), by:
MS. DOMENIQUE KIRCHNER,
appeared on behalf of the Defendant
and the Deponent.

ALSO PRESENT:
MR. STEPHEN LOBAUGH, In-House Counsel,
United States Postal Service.

REPORTED BY: JANET L. ROBBINS, CSR, RPR,
CERTIFICATE NO. 84-2207

Page 3

(WHEREUPON, the witness was duly sworn.)

RICHARD ANTHONY BATTAGLIN,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. KIRCHNER:

Q. Please state your full name and address for the record.
A. Richard Anthony Battaglin, 10401 South 75th Avenue, Palos Hills, Illinois, 60465-2015.
Q. Mr. Battaglin, my name is Domenique Kirchner. I'm going to ask you some questions today. If I ask you a question you do not understand, please let me know. Please remember that we both can't talk at the same time.
Please remember, also, that you have to put oral -- you have to give us an oral response. If you shake your head, nod your head, that's not sufficient. We need an oral response on the record for the court reporter.
Have you ever been deposed before?
A. Never.
Q. Now, you're here pursuant to our request

Page 4

for a deposition of you in this lawsuit, correct?
A. Correct.
Q. This is a lawsuit brought by L.P. Consulting Group, Incorporated, correct?
A. Correct.
Q. What is your role with regard to L.P. Consulting Group, Incorporated?
A. The corporate record would show I'm the secretary/treasurer of the company in the State of Illinois, and my function is project superintendent for the company.
Q. Do you have any other titles for the company?
A. No.
Q. Who else is involved in the company?
A. Linda M. Battaglin, that's my wife. She's the president.
Q. Anybody else?
A. No.
Q. During the time frame 1995 through 1999, did the company -- did L.P. Consulting have any employees besides yourself and your wife?
A. No.
Q. Other than yourself and your wife, does

Page 33

required the closing of a postal service, whether it be a dock area or customer lobby. Because I'm removing lock boxes and because of the OSHA regulations that the postal service is now under, has been under, we had to, from time to time, come in after or before these hours stated to do work before the customer or the postal employee was there. In some cases, a maintenance person was supplied to us to stay past those hours, but in most cases, we were denied by Mr. Rigsby or Mr. Southern or Mr. McNabb or Ms. Gunlogson to put those in my work orders that are in this litigation.
BY MS. KIRCHNER:
Q. You understand, you filed a complaint and an amended complaint in the Court of Federal Claims, correct?
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. And you're telling me that you're contending that you weren't paid overtime for overtime hours worked?
A. No. I'm contending that the postal service -- as I remember the question, was what were

Page 34

some of the reasons why I'm filing a claim. And one of them was because -- or my points in this case is that I am denied overtime if the work was to be ordered, which the work wasn't ordered.
Q. So you're not -- you're not claiming here in this lawsuit that you did any work for the postal service and then didn't get paid overtime hours for that work and you should have been paid overtime hours for that work?
A. The basis -- I can't answer that straight. I have to say it the way it is. I'm not claiming these monies at all. I'm pointing out to everyone that the basis of my work orders would have included this work, and I think that's why in some cases they didn't give me those work orders.
Q. But aren't you really here because there are certain work orders that you wanted that you didn't get from the postal service?
A. No. I have been denied work orders before, but I was never summarily rejected in this case, as I'm claiming in my claims.
The particular projects that I've claimed were ones that I had invested my time in that I could not recoup according to my contract. I

Page 35

was not contracted to provide scopes of work. I was contracted to supply work, materials, labor and equipment. But for whatever reason, the postal service chose to do it this way, to have myself and a project manager, that's a big nebulous word, but those individuals to come out and determine with the postmaster, always, what work would be done in their facility, when and what the limits would be.
And I'm contending on several occasions, I went to these jobs several times, not just once, and I'm saying that I was denied these for other reasons, which I think -- maybe I'm saying too much, but I think it would appear that it was steered in a different direction, for whatever reason, which I can't answer. I just know that those few that I did claim were ones that were -- were ones that were going to be given to me.
Q. Okay. Let's go on.
A. Yeah.
Q. Referring to provision C.12b, which is included on Page 10 of 99 in Exhibit 48, which you have in front of you.
A. Uh-huh.
Q. Now, can you tell me precisely how

Page 36

you're contending the government violated that provision in this litigation?
A. Well, it says, "The contract amount for each work order will be the total of each unit price included in that order, times the quantity required, times the multiplier entered on the proposal. This amount includes all profit, overhead, bonds, insurance, and other contingencies and no allowance for such items will be made after contract award."
So what this is saying is that unless I get a work order, I cannot recoup my profit, overhead, bonds or insurance or any other contingencies. And it says that no allowance for any items will be made after that award.
So if they tell me to go visit a job site and produce documents, drawings, my expertise, specifications that -- or submittals that I've procured to help me secure the project, when they deny me the work order, I cannot reclaim any of those items without the work order.
Q. Okay. Was it your understanding that you could not reclaim any of those items without issuance of a work order by the government?
A. Yes.

Q. And was it your understanding that you could not recoup any of those items without issuance of a formal work order by the postal service which then you also signed?

A. Yes.

Q. So have you told me how you're contending we violated that provision?

A. Yes. I'm saying that because the contracting officer refused to, I guess for lack of a better word, negotiate for my time and effort to visit the site and he refused to give me the work order, I cannot collect any of my overhead, my profit, definitely my bonds that it took to win the contract, and the insurance that's covering me to drive to these sites, that my general liability and Workmen's Comp. insurance covers me for the duration of this contract every area I go to, including the automobile insurance.

Q. Are you contending in the litigation that the government violated provision C.12d of the contract, referring to Battaglin Exhibit 48?

A. Yes.

Q. That's the provision that begins, "Proposals may include," correct?



A. Yes.

Q. Please tell me how you're contending the government violated that provision?

A. It says in the very first statement, "Proposals may include all items as listed on the price schedule." And sometimes you would do work or perform work or be asked to perform work that was not listed on the price schedule. And it goes on to say, if you do anything, delete it, change it, it will be cause for rejection.

Q. Rejection of your proposal?

A. Of the proposal.

Q. Meaning your proposal you submitted to the postal service?

A. I took it to be both ways.

Q. Meaning either the proposal you gave them or they gave you?

A. Or a work order they sent me.

Q. So as I understand what you're telling me, you're contending that the government violated C.12d because there were items that were not listed on the price schedule --

A. Well --

Q. -- is that correct?



A. Right.

Q. And what items are you referring to?

A. Well, my submission of documents will reflect there are negotiated line items that the postal service would not put into the unit price schedule through formal modification to the contract, but I was still, nonetheless, tasked to do the work.

Q. But in the litigation we have now before the Court, are you complaining about any particular line item that was a negotiated line item of a work order that you and the postal service signed?

A. I'm saying that the items -- the documents I submitted in my claim have items that were negotiated through all the zip codes on all -- on both contracts for the period of two years, and at no time was there an attempt by the postal service to add them in the unit price schedule to make them a legal part of the contract. So we were constantly open to a 25 percent limit problem outlined in the contract and by the contracting officer, Mr. Rigsby.

Q. Just clarify what you mean by "a 25 percent limit problem."



A. If you look at C.13 on Page 11, item F, "Schedule," meaning the price schedule, I'm assuming, "will be negotiated for each work order before the work order is issued, provided, however, that the cost of work not covered by the price schedule may not exceed 25 percent of the total amount of any work order."

Q. Let's go on. Let's look at C.11, Work Orders, of Battaglin Exhibit 48 on Page 11 of 99.

MR. PROSEN: You mean C.13.

BY MS. KIRCHNER:

Q. Sorry, C.13, Work Orders, Page 11 of 99. Are you contending that the government violated Section A?

A. Yes.

Q. And without reading this whole section into the record, which we really don't need to do, Mr. Battaglin --

A. Okay.

Q. -- can you just tell me how you're contending that the government violated Section A of C.13, Work Orders?

A. Sure. Mr. Rigsby's contention has been that I have proceeded to do, quote, "unauthorized

Q. On your computer?
A. No, this is handwritten.
Q. No, no. I'm trying to understand. The form itself, is the form itself in your computer?
A. This is postal supplied. This form is postal supplied.
Q. And you have copies of the blank forms that you could Xerox and then use?
A. That's correct.
Q. You said that this referred to the '94 contract. You're referring to your '94 Indefinite Quantity Contract?
A. Yeah. This probably is one of those carryover projects that I mentioned from '94 to '96. And Mr. McNabb picked up the baton after Mr. Steiner went back into retirement, now that I'm looking at it and recollecting. And we had to go back for a second visit for whatever reason.
Q. Did L.P. Consulting Group in the '94 to '98 time frame ever do work at the East Lynn Post Office?
A. No, I did not.
Q. And as you sit here and you look at Exhibit 53, can you tell me what type of work this



is addressing based on the document itself?
A. Well, looking at the document, now that I see the document, it reiterates what I said before. Up at the top says "Expense PA," so that tells me the other one was capital.
And looking at this, this looks like this was a lock box lobby renovation, let's see, putting a new postal furnished IRT. So this was what we would call a lock box lobby renovation with miscellaneous, it looks like, tile, just as the document reads, painting, electric.
Q. In whose handwriting is the upper portion of the document where you have the contract number, project description, location, project authorization number and the date?
A. The date, the project description and the project authorization number are not my writing, and I do not know whose that is.
Q. But you'll take the East Lynn?
A. East Lynn is not mine.
Q. Oh.
A. I'm going to guess it's Paul, but...
Q. Okay. But earlier you said that portions of this did have your handwriting on it.



A. Yes. Everything -- item number across here, this is all my writing.
Q. So even when we fill out the items themselves, that's your writing?
A. Those are my writings.
Q. How about this stamp? Was this a stamp?
A. Yeah. It's like what you put on your envelope return address. That's what that is.
Q. Can you explain to me, when you would go out to the sites, would you go out there with these forms that already had the L.P. Consulting stamp on it?
A. Yes, and they already had these line items laid out.
Q. With regard to Exhibit 53, as you sit here today, do you remember making a site visit in about November 1995 with Paul Steiner at East Lynn?
A. Yes.
Q. Do you remember how that site visit came about?
A. Typically, most visits were a call from either Sam Southern or Bob Rigsby to make a date with whoever they told me to make the date with. And in this case it was Mr. Steiner. And we talked,



"What's your schedule like?" And we would visit more than one job at a time, so this was probably in conjunction with another site visit. It's a long way to go to see just one little job like this.
Q. Now, do you have any draft work orders that relate to the $32,775 work order amount for the East Lynn building renovation that's in your claim, Exhibit 52?
A. No. Only the postal service can provide a draft work order.
Q. Remember you told me you went out with Mr. McNabb and you scoped out the work? Do you have any scopes of work, any documents, draft scopes of work that relate to the $32,775 East Lynn building renovation that's part of your claim, Battaglin Exhibit 52?
A. At the time of the claim, April 13th, 1998, we had these documents.
Q. Can you tell me where they are now, sir?
A. I don't know where they are.
Q. Did you get all of your documentation that you could obtain from the former law firm?
A. Yes. And all I had was Paul Steiner's, which I think I gave you, but I'm not sure. I think

so. But I'm not even sure of that. So whatever they sent back to me was what I used.
Q. And you don't have that today?
A. No, I don't.
Q. The site visit you remember having with Mr. McNabb at East Lynn that you told me about, did you prepare any drawings at the site -- at the time of the site visit?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. Yes.
BY MS. KIRCHNER:
Q. What type of drawings did you prepare?
A. Rough sketches, layouts, diagrams.
Q. Do you have any of those rough sketches?
A. All my original work went to the postal service to be converted into a draft work order that I would sign and return to them for signature and a notice to proceed to do the work.
Q. So as I understand it, you're telling us the process is this: There was a site visit, a scope of work is prepared, that goes back with the postal service, then something comes to you in the mail, a copy of it from the postal service?



A. A draft work order.
Q. How is that different from what is taken back out of the field from by the postal service?
A. It's a computerized document that the postal service generates and makes a financial commitment and award to.
Q. You never got anything like that for East Lynn?
A. No, just my copy of this back.
Q. So are you saying that when you scoped out work in the field with the postal service and they took the scope of work with them, that they would then send you a copy of it so that you had it for your files?
A. In East Lynn's case, yes.
Q. When you told me that you -- tell me more about East Lynn. You and Mr. McNabb scope it out, he takes it, then they send you back something. I'm not clear on whether they're sending you back the computerized document or they're just sending you back a Xerox copy of what you and Mr. McNabb generated in the field. What was it?
A. On East Lynn was my copy of the work that we performed at East Lynn .



Q. And that alone?
A. And that's all I got from them.
Q. So you never got a computerized generated work order?
A. No. That's why I filed the claim.
Q. Now, when you and Mr. McNabb completed the site visit at East Lynn, what did you think was going to happen next?
A. Typically, I get a draft work order in the mail from the postal service for me to review. If I agree with the final form that it's in, I sign my portion on the work order and return it to the contracting officer for signature and then the notice to proceed.
Q. Is that what you expected in the case of East Lynn itself?
A. Yes.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 54 for identification, as of 6/10/04.)
BY MS. KIRCHNER:
Q. Can you please take a look at what we've marked as Exhibit 54 to your deposition, Mr. Battaglin. This is a declaration of Sam



Southern. Do you see that, sir?
A. Uh-huh.
Q. And do you see in Paragraph 4, Mr. Southern is stating, "I have reviewed postal service files and records for information pertinent to the following construction projects," and he mentions the East Lynn building renovation. Do you see that?
A. Yes.
Q. And do you see below that he says that the postal service has not awarded contracts for the construction projects listed in Paragraph 4?
A. Yes, I do.
Q. So you see that?
A. Yes.
Q. Seeing that the postal service has not awarded a contract for the East Lynn building renovation, are you still pursuing the claim that the government violated some duty to you by failing to give you a contract for the East Lynn building renovation?
A. Yes.
Q. And why, sir?
MR. PROSEN: Objection, calls for a legal

simplified purchase, however his contracting method was. Someone else did the work.

Q. Do you have any facts on which you're basing the contention that the government let the work which is the subject of Exhibit 55?

A. Yes. I believe the binder shows that after the '98 claim and after Mr. Southern's affidavit to such, it shows somebody did some work and work has been done there.

Q. Can you tell me what work you believe was done at St. Anne?

A. I believe the interior and exterior was accomplished. I think everything I measured originally was accomplished by someone else.

Q. You think the work set forth in Exhibit 55 was accomplished at St. Anne?

A. Yes.

Q. What is L.P. Consulting contending regarding the Union Hill post office?

A. I was -- I went to the site with a project manager to determine what work would be done at Union Hill, and according to this, it was interior and exterior.

Q. You said that there was some document



for St. Anne, some note that you had in the notebook. Do you think you can take a few minutes, sir, and show me which exhibit you're referring to?

A. Yes.

MR. PROSEN: You opened right to it.

BY THE WITNESS:

A. Wow, Tab 12.

BY MS. KIRCHNER:

Q. Let me just see that.

MR. PROSEN: For the record, Tab 12 is Southern Exhibit 10.

BY MS. KIRCHNER:

Q. Tell us what is Southern Exhibit 10 that you have in front of you.

A. This was a letter I sent to Mr. Rigsby discussing -- or following up -- let's see. Let me read it.

MR. PROSEN: Take your time and read it.

BY THE WITNESS:

A. Yeah, this letter I sent to Mr. Rigsby referring to a phone call I had with him regarding the status of the work on these sites that I list here. And I make reference to the draft work order and the sketch furnished for contract issuance.



BY MS. KIRCHNER:

Q. Okay. Is all the handwriting on this document your handwriting?

A. Correct.

Q. That's your signature down there at the bottom of the document, correct?

A. Correct.

Q. When you sent the document to Mr. Rigsby, did you send it to him on or about May 29th, 1997?

A. Yes.

Q. And at the time you sent it to him, did it have all your notes on it there?

A. No.

Q. When did you put the notes on it?

A. I put the notes on it when I copied my attorney at the bottom and Mr. Southern at the bottom. I made my notes after my attorney contacted --

MR. PROSEN: That's privileged.

THE WITNESS: Okay.

MS. KIRCHNER: He was just saying when he did something.

MR. PROSEN: He was starting to get into when



his attorney --

THE WITNESS: I appreciate that.

BY THE WITNESS:

A. It was determined that I should put the dates down on the document before I would forget the exact dates because we were discussing filing the claim.

BY MS. KIRCHNER:

Q. So this is at the time you were discussing filing the 1998 claim?

A. In that time frame.

Q. And you have in front of you Battaglin Exhibit 51 and 52, which are your two claims, correct?

A. Yes.

Q. These are from March '98 and April '98, correct?

A. Yes.

Q. And it was at that approximate time frame that you made the notes --

MR. PROSEN: Objection.

BY MS. KIRCHNER:

Q. -- on Southern Exhibit 10, is that correct?

Page 129

MR. PROSEN: Objection, misconstrues the testimony.
BY THE WITNESS:
A. Correct.
BY MS. KIRCHNER:
Q. You made the notes on Southern Exhibit 10 at the request of your attorney, is that correct?
A. Correct.
Q. Now, at the time you made these notes on this exhibit, tell me how you went about making these notes here.
MR. PROSEN: Objection, vague.
BY THE WITNESS:
A. I called everybody that's listed and asked them when did we visit it, if I did not already have the date myself on my -- in my work order, if I didn't write it up at the top. In some cases, like I said, I have East Lynn down and others I didn't. I contacted every one of these.
BY MS. KIRCHNER:
Q. So the ones where you had the work order and it had the date in it, you used that date, is that correct?
A. Yes.

Page 130

Q. And the others you made a telephone call?
A. Correct.
Q. And what did you do for Hoopeston?
A. Hoopeston, it was on the work order.
Q. What did you do for St. Anne?
A. St. Anne and Momence, I called Sam Southern back up, and he looked in his phone record and said we were there -- or his calendar and he said it was May 24th, '96.
Q. May 24th, '96 was for St. Anne?
A. And Momence.
Q. I see. That date is for two?
A. Correct.
Q. You didn't remember in 1998 when you were at St. Anne and Momence?
A. I specifically wanted the exact date for reasons of pursuing the claim, postal documents, per diem, all that that applies to it so I can exactly have a date so I can pursue getting all that information when the time came.
Q. So you put on the document the date Sam gave you for St. Anne and Momence, right?
A. Correct.

Page 131

Q. How did you get the information for East Lynn?
A. Paul Steiner, I think it's on Exhibit 53, 11/14/95 for him. And that was the same time we visited Hoopeston, if you look at the top. And then with Jesse, it was 10/17/95, where I visited East Lynn, Goodwine and Claytonville.
Q. Explain to me, for East Lynn, are you telling me you called up Jesse McNabb or you're telling me you remember it?
A. I talked to Jesse and just said, "Do you recollect this?" "Yeah," and he gave me the date, 10/17/95.
Q. You put the date that Jesse gave you on this document, right?
A. Yes.
Q. At the time you were making these notes in 1998, did you, yourself, have a recollection of being at East Lynn on 10/17/95?
A. I knew it was in October because -- that particular date because it was -- as I said before, that was the date O.J. -- the decision on O.J. came and that was significant at that time in '95.
Q. At the time you made these notes in

Page 132

1998, did you remember that you had been at St. Anne on May 24th, 1996?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. Oh, sure. I mean, not the specific date. I tried -- as I said before, I tried to nail the date down to -- so I can attach the particular date for getting records.
BY MS. KIRCHNER:
Q. Okay. So you nailed it down through Sam?
A. I nailed Sam's down for Sam, yes.
Q. Now, you also have a notation for Aroma Park. Do you see that?
A. Yes.
Q. What are you indicating there in your notes?
A. That's that Paul Steiner and Catherine Marks, September of '95.
Q. How did you go about putting that information down in your notes?
A. I didn't have an exact date. That's from my own notes. That's from my notes.
Q. Was it from notes or memory, sir, when

you made this notation in '98?
A. It was from my note that we visited more than just these sites in September. We visited quite a few sites in September of '95. But this particular one, I didn't remember the exact date and neither did Paul when I talked to him, because we had visited quite a few sites.
Q. Do you recall talking to Paul --
A. Sure.
Q. -- in 1998 for the purpose of making your notes here on this exhibit?
A. I talked to him in late '97.
Q. You said you had some notes that you used to make the notes on Southern Exhibit 10 with regard to Aroma Park.
A. Yeah.
Q. What notes are you referring to?
A. I'm referring to work orders that I had received.
Q. Can you be any more specific?
A. Well, when you get issued a work order and you start work -- we were in that area, and Paul and Catherine Marks, that's who "CM" is, said, "If you're in that area, let's visit Aroma Park," so we



visited Aroma Park.
Q. Do you recall what work you were performing in the area of Aroma Park in September of 1995?
A. No.
Q. Directing your attention to your notes on Exhibit 10 with regard to Beaverville, what are you indicating there?
A. In September of '95, I visited it with Mr. Steiner.
Q. How did you come to make that note in 1998 on Exhibit 10?
A. I visited Aroma Park -- no, I'm sorry. I visited -- I visited Aroma Park and Papineau with Paul Steiner and Catherine Marks and Beaverville and Bradley with Paul Steiner by himself in September of '95. And how I came to that was just recollection of when we did that, asking Paul, and he said it was on or about -- sometime in September.
Q. How did you get -- come to make the reference here to Bradley on these notes in 1998?
A. The same way, talking to Paul and my recollection.
Q. So it was a combination of recollection



and a telephone call for Beaverville and Bradley, is that correct?
A. Correct.
Q. Is that a combination of memory and a telephone call for Papineau?
A. Yes.
Q. Were you doing any work in the area of the Bradley Post Office in September of 1995?
A. Yes. I was driving past there going south on all of these sites.
Q. When you say "all of these," which ones are you referring to, sir?
A. The ones you're referring to, Aroma Park, Papineau, Beaverville, Union Hill and Bradley.
Q. So were you on your way to other work?
A. They're all geographically clustered. So if they knew I was in the area, they'd say, "Let's make a site visit. Since you're down there, let's have a site visit."
Q. Other than these notes on Exhibit 10, do you have any other notes that bear on the dates of site visits?
A. Me personally, no.
MR. PROSEN: This is a good time to stop.



(WHEREUPON, the deposition was continued to June 11, 2004 at 8:30 a.m.)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

L.P. CONSULTING GROUP, INC., )
Plaintiff, )
vs. ) Case No.
THE UNITED STATES POSTAL ) 98-868 C
SERVICE, ) (Judge Allegra)
Defendant. )

The deposition of RICHARD ANTHONY BATTAGLIN, called for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions for the purpose of discovery, taken before Janet L. Robbins, CSR No. 84-2207, a Notary Public within and for the County of Cook, State of Illinois, and a Certified Shorthand Reporter of said state, at Suite 3300, Three First National Plaza, Chicago, Illinois, on the 11th day of June, A.D. 2004, at 8:43 a.m.



PRESENT:
BELL, BOYD & LLOYD PLLC,
(1615 L Street, N.W., Suite 1200,
Washington, D.C. 20036-5610,
202-955-6830), by:
MR. LAWRENCE M. PROSEN,
appeared on behalf of the Plaintiff;
UNITED STATES DEPARTMENT OF JUSTICE,
CIVIL DIVISION-COMMERCIAL LITIGATION BRANCH,
(1100 L Street, N.W., 8th Floor,
Washington, D.C. 20530,
202-307-0290), by:
MS. DOMENIQUE KIRCHNER,
appeared on behalf of the Defendant
and the Deponent.

ALSO PRESENT:
MR. STEPHEN LOBAUGH, In-House Counsel,
United States Postal Service.

REPORTED BY: JANET L. ROBBINS, CSR, RPR,
CERTIFICATE NO. 84-2207



RICHARD ANTHONY BATTAGLIN,
called as a witness herein, having been previously duly sworn, was examined and testified as follows:
EXAMINATION (Resumed)
BY MS. KIRCHNER:
Q. We're here, for the record, for the continuation of your deposition. And you understand you're still under oath?
A. Yes.
Q. Do you have any licenses, for example, engineering or architect or anything like that?
A. No.
Q. Have you ever had a license as an engineer, an architect?
A. No.
Q. Have you ever had a license regarding construction work?
MR. PROSEN: Objection, vague.
BY THE WITNESS:
A. What does that mean?
BY MS. KIRCHNER:
Q. Well, for example, have you ever had from a state government a license to perform construction work?



A. Yes.
Q. What licenses do you have?
A. The City of Chicago business license.
Q. And how long have you had that?
A. Continuously. It's renewed every year. I've had it since 1993.
Q. Can you describe the nature of that license?
MR. PROSEN: Objection, vague.
BY THE WITNESS:
A. Well, it's a business license.
BY MS. KIRCHNER:
Q. Is it to do construction work?
A. In the City of Chicago, yes.
Q. Only inside the geographical limits of the City of Chicago?
A. Correct.
Q. Have you had any other licenses related to performing construction work?
A. Just in the local counties or little towns that require it.
Q. Do some towns in Illinois have a requirement for a license?
A. Some of them have their little

measurements on the sheets?
A. Yes.
Q. Can we refer to these two documents as scopes of work for St. Anne?
A. Yes.
Q. Did you show these documents to Sam Southern at the time you were preparing them at the site visit?
A. I took these documents and my sketch, Exhibit 56, and I believe it was one more for the inside that is not here, and he took it back to his office to discuss with Mr. Rigsby to send back to me whatever changes that they did, they may have added, subtracted to the scope. And then I would get a work order for my review and signature to do the work.
Q. So at the time Sam Southern took these scopes of work for St. Anne back to the postal service, you had not yet filled in the extended price, is that correct?
A. That's true.
Q. Let's look, for example, on Exhibit 59. Let's take the first item, description. It says "demolition backhoe," is that correct?



A. Correct.
Q. And then you have here unit measures, hours. Do you see that?
A. Yes.
Q. And then what's the quantity?
A. Eight.
Q. Is that your handwriting, the eight?
A. Yes.
Q. How did you go about deciding that eight was the appropriate quantity for the demolition backhoe hours at St. Anne at the time of the site visit?
A. I don't recall the specifics, but I think we just determined that this service would have been required for a day.
Q. Is that a determination that you and Sam arrived at together, or was it your determination that it was eight hours a day for backhoe demolition?
A. Possibly both. I don't remember specifically talking about this particular item at this time, but it's possible.
Q. Is it also possible that it was just simply your judgment at the time and you put it in,



the eight hours?
A. No, because they could have made it zero when they sent the work order to me.
Q. No. I'm talking at the site visit itself, when the document is prepared at the time of the site visit, and I want to understand the procedure at the time of the site visit.
A. Everything in here would have been talked over with Sam. It wouldn't have just been arbitrary.
Q. So at the time of the site visit for St. Anne, the procedure was you and he would talk over the number of hours and then you write down the hours that the two of you had discussed?
A. Pretty much.
Q. Do you remember it ever being different during the site visit?
A. I'm sure possibly it could have been, sure.
Q. So sometimes you would just fill in the number of hours and then sometimes the two of you would discuss it and you'd put it in the number of hours?
MR. PROSEN: Objection, misconstrues the



testimony.
BY THE WITNESS:
A. I don't recall every meeting, but I would say you probably could say it happened. But at St. Anne, I know we went over item.
BY MS. KIRCHNER:
Q. So you remember going over every item with Sam at St. Anne?
A. Yes, pretty much.
Q. And that includes the number of hours for various items, is that correct?
A. Yes.
Q. Can we look at Exhibit 60 for St. Anne? I would like to direct your attention to the third page of the exhibit. And take, for example, the item, the third item down, it says "drywall." What's the rest of that line?
A. "Casing bead."
Q. And what does this refer to?
A. It's a product that you find or can buy for drywall.
Q. And there, what was determined for drywall casing bead for St. Anne?
A. If I'm looking at this correctly, none

Page 156

was required.
Q. Was that a judgment that you and Sam arrived at together or yourself?
A. Oh, no, that's a common decision that we would have made together.
Q. And make it together?
A. Right.
Q. I'm directing your attention to Exhibit 55 that we looked at yesterday, sir.
A. Uh-huh.
Q. And do you recall this, that we looked at Exhibit 55 yesterday?
A. Yes.
Q. And do you remember you told me this is all in your handwriting and you prepared Exhibit 55, is that correct?
A. Yes.
Q. But now we have the extend prices on the document, correct?
A. Yes.
Q. If we look at Exhibit 55, can you look at it, compare it with Exhibits 59 and 60, and then satisfy yourself that this includes both the scope of work for concrete at St. Anne and then the scope

Page 157

of work for interior work at St. Anne?
A. Yeah, it looks pretty similar. There might be some -- something different, but it looks pretty similar.
Q. You remember -- all right.
Can you put in front of you Exhibit 60 and Exhibit 55?
A. Uh-huh.
Q. As I understand it, what you're telling us is at the time of the site visit, Exhibit 60 was filled in and taken by -- you completed Exhibit 60, Sam Southern takes it back with him, and that at a later point in time, you get back Exhibit 60 from the postal service and then fill in the extended prices, is that correct?
A. No.
MR. PROSEN: Objection, misconstrues the testimony.
BY THE WITNESS:
A. That's not correct.
BY MS. KIRCHNER:
Q. Remember you told us about Exhibit 55 that has the extended prices filled in?
A. Yes.

Page 158

Q. When did you go about putting in the extended prices in Exhibit 55?
A. When I submitted my original copy to Mr. Southern, it was at his discretion to add or subtract any items in the quantity column and send it back to me. And then when I took it for my -- for my --
Q. Your claim?
A. -- my claim, then I had filled in the extended version. So whatever was in the quantity column when he sent it back to, I just carried it over to the extended price.
Q. In 1998, at the time of your claim, you were filling in the extend price column, is that correct?
A. Right, because I realized I wasn't going to get the work order, so I just took what he sent back to me and then extended it over.
Q. And what he took at the time of the site visit, as I understand from your testimony, is Exhibits 59 and 60, is that correct, the two without the extend prices?
A. Yes.
Q. Okay. Do you recall that earlier you

Page 159

told me that Exhibit -- yesterday you told me that all of Exhibit 55 was in your handwriting?
A. Yes.
Q. I would like to look at a particular item on Exhibit 55, sir.
A. Sure.
Q. Are you on the first page of Exhibit 55, please?
A. Yes. I'm sorry, 55 and 60?
Q. Yes. We can look first at Exhibit 55. And I'm on the first page, and I look down the description column and I see there the item, "Misc. hourly labor, carpenter finish." Do you see that?
A. Yes.
Q. And we have that same item on Exhibit 60, the first page. Do you see that?
A. Yes.
Q. And do you see that on Exhibit 60, there's 32 for the quantity hours, 32 hours, and that on Exhibit 55 -- I'm going a little too fast. I'm probably seeing this wrong. Sorry about that.
Do you see on Exhibit 60 that there's 32 hours for the item "Misc. hourly labor, carpenter finish"? Do you see that?

A. Yes.
Q. And what does that refer to, that item?
A. That would be a line item that we would have determined to use for finishing. There's two types of carpenters, and this was a finishing carpenter or carpenters.
Q. And do you see that on Exhibit 55, the quantity is not 32 hours for that same item, but now it's 160 hours? Do you see that?
A. Yes.
Q. You told me that that's your handwriting on Exhibit 55, is that correct?
A. Yes.
Q. Can you explain to me why it's 32 hours for miscellaneous hourly labor carpenter finish on Exhibit 60 and then it's changed to 160 hours for miscellaneous hourly labor carpenter finish on Exhibit 55?
A. I don't actually recollect the conversation. But typically on these work orders, I would be told we're going to do certain things different, add certain hours or sometimes it would even be changed for me or I would receive a little sticky note, add or delete certain things, and then



I would make my adjustments on the return copy.
Because this copy and this copy (indicating), with the exception of the writings on the top, are two different copies. So he must have, when he sent me this -- I'm only assuming that I had the typical Sam Southern, make your adjustments on these work orders based on his conversation with Mr. Rigsby or some other factor, maybe even with the post office.
It's possible they increased the hours because they weren't going to give me overtime. It's possible they gave me extra hours because the nature of the work was going to be different, depending on -- at the time when they issue the work order to me, that's when we go over the final -- the draft work order that they produce and we go over everything one more time. So that's possible that's what happened. There could be other quantities in here that changed, too, for that matter.
Q. Now, the 160 on Exhibit 55 is your handwriting, correct?
A. Yes.
Q. Do you remember at what point in time you made the change from 32 to 160?



A. Probably within a few days of receiving the document back from Mr. Southern.
Q. Well, but do you remember that actually happening, sir?
A. Receiving this?
Q. No, making the change.
A. Not exactly for St. Anne, but I know typically that's how we did business. I mean, it would always be that way on all the work orders I ever did with him. That was typical, whether it would be Sam or any other gentleman.
Q. Let's look at the third page of Exhibit 60 and the third page of Exhibit 55 together. Do you see on Exhibit 60 for St. Anne there is zero as the quantity for drywall casing bead? Do you see that?
A. Yes.
Q. And do you see that on Exhibit 55, there is now 275 for the drywall casing bead linear feet? Do you see that?
A. Yes.
Q. And did you make that change from zero to 275?
A. Yes.



Q. Do you remember at what point in time you made that change?
A. Typically within a few days after receiving the change requested by the government or the post office.
Q. But my question is: As you sit here today, do you remember at what point in time you made the change?
A. Yes, within a few days of getting this document and sending it back to him. I'm trying to get work, so I would have immediately responded to this and sent it back to him with my adjustment acknowledging it so he would produce a work order to me.
Q. So are you telling me that you and Sam together prepared Exhibit 60, he takes it back to the postal service, they mail it back to you so you have a copy identical to Exhibit 60, and then you make changes to it and send it to the postal service?
A. Yeah, if they request it. Sometimes they don't. Sometimes it's no change; sometimes add this; sometimes delete that. And then I send it back to them, and then they prepare their -- my work

there's an additional line item there, "premium time" --
A. Yes.
Q. -- on Exhibit 55?
A. Yes.
Q. Is that all in your handwriting?
A. Yes.
Q. If you could just read across on that line and tell me what you're indicating on the last line of Exhibit 55?
A. "Clause C-12 premium time." And in the quantity time, it's a percentage. The unit is 25 percent and the quantity is the amount of items covered by the work order to the -- and then I put in the extended price.
Q. When did you put that in on the document?
A. Probably when he determined that we would have to do some premium time work when he said to me we have to maybe do this on an extended period.
Q. Do you remember adding the line "clause C-12 premium time percent, 25 percent, $10,395.68," and then the $2,598.92. Do you remember adding that



line?
A. No, but I see I did. I mean, I know this is my writing. So at some point when I received this back, I followed the direction and put that down.
Q. But as you sit here today, you don't remember specifically when you did that?
A. I only know that within a few days of getting these back, I always would right away send them back because then they would produce the work order that would permit me to go do my work authorized.
So if I didn't get it back to them, if I let this sit a month, I reduced my chances of getting any work. So this would be expedient. A couple of days of getting his requests back, I would immediately send it back to them.
And then they would produce the document called a draft work order for my review. Again, that could have been readjusted again. They could have readjusted it and did some other things and sent it back to me for my review. And then that becomes what I will do. Then that will be what I will actually accomplish if they made that decision.



But this is what I sent back, and they never returned anything, so...
Q. When you say "this is what they sent back," what document are you referring to?
A. Exhibit 55 with all the changes that they requested.
Q. Well, are you telling me at the time you sent it back to them, it had the extend price column filled out?
A. No.
MR. PROSEN: Objection, misconstrues the testimony.
BY THE WITNESS:
A. No. I'm telling you that whatever quantities he needed me to adjust or line items to omit or line items to add, I would make that adjustment and send it back to him. And then I think I've said that I extended the price for the sake of the claim.
BY MS. KIRCHNER:
Q. Well --
A. I could have left it blank. It wouldn't have made any difference.
Q. For the sake of the claim, did you add



the "clause C-12 premium time, 25 percent units, $10,395.68," and then the extend price of $2,598.92?
MR. PROSEN: I'm going to object, ambiguous, misconstrues the facts, lacks a foundation.
BY THE WITNESS:
A. The answer is no.
BY MS. KIRCHNER:
Q. Do you have your original document, sir?
A. No. All the originals would be taken with them and then they would send me a copy back.
Q. But Exhibit 55 is a document that your counsel provided me on Tuesday for the first time in this litigation.
Do you have the originals that we can look at it?
A. I only have the copies that he has somewhere. I never have an original. All my originals went with the government and I was sent back copies, and I have a copy of all my originals. I don't have any original work. The postal service has all the original work.
Q. We're focusing on Exhibit 55 specifically now.
A. Yes, specific to Exhibit 55, the

original was sent in.
Q. No, I want you to -- I want to make this real clear, okay. Exhibit 55 with the extend column filled in, you filled in that extend column at the time of the claim in 1998, correct?
A. Yes.
MS. KIRCHNER: We need to see that document. That is his document that you have the original of. We need to see that.
THE WITNESS: Yeah, whatever you have --
MR. PROSEN: Let's go off the record for a second.
(WHEREUPON, a discussion was had off the record.)
MS. KIRCHNER: We've had a conversation between counsel and the witness, and I requested that the government see the original documents in the formal law firm's files. As I understand it, plaintiff's counsel is going to make arrangements to get those originals to Washington, D.C. so the government can see the original documents. And, of course, if there's privileged communications in the file, I'm not looking for the privileged communications. I'm just looking for the



non-privileged documents, the originals in the law firm's files. And we wish to see the originals. Let's go on.
BY MS. KIRCHNER:
Q. At the time the scopes of work were filled out during the site visits, when you were filling them out, what typically did you use? Did you use pen, pencil, how did you typically fill it out?
A. I don't remember.
Q. Directing your attention to the last page of Exhibit 55, is it possible, sir, that you filled in the "clause C-12 premium time, 25 percent" and the unit column, and then the $10,395.68, that you filled that information in in 1998 when you were working on the claim?
MR. PROSEN: Objection, asked and answered, misconstrues the testimony and compound.
BY THE WITNESS:
A. No.
BY MS. KIRCHNER:
Q. Okay. Now, as I understand the procedure for St. Anne, what you're telling us is you had the site visit, the scopes of work from the



site visit were taken by Sam Southern, you're telling us he sent them back to you with stickies or instructions or messages accompanying them, is that correct?
A. Yes.
Q. And then you then made changes in the scopes of work and sent them and did what with those?
MR. PROSEN: Asked and answered, objection.
BY THE WITNESS:
A. I sent everything back to the government, to the postal service.
BY MS. KIRCHNER:
Q. At the time, you understood that the government could make further changes in the scope of work for St. Anne and add line items or knock out line items and send it back to you?
A. Yes.
Q. Did you have any other conversations with Sam after the site visit where you say to him -- where you talk about the site visit after this has all gone on?
A. I think the record has shown that I have repeatedly sent letters and never got a response



from the government, the postal service, whether it be Sam or Mr. Rigsby, regarding the status of these work orders.
Q. So you sent letters.
Did you have any conversations with Sam regarding the site visit after the site visit itself?
A. It would be just a typical conversation that may have included St. Anne, but I don't think I ever specifically talked about St. Anne after I returned the originals, other than probably I asked him what's the status, and he said, you know, Mr. Rigsby -- because I basically started writing Mr. Rigsby giving updates, and I think that's what I've clearly demonstrated, that that's where the bottleneck came in.
Q. I understand you're telling me of what may have occurred. I'm asking you about your recollection.
As you sit here today, 2004, do you remember having conversations with Sam Southern after you sent back in the scopes of work with the changes made to them that we've gone over today? Do you remember a conversation with Sam after that?

Page 192

BY MS. KIRCHNER:
Q. You're telling me he asked you to perform specific items on premium time. Did you then compute what that amounted to and arrive at the $9,356 for that figure?
A. Yes.
Q. How did you do that?
A. With a calculator.
Q. So -- well, referring to the document itself, Exhibit 62, how did you figure out that that was the amount?
A. Mr. --
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. Mr. Southern specifically asked me to perform overtime on certain projects or parts of the project that he put down on his piece of paper.
BY MS. KIRCHNER:
Q. In order to compute the $9,356, did you have to know the items and how much the amounts were for each of those items?
A. No.
Q. You didn't have to fill in the extend total column?

Page 193

A. No.
Q. Can you explain to me why that is, sir?
A. All I would have needed is the item number. And then I would look at the work order and determine the existing quantity or whatever change he had made on a sticky, and that would then be -- become part of that particular item.
Q. Do you remember doing that in the case of Momence?
A. Sure. I mean -- not specifically, no, but, I mean, you're asking me kind of a vague question, so I'm answering it kind of like --
Q. We're sitting here, it's 2004.
A. Yeah.
Q. As you think back, do you remember for Momence making the computation and computing the 9,356 for premium time?
A. No.
Q. I take it you don't remember when you did that either?
MR. PROSEN: Objection, misconstrues the evidence -- or the testimony.
BY THE WITNESS:
A. Anytime I received one of my work orders

Page 194

back from the postal service, I would immediately make the adjustments that they requested at the time and then return it to the postal service.
BY MS. KIRCHNER:
Q. Did you tell me yesterday that the postal service did not want you using premium time on these projects?
A. That was one of the arguments that I got as to why they didn't want to issue this.
Q. Now you're telling me that Mr. Southern specifically directed you to put certain items into the premium time line of Exhibit 61 --
MR. PROSEN: Objection, asked and answered.
BY MS. KIRCHNER:
Q. -- is that right?
A. Yes.
Q. So even though -- let's just go on.
Why did you put the check next to premium time on Exhibit 62, the second page?
MR. PROSEN: Objection, assumes facts not in evidence.
BY THE WITNESS:
A. I did not put that check there.
BY MS. KIRCHNER:

Page 195

Q. Whose handwriting is that check?
A. Oh, I don't know.
Q. That mark, that check is not yours?
A. No.
Q. Do you see anything else on Exhibit 62 that is not your mark?
A. Just -- no, just that check and maybe some other checks or marks on the copy. I don't know. There's a lot of dots on this document, so...
Q. As you sit here, take whatever time you want, if there's anything else that you see in Exhibit 62 that's not your mark, would you let me know?
A. Yeah, there isn't any.
Q. Did you have any oral conversations with Sam Southern after you and he did the site visit at the Momence Post Office that we've been talking about?
MR. PROSEN: Objection, vague, ambiguous.
BY THE WITNESS:
A. Maybe. I don't recall.
BY MS. KIRCHNER:
Q. So as you sit here today, you don't remember specifically talking to Sam after the site

Q. Who was?
A. It wasn't Paul.
Q. What other post offices, other than Paxton, did you work on in the 609 zip code?
A. Ashkum, Bonfield, Buckingham, Buckley, Cabery, Campus, Chatsworth, Chebanse, Cissna Park, Clifton, Crescent City, Cullom, Danforth, Donovan, Elliott, Emington, Essex, Gilman, Herscher, Grant Park, Kempton, Ludlow, Loda, Martinton, Melvin, Manteno, Milford, Onarga, Rankin, Reddick, Paxton, Piper City, Roberts, Rossville, Sheldon, Thawville, Wellington and Woodland.
Q. During what time frame, what years are you talking that you did all this work, sir?
A. The same years in my claim, from somewhere in the calendar '95-ish to '97-ish.
Q. Was some of this work in 1994?
A. I don't recall. I'd have to check my records. Sitting here, I don't recall.
Q. How about Downers Grove? Is that in the 609 zip code?
A. 605.
Q. 605. I see.
Did Aroma Park at the time of the site



visit have Xerox capacity, a Xerox machine?
A. No. It's a very rural town. It's on the corner, as I recall.
Q. After the site visit at Aroma Park with Paul Steiner and the work is scoped out, what did you expect was going to happen for that post office?
MR. PROSEN: Objection, vague.
BY THE WITNESS:
A. My role in it, is that what you're asking?
BY MS. KIRCHNER:
Q. Let me rephrase the question.
A. Yeah.
Q. You conducted a site visit at Aroma Park with Paul Steiner and work was scoped out, is that correct?
A. Correct.
Q. Are there particular items that reflect handicap ramps in Exhibit 68?
A. No.
Q. So you were not scoping out a handicap ramp?
A. Yes. That doesn't mean that they wanted me to do the concrete work. I scoped it and gave



them the work order, but it's their discretion to keep it or deny it. I've only got the inside.
Q. I want to look at Exhibit 68. Are there particular line items in Exhibit 68 that relate to the handicap ramp?
MR. PROSEN: Asked and answered, objection.
BY THE WITNESS:
A. There are no ramp issues in this one.
BY MS. KIRCHNER:
Q. Okay. So you're not making any claims about Aroma Park with regard to a handicap ramp?
A. No.
Q. Was there already a handicap ramp at Aroma Park at the time of the site visit?
A. I can't explain why or why not we didn't do anything about it. I just know that it was...
Q. After the site visit at Aroma Park and the scope of work, you drew that up and Paul Steiner takes it back with him, what did you expect was going to happen next with regard to you're doing any work at Aroma Park?
MR. PROSEN: Objection, vague, ambiguous, asked and answered.
BY THE WITNESS:



A. I expect a returned draft work order from the post office with full extended prices and a time to start, estimated completion dates for my review and acceptance. And if I accepted it, I would sign it and return it for the contracting office's signature and a notice to proceed.
BY MS. KIRCHNER:
Q. So the document you expected to receive back from the post office, it would have extended prices on it?
A. Oh, it always would.
Q. I take it that didn't happen, is that correct?
A. Not on the ones I'm claiming, no.
Q. And not for Aroma Park?
A. Not for Aroma Park.
Q. Those extended prices that you expected, were those the prices that were part of your Indefinite Quantity Contracts that you had at that time?
A. Yes.
Q. Let's go on.
Did you make a site visit to Papineau?
A. Yes.

Page 296

A. Well, I think there were several at the time. I think Andy Fernandez, who's not a postal employee, was there, and I think Lois Gunlogson and I think Jesse McNabb, and I think this one even Bob Rigsby. This was a special one.
Q. So here you remember a site visit where all those individuals, in addition to yourself, were present at Downers Grove, is that correct?
A. Yes, and the postmaster.
Q. And that related to your lock box lobby job, right?
A. Yes.
Q. Did you perform yet another site visit at Downers Grove?
A. Yes.
Q. Was that after the one that you've already told me about?
A. That was during the work of the one we just discussed.
Q. So during the time you're performing the Downers Grove job, you also did another site visit?
A. Yeah.
Q. Did you scope out work?
A. Yes.

Page 297

Q. Was another postal employee with you at the time of this site visit when you were scoping out work?
A. Well, Lois was there and Jesse was there, but I'm not sure which one I interacted with on it. I want to say Jesse McNabb.
Q. Are you unsure?
A. No, they were both there, but I think it was Jesse because there were no measurements in this one. This one I was given some drawings to look at. I didn't have to measure. I'm pretty sure he handed me something. And then I got something else in the mail to change that. So I think there may be two or three adjustments that I made.
Q. The second site visit that you're remembering, generally what was the proposed work that that site visit was about?
A. A dock enclosure.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 80 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. Please take a look at what we've marked as Battaglin Exhibit 80 to your deposition. Do you

Page 298

recognize Exhibit 80?
A. Yes.
Q. What's Exhibit 80?
A. A computer generated floor plan in sections.
Q. Did you prepare these?
A. No, I did not.
Q. Did you obtain these from the postal service?
A. Yes.
Q. How did they come to you?
A. Through Jesse McNabb.
Q. Did they come in the mail or did he hand them to you?
A. I don't recall how this set came to me.
Q. After you got them, did you put your stamp, L.P. Consulting Group, on it?
A. Yes.
Q. Do these relate to the dock enclosure at the Downers Grove Post Office?
A. Yes, it does.
Q. So earlier when you said you got some drawings to look at, are these the drawings that you're referring to?

Page 299

A. These are the first set, yes.
Q. Did you obtain these drawings, which are in Exhibit 80, from Mr. McNabb before you did the site visit at Downers Grove?
A. Not this set, no.
Q. There was another set, sir?
A. Well, like I said, this is the first interaction I had with the dock enclosure.
Q. I understand that. We can put -- putting aside that site visit where Fernandez was there and Jesse McNabb and Rigsby and yourself, let's put that site visit aside. We're focusing on the second site visit at Downers Grove, okay?
At that second site visit, had you obtained drawings from Mr. McNabb before that site visit?
A. No. I received this particular set at the site visit with Mr. McNabb.
Q. That's Exhibit 80, correct?
A. Yes.
Q. Did you use Exhibit 80 during the course of the site visit with Mr. McNabb?
A. Yes.
Q. How did you use it?

A. If you note the plan, those are my words, which were written in pencil or pen, whatever the medium, those are my words. We went over the job and corrected what was discussed probably, I can't say for sure, with the postal -- postmaster or someone related to the facility who is typically on-site when we're doing these things. I don't recall if this one, if it was maintenance or the postmaster, but there was always someone with us.

Q. You're referring to the first page of Exhibit 80. Which is your handwriting, if you could point that out to me, sir?

A. Sure. If you look starting in your right-hand corner, the upper right-hand corner, the word "insulated," where it says "furnish and install a 10 by 10 panel, flush panel overhead door." We determined it's better to have an insulated door if you're enclosing a dock. Then right below it, we added the 10 by 10 wire glass to a particular door, and that door was also to be, instead of hollow metal, it was to be insulated.

If you sweep down clockwise underneath, I have a little arrow going to a "3 by 7 insulated door with a vision wire kit," a typical postal



special. And then right below it, I also put "insulated for the flush panel overhead door."

And then sweeping back up, again, the word "insulated for flush panel overhead door." And just immediately above that, "insulated door with a 10 by 10 wire glass." Those are my words.

Q. Were those your observations at the site or is that as a result of a discussion with Mr. McNabb at the site as to what work should be done?

A. That was with the discussion.

Q. If you just look through the remaining three pages of Exhibit 80, did you make any marks at all on those pages?

A. Yes.

Q. Which page are you on where you have your handwriting?

A. I don't have any handwriting, but the mark I made was I put my stamp on all three.

Q. Okay.

A. That's all that's on there.

Q. All right. At the time of the second site visit at Downers Grove, did you scope out work and fill out a scope of work form?



A. For this dock enclosure, yes, we did.

(WHEREUPON, a certain document was marked Battaglin Exhibit No. 81 for identification, as of 6/11/04.)

BY MS. KIRCHNER:

Q. Please take a look at what we've marked as Exhibit 81 to your deposition, and if you could tell me what Exhibit 81 is.

A. It's a scope of work for the Downers Grove dock.

Q. Did you prepare this scope of work?

A. Yes, I did.

Q. If we focus now on the second site visit at Downers Grove that you performed, at the time of this site visit, had you already filled out the item number and the description and the unit measure and the unit price on the scope of work form that we have here on Exhibit 81?

A. Not on this one. This is the second work order, not the first.

Q. Do you have the first?

A. No. I gave everything to the post office. The first was related to this document called document 80. This is referring to the second



set of drawings that I'm filing as my claim.

If I can elaborate, this first document was calling for a wood partition. And if you look at the top of this, the very first line, this is for a steel tube. This is when we went to a steel framed construction.

So this document 81 is unrelated to document 80, and I can't tell you where the post office put that copy of that work order. This work order that you're referring to now as document 81 is related to another set of drawings. It hasn't been produced yet.

Q. So L.P. Consulting doesn't have that set of drawings?

A. No, they were postal drawings that I don't have.

Q. You don't have a copy of that?

A. No.

Q. Just to make sure I'm following you, at the time of the second site visit at Downers Grove, you're there with Jesse McNabb and you scope out the work.

A. Correct.

Q. It's for a wood frame dock enclosure, is

that correct?
A. Correct, document 80.
Q. I take it after looking through all the documentation that's been produced by L.P. Consulting and the government, you have not seen the scope of work that you prepared for the wood frame dock enclosure, is that correct?
A. Right.
Q. And you've looked for it in your own records?
A. I have had no need to. I'm not claiming that project. I don't have a copy of that and I'm not claiming that particular scope of work. The scope of work I'm claiming in my lawsuit is document 81.
Q. How did it come about that you prepared that second scope of work?
A. The same site visit with Mr. McNabb and different drawings.
Q. The very same site visit?
A. No, it couldn't be the same site visit. He had different drawings. Why would I give him a proposal for this?
Q. I just want to clarify, okay?



You have a site visit with Mr. McNabb. You have the drawings that are in Exhibit 80 and you prepare a scope of work for Exhibit 80 that we don't have that scope of work?
A. Correct.
Q. Then do you do another site visit at Downers Grove with Mr. McNabb?
A. Yes.
Q. And you have another set of drawings at the time of that site visit?
A. I believe they were postal furnished through A.M. Fernandez that I didn't get a copy of that I reviewed on-site with Mr. McNabb only for the portion of work that was in addition to what we originally discussed, which is eliminating all the wood and replacing it with steel. So it's just a math thing; it's not a scientific -- anything scientific. It's just simply taking out one thing and adding another.
So when he took back, as I've said many times, when he took this document back with what we discussed in the field, he added it to Mr. Fernandez's drawing and came back to me, and I produced another scope of work taking out what was



not to be provided and putting in what was to be provided. And that's what this -- what are you calling it -- Exhibit 81 is.
Q. So Exhibit 81 is the second scope of work for a dock enclosure that you produced for Downers Grove, correct?
A. In a way it is, yes.
Q. Now, you were explaining how you had to eliminate the wood and you replaced it with steel.
Would you just tell me which line items in the description column are different because now we're using steel for Downers Grove?
A. Without the print in front of me, I can only say these for sure --
Q. Okay.
A. -- the first one --
Q. Where it says "steel tube"?
A. Yes.
Q. Okay.
A. (Continuing) -- the third one, metal fab; down there where it says welding. And I think that's it.
Q. At the time of the second site visit for the dock enclosure at Downers Grove when you're



there with Mr. McNabb, clarify for me, are you changing the old scope of work or are you filling out a new scope of work form?
A. Both. It's a new scope of work form with changes from the old scope of work, but the form itself hasn't changed, I don't think. I don't recall marking up the same piece of paper. I think it was probably something new because it related to something completely different than what we did originally.
Q. So for the second site visit that has to deal with the dock enclosure at Downers Grove, how did it come about that you were there? Are you there because you're working on the job or did you come on the site specifically for this site visit?
MR. PROSEN: Objection, compound.
BY THE WITNESS:
A. I can't say if I was standing on the site reviewing what we were doing or actually doing any work at the site where I specifically made a special trip, but we were at Downers Grove.
BY MS. KIRCHNER:
Q. Were you still doing -- if I remember correctly, you told me you were doing lock box