remodeling at Downers Grove, right?
A. (Nodding.)
Q. In about August of 1996, are you still doing lock box remodeling at the Downers Grove Post Office?
A. Maybe, yes.
Q. How did you learn that you would be scoping out a steel dock enclosure for Downers Grove as opposed to the earlier wood one?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. Mr. McNabb contacted me and said the old print that he produced was null and void and we need to look at these other drawings, and I'm pretty sure they were A.M. Fernandez's drawings.
BY MS. KIRCHNER:
Q. Did you arrive for that site visit, the second site visit, with the scope of work form all filled out in terms of the line -- the item number column, the description column, the unit measure column, the unit price column?
A. This one I don't think was that way. I think this one I drew it up in the field completely with my book because it was a total -- that drawing



was different than this drawing, so my old one was obsolete, if you will.
Q. The new drawing for the dock enclosure at Downers Grove that reflects steel in the construction, was that a blueprint?
A. Yes, it would have been a blueprint.
Q. Approximately what size?
A. The normal post -- whatever you want to call it, typical AE firm size. It might be -- I don't know sizes. I'm sorry. I can't gave you the dimension. It's pretty big. I used to know. 24 by 36 maybe.
Q. Just give me one second.
A. Sure.
MS. KIRCHNER: Go off the record for one second.
(WHEREUPON, there was a pause in the proceedings.)
BY MS. KIRCHNER:
Q. So you drew up the scope of work for the steel tube dock enclosure at Downers Grove, correct?
A. Yes.
Q. What did you do with your scope of work?
A. I gave it to Mr. McNabb.



Q. And at the time you gave it to Mr. McNabb, had you filled in the extend price column on the scope of work form?
A. I don't recall.
Q. Had you put a total price on the scope of work form before you gave it to Mr. McNabb?
A. I don't recall.
Q. After you gave the scope of work form to Mr. McNabb, what happened next with regard to the steel tube dock enclosure for Downers Grove?
MR. PROSEN: Objection, calls for speculation on the witness' part.
BY MS. KIRCHNER:
Q. Let me rephrase. Did you have conversations with Mr. McNabb about your scope of work for the steel constructed dock enclosure at Downers Grove after that site visit?
A. The only conversation I had with him, that was simply -- it was a status update, "Hi, how's it going? What's going on with the Downers Grove dock?" At that point he told me that A.M. Fernandez was going to handle the job and I should talk to Bob Rigsby.
Q. What did you say in response to that



statement from Mr. McNabb?
A. "I will look into it. Thank you very much," something like that probably. And we talked about other things we were working on. That was it.
Q. Did you look into it after that conversation with Mr. McNabb?
A. Yes.
Q. What did you do, sir?
A. I think I -- I didn't talk to Fernandez, but I did talk to Mr. Rigsby at some point in there, just asking what the status of this particular project was.
Q. Was it one conversation or more than one conversation with Mr. Rigsby?
A. I think it was just one that related to the dock. And he basically said that he'd let me know, get back to me, and that he just agreed, yes, it's with the architect. And that was all we talked about.
Q. With the architect --
A. We talked about other things, but, you know, specifically this project.
Q. So the two of you understood that the matter was with the architect at that point in time?

Page 312

A. I understood that the -- I guess the way you're wording it is probably accurate. The matter was between the post office and the architect and he would get back to me on it.
Q. Approximately when was it that you had this conversation with Mr. Rigsby that you're telling me about.
A. It would probably be still in August, because I didn't let these linger. Once I found out -- or once they tasked me, they said, "Hey, let's go do a scope," I followed up pretty quickly. Because without getting the information to produce the scope of work, I would never get a work order. So you have to be diligent in getting the quantities in and discussing time so that they could go back and do their computer work and give me a work order.
Q. So was this conversation with Mr. Rigsby in approximately August of 1996?
A. It would have to be, the first phone call, sure, to find out what's going on with the work order.
Q. After that conversation with Mr. Rigsby, did you have later conversations with Mr. Rigsby on the same topic?

Page 313

A. I don't know when, but probably, yes. I can't recall the time or date, but yes.
Q. Do you recall the substance of the telephone conversation?
A. It was probably -- I'd be speculating.
Q. I'm not asking you to speculate, sir. I'm just asking you about your recollections.
A. I'd be speculating. I know we talked. I just can't --
Q. You can't remember the substance of it?
A. No.
Q. During the time that you were working at the Downers Grove Post Office, you're doing construction work there because you got that interior work --
A. Yes.
Q. -- was any other contractor working on the dock enclosure?
A. No. Well, let's back up. I became aware that someone else was going to get the dock enclosure through -- I think it was the postmaster, in fact.
Q. You're remembering an oral conversation with the postmaster?

Page 314

A. Yeah. It had to do with --
Q. Let me just ask the questions.
A. I'm sorry.
Q. I just want to have a clear transcript.
A. I appreciate it.
Q. Who's this postmaster that you're remembering?
A. It was a woman. I don't know her name.
Q. What did you learn from this postmaster for Downers Grove?
A. Something to the effect that we -- we, my company, would move product from the dock through the facility, drywall, whatever, 2 by 4s. And it was at such point when I made a comment about, you know, "One of these days," something like, "this is going to get enclosed." And she said, "Yeah, I heard they're ready to give out a contract," or something to that effect. And that's when I first heard that some work was going to take place.
Q. Did the postmaster tell you that the post office had already awarded a contract for enclosure of the dock?
A. No.
Q. Can you tell me again --

Page 315

A. Well, she obviously, my opinion --
Q. What I want to do is understand your best recollection of what she said to you.
A. My best recollection was that she had heard or was told that the dock enclosure was either going to be let or was let, I don't remember the exact words, and that this would be -- this work would be starting soon. And that's what took me by surprise because I had thought I was going to be the guy, and I don't know what happened to the project. I just trusted that the powers that be are doing their usual paperwork to get me the work, so I was surprised.
Q. After you learned this from the postmaster, did you check up on your scope of work for the dock enclosure at Downers Grove?
A. Yes.
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. Yes, I contacted Mr. Rigsby.
BY MS. KIRCHNER:
Q. To clarify, is this the conversation where Mr. Rigsby tells you that the matter is with the architect?

A. No, this is now another conversation.
Q. Oh, another conversation.
A. After I talked to the postmaster.
Q. After you talked to the postmaster, you talked to Mr. Rigsby again?
A. Yes.
Q. Is this a conversation over the telephone --
A. Yes.
Q. -- or face to face?
A. No, it was on the phone.
Q. What did you say to Mr. Rigsby in this conversation?
A. I basically said -- I'm paraphrasing the conversation; I don't remember it verbatim. Basically it was I heard from the postmaster that that was going to be happening soon. And I just asked him, was that coming -- was my work order coming, and he said he wasn't going to issue me a work order; he had another contractor do the work. That's when I learned that Fernandez had bid the project. And subsequently in time after that, I found out all the facts of the matter, and that's what had happened.



Q. In this conversation with Mr. Rigsby that you're telling me about, did Mr. Rigsby tell you that the postal service had already awarded a -- well, let me back up.
In the conversation with Mr. Rigsby that you're telling me about, did Mr. Rigsby tell you that the dock enclosure had been bid for Downers Grove?
A. No, he never said it was bid.
Q. Did he tell you whether or not the postal service had already awarded a contract for the dock enclosure at Downers Grove?
A. He implied it.
Q. He led you to conclude that?
A. Yes.
Q. Do you remember what he said that led you to conclude that?
A. He said that we have selected a contractor and he'd be doing the work. He never mentioned the name of the contractor, but just that they had picked a contractor to do the work.
Q. Did you ask who the contractor was at that time?
A. I don't recall because I didn't bid it,



so I have no right to know the information. If I bid anything or I respond to an offer of solicitation, they're required to notify me because I was part of the process, but I was locked out of the process. I had no involvement in the process.
Q. Did you say anything further to Mr. Rigsby in this telephone call about the Downers Grove scope of work for a dock enclosure?
A. I received no notice of any type or any communication from anyone in the postal service regarding my scope of work for Downers Grove and no communication whatsoever from any of the project managers or the architect on the solicitation and awards of the project. I did not know any of that was going on, so I had no opportunity to protest.
Q. I'm just asking you about the conversation with Mr. Rigsby. Did you say anything else to him in that conversation that had to do with Downers Grove's scope of work for a dock enclosure?
A. I said to him if I would have known, I would have protested. And he said something to the effect that -- he kind of dismissed it, you know, just in normal parlance as if, "Well, there will be other work," just, you know, just politely brushed



it off. At the time I was disappointed and at the time he didn't really care that I was disappointed.
Q. Did he tell you that he didn't care?
A. Just by his demeanor, just like, "Well, you know, I'm sorry."
Q. This is a telephone conversation, right?
A. Yes, just a phone conversation.
Q. Did he tell you anything else in this phone conversation?
A. That's it.
Q. When you told Mr. Rigsby that if you had known, you would have protested it, what did you mean by that?
A. Well, I would have formally protested the award, but I would have been untimely, because by the time I found out, it was too late.
Q. After you learned of this from Mr. Rigsby in this telephone call, did you take any other actions or have any other further conversations with him with regard to Downers Grove and the dock enclosure?
A. Not this particular project, no.
Q. Referring back to that conversation with Mr. Rigsby about the dock enclosure in Downers

quantity, would have been -- it looks like it's my typical -- the description and line item, there's only one provided in the book, so I just took that and put it in this form again and put the unit price. And we measured in the field and I got new quantities.

Q. Did you make another site visit to Hoopeston after the site visit on November 14th, 1995?

A. This date could be the date I sent it to Ms. Gunlogson. This date could be a lot of things. I know it's there. I do notice, though, it's different than the first one because I wrote on here "capital." So someone informed me that this was going to be a capital expenditure. That would make a difference, which could be why we did this again.

Q. What I'm asking you is: You remember doing a site visit on or about November 14th, 1995, is that correct?

A. Yes.

Q. And that's at Hoopeston, correct?

A. That's correct.

Q. Do you remember making another site visit at Hoopeston?



A. All I recall is I was with Paul or Lois, and if there are two different times, I don't recall. But I do know that this is my document and I produced it.

Q. But you're not sure whether you made another site visit?

A. No, I don't recall.

Q. Well, did you produce Exhibit 91 on or about August 1st, 1996?

A. That date could be the date we visited or it could be the date I put down when I sent it to her. That I don't recall. It's possible.

Q. Okay.

A. I don't recall.

Q. Let's look further at Exhibit 91. How did you arrive at the information you put in the unit price column on Exhibit 91?

A. Say that one more time.

Q. There's a unit price column on Exhibit 91, right?

A. Uh-huh.

Q. How did you determine what amounts to put in the unit price column on Exhibit 91?

A. I know exactly what this is now. This



is -- I have a different contract now. That's what this is telling me now. Now that I look at it and now that I recall, this one, if I put in here 94-B-0083, I may have submitted this and it was expired and they requested me to supply them with a new one, and that's what that date relates to.

So I what I did was send a second work order, only because at this time this transpired under one contract and this was under the new contract. That's exactly what it is. Now I can remember that. That's why I have the same document because this one is for the expiring or maxed out contract and this is for the other one. Yeah, that's why there's two of them.

Q. I just want to make this a little bit clear on the record.

A. I understand.

Q. Referring to Exhibit 90, do you have Exhibit 90 in front of you?

A. Yes, I do.

Q. That's the one where you filled out the scope of work using the unit prices from the contract 94-B-0083, is that correct, sir?

A. That's correct.



Q. That was the Indefinite Quantity Contract that you had in November of 1995, is that correct?

A. That's correct.

Q. Now, in August of 1996, you filled out Exhibit 91, is that correct?

A. That's not correct. I could have filled that out any time other than August 1st, '96.

Q. But at the time you filled out Exhibit 91, you were operating under the Indefinite Quantity Contract that you had in 1996, is that correct?

A. I'm not sure of the dates, but it was a different contract.

Q. A different Indefinite Quantity Contract?

A. Than Exhibit 90.

Q. Just to get the chronology straight, is it correct that back in 1994, you had an Indefinite Quantity Contract; and then in June of 1996, you were awarded two new Indefinite Quantity Contracts, is that correct?

A. That's correct.

Q. And they had unit prices which were

Page 364

different from the '94 contract, is that correct?
A. That's not correct. It was the same unit price, same line items. The only thing different was my multiplier, because I'm competing for a contract to get the contract.
My multiplier assures me of a contract, which is why we're here today because I competed for this geographic area under a specific contract with a special multiplier relating to the line items. The line items stay the same, but my multiplier against them change with wage rates and dumping fees and things that take for cost of business.
So what ends up happening is this document could end up being different than this document by nature of the fact that I have a different multiplier.
Q. So you're saying --
A. A contract is a contract, so...
Q. Just so I'm really clear, on Exhibit 91, the unit prices in that column, the unit price column on Exhibit 91 --
A. Uh-huh.
Q. -- do they reflect the unit prices for the 1996 Indefinite Quantity Contracts?

Page 365

A. To the best of my knowledge, they do.
Q. And are you telling us then that the reason why the unit price column is different in Exhibit 90 versus Exhibit 91 is because there were different multipliers for the two Indefinite Quantity contracts?
A. That could be, yes, that's exactly what it could be, or they could be the same. I don't have a calculator to crunch the number.
Q. I guess I'm not following you when you say "they could be the same." Let me just ask some more questions.
First off, I would like to ask you to compare the second page of Exhibit 90 and Exhibit 91. Those second pages, they look identical to me. Do they look identical to you?
A. Pretty much.
Q. Earlier you said that you knew exactly what Exhibit 91 is. What do you think Exhibit 91 is?
A. It's a replication for my contract for '96. See, I'm just going to say this for time sake, because I believe I'm educating everyone on something that it took me ten years to -- when I was

Page 366

doing this.
All you need is my contract number, go to the PACS system, pull up these items times the quantity and you'll get your extended price and you'll get the government price. You don't need to know I wrote different numbers down in my extended column or they seem to be different.
This exercise, frankly, is starting to be fruitless because these quantities, these unit prices are based against the quantity. This is a government generated thing. I can't generate this part. I can only put in the quantities.
To get the extended version, you just do the math and you'll get the exact number. And that can be done by anybody in the current postal system. And I'm getting a little frustrated in the sense that I'm educating on how a work order is put together and I don't see the purpose of it.
Q. Can you explain to me, sir, why it is in these two documents that you prepared there are different numbers in the unit price column on the first page?
A. Very simply. Maybe this page --
Q. When you're talking, you have to refer

Page 367

to the exhibit number of the document.
A. Exhibit 90, I took the time to run my multiplier against that number, which was $80. If, in fact, $68.72 is 15 percent less than 80, that will make the difference. It's possible that the new contract I changed the way I did the format, but the numbers don't change in regard to the end result, because the government's computer automatically takes my multiplier off against the unit price and the individual item number.
If I didn't write the description down in here or the unit measure, all I needed to put down, for example, is the first line on the item number and a quantity, and the postal service's work order would have produced everything else.
All this other information is completely moot, because all you need is an item number and a quantity and you can build a work order. Do you understand that?
Q. I have another question for you, sir. Do you see that on Exhibit 90 you have a total of $45,951.88, and on Exhibit 91 you have a total $45,472? Do you see that?
A. Yes.

Page 368

Q. Did you compute both of those totals?
A. I may have made a mistake, yes. I observe that now. But as I've reiterated, and I'll reiterate it again, you can take this item number times this quantity and you'll get the end result for my contract for this particular work order.
Q. Do either --
A. And I would live with that final number.
Q. Do either Exhibit 90 or Exhibit 91 relate to your claim, which is the subject of the lawsuit?
A. I've got to find it first.
Document 83, Exhibit 83, No. 2 says, on October 1st and August 1st, on or about, L.P. provided a site visit and they produced these work orders, and the total amount is $62,752.
Q. So --
A. That would be for both work orders.
Q. Which two work orders?
A. The interior and exterior.
Q. Which two documents of the scopes of work for Hoopeston are you referring to?
A. I believe it to be 87 and -- well, either 90 or 91.

Page 369

Q. Can you tell us which one it is for the handicap ramp?
A. No, I cannot.
Q. So it's either 90 or 91 and you don't know which?
A. Now that you've pointed out the total in this extended price, I'd have to do some math. One of these two would equal what this one would equal in my claim.
MS. KIRCHNER: Does anybody have a calculator to find out which one it is?
(WHEREUPON, a recess was had.)
BY MS. KIRCHNER:
Q. With regard to the Hoopeston Post Office, does your claim relate to a scope of work which amounted to $62,752?
A. Yes.
Q. Have you looked at the documents and can you tell us which scopes of work are relevant to your claim?
A. Not really. I believe that this is a different multiplier --
Q. Again, when you --
A. Exhibit 91 is a different multiplier

Page 370

than Exhibit 90. Therefore, the concern that the government has is the written extended price, and that's the difference.
Q. That's not my question, sir. I want to know which documents are the documents on which you're basing your claim.
Which particular document relates to the scope of work in the amount of $62,752?
A. I'm going to say Exhibit 91.
Q. And that has on it an amount of $45,472?
A. Yes.
Q. Can you explain to me -- we have also this scope of work in Exhibit 87. Does that relate to your claim for Hoopeston, which has a scope of work amount of $62,752?
A. Yes, it would.
Q. So you're saying that the $62,752, that scope of work was for interior plus the handicap ramp?
A. I believe it was.
Q. Do you have any document that totals out the amount for the interior part of the scope of work for Hoopeston?
A. None that totals out on the document.

Page 371

Q. Have you ever sat down and totaled out the numbers on Exhibit 87?
A. Oh, yes.
Q. Do you have that someplace?
A. No. I would have thrown that away. It was just a mathematical. It's irrelevant to me.
Q. But was it important to you at the time you filed your claim?
A. Yes, but it's a government math number, not my number. Anybody can do the math.
Q. The number $62,752, that was in your claim, correct?
A. That's correct.
Q. Did you satisfy yourself at the time you filed the claim that that was a correct number?
A. Yes, it was.
Q. How did you satisfy yourself that it was correct?
A. I ran the computation as if my calculator was the government computer, and I determined on a tab what the amount would be. And I didn't feel the need to write that number on my scope of work.
Q. So the $62,752 is the sum of the items

listed in 87 and the items listed in 91?
A. It's the amount that I have determined based on my calculations that I filed in my claim.
Q. And it's for the items of work listed in Exhibit 87 and Exhibit 91, is that correct?
A. It's -- the items that I believe are important to my claim is in those two exhibits, yes.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 92 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. Please take a look at what we've marked as Exhibit 92 to your deposition and tell me whether you recognize Exhibit 92.
A. Yes, I do.
Q. What's Exhibit 92?
A. Exhibit 92 is another contract with another price, and it's for $62,000.
Q. Did you prepare Exhibit 92?
A. With the exception of the quantities, yes, and -- yeah.
Q. Whose handwriting is on Exhibit 92?
A. My handwriting.
Q. Is all the handwriting your handwriting?



A. Yes, it is.
Q. When did you prepare Exhibit 92?
A. This would have been at the time I received that other contract that's shown up at the top.
Q. As I understand it, you received the Indefinite Quantity Contract 96-B-0098 in June of 1996, is that correct?
A. I believe so, on or about, yeah.
Q. Are you telling us that it was at or around that time that you prepared Exhibit 92?
A. I'm saying that I took the item number against the quantity that was derived, whether it be on Exhibits 92, 91, 90 or any of the exhibits shown, or 87, and I filed a claim for the amount of $62,000 and whatever my claim is for. Whether it be Exhibit 92, 91 or 90 or 87, I'm claiming the item number against the quantity that's listed on the document. I'm not claiming the extended price or the government's unit price or my multiplier.
Q. Are you claiming the quantity?
A. I'm claiming the item number and I'm claiming the quantities, and whatever that comes out to be is my claim.



Q. Well, as you sit here today, can you tell us what quantities you are claiming for Hoopeston with regard to the concrete handicap ramp?
A. I'm going to say that I'm claiming the quantities against the item number on document Exhibit 92.
Q. And you'll note, sir, that those quantities are different than the quantities in Exhibits 90 and 91, is that correct?
A. They might be, yes.
Q. Well, could you just satisfy yourself, sir?
A. Yes, they are different.
Q. How did you go about determining the quantities that you put in the quantity column of Exhibit 92?
A. The same way I did the others. I would get with the postal people and we would determine that this is the amount required. It's very possible that this document --
Q. Which one are you referring to?
A. Let me finish.
Q. Sorry.
A. I'd appreciate it.



Exhibit 92 is probably a take-off of Mr. Fernandez's drawings that I protested and was given by Mr. Rigsby, and I came up with a number of $62,000. And that's probably what document 92 is, which is the issue of the claim.
Q. Did you obtain Mr. Fernandez's drawings for the Hoopeston ramp?
A. Yes.
Q. And did you then do a take-off for those drawings of Mr. Fernandez?
A. Yes.
Q. And is that take-off of yours Exhibit 92?
A. Yes.
Q. And by "take-off," please tell us what you mean, for the record?
A. The government's item number, description, unit measure and unit price times the quantity as it related to the document provided by the government. And that's how I came up with my number against my multiplier of my contract.
Q. In the document that you had from the government was Mr. Fernandez's drawings for the Hoopeston ramp, is that correct?

A. That's correct.
Q. From those drawings, in your experience, you came up with the quantity column on Exhibit 92, is that correct?
A. That's correct.
Q. And those amounts listed are different from the amounts -- quantities listed in Exhibits 90 and 91, is that correct?
A. That's correct.
Q. And you prepared Exhibit 92 sometime in 1996, is that correct?
A. That's correct.
Q. What did you do with Exhibit 92 after you prepared it in 1996 based on Mr. Fernandez's drawings?
A. I gave it to Mr. Rigsby.
Q. And you'll see that your total on Exhibit 92 is $62,000, is that correct?
A. That's correct.
Q. Yet your claim amount -- the amount of your scope of work for purposes of the claim is $62,752, is that correct?
A. If that's what's written, sure.
Q. Yes. How do you account for the



difference, sir?
A. Math error, maybe the multiplier, I used the wrong multiplier, that's possible. Because it's just unit prices against quantity with a multiplier, so it's possible it's a calculator mistake. I don't have the government, you know, system, so it's a very arduous task.
Q. I didn't hear you.
A. I don't have the government system to produce this in 30 seconds, so I have to produce it long hand.
Q. When you did Exhibit 92, when you prepared Exhibit 92 in 1996, did you do it long hand?
A. I would think, yeah. You could see it on the document.
Q. Now, after you gave your amount for the Hoopeston ramp to Mr. Rigsby, how did you do that? Did you do that orally? Did you give him a piece of paper?
A. I handed him the document that you're referring to as No. 92.
Q. Did you say anything when you handed it to him?



A. "Here's the Hoopeston exterior ramp."
Q. Did he say anything to you at the time you gave him the document?
A. Yes, he said it's too late.
Q. Did you respond to that?
A. Yeah, I formally protested to senior counsel in Washington.
Q. And what was the result of your formal protest?
A. It was dismissed because it was untimely.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 93 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. Please take a look at what we've marked as Exhibit 93 to your deposition, and let me know when you're ready.
A. I'm ready.
Q. Do you recognize Exhibit 93?
A. Uh-huh.
Q. What's Exhibit 93?
A. A letter to Mr. Sakrider in Chicago from my attorney at the time regarding Hoopeston and



other matters.
Q. Is this your formal protest regarding the Hoopeston matter?
A. No. My formal protest went to William Jones in Washington. This may be a copy of something. This is not the official protest.
MS. KIRCHNER: Go off the record.
(WHEREUPON, a discussion was had off the record.)
BY MS. KIRCHNER:
Q. So you got the drawings from Mr. Fernandez and did your take-off?
A. No, I got the drawings from Mr. Rigsby and did my take-off.
Q. Okay. You got Mr. Fernandez's drawings, you did your take-off, and the take-off is Exhibit -- is that Exhibit 92?
A. That's correct.
Q. You have no explanation for the difference between the $62,000 and the $62,752 in your claim amount?
A. My explanation is a possible difference in the multiplier that I failed to calculate right as a math error. And I'm willing -- going on record