IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **L.P. CONSULTING GROUP, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 98-868C** |
| | ) | |
| **THE UNITED STATES,** | ) | **(Judge Allegra)** |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S RESPONSES TO PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT

Defendant, the United States, pursuant to RCFC 56 (h)(2), hereby submits its responses to Plaintiff's Proposed Findings of Uncontroverted Fact, and adopts the numbering used by L.P. Consulting Group, Inc. ("LP"), which begins with number two:

2. LP's secretary/treasurer Mr. Richard Battaglin ("Battaglin") has extensive experience in building construction as well as United States Postal Service ("USPS") construction contracts having worked for the USPS as a contract employee for the USPS at the Field Real Estate and Building Office, Illinois Central Region between 1985 and 1988. In that capacity, Mr. Battaglin's job description included developing scopes of work to be issued to IQC contractors, and developing the unit items/prices for solicitation at various facilities. During the course of Mr. Battaglin's employment with the USPS as project manager/architect/engineer, he was involved in approximately twenty (20) indefinite quantity contracts, involving at least 300 individual work orders. In fact, the work that he performed for the USPS involved contracts in which work such as that alleged in the underlying IQC contracts was performed. LP App. 1, Battaglin Aff. ¶¶ 2-3.[1]

---

[1] All references to "App." refer to the documents contained in the Government's Appendix. All references to "LP App. ___" refer to LP Consulting Group's Appendix.

DEFENDANT'S RESPONSE: Battaglin was not a USPS employee, but was employed through a contract for the USPS. App. 976. Denied that Battaglin was an architect or an engineer. Battaglin was not an architect or an engineer for the USPS. Id.

3. In 1993, after Battaglin had resigned from the USPS, he formed Plaintiff, L.P. Consulting Group, Inc. with his wife, Linda Battaglin. LP is a licensed Illinois corporation which performs general construction contracting services in, among other places, Illinois, Wisconsin, Michigan, and Indiana. LP App. 2, Battaglin Aff. ¶ 4.

DEFENDANT'S RESPONSE: Admitted.

4. Since its inception, one of LP's primary sources of business has been the bidding on and receipt of awards for USPS renovation, repair and Americans with Disabilities Act–compliance contracts. LP has been awarded no less than twelve (12) indefinite quantity contracts by the USPS since approximately 1993, for the USPS region known as the Great Lakes Area. LP App. 2, Battaglin Aff. ¶ 5.

DEFENDANT'S RESPONSE: Admitted only that LP has had various indefinite quantity contracts ("IQCs") with the USPS for various areas, generally described below, within the USPS Great Lakes Region; those IQCs were as follows:

> 162640-02-B-0020, awarded about November 16, 2001, greater IN District, northern IN;
>
> 162640-99-B-0050, awarded about January 29, 1999, for Central IL area processing and distribution facilities;
>
> 162640-99-B-0039, awarded about January 28, 1999, Central IL area, zip codes 604, 605, 609, 613 through 619, 625 through 627;

162640-98-B-0124, awarded about May 15, 1998, for Northwest IN, zip codes 463-464, 469.

162640-97-B-0111, awarded about April 3, 1997, for Chicago Metro area;

162640-97-B-0062, awarded about January 13, 1997, for Central IL area processing and distribution facilities;

162640-96-B-0096, awarded about June 7, 1996, for Springfield, IL area, zip codes 618, 619, 625 through 627;

162640-96-B-0098, awarded June 3, 1996, for North Central IL area, zip codes 604, 605, 609;

162640-96-B-0094, awarded June 6, 1996, for Peoria, IL area, zip codes 614, 615, 616, 617;

162640-94-B-0083, awarded May 18, 1994, for North Central IL area, zip codes 604, 605, 609.

App. 43, 52-54, 155-57, 690-91. LP also has had the following two IQCs:

193045-98-B-0149, awarded about February 2, 1998, Gateway District;

193045-93-B-0110, awarded about November 19, 1993.

App. 690-91. The last two IQCs were not awarded by the USPS Great Lakes Region. They were awarded by the Kansas City Facilities Services Office. Id. Any remaining allegations in paragraph 4 are denied.

Only three of these IQCs have any relevance to this case: 162630-96-B-0098, awarded June 3, 1996; 162640-96-B-0094, awarded June 6, 1996; and 162640-94-B-0083, awarded May 18, 1994. These contracts are the only IQCs alleged in LP's second amended complaint.

5. In total, LP has performed close to 200 work orders under those 12 IQC contracts, including the award of numerous repair and alteration type projects covering the last 12 years, similar in nature to the 12 work orders (the "WOs") which constitute the basis of this law suit as

identified in Plaintiff's Proposed Uncontroverted Fact 10, *infra*. LP App. 2, Battaglin Aff. ¶ 6.

DEFENDANT'S RESPONSE: Denied that LP has had IQCs covering the last 12 years; its 1994 IQC was awarded May 18, 1994, which is roughly 11 years. See Defendant's Response to LP's PFUF No. 4. The USPS has not determined the number of work orders performed by LP under its IQCs, but they were numerous. Denied that there are "12 work orders" which constitute the basis of the law suit. LP prepared only draft work orders/scopes of work and it is incorrect to refer to LP's documents as "work orders." See Defendant's Response to LP's PFUF No. 13.

6. In May 1994, the USPS awarded LP an indefinite quantity contract (No. 162640-94-B-0083) which initially contained a two-year performance term (the "94 IQC"). App. 41-49.

DEFENDANT'S RESPONSE: Admitted. App. 41-49.

7. LP's 94-B-0083 contract was subsequently extended through modification for an additional one-year period of time. LP App. 2, Battaglin Aff. ¶ 7.

DEFENDANT'S RESPONSE: Denied. Battaglin and LP knew that the 1994 IQC expired. App. 1018 (LP May 17, 1996 letter). As stated in the contract modifications signed by LP and the USPS (by Contracting Officer Larry Linnenburger), LP's IQC 162640-94-B-0083 was modified in May 1995 to increase its limit to $600,000.00, and was modified again in November 1995 to increase its limit to $1,000,000.00. App. 37, 40. The contract modifications also stated: "The contract completion date of May 18, 1996, will remain unchanged." App. 37, 40. The IQC provided that work would be "ordered during the 24-month period beginning on the day following the date" on which the IQC was signed. App. 716. After May 18, 1996, new work orders could not be issued pursuant to the 1994 IQC. The IQC further provided:

> The contractor is required to perform all work under a work order for which a Notice to Proceed has been issued and received before the expiration date of the contract. If the Notice to Proceed under a work order is not received by the contractor before the expiration date of the contract, the work order will be considered terminated for the convenience of the Postal Service.

App. 718.

8. Subsequently, LP competed for, and was awarded two indefinite quantity contracts (the "IQCs") by the USPS, numbered 162640-96-B-0094 and 162640-96-B-0098, respectively. App. 52-153, 155-256. These contracts were executed and entered into by the USPS on June 6, 1996, and June 3, 1996, respectively. App. 52, 54, 155, 157. LP App. 2, Battaglin Aff. ¶ 9.

DEFENDANT'S RESPONSE: Admitted. App. 52-54, 155-57.

9. The 94 IQC was the predecessor to the 1996 IQCs. In fact, Battaglin was verbally told by contracting officer Robert Rigsby and one of his Architect/Engineer, Project Managers, Samuel Southern, to perform site visits and submit work orders on a number of projects at the end of the 94 IQC's term with the verbal understanding that those work orders would be performed under the follow-on IQCs. LP App. 3, Battaglin Aff. ¶ 10; LP App. 119, Battag. Depo. at 54.

DEFENDANT'S RESPONSE: Admitted only that LP's 1994 IQC preceded the two 1996 IQCs. Denied that Mr. Rigsby and Mr. Southern told Battaglin to perform site visits and submit work orders on a number of projects at the end of the 1994 IQC term with the understanding that those work orders would be performed under the two 1996 IQCs. App. 978 (Rigsby), 1034, 1037 (Southern). There was never any promise or guarantee that LP would perform the work that it

had scoped in a draft work order at or as the result of a site visit. Id. Denied that the two 1996 IQCs were "follow-on contracts." LP competed for and was awarded those two separate IQCs. See LP's PFUF No.8.

10. The current lawsuit seeks recovery of damages sustained by LP for, among other things, the Government's breaches of implied-in-fact contracts. More particularly, and as discussed further below, LP filed two claims, one dated March 3, 1998, and one dated April 13, 1998, seeking a total recovery of $135,377.00. The first claim addressed the following projects:

1. The Berwick Modular Post Office;
2. The Hoopeston handicapped ramp;
3. The Downers Grove dock enclosure; and
4. The Brookfield ramp and dock enclosure.

App. 32-34. LP App. 3-4, Battaglin Aff. ¶ 11. That claim was subsequently resubmitted with a Contract Disputes Act certification on April 13, 1998. App. 26; *Id.*

The second, April 13, 1998, claim sought recovery for the following projects:

5. Aroma Park interior lobbies and building renovation;
6. Beaverville lobby and building renovation;
7. Bradley concrete ramp, lobby and building renovation;
8. East Lynn building renovation
9. Momence concrete ramp and lobby renovation
10. Papineau interior renovation and concrete ramp;
11. St. Anne concrete, asphalt and interior renovations; and

12. Union Hill interior and exterior ramps. App. 29-31. Amended certifications were submitted with the claims to the contracting officer, Mr. Robert Rigsby, by letter dated August 11, 1998. App. 26-28. LP App. 4, Battaglin Aff. ¶11.

DEFENDANT'S RESPONSE: This is LP's characterization of its action, not a statement of fact, and requires no response.

11. The current action seeks recovery of damages based upon the formation of a series of implied-in-fact contracts arising out of an ongoing course of dealing between LP and the USPS extending over the course of several years. LP App. 4, Battaglin Aff. ¶ 12.

DEFENDANT'S RESPONSE: This is LP's characterization of its action, not a statement of fact and requires no response. Defendant denies any factual allegation that there were a series of 12 implied-in-fact contracts arising out of the course of dealings between LP and the USPS.

12. The 12 WOs located in the Government's appendix at 584 *et seq.*, constitute the 12 WOs which are the subject of the current litigation. LP App. 4, Battaglin Aff. ¶ 13.

DEFENDANT'S RESPONSE: Denied that there were 12 "work orders" which are the subject of the current litigation. The documents located in the Government's appendix at pages 584-664 are numerous draft work orders/scopes of work prepared by Battaglin. Denied there are "12" draft work orders in the Government's appendix. Neither the Government nor LP has a copy of the draft work order/scope of work that LP claims to have prepared for the East Lynn Post Office. App. 979, 528 (Battaglin Dep. 81)("I cannot find those.").

13. During the more than 10 years during which LP has performed indefinite quantity contracts for the USPS, it was LP's experience that it was routine for the USPS, either through the contracting officer on a given contract, or his subordinates, whether they be architects/engineers or project managers, to contact LP, direct LP to travel to a given rural postal facility, meet with either the postmaster and/or project manager/A/E and for LP to self-perform a detailed field survey and develop a scope of work/work order for that project. LP App. 4, Battaglin Aff. ¶ 14. Thereafter, the work order would be submitted either during the course of the site visit or immediately thereafter by LP to the USPS for its review and issuance of a formal/final work order. *Id.*; *see also*, LP App. 138, Battag. Depo. at 110:19; 201, Rigsby Depo. at 29:21.

DEFENDANT'S RESPONSE: Denied. LP was to meet with the USPS project manager for the purpose of preparing a draft work order/scope of work, and was not to negotiate with postmasters. App. 983, 979-83. Denied that LP was directed to "self-perform" "a detailed field survey" and develop a "scope of work/work order." Id. LP was to make a site visit and develop a draft work order/scope of work with the USPS project manager; the site visit involved looking at the areas that were relevant to a project, not a "detailed field survey." Id. Denied that the "work order" would be submitted by LP "to the USPS for its review and issuance of a formal/final work order." Id. The preparation of a draft work order/scope of work did not guarantee that the USPS would issue a formal/final work order. Id. If a final USPS work order was issued, it often differed from the draft work order/scope of work that was prepared at the time of the site visit; the draft was only a guide. Id.

Battaglin described the process or the parties' practice or course of dealing concerning the issue of work orders for USPS facilities as follows:

1. Battaglin would make a site visit with a USPS project manager and prepare a draft work order/scope of work and provide the document to the USPS,
2. The USPS provides LP with a computer generated draft work order,
3. LP reviews and signs the USPS draft work order and returns it, and
4. The USPS contracting officer signs the USPS work order, thereby finalizing it, and issues it to LP and also issues a Notice to Proceed to LP.

For example, with regard to the East Lynn Post Office, which was the first project upon which he was questioned, Battaglin testified as follows:

> Q. Do you have any of those rough sketches?
> A. All my original work [referring to the scopes of work and sketches that he prepared] went to the postal service to be converted into a draft work order that I would sign and return to them for signature and a notice to proceed to do the work.
> Q. So as I understand it you're telling us the process is this: There was a site visit, a scope of work is prepared, that goes back with the postal service, then something comes to you in the mail, a copy of it from the postal service?
> A. A draft work order.
> Q. How is that different from what is taken back out of the field [] by the postal service?
> A. It's a computerized document that the postal service generates and makes a financial commitment and award to.
> Q. You never got anything like that for East Lynn?
> A. No, just got my copy of this back [referring to a draft work order/scope of work prepared by LP].

App. 1062 (Dep. 89-90). Battaglin affirmed that he expected to receive a draft work order from the USPS and that he never received that document. He stated:

> A. And that's all I got from them.
> Q. So you never got a computerized generated work order.
> A. No, that's why I filed the claim.
> Q. Now, when you and Mr. McNabb completed the site visit at East Lynn, what did you think was going to happen next?
> A. Typically, I get a draft work order in the mail from the postal service for me to review. If I agree with the final form that it's in, I sign my portion on the work order and return it to the contracting officer for signature and then the notice to proceed.

App. 1062 (Dep. 91). Battaglin further testified that, when the USPS mails LP the draft USPS work order for his review and signature, he goes over "everything one more time" with the

USPS. Battaglin stated "at the time when they [the USPS] issue the work order to me, that's when we go over the final – the draft work order that they produce and we go over everything one more time." App. 1069 (Dep. 161). Battaglin again affirmed that, after his submittal of a draft work order/scope of work, "the USPS would produce the document called a draft work order for my review." App. 1070, 1073 (Dep. 173; see also Dep. 230-31).

Battaglin also testified that he never received draft work orders from the USPS for the projects that LP included in its claims:

> Q. After the site visit at Aroma Park and the scope of work, you drew that up and Paul Steiner takes it back with him, what did you expect was going to happen next with regard to you're doing any work at Aroma Park?
> Mr. Prosen: Objection, vague, ambiguous, asked and answered.
> By The Witness:
> A. I expect a returned draft work order from the post office with full extended prices and a time to start, estimated completion dates for my review and acceptance. And if I accepted ti, I would sign it and return it for the contracting officer's signature and a notice to proceed.
> By Ms. Kirchner:
> Q. So the document you expected to receive back from the post office, it would have extended prices on it?
> A. Oh, it always would.
> Q. I take it that didn't happen, is that correct?
> A. Not on the ones I'm claiming, no.

App. 1073 (Battaglin Dep. 230-31). Battaglin expected to receive draft work orders and did not receive such draft work orders from the USPS. Id.

14. It has always been LP's, and for that matter Battaglin's, understanding and interpretation of both the two 1996 IQCs and their predecessor 1994 IQC contracts, that these contracts did not require LP to self-perform or otherwise develop scopes of work, pricing or work orders. LP App. 138, Battag. Depo. at 110:6. Instead, all of the language in the IQCs is

couched in terms that the Government will develop and provide scopes of work to the contractor. LP App. 4, Battaglin Aff. ¶ 15.

DEFENDANT'S RESPONSE: Denied. It was common practice for LP to prepare draft work orders/scopes of work under the 1994 IQC and under the two 1996 IQCs. The IQCs contemplated that contractors would prepare proposals or draft work orders/scopes of work and submit them to the USPS. The IQCs in clause FB-249 "Indefinite-Quantity Contract" recognized that contractors would prepare proposals and stated that "[t]he price per unit of each proposal item in this contract will include all materials, labor, and equipment required to perform the work described in the attached specification," and further stated that work would be done only on written work orders issued by the USPS. App. 64. IQC contractors were on notice as to the prices of most of the items that could be incorporated in their proposals or the USPS's work orders. Id. In clause 11-1 "Conditions Affecting The Work," the IQCs further directed that:

> The contractor is responsible for having taken steps reasonably necessary to ascertain the nature and location of the work, and the general and local conditions that can affect the work or its cost.

App. 81. IQC contractors therefore should reasonably inspect the facility before signing a USPS work order for a project. The IQCs contained a related clause FB-260, "Inspection Of Site Or Building," stating:

> It shall be the contractor's responsibility to inspect conditions at each site, including such things as elevator size and capacities, existing building materials and components, and the like, before finalizing work orders (see Clause 11-1).

App. 93, 196. The IQCs thus contemplated that contractors would make site visits and become familiar with the nature of the work before they agreed to and signed USPS work orders. IQC contractors generally became familiar with proposed projects by making site visits and preparing proposals or draft work orders/scopes of work and submitting them to the USPS. See LP's PFUF

No. 47 and Defendant's Response thereto. Thus, IQC contractors generally made site visits and prepared proposals or draft work orders/scopes of work with the understanding that such proposal costs were, as stated by IQC contractor St. Louis Design, "a cost of doing business with the USPS under its IQCs." App. 1020 (Buchholtz). As stated by LP's counsel and assented to by Mr. Rigsby, proposal costs were the contractor's "cost to eat." App. 680 (Dep. 30).

15. That notwithstanding, and despite the total lack of an express contractual requirement for LP to perform such work, on the two 1996 and one 1994 IQC contracts (which 1994 contract was the predecessor and was continued in the 1996 contracts by the parties' course of conduct), and in addition to the twelve subject WOs, LP was directed to perform approximately 96 site visits and submit 96 work orders to the Government. LP App. 4-6, Battaglin Aff. ¶ 16. On only two projects which LP performed under the IQCs, those being the La Salle roof and the Princeton floor replacement, did the USPS self-develop a scope of work. *Id.* With those two exceptions, on every other project which LP performed under the IQCs, every single work order which LP received arose out of the USPS personnel contacting LP and instructing LP to perform a site visit and develop a work order. *Id., see also*, LP App. 227, Southern Depo at 28:18. Such work order was then submitted and approved by the contracting officer/USPS. *Id.*

DEFENDANT'S RESPONSE: Denied. Denied that there was "a total lack of an express contractual requirement" for LP to prepare proposals or draft work orders/scopes of work. See Defendant's response to LP's PFUF No. 14, which is incorporated herein by reference.

Denied that the 1994 IQC contract "was continued by the 1996 IQC contracts by the parties' course of dealing." The 1994 IQC contract had a two year term, and was not extended.

See Defendant's response to LP's PFUF No. 7, which is incorporated herein by reference. Battaglin and LP knew that the 1994 IQC expired. App. 1018 (LP May 17, 1996 letter).

Denied that there were 12 subject "work orders" or that LP was directed to develop and submit "work orders." Battaglin together with the USPS project managers, prepared draft work orders/scopes of work. See Defendant's response to LP's PFUF No. 13, which is incorporated herein by reference. Denied that draft work orders/scopes of work prepared by LP were "approved by the contracting officer/USPS." The USPS/contracting officer does not "approve" draft work orders submitted by an IQC contractor. Instead, the USPS prepares its own work order and provides it to the contractor for its review, and no such draft USPS work orders were issued to LP for the 12 projects. See Defendant's response to LP's PFUF No. 13, which is incorporated herein by reference.

Denied that LP was directed to perform site visits on "96" projects and to submit draft work orders/scopes of work for those "96" projects, and denied that there were a total of "98" projects on the three IQCs. Defendant is informed by LP's counsel that LP's references to a total of "98" work orders or projects and to "96" work orders or projects refers to the list of 98 projects contained at pages 410-435 of the Government's appendix. The list of 98 projects in the Government's appendix includes the fixed price contracts that were awarded to LP and those fixed price contracts were not issued under any IQCs. App. 423-35. There were not a total of "98" work orders. The process for awarding fixed price contracts, including those issued to LP, was different from the process for issuing work orders under an IQC.

16. With the exception of the 12 WOs which are the subject of the current action, on every other occasion under the IQCs, the course of conduct was clear: The Government would

contact LP, direct LP to perform a field survey at a given facility, and direct LP to self-prepare and submit a work order. LP App. 6, Battaglin Aff. ¶ 17. On each of those occasions, including the 12 subject WOs, LP would perform the site visit, typically with a USPS project manager or other subordinate of Mr. Rigsby, the contracting officer, and the USPS would thereafter take the LP scope of work and issue a "formal" work order in response thereto. *Id.*; *see also*, LP App. 18-19, 26, 29, 32-33; LP App. 239 *et seq.*, Southern Depo. at 91:18 *et seq.*

DEFENDANT'S RESPONSE: Denied that there was such a course of conduct as described in LP's PFUF No. 16. Denied that there were 12 subject "work orders;" the documents are draft work orders/scopes of work. Denied that LP was directed to perform a "field survey." Denied that LP was direct to "self-prepare and submit a work order" for the 12 projects. Denied that the USPS would "issue a 'formal' work order in response" to LP's preparation of a draft work order/scope of work together. The course of conduct was as described in Defendant's responses to LP's PFUF Nos. 13 and 15, which are incorporated herein by reference.

There certainly were other draft work orders/scopes of work that Battaglin prepared and submitted to the USPS that did not lead to the issuance of a USPS final work order. As Battaglin testified, LP had "been denied work orders before." App.1059 (Dep.34) See also App.1075-76 (Dep. 302-04)(describing another LP draft work order/scope of work for a "wood partition" dock enclosure at Downers Grove that LP is not making a claim for in this case); App. 1061 (Dep. 87) (describing another site visit and draft work order/scope of work prepared with Paul Steiner at East Lynn that LP is not making a claim for in this case).

LP also complained about the USPS's not issuing work orders to LP for other projects that LP had scoped. App. 375 (LP attorney letter dated July 25, 1997 complaining about the failure to issue USPS work orders for Gibson City, Wilmington, Grand Ridge, Blackstone,

Leonore, Bishop Hill, Lee, DePue, and Peru); App. 436 (LP letter dated May 29, 1997 complaining about the failure to issue LP work orders for Goodwine, Claytonville, Verona, Gibson City, Wilmington, Grand Ridge, Blackstone, Leonore, Bishop Hill, Lee, DePue, and Peru).

The USPS issued LP USPS final work orders for Goodwine and Claytonville, but both were cancelled in modifications signed by both parties. App 799-816. USPS final work orders were not issued for the other facilities listed by LP.

Further, Battaglin also made unauthorized site visits to postal facilities and provided the USPS with unsolicited draft work orders/scopes of work. App. 437, 981.

17. More particularly, during this time LP was contacted either directly by contracting officer Robert Rigsby or his subordinate USPS Project Managers, including Mr. Samuel Southern, Bruce Rothermel, Paul Steiner, Jesse McNabb and Ms. Lois Gunlogson (the "Project Managers"), directing LP to visit USPS facilities that contracting officer Rigsby directed LP to visit. LP App. 6, Battaglin Aff. ¶ 18; LP App. 29.

DEFENDANT'S RESPONSE: Denied that LP made site visits solely at the direction of Rigsby or his Project Managers. Battaglin also made unauthorized site visits to USPS facilities and submitted unsolicited draft work orders/scopes of work to the USPS. App. 981. LP's actions resulted in Mr. Rigsby's issuance of a letter dated, June 4, 1997, instructing LP as follows:

> No site visits will be permitted under any circumstances unless directed by the Contracting Officer through the USPS project manager. This includes sending subcontractors to sites to do preliminary surveys without an issued work order/contract.
>
> Again, this means no unauthorized visits will be made to postal facilities by contractors. Your full cooperation in this matter is appreciated.

App. 437. In that same letter, Mr. Rigsby informed LP that it would be considered for projects when the USPS "determines your services are needed." App. 437. Battaglin was informed that there was never any guarantee that LP would receive a USPS work order if it made a site visit and prepared a draft work order/scope of work. App. 981.

Mr. Rigsby never told Battaglin to make a site visit at a USPS facility and that, if he did so, LP would receive a work order for that facility. App. 982. There was never any understanding or any statements by Mr. Rigsby to LP or Battaglin to the effect that LP would be issued a work order, if it would make a site visit and prepare a draft work order/scope of work. Rigsby's project managers, including Sam Southern, Bruce Rothermel, Paul Steiner, Jesse McNabb, and Lois Gunlogson, knew that the making of a site visit and the preparation of draft work orders/scopes of work with an IQC contractor did not guarantee that the USPS would issue a work order to the contractor, and they also knew that only the contracting officer possessed the authority to issue a USPS work order. App. 50, 982. USPS project managers told Battaglin that there was never any guarantee that LP would receive a USPS work order for projects that LP scoped and prepared a draft work order/scope of work. App. 1034, 1037 (Southern), 1025-26 (Steiner), 678-79.

18. Each time LP received such a directive from one of the Project Managers, directing LP to perform facility site visits, it was LP's reasonable understanding that the USPS Project Manager was either directly authorized by Mr. Rigsby to make such a direction to LP, that the project manager was acting with actual authority or that their actions were otherwise being ratified by Mr. Rigsby. LP App. 6, Battaglin Aff. ¶ 19.

DEFENDANT'S RESPONSE: Plaintiff's assertion is a legal conclusion not an allegation of fact. If it is construed as a factual allegation, it is denied. Mr. Rigsby gave directions to the project managers concerning the facilities that they were to visit and the types of work that they were to scope out at the facility. App. 982-83. Project mangers had to work through Mr. Rigsby and they did not have the authority to decide unilaterally whether they would direct an IQC contractor to make a site visit for the purpose of preparing a draft work order/scope of work. Id. Project managers did not have actual authority and Mr. Rigsby did not ratify their actions with regard to giving directions to IQC contractors to make site visits for the purpose of preparing draft work orders/scopes of work. Id.

19. These Project Managers assisted LP in obtaining access to the facility and acted as mediators between LP and the facility Post Masters. LP App. 7, Battaglin Aff. ¶ 20.

DEFENDANT'S RESPONSE: Denied. USPS project managers developed proposals or draft work orders/scopes of work together with IQC contractors, including LP. USPS project managers did not act as mediators between LP and the facility postmasters. App. 983. LP was not supposed to negotiate with the USPS postmasters and was not supposed to provide postmasters with draft work orders/scopes of work. Id.

20. As a result of the Project Manager's and/or Mr. Rigsby's instructions, LP would develop a scope of work, provide sketches, negotiate quantities, unit items and construction completion time at or immediately after the subject site visit, produce a draft work order, and submit it to the Project Manager and/or the facility Postmaster. LP App. 7, Battaglin Aff. ¶ 21; *see generally*, App. 584-664.

DEFENDANT'S RESPONSE: Denied that LP submitted draft work orders/scopes of work to USPS postmasters. LP was not directed to submit draft work orders/scopes of work to USPS postmasters. App. 983. Battaglin also made unauthorized site visits to USPS facilities and submitted unsolicited draft work orders/scopes of work to the USPS. App. 981. See Defendant's response to LP's PFUF No. 17, which is incorporated by reference.

21. When Battaglin received each of these telephone calls and was instructed by Mr. Rigsby or the USPS Project Managers to perform these site visits and develop and submit a WO, Battaglin expected and understood that LP would thereafter be given the work for which LP developed the WO. LP App. 7, Battaglin Aff. ¶ 22; LP App 29, 114-115.

DEFENDANT'S RESPONSE: Denied. Denied that Battaglin was instructed to develop and submit "work orders." Battaglin prepared draft work orders/scopes of work. Battaglin could not have reasonably expected or understood that LP would receive the work if LP was instructed to perform a site visit and prepare a draft work order/scope of work, and did so. The process or course of dealing was as described in Defendant's response to LP's PFUF Nos. 13 and 15, which are incorporated herein by reference. There was never any promise or guarantee by the USPS that LP would receive the work if LP made a site visit and scoped the work. App. 983. Mr. Rigsby never promised or stated to Battaglin that LP would receive the work if it made a site visit and scoped the work. Id. USPS project managers told Battaglin that there was never any guarantee that LP would receive a USPS work order for projects that LP scoped and prepared a draft work order/scope of work. App. 1034, 1037 (Southern), 1025-26 (Steiner), 678-79.

Battaglin's letters also acknowledged that the USPS could contract with other sources for work that LP had scoped or prepared a draft work order. In his letter dated April 30, 1997,

Battaglin requested that LP be placed on Mr. Fernandez's "solicitation bid list" and acknowledged that the USPS might contract with other sources for projects that LP allegedly had scoped. LP App. 28. In his letter dated September 20, 1996, Battaglin requested that the USPS schedule another site visit at facilities that, according to Battaglin, already had been scoped by LP. LP App. 26. The IQCs themselves stated that the USPS could contract for such work through other sources. App. 57, 60.

22. As relates to the current action, this was the routine for 96 work orders under the subject IQC contracts and the predecessor 1994 IQC contract. LP App. 7, Battaglin Aff. ¶ 23. Out of a total of 98 work orders issued under the IQCs, only two were produced solely by Mr. Rigsby's office themselves, both by Mr. McNabb, for the LaSalle Roof and Princeton Floor Replacement. *Id.* All other work orders awarded to LP, as well as the subject 12 WOs in this law suit, were prepared by LP at the direction of USPS authorized personnel. *Id.*

DEFENDANT'S RESPONSE: Denied. Defendant assumes that "this was the routine" refers to LP's PFUF No. 21, which defendant has denied. See Defendant's response to LP's PFUF No. 21, which is incorporated herein by reference. Denied further that there were "a total of 98 work orders issued under the IQCs." See Defendant's response to LP's PFUF No. 15, which is incorporated herein by reference. Denied further that there are 12 "work orders" that are the subject of this law suit. Defendant further addresses the 12 alleged draft work orders/scopes of work at issue in response to LP's PFUF No.24, which is incorporated herein by reference.

23. With particular regard to the 12 WOs, when LP was directed by the USPS to meet at the 12 facilities in the subject claim, LP, the Project Managers and the Postmasters went

through the usual routine of having LP produce the scope of work. LP App. 7, Battaglin Aff. ¶24.

DEFENDANT'S RESPONSE: Denied. Denied that there were 12 work orders; the documents at issue are draft work orders/scopes of work. Denies that LP went through what LP alleges to be the "usual routine" for the 12 draft work orders/scopes. The course of conduct was as stated in Defendant's response to LP's PFUF Nos. 13 and 15, which are incorporated herein by reference. Denied that USPS postmasters had LP produce scopes of work. LP was not directed by USPS postmasters to develop draft work orders/scopes of work and was not supposed to negotiate with postmasters. App. 983 (Rigsby ¶ 13). See also Defendant's Response to LP's PFUF No. 24, which is incorporated herein by reference.

24. Based upon the ongoing, continuous procedure established on the previous 96 facilities, LP reasonably anticipated issuance of each WO. LP App. 7, Battaglin Aff. ¶ 25.

DEFENDANT'S RESPONSE: Denied. Further denied that "the ongoing, continuing procedure" was as alleged by LP. The course of dealing or "procedure" was as stated in Defendant's responses to LP's PFUF Nos. 13 and 15, which are incorporated herein by reference. Further denied that LP reasonably anticipated issuance of a USPS final work order for any of the 12 projects. See Defendant's response to LP's PFUF No. 21, which is incorporated herein by reference. Further denied that there were a "previous 96 facilities." See Defendant's response to LP's PFUF No. 15.

25. LP was contacted by authorized USPS personnel on each and every one of the subject 12 projects to perform a site visit with USPS personnel at each of the facilities, and

tasked with developing a scope of work, preparing a work order and submitting that work order for approval to the USPS. LP App. 7-8, Battaglin Aff. ¶ 26; LP App. 65, 66, 70, 87. The following chart synopsizes the applicable information for each of the subject projects:

| POST OFFICE NAME | DATE OF SITE VISIT | USPS ORDERED LP TO PERFORM SITE VISIT? | USPS PERSONNEL WHO MET LP AT FACILITY | LP WORK ORDER PREPARED (APP. NO) |
|---|---|---|---|---|
| Hoopeston | 11/14/95 | Yes | Paul Steiner | Yes (App. 654) |
| Momence | 5/24/96 | Yes | Sam Southern | Yes (App. 598) |
| St. Anne | 5/24/96 | Yes | Sam Southern | Yes (App. 584) |
| East Lynn | 10/17/95 | Yes | Paul | Yes |
| | | | Steiner/Jesse McNabb | |
| Aroma Park | 9/95 | Yes | PaulSteiner/Catherine Marks | Yes (App. 618) |
| Papineau | 9/95 | Yes | PaulSteiner/Catherine Marks | Yes (App. 626) |
| Beaverville | 9/95 | Yes | Paul Steiner | Yes (App. 615) |
| Union Hill | 8/15/95 | Yes | PaulSteiner/Catherine Marks | Yes (App. 612) |
| Bradley | 9/95 | Yes | Paul Steiner | Yes (App. 629) |
| Berwick | 9/16/96 | Yes | Bruce Rothermal | Yes (App. 639) |
| Downers Grove | | Yes | Jesse McNabb | Yes (App. 652) |
| Brookfield | 8/96 | Yes | Jesse McNabb | Yes (App. 643) |

The majority of this information is further reflected in the document (Southern Depo. Ex. 10) appended as LP App. 29, LP App. 143 *et seq.*, Battaglin Depo. at 129-134. The Notes contained thereon, were made by Battaglin in 1997, while his recollection of these site visits was still clear, and denote the date of the site visit and the initials of the USPS personnel with whom Battaglin met. *Id. See also,* LP App. 120, 127 (East Lynn); 131-34, 150-52 (St. Anne); 140 *et seq.* (Union

Hill); 148 (Aroma Park, Papineau, Beaverville, Union Hill & Bradley); 154-55 (Momence); 15556; 157-58 (Union Hill); 163 (referencing LP App. 32-33); 165-67 (Aroma Park); 168 (Bradley); 169-73 (Berwick); 174-75, 177 (Brookfield); 178-79 (Downers Grove); 185-87 (Hoopeston); LP App. 228, 246, Southern Depo. at 29:23, 103:16.

DEFENDANT'S RESPONSE: Denied. Denied that LP was directed to perform a site visit with USPS at all of the 12 facilities and tasked with developing scopes of work, preparing work orders and submitting those work orders for approval to the USPS.

With regard to LP's claim concerning the Berwick Modular Post Office, Berwick and St. David were two sites where the USPS wanted to install a trailer or modular post office; the sites were simply land where the USPS wanted to install the modular structure. App. 985. The USPS requested and received bids from WM Aupperle for site preparation work at both sites. App. 302-03, 470-71. LP was invited to submit bids for site preparation work at both sites. App. 985. LP was not directed to develop and submit a draft work order/scope of work. App. 985. LP provided its prices in the documents that it prepared for Berwick and St. David. App. 305-07, 466-69. Rigsby awarded the work to the lowest bidder, awarding the Berwick Modular site preparation work to WM Aupperle as a fixed price contract (App. 304), and the St. Davids Modular site preparation work to LP as a work order under its IQC (App. 472). LP's price for Berwick was considered, but WM Aupperle's bid for Berwick was lower. App. 985.

Admitted that LP made a site visit at St. Anne with Samuel Southern and that they prepared a draft work order/scope of work. Denied that the site visit for St. Anne was on May 24, 1996, and denied that the draft work orders/scopes of work prepared at the time of the St. Anne site visit are the documents produced in discovery by Battaglin. Denied that Battaglin and Mr. Southern made a site visit at Momence on May 24, 1996 and prepared the draft work

orders/scopes of work produced by LP in discovery. With regard to St. Anne and Momence Post Offices, Samuel Southern remembers making a site visit at St. Anne with Battaglin, but does not recall the date of that site visit. App. 1034. Mr. Southern's diary does not show the date of the site visit and does not indicate that the site visit was on May 24, 1996, as claimed by LP. App. 1034-35. Mr. Southern has produced the original documents that were prepared at the St. Anne site visit and the documents contain Mr. Southern's handwriting in the quantities columns. App. 1035, 1047-56. Mr. Southern's documents are different from the documents produced by LP in discovery with regard to the St. Anne site visit. App. 1035-36. Mr. Southern is unsure whether he made a site visit at Momence with Battaglin; he has searched his records and cannot find any field notes or draft work orders that indicate such a site visit. App. 1035.

With regard to Downers Grove, admitted that Battaglin made a site visit at Downers Grove and prepared a draft work order/scope of work. Battaglin later learned that the USPS was soliciting bids for the Downers Grove dock enclosure. App. 1078 (Battaglin Dep. 313-15). By letter to Mr. Rigsby dated December 3, 1996, LP inquired about the USPS's solicitation of bids for the Downers Grove dock enclosure. App. 345. By letter to Mr. Rigsby dated December 17, 1996, LP made a claim that LP should have been awarded a contract for the Downers Grove dock enclosure. App. 346-47. LP knew that the Downers Grove dock enclosure was awarded to another contractor, and that LP would not receive a USPS work order for the dock enclosure. App. 345-46, 351, 1078. On November 26, 1997, Mr. Rigsby had issued a notice of intent to award a contract for the Downers Grove dock enclosure to Waner Enterprices, Inc. App. 343. On January 10, 1997, Mr. Rigsby awarded a fixed price contract for the Downers Grove dock enclosure to Waner. App. 344, 341-42. By letter to Mr. Rigsby dated January 31, 1997, LP withdrew its claim regarding the Downers Grove dock enclosure. App. 351.

Denied that LP made site visits and prepared draft work orders/scopes of work with Paul Steiner on the dates indicated, except admitted that Battaglin and Paul Steiner made site visits at Hoopeston and East Lynn. With regard to LP's claim that it made site visits and prepared draft work orders/scopes of work with Paul Steiner at Aroma Park, Papineau, Beaverville, Union Hill, Bradley, Hoopeston and East Lynn Post Offices, Mr. Steiner does not recall any such site visits, except for Hoopeston and East Lynn. App. 1025-32. Mr. Steiner does not recognize any of the documents that LP claims to have prepared at such site visits and LP's documents do not contain Mr. Steiner's handwriting. Id. Mr. Steiner told Battaglin that there was no guarantee that LP would get the work that it scoped and for which it prepared draft work orders/scopes of work. Id.

For East Lynn, Mr. Steiner recalls a site visit with Battaglin on November 14, 1995, as noted on the draft work order/scope of work that Mr. Steiner prepared at the site visit. Id . However, Battaglin is not making any claims in this lawsuit for that site visit or draft work order/scope of work that he prepared with Paul Steiner at East Lynn. App. 1061 (Battaglin Dep. 87). Battaglin claims that he made another site visit at East Lynn with Jesse McNabb. Mr. McNabb did not recall such a site visit at East Lynn with Battaglin, or a site visit with Battaglin at Downers Grove for the purpose of scoping a dock enclosure project.

With regard to LP's claim that it submitted a draft work order for the Hoopeston handicap ramp, LP did not provide Mr. Rigsby with a draft work order. Rather, in May 1997, in a letter referencing the "Hoopeston Post Office; Concrete Ramp," LP stated as follows:

> As we previously discussed, and outlined in our April 30th letter to you, we are pleased to submit a price to accomplish the subject work as shown per A.M. Fernandez, Arch., drawings. Total cost: $62,752.00.

App. 370. LP did not submit the draft work order in the amount of $62,000 for the Hoopeston ramp, that it produced in discovery and that is contained in the Government's appendix at pages 663-65. App. 986-87. Instead, LP provided an unsolicited bid in the amount of $62,752.00 in its May 1997 letter. App. 370, 379. Rigsby provided a detailed response to LP's July 25, 1997 bid protest in his memorandum dated September 10, 1997, which addresses other allegations related to this matter. App 378-83.

In late April 1997, Battaglin visited Mr. Rigsby's office and noticed the drawing for the Hoopeston ramp out on a table and asked to take a copy. App. 379. Mr. Rigsby replied that it was "too late to bid, all decisions had been made." App. 379. Battaglin responded, "Oh that's okay, I just want to see the difference between this and Paxton." App. 379. Mr. Rigsby permitted him to take the drawing, and in May 1997, Rigsby received LP's letter containing an unsolicited bid in the amount of $62,752 for the Hoopeston handicap ramp. App. 379. Mr. Rigsby later saw Mr. Battaglin and again explained that LP's bid "was too late" and he responded, "I know, I just wanted you to have it anyway." App. 379.

With regard to the document (Southern Dep. Ex. 10), defendant denies that the notes were made by Battaglin in 1997, and denies that Battaglin's recollection of the site visits was clear when he made the notes on the document. Battaglin testified that he made the notes at the time that he was preparing LP's claims in 1998 (LP's claim letters are dated March 2 and April 13, 1998), that he made the notes at the request of his prior attorney, and that some of the notes were not based upon his own recollections but instead were based upon information that Battaglin obtained from others, including Samuel Southern and Paul Steiner. The notes made by Battaglin on Southern Dep. Ex. 10 are inadmissible hearsay, and not a business record. The

notes were made at the request of LP's attorney for purposes of the claim and were not based upon Battaglin's own recollections. Battaglin testified as follows:

> Q. When you sent the document [Southern Ex. 11] to Mr. Rigsby, did you send it to him on or about May 29, 1997?
> A. Yes.
> Q. And at the time you sent it to him, did it have all your notes on it there?
> A. No.
> Q. When did you put the notes on it [Southern Ex. 11]?
> A. I put the notes on it when I copied my attorney at the bottom and Mr. Southern at the bottom. I made my notes after my attorney contacted –
> Mr. Prosen: That's privileged.
> The Witness: Okay.
> Ms. Kirchner: He was just saying when he did something.
> Mr. Prosen: He was starting to get into when his attorney –
> The Witness: I appreciate that.
> By The Witness:
> A. It was determined that I should put the dates down on the document before I would forget the exact dates because we were discussing filing the claim.
> Q. So this is at the time you were discussing filing the 1998 claim?
> A. In that time frame.
> Q. And you have in front of you Battaglin Exhibit 51 and 52, which are your two claims, correct?
> A. Yes.
> Q. These are from March '98 and April ' 98, correct.
> A. Yes.
> Q. And it was at that approximate time frame that you made the notes
> Mr. Prosen: Objection.
> Q. – on Southern Exhibit 10, is that correct?
> Mr. Prosen: Objection, misconstrues the testimony.
> A. Correct.
> Q. You made the notes on Southern Exhibit 10 at the request of your attorney, is that correct?
> A. Correct.
> Q. Now, at the time you made these notes on this exhibit, tell me how you went about making these notes here.
> Mr. Prosen: Objection, vague.
> A. I called everybody that's listed and asked them when did we visit it, if I did not already have the date myself on my – in my work order, if I didn't write it up at the top. In some cases, like I said, I have East Lynn down and others I didn't. I contacted every one of these.
> Q. So the ones where you had the work order and it had the date in it, you used that date, is that correct?
> A. Yes.

Q. And the others you made a telephone call?
A. Correct.
Q. And what did you do for Hoopeston?
A. Hoopeston, it was on the work order.
Q. What did you do for St. Anne?
A. St. Anne and Momence, I called Sam Southern back up, and he looked in his phone record and said we were there – or his calendar and he said it was May 24th, '96.
Q. May 24, '96 was for St. Anne?
A. And Momence.
Q. I see. That date is for two?
A. Correct.
Q. You didn't remember in 1998 when you were at St. Anne and Momence?
A. I specifically wanted the exact date for reasons of pursuing the claim ... so I can exactly have a date so I can pursue getting all that information when the time came.
Q. So you put on the document [Southern Ex. 11] the date Sam gave you for St. Anne and Momence, right?
A. Correct.
Q. How did you get the information for East Lynn?
A. Paul Steiner, I think it's on Exhibit 53, 11/14/95 for him. And that was the same time we visited Hoopeston, if you look at the top. And then with Jesse [McNabb], it was 10/17/95, where I visited East Lynn, Goodwine and Claytonville.
Q. Explain to me, for East Lynn, are you telling me you called up Jesse McNabb or you're telling me you remember it?
A. I talked to Jesse and just said, "Do you recollect this?" "Yeah," and he gave me the date 10/17/95.
Q. You put the date that Jesse gave you on this document [Southern Ex. 11], right?
A. Yes.

App. 1063-64 (Dep. 127-32).

26. Curiously during this same time several other work orders were issued to LP through the same process, including the following projects: Rossville, Sugar Grove, Millbrook, Wellington, and South Holland. LP App. 8, ¶ 27.

DEFENDANT'S RESPONSE: Denied that all these work orders were issued "during the same time" or "through the same process" described by plaintiff. The process for issuing work orders

was as described in Defendant's responses to LP's PFUF No. 13 and 15, which are incorporated herein by reference. The USPS issued the following final work orders to LP:

Rossville work order 7.00 (July 1997)(App. 849-59);
Sugar Grove work order 31.00 (August 1995)(App. 772-78);
Sugar Grove work order 31.01 (October 1995, a modification)(App. 779-84);
Millbrook work order 10.00 (September 1996)(App. 817);
Millbrook work order 49.00 (December 1995)(App. 785-93);
Millbrook work order 49.01 (March 1997, a modification)(App. 818);
Millbrook work order 49.02 (March 1997, another modification)(App. 819);
Wellington work order 5.00 (October 1997)(App. 868-76).

App. 849-59, 772-98, 868-76. The USPS also issued South Holland work order 1.00 (September 1999, under IQC 162640-99-B-0039), after Rigsby left the USPS. App. 897.

27. When Battaglin followed-up with the USPS on the 12 subject facilities, he was informed by Mr. Rigsby that Mr. Fernandez A/E was suddenly in the process of soliciting them competitively. App. 395-96.

DEFENDANT'S RESPONSE: Denied. Further denied that Mr. Rigsby made the alleged statement to Battaglin or that Battaglin followed-up with Mr. Rigsby on all 12 subject facilities. App. 988-89 (Rigsby). Battaglin and Mr. Rigsby's conversations regarding the Hoopeston ramp are described in Defendant's response to LP's PFUF No. 25, and are incorporated herein by reference.

Mr. Fernandez was not involved with a number of the 12 projects listed in LP's claim letters. Id. With regard to the Berwick Modular Post Office and the St. David Modular Post Office, Mr. Fernandez did not serve as the architect and was not involved in the procurement. Rigsby never told Mr. Battaglin that Mr. Fernandez was soliciting bids for the Berwick Modular Post Office. Id. On November 26, 1996, Rigsby awarded WM Aupperle a contract for site

preparation work for the Berwick Modular Post Office. App. 304. Mr. Rigsby did not tell Battaglin that Mr. Fernandez was in the process of soliciting Berwick competitively. App. 989.

Up until Rigsby's retirement in March 1999, the USPS did not solicit bids for: (1) the Beaverville Post Office lobby and building renovation, (2) the East Lynn Post Office building renovation, (3) the Papineau Post Office interior renovation and concrete ramp, (4) the St. Anne Post Office concrete and asphalt and interior renovation, (5) the Union Hill Post Office interior and exterior ramp, and (6) the Aroma 6) the Aroma Park interior lobbies and building renovation. App. 960. Rigsby did not tell Battaglin that Mr. Fernandez was soliciting bids for any of those six projects. App. 989.

With regard to the Momence handicap ramp, the USPS solicited bids for that project in the summer of 1998. App. 442-45. As indicated in his September 8, 1998 note to Samuel Southern, Mr. Rigsby decided to award the Momence handicap ramp to Somers Company, Inc., which submitted the lowest bid. App. 445-46. In August 1998, Mr. Fernandez prepared drawings for the Momence handicap ramp, but did not solicit bids for that procurement. App. 442-44. The bids were submitted to the contracting officer. App. 442-44. Mr. Rigsby did not tell Battaglin that Mr. Fernandez was soliciting bids for Momence. App. 989.

28. LP made repeated attempts to be included in that competitive process. LP App. 9, Battaglin Aff. ¶ 29.

DEFENDANT'S RESPONSE: Denied that there was a "competitive process" for the 12 projects or facilities or that Mr. Fernandez solicited bids for the 12 projects or facilities. App. 988-89. Up until Mr. Rigsby's retirement in March 1999, the USPS did not solicit bids for: (1) the Beaverville Post Office lobby and building renovation, (2) the East Lynn Post Office building

renovation, (3) the Papineau Post Office interior renovation and concrete ramp, (4) the St. Anne Post Office concrete and asphalt and interior renovation, (5) the Union Hill Post Office interior and exterior ramp, and (6) the Aroma 6) the Aroma Park interior lobbies and building renovation. App. 960. See Defendant's response to LP's PFUF No. 27, which is incorporated herein by reference.

Defendant does not know precisely what actions LP is referring to by stating that "LP made repeated attempts" and therefore cannot admit or deny that portion of LP's statement. Defendant admits that Mr. Rigsby received LP's letter dated April 30, 1997. LP App. 28. As Mr. Rigsby informed LP by letter dated June 4, 1997, the Hoopeston handicap ramp already had been decided. LP App. 30. Bids were solicited for various handicap ramps in August and September of 1996. App. 309-15 (Bradley ramp), 332-39 (Brookfield ramp); 353-67 (Hoopeston ramp).

29. For reasons never explained by USPS, LP was summarily excluded from the solicitation process for those 12 projects. LP App. 9, Battaglin Aff. ¶ 30.

DEFENDANT'S RESPONSE: Denied. Further denied that there was a "solicitation process for those 12 projects," and that LP was "summarily excluded.".

LP was invited to submit a bid for the Berwick Modular Post Office, and provided a draft work order with its price. App. 985. LP's price was considered, and it was higher than the price of the awardee, WM Aupperle. App. 985, 302-07. See Defendant's statement regarding Berwick in response to LP's PFUF No. 25, which is incorporated herein by reference.

Up until Mr. Rigsby's retirement in March 1999, the USPS did not solicit bids for six of the 12 projects and LP was not excluded from any solicitation for those six projects: (1) the

Beaverville Post Office lobby and building renovation; (2) the East Lynn Post Office building renovation; (3) the Papineau Post Office interior renovation and concrete ramp; (4) the St. Anne Post Office concrete and asphalt and interior renovation; (5) the Union Hill Post Office interior and exterior ramp; and (6) the Aroma Park interior lobbies and building renovation. App. 990.

With regard to the Hoopeston handicap ramp, LP was provided with Mr. Rigsby's letter, dated September 10, 1997, and supporting documents, which addressed the solicitations for handicap ramps in August and September of 1996. App. 378 (Rigsby letter); App. 309-15 (Bradley ramp), 332-39 (Brookfield ramp); 353-67 (Hoopeston ramp), 990. See also Defendant's statement regarding Hoopeston in response to LP's PFUF No. 25, which is incorporated herein by reference. The USPS had adequate competition for the projects that it solicited competitively, and it was not necessary or advisable to invite all potential contractors to submit bids for those projects, i.e., the Hoopeston handicap ramp, Bradley Post Office handicap ramp, Brookfield Post Office dock enclosure, Brookfield Post Office handicap ramp, Downers Grove Post Office dock enclosure, and Momence Post Office handicap ramp. App. 990-91. Contractors that were not invited to bid were not "summarily excluded;" the USPS had adequate competition. Id.

With regard to the Downers Grove dock enclosure, Battaglin later after making his site visit learned that the USPS was soliciting bids for the Downers Grove dock enclosure. App. 1078 (Battaglin Dep. 313-15). By letter dated December 3, 1996, LP inquired about the USPS's solicitation of bids for the Downers Grove dock enclosure. App. 345. By letter dated December 17, 1996, LP made a claim and requested a final CO decision based on LP's not being awarded a contract for the Downers Grove dock enclosure. App. 346. By letter dated January 31, 1997, LP withdrew its claim regarding the Downers Grove dock enclosure. App. 351. LP knew that the

Downers Grove dock enclosure was awarded to another contractor, and that LP would not receive a USPS work order for the dock enclosure. App. 345-46, 351, 1078 (Battaglin Dep. 313-15).

30. Apparently, only the contractors handpicked by Mr. Rigsby were permitted to bid. LP App. 9, Battaglin Aff. ¶ 31.

DEFENDANT'S RESPONSE: Denied. Further denied that contractors were permitted to bid for the 12 projects. Up until Rigsby's retirement in March 1999, the USPS did not solicit bids for six of the 12 projects, i.e., (1) the Beaverville Post Office lobby and building renovation, (2) the East Lynn Post Office building renovation, (3) the Papineau Post Office interior renovation and concrete ramp, (4) the St. Anne Post Office concrete and asphalt and interior renovation, (5) the Union Hill Post Office interior and exterior ramp, and (6) the Aroma Park interior lobbies and building renovation.

With regard to the Hoopeston handicap ramp, the Bradley handicap ramp, and the Brookfield handicap ramp, bids were solicited in August and September 1996. App. 309-15 (Bradley), 332-39 (Brookfield); 353-67 (Hoopeston), 991. Mr. Fernandez was provided with a list of five contractors to solicit bids. App. 395 (Fernandez letter to Rigsby dated August 13, 1996), 991. Those contractors had done work for the USPS before and "had the expertise to do ramp work." App. 689 (Rigsby Dep. 113), 991. Mr. Fernandez added Phoenix Construction Company to the list, and Mr. Rigsby agreed to that addition. App. 395, 991.

31. In late April 1997 for reasons unknown to LP, Mr. Rigsby permitted LP to bid the Paxton facility, apparently after having already gone through a best and final offer phase to

determine the successful offeror. LP App. 9, Battaglin Aff. ¶ 32. Thereafter, Mr. Rigsby awarded the project to LP. *Id.*

DEFENDANT'S RESPONSE: By letter to Mr. Rigsby dated April 30, 1997, LP submitted a bid in the amount of $42,000 for the handicap ramp at the Paxton Post Office. App. 489. On June 28, 1997, Mr. Rigsby awarded LP a simplified purchase contract in the amount of $42,000 for the Paxton handicap ramp. App. 491.

32. Based upon the Paxton award, LP asked Mr. Rigsby for, and received, the bid package for the Hoopeston project. LP App. 9, Battaglin Aff. ¶ 33.

DEFENDANT'S RESPONSE: Denied. See Defendant's statements regarding the Hoopeston ramp in response to LP's PFUF No. 25, which is incorporated herein by reference. Battaglin asked if he could take a drawing for the Hoopeston handicap ramp, and he took the drawing. App. 379, 992. Mr. Battaglin did not ask for a bid package for the Hoopeston handicap ramp and did not receive a bid package. App. 379, 992. As stated in Mr. Rigsby's September 10, 1997 memorandum,

> in late April 1997, Mr. Battaglin visited by office to drop off some documents and as he was leaving he noticed a drawing for the Hoopeston Ramp on a table near the door and said, "Can I take one of these," and I replied, "It is too late to bid, all decisions have been made," and he said, "Oh that's okay, I just want to see the difference between this and Paxton." In the spirit of cooperation I permitted him to take the drawing, and on May 19, 1997 I received a ($62,752) bid for the project. I later saw Mr. Battaglin and again explained to him that his bid was "too late" and he replied, "I know, I just wanted you to have it anyway."

App. 379, 992.

Mr. Battaglin knew why LP's unsolicited bid for the Hoopeston ramp was rejected. Before LP provided its bid, Rigsby told Mr. Battaglin that it was "too late" for LP to bid the Hoopeston ramp and that "all decisions had been made." App. 379, 992. After receipt of LP's unsolicited bid contained in its May 1997 letter, Rigsby again told Mr. Battaglin that LP's bid was too late and he replied, "I know, I just wanted you to have it anyway." App. 379, 992. LP also filed a bid protest and received Rigsby's September 10, 1997 letter (App. 378) and supporting documentation, as well as the USPS's October 1, 1997 decision denying the bid protest. App. 438, 992.

33. LP provided an offer, as was the practice on Paxton before, which came in substantially lower than the next lowest bidder. LP App. 9, Battaglin Aff. ¶ 34. Again for reasons unknown to LP, Mr. Rigsby summarily rejected LP's bid on this project. *Id.*

DEFENDANT'S RESPONSE: Denied. See Defendant's response to LP's PFUF No. 32, which is incorporated herein by reference.

34. When LP became aware that several of the subject facilities had been solicited, LP protested to Mr. Rigsby. LP App. 9, Battaglin Aff. ¶ 35, LP App. 28.

DEFENDANT'S RESPONSE: LP asserts that "when LP became aware that several of the subject facilities had been solicited, LP protested ro Mr. Rigsby" and cites to its April 30, 1997 letter contained in its appendix at page 28. Mr. Rigsby received the April 30, 1997 LP letter. App. 993. It is unclear which solicitations LP claims to have known about. Bids had been solicited for various handicap ramps in August and September 1996, including the Hoopeston ramp (App. 353-68), the Bradley ramp (App. 309-11), and the Brookfield ramp. App. 332-39.