35. Thereafter, LP was no longer contacted by the USPS to produce scopes of work or perform work under its IQCs, without the USPS providing any explanation, excuse or reason. LP App. 9, Battaglin Aff. ¶ 36.

<u>DEFENDANT'S RESPONSE</u>: Denied. The USPS continued to issue work orders to LP, and LP continued to perform work under its IQCs. App. 993. For example, with regard to the St. David Modular Post Office, on December 9, 1996, the USPS had issued LP work order 2.0 in the amount of $31,932.72.00. App. 472, 993. On about August 25, 1997, LP submitted a draft work order in the amount of $17,308.27. App. 890. On about October 15, 1997, LP submitted another draft work order in the amount of $45,130.33. App. 891-92. In November 1997, the USPS issued LP work order 2.01 in the amount of $39,932.63 for the St. David Modular Post Office. App. 886-89, 993. On July 2, 1997, LP submitted a request for payment for work performed at St. David in the amount of $21,412.72. App. 893, 993. On May 28, 1998, LP submitted its final request for payment for work performed at St. David. App. 896, 993.

In May 1997, the USPS issued LP work order 4.0 in the amount of $22,274.40 for lobby/interior painting at the Roberts Post Office. App. 839, 993-94. On May 1, 1997, the USPS issued LP work order 3.00 in the amount of $21,666.51 for lobby renovation work at the Thawville Post Office. App. 820, 994. On July 28, 1997, the USPS issued LP work order 7.00 in the amount of $30,990.20 for interior renovation work at the Rossville Post Office. App. 849, 994. On October 25, 1997, the USPS issued LP work order 5.00 in the amount of $19,998.85 for lockbox renovation work at the Wellington Post Office. App. 868, 994.

In addition, on June 28, 1997, the USPS awarded LP a simplified purchase contract in the amount of $42,000 for the Paxton Post Office handicap ramp. App. 491.

36. This sudden change in the USPS's contract administration and conduct led LP to believe that there was something different happening in the USPS's regional solicitation process. LP App. 9, Battaglin Aff. ¶ 37.

DEFENDANT'S RESPONSE: Denied. See Defendant's response to LP's PFUF No. 35, which is incorporated herein by reference.

37. LP was contacted and interviewed by an USPS Office of Inspector General Agent Mr. Carl Puricelli to discuss possible irregularities with Mr. Rigsby and the A/E Mr. Fernandez. LP App. 10, Battaglin Aff. ¶ 38. This OIG investigation resulted in the government's repeated requests that the Court of Federal Claims stay this case citing, among other things, Grand Jury privilege. *Id.*, LP App. 37 *et seq.*

DEFENDANT'S RESPONSE: The Government's requests for stays of discovery were agreed to by plaintiff and are a matter of record. LP's assertion is not material to either parties' motion.

38. The testimony of Messrs. Fernandez, McNabb, Southern, and Rigsby reveal that only Mr. Fernandez ever met with the Grand Jury or was interviewed by the OIG. LP App. 10, Battaglin Aff. ¶ 39, LP App. 208, Rigsby Depo. 84, LP App. 237, Southern Depo. 81, LP App. 258A, McNabb Depo 44-45.

DEFENDANT'S RESPONSE: Denied. The identity of individuals who testified before the Grand Jury is privileged and defendant's counsel is not aware of who testified before the Grand Jury. The OIG interviewed numerous other individuals besides Mr. Fernandez, although it did not interview Mr. Southern and Mr. Rigsby. Although Mr. McNabb did not recall the interview, he was interviewed by the OIG. LP's assertion is not material to either parties' motion.

39. LP's lost profit damages calculation is based upon LP's historical and reasonably anticipated profit on projects of like size and complexity. LP App. 10, Battaglin Aff. ¶ 40. LP has performed over 200 work orders, most of which were comparable to the 12 WOs which are the subject of this litigation. *Id.* These percentages of profit are based upon that historical data and LP's experience in this field, for this type of work, and represent reasonable estimates of what profits LP could have reasonably expected to receive minus what its reasonable costs would have been but for the USPS's breaches of the implied-in-fact contracts. *Id.* LP will produce at trial documentation which supports these percentages of profit. *Id.* In addition, LP based its multiplier upon which it successfully competed for, and was awarded the IQCs, upon that historical analysis, such that LP could perform the work (based upon the USPS-prepared and provided unit prices) and still earn a reasonable profit. *Id.*

<u>DEFENDANT'S RESPONSE</u>: Denied. LP has not produced any evidence of historical data or its experience that supports its assertion that its numbers represent reasonable estimates of what profits LP could have reasonably expected to receive minus what its reasonable costs would have been but for the USPS's alleged breaches. LP's historical data and experience demonstrates that LP had a loss of 5.43% in 1996, profit of 8.33% in 1997, and profit of 1.54 % in 1998, based upon the numbers contained in LP's tax returns. <u>See</u> IRS Forms 1120 for 1996, 1997, 1998 p. 1 (at the request of LP's counsel, the tax forms are not contained in Defendant's Appendix). The profits are similar based upon the numbers contained in LP's financial statements: a loss of 6.50% in 1996, profit of 6.58% in 1997, and profit of 0.58% in 1998. App. 1003-17.

LP Profit/Loss Per Financial Statements

| Calendar Year | 1996 | 1997 | 1998 | Three Year Totals |
|---|---|---|---|---|
| Gross Profit | $183,038 | $146,763 | $208,873 | $538,674 |
| Operating Expenses | $177,077 | $127,809 | $190,642 | $495,528 |
| Other Income Expenses | $17,861 | $6,526 | $16,221 | $40,608 |
| Income/(Loss) before taxes | ($11,900) | $12,428 | $2,010 | $2,538 |
| Income Tax | -0- | $2,769 | $797 | $3,566 |
| Income/(Loss) after taxes | ($11,900) | $9,659 | $1,213 | ($1,028) |
| Income/(Loss) before income taxes As a Percentage of Gross Profit | -6.50% | 8.47% | 0.96% | 0.47% |
| Income/(Loss) after income taxes As a Percentage of Gross Profit | -6.50% | 6.58% | 0.58% | -0.19% |

LP Profit/Loss Per Tax Returns (Forms 1120)

| Calendar Year | 1996 | 1997 | 1998 | Three Year Totals |
|---|---|---|---|---|
| Total Income | $183,502 | $150,262 | $210,684 | $544,448 |
| Total Deductions | $193,474 | $137,744 | $207,445 | $538,663 |
| Taxable Income/(Loss) | ($9,972) | $12,518 | $3,239 | $5,785 |
| Taxable Income/(Loss) As a Percentage of Total Income | -5.43% | 8.33% | 1.54% | 1.06% |

40. LP has never received any notice of termination for default or convenience on any USPS project, including the 94 IQC or 1996 IQCs. LP App. 10, Battaglin Aff. ¶ 41.

<u>DEFENDANT'S RESPONSE</u>: Admitted for projects within the USPS Great Lakes Region. Defendant has not been able to determine whether this is true for other USPS regions.

41. It was always Battaglin's understanding and expectation that the USPS Procurement Manual and Purchasing Manual and their applicable regulations would require that LP be provided with at least the opportunity to compete for the subject work orders and for comparable work which was formally competed. LP App. 10, Battaglin Aff. ¶ 42.

<u>DEFENDANT'S RESPONSE</u>: Denied. LP's alleged understanding and expectation are not supported by any provisions of the USPS Procurement Manual, the Purchasing Manual or regulations. The USPS Procurement Manual and the USPS Purchasing Manual did not require that the USPS solicit bids from all interested contractors. The USPS Procurement Manual, in the provisions for simplified purchases, provided: "Proposals or quotations must be solicited from a sufficient number of qualified sources (normally at least three) to ensure that the price is fair and reasonable." App. 260. The USPS Purchasing Manual (effective January 31, 1997) provides: "Proposals or quotations must be solicited from a sufficient number of qualified sources to ensure adequate competition." App. 265, 267. Also LP's IQCs stated, in their Quantity of Work clause, as follows:

> The Postal Service reserves the right to undertake, by Postal Service sources or others, the same type of work or similar work as contracted for in this contract, in the area covered by this contract, while this contract is in force.

App. 4, 57, 160.

42. During the course of dealing between the parties, LP and United States Postal Service ("USPS"), it was standard practice for the USPS on both the subject IQC contracts as

well as other, unrelated, indefinite quantity contracts, for the Government to have the contractor perform an on-site visit and self-prepare a price proposal or work order. LP App. 195, Rigsby Depo. at 19 *et seq*.

DEFENDANT'S RESPONSE: Denied that LP "self-prepare[d]" a price proposal or "work order." The course of dealing and process for issuance of work orders was as described in Defendant's responses to LP's PFUF No. 13 and 15, which are incorporated herein by reference. Battaglin also would scope out work at USPS facilities and prepare draft work orders/scopes of work, without being directed or requested to do so by the USPS. App. 995.

43. Given the time that has passed since this action, the USPS's contracting officer, Robert A. Rigsby, has no current direct recollection of the projects in question and he is not familiar with any with the exception of Aroma Park. LP App. 194A, Rigsby Depo. at 11.

DEFENDANT'S RESPONSE: Denied. At his deposition, Mr. Rigsby stated: "The Hoopeston ramp, I do remember that." App. 975 (Dep. 12). Mr. Rigsby also addressed the other handicap ramp projects. For example, Mr. Rigsby stated that the USPS competed the Bradley Post Office handicap ramp because "we felt it was in the best interest of the postal service to do that." App. 687 (Dep. 78). Mr. Rigsby explained that "in the case of the ramps, it was not just one ramp involved ... there may have been 20-plus ramps involved.... So the decision was to do all the ramps at one time." App. 687 (Dep. 80). Mr. Rigsby also stated that there was "adequate competition" because the USPS had "four contractors bidding," and that "you don't have to invite the IQC [contractor] to bid on the project under the simplified purchasing process." App. 687 (Dep. 80).

Mr. Rigsby retired in March 1999, and much time has passed since the events at issue, much of which relates to the 1995 to 1997 timeframe. Many of the relevant facts are set forth in his letter dated September 10, 1997, App. 378-84, which was supported by documentation. Mr. Rigsby does need to see the relevant documents and has relied upon them to refresh his recollections. App. 996.

44. Mr. Rigsby received scopes of work/work orders from LP, some being computer generated and others handwritten. LP App. 196, Rigsby Depo. at 20 *et seq*.

DEFENDANT'S RESPONSE: Admitted; however, some of the draft work orders/scopes of work that the USPS received from LP were not requested or directed by the USPS. App. 996.

45. The USPS, including Mr. Rigsby, routinely requested LP to travel to USPS facilities under LP's IQCs and perform field surveys. LP App. 197, Rigsby Depo. at 22. *See also,* LP App. 120, 127 (East Lynn); 131-34, 150-52 (St. Anne); 140 *et seq.* (Union Hill); 148 (Aroma Park, Papineau, Beaverville, Union Hill & Bradley); 154-55 (Momence); 155-56; 15758 (Union Hill); 163 (referencing LP App. 32-33); 165-67 (Aroma Park); 168 (Bradley); 169-73 (Berwick); 174-75, 177 (Brookfield); 178-79 (Downers Grove); 185-87 (Hoopeston); LP App. 228, 246, Southern Depo. at 29:23, 103:16.

DEFENDANT'S RESPONSE: Denied that LP was requested or directed to perform "field surveys." The process was that LP was requested to go and look at the facility, and the USPS manager and LP together would estimate the quantities of line items of work and prepare a draft work order/scope of work for a particular project. App. 997. LP was to look at only those items or areas pertinent to the proposed project, and was not requested to make a general "field survey"

of the facility to suggest deficiencies or recommend possible improvements. App. 997. See Defendant's responses to LP's PFUF Nos. 13 and 15, which are incorporated herein by reference.

46. As contracting officer, Rigsby and/or his subordinates regularly directed LP to travel to USPS facilities, perform site surveys, typically with USPS personnel, and generate work orders upon and at the USPS's request. LP App. 198 *et seq*, Rigsby Depo. at 24:18, 26:10.

DEFENDANT'S RESPONSE: Denied that LP generated "work orders upon and at the USPS's request." The process was that LP was requested to go and look at the facility, and the USPS manager and LP together would estimate the quantities of line items of work and prepare a draft work order/scope of work for a particular project. App. 997. LP was to look at only those items or areas pertinent to the proposed project, and was not requested to make a general field survey of the facility to suggest deficiencies or recommend possible improvements. App. 997. See Defendant's responses to LP's PFUF Nos. 13, 15 and 45, which are incorporated herein by reference.

47. The USPS through its authorized personnel would likewise regularly ask other IQC contractors, including St. Louis Design and Construction, and Summers Construction, to also self-perform such tasks. LP App. 200, Rigsby Depo. at 26:15.

DEFENDANT'S RESPONSE: "Summers Construction" is correctly stated as "Somers Co." Admitted that USPS asked other IQC contractors, including St. Louis Design and Construction and Somers Co., to make site surveys and develop price proposals or draft work orders/scopes of work together with USPS project managers. As John Buchholtz, a USPS IQC contractor since 1982, stated:

> 3. As an IQC contractor for the USPS, I often made site visits to USPS facilities to scope out work with USPS Project Managers. At these site visits, the USPS Project Manager and I together would estimate quantities and consider what various items of work would be needed to accomplish a project. I would prepare a draft scope of work, which I call a proposed pricing sheet. I would prepare our proposed pricing sheets using our computer, which has all the various line items of work and prices for an IQC stored in its memory. Shortly after my site visit with the USPS Project Manager, I would provide our proposed pricing sheet to the USPS Project Manager. I have made such site visits with USPS Project Managers and have prepared proposed pricing sheets pursuant to our IQCs countless times, and it was routine for St. Louis Design to do so on its USPS IQCs. The vast majority of the time, I made the site visits and prepared the proposed pricing sheets for St. Louis Design myself, and, only occasionally, did I have an employee of St. Louis Design make such site visits with the USPS Project Managers. The site visits and preparation of the proposed pricing sheets with the USPS Project Manager are a cost of doing business with the USPS under its IQCs.
>
> 4. In order for St. Louis Design to receive work orders under its USPS IQCs, I would have to make these site visits and prepare proposed pricing sheets with the USPS Project Managers; the USPS and St. Louis Design would have to agree upon the quantities and the line items of work necessary for each project; the USPS contracting officer would forward to St. Louis Design a written USPS work order, which I would sign and return to the USPS, and the USPS contracting officer would sign the USPS work order beside my signature, making a work order contract for that individual project. Each USPS work order signed by both St. Louis Design and the USPS contracting officer was a contract for the line items of work contained in the work order.

App. 1020.

48. On other contracts such as the A.M. Fernandez A/E IQC contract, Rigsby would direct that contractor, A.M. Fernandez, to prepare scopes of work and submit them for review and approval by Rigsby. LP App. 211, Rigsby Depo. at 109.

DEFENDANT'S RESPONSE: Denied that Fernandez would submit scopes for Mr. Rigsby's "approval" or that Mr. Rigsby directed him to submit scopes of work for "approval" and Mr. Rigsby did not so state in his deposition. A.M. Fernandez had an IQC contract for architectural

services with the USPS. App. 388. Sometimes Mr. Fernandez prepared draft scopes of work for that contract and submitted them to the USPS, and sometimes the USPS prepared the scopes of work and gave them to A.M. Fernandez. App. 997; LP App. 211 (Rigsby Dep. 109).

49. Except for the Princeton and La Salle properties, the entire balance of LP's work orders under the IQCs, each and every one, was initiated by a telephone call or other communication from USPS authorized personnel to LP, directing LP to perform a site visit to the relevant facility, perform a detailed field survey and self-develop and submit a draft work order. LP App. 5-6, Battaglin Aff. ¶ 16-17.

DEFENDANT'S RESPONSE: Denied. LP was not directed to perform "detailed field survey[s]." App. 997. Battaglin was to look at the site and estimate the quantities of various line items of work and prepare a draft work order/scope of work as explained in Defendant's responses to LP's PFUF No. 13 and 15, which are incorporated herein by reference.

LP was invited to submit bids for the site preparation work for the Berwick and St. David Modular Post Offices, and provided draft work orders/scopes of work with its prices. App. 998. Also see Defendant's statement regarding Berwick in response to LP's PFUF No. 25, which is incorporated herein by reference.

50. With the exception of the 12 work orders (the "WOs") which are the subject of this litigation, on each and every other occasion the USPS promptly issued a "formal" work order to LP to perform such work, which work LP performed and was paid by, the USPS. LP App. 6, Battaglin Aff. ¶ 17.

DEFENDANT'S RESPONSE: Denied. The process regarding the issuance of work orders and the course of dealing were as stated in Defendant's response to LP's PFUF Nos. 13 and 15, which are incorporated herein by reference.

There also were other draft work orders/scopes of work that Battaglin prepared and submitted and that did not lead to the issuance of a USPS final work order. As Battaglin testified, LP had been denied work orders before." App. 1059 (Dep. 34). See also App. 1075-76 (Battaglin Dep. 30204)(describing another LP draft work order/scope of work for a "wood partition" dock enclosure at Downers Grove that LP is not making a claim for in this case); App. 1061 (Battaglin Dep. 87)(describing another site visit and draft work order/scope of work prepared with Paul Steiner at East Lynn that is not part of LP's claims).

LP also complained about Mr. Rigsby's not issuing work orders for other projects that LP allegedly had scoped. App. 375 (LP attorney letter dated July 25, 1997 complaining about the failure to issue USPS work orders for Gibson City, Wilmington, Grand Ridge, Blackstone, Leonore, Bishop Hill, Lee, DePue, and Peru); App. 436 (LP letter dated May 29, 1997 complaining about the failure to issue LP work orders for Goodwine, Claytonville, Verona, Gibson City, Wilmington, Grand Ridge, Blackstone, Leonore, Bishop Hill, Lee, DePue, and Peru).

USPS work orders were issued for both Goodwine and Claytonville, but both were cancelled in modifications signed by both parties. App 799-816. USPS work orders were not issued for the other facilities listed in LP's letters.

51. It was against USPS policy to send two IQC contractors to the same project. LP App. 200, Rigsby Depo. at 26:22.

DEFENDANT'S RESPONSE: Denied. This was not an official written USPS policy. App. 998. It was the practice of the USPS not to request or direct two IQC contractors to scope out the same project at a facility. App. 998 (Rigsby ¶ 37), 679 (Rigsby Dep. 26-27). The USPS could request that different IQC contractors scope out different projects at the same facility. App. 998 (Rigsby ¶ 37).

52. If the USPS sent an IQC contractor to perform a USPS facility field survey, it was reasonable for them to assume that there was work to be done at that facility and there was interest in having that contractor perform such work. LP App. 201, Rigsby Depo. at 29:21.

DEFENDANT'S RESPONSE: Denied that contractors were directed to perform "field surveys." IQC contractors made site visits and estimated the quantities of various line items of work for a potential project. Denied that any funds had been committed for a potential project at this stage of the process. App. 1062 (Battaglin Dep. 90). As Mr. Rigsby stated, if the USPS requested an IQC contractor to make a site visit, "it's fair to assume that there's an interest in having work done at that site." App. 680 (Dep. 29-30). As Mr. Rigsby further stated, everyone knows that by "virtue of your going to visit and look to see if there's work that needs to be done does not guaranty (sic) that you're going to get it done." App. 680 (Dep. 29-30). There was never any guarantee that the contractor that made the site visit would receive a USPS work order for the project. Mr. Rigsby also was asked: "So, it's their cost [of the site visit] to eat, the contractor's?" and he answered: "At the time that that contract was being administered, ... that was the case." App. 680 (Rigsby Dep. 30).

53. Robert Rigsby was authorized to direct LP to perform site visits. LP App. 202A, Rigsby Depo. at 22:13, 44:11.

DEFENDANT'S RESPONSE: Admitted.

54. Mr. Rigsby's subordinates, including Messrs. Southern, Rothermal and McNabb, were directed by Mr. Rigsby and authorized by Mr. Rigsby to contact, *inter alia*, LP to perform site visits and direct LP to self-develop, prepare and submit work orders. LP App. 227 *et seq*., Southern Depo. at 28, 32, 37, 38:2; LP App. 294 *et seq*., McNabb Depo. at 20:21-21:1, 36:6.

DEFENDANT'S RESPONSE: Denied. Further denied that LP was directed to "self-develop, prepare and submit work orders." The process or course of dealing was as stated in Defendant's responses to LP's PFUF Nos. 13 and 15, which are incorporated herein by reference. LP also has not correctly stated the responsibilities of Mr. Rigsby's subordinates. App. 999 (Rigsby ¶ 40). With regard to Rigsby's subordinates, different individuals would be directed to do different things depending upon their abilities and their levels of expertise. Id. At times, Mr. Rigsby directed Messrs. Southern, Rothermel, and McNabb to make site visits to certain facilities for the purpose of scoping out certain types of work. Id. Some of Rigsby's subordinates were seldom, if ever, directed to scope out work at postal facilities. Id.

55. The USPS and Rigsby utilized LP and Richard Battaglin's expertise to develop scopes of work. LP App. 198, 203, Rigsby Depo. at 24:21, 52:23. *See also,* LP App. 120, 127 (East Lynn); 131-34, 150-52 (St. Anne); 140 *et seq.* (Union Hill); 148 (Aroma Park, Papineau, Beaverville, Union Hill & Bradley); 154-55 (Momence); 155-56; 157-58 (Union Hill); 163 (referencing LP App. 32-33); 165-67 (Aroma Park); 168 (Bradley); 169-73 (Berwick); 174-75,

177 (Brookfield); 178-79 (Downers Grove); 185-87 (Hoopeston); LP App. 228, 246, Southern Depo. at 29:23, 103:16.

DEFENDANT'S RESPONSE: Denied. Battaglin together with USPS project managers developed draft work orders/scopes of work. For example, Battaglin and Mr. Southern developed the draft work orders/scopes of work for St. Anne that are attached to Mr. Southern's declaration. App. 1035. The USPS knew of Battaglin's ability to go out and produce a proposed scope of work and he was allowed to do that upon request. App. 678-79 (Rigsby Dep. 24-25).

56. The USPS received handwritten work orders from LP on several occasions. LP App. 196, 210, Rigsby Depo. at 20:22, 108:5, LP App. 222, Southern Depo. at 19; *see generally*, App. 523 *et seq.*.

DEFENDANT'S RESPONSE: Admitted with the clarification that the USPS received handwritten draft work orders from LP on several occasions. USPS did not receive "work orders" from LP.

57. The USPS is not permitted to compete work to be performed under an IQC contract. LP App. 212, Rigsby Depo. at 110:21.

DEFENDANT'S RESPONSE: Denied. LP's statement is incorrect in that there is no work that is "to be performed under an IQC contract." App. 1000. The USPS IQCs state as follows:

> The Postal Service reserves the right to undertake, by Postal Service sources or others, the same type of work or similar work as contracted for in this contract, in the area covered by this contract, while this contract is in force.

App. 4, 57, 160.

It was not the USPS's practice to compete IQC work in the sense that the USPS would not request or direct that two IQC contractors scope out the same project at the same facility. App. 1000, 679 (Rigsby Dep. 26-27)("Never an IQC and an IQC to the same project."). Two IQC contractors could be requested to make site visits at the same facility to scope out different work. App. 1000.

58. LP Consulting was not included in the bidders selected by Rigsby to bid upon the following projects: Aroma Park, Berwick, Bradley, Brookfield dock enclosure, Brookfield ramp, Downers Grove, Hoopeston, and Paxton. *See generally*, App. 285-288, 302, 309-315, 325, 329334, 341-342, 353-367, 442-444, 481-488. *See also*, App. 395-96 (Fernandez letter of bidders).

DEFENDANT'S RESPONSE: Denied. There was no USPS solicitation for Aroma Park before Mr. Rigsby's retirement, and he did not decide which contractors were invited to bid for Aroma Park. App. 1000. LP was invited to submit a bid for the Berwick Modular Post Office site preparation work, and LP submitted a draft work order/scope of work with its price. App.1000 . LP's price was considered, but the awardee's price was lower than LP's price. App. 302-07, 1000.

With regard to the handicap ramp projects, it was in the USPS's interest to compete the ramp projects, and "in the case of the ramps, it was not just one ramp involved ... there may have been 20-plus ramps involved.... So the decision was to do all the ramps at one time." App. 687 (Rigsby Dep. 80), 1001. As Mr. Rigsby stated, USPS had "adequate competition" because we had "four contractors bidding," and that "you don't have to invite the IQC [contractor] to bid on the project under the simplified purchasing process." App. 687 (Rigsby Dep. 80), 1000. Mr.

Rigsby also explained that the list of contractors for the ramps "came from contractors that had done work for us before and who had the expertise to do ramp work." App. 689 (Rigsby Dep. 113), 1001. LP's attorney asked why LP was not on the list, and Mr. Rigsby responded "because this [referring to the list of contractors for the ramps] was enough competition right here" and LP "was not excluded for any particular reason. We just had enough competition." App. 689 (Rigsby Dep. 113), 1000. As Mr. Rigsby stated, "if you've got enough competition, you have enough competition. I don't want to put ten contractors [on the list]." App. 689 (Rigsby Dep.113). The USPS had "adequate competition" to award contracts for the Bradley handicap ramp (309-15), the Brookfield ramp (App. 332-34), and the Hoopeston handicap ramp. App. 353-67, 378-83 (Rigsby Sept. 10, 1997 letter), 1001.

The USPS also had "adequate competition" to award the contracts for the Brookfield dock enclosure and the Downers Grove dock enclosure. App. 325, 329-30, 1001.

By letter dated April 30, 1997, LP submitted a bid for the handicap ramp at the Paxton Post Office, and, in June 1997, Rigsby awarded LP a simplified purchase contract for the Paxton ramp. App. 489-91, 1001.

59. LP was not excluded for any particular reason by Mr. Rigsby, except that Mr. Rigsby believed that LP had gotten enough work. LP App. 214, Rigsby Depo. at 113.

DEFENDANT'S RESPONSE: Denied. See Defendant's response to LP's PFUF No.58, which is incorporated by reference.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Kathryn A. Bleecker
KATHRYN A. BLEECKER
Assistant Director

s/Domenique Kirchner
DOMENIQUE KIRCHNER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit,
8th Floor, 1100 L. St., N.W.
Washington, D.C. 20530
Tele: (202) 307-0290
Attorneys for Defendant

Of Counsel:
STEPHEN D. LOBAUGH
United States Postal Service

April 6, 2005

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 6th day of April 2005, a copy of the foregoing "DEFENDANT'S RESPONSES TO PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT" and accompanying appendix was electronically filed. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

/s DOMENIQUE KIRCHNER