**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **L.P. CONSULTING GROUP, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 98-868C** |
| | ) | **(Judge Allegra)** |
| **THE UNITED STATES** | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY TO LP'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

April 25, 2005

Brian Cohen, Esq.
BELL, BOYD & LLOYD PLLC
1615 L Street, N.W., Suite 1200
Washington, DC 20036
(202) 955-6836 tel.
(202) 835-4117 fax.
Attorney of Record for Plaintiff
L.P. Consulting Group, Inc.

Of Counsel:

Lawrence M. Prosen, Esq.
BELL, BOYD & LLOYD PLLC
1615 L Street, N.W., Suite 1200
Washington, DC 20036
(202) 955-6830 tel.
(202) 835-4127 fax.

TABLE OF CONTENTS

Page

I. **INTRODUCTION** ..... 1

II. **ARGUMENT** ..... 2

A. **Defendant Has Not Met its Burden of Proof to Obtain Summary Judgment** ..... 2

B. **Defendant's Responses to Plaintiff's Proposed Findings of Uncontroverted Fact Are Inconsistent and Lack Bases in Fact and the Record** ..... 3

C. **The Government's Own Filings Require that the Court Reject Defendant's Motion for Summary Judgment, while Granting Plaintiff's Cross-Motion.** ..... 6

D. **LP Has Demonstrated the Prerequisites Establishing Implied-In-Fact Contracts** ..... 7

i. **Only East Lynn is addressed by USPS** ..... 8

E. **LP's Performance In Response To The USPS's Explicit Directions, Evidences Mutuality Of Intent To Contract.** ..... 8

i. **LP did provide consideration to the USPS** ..... 12

F. **The IQCs Do Not Require That An IQC Contractor Perform Site Visits, Or Prepare Work Orders Or Scopes Of Work.** ..... 13

G. **The USPS's Conduct And That Of Its Authorized Agents Support LP's Claims** ..... 15

H. **The Government Breached It's Duty Of Good Faith and Fair Dealing** ..... 16

I. **LP Is Entitled To Recovery Of Its Lost Profits** ..... 17

III. **DEFENDANT'S DECLARATIONS** ..... 19

A. **Declaration of Terri Jacobsen** ..... 20

B. **Declaration of Robert Rigsby** ..... 21

C. **Declaration of John Buchholz** ..... 25

D. **Declaration of Paul Steiner** ..... 26

**E. Declaration of Samuel W. Southern** .......... 27

**IV. CONCLUSION** .......... 29

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Ace-Federal Reporters, Inc. v. Barram*,
226 F.3d 1329 (Fed. Cir. 2000) ............ 18
*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)............ 3
*Anderson v. United States*,
344 F.3d 1343 (Fed. Cir. 2003) ............ 8
*Gorn Corp. vs. United States*,
191 Ct. Cl. 560, 424 F.2d. 588 (1970)............ 15
*Gresham & Co. v. United States*,
470 F.2d 425 (Ct.Cl. 1972)............ 11, 16
*H.F. Allen Orchards v. United States*,
749 F.2d 1571 (Fed. Cir. 1984) ............ 8
*Hanlin v U.S.*,
50 Fed. Cl. 697 (2001)
*affd.* 316 F.3d 1325 (2003) ............ 11, 13
*HPI/GSA-3C, LLC v. Perry*,
364 F.3d. 1327 (Fed. Cir. 2004) ............ 15
*Hubbard v. United States*,
52 Fed. Cl. 192 (2002)............ 19
*Int'l Resource Recovery v. United States*,
60 Fed.Cl. 428, 431 (2004)............ 16
*LaSalle Talman v. United States*,
45 Fed. Cl. 64 (1999)............ 19
*Locke v. United States*,
151 Ct. Cl. 262, 283 F.2d 521 (Ct. Cl. 1960) ............ 18
*Mega Construction Co., Inc. v. United States*,
29 Fed. Cl. 396 (1993)............ 17
*N.R. Acquisition Corp. v. United States*, 52 Fed.Cl. 490, 494 (2002) ............ 3
*Porter v. United States*,
204 Ct.Cl. 355, 496 F.2d 583 (1974),
cert. denied 420 U.S. 1004 (1975)............ 10, 13
*Rumsfeld v. Applied Companies, Inc.*,
325 F.3d 1328 (Fed. Cir. 2003) ............ 18
*Russell v. Acme-Evans Co.*,
51 F.3d 64 (7th Cir. 1995) ............ 20

## TREATISES

*Restatement (2d) of Contracts* §4 (1979)............ 11
*Restatement (2nd) of Contract* §24 (1981) ............ 8

## BOARD OF CONTRACT APPEALS

*Burke Court Reporting Co.*,
97-2 BCA ¶29,323 .......... 17
*Carroll Automotive*,
ASBCA No. 50993, 98-2 BCA 29,864.......... 18
*City Window & Construction Company*, PSBCA No. 4563, Dec. 14, 2001,
02-1 BCA ¶31,706 .......... 11
*Comm. Consulting Intl*,
ASBCA No. 53489, 02-2 BCA ¶31,940.......... 17
*David Finley*, PSBCA No. 3922,
98-2 BCA ¶29,989 .......... 11
*T&M Distributors, Inc.*,
ASBCA No. 51279, 01-2 BCA 31,442.......... 18

# REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY TO LP'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, L.P. Consulting Group, Inc., ("LP"), through undersigned counsel, hereby files its Reply to Defendant's Opposition to Plaintiff's Cross-Motion for Summary Judgment and Reply to LP's Opposition to Defendant's Motion for Summary Judgment (collectively, the "Opposition"), pursuant to RCFC 56, and states as follows:

## I. INTRODUCTION

A review of the Defendant's Opposition reinforces Plaintiff's arguments in its Cross-Motion and Opposition, that the U.S. Postal Service ("USPS") still does not understand either the basis of the underlying twelve (12) implied-in-fact contracts, or LP's entitlement to recover its lost profits arising therefrom. The government's reliance upon "explicit contract provisions" (Defendant's Opposition at page 1) neither supports nor establishes that LP is in any way responsible or otherwise obligated to (1) perform site visits; (2) perform field surveys or take-offs; (3) prepare work orders or develop scopes of work; or (4) submit those work orders for the government's internal use by simply incorporating these items into its computer system known as FMSWin.

The government fails to point to a single "explicit contract provision" making LP responsible to perform these obligations. LP believes that the documents contained in the USPS's supplemental and original appendices, further support LP's argument, and provide direct evidence allowing the Court to grant LP's Cross-Motion for Summary Judgment. At the very least, the USPS's Appendices and declarations, raise significant issues of material fact which preclude granting the government's motion for summary judgment.

## II. ARGUMENT

The government's supplemental appendix supports and recognizes the on-going course of conduct which LP alleges existed and resulted in the underlying 12 implied-in-fact contracts. That appendix supports LP's position that a course of conduct existed between the parties. There is no issue of material fact that LP did prepare and submit the 12 WOs resulting in the 12 implied-in-fact contracts.

Defendant alleges that "LP adopts a new theory, directly contrary to the allegations of its amended complaint." Defendant's Reply at 2. Nothing could be further from the truth. Despite the government's interpretation to the contrary, LP's consistent basis for recovery has been: (1) LP would receive a telephone call or other communication from authorized USPS personnel to perform site visits at various postal facilities (including the 12 which are the subject of this litigation); (2) LP would be directed to perform field surveys of each facility including on occasion preparing sketches and/or other designs with regard to what construction would have to be performed at the facility; (3) USPS would require LP to prepare a scope of work; and (4) upon LP's performance of these obligations and submission of the work order, the implied-in-fact contracts arose.

LP submits that the parties' course of conduct is established both by LP's Motion and the joint appendices of LP and the USPS, as is the ratification of this course of conduct by the USPS contracting officer, and the bases for these implied-in-fact contracts. Additionally, LP maintains that the USPS breached its implied duty of good faith and fair dealing, implicit in the IQCs as discussed below.

### A. Defendant Has Not Met its Burden of Proof to Obtain Summary Judgment.

Summary judgment may only be granted upon a showing of no genuine issue of material fact and that the movant is entitled judgment as a matter of law. *N.R. Acquisition Corp. v. United States*, 52 Fed.Cl. 490, 494 (2002); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Likewise, as *Anderson* held, where the opponent to a summary judgment motion establishes an "evidentiary conflict created on the record by at a counter statement of a fact or facts set forth in detail and an affidavit by a knowledgeable affiant," summary judgment cannot be granted. *Id*. Given the government's reliance upon its almost 1200 page appendix, at the very least, there are questions of material fact, especially when coupled with the affidavits of Mr. Battaglin (LP App. 1 *et seq.*; LP App. 266 *et seq.*).

Alternatively, should the Court conclude that there are issues of material fact, then at the very least the Defendant's motion for summary judgment must be denied.

**B. Defendant's Responses to Plaintiff's Proposed Findings of Uncontroverted Fact Are Inconsistent and Lack Bases in Fact and the Record.**

Defendant's Responses to Plaintiff's Proposed Findings of Uncontroverted Fact, reveal a multitude of instances where the government lacks any factual support to justify its responses or denials of Mr. Battaglin's affidavit and/or LP's arguments.

For example, Plaintiff's PFUF No. 25 provides a chart specifically denoting the name of the post office facility visited, the date (or at least month) of the visit (with the exception of one), whether the USPS actually ordered LP to perform that site visit ("yes," in every case) which USPS personnel LP met with at that facility, and whether LP prepared a work order. Defendant's responses thereto, repeatedly deny either that the site visits took place or that documents which resulted therefrom (*i.e.*, WOs) are true and accurate copies of the documents that LP prepared and submitted to the post office. *See e.g.*, Defendant's Responses to LP's PFUF Nos. 12, 13 and 25. In support of these statements, the Government fails to cite any

substantive documentary or other evidence supporting these sweeping denials. The government also denies that LP was directed to perform site visits at the 12 facilities and tasked to develop scopes of work, prepare or submit work orders. The government does not definitively refute the documentary evidence provided by LP and testimony provided by Mr. Battaglin. While the government admits that St. Anne was visited by LP with Mr. Southern; it summarily rejects the date that the site visit took place or that the documents produced in discovery by LP are the same documents. The government fails to point to any substantive, factual or documentary support for its denial. Similarly, while conceding that LP performed site visits at St. Anne and Momence post offices, the government provides no substantiation (other than the silence of Mr. Southern's diaries (App. 1034-1035)) to deny in LP's PFUF No. 26, relating to those facilities.[1]

Similarly, the government admits that LP performed a site visit at Downer's Grove and prepared a work order/scope of work. The government's subsequent award through a competitive procurement constituted a breach of the government's duty of good faith and fair dealing and for the support of the breached implied-in-fact contracts. In admitting that LP performed site visits at Hoopeston and East Lynn (while summarily denying the dates on which they occurred) the government does not refute LP PFUF No. 26. Relying only upon Mr. Steiner's failure to recall site visits to Aroma Park, Papineau, Beaverville, Union Hill, Bradley, and Eastland, the government denies those site visits occurred, despite LP's providing the Court with a record establishing these site visits and the facts/circumstances of those visits. *See,* PFUF

---

[1] With regard to Mr. Southern's version of the documents being different (App. 1047-56, 1035-36), LP notes that these documents were never produced during the course of discovery, despite the fact that Mr. Southern has now testified that these documents were maintained in his personal records. This discovery violation is further compounded by the fact that Mr. Southern was served with a subpoena *duces tecum* requesting him to produce all documents in his possession, custody or control referring or relating to this case and the twelve WOs, which represent the 12 counts for breach of implied contract in this action. Plaintiff incorporates its Motion to Strike the documents (located at USPS App. 1047-56 and 1035-36), as if fully set forth herein.

No. 25; LP App. 6-7; Battag. Aff. at ¶ 26; and LP App. 267; Battaglin 2nd Aff at ¶ 5. Mr. Battaglin specifically recalls those meetings and has testified that the documents at LP App. 18-19, 26, 29, and 30 are true and accurate. *Id*.

The government's repeated arguments that LP is relying on simple "oral assurances" is neither an accurate interpretation of LP's basis for its underlying complaint nor is it supported by the actual record. LP has never alleged that there were only oral assurances that created the implied in-fact contracts. Instead, LP's consistent position is that the twelve implied-in-fact contracts arose primarily from the parties' actions and their course of conduct. The course of conduct extends not only to the 12 WOs, but to numerous other work orders arising both out of the 94 IQC, 1996 IQCs and other contract work performed by LP for the USPS. This course of dealing is set forth in extensive detail in Plaintiff's Proposed Findings of Uncontroverted Fact, as well as its rebuttal to the Defendant's responses thereto.

In summary, LP alleges that the course of dealing resulting in the underlying implied-in-fact contracts arose from the USPS's authorized agent/employees directing LP to perform site visits, take field measurements and surveys, prepare work orders and submit those work orders to the USPS. LP has provided extensive testimonial and documentary evidence supporting this position. For the most part, USPS relies upon *innuendo* and inferences arising from, *inter alia*, lack of recollection, silent date books (in the case of Mr. Southern) and pure speculation. Except for the 12 WOs, on virtually every other occasion in which LP was directed to perform this work under the 94 and 1996 IQCs, the government adopted said work orders and issued a computerized version of same. The government's misplaced reliance upon purported "oral assurances," as evidenced in both its Opposition and the declarations of Messrs. Southern (App. 1033), Rigsby (App. 976) and Steiner (App. 1025), fails to take into account the actual actions

and conduct of USPS employees and the ratification of those actions by the contracting officer, Mr. Rigsby, resulting in the formation of the implied-in-fact contracts..

### C. The Government's Own Filings Require that the Court Reject Defendant's Motion for Summary Judgment, while Granting Plaintiff's Cross-Motion.

The issues of material fact which result from the government's filings not only preclude the government's motion, but support LP's Cross-Motion for Summary Judgment.

For example, a review of the USPS's supplemental appendix provides several additional "formal" or final work orders issued by the government on various IQCs between LP and the USPS. Appended to the back of these "formal" work orders are the LP-prepared work orders, which directly mirror the appurtenant USPS work order. For example, a face-to-face comparison of the Millbrook, Illinois main office work order 49.00 on the 94 IQC (App. 785-793) with the LP-prepared work order for that project (App. 794-798) reveals that the item numbers, descriptions units and other information are virtually identical (albeit in a different order).

Similarly, the Goodwine, Illinois work order 48.00 (App. 805-810), when compared with LP's handwritten work order (App. 811-813), once again mirrors the work prepared by LP with the actual issued work order. [2]

This same situation exists on several other work orders provided in the government's appendix, including Thawville, Illinois (App. 820-830) with the handwritten LP work order (App. 831-838); Rossville, Illinois main office (App. 849-859) when compared with the LP-prepared work order located at App. 860-867; Wellington, Illinois (App. 868-876), vice LP's

---

[2] Similarly, at App. 886 the actual scope of work LP performed, was handwritten thereon by Mr. Battaglin (as evidenced by his "RB" initials), as affirmed by Mr. Rigsby (through his "RR" initials) on 11/25/97. This further evidences LP's involvement in the preparation of the work orders and the parties' course of conduct.

handwritten work order at App. 877-884; and St. David, Illinois (App. 886-889), versus LP's handwritten work order at App. 890-892.

Thus, the government's submission into the record of these additional documents, at the very least raises significant issues of material fact favoring LP as to whether or not these implied-in-fact contracts and the underlying course of conduct existed. LP maintains that these documents support LP's Cross-Motion, establishing that the alleged course of conduct was on-going both on the 94 IQC and the subsequent 1996 IQCs, between USPS/Mr. Rigsby as contracting officer and LP. Undoubtedly, Mr. Rigsby, whose signature appears on each of the above-referenced "formal" work orders, was aware of the LP draft work orders which are appended to the back of these (and presumably other) work orders in the USPS's files.

With regard to the USPS's issue of "authority," Mr. Rigsby has recognized that "[a]ll contractual orders are given by the Contracting Officer, Contracting Officer's Representative or project manager" (App. 899), thus making it possible for USPS personnel, including the Project Managers, to issue WOs. LP PFUF Nos. 9, 13, 15, 16, 17, 18, 21, 22, 26 and their respective Rebuttals. Likewise, as alleged in Plaintiff's Cross-Motion for Summary Judgment and LP's appendix, the course of dealing between the parties is readily established. Mr. Rigsby, either expressly or through ratification, authorized USPS employees/Project Managers to direct LP to perform site visits, submit works orders and, with the exception of the 12 subject projects, thereafter issue "formal" work orders. PFUF 16, 54 and their rebuttals.

### D. LP Has Demonstrated the Prerequisites Establishing Implied-In-Fact Contracts.

LP has provided sufficient evidence establishing a mutuality of intent to contract; an offer to contract as evidenced by Mr. Rigsby's conduct in exercising his actual authority to bind the government, as ratifying his subordinate's actions, LP's acceptance of that offer, and

consideration. *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1575 (Fed. Cir. 1984); *Anderson v. United States*, 344 F.3d 1343, 1353 (Fed. Cir. 2003).

A review of the government's sizable appendix establishes that Mr. Rigsby authorized his Project Managers, including Messrs. Southern, Steiner and McNabb (as well as other Project Managers) to direct LP to perform site visits and submit work orders. App. 979 ¶11; 982 ¶12; *see also*, PFUF Nos. 9, 14-16, 26. The initial offer of USPS directing LP to perform the site surveys and prepare and submit work orders was accepted upon LP's performing such actions. *Restatement (2nd) of Contract* §24 (1981).

**i. Only East Lynn is addressed by USPS.**

While the government discusses the East Lynn facility in some detail (Opposition at 7-8), the government provides little substantive discussion refuting the facts and circumstances resulting in LP's preparation and submission of WOs on the other 11 projects which are the subject of this litigation. Discounting USPS's discussions regarding East Lynn, LP, through its appendix and affidavits (LP App. 1*;* 266*)* provides detailed discussions of site visits, preparation of work orders, and other related factors which evidence the implied-in-fact contracts entered into by the government on each of the other 11 projects. On the other hand, the government has failed to provide any actual, documented rebuttal or contradictory evidence. At the very least, this raises a significant issue of material fact, at least as to the other 11 projects. LP believes, however, that there is no question of material fact, precluding the Court from granting LP's Cross-Motion for Summary Judgment as to the 12 projects.

**E. LP's Performance In Response To The USPS's Explicit Directions, Evidences Mutuality Of Intent To Contract.**

The government alleges that "there is no undertaking by LP" evidencing LP's mutuality of intent to contract (Opposition at 10). This is simply inaccurate. As set forth in LP's PFUF

Nos. 15, 16, 25 and in LP's rebuttals to Defendant's Responses to same, LP did act. Upon LP's receipt of explicit direction from authorized USPS personnel to perform site visits, LP would schedule those visits, travel to the various rural sites, several which were dozens, if not hundreds of miles away from LP's Chicago headquarters, spend several hours performing detailed measurements and site surveys; followed by several additional hours preparing the various work orders (*see* LP App. 296) and submitting those work orders with the understanding and expectation that LP would receive the work. Each of these actions, culminating in LP's submission of a work order, represents the undertaking and acceptance by LP of the USPS's offer.

The underlying course of dealing consummated in the formation of an implied-in-fact contract when LP submitted a work order. This, coupled with the USPS's initial decision that the underlying work to be performed through its IQC contract vehicle, required this work to be designated to, and performed by, LP. Similarly, as Mr. Battaglin sets forth in his two affidavits (*see*, LP App. 1; 266), LP had every intention to perform this work with the understanding and expectation that it would perform the resulting work. LP never intended nor desired to provide charitable services to the USPS with no reasonable expectation of subsequently receiving the construction work. To the contrary, the record is replete with instances where LP submitted work orders with the reasonable understanding and expectation that it was to receive the resulting work. *See generally,* LP App. 4 *et seq.*, Battag. Aff. at ¶¶ 10, 15 *et seq.*; LP App. 18-19; 26, 29 & 30; PFUF Nos. 13, 21.

Similarly, despite the government's contentions to the contrary, offers were made by the USPS as evidenced by its repeated and on-going course of dealing in having LP perform

numerous site visits and submission of work orders; with the reasonable expectation thereafter, that the "formal" work order would be issued to LP.

Further, LP disputes that it was ever notified that it was not "guaranteed" that it would receive the final USPS work order for a given project. LP App. 262, 274; Battag. 2nd Aff. at ¶¶ 6, 36. Instead, the government's conduct failed to conform to its own contract terms (requiring USPS to develop work orders on its own and then issue them to the IQC contractor for review and acceptance). This, coupled with the multiple meetings, representations by USPS authorized personnel, *when taken together*, resulted in the established course of dealing in the underlying implied-in-fact contracts.

Mr. Rigsby, either through his own actions or through the authorized and ratified actions of his Project Managers, did direct LP to perform site visits, and prepare and submit work orders. Likewise, on numerous occasions he freely accepted those work orders and issued a "formal" work order which virtually mirrored the handwritten LP-prepared work orders. In short, there was an offer, acceptance, mutuality of intent to contract, ratified by Mr. Rigsby's actual conduct and acknowledgements, and consideration was provided by LP. LP PFUF Nos. 13, 14, 15, 16, 26.

Contracts were in place for each of the 12 projects, as they were for each of the other numerous work orders prepared and performed by LP under the 94 IQC, the 1996 IQCs and other similar USPS contracts. As the Court of Claims has recognized, proof of implied-in-fact contracts, is circumstantial, inferred "as a fact" from conduct of the parties showing, through the surrounding circumstances, their tacit understanding. USPS motion at 10-11 (*citing, Porter v. United States*, 204 Ct.Cl. 355, 356, 496 F.2d 583, 590 (1974), *cert. denied* 420 U.S. 1004 (1975)) (remaining citations omitted)). The parties' intent to make a binding promise resulting in the

implied-in-fact contract may be manifested from either language (*i.e.*, oral representations) or by other circumstances, including the parties' course of dealing, trade usage or course of performance. LP Cross-Motion Memorandum at 10 (*citing, Hanlin v U.S.*, 50 Fed. Cl. 697, 699 (2001) *affd.* 316 F.3d 1325 (2003); *Restatement (2d) of Contracts* §4 cmt. a (1979)).

This longstanding doctrine is further supported by the very tribunal which regularly interprets the unique USPS procurement regulations set forth in its procurement manual, the Postal Service Board of Contract Appeals. As discussed in Plaintiff's opposition and cross-motion brief, in both *City Window & Construction Company*, PSBCA No. 4563, Dec. 14, 2001, 02-1 BCA ¶31,706 and *David Finley*, PSBCA No. 3922, 98-2 BCA ¶29,989 the Board recognized that over the course of a number of work orders issued by the USPS under a similar IQC contract, "[a] practice developed between Appellant and Respondent in performing these 31 work orders in which oral directions for additional work were issued by Respondent's employees, with the paperwork to reflect the oral instruction prepared at a later day." *City Window* at Finding 4. In *City Window*, the verbal directions came from the Contracting Officer's subordinate, an architect. The Board recognized that the USPS's conduct on prior work orders constituted a waiver of "the contract's requirement that written authorization from the Contracting Officer was necessary before Appellant could proceed with additional or changed work under the work order." *Id.* As a result, the Board prevented the USPS from later reviving, to the Appellant's prejudice after it had changed position in reliance upon such waiver, the written authorization requirement and upheld judgment for Appellant. *Id.* at 13-14 (*citing, Gresham & Co. v. United States*, 470 F.2d 425, 555 (Ct.Cl. 1972)).

In the current case, LP performed over ninety (90) work orders under the 94 and 1996 IQCs. LP PFUF No. 15 *et seq.* On virtually every one of these work orders, the USPS through

its authorized employees/agents, directed LP to travel to the various facilities, perform field surveys, determine the work required to be performed, including meeting with the Project Managers, and as a result therefrom, prepare and submit work orders including the subject 12 WOs. LP PFUF Nos. 16, 18 and 20. LP complied with these actions in each and every situation in reliance upon and with the reasonable expectation that, as a result of its incurring these "up front" costs it would perform the resulting work. This did not happen on the subject 12 implied-in-fact contracts/WOs.

**i. LP did provide consideration to the USPS.**

The government alleges is a want of consideration, precluding the formation of any implied-in-fact contract. As discussed, *supra*, once the agency decided that the work in question should be performed through its IQC vehicle, the decision making was over. The government's claim that it somehow reserved a right for alternative performance is not supported by the contract itself or the record before the Court.

First, the offer was effectuated by the agency's directing LP to perform the site visit and submit work orders; and LP's acceptance and consideration were met upon LP's compliance with these directions, by performing the site visit and submitting the WOs. On the other occasions, the submitted handwritten WO was accepted by the USPS and LP performed the work. To allow the agency to require LP to perform agency functions such as developing scopes of work and other like functions, with no consideration on the agency's part, renders the underlying contract illusory.

The agency in arguing a lack of consideration (Opposition at 20), rests its entire argument upon the making (or lack thereof) of oral promises. Certainly oral promises are one possible aspect of the formation of implied-in-fact contracts; but as discussed above, one can have an

implied-in-fact contract without any oral statements; based instead upon the parties' actions. *See*, *Porter* and *Hanlin*, *supra* at 12.

**F. The IQCs Do Not Require That An IQC Contractor Perform Site Visits, Or Prepare Work Orders Or Scopes Of Work.**

Nowhere in the IQC contracts, including the language to which the USPS directs the Court's attention, do the IQCs require LP to perform site visits for the purpose of developing, preparing and submitting its own scope of work/work orders. In fact, both the purchasing manual and IQC contract language appear to require that the USPS prepare its own internal estimates. LP App. 281 at § 2.1.1.b.2; 282 at §2.3.1.

To require an IQC contractor to perform such actions, the government would have to first determine what work had to be performed for the given facility, which would only be achievable through USPS's performance of a site visit. The record reveals that USPS never undertook such actions.

Also, the IQCs are not design-build contracts, in which the contractor is required to perform both design and construction services. Instead, the IQCs are "straight forward" indefinite-quantity contracts for minor repair, restoration and disabled-access work of various USPS facilities. The contracts did not contemplate or require LP to perform design services. The government's admitted directions that LP perform site visits and submit work orders, however, constituted material changes to LP's bargained-for work duties and contract requirements. *Id.*

The IQC contracts direct the contractor that (1) it is "responsible for having taken steps reasonably necessary to ascertain the nature and location of the work, and the general and local conditions that can affect the work or its cost," (USPS Opposition at 16, (*citing* Clause 11-1)); and (2) the contractor is "responsibl[e] to inspect conditions at each site, including such things as

elevator size and capacities, existing building materials and components, and the like, . . . ." (Defendant's Reply at 17 (*quoting* Clause FB-260)).

A plain reading of these clauses, however, simply places the contractor on notice that it is responsible to know the existing conditions of the site for its performance of the work order (presumably prepared by the USPS*)*. Nowhere does this language cited by USPS, or for that matter any IQC clause, require LP to have performed the pre-construction design services or field surveys that the USPS, in actuality, required LP to perform. Based upon the IQC's plain language, whether LP elected to perform a site visit or otherwise familiarize itself with the given facility, was at LP's election and risk. The clauses do not mandate that these site visits or inspections take place or that LP must develop its own work orders or scope of work. They merely state that if LP failed to make such a site visit it could not later recover damages from the USPS caused by its failure to inspect.

Likewise, by their very nature, the IQCs competed only one thing, the multiplier (*i.e.*, the amount which the contractor would multiply the USPS-provided unit prices (LP App. 296) to get its final price). This is not a situation where multiple contractors are competing for the same IQC work orders. Instead, the competition was over once the IQC contract was awarded to a given contractor, in this case LP. At that time, once the USPS decided that work would be performed through the IQC vehicle, it was simply a matter of the USPS notifying LP of its need to perform this work and providing LP the work order/scope of work to be performed. In the current case, this did not happen, and LP was forced by the USPS to perform the field visits and submit the work orders. This is contrary to the underlying IQC contract language.

Many of the USPS's arguments in its Opposition rely upon Clause FB-248, which states:

> The Postal Service reserves the right to undertake, by Postal Service sources or others, the same type of work or similar work as

> contracted for in this contract, in the area covered by this contract, while this contract is in force. App. 57, 160. (Emphasis added).

Nowhere does this clause state that the actual work to be performed under the IQC can then be awarded to others. Again, once the USPS decided that the work (in this case, that contemplated by the WOs) was to be performed by the IQC, *that* work was the IQC contractor's to perform. LP has never alleged that the same type or similar work could not be awarded to other contractors. LP does, however, believe that once it was directed to perform the site visit, as admitted by Mr. Rigsby, there was interest in having the IQC perform that work (*see*, LP App. 201; LP PFUF No. 52). It is *that* specific work (which is not the same as the "same type of work or similar work," which contemplates by its very language other similar, but not the same, work) that was LP's to perform. Once the CO or his authorized subordinates elected to use the IQC vehicle and contact the IQC contractor (LP), the agency's/CO's discretion was exercised, and the agency was bound by that decision.[3] The government's attempt to "shoe horn" this language into the current circumstances is misplaced and inappropriate. Again, as the drafter, this language is construed against the USPS. *See e.g.*, *Gorn Corp. vs. United States*, 191 Ct. Cl. 560, 566, 424 F.2d. 588, 592 (1970); *HPI/GSA-3C, LLC v. Perry*, 364 F.3d. 1327, 1334 (Fed. Cir. 2004).

**G. The USPS's Conduct And That Of Its Authorized Agents Support LP's Claims.**

The government's position that LP failed to demonstrate a waiver of the IQC contract requirements regarding a "written work order," similarly fails to take into account the actual

[3] This situation is synonymous with that where the contracting officer unilaterally directs a contractor to perform some change order work. Once the contractor begins to comply with that direction, the CO should not be able to suddenly "change his/her mind" and suddenly state that it is not responsible for the directive.

events surrounding the performance of these IQCs, as well as the explicit actions of USPS authorized personnel. Not only has LP provided detailed evidence supporting its legal argument but it has also established beyond any question all necessary requirements for establishing waiver. As the Court held in *Gresham & Co. v United States*, 200 Ct.Cl. 97, 470 F.2d 542, 554 (1972), a waiver of a contractual requirement can occur where a "party knowingly fails to exact its performance, over such an extended period, that the other side reasonably believes the requirement to be dead." As the government acknowledges, "in order to establish a waiver of a contractual requirement, a party must establish an extended course of conduct, such as that found in *Gresham*, which involved the waiver of a specific contract requirement in 36 contracts with the same party." USPS Opposition/Reply at 5 n.2 (*quoting, Int'l Resource Recovery v. United States*, 60 Fed.Cl. 428, 431 (2004)).

### H. The Government Breached It's Duty Of Good Faith and Fair Dealing.

The record, as discussed above, and as proffered by the agency, contains numerous instances where the government admits to having directed LP to perform site visits and prepare and submit work orders. At least three factors result in the government's having breached its duty of good faith and fair dealing. First, the government directed LP to perform these USPS functions, despite the fact that the IQCs are totally silent on LP's having such contractual responsibilities. Second, the government's argument that LP had to perform these functions, while not having any right for expecting the resulting work would result in an illusory contract. If this were the way USPS routinely conducted business, one can imagine that few, if any contractors, would wish to compete for, to say nothing of being awarded, an IQC contract. This is neither equitable nor in the public's best interests.

Third, the agency had LP develop the 12 WOs, which effectively provided the USPS with a "road map" as to what work each relevant facility required to be performed. Instead of LP then getting that work (at least on the projects subsequently awarded by USPS), the USPS inexplicably decided to formally compete that work. App. 985 *et seq.*, Rigsby Decl. at ¶16 (discussing the awarded contracts). Despite having forced LP to develop the WOs/scopes of work, the USPS refused to allow LP to participate in the subsequent competitions; thereby violating LP's right to have the opportunity to compete for that work. *Burke Court Reporting Co.*, 97-2 BCA ¶29,323; *Comm. Consulting Intl*, ASBCA No. 53489, 02-2 BCA ¶31,940.

These facts establish a breach of the duty of the USPS's good faith and fair dealing. The facts and record evidence entitle LP to summary judgment.

**I. LP Is Entitled To Recovery Of Its Lost Profits.**

Further, LP disputes the government's contention that if the government breached the implied-in-fact contacts it would still not be liable for anticipated lost profits. The cases cited by the government are distinguishable. For example, *Mega Construction Co., Inc. v. United States*, 29 Fed. Cl. 396 (1993), is a case in which the contractor was properly terminated for default and sought recovery of lost profits due to its inability to gain further rework due to its bonding capacity being "tied-up" on the defaulted project. Not surprisingly, the court found plaintiff's claim to be too remote, consequential and speculative.

Here, the government did not terminate any of the disputed work orders for default or purport to exercise its right to terminate any of the work orders for convenience. Further, to accept the proposition that if the contracts exist the government may eliminate its responsibility for <u>any</u> damages by attempting to retroactively apply the theory of constructive termination for convenience would be patently unfair and contrary to established caselaw.

In *Ace-Federal Reporters, Inc. v. Barram*, 226 F.3d 1329 (Fed. Cir. 2000), the Federal Circuit found a breach of a requirements contract for reporting services and awarded breach damages in the form of lost profits. As the court stated:

> We see no reason in law or logic to impose a retroactive constructive termination for convenience here. The concept is a fiction to begin with, but there has to be some limit to its elasticity. The contractors stood ready to perform throughout, did perform those orders placed, and the contract ended.

*Id.* at 1333-34.

Further, it should be noted that the Federal Circuit in *Ace-Federal Reporters* did not address bad faith or abuse of discretion and did not state that either was a prerequisite for its conclusion that the termination for convenience clause was inapplicable. Indeed, several cases have held that allegations of bad faith, abuse of discretion, or arbitrary and capricious action are not essential for a claim for improper diversions under a requirements contract. *T&M Distributors, Inc.*, ASBCA No. 51279, 01-2 BCA 31,442; *Carroll Automotive*, ASBCA No. 50993, 98-2 BCA 29,864.

In essence, this case is analogous to the diversion cases where lost profit recovery is allowed because the government has improperly diverted orders to other sellers. The critical point is that the government's breach of its obligation had the effect of taking away LP's opportunity to earn a profit. *Rumsfeld v. Applied Companies, Inc*., 325 F.3d 1328, 1339 (Fed. Cir. 2003). *Accord, Locke v. United States*, 151 Ct. Cl. 262, 283 F.2d 521 (Ct. Cl. 1960) (Court awarded lost profits noting that the possibility of obtaining work from a listing in the schedule had real business value even if there was no guarantee of obtaining a certain amount of work).

Here, as in *Ace-Federal* and *Locke*, the breach deprived LP the opportunity to earn a profit. Under such circumstances lost profit recovery is sanctioned. *Ace-Federal Reporters, Inc., supra; Locke, supra.*

Even if a finding of bad faith is required, LP has presented sufficient evidence to meet that burden. In a recent case, this Court found bad faith even without evidence of a specific intent to injure when the government acted with deliberate disregard for the business interests of its contracting partner. In *Hubbard v. United States*, 52 Fed. Cl. 192 (2002), the Court found bad faith where the government forced plaintiff to move his rental office to a less desirable location than stated in the contract. Although plaintiff provided no evidence to suggest the government intended to injure it, the court found bad faith based on its conclusion that the government actions were "engineered in bad faith, without regard, indeed, with deliberate and bad faith disregard, for the legitimate business interests of [the plaintiff]." *Id*. at 196. Interestingly, the court could only "hazard a guess" as to the government's motives, but found that the government's explanations for the move were "pretextual."

As in *Hubbard*, the government conduct in this case was in deliberate disregard of LP's legitimate business interests and constitutes bad faith.[4]

Accordingly, whether or not bad faith is a requirement LP is entitled to recover for breach of contract. Under applicable precedent of this court such recovery should include the profits that could have been realized but for the breach. *LaSalle Talman v. United States*, 45 Fed. Cl. 64 (1999).

## III. DEFENDANT'S DECLARATIONS

[4] This is also a case where more than one person acted on behalf of the government. As such, the Court should apply the rule that if the aggregate of the actions of all the agents would, if all done by one individual, fall below the standard of good faith, the entity for whom the various agents acted should be held to have violated that standard. *Libertatia Associated, Inc. v. U.S.*, 46 Fed. Cl. 702, 710 (2000). In that regard, the conduct of Mr. Fernandez described at Footnote 5 to LP's Opposition to Defendant's Motion for Summary Judgment and Memorandum of Points & Authorities in Support of Plaintiff's Cross-Motion for Summary Judgment, should be imputed to the government. Such conduct reinforces and fully supports a finding that the government's conduct falls below the standard of good faith that is essential to the integrity of government contracting. *Libertatia, supra* at 711.

A review of the purported declarations submitted in the government's supplemental appendix by, *inter alia*, Terri Jacobsen (App. 690-692), Robert Rigsby (App. 976-1002), Paul Steiner (App. 1025-1027) and Samuel W. Southern (App. 1033-1037), raises serious questions. By their very nature, these USPS-proffered declarations, at most raise serious issues of material fact which preclude granting of the government's Motion for Summary Judgment. As discussed below, however, the admissions in those declarations also support a number of LP's positions and allegations in LP's Proposed Findings of Uncontroverted Fact and thus support LP's Motion for Summary Judgment. [5]

Perhaps most important about a number of these declarations, with particular regard to those of Messrs. Rigsby and Southern, is the fact that they seek to utilize them as a means of revising their deposition testimony. A party's use of affidavits to "explain away" statements made during the declarant's deposition are inappropriate. *Russell v. Acme-Evans Co.*¸ 51 F.3d 64, 67 (7th Cir. 1995). As that court held, "[w]e have been highly critical of efforts to patch up a party's deposition with his own subsequent affidavit." *Id.* (citations omitted). As discussed below, both Mr. Rigsby's and Southern's depositions are couched in broad, unspecific terms. There are few if any references to specific events, documents or occurrences; and there is virtually no evidentiary foundation provided in either of their depositions. This, coupled with their deposition testimony in which they testified that their respective recollections were poor at best, forces the Court to disregard their declarations (which are not even as strong as true affidavits) and refer to their deposition testimony.

### A. Declaration of Terri Jacobsen

---

[5] Simultaneous with the filing of this reply, LP is filing a Motion to Strike the declaration of John Buckholz, given that Mr. Buchholz was never identified as a fact witness by the government in this case. The statements set forth therein are materially prejudicial, especially given LP's inability to examine Mr. Buchholz and the underlying documents upon which his purported declaration relies.

LP appreciates Ms. Jacobsen's efforts (App. 690-692) to clarify her prior Declaration (App. 1 *et seq.*) and her verification of the various IQC contracts that LP has been awarded and performed for USPS over the past decade. It appears, however, that she has admitted that, as the 94 IQC contracting officer, she and her office violated the terms of that contract and related USPS procurement regulations. As she admits in paragraph 5 of her second declaration (App. 691 at ¶5), only now, almost ten years later, she has discovered that USPS exceeded the $1 million ceiling for that IQC, violating contract clause H.14 clause 7-2. This admission runs directly contrary to her and the other USPS (current and former) employee representations that the USPS has strictly followed USPS procedures. LP App. 266-67; Battag. 2nd Aff. at ¶ 4. These types of USPS violations are further shown in, *inter alia*, Mr. Rigsby's Declaration that he admittedly violated USPS "unwritten" policy not "to send two IQC contractors to the same project." App. 998, Rigsby Decl. at ¶ 37.

It is these types of violations that the USPS in the current case points to. This is further exacerbated by its mandating that LP perform site visits and prepare/submit the WOs in direct contravention to the terms of the relevant IQCs.

**B. Declaration of Robert Rigsby**

Mr. Rigsby's lengthy Declaration represents a significant shift from his deposition testimony in June 2004. Amazingly, despite being a further ten months removed from the events surrounding this litigation, he has suddenly resurrected his poor recollection of the documents and events leading up to the current litigation. As discussed in LP's Rebuttal to Defendant's Responses to LP's PFUF No. 27, at the time of his deposition, Mr. Rigsby's recollection of specifics surrounding the twelve WOs and related topics was, to say the least, poor. When questioned about almost all of the subject projects Mr. Rigsby stated *at least* thirteen separate

times that he had no recollection of the project and related events. At the same time, he has failed to provide any specifics in his declaration refuting the specific events, facts and documents (some of which he is the author, *e.g.*, App. 30, and virtually all of which he received, *e.g.*, LP App. 26, 28, 29).

Through this significant series of suddenly revived recollection, Mr. Rigsby's declaration, at best, raises questions of material fact which preclude the Court's granting either party's motion for summary judgment.[6]

In lieu of completely rehashing the numerous inconsistencies and inaccuracies in Mr. Rigsby's declaration, LP incorporates both the first and second Affidavits of Mr. Battaglin (LP App. 1 and 266, respectively, as if fully set forth herein); as well as its PFUF Nos. 9, 14-19, 20-25, 31-33, 41-43, 45-55, and LP's Rebuttals thereto. There are, however, several material facts which bear noting as being wholly inconsistent with the actual record.

First, despite Mr. Rigsby's claim that the USPS, and therefore he, was free to award the work to be performed under the WOs to an alternate contractor, he fails to point to a single regulatory or contractual basis for this statement.

Likewise, the statements in paragraph 11 *et seq.* of the Rigsby declaration are contrary to Mr. Battaglin's First Affidavit paragraphs 13 through 16, and LP's PFUF Nos. 14 through 17; as well as Mr. Battaglin's Second Affidavit (*see*, *e.g.*, LP App. 268 *et seq.* at ¶¶ 11-30). First, Mr. Rigsby "hedges his bets" by stating that LP performed site visits and submitted WOs, either "upon its own initiative or at the request of the USPS." App. 979 at ¶ 11;

---

[6] Mr. Rigsby's convenient explanation that "I retired in March 1999, and much time has passed since the events at issue, most of which relates to the 1995 to 1997 timeframe. . . .I do need to see the relevant documents, . . . ." (App. 996, Rigsby Decl. at ¶31) fails to take into account the fact that this action was filed in 1998 and LP should not be prejudiced by the repeated continuances/stays in this matter caused by the government.

*see also,* App. 995 ¶30 ("... Mr. Battaglin also would scope out work at USPS facilities, without being directed or requested to do so by the USPS."). Which is it? Was LP authorized or not? LP has directed the court to multiple places in the combined appendices where the *contemporaneous* record shows that these site visits occurred, with the USPS's/Rigsby's actual knowledge. Just as accurate is the fact that at *no time* during the course of these events did the USPS *ever* state that the twelve (to say nothing of the other numerous) WOs were unauthorized or not otherwise prepared at the behest of Mr. Rigsby or his subordinates. Even the June 4, 1997 letter (App. 437) which states that LP is not to perform unauthorized site visits, fails to identify that any site visits as of that date were unauthorized, merely that LP should not perform unauthorized visits. That very same letter identifies and acknowledges the USPS's and Mr. Rigsby's receipt of twenty-one (21) work orders from LP; yet nowhere does that letter state that a single one of those WOs was unauthorized. Likewise, Rigsby's Declaration fails to provide any specifics. Mr. Rigsby has not directed the Court to a single specific instance where a site visit was unauthorized, including the 12 WOs. LP maintains that it never performed site visits or submitted any WO on its own initiative. LP App. 269; Battag. 2nd Aff. at ¶ 15.

The same applies to Mr. Rigsby's unsupported allegation that "LP sometime submitted draft work orders/scopes of work, and the USPS did not issue a work order for that work. . . . " App. 980 at ¶ 11. Again, no specifics have been provided by Mr. Rigsby or the government to substantiate this blind claim.

Mr. Rigsby's declaration also contradicts the statements of his subordinates. For example, both Messrs. Southern and McNabb stated in their respective depositions that they were authorized by Mr. Rigsby to direct, *inter alia*, LP to perform site visits, and prepare and submit work orders. *See* Rebuttal to Defendant's Resposne to LP PFUF No. 54. Mr. McNabb

went so far as to state that he apparently had carte blanche to issue a work order, presumably without first obtaining Mr. Rigsby's explicit consent. *Id.* Not only does this contradict Mr. Rigsby's declaration (App. 982 at ¶ 12) (made over eight years after the events occurred), but actually supports LP's claims. This very testimony flies in the face of Mr. Rigsby's self-serving statement that "[p]roject manager had no actual authority and I did not ratify their actions with regard to giving direction to IQC contractors to make site visits for the purpose of preparing draft work orders/scopes of work." *Id.* at 982-983.

Other bizarre juxtapositions exist in Mr. Rigsby's declaration. For example, in one paragraph he states that his Project Managers lacked any authority to direct IQC contractors (*Id.*), yet his Declaration also states that "LP was requested to go and look at the facility with the USPS project manager, . . . ." *See e.g.*, App. 997, Rigsby Decl. at ¶ 33; *see also*, App. 999 ¶ 40.

Likewise, Mr. Rigsby's current position regarding LP's performance of work prior to issuance of a "formal" work order is that such work was at its own risk. App. at 978, Rigsby Decl. at ¶ 6. However, nowhere does Mr. Rigsby provide any contractual or regulatory basis for this statement.

Such convenient and wholly unsubstantiated statements provide no relief for the government. LP maintains that the government has failed to refute virtually every material fact provided by LP, each of which is supported by the record (much of which was provided to the court by the government's appendices). This includes Mr. Rigsby's admissions that "[i]t was the practice of the USPS not to request or direct that two IQC contractors scope out the same project at a facility, . . . ." (App. 998, Rigsby Decl. at ¶ 37) and "[a]s I stated, if we requested an IQC contractor to make a site visit, 'it's fair to assume that there's an interest in having work done at that site.'" *Id.* at ¶ 38. While the government's proffer of the Rigsby Declaration raises a

number of material issues of fact concerning the bases for the government's Motion for Summary Judgment (thus preventing its being granted), LP is simultaneously entitled to summary judgment.

### C. Declaration of John Buchholz[7]

LP notes first and foremost, that literally no specifics are provided in Buchholz's declaration, including a wholesale failure to identify how many work orders Mr. Buchholz's company was awarded, performed for and rejected by USPS; no identification of when, who or where site visits were performed, and whether or not USPS project managers performed those site visits with whom. Additionally, with particular regard to this litigation, there is no discussion whatsoever of St. Louis Design's or Mr. Buchholz's participation in any such purported IQCs or work orders with any of the USPS personnel involved in the current litigation, including Mr. Rigsby. As such, one must question the relevance which Mr. Buchholz's testimony may have to the underlying case.

That notwithstanding, however, of critical note is the fact that virtually every "material" statement and representation made by Mr. Buchholz in his "declaration" runs directly contrary to Mr. Battaglin's First Affidavit. LP App. 1 *et seq.* This fact, coupled with St. Louis Design's position as a longtime direct competitor to LP, raises serious questions about Mr. Buchholz's bias.

Additionally, Mr. Buchholz also recognizes and supports Mr. Battaglin's position that it was also his ". . . expectation that St. Louis would receive the work . . ." when he made a site visit and prepared his "proposed pricing sheet" or as LP calls it its work order. App. at 1021 at ¶ 5).

---

[7] With regard to the declaration of John Buchholtz, LP directs the Court's attention to its Motion to Strike said declaration that is incorporated herein by reference.

**D. Declaration of Paul Steiner.**

Mr. Steiner's Declaration (App. 1025-1027), with rare exception, offers little substantive information or testimony in support of the USPS's defense and Motion. First, he admits to making site visits with various IQC contractors, including LP. App. 1025 at ¶ 2. He admits that he does not recall many specifics regarding these site visits, including when and where they took place. App. 1026 at ¶ 3. "I do not recall receiving the documents at pages 654-660" is not the same as an affirmative statement that he did not receive those documents. Likewise, he recalls making a site visit with Mr. Battaglin to Hoopeston and East Lynn, but has no recollection of site visits to Union Hill, Aroma Park, Papineau or Bradley. *Id.* at ¶ 4-5. Again, he states that he does not recall such site visits, but he does not affirmatively state that these site visits did not happen. Simply stated, given the time that has passed, Mr. Steiner merely that he does not recall these site visits.

Finally, Mr. Steiner's declaration lacks any real substance excepting one statement in which he purportedly recalls informing Mr. Battaglin that "there was no guarantee that LP would get the work that we were scoping. . . ." App. 1025 at ¶ 2. This statement lacks any specifics as to when it was made and in what context. Also, it runs directly contrary to Mr. Battaglin's repeated testimony and statements, including his 2nd Affidavit. LP App. 267 at ¶ 6.

Contrary to Mr. Steiner's vague recollections, Mr. Battaglin has specific recollection of these visits, as he testified to in his deposition and his first affidavit in support of LP PFUF No. 26 and the documents referenced therein. At the very least, there are issues of material fact associated with these site visits and the affiliated WOs, precluding the granting of the USPS's Motion for Summary Judgment. LP believes, however, that the factual and documentary evidence which it has provided on the record establishes that these site visits occurred, that LP

prepared the subject WOs, and that, as a result, those implied-in-fact contracts came into existence. Therefore, LP is entitled to summary judgment.

**E. Declaration of Samuel W. Southern**

A similar "failing" exists with Mr. Southern's Declaration. App. 1033-1037. First, he admits to making site visits with various IQC contracts, including LP, then he questions LP's scopes of work, while simultaneously lacking any recollections of the majority of these site visits or what activities occurred during those visits. Also, Mr. Southern's declaration, upon which the government so heavily relies, lacks any real specifics.

Mr. Southern's allegations that he would actively estimate quantities on each proposed project "together" with LP is likewise surprising. During his deposition, Mr. Southern testified that he lacked specific recollection of "how the work orders were handled," (LP App. 434; Southern Depo. at ¶ 20), many of the site visits, or for that matter, even seeing WOs for, *inter alia*, Momence, Beaverville, Papineau, Aroma Park, Bradley and Union Hill. LP App. 436 *et seq.*, Southern Depo. at ¶¶ 61, 65, 66-67, 68-69, 84, 89-90. He also did not truly participate in the scoping and take-offs of these WOs. Instead, he would at most show up at a given facility and participate with Mr. Battaglin in a generic discussion of what general areas of work or physical areas LP should review at a given facility. LP App. 268; Battag. 2nd Depo. at ¶ 7.

Likewise, Mr. Southern relies heavily upon his diary with regard to the site visits to, *inter alia*, St. Anne, Momence, Paxton, and other facilities. Those pages appear to correspond with Mr. Battaglin's testimony and LP's PFUF No. 25 (and the documents referenced therein). Similarly, with regard to Momence, Mr. Southern reiterates his deposition testimony in which he discusses his inability to recall when the Momence site visit with Mr. Battaglin took place. App.

1035 at ¶ 5. Mr. Southern's declaration does not deny that this site visit occurred, just that Mr. Southern cannot recall when it happened.[8]

Without waiving the Motion to Strike associated with Mr. Southern's "field notes," the purported contradictory items discussed in paragraphs seven and eight of Mr. Southern's declaration at the very most raise issues of material fact which preclude granting of the Government's Motion for Summary Judgment. Notwithstanding those purported inconsistencies, the WOs which LP prepared and submitted to the USPS are the documents prepared and submitted by LP, which are the subject of this litigation. What "field notes" Mr. Southern may have kept are irrelevant.

Mr. Southern's Declaration provides little, if any, specifics. With particular regard to his field notes, Mr. Southern's declaration is wholly lacking in authenticating or providing the foundation necessary for admission of these items. Nowhere does Mr. Southern's Declaration state that they were prepared while at the site visit, the date/time they were prepared, and why they were not produced or provided to the USPS and not in the USPS files. These "field notes" are specious at best.

At best, Mr. Southern's Declaration appears to comport with LP's claims that LP was directed to perform site visits and submit work orders at the direction of USPS. Likewise, Mr. Southern's Declaration appears to support LP's claim (and Mr. Southern's deposition testimony)

---

[8] With regard to Mr. Southern's "original documents," LP notes that at no time prior to its receipt of Mr. Southern's declaration as part of the USPS's supplemental appendix, were these documents ever produced to LP. This is further exacerbated by the fact that Mr. Southern apparently "kept these original field notes in [his] personal file" (App. 1025 at ¶ 6) but did not produce them in response to the subpoena *duces tecum* which LP served him. As a result, LP has filed a motion to strike these documents, Mr. Southern's statements regarding those documents (App. 1035-36 ¶¶ 7 and 8) and the government's statements relating to same. This failure to produce appears to be an ongoing habit, as no less than one week ago, Plaintiff's counsel received yet further materials from Government's counsel for documents suddenly found by Mr. Southern.

that he was authorized by Mr. Rigsby to direct LP to perform site visits, as well as prepare and submit work orders. LP PFUF No. 54.

Lastly, Mr. Southern's Declaration is contrary to Mr. Battaglin's testimony, that Southern and/or Rigsby directed LP to perform site visits under the 94 IQC, with the understanding that the resulting work orders would be awarded under the follow-on 1996 IQCs, if the 94 IQC's term expired. LP App. 3; Battag. Depo. at ¶ 10. Again, at best, this raises a question of material fact, precluding the government's right to summary judgment.

## IV. CONCLUSION

Based upon the foregoing, Defendant has failed to meet its burden of proof and the government is not entitled to summary judgment. LP has, however, carried its burden of proof and its cross-motion for summary judgment should be being granted.

WHEREFORE, Plaintiff L.P. Consulting Group, Inc., hereby moves the Court to deny Defendant, United States Postal Service's Motion for Summary Judgment and grant Plaintiff's Cross-Motion for Summary Judgment; and that the Court grant such other and further relief as it deems just and proper.

Respectfully submitted,

Dated: April 25, 2005

By: /s/ Brian Cohen
Brian Cohen
BELL, BOYD & LLOYD PLLC
1615 L Street, N.W., Suite 1200
Washington, DC 20036
(202) 955-6836 tel.
(202) 835-4117 fax.
Attorney of Record for Plaintiff
LP Consulting Group, Inc.

Of Counsel:
Lawrence M. Prosen, Esq.
BELL, BOYD & LLOYD PLLC
1615 L Street, N.W., Suite 1200
Washington, DC 20036

(202) 955-6830 tel.
(202) 835-4127 fax

**Certificate of Service**

I hereby certify that on this 25th day of April 2005, a copy of the foregoing "Plaintiff's Reply to Defendant's Opposition to Plaintiff's Cross-Motion for Summary Judgment" was electronically filed. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

s/ Brian Cohen