**No. 98-868C**
**(Judge Allegra)**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**L.P. CONSULTING GROUP, INC.**

**Plaintiff,**

**v.**

**THE UNITED STATES**

**Defendant.**

**PLAINTIFF'S SUPPLEMENTAL APPENDIX OF EXHIBITS IN REPLY TO DEFENDANT'S OPPOSITION TO LP'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S RESPONSES TO PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

April 25, 2005

Brian Cohen, Esq.
BELL, BOYD & LLOYD PLLC
1615 L Street, N.W., Suite 1200
Washington, DC 20036
(202) 955-6836 tel.
(202) 835-4117 fax.
Attorney of Record for Plaintiff
L.P. Consulting Group, Inc. Intervenor

Of Counsel:

Lawrence M. Prosen, Esq.
BELL, BOYD & LLOYD PLLC
1615 L Street, N.W., Suite 1200
Washington, DC 20036
(202) 955-6830 tel.
(202) 835-4127 fax.

# Table of Contents of Appendix

**Document Title** **Page No.**

General
1. Second Affidavit of Richard A. Battaglin....................266
2. Excerpts from Procurement Manual....................277
3. IQC Unit Price Schedule....................295

USPS Office of Inspector General Documents
4. October 6, 1998 Memorandum of Interview of Betty Chears....................398
5. September 4, 1997 Memorandum of Interview of Dennis Manescalchi....................401
6. USPS FMS Win Computer Printout....................404

Deposition Excerpts
7. Excerpts from the Deposition of Richard A. Battaglin....................411
8. Excerpts from the Deposition of Terri Jacobsen....................416
9. Excerpts from the Deposition of Larry Linnenburger....................422
10. Excerpts from the Deposition of Samuel W. Southern....................429

# SECOND AFFIDAVIT OF RICHARD A. BATTAGLIN

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **L.P. CONSULTING GROUP, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 98-868C** |
| | ) | **(Judge Allegra)** |
| **THE UNITED STATES** | ) | |
| | ) | |
| **Defendant.** | ) | |

## SECOND AFFIDAVIT OF RICHARD A. BATTAGLIN

I, Richard A. Battaglin, under penalty of perjury, do hereby state that the following statements are true and correct to the best of my knowledge and belief:

1. I am at least 18 years of age and possess first-hand, direct knowledge regarding the averments, facts and statements set forth herein.

2. I continue to maintain that the statements and averments set forth in my first affidavit (LP App. 1-12) [1]are true and correct.

## I. USPS Declarations

3. I have had the opportunity to review the declarations of Ms. Terri Jacobsen, Messrs. Robert Rigsby, Samuel Southern, Paul Steiner and John Buchholz, and in addition to the statements in my first affidavit, state in response, as follows:

### A. Declaration of Terry Jacobsen

4. As she admits in paragraph 5 of her declaration (App. 691), the government apparently ordered more than $1 million of work under LP's IQC 162640-94-B-0083, thus exceeding the limits set forth therein. This contract was administered by Ms. Jacobsen and Mr. Robert Rigsby. Despite the government's statement that it "performed all functions pursuant to

---

[1] All references to "App." refer to the documents contained in the Government's Appendix. All references to "LP App. ___" refer to LP Consulting Group's Appendix.

the applicable procurement regulations/purchasing manual," Ms. Jacobsen admits that this did not happen (given the government's failure to increase LP's 94 IQC contract amount and/or bond requirements). This further evidences that Ms. Jacobsen, as the umbrella IQC Contracting Officer, failed to monitor this contract.

**B. Declaration of Steiner**

5. I concur with Mr. Steiner's statements in his declaration that "I made site visits with contractors which had indefinite quantity contracts (IQCs), including L.P. Consulting Group, Inc. (LP)." App. 1025 at ¶ 2. I also agree that he made site visits with me "for the purpose of scoping out work that might be done at the site." What Mr. Steiner fails to acknowledge or recall is that LP routinely made multiple site visits with USPS Project Managers, sometimes including overnight stays, and he totally fails to mention that. Additionally, while he does not recall making site visits to Union Hill Post Office, Aroma Park Post Office, Papineau Post Office or Bradley Post Office, as my first affidavit states at Paragraph 27 (LP App. 27), not only do I specifically recall making those site visits, but I reaffirm that the documents in LP App. 18-19 and LP App. 29 are true and accurate. More particularly, the notes set forth on LP App. 29 were prepared by me at the advice of counsel while this information was still fresh in my mind and are accurate based upon my recollection of the various site visits (including both the site visit time frame and with whom I visited). I also reaffirm that the chart in my prior affidavit at Paragraph 26 (LP App. 6-7, LP Aff. at 25) is true and accurate.

6. Despite Mr. Steiner's lack of recalling site visits made with me to Union Hill, Aroma Park, Papineau and Bradley, I specifically recall those site visits and am prepared to testify as to the events leading up to and surrounding said site visits. I likewise have no recollection of Mr. Steiner's telling me that there was no guarantee that LP would get the work it was scoping.

**C. Southern Declaration**

7. Despite Mr. Southern's admission that he performed site visits with LP Consulting Group (App. 1033 at ¶ 3), I dispute that on every one of those occasions Mr. Southern truly worked together with me to estimate such quantities. On most of the occasions, including the ones in which Mr. Southern performed site visits with me which are the subject of the current litigation, Mr. Southern would spend, at most, 30 to 45 minutes of his time generally discussing the types and areas of work with which he was concerned. Instead, it was I, on LP's behalf, who took several hours of time to perform detailed site surveys, field surveys and take-offs.

8. Prior to submission of the government's supplemental appendix, I had never before seen the documents referenced in Mr. Southern's declaration at Paragraphs 6, 7 and 8 and identified as government App. 1047-1056.

9. The documents upon which Mr. Southern cites to at App. 584-97 are documents which I prepared in the field contemporaneous with, and immediately following, my site visits to St. Anne.

**D. Buchholz Declaration**

10. I have reviewed Mr. Buchholz's declaration. I am not privy to and cannot respond to any of the allegations set forth therein. I can, however, state unequivocally that his belief of what my understanding was with regard to the underlying lawsuit and how the USPS was to administer and enforce its IQC contracts with L.P. Consulting Group runs directly contrary to my understanding and experience.

**E. Rigsby Declaration**

11. In further support of LP PFUF No. 2 and rebuttal to Defendant's response, for the record I am not a licensed architect or engineer and I have never represented myself as such.

The title "architect/engineer" was a job title given to me by the USPS as a description of my general duties and obligations as set forth by the USPS.

12. Despite Mr. Rigsby's statements to the contrary in his Declaration at App. 978 ¶ 8, Messrs. Rigsby and Southern directed me to perform site visits at the various underlying facilities at the end of the 94-B-0083 IQC contract term. When I informed them that the term expiration was approaching, they informed me that I should do the site visits, submit the work orders, and any resulting work would be performed under the follow-on 96 IQCs.

13. I take exception to Mr. Rigsby's second declaration paragraph 11 (App. 979-82). I continue to aver and maintain that paragraphs 14 through 17 and the other related paragraphs of my affidavit, as well as LP PFUF Nos. 13-16 and other related paragraphs, are true and accurate recitations of the course of dealing which actually took place, not only on the 94 IQC, and the 1996 IQCs, but also on several other USPS IQCs which LP performed for the USPS.

14. While it is correct that "the IQCs provided that the USPS Contracting Officer would decide what work would be done at postal facilities . . ." (App. 979, Rigsby 2nd Decl. at ¶ 11) (emphasis added), this is not what actually occurred through the parties' course of dealing. Instead, I would be contacted either by Mr. Rigsby or his authorized subordinates to perform site visits, prepare the work orders and submit those work orders having determined what work was required for a given facility. On occasion, these work orders were prepared with the minor cooperation of a Project Manager on a given project, but for the most part -- at the USPS's directions -- I would be required to travel to the facility, perform detailed field surveys and measurements, and self-prepare the work orders.

15. With regard to the subject 12 work orders, each and every one was performed at the request of the USPS and not upon LP's own initiative as inferred by Mr. Rigsby in his Second Affidavit at Paragraph 11 (App. 979-80).

16. Additionally, it has always been my understanding that once a given project is determined by USPS to be performed by an IQC contractor, the "competition is over," and that IQC contractor is expected to develop work orders or perform that work. In fact, it has always been my understanding in IQC contracts, that if I am directed to perform take-offs or work under that contract and refuse to do so, then I can be held in default by the USPS.

17. Mr. Rigsby's admission that the USPS would receive work orders from LP and use them to develop a "formal work order," is accurate. App. 980, Rigsby 2nd Decl. at 5.

18. While Mr. Rigsby states "LP sometimes submitted draft work orders/scopes of work, and the USPS did not issue a work order for that work . . . ," I reaffirm my earlier statements that with the exception of the subject 12 work orders, the parties' course of dealing was clear; the government would direct LP to perform a field visit, prepare and submit a work order, and thereafter on every other occasion (save the two which Mr. McNabb prepared in-house for LaSalle and Princeton), LP would then be issued the "formal" work order.

19. With regard to the June 4, 1997 letter relied upon by Mr. Rigsby at page six of his Second Declaration (App. 981), which document is located at App. 437, I was never 100 percent clear on what "unauthorized visits" he was referring to. At no time prior to this June 4, 1997 date, had Mr. Rigsby informed me that any site visits I had performed at the direction of his subordinates were unauthorized. Nowhere in the June 4, 1997 letter (App. 437) does Mr. Rigsby identify a single project or visit which was performed by LP which were "unauthorized." This was the first time where the USPS or Mr. Rigsby took the position that LP had performed any unauthorized site visits.

20. With regard to Paragraph 13 of Mr. Rigsby's Second Declaration (App. 983), in which he alleges that LP was not supposed to negotiate with USPS postmasters, provide them the work orders or that I somehow got into arguments with postmasters, this is simply inaccurate.

21. Paragraph 14 of Mr. Rigsby's declaration (App. 983) again alleges that LP or I made unauthorized site visits to USPS facilities and submitted unsolicited work orders. Again, this is inaccurate, as it would be impossible for either LP or me to self-determine (1) what facilities needed work; (2) the type of work those facilities needed; or (3) whether the work constituted IQC, formally competed or other type of contract work. Mr. Rigsby has never provided a specific instance where such work orders were unsolicited or otherwise unauthorized. To the contrary, with particular reference to the 12 work orders which are the subject of this litigation, as admitted throughout Messrs. Steiner's and Southern's declarations, I performed site visits with those gentlemen and other USPS Project Managers on several occasions, including with Mr. McNabb and Ms. Lois Gunlogson. Mr. Rigsby himself admits "LP is allowed to make site visits and prepare draft work orders/scopes of work together with the USPS Project Manager." Therefore, LP's position continues to be that none of these site visits, and certainly none of the ones which are the subject of this litigation, was "unauthorized."

22. With regard to Mr. Rigsby's reliance upon my April 30, 1997 letter (LP App. 28), which he discusses at Paragraph 14 of his Second Declaration (App. 984), the sole reason I requested that LP be added to Mr. Fernandez's solicitation bid list was the fact that LP and I were relegated to the fact that the USPS was apparently not going to allow us to perform the work which we spec-ed out and for which implied-in-fact contracts were formed under the subject facilities. As such, without waiving any of LP's rights for recovery under this litigation, LP sought to minimize its damages and attempted to get involved in the formally let solicitations for those subject projects.

23. With regard to Paragraph 21 of Mr. Rigsby's Second Declaration (App. 991), the basis for my assertion that Mr. Rigsby had "hand-picked" contractors which could be included on the various projects was based upon my plain reading of Mr. Fernandez's August 13, 1996

letter (App. 395-96), in which he verifies ". . . the list of General Contractors whom you [Mr. Rigsby] instructed me [Mr. Fernandez] to contact regarding the above-mentioned projects. . . ." I continue to believe that these contractors were "hand-picked" by Mr. Rigsby.

24. With regard to Paragraph 23 of Mr. Rigsby's Second Declaration (App. 992), I stand by the statements in my first affidavit at Paragraphs 33-34 (LP App. 8) and Plaintiff's PFUF Nos. 32 and 33 in lieu of fully reiterating the statements set forth therein. I also note that my recollection of the discussions surrounding the Hoopeston Ramp in which Mr. Rigsby alleges that he informed me that LP's bid was too late and that I stated "I know, I just wanted you to have it anyway," are inaccurate. Instead, it uses my contemporaneous understanding that Mr. Rigsby was providing LP with an actual opportunity to submit a price/bid on this solicitation, with the hopes of obtaining yet further competition. This did not come to pass.

25. With regard to Mr. Rigsby's Second Declaration Paragraph 30, I reiterate my statement above in response to Rigsby Paragraphs 11 and 12 as if fully set forth herein regarding LP's alleged "unauthorized" site visits and work order submission.

26. With regard to Paragraph 32 of Mr. Rigsby's Second Declaration, I take issue with Mr. Rigsby's statement that some of the work orders from LP were not requested by USPS. More particularly, he does not identify which work orders were purportedly not requested, or if any of those work orders are among the 12 WOs involved in the current litigation. It is my and LP's continuing position that the 12 subject WOs were all performed at the direction of USPS authorized personnel.

27. Despite Mr. Rigsby's statements in Paragraph 33 of his Second Declaration that LP's PFUF Nos. 45-46 are not "wholly correct," respectfully it is apparent that he does not recall the actual events as they occurred in this matter. LP was requested to perform site visits often but not always with USPS Project Managers in attendance. Occasionally, a Project Manager

would assist in estimating quantities, however, for the lion's share of the work orders involved in the 94 IQC and the 1996 IQCs, as well as the 12 subject work orders, LP performed the vast majority of the work by itself and self-prepared the various work orders for each of the projects. On several occasions, despite Mr. Rigsby's apparent belief to the contrary, the actual events that occurred were LP was to perform a detailed survey of the facility and suggest not only actual deficiencies but also other areas that would possibly require improvement.

28. Responding to Mr. Rigsby's Paragraph 36 of his Second Declaration, I incorporate the paragraphs 14 and 18 above, as if fully set forth herein.

29. Responding to Paragraph 37 of Mr. Rigsby's Second Declaration, it has always been my understanding that "it was against USPS policy to send two IQC contractors to the same project. "*See also*, LP App. 200; Rigsby Depo. at 26:24.

30. As Mr. Rigsby admits in Paragraph 43 of his Second Declaration (App. 1000), "it was not the USPS's practice to compete IQC work in the sense that the USPS would not request or direct two IQC contractors to scope out the same project at a facility."

## II. <u>Rebuttal of Defendant's Responses to LP's PFUFs.</u>

31. Neither LP nor I have ever represented that I am a licensed architect or engineer.

32. I was directed, on LP's behalf, by Mr. Rigsby's Project Managers to perform the site visits and submit the subject twelve WOs, including Messrs. Southern, McNabb and Steiner. On each occasion that LP/I performed a site visit and prepared and submitted a WO, LP was expressly directed by USPS personnel (the Project Managers and/or Mr. Rigsby) to perform the site visit and submit a work order.

33. I was required to perform and determine each of the work items to be done under each of the subject work orders. This was not a generic review of a project, but, to the contrary, I was required by the USPS to determine each and every one of the work items out of the hundreds

of line items provided by USPS in the IQCs that were necessary for each of the projects in question.

34. I disagree with, and refute, any allegation that LP or I made unauthorized site visits to postal facilities, notwithstanding the statements set forth in App. 437, 981. Every site visit associated with the WOs was made at the direction, and with the knowledge, of USPS authorized personnel.

35. As for Goodwine and Claytonville, the parties mutually agreed to cancel those two work orders. With regard to the remaining projects cited by defendant as being issued after this time period, these represent either work orders which LP had prepared and submitted prior to that time or were merely modifications to pre-existing work orders, not "new" work orders.

36. At no time did either Messrs. Steiner, Rigsby or Southern tell me that there was never any guarantee that LP would receive a work order on the subject IQCs.

37. The USPS's procedure was as follows: (1) USPS postmasters initiated the work request through Rigsby's office with a grocery list of repairs; (2) sometimes USPS project managers mediated the requests with LP to see what could or should be included. At no time did LP dictate to postmasters what work would be accomplished in their facility.

38. Based upon my experience and knowledge as both a USPS contract employee and private contractor involved in USPS IQC contracts it is my understanding that once the IQC vehicle was determined to be used by the USPS in its sole discretion, the competition was over. The IQC contractor was to receive that specific work.

39. The site visits and the documentation in support thereof as referenced in PFUF No. 26 are contemporaneous, true and accurate.

40. I met with Mr. Rigsby on numerous occasions to discuss, among other things, LP's exclusion from further USPS work under these IQCs or contracts which were competitively

let separately. Mr. Rigsby informed me that Mr. Fernandez was going to handle all of the solicitations and the underlying projects. While hindsight reveals that this did not come to pass, as Fernandez did not wind up performing all 12 solicitations at the time of these events, Mr. Rigsby also informed me at that time that this was the method the USPS had elected to use.

41. On LP's behalf, both LP's president and I repeatedly attempted to discuss LP's concerns regarding its summary exclusion from potential competitive procurements and LP's not receiving any more IQC work, including contacting Mr. Rigsby, Ms. Jacobsen and their superiors.

42. LP provided Bruce Rothermel with a statement of work, which included a detailed field site survey. Neither LP nor I were aware of USPS's intention to formally compete this project, and LP was not provided with a solicitation for Berwick.

43. Regarding Hoopeston, despite numerous requests for information, LP was never informed at the time that bid prices were requested by Mr. Fernandez from Mr. Rigsby's designated contractors.

44. The government misconstrues the Downer's Grove matter. The original dock enclosure was intended to be constructed with a wood frame, for which LP provided a sketch and statement of work (at USPS's direction). After Mr. Fernandez produced design drawings the framework changed from wood to steel. As a result of this change, resulting in material cost changes, LP withdrew the claim for the first wood-framed request. Based on the architect's drawings provided to LP, LP's second WO was handled through Mr. McNabb and constitutes the basis of this portion of the complaint.

45. LP denies that it contemporaneously knew why its Hoopeston bid was not accepted by Mr. Rigsby. As a direct result of Mr. Rigsby's actions by awarding LP the Paxton project, LP requested and received the Hoopeston drawings, based upon the reasonable

assumption that LP could also be awarded Hoopeston. Like Paxton, LP provided a sketch and work order for Hoopeston.

46. Mr. Rigsby was not attendant at virtually any of the site visits in question.

47. On the vast majority of occasions, the Project Manager would typically spend 30-40 minutes on-site and have LP perform virtually all aspects of quantity take-offs and determinations as to what line items were required to be performed. With respect to the government's claim to the contrary, LP was not directed only to look at certain specified items, but many times, including the 12 projects, was required to perform generic field surveys including not only the items that may have been directed but also other related items which may be impacted and/or otherwise affected by such work items.

48. For the most part Mr. Southern and/or Mr. McNabb would show up on the project site on occasion and provide general instructions as to what areas/trades of work would be performed (i.e., drywall, paint, tile, concrete, demolition). I would then often be left alone to perform the field surveys, take field measurements, prepare scopes of work, and prepare, as applicable, construction sketches/diagrams.

FURTHER AFFIANT SAYETH NOT.

I Declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on April 25, 2005, by Richard A. Battaglin

SUBSCRIBED AND SWORN TO BEFORE ME, A NOTARY PUBLIC FOR THE STATE OF ILLINOIS, COUNTY OF Cook, THIS 25th DAY OF APRIL, 2005.

Notary Public

Print Name: Ilene W Iglarsh

My Commission Expires: April 6, 2008

"OFFICIAL SEAL"
ILENE W IGLARSH
Notary Public State of Illinois
My Commission Expires April 6, 2008

# EXCERPTS FROM USPS PROCUREMENT MANUAL (PUBLICATION 41)

UNITED STATES POSTAL SERVICE®



# Publication 41, USPS Procument Manual - Archive

(obsolete)

Appendix F Index to Pub 41

Transmittal Letter
Summary of Changes

Chapter 1 Authority, Responsibility, and Policy
Chapter 2 Procurement Planning
Chapter 3 Sources
Chapter 4 Purchasing Methods
Chapter 5 Contract Pricing
Chapter 6 Contract Administration
Chapter 7 Bonds, Insurance, and Taxes
Chapter 8 Special Categories of Contracts
Chapter 9 Patents and Data Rights
Chapter 10 Socioeconomic Policies
Chapter 11 Facilities and Related Services
Chapter 12 Mail Transportation
Appendix A Solicitations
Appendix B Contract Clauses
Appendix C Forms and Formats
Appendix D Rules of Practice in Proceedings Relative to Debarment and Suspension from Contracting
Appendix E Rules of Practice Before the Postal Service Board of Contract Appeals

# Chapter 2
# Procurement Planning


| | | |
|---|---|---|
| **Section 1** | **Policy** | 41 |
| | 2.1.1 General | 41 |
| | 2.1.1.a Definition | 41 |
| | 2.1.1.b Responsibilities | 41 |
| | 2.1.1.c Benefits | 41 |
| | 2.1.2 Market Research | 42 |
| | 2.1.2.a Importance | 42 |
| | 2.1.2.b Methods | 42 |
| | 2.1.3 Advance Planning | 42 |
| | 2.1.4 Annual Procurement Summary Plans | 43 |
| | 2.1.5 Individual Procurement Plans | 43 |
| | 2.1.6 Implementation Plans | 44 |
| | 2.1.7 Source Selection Plans | 44 |
| | 2.1.7.a General | 44 |
| | 2.1.7.b Evaluation Panels | 44 |
| | 2.1.7.c Evaluation Factors | 45 |
| | 2.1.7.d Decisional Logic | 46 |
| **Section 2** | **Planning Considerations** | 46 |
| | 2.2.1 Quality Requirements | 46 |
| | 2.2.1.a General | 46 |
| | 2.2.1.b Types of Quality Assurance Requirements | 47 |
| | 2.2.1.c Quality Assurance at Origin | 47 |
| | 2.2.1.d Quality Assurance at Destination | 48 |
| | 2.2.1.e Simplified Purchasing | 48 |
| | 2.2.2 First Article Approval | 48 |
| | 2.2.2.a Definitions | 48 |
| | 2.2.2.b General | 48 |
| | 2.2.2.c Waiver | 49 |
| | 2.2.2.d Solicitation and Contract Requirements | 49 |
| | 2.2.3 Acceptance | 49 |
| | 2.2.3.a Place of Acceptance | 49 |
| | 2.2.3.b Delayed Acceptance | 50 |
| | 2.2.4 Warranties | 50 |
| | 2.2.5 Delivery or Performance Schedule | 52 |
| | 2.2.6 Liquidated Damages | 53 |
| | 2.2.7 Postal Service Property | 54 |
| | 2.2.7.a Policy | 54 |
| | 2.2.7.b Solicitations | 54 |
| | 2.2.7.c Special Tooling and Test Equipment | 54 |
| | 2.2.7.d Clauses | 55 |
| | 2.2.8 Options | 56 |
| | 2.2.9 Multiyear Procurement | 57 |
| | 2.2.10 Value Engineering | 58 |
| | 2.2.10.a General | 58 |


000279

2.2.10.b Definitions ..... 58
2.2.10.c Sharing ..... 58
2.2.10.d Noncompetitive Purchases ..... 59
2.2.10.e Evaluation ..... 59
2.2.10.f Withdrawal ..... 59
2.2.10.g Acceptance ..... 60
2.2.10.h Subcontracts ..... 60
2.2.10.i Clause ..... 60

**Section 3 Specifications and Statements of Work** ..... 60
2.3.1 Definitions ..... 60
2.3.1.a Specifications ..... 60
2.3.1.b Statements of Work ..... 60
2.3.1.c Product Descriptions ..... 60
2.3.2 Use ..... 61
2.3.2.a Specifications ..... 61
2.3.2.b Statements of Work ..... 61
2.3.2.c Product Descriptions ..... 61
2.3.3 Technical Data Packages ..... 61
2.3.4 Component Parts ..... 62
2.3.5 Construction Specifications ..... 62

000280

# Chapter 2 Procurement Planning

## SECTION 1 POLICY

### 2.1.1 General

2.1.1.a *Definition.* Procurement planning is the process by which the efforts of the requirements and purchasing organizations are coordinated and integrated in a comprehensive plan to fulfill needs of the Postal Service in a timely manner and at a reasonable cost.

2.1.1.b *Responsibilities*

1. Requirements organization responsibilities include:
   (a) Determining the supply or service required;
   (b) Identifying potential sources;
   (c) Ensuring funds availability and authorization;
   (d) Preparing and providing adequate purchase descriptions;
   (e) Preparing the Postal Service price or cost estimate;
   (f) Defining the period of performance or delivery;
   (g) Establishing any contractor reporting requirements;
   (h) Assisting in the development of evaluation criteria, and
   (i) Participating in evaluation panels when requested;
   (j) Providing justification for noncompetitive purchases.
2. Purchasing organization responsibilities include:
   (a) Providing planning, advice and assistance;
   (b) Consulting with assigned counsel as needed;
   (c) Assisting the requirements organization in identifying new or competitive sources;
   (d) Maintaining source lists;
   (e) Preparing source selection plans;
   (f) Establishing evaluation panels as needed;
   (g) Determining appropriate contract type; and
   (h) Identifying suitable purchases for competition among minority-owned and woman-owned businesses.

2.1.1.c *Benefits.* Among the benefits of procurement planning are:

1. Allowing better workload planning;
2. Consolidating requirements for greater economy;
3. Providing lead time to select customer-responsive contract types or to develop innovative contracting methods;

000281

2.2.10.g *Acceptance*

1. Acceptance of all or part of a VECP and agreement on price reductions resulting from acceptance requires the agreement of both parties. See 4.4 concerning negotiation of price. Acceptance is accomplished by supplemental agreement to the contract. If agreement on price is reserved for a later supplemental agreement, and if such agreement cannot be reached, the disagreement must be treated as a dispute under Clause B-9, *Claims and Disputes.*
2. The contractor must perform in accordance with the existing contract until a VECP is accepted.
3. The contracting officer's decision to accept or reject all or part of a VECP is final and not subject to Clause B-9, or to litigation under the Contract Disputes Act of 1978 (41 U.S.C. 601–613).

2.2.10.h *Subcontracts.* If the contracting officer foresees a potential cost reduction through value engineering under subcontracts, additional paragraph j should be added to Clause 2-22.

2.2.10.i *Clause.* If there is a potential for cost reduction through value engineering, Clause 2-22 may be included in firm-fixed-price contracts of $100,000 or more, at any time during the term of the contract. However, the clause may not be used in:

1. Cost-reimbursement contracts (see 5.1.4);
2. Fixed-price incentive contracts (see 5.1.3.b);
3. Research and development contracts;
4. Contracts with nonprofit or educational organizations;
5. Contracts for professional or consultant services (see 8.2);
6. Contracts for product or component improvement; or
7. Contracts for standard or modified commercial products.

# Section 3 Specifications and Statements of Work

## 2.3.1 Definitions

2.3.1.a *Specifications.* Specifications describe the technical requirements of an end product. Specifications usually include qualitative and quantitative design and performance requirements, and the factors used to determine whether the contract requirements have been met.

2.3.1.b *Statements of Work.* Statements of Work (SOW) describe the work to be performed, rather than the end product. SOWs may contain specifications or other descriptions of requirements. SOWs are usually used in contracts for services or research and development.

2.3.1.c *Product Descriptions.* Product descriptions are usually described by a common generic description of the item. However, they are not as qualitative or quantitative as a specification, and usually describe the end product in terms of performance or standard commercial name (an example of a product description is a "copier").

## 2.3.2 Use

2.3.2.a *Specifications*

1. Specifications are normally used when purchasing an end item rather than a service. Specifications must fully and completely state the Postal Service's needs, considering the nature of the commodities being purchased.
2. Specifications may be stated in terms of:
   (a) Function, so that a variety of commodities may be considered as qualified;
   (b) Performance, including the range of acceptable characteristics or the minimum acceptable standards; or
   (c) Design requirements, providing exact dimensions, materials or characteristics.

2.3.2.b *Statements of Work*

1. Statements of Work are normally used when purchasing a service rather than an end product. SOWs may include specifications or product descriptions. SOWs must describe the work as precisely as practicable and at a level of detail appropriate to ensure best value to the Postal Service.
2. After award SOWs are the standard for measuring performance, and are used by both parties to determine rights and obligations under the contract.

2.3.2.c *Product Descriptions*

1. Whenever standard or modified commercial products will meet Postal Service requirements, product descriptions must be used instead of specifications.
2. Product descriptions must include:
   (a) A common generic identification of the item;
   (b) Known acceptable brand-name products, identified by model or catalog number, and the commercial catalogs in which they appear;
   (c) The name and address of the manufacturer, or distributor of each brand-name product referenced; and
   (d) A description of any required modification.
3. If at least three acceptable brand names are specified, the solicitation may provide that only proposals for those products will be considered.
4. Except for construction specifications, if fewer than three acceptable brand-name products are specified, or if proposals for equivalent products other than those specified will be considered:
   (a) The product description must include a description of the item's essential characteristics, such as material, size or capacity, the equipment with which the items will be used, and any restrictive operating environmental conditions;
   (b) The brand names in the product description must be followed by the words "or equal;"
   (c) Space must be provided for offerors to identify the manufacturer's brand names and models or catalog numbers proposed (see A.2.3.b.8);
   (d) The solicitation must include Provision 2-4, *Brand Name or Equal.*

## 2.3.3 Technical Data Packages

2.3.3.a A Technical Data Package (TDP) is a complete set of documentation which may include a specification, engineering drawings, or associated lists required to build

and provide support of an end item. Every TDP is under the control of a design-responsible organization (such as Engineering, Research and Development or the Mail Equipment Shops) which maintains the integrity of the end item design.

2.3.3.b When a purchase will be made using a TDP, the contracting officer must ensure that the most current version of the TDP is used. Any modifications to a TDP before or during solicitation or after contract award must, before implementation, be coordinated with the design-responsible organization as well as with the requirements activity.

2.3.3.c When a TDP will be purchased, the contracting officer must ensure that the design-responsible organization reviews all contractor submittals to ensure that the final product is in accordance with the Postal Service standards contained in the contract requirements.

## 2.3.4 Component Parts

When component parts in a deliverable contract line item are described in the specifications by a brand or manufacturer's name, the contract must include Clause 2-21, *Component Parts*.

## 2.3.5 Construction Specifications

The contractor may seek the contracting officer's approval after contract award to substitute equal products or processes for those specified by brand name (see Clause 11-5, *Materials and Workmanship*). Accordingly, the solicitation should identify any products or processes that may not be substituted after award.

000284

# Chapter 5
# Contract Pricing


**Section 1 Types of Contracts** ........ 117
5.1.1 General ........ 117
5.1.2 Selection of Contract Type ........ 117
5.1.3 Fixed Price Contracts ........ 118
5.1.3.a Firm-Fixed-Price Contract ........ 118
5.1.3.b Fixed-Price Incentive Contract ........ 118
5.1.3.c Fixed-Price Contract with Economic Price Adjustment ........ 119
5.1.3.d Clauses ........ 120
5.1.4 Cost-Reimbursement Contracts ........ 120
5.1.4.a General ........ 120
5.1.4.b Limitations ........ 121
5.1.4.c Cost Contract ........ 121
5.1.4.d Cost-Sharing Contract ........ 121
5.1.4.e Cost-Plus-Incentive-Fee Contract ........ 121
5.1.4.f Cost-Plus-Fixed-Fee Contract ........ 121
5.1.4.g Clauses ........ 122
5.1.5 Indefinite-Delivery Contracts ........ 122
5.1.5.a General ........ 122
5.1.5.b Ordering ........ 122
5.1.5.c Definite-Quantity Contract ........ 123
5.1.5.d Indefinite-Quantity Contract ........ 123
5.1.5.e Requirements Contract ........ 123
5.1.5.f Clauses ........ 123
5.1.6 Time-and-Materials and Labor-Hour Contracts ........ 124
5.1.6.a Time-and-Materials Contract ........ 124
5.1.6.b Labor-Hour Contract ........ 125
5.1.6.c Clause ........ 125
5.1.7 Letter Contracts ........ 125
5.1.7.a Description ........ 125
5.1.7.b Application ........ 125
5.1.7.c Limitations ........ 125
5.1.7.d Clauses ........ 126
5.1.8 Ordering Agreements ........ 126
5.1.8.a General ........ 126
5.1.8.b Limitations ........ 126
5.1.8.c Content of Agreement ........ 126
5.1.8.d Ordering ........ 127
5.1.8.e Pricing ........ 127
5.1.9 Task Order Contracts ........ 127
5.1.10 Multiyear Contracts ........ 127
5.1.10.a Requirements ........ 127
5.1.10.b Definite-Quantity ........ 128


000286

Section 2 **Cost Principles** ........ 128
5.2.1 General ........ 128
5.2.2 Contract Cost ........ 128
5.2.2.a Composition of Total Cost ........ 128
5.2.2.b Direct Costs ........ 128
5.2.2.c Indirect Costs ........ 129
5.2.2.d Credits ........ 129
5.2.3 Cost Allowability ........ 129
5.2.3.a Determining Allowability ........ 129
5.2.3.b Reasonableness ........ 129
5.2.3.c Allocability ........ 129
5.2.4 Advance Agreements ........ 129
5.2.5 Unallowable Costs ........ 130
5.2.5.a Categories of Unallowable Costs ........ 130
5.2.5.b Exclusion of Unallowable Costs ........ 133
5.2.6 Termination Costs ........ 133
5.2.6.a General ........ 133
5.2.6.b Common Items ........ 133
5.2.6.c Costs Continuing After Termination ........ 133
5.2.6.d Start-Up Costs ........ 134
5.2.6.e Loss of Useful Value ........ 134
5.2.6.f Rental Under Unexpired Leases ........ 134
5.2.6.g Alterations of Leased Property ........ 134
5.2.6.h Settlement Expenses ........ 134
5.2.6.i Subcontractor Claims ........ 134
5.2.7 Construction and Architect-Engineer Contracts ........ 135
5.2.8 Facilities Contracts ........ 136
5.2.9 Educational Institutions ........ 137
5.2.10 Nonprofit Organizations ........ 137
5.2.11 State, Local, and Indian Tribal Governments ........ 137
5.2.12 Indirect Cost Rates ........ 137
5.2.12.a General ........ 137
5.2.12.b Definitions ........ 137
5.2.12.c Billing Rates ........ 138
5.2.12.d Determination Procedure ........ 138
5.2.12.e Educational Institutions ........ 138
5.2.12.f Nonprofit Organizations ........ 139
5.2.12.g State, Local, and Indian Tribal Governments ........ 139
5.2.12.h Cost-Sharing Rates ........ 139
5.2.12.i Ceilings on Indirect Cost Rates ........ 139

Section 3 **Price Evaluation** ........ 139
5.3.1 General ........ 139
5.3.2 Definitions ........ 140
5.3.3 Proposal Analysis ........ 140
5.3.3.a Contracting Officer's Responsibility ........ 140
5.3.3.b Price Analysis ........ 141
5.3.3.c Adequate Price Competition ........ 141
5.3.3.d Cost Analysis ........ 142
5.3.3.e Technical Analysis ........ 143
5.3.3.f Cost or Pricing Data ........ 143
5.3.3.g Profit ........ 143

000287

5.3.3.h Defective Cost or Pricing Data .................................... 144
5.3.3.i Clauses .................................................... 145

000288

# Chapter 5 Contract Pricing

## Section 1 Types of Contracts

### 5.1.1 General

5.1.1.a The negotiation of contract type and price are closely related and must be considered together with the issues of risk, uncertainty, and responsibility for costs.

5.1.1.b The type of contract used should reflect the cost risk and responsibility assumed by the contractor. Full cost responsibility is assumed under a firm-fixed-price contract, while there is minimal cost responsibility under a cost-reimbursement contract. The profit or fee arrangement should also reflect the cost responsibility assumed.

5.1.1.c Any type of contract described in this section may be used, as appropriate to the procurement. When in the Postal Service's interest, the contracting officer may decide to use a type of contract not described in this section, subject to the approval of the manager of Headquarters Purchasing, Field Customer Support, Major Facilities Purchasing, or National Mail Transportation Purchasing.

5.1.1.d When a contract type other than firm-fixed-price is used, the contract file must include adequate documentation to support the choice.

### 5.1.2 Selection of Contract Type

5.1.2.a The contracting officer is responsible for negotiating the least costly contract type appropriate to the circumstances of the procurement.

5.1.2.b Although contract type is a matter for negotiation, competitive purchasing procedures require that the solicitation specify a particular type of contract (permitting alternatives, if appropriate) in order to provide a basis for comparing proposals. Provision 5-1, *Type of Contract*, must be included in all solicitations. Clause B-3, *Contract Type*, must be included in all contracts awarded without the issuance of a written solicitation. A cost-plus-a-percentage-of-cost contract may not be used.

5.1.2.c A firm-fixed-price contract is generally preferred because it makes the contractor fully responsible for cost control and minimizes the need for Postal Service monitoring of performance. But if no reasonable basis for firm pricing exists, requiring a firm-fixed-price contract may reduce competition and lead to higher prices because of allowances for contingencies added to protect contractors from perceived risks. Whenever the probable cost of contract performance cannot be realistically estimated, a firm-fixed-price contract should not be used.

3. *Completion or Level-of-Effort Form.* A cost-plus-fixed-fee contract must be in one of two basic forms — the completion form or the level-of-effort form.

   (a) *Completion Form.* The completion form describes the scope of work by stating a definite goal or target and specifying an end product. This form of contract normally requires the contractor to complete and deliver the specified end product within the estimated cost, if possible, as a condition for payment of the entire fixed fee. If the work cannot be completed within the estimated cost, the Postal Service may require more effort without increase in fee, but the estimated cost must be increased.

   (b) *Level-of-Effort Form.* The level-of-effort form describes the scope of work in general terms and obligates the contractor to devote a specified level of effort for a stated time period. Under this form, if performance is satisfactory, the fixed fee is payable at the expiration of the agreed upon period, upon contractor certification that the level of effort specified in the contract has been expended in performing the contract work. Renewal for further periods of performance requires new cost and fee arrangements, and is treated as a new purchase.

   (c) *Preference.* Because of the greater obligation assumed by the contractor, the completion form is preferred over the level-of-effort form whenever the work can be defined well enough to permit a reasonable cost estimate within which the contractor can be expected to complete the work.

5.1.4.g *Clauses*

1. All cost-reimbursement contracts must include the following clauses:

   (a) Clause 5-4, *Allowable Cost and Payment.*

   (b) Either Clause 5-5, *Limitation of Cost,* (if the contract is fully funded) or Clause 5-6, *Limitation of Funds,* (if the contract is incrementally funded).

2. Cost contracts must include Clause 5-7, *Cost Contract — No Fee.*

3. Cost-sharing contracts must include Clause 5-8, *Cost-Sharing Contract — No Fee.*

4. Cost-plus-incentive-fee contracts must include Clause 5-9, *Incentive Fee.*

5. Cost-plus-fixed-fee contracts must include Clause 5-10, *Fixed Fee.*

## 5.1.5 Indefinite-Delivery Contracts

5.1.5.a *General.* An indefinite-delivery contract may be used when it is known or anticipated that there will be requirements for supplies or services over a period of time, but quantities, times, or places of deliveries are not known at the time of contract award. The contracts establish firm fixed prices, with orders to be placed directly by using activities or by specified purchasing offices with deliveries made directly to using activities.

5.1.5.b *Ordering.* The period for placing orders and the activities authorized to place orders must be identified in the contract Schedule. Ordinarily, orders should be placed in writing or by written communication; when necessary, oral orders may be made if they are promptly confirmed in writing. Orders must contain:

1. Date of order, contract number, and order number;
2. Item number and description, and unit price;

000290

3. Place and date of delivery or performance;
4. Packaging, packing, and shipping instructions, if any;
5. Accounting and fiscal data; and
6. Any other pertinent information.

5.1.5.c *Definite-Quantity Contract.* A definite-quantity contract provides for a definite quantity of specific supplies or services during the contract period, with deliveries to designated locations when ordered.

5.1.5.d *Indefinite-Quantity Contract.* An indefinite-quantity contract provides for an indefinite quantity of specific supplies or services, within stated minimum and maximum limits, to be delivered during the contract period to designated locations when ordered. It is for use when precise requirements for supplies or services during the contract period, above known minimum requirements, cannot be determined before contract award.

1. The contract must require the Postal Service to order, and the contractor to deliver, at least a stated minimum quantity of supplies or services as ordered during the contract period, and requires the contractor to deliver any additional quantities ordered, not to exceed a stated maximum.
2. The minimum quantity must not exceed known requirements, and the maximum quantity must be realistic. The contract may specify minimum or maximum quantities for individual delivery orders, and a maximum that may be ordered during a specified time.

5.1.5.e *Requirements Contract.* A requirements contract provides for filling all actual purchase requirements of designated activities for specific supplies and services to be delivered as ordered during the contract period. It is for use when recurring requirements are anticipated during the contract period, but precise quantities that designated activities will need cannot be determined before contract award. it may also be used to obtain supplies and services that may be required in excess of the quantities that the activities themselves can furnish within their own capabilities.

1. The solicitation and contract must state an estimated total quantity, and, if feasible, the maximum limit of the contractor's obligation to deliver and the Postal Service's obligation to order. The total quantity estimate must be as realistic as possible, based on records of previous requirements and current information. The contract may specify minimum or maximum quantities for individual delivery orders, and a maximum that may be ordered during a specified time.
2. When a requirements contract is for repair, modification, or overhaul of items of Postal Service property, the solicitation must state that failure of the Postal Service to furnish such items in the amounts described as "estimated" or "maximum" will not entitle the contractor to any price adjustment under the *Postal Service Property* clause of the contract.

5.1.5.f *Clauses*

1. All indefinite-delivery contracts must include the following clauses:
   (a) Clause 5-11, *Ordering.*
   (b) Clause 5-12, *Delivery-Order Limitations.*
2. All definite-quantity contracts must include Clause 5-13, *Definite Quantity.*
3. All indefinite-quantity contracts must include Clause 5-14, *Indefinite-Quantity.*

000291

2. Describe the method for determining prices to be paid to the contractor for the supplies or services;
3. Include delivery terms and conditions or specify how they will be determined;
4. List the activities authorized to issue orders under the agreement;
5. Specify the point at which each order becomes a binding contract (for example, issuance of the order, acceptance of the order in a specified manner, or failure to reject the order within a specified number of days);
6. Provide that failure to reach agreement on price on any one order issued before its price is established (see paragraph e below) is a dispute under Clause B-9, *Claims and Disputes* included in the ordering agreement; and
7. Contain the clauses prescribed for the type of contract represented by the orders to be placed. (For clauses prescribed according to contract dollar amount, the aggregate value of orders expected to be placed must be estimated.)

5.1.8.d *Ordering.* A contracting officer representing any activity listed in an ordering agreement may issue orders for supplies or services covered by that agreement. Except for orders under mandatory ordering agreements (see 3.1.4.b), competition must be obtained before placing an order, unless precluded by compelling urgency or other good reason in the Postal Service's interest. Competition may be by oral or written solicitation among firms holding ordering agreements for the same supplies or services, or on the open market. If an order is placed without obtaining competition, the file must be documented to show the reason.

5.1.8.e *Pricing.* The contracting officer may not authorize the contractor to begin work on an order under an ordering agreement until prices have been established, unless urgency precludes advance pricing and the order establishes a ceiling price limiting the Postal Service's obligation. Pricing must be accomplished as soon as possible after issuance of an unpriced order.

## 5.1.9 Task Order Contracts

Task order contracts are suitable for use when purchasing services that can only be described in general terms at the time of contract award, and must be ordered as specific requirements develop or can be defined. The contract describes the scope of the services to be provided, contains appropriate terms and conditions, and provides for the placement of task orders by the contracting officer. The contract must be for a specified period and must state the maximum liability of the Postal Service. Each task order describes and establishes a price for the task to be performed. If the price cannot be negotiated before issuance of the task order, the task order must have a ceiling price limiting the Postal Service's obligation.

## 5.1.10 Multiyear Contracts

When a multiyear contract is appropriate (see 2.2.9), any authorized type of contract may be used, but one of the following will be suitable for most situations:

5.1.10.a *Requirements.* A multiyear requirements contract commits the Postal Service to purchase all of its requirements for the specified supplies or services from the

allocated must exclude the same and similar costs claimed directly or indirectly as settlement expenses.

## 5.2.7 Construction and Architect-Engineer Contracts

5.2.7.a The cost principles of this section apply to contracts for construction (including alteration or repair) of buildings and other kinds of real property, and to architects-engineer contracts related to construction, except as provided in this part 5.2.7.

5.2.7.b Because of widely varying factors such as the nature, size, duration, and location of construction projects, advance agreements (see 5.2.4) for such items as home office overhead, partner's compensation, employment of consultants, and equipment use costs are particularly important in construction and architect-engineer contracts.

5.2.7.c Allowable ownership and operating costs of construction equipment must be determined as follows:

1. Actual cost data must be used when they can be determined for both ownership and operating costs from the contractor's accounting records. When such costs cannot be determined, the contract may specify the use of a schedule of predetermined rates to determine ownership and operating costs of construction equipment, such as the *Construction Ownership and Operating Expense Schedule* published by the U.S. Army Corps of Engineers.
2. Predetermined schedules of construction equipment use rates provide average ownership and operating rates for construction equipment. The allowance for ownership costs should include the cost of depreciation and may include costs facilities capital cost of money. The allowance for operating costs may include costs for such items as fuel, filters, oil, and grease; servicing, repairs, and maintenance; and tire wear and repair. Costs of labor, mobilization, demobilization, overhead, and profit are generally not reflected in schedules, and separate consideration may be necessary.
3. When a schedule of predetermined use rates for construction equipment is used to determine direct costs, all costs of equipment that are included in the cost allowances provided by the schedule must be identified and eliminated from the contractor's other direct and indirect costs charged to the contract. If the contractor's accounting system provides for site or home office overhead allocations, all costs included in the equipment allowances may need to be included in any cost input base before computing the contractor's overhead rate. In periods of work suspension pursuant to a contract clause, the allowance for equipment ownership may not exceed an amount for standby cost as determined by the schedule or contract provision.

5.2.7.d Reasonable costs of renting construction equipment are allowable as follows:

1. Minor repair and maintenance costs incident to operating such rented equipment not included in the rental rate are allowable.
2. Costs incident to major repair and overhaul of rental equipment are unallowable.
3. Charges for construction equipment rented from any division, subsidiary, or organization under common control are allowable if such rental is the contractor's established practice, and if no part of such costs duplicates any other allowed cost.

000293

5.2.7.e Costs incurred at the job site incident to performing the work, such as the cost of superintendence, timekeeping and clerical work, engineering, utility costs, supplies, material handling, and restoration and cleanup are allowable as direct or indirect costs. provided the accounting practice used is in accordance with the contractor's established and consistently followed cost accounting practices for all work.

5.2.7.f Rental and other costs, less any applicable credits, incurred in acquiring the temporary use of land, structures, and facilities are allowable. Costs, less any applicable credits, incurred in constructing or fabricating structures and facilities of a temporary nature are allowable.

## 5.2.8 Facilities Contracts

5.2.8.a The cost principles of this section apply to facilities contracts (under which Postal Service facilities are provided to a contractor or subcontractor for use in performing one or more related contracts for supplies or services), except as provided in this part 5.2.8.

5.2.8.b Advance agreements (see 5.2.4) should be made between the contractor and the contracting officer as to indirect cost items to be applied to the facilities purchase. When necessary to produce an equitable result, the contractor's usual method allocating indirect cost may be varied and appropriate adjustment may be made to the pool of indirect cost and the bases of their distribution.

5.2.8.c Indirect manufacturing and plant overhead costs primarily incurred or generated by reason of direct labor or maintenance labor operations are not allocable to the purchase of existing facilities.

5.2.8.d Contracts providing for the installation of new facilities or the rehabilitation of existing facilities may involve the use of the contractor's plant maintenance labor, as distinguished from direct labor engaged in the production of the company's normal products. In such instances, only those types of indirect manufacturing and plant operating costs related to or incurred by reason of the expenditures of the classes of labor needed for the performance of the facilities work may be allocated to the facilities contract. Thus, a facilities contract involving the use of plant maintenance labor only would not be subject to an allocation of such cost items as direct productive labor supervision, depreciation, and maintenance expense applicable to productive machinery and equipment, or raw material and finished goods storage costs.

5.2.8.e When a facilities contract calls for the construction, production, or rehabilitation of equipment or other items involved in the regular course of the contractor's business by the use of the contractor's direct labor and manufacturing processes, the indirect costs normally allocated to all that work may be allocated to the facilities contract.

5.2.8.f If facilities constituting the contractor's usual commercial products (or only minor modifications thereof) are acquired by the Postal Service under the contract, the Postal Service must not pay more than the contractor's most-favored-customer price or the price of other suppliers for like quantities of the same or substantially the same items, whichever is lower.

000294