No. 98-868C
(Judge Allegra)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

L.P. CONSULTING GROUP, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE DECLARATION OF JOHN BUCHHOLZ

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

KATHRYN A. BLEECKER
Assistant Director

DOMENIQUE KIRCHNER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street N.W.
Washington, D.C. 20530
Tele: (202) 307-0290
Fax: (202) 514-8624
Attorneys For Defendant

May 12, 2005

## TABLE OF CONTENTS


ARGUMENT .... 2

I. Mr. Buchholz's Declaration Is Relevant .... 2

II. LP Has Not Met The Criteria Of RCFC 12(f) .... 7

III. Mr. Buchholz's Declaration Is An "Opposing Affidavit" That Was Timely Under Rule 56 .... 8

IV. Mr. Buchholz's Declaration Is Not Precluded By RCFC 37(c) .... 13

CONCLUSION .... 19

## TABLE OF AUTHORITIES

### CASES

Baker v. United States,
127 F.3d 1081 (Fed. Cir. 1997) .......................... 3

Black v. Secretary of Health and Human Services,
93 F.3d 781 (Fed. Cir. 1996) ........................ 9, 10

Brubaker Amusement Co., Inc. v. United States,
304 F.3d 1349 (Fed. Cir. 2002) ......................... 10

FDIC v. Butcher,
660 F. Supp. 1274 (E.D. Tenn. 1987) ..................... 7

Globe Savings Bank v. United States,
61 Fed. Cl. 91 (2004) .................................. 12

Gutierrez v. AT&T Broadband,
382 F.3d 725 (7th Cir. 2004) ...................... 15, 16

Hauschild v. United States,
53 Fed. Cl. 134 (2002) ............................ 10, 11

Johnson Management Group CFC v. Martinez,
308 F.3d 1245 (Fed. Cir. 2002) .................... 16, 18

Kraft, Inc. v. United States,
85 F.3d 602 (Fed. Cir. 1996) ........................ 9, 10

Local Oklahoma Bank v. United States,
59 Fed. Cl. 713 (2004) ................................. 18

Markland v. Office of Personnel Management,
140 F.3d 1031 (Fed. Cir. 1998) ......................... 16

New American Shipbuilders, Inc. v. United States,
871 F.2d 1077 (Fed. Cir. 1989) ......................... 10

Patton v. Secretary of Health and Human Services,
25 F.3d 1021 (Fed. Cir. 1994) ....................... 9, 10

In re Safeguard Scientifics,
2004 WL 2644393 (E.D. Pa. 2004) ..................... 8, 12

Schmitt v. Beverly Health and Rehabilitation Services, Inc.,
993 F. Supp. 1354 (D. Ka. 1998) ..................... 8, 12

Tamko Roofing Products, Inc. v. Ideal Roofing Co.,
282 F.3d 23 (1st Cir. 2002) ............................ 3

Taylor v. St. Louis Southwestern Railway Co.,
746 F. Supp. 50 (D. Ka. 1990) .................... 7, 9, 12

Tritek Technologies, Inc. v. United States,
63 Fed. Cl. 740 (2005) ..................... 14, 15, 16, 17

United States v. Chance,
306 F.3d 356 (6th Cir. 2002) ........................... 3

Winfield Collection, Ltd. v. Sun Hill Industries, Inc.,
2002 WL 1009571 (E.D. Mich. 2002) ...................... 11

**STATUTES**

Fed.R.Civ.P. 26(e) ........................................ 11

Fed.R.Civ. Proc. 37(b)(2)(B) .................................. 8

Fed.R.Civ.Proc. 56 .................................... 9, 10

Fed.R.Civ.Proc. 56(f) ................................ 10, 11

Table Of Contents Of Appendix

Page

1. Declaration of John Buchholz............................1

2. Excerpt from Deposition of Robert Rigsby................7

3. Excerpt from Defendant's Response To LP's Proposed Findings Of Uncontroverted Fact.........................................9

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| L.P. CONSULTING GROUP, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 98-868C |
| THE UNITED STATES, | ) | (Judge Allegra) |
| Defendant. | ) | |

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE
DECLARATION OF JOHN BUCHHOLZ

Plaintiff LP Consulting Group, Inc. ("LP") has moved to strike the declaration of John Buchholz, the President and owner of St. Louis Design and Construction Inc., and all statements of defendant in reliance thereon citing Rules 37(c)(1) and 26(e)(1) of the Rules of the Court of Federal Claims ("RCFC"). LP argues that the Government was required to identify Mr. Buchholz in its preliminary witness list or in a supplement to its preliminary witness list, and that the Government's failure to do so was unjustified and prejudicial to LP. LP also argues that Mr. Buchholz's declaration should be struck because it is not relevant. As demonstrated below, the Court should deny LP's motion because Mr. Buchholz's testimony is relevant, the Government did not violate the discovery rules in submitting his declaration in opposition to LP's cross-motion for summary judgment, and LP is not prejudiced by our submission of the declaration. The Government respectfully requests oral argument on LP's motion.

ARGUMENT

I. Mr. Buchholz's Declaration Is Relevant

In its cross-motion for summary judgment, LP made, for the first time in this litigation, allegations about indefinite quantity contract ("IQC") contractors other than LP and completely surprised defendant. For example, in its Proposed Findings Of Undisputed Fact, LP asserted as follows:

> 47. The USPS through its authorized personnel would likewise regularly ask other IQC contractors, including St. Louis Design and Construction and Summers (sic) Construction, to also self-perform such tasks. LP App. 200, Rigsby Depo. at 26:15.

App. 13.[1] "Self-perform[ing] such tasks" refers to LP's making site visits and preparing draft work orders/scopes of work and providing them to the United States Postal Service ("USPS"). App. 13. Together with this allegation, LP made related assertions about the proper interpretation of the generic contract language that is contained in LP's IQC, as well as in the IQCs of other USPS contractors. For example, LP asserted as follows:

> 14. It has always been LP's and for that matter Battaglin's understanding and interpretation of both the two 1996 IQCs and their predecessor 1994 IQC contracts, that these contracts did not require LP to self-perform or otherwise develop scopes of work, pricing or work orders. LP App. 138, Battag. Depo. at 110:6. Instead, all of the language

1 "App." refers to the appendix to this brief.

> in the IQCs is couched in terms that the Government will develop and provide scopes of work to the contractor. LP App. 4, Battaglin Aff. ¶ 15.

App. 10. Before filing of its cross-motion, LP had not made any assertions about other IQC contractors, or the USPS's treatment of other IQC contractors. Before filing its cross-motion, LP also had not made any legal arguments about the generic language that is contained in USPS IQCs, as well as the IQCs of other USPS contractors.

LP's cross-motion first opened the door for factual testimony and argument upon these matters. Baker v. United States, 127 F.3d 1081, 1088 (Fed. Cir. 1997)(Government opened the door to testimony on the workings of the Selective Early Retirement Board when it offered the declarations); Tamko Roofing Products, Inc. v. Ideal Roofing Co., 282 F.3d 23, 40 (1st Cir. 2002); United States v. Chance, 306 F.3d 356, 385 (6th Cir. 2002) (where one party has "opened the door" on an issue, the opponent may introduce testimony on the same issue). In order to respond to LP's cross-motion, the Government first sought testimony from other IQC contractors. Defendant contacted John Buchholz of St. Louis Design and Construction, interviewed him, and he provided the declaration relied upon in our opposition to LP's cross-motion. Mr. Buchholz has provided testimony that is plainly relevant to LP's cross-motion. He stated:

3. As an IQC contractor for the USPS, I often made site visits to USPS facilities to scope out work with USPS Project Managers. At these site visits, the USPS Project Manager and I together would estimate quantities and consider what various items of work would be needed to accomplish a project. I would prepare a draft scope of work, which I call a proposed pricing sheet. I would prepare our proposed pricing sheets using our computer, which has all the various line items of work and prices for an IQC stored in its memory. Shortly after my site visit with the USPS Project Manager, I would provide our proposed pricing sheet to the USPS Project Manager. I have made such site visits with USPS Project Managers and have prepared proposed pricing sheets pursuant to our IQCs countless times, and it was routine for St. Louis Design to do so on its USPS IQCs. The vast majority of the time, I made the site visits and prepared the proposed pricing sheets for St. Louis Design myself, and, only occasionally, did I have an employee of St. Louis Design make such site visits with the USPS Project Managers. The site visits and preparation of the proposed pricing sheets with the USPS Project Manager are a cost of doing business with the USPS under its IQCs.

4. In order for St. Louis Design to receive work orders under its USPS IQCs, I would have to make these site visits and prepare proposed pricing sheets with the USPS Project Managers; the USPS and St. Louis Design would have to agree upon the quantities and the line items of work necessary for each project; the USPS contracting officer would forward to St. Louis Design a written USPS work order, which I would sign and return to the USPS, and the USPS contracting officer would sign the USPS work order beside my signature, making a work order contract for that individual project. Each USPS work order signed by both St. Louis Design and the USPS contracting officer was a contract for the line items of work contained in the work order. In addition, the USPS would inspect the work after it was completed and, if the quantities of a line item used in the project were less, the USPS would issue a modification in the form of a modified work order consistent with the quantities actually used in the project.

5. When I made a site visit and prepared a proposed pricing sheet with the USPS Project Manager under our IQCs, it was my expectation that St. Louis Design would receive the work if the USPS had the funds available and went forward with the project. However, I was never promised by any USPS official, including Mr. Rigsby and his Project Managers, that St. Louis Design would get the work if it made such site visits and prepared such proposed pricing sheets. I also understood that St. Louis Design was not entitled to the work because it had made the site visit and prepared a proposed pricing sheet for the USPS. In this respect, our IQCs contained the standard contract clause that provided as follows:

> The Postal Service reserves the right to undertake, by Postal Service sources or others, the same type of work or similar work as contracted for in this contract, in the area covered by this contract, while this contract is in force.

I understood that the USPS could use other sources for the same type of work in circumstances where St. Louis Design had made a site visit and prepared a proposed pricing sheet with the USPS Project Manager for the project. On infrequent occasions, St. Louis Design would make site visits and prepare proposed pricing sheets with the USPS Project Manager, but the USPS would not award St. Louis Design a signed USPS work order for the project.

6. Sometimes the work contained in a USPS work order, signed by St. Louis Design and the USPS, was only a portion of the work that I initially had scoped and included in my proposed pricing sheet. However, sometimes the scope of work had been increased in that the signed USPS work order contained more work than had contained in my proposed pricing sheet. My proposed pricing sheet was only a guide, and it did not determine what work the USPS would contract for in a signed work order contract.

App. 1-4. Prior to this, defendant did not have information from Mr. Buchholz regarding his understanding and expectations as an

IQC contractor.

Mr. Buchholz's testimony is relevant and pertinent to the Court's resolution of LP's cross-motion for summary judgment. Like LP, Mr. Buchholz's company, St. Louis Design and Construction, has had various IQCs with the USPS Central Illinois District. Buchholz ¶ 2. The specific IQC numbers and covered areas are stated in the attachment to Mr. Buchholz's declaration. App. 5-6. Like LP's IQCs, the IQCs that St. Louis Design and Construction possessed with the USPS contained the generic contract language providing:

> The Postal Service reserves the right to undertake, by Postal Service sources or others, the same type of work or similar work as contracted for in this contract, in the area covered by this contract, while this contract is in force.

Buchholz ¶ 5. There is nothing special about the contract language contained in LP's IQCs. Further, like LP's IQCs, the IQCs that St. Louis Design and Construction possessed with the USPS Central Illinois District were administered by USPS contracting officer Robert Rigsby from about 1993 until his retirement in 1999. Buchholz ¶ 2. Mr. Rigsby is the contracting officer whom LP claims allegedly made and breached its alleged implied contracts.

As noted, LP raised this issue by asserting that the process for issuing work orders under its IQCs was the same as the

process for issuing work orders to other USPS contractors under their IQCs. App. 13. Mr. Buchholz has personal knowledge and extensive familiarity with process for issuing IQC work orders. Buchholz ¶¶ 2-6. The Government should be permitted to respond to LP's argument by introducing the testimony of a IQC contractor who is not otherwise involved in this litigation.

II. LP Has Not Met The Criteria Of RCFC 12(f)

Although LP has moved to strike Mr. Buckholz's declaration and our references to it, LP has not demonstrated that the criteria of the governing rule, RCFC 12(f), are met by Mr. Buckholz's declaration, and has not even cited to RCFC 12(f). RCFC 12(f) governs motions to strike and provides "[upon motion made by a party before responding to a pleading...the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Motions to strike are within the discretion of the court. Taylor v. St. Louis Southwestern Railway Co., 746 F. Supp. 50, 53 (D. Ka. 1990); FDIC v. Butcher, 660 F. Supp. 1274, 1277 (E.D. Tenn. 1987). Here, there is nothing "redundant, immaterial, impertinent, or scandalous" about Mr. Buchholz's declaration, or our references to it. LP's motion to strike should therefore be denied.

## III. Mr. Buchholz's Declaration Is An "Opposing Affidavit" That Was Timely Under Rule 56

Mr. Buchholz's declaration was submitted by defendant in opposition to LP's cross-motion. It is an "opposing affidavit" or declaration governed by RCFC 56. Witnesses providing affidavits or declarations submitted in opposition to a summary judgment motion are not required to have been previously listed in an initial disclosure or a supplement to an initial disclosure under RCFC 26(a). For example, in In re Safeguard Scientifics, 2004 WL 2644393 (E.D. Pa. 2004), defendants moved to strike a declaration submitted by plaintiff in opposition to defendants' motion for summary judgment as untimely pursuant to Fed.R.Civ. Proc. 37(b)(2)(B). The district court held that the declaration was governed by "Rules 56(c) and 56(e), which establish that a party opposing a motion for summary judgment may serve opposing affidavits at any point prior to the date of the hearing." Id. Because the declaration was filed with plaintiff's opposition to the motion for summary judgment, the "opposing affidavit" was timely filed. Id.

Similarly, in Schmitt v. Beverly Health and Rehabilitation Services, Inc., 993 F. Supp. 1354, 1359 (D. Ka. 1998), Ms. Schmitt argued that the district court should not consider affidavits filed in support of defendant's summary judgment motion because defendant had not previously identified the

affiants in discovery or listed them as trial witnesses. The court rejected the argument because Rule 56(e) did not require that affiants be listed as witnesses or previously identified in discovery. Id.

In Taylor, 746 F. Supp. at 53, defendant presented affidavits in connection with its summary judgment motion, but had not previously identified the affiants in discovery. The court relied upon Rule 12(f) and Rule 56(e), which governs affidavits presented in connection with a summary judgment motion. The court rejected plaintiff's motion to strike the affidavits and emphasized that there was no "strict requirement that affiants used in connection with a motion must appear on a party's witness list," and "as a practical matter, witness lists tend to be modifiable." Id.

LP may argue that these Federal cases should not be relied upon because RCFC 56 does not contain the language that is found in Fed.R.Civ.Proc. 56, stating that "[t]he adverse party prior to the day of hearing may serve opposing affidavits." However, that argument is not persuasive. As the Federal Circuit has recognized, the rules of this Court are based upon the Federal Rules of Civil Procedure and are to be interpreted consistent with and based upon that case law. Kraft, Inc. v. United States, 85 F.3d 602, 604-05 (Fed. Cir. 1996); Black v. Secretary of Health and Human Services, 93 F.3d 781, 789 (Fed. Cir. 1996);

Patton v. Secretary of Health and Human Services, 25 F.3d 1021, 1025 n.4 (Fed. Cir. 1994). See also RCFC, Forward May 1, 2002 ("the court has endeavored to create a set of rules that conforms to the Federal Rules of Civil Procedure.... Consistent with this objective, interpretation of the court's rules will be guided by case law and the Advisory Committee Notes that accompany the Federal Rules of Civil Procedure."). Therefore, this Court should rely upon precedents construing Fed.R.Civ.Proc. 56 in resolving LP's motion. Kraft, Inc., 85 F.3d at 604-05; Black, 93 F.3d at 789; Patton, 25 F.3d at 1025 n.4.

Further, RCFC 56(f) and Fed.R.Civ.Proc. 56(f) both allow the Court to grant further discovery in the summary judgment context where a party files an affidavit stating "that it is unable to present by affidavit facts essential to justify the party's opposition." In such circumstances, the Court may "refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just." Id. See generally Brubaker Amusement Co., Inc. v. United States, 304 F.3d 1349, 1361 (Fed. Cir. 2002); New American Shipbuilders, Inc. v. United States, 871 F.2d 1077, 1081 (Fed. Cir. 1989). Accordingly, the Court has ample discretion to allow further discovery to enable a party to obtain information to support an opposition to a motion for summary judgment.

Indeed, the Court has held that RCFC 56(f) is the proper vehicle for opening discovery in response to affidavits of witnesses not previously identified in discovery which are filed with summary judgment motions. In Hauschild v. United States, 53 Fed. Cl. 134, 141 (2002), the Court was presented with cross-motions for summary judgment and plaintiff also moved, pursuant to RCFC 37(c)(1), to strike the declarations of Government witnesses because they had not been previously disclosed to plaintiff allegedly in violation of RCFC 26(a) and 26(e)(2). The Court held that the affidavits actually supported plaintiff's allegations and the failure to disclose the witnesses earlier was harmless, and further ruled that "RCFC 56(f) is the appropriate rule by which to open discovery on the contents of those affidavits." 53 Fed. Cl. at 141. Accord Winfield Collection, Ltd. v. Sun Hill Industries, Inc., 2002 WL 1009571 (E.D. Mich. 2002) (denying plaintiff's motion to strike, pursuant to Fed.R.Civ.P. 26(e)and 37(c)(1), declarations submitted with defendant's opposition to plaintiff's summary judgment motion and reopening discovery for the limited purpose of deposing the declarants; defendant's disclosure was timely since it was made in its response to plaintiff's summary judgment motion).

Here, the Government did not need to invoke RCFC 56(f) to obtain a deposition of Mr. Buchholz, however, because he cooperated in providing an interview and a declaration. RCFC 56

demonstrates that Mr. Buchholz's declaration was timely filed. LP's cross-motion first made assertions regarding other USPS IQC contractors and, absent Mr. Buchholz's cooperation, the Government, upon filing a RCFC 56(f) affidavit to obtain additional discovery, would have been entitled to a continuance to obtain such deposition testimony. Because Mr. Buchholz's declaration was an "opposing affidavit" submitted in opposition to LP's cross-motion, the Government was not required to have previously identified Mr. Buchholz during the discovery period, as LP argues. In re Safeguard Scientifics, 2004 WL 2644393; Schmitt, 993 F. Supp. at 1359; Taylor, 746 F. Supp. at 53.

Further, RCFC 26(a) and (e)(1) and 37(c)(1) must be construed consistently with Appendix A to this Court's rules. Appendix A - Post Discovery Procedures provides for a meeting of counsel and an exchange of a final list of witnesses no later than 63 days before the pretrial conference, and further provides: "Any witness whose identity has not been previously disclosed shall be subject to discovery." Appendix A, paragraph 13(b). These rules would be superfluous if, as LP argues, a party had to have previously identified all of its witnesses or suffer their preclusion or the striking of their affidavits. A final list of witnesses is not required until there is an exchange of final witness lists pursuant to Appendix A, paragraph 13(b), which has not yet occurred in this case. Further, in

Globe Savings Bank v. United States, 61 Fed. Cl. 91, 100-01 (2004), plaintiff argued that, under RCFC 37(c)(1), the Government should be precluded from calling certain witnesses at trial because they were not identified in a supplemental disclosure as required by RCFC 26(e)(1). The Court rejected that argument because, among other things, the witnesses were timely identified in a witness list submitted pursuant to RCFC Appendix A, paragraph 13(b), and plaintiff could depose them pursuant to that rule even though discovery had closed. Id.

IV. Mr. Buchholz's Declaration Is Not Precluded By RCFC 37(c)

LP's contends that (1) the Government failed to identify Mr. Buchholz in a supplemental disclosure at an "appropriate interval" as required by RCFC 26(e)(1),[2] and (2) Mr. Buchholz's

---

2 RCFC 26(e) Supplementation of Disclosures and Responses pertinently states as follows:

> A party who has made a disclosure under subdivision (a)...is under a duty to supplement or correct the disclosure or response to include information thereafter acquired ...in the following circumstances:
>
> > (1) A party is under a duty to supplement at appropriate intervals its disclosures under subdivision (a) if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing....
> > (2) A party is under a duty seasonably to amend a prior response to an interrogatory request for production, or request for admission if the party learns that the

declaration therefore must be struck because preclusion of his testimony is automatic under RCFC 37(c)(1).[3] LP Mot. 2.

LP asserts that the Federal Circuit does not appear to have fashioned a test for applying the exclusionary provisions of RCFC 26 and 37, citing Tritek Technologies, Inc. v. United States, 63 Fed. Cl. 740, 750 (2005). LP contends, however, that RCFC 37(c) automatically requires the exclusion of a witness unless the sanctioned party can show that its violation of RCFC 26 was either justified or harmless, citing Tritek. In that patent case, Tritek moved to preclude the Government from relying upon certain arguments that had not been identified in response to Triket's contention interrogatories, and the Court denied Triket's motion. The Government had failed to supplement its response to plaintiff's contention interrogatories; however, in a summary judgment motion, the Government had disclosed some of its

---

> response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

3 RCFC 37(c)(1) provides:

> A party without substantial justification fails to disclose information required by RCFC 26(a) or 26(e)(1), or to amend a prior response to discovery as required by RCFC 26(e)(2), is not, unless such failure is harmless permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

arguments "in writing." 63 Fed. Cl. at 745. The Court reasoned that (1) the contention interrogatories requested identification of the arguments sought to be precluded, (2) the Government was required to supplement its responses to those interrogatories by RCFC 26(e)(2) and failed to do so, and (3) the Government made some of the information (i.e. "non-infringement arguments 1 and 5") requested otherwise known to plaintiff "in writing" in its original summary judgment motion. 63 Fed. Cl. at 746-47. The Court held that the Government had not violated RCFC 26(e)(2) with regard to those arguments that were made known to Tritek "in writing," i.e. in its earlier summary judgment motion. Id. Other Government arguments were not otherwise made known to plaintiff "in writing," but the Court refused to strike them because it allowed plaintiff to amend its claim chart to address those matters. Id. at 753.

Tritek is not directly on point first because it involved a violation of RCFC 26(e)(2), which requires the supplementation of answers to interrogatories, production requests, and requests for admission, and no such violation is alleged by LP with regard to Mr. Buchholz's declaration. Further, in Tritek, the Court looked to Gutierrez v. AT&T Broadband, 382 F.3d 725 (7th Cir. 2004). There, the Seventh Circuit affirmed a grant of summary judgment, but did so without considering one of the affidavits submitted by defendant in support of the summary judgment motion, and held

that the district court should have reopened discovery to allow for that affiant's deposition. 382 F.3d at 734. Consequently, Gutierrez does not support an argument for preclusion of an affidavit that is submitted in support of motion for summary judgment. To the extent that the Tritek court interpreted Gutierrez as supporting a ruling striking or precluding an affidavit submitted in support of a summary judgment motion, it was error.

Further, in Johnson Management Group CFC v. Martinez, 308 F.3d 1245, 1251 (Fed. Cir. 2002), the Government produced material documents 10 days before a contract appeals board hearing and the board refused to exclude them because they were not previously produced in response to the contractor's discovery. The Federal Circuit held that the failure to strike the documents was not an abuse of discretion because the Government had not acted in bad faith and its actions had not resulted in "undue prejudice" because the contractor was given an opportunity to request additional time to examine and inspect the documents but did not do so. Id. Accord Markland v. Office of Personnel Management, 140 F.3d 1031, 1036 (Fed. Cir. 1998). Consequently, this Court has ample discretion in deciding discovery matters and is not required to automatically exclude or strike documents or affidavits because they were not previously disclosed.

Further, the Government did not violate RCFC 26(e)(1) with regard to Mr. Buchholz's declaration. RCFC 26(e)(1) requires supplementation "at appropriate intervals" "if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." RCFC 26(e)(1)(emphasis added). The Government's opposition to LP's cross-motion made the additional information involving Mr. Buchholz and his company, St. Louis Design and Construction, known to LP "in writing." Tritek held that information met the disclosure requirements of RCFC 26(e)(2), where it was made known to a party "in writing" in a summary judgment motion. 63 Fed. Cl. at 746-47.

Further, the Government first became aware of the pertinency of Mr. Buchholz's testimony when LP, in its cross-motion, made assertions regarding other USPS IQC contractors. See discussion above pp. 2-3. LP had elicited some limited testimony from Mr. Rigsby about other USPS IQC contractors in his deposition, but the materiality of that testimony was not apparent. App. 8 (Dep. 26). LP's cross-motion, with its assertions about site visits and the practice of developing work orders as it affected other IQC contractors, first made such matters pertinent. Consequently, the Government was not under any obligation to

supplement its disclosures by identifying Mr. Buchholz prior to receipt of LP's cross-motion. Accordingly, there also is "substantial justification" for the Government's not identifying Mr. Buchholz as a witness earlier in this litigation, because the development of IQC work orders by other USPS contractors was not pertinent until LP, in its cross-motion, first made assertions regarding other IQC contractors' site visits and development of draft work orders for the USPS. RCFC 37(c)(1).

In opposing LP's cross-motion, we have demonstrated that there are numerous disputed issues of material fact which preclude the entry of summary judgment in favor of LP. If the Government's motion for summary judgment also is denied, this case then must proceed to trial. LP's motion to strike therefore should be denied because LP cannot demonstrate "undue prejudice." Johnson Management Group, 306 F.3d at 1251. Accord Local Oklahoma Bank v. United States, 59 Fed. Cl. 713, 724 n.21 & n.25 (2004)(denying plaintiff's motion to strike an undisclosed Government document under RCFC 37(c) because genuine issues of material fact remained disputed). As noted above, both RCFC 56(f) and the Court's pretrial procedures give LP ample opportunity to obtain a deposition of Mr. Buchholz, if it wishes to do so. Appendix A, paragraph 13(b), explicitly provides: "Any witness whose identity has not been previously disclosed shall be subject to discovery." Consequently, LP has not

demonstrated "undue prejudice" as a result of the Government's failure to identify Mr. Buchholz at an earlier point in this proceeding. Absent LP's demonstration of "undue prejudice," its motion to strike Mr. Buchholz's declaration must be denied. Johnson Management Group, 308 F.3d at 1251 (a motion to preclude evidence must be denied where the movant has failed to demonstrate "undue prejudice").

CONCLUSION

For these reasons, the Court should deny LP's motion to strike Mr. Buchholz's declaration and defendant's reliance upon that declaration.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Kathryn A. Bleecker
KATHRYN A. BLEECKER
Assistant Director

s/Domenique Kirchner
DOMENIQUE KIRCHNER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street N.W.
Washington, D.C. 20530
Tele: (202) 307-0290
Fax: (202) 514-8624
Attorneys For Defendant

May 12, 2005

Table Of Contents Of Appendix

Page

1. Declaration of John Buchholz............................1

2. Excerpt from Deposition of Robert Rigsby................7

3. Excerpt from Defendant's Response To LP's Proposed Findings Of Uncontroverted Fact.........................................9

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| L.P. CONSULTING GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 98-868C |
| | ) | |
| THE UNITED STATES, | ) | (Judge Allegra) |
| | ) | |
| Defendant. | ) | |

DECLARATION OF JOHN BUCHHOLZ

I, John Buchholz, under penalty of perjury, do hereby state that the following statement is true and correct:

1. I have been the owner and president of St. Louis Design and Construction Inc. since 1974.

2. I am making this declaration with regard to the Indefinite Quantity Contracts ("IQCs") that St. Louis Design and Construction Inc. has had with the United States Postal Service ("USPS"). St. Louis Design has had IQCs with the USPS from 1982 to the present. Our IQCs have covered work in seven states, including Missouri, Illinois, and Indiana. Information from the USPS Financial Management System ("FMS") identifying some of our IQCs is attached to my declaration. Our IQCs included contract 162640-94-B-0084, for the North Central IL area, zip codes 604, 605, and 609. The IQCs that St. Louis Design has had with the USPS Central Illinois District were administered by USPS contracting officer Robert Rigsby from about 1993 until his retirement in 1999. Prior to that time, other USPS contracting officers administered our IQCs and, after Mr. Rigsby left the USPS, other USPS contracting officers administered our IQCs. I understand that my declaration will be filed with the Court in a lawsuit brought against the USPS by another IQC contractor, L.P. Consulting Group, Inc. and Mr. Battaglin.

3. As an IQC contractor for the USPS, I often made site visits to USPS facilities to scope out work with USPS Project Managers. At these site visits, the USPS Project Manager and I together would estimate quantities and consider what various items of work would be needed to accomplish a project. I would prepare a draft scope of work, which I call a proposed pricing sheet. I would prepare our proposed pricing sheets using our computer, which has all the various line items of work and prices for an IQC stored in its memory. Shortly after my site visit with the USPS Project Manager, I would provide our proposed pricing sheet to the USPS Project Manager. I have made such site visits with USPS Project Managers and have prepared proposed pricing sheets pursuant to our IQCs countless times, and it was routine for St. Louis Design to do so on its USPS IQCs. The vast majority of the time, I made the site visits and prepared the proposed pricing sheets for St. Louis Design myself, and, only occasionally, did I have an employee of St. Louis Design make such site visits with the USPS Project Managers. The site visits and preparation of the proposed pricing sheets with the USPS Project Manager are a cost of doing business with the USPS under its IQCs.

4. In order for St. Louis Design to receive work orders under its USPS IQCs, I would have to make these site visits and prepare proposed pricing sheets with the USPS Project Managers; the USPS and St. Louis Design would have to agree upon the quantities and the line items of work necessary for each project; the USPS contracting officer would forward to St. Louis Design a written USPS work order, which I would sign and return to the USPS, and the USPS contracting officer would sign the USPS work order beside my signature, making a work order contract for that individual project. Each USPS work order signed by both St. Louis Design and the USPS contracting officer was a contract for the line items of work contained in the work order. In addition, the USPS would

inspect the work after it was completed and, if the quantities of a line item used in the project were less, the USPS would issue a modification in the form of a modified work order consistent with the quantities actually used in the project.

5. When I made a site visit and prepared a proposed pricing sheet with the USPS Project Manager under our IQCs, it was my expectation that St. Louis Design would receive the work if the USPS had the funds available and went forward with the project. However, I was never promised by any USPS official, including Mr. Rigsby and his Project Managers, that St. Louis Design would get the work if it made such site visits and prepared such proposed pricing sheets. I also understood that St. Louis Design was not entitled to the work because it had made the site visit and prepared a proposed pricing sheet for the USPS. In this respect, our IQCs contained the standard contract clause that provided as follows:

> The Postal Service reserves the right to undertake, by Postal Service sources or others, the same type of work or similar work as contracted for in this contract, in the area covered by this contract, while this contract is in force.

I understood that the USPS could use other sources for the same type of work in circumstances where St. Louis Design had made a site visit and prepared a proposed pricing sheet with the USPS Project Manager for the project. On infrequent occasions, St. Louis Design would make site visits and prepare proposed pricing sheets with the USPS Project Manager, but the USPS would not award St. Louis Design a signed USPS work order for the project.

6. Sometimes the work contained in a USPS work order, signed by St. Louis Design and the USPS, was only a portion of the work that I initially had scoped and included in my proposed pricing

sheet. However, sometimes the scope of work had been increased in that the signed USPS work order contained more work than had contained in my proposed pricing sheet. My proposed pricing sheet was only a guide, and it did not determine what work the USPS would contract for in a signed work order contract.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on MARCH 15, 2005

President

John Buchholz

St Louis Design —

IQC's



List of Contracts

| Contract No. | Contractor | Contract Type | Covered Area | Status | Create Date | Creator |
|---|---|---|---|---|---|---|
| 162640-04-B-0094 | ST LOUIS DSG AND CONSTR | Prime Construction | Central IL - APC Site Prep | Expired | 07/16/2004 | TERI WILCOX-DUB |
| 162640-04-P-0091 | ST LOUIS DSG AND CONSTR | Prime Construction | Various Fac Eastern & No | Expired | 07/12/2004 | TERI WILCOX-DUB |
| 162640-04-P-0090 | ST LOUIS DSG AND CONSTR | Prime Construction | Various Fac. Western & S | Expired | 07/12/2004 | TERI WILCOX-DUB |
| 162640-04-P-0061 | ST LOUIS DSG AND CONSTR | Prime Construction | Central & Northern IN | Expired | 05/11/2004 | TERI WILCOX-DUB |
| 162640-04-B-0060 | ST LOUIS DSG AND CONSTR | Prime Construction | Central & Southern IN | Expired | 05/11/2004 | TERI WILCOX-DUB |
| 162640-03-B-0145 | ST LOUIS D&C | Prime Construction | Springfield; IL-Sprinkler | Expired | 09/12/2003 | TERI WILCOX-DUB |
| 162640-03-B-0073 | ST LOUIS DESIGN AND | IQ Construction | Greater IN District - NO IN | Active | 04/09/2003 | TERI WILCOX-DUB |
| 162640-03-B-0003 | ST LOUIS DSG AND CONSTR | IQ Construction | Central Illinois District | Active | 09/13/2002 | TERI WILCOX-DUB |
| 162640-02-B-0158 | ST LOUIS DSG AND CONSTR | IQ Construction | DUMMYTEST PROJECT ON | Expired | 09/13/2002 | TERI WILCOX-DUB |
| 162640-02-B-0019 | ST LOUIS DSG AND CONSTR | IQ Construction | Greater IN District - SO IN | Active | 10/05/2001 | TERI WILCOX-DUB |
| 162640-99-P-0229 | ST LOUIS DSG AND CONSTR | Prime Construction | Munster Br.-Hammond, IN | Expired | 08/17/1999 | TERI WILCOX-DUB |
| 162640-99-B-0060 | ST LOUIS DSG AND CONSTR | IQ Construction | State of IN-Grt Lks P&DC | Expired | | |
| 162640-99-B-0051 | ST LOUIS DSG AND CONSTR | IQ Construction | Central IL-Grt Lks P&DC | Expired | | |
| 162640-99-B-0042 | ST LOUIS DSG AND CONSTR | IQ Construction | Central IL Dist | Expired | | |
| 162640-98-B-0127 | ST LOUIS DSG AND CONSTR | IQ Construction | Southern IN 472; 474-475; | Expired | | |
| 162640-98-B-0119 | ST LOUIS DSG AND CONSTR | IQ Construction | Central IN 460-462; 473 | Expired | | |
| 162640-97-B-0231 | ST LOUIS DSG AND CONSTR | IQ Construction | Test Dummy | Expired | | |
| 162640-97-B-0065 | ST LOUIS DESIGN AND | IQ Construction | Central IL-Grt Lake | Expired | | |
| 162640-96-B-0102 | ST LOUIS DESIGN AND | IQ Construction | No. Central Illinois | Expired | | |
| 162640-96-B-0097 | ST LOUIS DESIGN AND | IQ Construction | Springfield, IL Area | Expired | | |

Terminal Services Connection - Microsoft Internet Explorer

File Edit View Favorites Tools Help

Back Search Favorites Media

Address http://aceportal/connect.asp Go

Search Companion

What are you looking for?

Type your question below. For best results, use complete sentences.

Please type your query here, then press <Enter>.

Sample question:

Look at classified ads

You may also want to...

Search this computer for files

Change preferences

Learn more about Search Companion

Search

File Edit Sub-System Tools Window Help

Help Exit Print Save Note

**List of Contracts**

Edit W/O's Add Find Estimate Close

| Contract No. | Contractor | Contract Type | Covered Area | Status | Create Date | Creator |
|---|---|---|---|---|---|---|
| 162640-03-B-0073 | ST LOUIS DESIGN AND | IQ Construction | Greater IN District - NO IN | Active | 04/09/2003 | TERI WILCOX-DUB( |
| 162640-03-B-0003 | ST LOUIS DSG AND CONSTR | IQ Construction | Central Illinois District | Active | 09/13/2002 | TERI WILCOX-DUB( |
| 162640-02-B-0158 | ST LOUIS DSG AND CONSTR | IQ Construction | DUMMYTEST PROJECT ON | Expired | 09/13/2002 | TERI WILCOX-DUB( |
| 162640-02-B-0019 | ST LOUIS DSG AND CONSTR | IQ Construction | Greater IN District - SO IN | Active | 10/05/2001 | TERI WILCOX-DUB( |
| 162640-99-P-0229 | ST LOUIS DSG AND CONSTR | Prime Construction | Munster Br.-Hammond, IN | Expired | 08/17/1999 | TERI WILCOX-DUB( |
| 162640-99-B-0060 | ST LOUIS DSG AND CONSTR | IQ Construction | State of IN-Grt Lks P&DC | Expired | | |
| 162640-99-B-0051 | ST LOUIS DSG AND CONSTR | IQ Construction | Central IL-Grt Lks P&DC | Expired | | |
| 162640-99-B-0042 | ST LOUIS DSG AND CONSTR | IQ Construction | Central IL Dist | Expired | | |
| 162640-98-B-0127 | ST LOUIS DSG AND CONSTR | IQ Construction | Southern IN 472; 474-475; | Expired | | |
| 162640-98-B-0119 | ST LOUIS DSG AND CONSTR | IQ Construction | Central IN 460-462; 473 | Expired | | |
| 162640-97-B-0231 | ST LOUIS DSG AND CONSTR | IQ Construction | Test Dummy | Expired | | |
| 162640-97-B-0065 | ST LOUIS DESIGN AND | IQ Construction | Central IL-Grt Lake | Expired | | |
| 162640-96-B-0102 | ST LOUIS DESIGN AND | IQ Construction | No. Central Illinois | Expired | | |
| 162640-96-B-0097 | ST LOUIS DESIGN AND | IQ Construction | Springfield, IL Area | Expired | | |
| 162640-96-B-0095 | ST LOUIS DESIGN AND | IQ Construction | Peoria, IL Area | Expired | | |
| 162640-95-P-0020 | ST LOUIS D&C | Prime Construction | | Expired | | |
| 162640-94-B-0084 | ST LOUIS DESIGN AND | IQ Construction | North Central IL | Expired | | |
| 162640-94-B-0067 | ST LOUIS DESIGN AND | IQ Construction | Springfield, IL | Expired | | |
| 162640-94-B-0065 | ST LOUIS DESIGN AND | IQ Construction | Peoria, IL | Expired | | |
| 162640-93-B-0066 | ST LOUIS TUCKPOINTING | Prime Construction | | Expired | | |

Done

Local intranet

Start Terminal Services Co...

Friday, Mar 11, 2005 01:48 PM

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

L.P. CONSULTING GROUP, INC., )
Plaintiff, )
vs. ) Case No.
THE UNITED STATES POSTAL ) 98-868 C
SERVICE, ) (Judge Allegra)
Defendant. )

The deposition of ROBERT A. RIGSBY, called for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions for the purpose of discovery, taken before Janet L. Robbins, CSR No. 84-2207, a Notary Public within and for the County of Cook, State of Illinois, and a Certified Shorthand Reporter of said state, at Suite 3300, Three First National Plaza, Chicago, Illinois, on the 9th day of June, A.D. 2004, at 2:24 p.m.

Page 2

PRESENT:
BELL, BOYD & LLOYD PLLC,
(1615 L Street, N.W., Suite 1200,
Washington, D.C. 20036-5610,
202-955-6830), by:
MR. LAWRENCE M. PROSEN,
appeared on behalf of the Plaintiff;
UNITED STATES DEPARTMENT OF JUSTICE,
CIVIL DIVISION-COMMERCIAL LITIGATION BRANCH,
(1100 L Street, N.W., 8th Floor,
Washington, D.C. 20530,
202-307-0290), by:
MS. DOMENIQUE KIRCHNER,
appeared on behalf of the Defendant
and the Deponent.

ALSO PRESENT:
MR. RICHARD BATTAGLIN,
L.P. Consulting Group, Inc.;
MR. STEPHEN LOBAUGH, In-House Counsel,
United States Postal Service.

REPORTED BY: JANET L. ROBBINS, CSR, RPR,
CERTIFICATE NO. 84-2207

Page 3

(WHEREUPON, the witness was duly sworn.)

ROBERT A. RIGSBY,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. Prosen:

Q. Please state your name and address for the record.
A. Robert A. Rigsby, 1655 East 91st Street, Chicago, 60617.
Q. Do you have a work address or phone number, as well?
A. Yes.
Q. Can you put that on the record, please, too?
A. It's the same address.
Q. Oh, it's the same address. I'm sorry.
Sir, my name is Lawrence Prosen, and I'm counsel to L.P. Consulting. I presume you know Mr. Battaglin?
A. Uh-huh.
Q. We're here regarding the claims that were submitted to you and then were appealed to the

Page 4

Court of Federal Appeals some years ago now, March 3rd and April 13th, 1998.
For ease of reference, there's a list in front of you there which is marked as Southern Exhibit 1. These are the 12 projects which are involved in the current litigation. Given the time, I thought it would be possibly a good tool to use. And we'll be making reference to that, and you can refresh your recollection using those, as well.
Excuse me just a second here.
Can you just give a brief background of your educational background?
A. Starting from when?
Q. Let's say high school on.
A. Okay. I'm a high school graduate. I'm also a post college graduate.
Q. What are your degrees in? You have an undergrad and graduate?
A. I have an undergrad degree in business, and I have a graduate degree in urban sociology.
Q. Where were your degrees obtained?
A. Governor State University.
Q. Which is?
A. Illinois.

postal service employee may be with him, but there was not a need to duplicate the work order generation portion of it.

So he would be allowed to do that in some cases, generate a scope of work upon request, when he was requested to do it. If you go out and do that, bring the scope of work back; and if it was agreed upon, then it would be signed and we would proceed. But the ultimate scope is produced by the postal service.

Q. You said the ultimate scope is what?

A. The ultimate scope of work is produced by the postal service. It can only be generated by the postal service. What he may be supplying to us is a proposal; in other words, this is what he thinks needs to be done. In a lot of cases, it's just repetitive work. We use the same color in every post office, which is white, the same kind of counter. When you walk up to a counter in one office, it's the same as it is in another, so you know what you've got to do.

Q. Kind of like a corporate image so --

A. Corporate image. We use the same kind of tile on the floor.



Q. -- every post office looks the same to a certain extent?

A. It's the same kind of tile on the floor. It's the same kind of door you come through all the time. So it wasn't rocket science, okay?

Q. So the two IQC contracts that we have here, L.P. was requested by you to go out and perform site surveys and submit a draft scope of work?

A. For specific projects.

Q. Okay. Okay.

A. So were other contractors, so were other IQC contractors.

Q. Who?

A. St. Louis Design and Construction.

Q. Anyone else you can recall, any other IQC contractors?

A. I can't think of the name of the guy out of Wisconsin.

Q. Summer?

A. Summers, right, Summers Construction.

Q. You would send them to the same projects or to different projects?

A. Never an IQC and an IQC to the same



project.

Q. Okay. I just want to make sure we're clear.

Was there any -- I don't know how to quite -- system in place to decide which IQC was sent to which projects?

A. You try to cluster the projects and keep them in some proximity so you wouldn't have an IQC running all over from west to east.

Q. For example, in this IQC, 96-B-0098, it says for zip codes -- and I'm referring to Page 078 -- zip codes 604, 605 and 609.

There were other IQC contractors under separate IQC contracts that also were assigned to those same zip codes?

A. I'm almost certain there were other contractors in there.

Q. I'm just trying to make sure it's clear.

A. Yeah. I would say I'm 99 percent sure there were.

Q. Where an IQC contractor such as L.P. submitted a draft scope of work to you, did the government perform any sort of independent estimate or have anything to compare with the scope of work



to make sure, in fact, the quantities on there were reasonable and accurate?

A. We have the same book -- we produce the book that we gave him to do the cost estimations, so we have the same source as he has.

Q. Right. But once -- those costs are the same, is that a fair statement?

A. Yes.

Q. The costs in there are the same. They competed -- the multiplier we saw was .85 percent in Southern Exhibit 5.

A. Uh-huh.

Q. So that cost is a fixed cost per unit, right? It's the quantities that's the variable?

A. That's absolutely right.

Q. How does the postal service verify that the quantities in an IQC contractor proposed scope of work are reasonable and accurate?

A. You have to have a project manager or someone visit the site. If he says he's going to put in 200 pieces of tile, you have to assume he's going to do it until you get a person out there to visit.

Q. And if it only fits 20 pieces of tile or

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **L.P. CONSULTING GROUP, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 98-868C** |
| | ) | |
| **THE UNITED STATES,** | ) | **(Judge Allegra)** |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S RESPONSES TO PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT

Defendant, the United States, pursuant to RCFC 56 (h)(2), hereby submits its responses to Plaintiff's Proposed Findings of Uncontroverted Fact, and adopts the numbering used by L.P. Consulting Group, Inc. ("LP"), which begins with number two:

2. LP's secretary/treasurer Mr. Richard Battaglin ("Battaglin") has extensive experience in building construction as well as United States Postal Service ("USPS") construction contracts having worked for the USPS as a contract employee for the USPS at the Field Real Estate and Building Office, Illinois Central Region between 1985 and 1988. In that capacity, Mr. Battaglin's job description included developing scopes of work to be issued to IQC contractors, and developing the unit items/prices for solicitation at various facilities. During the course of Mr. Battaglin's employment with the USPS as project manager/architect/engineer, he was involved in approximately twenty (20) indefinite quantity contracts, involving at least 300 individual work orders. In fact, the work that he performed for the USPS involved contracts in which work such as that alleged in the underlying IQC contracts was performed. LP App. 1, Battaglin Aff. ¶¶ 2-3.[1]

---

[1] All references to "App." refer to the documents contained in the Government's Appendix. All references to "LP App. __" refer to LP Consulting Group's Appendix.

USPS. Battaglin stated "at the time when they [the USPS] issue the work order to me, that's when we go over the final – the draft work order that they produce and we go over everything one more time." App. 1069 (Dep. 161). Battaglin again affirmed that, after his submittal of a draft work order/scope of work, "the USPS would produce the document called a draft work order for my review." App. 1070, 1073 (Dep. 173; see also Dep. 230-31).

Battaglin also testified that he never received draft work orders from the USPS for the projects that LP included in its claims:

> Q. After the site visit at Aroma Park and the scope of work, you drew that up and Paul Steiner takes it back with him, what did you expect was going to happen next with regard to you're doing any work at Aroma Park?
> Mr. Prosen: Objection, vague, ambiguous, asked and answered.
> By The Witness:
> A. I expect a returned draft work order from the post office with full extended prices and a time to start, estimated completion dates for my review and acceptance. And if I accepted ti, I would sign it and return it for the contracting officer's signature and a notice to proceed.
> By Ms. Kirchner:
> Q. So the document you expected to receive back from the post office, it would have extended prices on it?
> A. Oh, it always would.
> Q. I take it that didn't happen, is that correct?
> A. Not on the ones I'm claiming, no.

App. 1073 (Battaglin Dep. 230-31). Battaglin expected to receive draft work orders and did not receive such draft work orders from the USPS. Id.

14. It has always been LP's, and for that matter Battaglin's, understanding and interpretation of both the two 1996 IQCs and their predecessor 1994 IQC contracts, that these contracts did not require LP to self-perform or otherwise develop scopes of work, pricing or work orders. LP App. 138, Battag. Depo. at 110:6. Instead, all of the language in the IQCs is

couched in terms that the Government will develop and provide scopes of work to the contractor. LP App. 4, Battaglin Aff. ¶ 15.

DEFENDANT'S RESPONSE: Denied. It was common practice for LP to prepare draft work orders/scopes of work under the 1994 IQC and under the two 1996 IQCs. The IQCs contemplated that contractors would prepare proposals or draft work orders/scopes of work and submit them to the USPS. The IQCs in clause FB-249 "Indefinite-Quantity Contract" recognized that contractors would prepare proposals and stated that "[t]he price per unit of each proposal item in this contract will include all materials, labor, and equipment required to perform the work described in the attached specification," and further stated that work would be done only on written work orders issued by the USPS. App. 64. IQC contractors were on notice as to the prices of most of the items that could be incorporated in their proposals or the USPS's work orders. Id. In clause 11-1 "Conditions Affecting The Work," the IQCs further directed that:

> The contractor is responsible for having taken steps reasonably necessary to ascertain the nature and location of the work, and the general and local conditions that can affect the work or its cost.

App. 81. IQC contractors therefore should reasonably inspect the facility before signing a USPS work order for a project. The IQCs contained a related clause FB-260, "Inspection Of Site Or Building," stating:

> It shall be the contractor's responsibility to inspect conditions at each site, including such things as elevator size and capacities, existing building materials and components, and the like, before finalizing work orders (see Clause 11-1).

App. 93, 196. The IQCs thus contemplated that contractors would make site visits and become familiar with the nature of the work before they agreed to and signed USPS work orders. IQC contractors generally became familiar with proposed projects by making site visits and preparing proposals or draft work orders/scopes of work and submitting them to the USPS. See LP's PFUF

No. 47 and Defendant's Response thereto. Thus, IQC contractors generally made site visits and prepared proposals or draft work orders/scopes of work with the understanding that such proposal costs were, as stated by IQC contractor St. Louis Design, "a cost of doing business with the USPS under its IQCs." App. 1020 (Buchholtz). As stated by LP's counsel and assented to by Mr. Rigsby, proposal costs were the contractor's "cost to eat." App. 680 (Dep. 30).

15. That notwithstanding, and despite the total lack of an express contractual requirement for LP to perform such work, on the two 1996 and one 1994 IQC contracts (which 1994 contract was the predecessor and was continued in the 1996 contracts by the parties' course of conduct), and in addition to the twelve subject WOs, LP was directed to perform approximately 96 site visits and submit 96 work orders to the Government. LP App. 4-6, Battaglin Aff. ¶ 16. On only two projects which LP performed under the IQCs, those being the La Salle roof and the Princeton floor replacement, did the USPS self-develop a scope of work. *Id.* With those two exceptions, on every other project which LP performed under the IQCs, every single work order which LP received arose out of the USPS personnel contacting LP and instructing LP to perform a site visit and develop a work order. *Id., see also*, LP App. 227, Southern Depo at 28:18. Such work order was then submitted and approved by the contracting officer/USPS. *Id.*

<u>DEFENDANT'S RESPONSE</u>: Denied. Denied that there was "a total lack of an express contractual requirement" for LP to prepare proposals or draft work orders/scopes of work. <u>See</u> Defendant's response to LP's PFUF No. 14, which is incorporated herein by reference.

Denied that the 1994 IQC contract "was continued by the 1996 IQC contracts by the parties' course of dealing." The 1994 IQC contract had a two year term, and was not extended.

of the facility to suggest deficiencies or recommend possible improvements. App. 997. See Defendant's responses to LP's PFUF Nos. 13 and 15, which are incorporated herein by reference.

46. As contracting officer, Rigsby and/or his subordinates regularly directed LP to travel to USPS facilities, perform site surveys, typically with USPS personnel, and generate work orders upon and at the USPS's request. LP App. 198 *et seq*, Rigsby Depo. at 24:18, 26:10.

DEFENDANT'S RESPONSE: Denied that LP generated "work orders upon and at the USPS's request." The process was that LP was requested to go and look at the facility, and the USPS manager and LP together would estimate the quantities of line items of work and prepare a draft work order/scope of work for a particular project. App. 997. LP was to look at only those items or areas pertinent to the proposed project, and was not requested to make a general field survey of the facility to suggest deficiencies or recommend possible improvements. App. 997. See Defendant's responses to LP's PFUF Nos. 13, 15 and 45, which are incorporated herein by reference.

47. The USPS through its authorized personnel would likewise regularly ask other IQC contractors, including St. Louis Design and Construction, and Summers Construction, to also self-perform such tasks. LP App. 200, Rigsby Depo. at 26:15.

DEFENDANT'S RESPONSE: "Summers Construction" is correctly stated as "Somers Co." Admitted that USPS asked other IQC contractors, including St. Louis Design and Construction and Somers Co., to make site surveys and develop price proposals or draft work orders/scopes of work together with USPS project managers. As John Buchholtz, a USPS IQC contractor since 1982, stated:

3. As an IQC contractor for the USPS, I often made site visits to USPS facilities to scope out work with USPS Project Managers. At these site visits, the USPS Project Manager and I together would estimate quantities and consider what various items of work would be needed to accomplish a project. I would prepare a draft scope of work, which I call a proposed pricing sheet. I would prepare our proposed pricing sheets using our computer, which has all the various line items of work and prices for an IQC stored in its memory. Shortly after my site visit with the USPS Project Manager, I would provide our proposed pricing sheet to the USPS Project Manager. I have made such site visits with USPS Project Managers and have prepared proposed pricing sheets pursuant to our IQCs countless times, and it was routine for St. Louis Design to do so on its USPS IQCs. The vast majority of the time, I made the site visits and prepared the proposed pricing sheets for St. Louis Design myself, and, only occasionally, did I have an employee of St. Louis Design make such site visits with the USPS Project Managers. The site visits and preparation of the proposed pricing sheets with the USPS Project Manager are a cost of doing business with the USPS under its IQCs.

4. In order for St. Louis Design to receive work orders under its USPS IQCs, I would have to make these site visits and prepare proposed pricing sheets with the USPS Project Managers; the USPS and St. Louis Design would have to agree upon the quantities and the line items of work necessary for each project; the USPS contracting officer would forward to St. Louis Design a written USPS work order, which I would sign and return to the USPS, and the USPS contracting officer would sign the USPS work order beside my signature, making a work order contract for that individual project. Each USPS work order signed by both St. Louis Design and the USPS contracting officer was a contract for the line items of work contained in the work order.

App. 1020.

48. On other contracts such as the A.M. Fernandez A/E IQC contract, Rigsby would direct that contractor, A.M. Fernandez, to prepare scopes of work and submit them for review and approval by Rigsby. LP App. 211, Rigsby Depo. at 109.

DEFENDANT'S RESPONSE: Denied that Fernandez would submit scopes for Mr. Rigsby's "approval" or that Mr. Rigsby directed him to submit scopes of work for "approval" and Mr. Rigsby did not so state in his deposition. A.M. Fernandez had an IQC contract for architectural

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 12th day of May 2005, a copy of the foregoing "DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE DECLARATION OF JOHN BUCHHOLZ" was electronically filed. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

/s DOMENIQUE KIRCHNER