# Table Of Contents Of Appendix

Page
1. March 14, 2004 Letter of Defendant's Counsel..............1
2. March 14, 2004 Trip Sheet Showing Receipt By Plaintiff's Counsel on March 14, 2004...................................2
3. May 10, 2005 Declaration of Samuel Southern...............3
4. Excerpts from Deposition of Richard Battaglin.............7

U.S. Department of Justice

Civil Division

DKirchner
154-98-868C

Telephone:
(202) 307-0290

*Washington, D.C. 20530*

March 14, 2005

Lawrence Prosen
Bell, Boyd & Lloyd
1615 L Street NW, Suite 1200
Washington, D.C. 20036-5610
Tele: (202) 466-6300
FAX: (202) 835-4117
By messenger

Re: LP Consulting Group, Inc. v. United States,
Fed. Cl. No. 98-868C

Dear Mr. Prosen:

The USPS recently found additional records relating to this matter, copies of which are enclosed. Enclosed are the two drawings for the Momence handicap ramp, dated August 25, 1998, and two draft work orders with a sketch with regard to St. Anne. Samuel Southern has returned to work part time and found the documents. I have the original draft work orders for St. Anne at my office if you wish to see the originals. They contain handwriting in pencil which Mr. Southern says is his handwriting. Mr. Southern's handwriting is in the quantity columns and in other places on the originals. Thank you for your cooperation in this matter.

Very truly yours,

Domenique Kirchner

DOMENIQUE KIRCHNER
Trial Attorney
Commercial Litigation Branch

COPY

# CIVIL DIVISION TRIPSHEET

COPY

Please fill in all blanks.

Sender's Special Instructions and Deadline Information (date/time):

3/14 asap

| | | |
|---|---|---|
| PICKUP FROM | Name [signature] | Telephone Number X2/111 |
| | Organization DOJ | |
| | Address 1100 L St NW | Room Number 12046 |
| DELIVER TO | Name Larry Prosen | Telephone Number 466-6300 |
| | Organization Bell Boyd | |
| | Address 1615 L St NW | Room Number 1200 |

******************FOR MAIL ROOM USE ONLY*****************

Messenger's Signature

Problems with Pick-up/Delivery

**Overtime Information:**
Authorization received from ______
Driver's/Messenger's signature ______
No. of hours worked ______ Time mail rec'd ______ Time mail delivered ______

RECEIVED
2005 MAR 14 A 9:43
CIVIL MAIL ROOM

| | |
|---|---|
| Recipient's Signature (Required) J. Queen | Date/Time Received (Required) 3/14 10 AM |

*CIVIL DIVISION MAIL ROOM - 307-0357*

COPY



COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| L.P. CONSULTING GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 98-868C |
| | ) | |
| THE UNITED STATES, | ) | (Judge Allegra) |
| | ) | |
| Defendant. | ) | |

DECLARATION OF SAMUEL W. SOUTHERN

I, Samuel W. Southern, under penalty of perjury, do hereby state that the following statement is true and correct:

1. I previously gave a declaration in this case dated April 6, 2005, and attached to my declaration copies of my original field notes made during the site visit that I made at the St. Anne Post Office with Richard Battaglin of LP Consulting Group, Inc. ("LP"). In my declaration, I stated as follows:

> 6. In our site visit at the St. Anne Post Office, Mr. Battaglin and I prepared field notes, which might also be called draft work orders, copies of which are attached to my declaration; the first one was for interior work and the second was for a handicap ramp. App.1047-56. At the site visit, Mr. Battaglin provided me with the form which already had information printed in the item, number, unit measure, and unit price columns. The quantity column and extend price columns were blank when Mr. Battaglin gave me the form at the site visit. During our site visit, Mr. Battaglin and I together estimated the quantities for the various items and I wrote the quantity amounts in the quantity column on the form during the site visit. When we estimated that a particular item would not be needed, I wrote zero in the quantity column for that item. On my original documents, the numbers in the quantity columns are written in pencil and are in my handwriting. I kept these original field notes in my personal file.
>
> 7. I have compared my field notes, which might also be called draft work orders, with the draft work orders that are contained in the Government's appendix at pages 584-97, which I understand to be documents that Mr. Battaglin claims to have prepared for the St. Anne Post Office. My field notes and Mr. Battaglin's draft work orders are not identical. My document (App. 1047) states "32" hours of "misc. hourly labor carpenter" while Mr. Battaglin's document states "160"



May 12 05 12:08p JL MEEKER LEARNING CTR (630) 539-8888 p.2

hours for the same item at page 584 of the Government's Appendix. My document (App. 1048) state "32" hours of rough carpentry hourly labor while Mr. Battaglin's document states "160" hours for the same item at page 585 of the Government's Appendix. My document (App.1049) states zero for drywall casing bead, while Mr. Battaglin's document states "275" for the same item at page 586 of the Government's Appendix. My document (App. 1051) states "68" for furnish and install #12 wire, while Mr. Battaglin's documents state "78" for the same item at pages 588 and 597 of the Government's Appendix.

8. With regard to a proposed St. Anne handicap ramp, my field notes and Mr. Battaglin's document are not identical. For the "demolition backhoe" item, my document (App.1053) states "8" hours while Mr. Battaglin's document states "16" hours at page 589 of the Government's Appendix. For the "misc. hourly labor mason" item, my document (App.1053) states 10 hours while Mr. Battaglin's document states "36" hours at page 589 of the Government's Appendix. For the "mis. hourly labor carpenter" item, my document (App. 1053) states "8" hours while Mr. Battaglin's document states "40" hours at page 589 of the Government's Appendix. For the "hauling, truck, driver" item, my document (App.1054) states "8" hours while Mr. Battaglin's document states "16" hours at page 590 of the Government's Appendix. My document does not state an amount for premium time, while Mr. Battaglin's document includes an additional amount for premium time at page 590 of the Government's Appendix.

2. I understand that LP is asserting that I should have brought my original field notes for St. Anne to my deposition on June 9, 2004, and that I should have found these field notes before the close of discovery on October 29, 2004. That was not possible. On May 10, 2004, I received LP's subpoena duces tecum for my deposition on June 9, 2004. At that time, I had been continuously out of work since February 2003, because of disability. In response to the subpoena duces tecum, I brought to the deposition my original personal diaries that I had at home. It was not possible for me to go to the office and search my files there for any documents in response to LP's subpoena duces tecum. As I stated, I had been out of work because of disability since February 2003, under doctor's orders. I was on heavy pain medication during this period which often made me sleep or made me drowsy, but did not stop the pain, although the medication did lessen the pain's intensity. I also was on my pain medication at the time of my deposition and

felt pain during the deposition. I tried to alleviate the pain by standing or moving during the deposition, and I also took additional medication during the deposition for the pain.

3. I first returned to work part time on about October 25, 2004, under doctor's instructions that I not work more than five hours a day, that I not lift or carry anything over 10 pounds, that I not twist or climb, and that I not sit for extended periods. Since returning to work, I still am on pain medications which lessen the intensity of the pain but did not stop it and my activities still are restricted, including no twisting or climbing, and no lifting or carrying more than 10 pounds. I am working part time and now work about six hours a day.

4. I first found the field notes that were attached to my prior declaration in March 2005, during the process of looking through all the files in my office, in response to prior requests from Government counsel. Before I found my field notes for St. Anne in March 2005, I did not remember that I had made those notes. The field notes are my original documents and are in my own handwriting. Upon locating my field notes, I provided the original documents to Government counsel, Domenique Kirchner. I found my field notes for St. Anne in a file cabinet in my office. I do not believe that anyone else but me could have located these documents. The notes were in my personal files and, until I found them, I did not even know that I had such documents and I did not remember making those field notes.

5. Previously, in about 2000, I had searched my records in response to LP's request for production of documents, but I did not find my original field notes for St. Anne at that time. When I reviewed my records, I made everything that I found available to counsel. At that time, I did not believe that I had overlooked anything. It was only in March 2005, when I found my original field notes, in my own handwriting, that I recalled making such notes at St. Anne.



A 5

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 10, 2005

Samuel W. Southern

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

L.P. CONSULTING GROUP, INC., )
Plaintiff, )
vs. ) Case No.
THE UNITED STATES POSTAL ) 98-868 C
SERVICE, ) (Judge Allegra)
Defendant. )

The deposition of RICHARD ANTHONY BATTAGLIN, called for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions for the purpose of discovery, taken before Janet L. Robbins, CSR No. 84-2207, a Notary Public within and for the County of Cook, State of Illinois, and a Certified Shorthand Reporter of said state, at Suite 3300, Three First National Plaza, Chicago, Illinois, on the 10th day of June, A.D. 2004, at 1:36 p.m.



PRESENT:
BELL, BOYD & LLOYD PLLC,
(1615 L Street, N.W., Suite 1200,
Washington, D.C. 20036-5610,
202-955-6830), by:
MR. LAWRENCE M. PROSEN,
appeared on behalf of the Plaintiff;
UNITED STATES DEPARTMENT OF JUSTICE,
CIVIL DIVISION-COMMERCIAL LITIGATION BRANCH,
(1100 L Street, N.W., 8th Floor,
Washington, D.C. 20530,
202-307-0290), by:
MS. DOMENIQUE KIRCHNER,
appeared on behalf of the Defendant
and the Deponent.

ALSO PRESENT:
MR. STEPHEN LOBAUGH, In-House Counsel,
United States Postal Service.

REPORTED BY: JANET L. ROBBINS, CSR, RPR,
CERTIFICATE NO. 84-2207



(WHEREUPON, the witness was duly sworn.)
RICHARD ANTHONY BATTAGLIN,
called as a witness herein, having been first duly sworn, was examined and testified as follows:
EXAMINATION
BY MS. KIRCHNER:
Q. Please state your full name and address for the record.
A. Richard Anthony Battaglin, 10401 South 75th Avenue, Palos Hills, Illinois, 60465-2015.
Q. Mr. Battaglin, my name is Domenique Kirchner. I'm going to ask you some questions today. If I ask you a question you do not understand, please let me know. Please remember that we both can't talk at the same time.
Please remember, also, that you have to put oral -- you have to give us an oral response. If you shake your head, nod your head, that's not sufficient. We need an oral response on the record for the court reporter.
Have you ever been deposed before?
A. Never.
Q. Now, you're here pursuant to our request



for a deposition of you in this lawsuit, correct?
A. Correct.
Q. This is a lawsuit brought by L.P. Consulting Group, Incorporated, correct?
A. Correct.
Q. What is your role with regard to L.P. Consulting Group, Incorporated?
A. The corporate record would show I'm the secretary/treasurer of the company in the State of Illinois, and my function is project superintendent for the company.
Q. Do you have any other titles for the company?
A. No.
Q. Who else is involved in the company?
A. Linda M. Battaglin, that's my wife. She's the president.
Q. Anybody else?
A. No.
Q. During the time frame 1995 through 1999, did the company -- did L.P. Consulting have any employees besides yourself and your wife?
A. No.
Q. Other than yourself and your wife, does

Page 97

A. No, I don't.
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. I do not.
BY MS. KIRCHNER:
Q. Did you destroy them?
A. I don't recall where they went.
Q. Where have you looked for them?
A. I've looked in every conceivable place in my office during this time frame to look for those two documents.
Q. What is L.P. Consulting claiming with regard to the St. Anne Post Office in this litigation?
A. That I met in the field with the project manager from the postal service and I developed sketches and/or a scope of work accomplished in exchange for the work itself.
Q. So you went to the St. Anne Post Office?
A. Yes.
Q. When did you do this?
A. Sitting here, I don't recall.
Q. Do you have any notes?
A. Yes.

Page 98

Q. What notes do you have, sir?
A. They're in the -- this document.
Q. Let me go on and ask you some more questions before we look at some notes.
When you were at the St. Anne Post Office, do you recall whether anyone was with you?
A. Yes.
Q. Who was with you?
A. Sam Southern.
Q. Approximately when was this?
A. I have the date, but it's not -- it's in this binder.
Q. So you don't remember right now?
A. Off the top of my head, no.
Q. Now, why did you go to the St. Anne Post Office?
A. To receive work.
Q. When you were at the St. Anne Post Office, what did you do there?
A. Sam and I measured the facility inside and out based on the scope of work developed with the postmaster.
Q. Which postmaster -- who are you referring to for St. Anne?

Page 99

A. At the time, his first name was Bob, and I don't have his name off the top of my head. I'd have to think about it.
Q. At the time of this site visit with Sam Southern, was the postmaster there with you at that site visit?
A. Yes.
Q. Would you do the same thing as you described to me earlier with Mr. McNabb, that you and Sam pulled the tape measure and made the measurements together?
A. Yes.
Q. With regard to St. Anne, what were the important things you were measuring?
A. I believe we were doing a lock box lobby on the inside and what we would call the typical package inside. And on the outside we were measuring for concrete work for an accessibility facility in the front and rear.
Q. You mean handicap accessible?
A. Yes.
Q. And do you recall making measurements with regard to a handicap ramp with Sam?
A. Yes.

Page 100

Q. So is it fair to say that there were two parts to the site visit, the handicap ramp measurements and work associated with that, and then also looking at the lock box for the lobby?
A. Yes.
Q. Now, other than these measurements that you took with Sam, what else did you do at the time of the site visit?
A. Just discussed the project, what we were going to do and the scope of work that would become my work order.
Q. Did you have with you at St. Anne at the time of this site visit your work form with your L.P. Consulting stamp on it? Did you have a blank form like that?
A. Yes.
Q. Did Sam also come with a blank form to this site visit of this nature --
A. No.
Q. -- meaning Battaglin Exhibit 53?
A. No.
Q. What did you and Sam do with regard to the blank form that you brought with you to the site visit at St. Anne?

Page 101

A. My form was not blank. It included all the line items that would have been needed per previous conversations with Mr. Rigsby to expedite producing a work order.
The object was to develop the scope of work in the field so that they could bring it back to their office and generate the work order. So it was simplified so that all we needed to do was put the quantities in the form and negotiate the time and the schedule with the postmaster, and then I would receive a work order contract and a notice to proceed.
Q. With regard to St. Anne, when you came to the St. Anne site visit, did you have your form? You've got the line items filled in there. Did you fill in those line items by hand or is this a Xerox of some other form you have in the office and you just always go out with that?
A. I always go out with an unfilled quantity and extended price form. All the line items that we believe are important to the work we're doing have already been prefilled in, and I would just make photocopies of the same document and bring it to the field with me. It would usually be

Page 102

an interior and an exterior.
Q. Now, focusing on St. Anne itself, did you do that for St. Anne, arrive at St. Anne with the form with line items already filled in, your stamp on the form and then proceed with the site visit?
A. Yes.
MR. PROSEN: Objection, assumes facts not in evidence.
BY THE WITNESS:
A. Yes.
BY MS. KIRCHNER:
Q. Now, at the time you're at the site visit for St. Anne, did you add additional line items to the form? Were other things that came up that you then had to go on, like additional line items?
A. Sometimes.
Q. Do you remember for St. Anne, whether that happened or not?
A. Not specifically.
Q. Do you remember whether or not you made drawings for St. Anne when you were there for the site visit?

Page 103

A. Yes, drawings were made. Sketches, not drawings, sketches.
Q. Who made the sketches?
A. I think I did the inside and Sam did the outside just for expedience sake.
Q. And at the time of the site visit for St. Anne, did you or Sam fill in any of the quantities on the form?
A. Yes.
Q. Who filled in the quantities?
A. Without seeing the document, I couldn't answer that.
Q. At the time of the site visit for St. Anne, did you fill in the extended prices?
A. I don't recall.
Q. Now, you also mentioned that the postmaster was there at the time of the site visit for St. Anne, is that correct?
A. Yes.
Q. Do you remember any conversations you had with him at the time of the site visit?
A. Sure.
Q. What did you talk to him about at the site visit?

Page 104

A. The type of work we were going to do, how we would get it done, how it would impact his customer service, e-mail delivery, the important things that would affect him, and then his input on what -- you could call it a wish list of what he would like to see done and that would be added to the work order.
Q. In the conversations with the postmaster or Sam at the time of the site visit with regard to St. Anne, did you arrive at an agreed upon schedule?
A. That I couldn't answer because I don't remember what we finally decided as far as -- I do know that the postmaster initiated a 7381 to purchase his equipment for the project.
Q. When you say "his equipment for the project," can you explain what you're referring to?
A. The postal service supplies the lock boxes and the post office furnishes their work stations or IRT work stations. And he initiated his requisition to get that in a timely fashion before we would start.
Q. Now, the scope of work that was put together at St. Anne at the time of the site visit, did Sam do any of the writing on that document?

Page 105

A. I don't recall.
Q. What happened to that document?
MR. PROSEN: Objection, calls for conjecture.
BY MS. KIRCHNER:
Q. Let me be more specific, sir. You were there with Sam at the site visit, correct?
A. Yes.
Q. And there was a scope of work that was being prepared, is that correct?
A. Correct.
Q. What did you do with it at the time of the site visit?
A. Once the quantities were filled out, everything was given to Mr. Southern to take back to produce a draft work order for my signature.
Q. And I take it there was only one copy of this scope of work; there were not like two copies, one for you and one for him, that you together prepared in the field?
A. As I said before, if the facility had copying capabilities, which this one didn't either, to my recollection, we would make a copy in the field and I would have it on the spot. Otherwise, they would take it back and make a copy because they

Page 106

wanted the originals so that there would be no additions on my part, going back to my office and slipping in something. It left right from the field in their government hands to be produced into a work order. Then they would send it back to me in whatever form it came back.
And maybe in a short amount of time later, I would get a work order, draft work order for my review so that I would agree with the quantities and time only. And then I would sign it if I agreed with it, or whatever needed to be done, and I'd send it back.
Q. Do you remember for St. Anne whether, in fact, there was the Xerox capacity in the field and you got your copy right then?
MR. PROSEN: Objection, asked and answered, conjecture.
BY THE WITNESS:
A. I really don't recall.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 55 for identification, as of 6/10/04.)
BY MS. KIRCHNER:
Q. Please take a look what we marked as

Page 107

Exhibit 55 to your deposition, and let me know when you're ready.
A. Okay.
Q. Do you recognize Exhibit 55?
A. Yes.
Q. Now, I would like you to focus on the first four pages, okay?
A. Uh-huh.
Q. Excuse me, the first five pages. You see they're numbered 1 through 5 at the top --
A. Yes.
Q. -- with the little circles?
Focus first on the numbering in the little circles. Is that your numbering, sir?
A. Yes.
Q. So did you number these pages here, 1, 2, 3, 4, 5 that are at the beginning of this exhibit?
A. Yes.
Q. And when did you do that?
A. I don't remember.
Q. Well, did you do it at the time of the site visit?
MR. PROSEN: Objection, asked and answered.

Page 108

BY THE WITNESS:
A. I don't know.
BY MS. KIRCHNER:
Q. You don't know whether you did it at a later time?
A. No, I don't know.
Q. Let's just look at the first five pages, okay, and then we'll look at the other pages.
Now, if we look at the first five pages, can you tell me what portions of the first five pages are your handwriting?
A. All of it.
Q. So Sam's handwriting is not on this document?
A. No.
Q. No date?
A. No.
Q. What work is being described here on the first five pages?
A. It looks like a lock box lobby renovation with counter work, IRT work stations, no vending machine, and the basic -- what we would call the basic interior package, floor tile, new doors, painting, electric.

Page 109

Q. Now that you've looked at the first five pages of this, does this refresh your recollection with regard to the site visit to St. Anne that you've told us about?
MR. PROSEN: Refresh his recollection is a vague question.
BY THE WITNESS:
A. All I can say is what we were proposing to do. We were proposing to do some lock boxes, work stations. This is, for lack of a better expression, this is a typical boilerplate for doing the work that we were doing.
BY MS. KIRCHNER:
Q. Okay. Now, you prepared the first five pages, correct?
A. Yes.
Q. And you prepared all of the information on the first five pages, right?
A. Yes.
Q. Now, at what point did you fill in the line item numbers and the line items, just this portion and this portion (indicating)?
A. This portion here (indicating)?
Q. Yes, which is line item number and the

Page 110

substance of the line.
A. When was that filled out?
Q. Yes.
A. Right after I got the contract, I made these -- once we determined we were going to do the 609 zip code, once Mr. Rigsby said we're going to do all these facilities in 609, I came up with a standardized format so we can go in the field, come up with quantities and negotiate the construction time schedule with the postmaster. And extended price wasn't an issue because the computer at the post office produces that.
Q. Is this in your standard format? Referring to the line item numbers and then the substance of the next area where it says "rough carpentry and finish carpentry" and the items under that, that's your standard format?
A. Yes, that's what I would have typically -- this is typical. On 200 jobs, I did it this way.
Q. I take it you had in your office copies of this form with the first item number filled in and then the substance filled in?
A. At the time --

Page 111

MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. At the time I had these contracts, I would have had this.
BY MS. KIRCHNER:
Q. How about "Unit Measure," do you see that column?
A. Uh-huh.
Q. What's the purpose of that column?
A. Units measurements.
Q. For St. Anne, before you went out to St. Anne for this site visit, had you already filled in that column also where it says "Unit Measure"?
A. Yes, you would have to.
Q. And before you went out for St. Anne for the site visit, had you already filled in the unit price column?
A. Yes, you would have to.
Q. And I take it the quantity column was blank and then extend price was blank before you went to the site visit, is that right?
A. Yes.
Q. What did you do at the site visit with regard to St. Anne and the quantity column?

Page 112

A. I would hold the front end of the tape and Mr. Southern would take the final number end of the tape and tell me 60 linear feet and I would write it on the work order. Or in some cases, it would be reversed, he would have the work order and he would write the number and I'd be on the other end holding the front end of the tape.
Q. I gather that you filled out this whole one for St. Anne?
A. On this particular one, it looks like I did.
Q. If we just take as an example the first line, "various fasteners, self" -- is that tap?
A. Yes.
Q. You have quantity, 10. How was that arrived at?
A. On this project, I couldn't say.
Q. Is that a measurement?
A. That's a quantity, 10 each. If I'm reading my writing correctly, there's 10 self tap fasteners, yeah.
Q. If we go down that whole quantity column, are all of those entries quantities?
A. Yes.

Q. So they're not measurements, right, they're quantities?
A. They're --
MR. PROSEN: Objection, misconstrues the exhibit.
BY THE WITNESS:
A. They're measurements, results of measurements. Linear feet is a measurement.
BY MS. KIRCHNER:
Q. Where do you see one for linear feet in this quantity column?
MR. PROSEN: Objection.
BY THE WITNESS:
A. Well, the third item down, 2 by 4 wood stud, 370 linear feet, stud.
BY MS. KIRCHNER:
Q. I see that, that's 370 linear feet, because the LF is in the unit measure?
A. Correct.
Q. Okay. And what does the EA stand for?
A. Each. SF is square foot.
Q. So where you have the unit measure and you have an EA, each, is it fair to say that that quantity is the number of the various items?



A. Yeah.
Q. Now, at the time of the site visit at St. Anne, did you fill in this extend price column at the site visit?
A. Yes.
Q. How do you do that?
A. I'm sorry, no, I did not fill in the extended price. I filled in the quantity. I filled in the extended price later.
Q. When did you fill in the extended price?
A. When I had to file my claim so I can get to an amount so I can make a claim.
Q. So you received back from the postal service a copy of the St. Anne scope of work that did not have prices in the price column, and then you at this point sometime later put in those prices?
A. Correct.
Q. You did that so you could file your claim, is that correct?
A. Correct.
Q. So the document that came to you from the postal service for St. Anne was blank in the extend price column, correct?



A. Yeah.
Q. Do you have that document, sir?
A. Well, it would have been this one and I filled in the number.
Q. So you didn't keep a copy of the document you got from the postal service in the condition that you got it?
A. They made a photocopy and I kept the photocopy, which became this original, which is what you're looking at.
Q. What I understand what you're telling me, they sent you a copy of the St. Anne scope of work that did not have prices in the extend price column, correct?
A. Yeah, it wasn't needed.
Q. You didn't keep a copy of that without you then putting in the numbers? You didn't keep a copy of it as it was sent to you by the postal service?
A. I had no reason to.
Q. So the answer is that you did not keep a copy as it was sent?
A. No, I didn't because the copy -- I did not make a copy of what they sent me. I used it in



its original format and produced these numbers.
Q. I gather that you did that, for St. Anne, you filled in the numbers -- when did you fill in those numbers?
A. On or about --
MR. PROSEN: Asked and answered, objection.
BY THE WITNESS:
A. On or about the time I filed the claim. It was requested by my attorney.
BY MS. KIRCHNER:
Q. So in 1998?
A. Yes.
Q. So your attorney requested that you fill in the extend price column?
MR. PROSEN: Objection, privilege.
BY THE WITNESS:
A. Yes.
BY MS. KIRCHNER:
Q. Now, for St. Anne, now that you look at this, the first five pages of Exhibit 55 to your deposition, does that refresh your recollection concerning whether you and the postmaster talked about the schedule and arrived on any agreed upon schedule for St. Anne?

A. As I said before, based on our conversations with the postmaster, he went ahead and ordered his equipment that was to be postal furnished so that it would be received in a timely fashion in conjunction to when we were going to start the work.
Q. But did you and the postmaster agree upon any date when L.P. Consulting would start the work at St. Anne?
A. That was not my call. That was between Mr. Southern and the postmaster. I had no conversation on that.
Q. Let's look at the second two pages -- I'm sorry, the last two pages of Exhibit 55 to your deposition.
A. Uh-huh.
Q. Do you recognize these pages?
A. Yeah.
Q. Can you tell us what these two pages are?
A. The last two?
Q. Right, the last two, the last two pages of the exhibit itself.
A. I'm sorry.



Q. You're with me now?
A. Yes.
Q. You see it has contract number 94-B-0083 and it's crossed out.
A. Yes.
Q. Do you see that?
A. Yes.
Q. So we're all together now, can you tell me what those last two pages are?
A. Yes. This was apparently intended to be on my 94-B-83 contract and it was going to carry over to 96. And this is for exterior work, exterior concrete work.
Q. Is all the handwriting on these two pages your handwriting?
A. Yes.
Q. And you say "exterior concrete work." Can you be more specific, sir?
A. No. It's for concrete. Sidewalk, ramp work, that's concrete work.
Q. Do you recall how it came about that you prepared this document --
MR. PROSEN: Objection.
BY MS. KIRCHNER:



Q. -- the two-page document?
MR. PROSEN: Ambiguous, objection, vague.
BY THE WITNESS:
A. At the same meeting with Mr. Southern, we developed this particular scope of work.
BY MS. KIRCHNER:
Q. And when was that?
A. The same visit as the first, when we did the first five pages.
Q. Do you recall what year?
A. As I said before, it's in this document, the binder. I can give you a date.
Q. Okay. So is all of the work set forth in the last two pages of Exhibit 55 work on the exterior of the post office?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. Yes.
BY MS. KIRCHNER:
Q. Do you know what this handwriting refers to, the handwriting above the "Term Construction Contract Work Order," this handwriting?
A. It's just some form of a calculation.
Q. What sort of calculation?



A. Well, it looks like square footages, 8 by 50, 15 feet of curb. So it's some sort of linear foot of calculation or square foot of calculation.
Q. That you made?
A. Yeah, yeah, that's my writing.
Q. Did you arrive at the site visit with the form for this scope of work, with the two-page scope of work, with the item number column filled in, with the description column filled in, the unit measure filled in and the unit price column filled in before you begin the site visit?
A. Yes.
Q. How did you go about filling in the quantity column?
A. Mr. Southern held one end of the tape and I held the other, and when we calculated it, I would enter it on the quantity column.
Q. Are all the entries in the quantity column, is every one of those entries a result of a measurement?
A. Probably, yes.
Q. Do you see any that's not the result of actually making a measurement with the tape measure?

A. Yes.
Q. Which one, sir?
A. The one that says "minimum charge for curb removal." It's a lump sum job and there's another one that says "lump sum," meaning, you know, lump sum. There's two there, it looks like, on that page.
Q. Where it has the extend price, did you fill that in at the time of this site visit?
A. No.
Q. Did you fill that in later at the time you were preparing your claim with regards to the St. Anne Post Office?
A. Yes.
Q. So this was in 1998 at the request of your attorney?
A. Yes.
Q. And I take it you did not save a copy of the scope order that was sent to you -- excuse me -- you did not save a copy of the scope of work sent to you by the postal service in the condition that they sent it to you?
A. Correct.
Q. Now, at the time you filled in this



document, the extended prices, in 1998, did you check your math, make sure your numbers were right?
A. I did the best I could.
Q. Do you use a calculator?
A. I used a calculator with a tape. So if I'm off by a penny, that's possible, but I did do it that way.
Q. So for St. Anne, you arrived at $41,691 as a result of these two scopes of work that we have here in Exhibit 55, is that correct?
A. Correct.
Q. Why did you not date the scopes of work at the time that you were doing this with Sam and gave the scopes of work to Mr. Southern?
MR. PROSEN: Objection, misconstrues the exhibits.
BY THE WITNESS:
A. Sometimes I put them in; sometimes he'd put them in or whoever I was with; sometimes -- I can't answer for this work order.
BY MS. KIRCHNER:
Q. I'm focusing on St. Anne.
A. Yes.
Q. Did you date these two scopes of work



that we have here in Exhibit 55?
MR. PROSEN: Objection, asked and answered. The documents speak for themselves.
BY THE WITNESS:
A. The answer is no.
BY MS. KIRCHNER:
Q. Did you make any drawings at this site visit at St. Anne? Did you make any sketches?
A. Yes.
Q. Do you have the sketches?
A. No, they all went -- all my original documentation goes to the postal service so they can generate the work order. And whatever came back with the work order would be either copies of the original work, sketches or something that they would have modified based on their internal conversations. And then it would come back to me to do my -- to fulfill my contract which is to do that work.
Q. When they sent you back a copy of what was developed in the field as a courtesy, did they include -- did the postal service include the sketches for St. Anne?
A. Oh, yes.
Q. Well, where are those sketches?



A. I cannot find them. I just held on to what I have here.
Q. Have you looked for the sketches for St. Anne that you had?
A. Yes, and I cannot find the sketches.
Q. Did you destroy your copies?
A. Probably. It's possible they were put in something, and I can't find them.
Q. Have you moved your business since back in the 1995, '96 time frame?
A. No.
Q. Now, since the time of the site visit at St. Anne with Sam, have you been back to look at the St. Anne Post Office?
A. No.
Q. Why not?
A. I have no reason to.
Q. Are you contending that any other contractor got the work which is the subject of Exhibit 55 to your deposition?
A. Yes.
Q. Who are you contending got that work?
A. Well, someone the postal service through Bob Rigsby selected, whether it be an IQC or

Page 140

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

L.P. CONSULTING GROUP, INC., )
Plaintiff, )
vs. ) Case No.
THE UNITED STATES POSTAL ) 98-868 C
SERVICE, ) (Judge Allegra)
Defendant. )

The deposition of RICHARD ANTHONY BATTAGLIN, called for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions for the purpose of discovery, taken before Janet L. Robbins, CSR No. 84-2207, a Notary Public within and for the County of Cook, State of Illinois, and a Certified Shorthand Reporter of said state, at Suite 3300, Three First National Plaza, Chicago, Illinois, on the 11th day of June, A.D. 2004, at 8:43 a.m.

Page 141

PRESENT:
BELL, BOYD & LLOYD PLLC,
(1615 L Street, N.W., Suite 1200,
Washington, D.C. 20036-5610,
202-955-6830), by:
MR. LAWRENCE M. PROSEN,
appeared on behalf of the Plaintiff;
UNITED STATES DEPARTMENT OF JUSTICE,
CIVIL DIVISION-COMMERCIAL LITIGATION BRANCH,
(1100 L Street, N.W., 8th Floor,
Washington, D.C. 20530,
202-307-0290), by:
MS. DOMENIQUE KIRCHNER,
appeared on behalf of the Defendant
and the Deponent.

ALSO PRESENT:
MR. STEPHEN LOBAUGH, In-House Counsel,
United States Postal Service.

REPORTED BY: JANET L. ROBBINS, CSR, RPR,
CERTIFICATE NO. 84-2207

Page 142

RICHARD ANTHONY BATTAGLIN,
called as a witness herein, having been previously duly sworn, was examined and testified as follows:
EXAMINATION (Resumed)
BY MS. KIRCHNER:
Q. We're here, for the record, for the continuation of your deposition. And you understand you're still under oath?
A. Yes.
Q. Do you have any licenses, for example, engineering or architect or anything like that?
A. No.
Q. Have you ever had a license as an engineer, an architect?
A. No.
Q. Have you ever had a license regarding construction work?
MR. PROSEN: Objection, vague.
BY THE WITNESS:
A. What does that mean?
BY MS. KIRCHNER:
Q. Well, for example, have you ever had from a state government a license to perform construction work?

Page 143

A. Yes.
Q. What licenses do you have?
A. The City of Chicago business license.
Q. And how long have you had that?
A. Continuously. It's renewed every year. I've had it since 1993.
Q. Can you describe the nature of that license?
MR. PROSEN: Objection, vague.
BY THE WITNESS:
A. Well, it's a business license.
BY MS. KIRCHNER:
Q. Is it to do construction work?
A. In the City of Chicago, yes.
Q. Only inside the geographical limits of the City of Chicago?
A. Correct.
Q. Have you had any other licenses related to performing construction work?
A. Just in the local counties or little towns that require it.
Q. Do some towns in Illinois have a requirement for a license?
A. Some of them have their little

Page 144

requirements. There is no state license, so every municipality is required to, if they want to, have you licensed.
Q. What licenses have you had from municipalities in the State of Illinois?
A. Just business licenses to do work in their jurisdiction.
Q. To perform construction work?
A. Yes.
Q. How long have you had those types of licenses?
A. Only for the period I was doing the work at the location I was at.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 56 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. Mr. Battaglin, I'm showing you what we've marked as Exhibit 56 to your deposition.
Can you tell me, do you recognize this, sir?
A. Yes.
Q. What is this?
A. It's in my writing, and it looks like

Page 145

it's a sketch of work.
Q. Is this your document?
A. Yes.
Q. When did you prepare it?
A. At the site visit.
Q. Is this the site visit with Mr. Sam Southern?
A. Yes.
Q. And that's the visit you told us about yesterday, right?
A. Correct.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 57 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. Let me show you what we've marked as Exhibit 57 to your deposition. Please tell me, do you recognize this?
A. Yes.
Q. What is this, sir?
A. Somebody else's writing, but it's a list of work that we were discussing or -- yeah.
Q. Is this your document? Did you prepare this?

Page 146

A. No.
MR. PROSEN: Object --
BY MS. KIRCHNER:
Q. Do you recognize the handwriting?
A. It's not my handwriting.
Q. Okay. Let's go on.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 58 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. Let me show you what we've marked as Exhibit 58 to your deposition. And please take your time to look through this and let me know when you're ready. I'm going to ask you questions about specific pages in the exhibit.
Are you ready, sir?
A. Yes.
Q. The first two pages, do you recognize the handwriting?
A. No.
Q. So that's not your handwriting?
A. It's not my handwriting.
Q. Then we go to the third page. It appears to be a drawing, is that correct?

Page 147

A. Yes.
Q. Do you recognize that?
A. No.
Q. So that's not your handwriting?
A. No.
Q. Do you see it says "St. Anne" -- I'm on the third page now. Do you see if you turn it sideways, it says "St. Anne" up there?
A. Yes.
Q. Looking at this, have you ever seen it before?
A. No.
Q. Now, let's go to the fourth page of the document. Do you see this appears to be another drawing? Do you recognize this?
A. Yeah.
Q. Is this yours?
A. No.
Q. Do you recognize any of the handwriting on it?
A. No.
Q. But you say you recognize it. What is it, sir?
A. Well, what refreshes my memory, this is

Page 148

the shape of the St. Anne Post Office, now that I look at the document.
Q. Okay. But you recognize it as the shape of the post office, but you're not really familiar with the sketch?
A. Correct.
Q. How about the next sketch right behind it. Whoops let me make sure I've got it here. Sorry.
I want you to look at the sketch, which is the second to the last page.
A. Uh-huh.
Q. Tell me whether you recognize that sketch.
A. No.
Q. Is that your handwriting?
A. No.
Q. If you could look at the last page of the document, do you recognize this?
A. No.
Q. And do you see it's dated -- "St. Anne Scope, Cont.," and then it has 2/1/94. Do you see that?
A. Yes.

Page 149

Q. Let's move on.
Let me ask you this: This Exhibit 58, do you see anything inside this exhibit that in your mind relates to the site visit to St. Anne that you told us about, that you had a site visit with Sam Southern?
A. No.
Q. Okay. I'm going to move on.
Can you turn back to 56 for a moment, sir. It's a one-page sketch.
Could you clarify for me, did you make this sketch at the time of the site visit with Sam Southern?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. Yes.
BY MS. KIRCHNER:
Q. So during the very site visit itself?
A. Yes.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 59 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. Please take a look at what we've marked

Page 150

as Exhibit 59 to your deposition and tell me whether you recognize this.
A. Yes.
Q. What is Exhibit 59?
A. It's a scope of work for the St. Anne Post Office.
Q. Can you tell me generally what sort of work?
A. Concrete.
Q. Did you prepare this document?
A. Yes.
Q. This is your handwriting?
A. Yes.
Q. Can we refer to this as a scope of work for concrete work at St. Anne?
A. Yes.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 60 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. Please take a look at what we've marked as Exhibit 60 to your deposition. Do you recognize Exhibit 60?
A. Yes.

Page 151

Q. What is Exhibit 60?
A. A St. Anne scope of work.
Q. For what sort of work generally, sir?
A. Interior construction.
Q. Is this in your handwriting?
A. Yes.
Q. Did you prepare this document?
A. Yes.
Q. Now, if you could look at Exhibits 59 and 60, look at them together. You have both of them in front of you?
A. Uh-huh.
Q. You told us about your visit to St. Anne with Mr. Sam Southern.
A. Uh-huh.
Q. Do these documents, Exhibits 59 and 60, relate to that site visit?
A. Yes.
Q. And did you prepare Exhibits 59 and 60 at the time of the site visit with Sam Southern?
A. Yes.
Q. Did you go about preparing them in the same way you told us about yesterday where you and Sam measured the various distances and put the

measurements on the sheets?
A. Yes.
Q. Can we refer to these two documents as scopes of work for St. Anne?
A. Yes.
Q. Did you show these documents to Sam Southern at the time you were preparing them at the site visit?
A. I took these documents and my sketch, Exhibit 56, and I believe it was one more for the inside that is not here, and he took it back to his office to discuss with Mr. Rigsby to send back to me whatever changes that they did, they may have added, subtracted to the scope. And then I would get a work order for my review and signature to do the work.
Q. So at the time Sam Southern took these scopes of work for St. Anne back to the postal service, you had not yet filled in the extended price, is that correct?
A. That's true.
Q. Let's look, for example, on Exhibit 59. Let's take the first item, description. It says "demolition backhoe," is that correct?



A. Correct.
Q. And then you have here unit measures, hours. Do you see that?
A. Yes.
Q. And then what's the quantity?
A. Eight.
Q. Is that your handwriting, the eight?
A. Yes.
Q. How did you go about deciding that eight was the appropriate quantity for the demolition backhoe hours at St. Anne at the time of the site visit?
A. I don't recall the specifics, but I think we just determined that this service would have been required for a day.
Q. Is that a determination that you and Sam arrived at together, or was it your determination that it was eight hours a day for backhoe demolition?
A. Possibly both. I don't remember specifically talking about this particular item at this time, but it's possible.
Q. Is it also possible that it was just simply your judgment at the time and you put it in,



the eight hours?
A. No, because they could have made it zero when they sent the work order to me.
Q. No. I'm talking at the site visit itself, when the document is prepared at the time of the site visit, and I want to understand the procedure at the time of the site visit.
A. Everything in here would have been talked over with Sam. It wouldn't have just been arbitrary.
Q. So at the time of the site visit for St. Anne, the procedure was you and he would talk over the number of hours and then you write down the hours that the two of you had discussed?
A. Pretty much.
Q. Do you remember it ever being different during the site visit?
A. I'm sure possibly it could have been, sure.
Q. So sometimes you would just fill in the number of hours and then sometimes the two of you would discuss it and you'd put it in the number of hours?
MR. PROSEN: Objection, misconstrues the



testimony.
BY THE WITNESS:
A. I don't recall every meeting, but I would say you probably could say it happened. But at St. Anne, I know we went over item.
BY MS. KIRCHNER:
Q. So you remember going over every item with Sam at St. Anne?
A. Yes, pretty much.
Q. And that includes the number of hours for various items, is that correct?
A. Yes.
Q. Can we look at Exhibit 60 for St. Anne? I would like to direct your attention to the third page of the exhibit. And take, for example, the item, the third item down, it says "drywall." What's the rest of that line?
A. "Casing bead."
Q. And what does this refer to?
A. It's a product that you find or can buy for drywall.
Q. And there, what was determined for drywall casing bead for St. Anne?
A. If I'm looking at this correctly, none

was required.
Q. Was that a judgment that you and Sam arrived at together or yourself?
A. Oh, no, that's a common decision that we would have made together.
Q. And make it together?
A. Right.
Q. I'm directing your attention to Exhibit 55 that we looked at yesterday, sir.
A. Uh-huh.
Q. And do you recall this, that we looked at Exhibit 55 yesterday?
A. Yes.
Q. And do you remember you told me this is all in your handwriting and you prepared Exhibit 55, is that correct?
A. Yes.
Q. But now we have the extend prices on the document, correct?
A. Yes.
Q. If we look at Exhibit 55, can you look at it, compare it with Exhibits 59 and 60, and then satisfy yourself that this includes both the scope of work for concrete at St. Anne and then the scope



of work for interior work at St. Anne?
A. Yeah, it looks pretty similar. There might be some -- something different, but it looks pretty similar.
Q. You remember -- all right.
Can you put in front of you Exhibit 60 and Exhibit 55?
A. Uh-huh.
Q. As I understand it, what you're telling us is at the time of the site visit, Exhibit 60 was filled in and taken by -- you completed Exhibit 60, Sam Southern takes it back with him, and that at a later point in time, you get back Exhibit 60 from the postal service and then fill in the extended prices, is that correct?
A. No.
MR. PROSEN: Objection, misconstrues the testimony.
BY THE WITNESS:
A. That's not correct.
BY MS. KIRCHNER:
Q. Remember you told us about Exhibit 55 that has the extended prices filled in?
A. Yes.



Q. When did you go about putting in the extended prices in Exhibit 55?
A. When I submitted my original copy to Mr. Southern, it was at his discretion to add or subtract any items in the quantity column and send it back to me. And then when I took it for my -- for my --
Q. Your claim?
A. -- my claim, then I had filled in the extended version. So whatever was in the quantity column when he sent it back to, I just carried it over to the extended price.
Q. In 1998, at the time of your claim, you were filling in the extend price column, is that correct?
A. Right, because I realized I wasn't going to get the work order, so I just took what he sent back to me and then extended it over.
Q. And what he took at the time of the site visit, as I understand from your testimony, is Exhibits 59 and 60, is that correct, the two without the extend prices?
A. Yes.
Q. Okay. Do you recall that earlier you



told me that Exhibit -- yesterday you told me that all of Exhibit 55 was in your handwriting?
A. Yes.
Q. I would like to look at a particular item on Exhibit 55, sir.
A. Sure.
Q. Are you on the first page of Exhibit 55, please?
A. Yes. I'm sorry, 55 and 60?
Q. Yes. We can look first at Exhibit 55. And I'm on the first page, and I look down the description column and I see there the item, "Misc. hourly labor, carpenter finish." Do you see that?
A. Yes.
Q. And we have that same item on Exhibit 60, the first page. Do you see that?
A. Yes.
Q. And do you see that on Exhibit 60, there's 32 for the quantity hours, 32 hours, and that on Exhibit 55 -- I'm going a little too fast. I'm probably seeing this wrong. Sorry about that.
Do you see on Exhibit 60 that there's 32 hours for the item "Misc. hourly labor, carpenter finish"? Do you see that?

Page 160

A. Yes.
Q. And what does that refer to, that item?
A. That would be a line item that we would have determined to use for finishing. There's two types of carpenters, and this was a finishing carpenter or carpenters.
Q. And do you see that on Exhibit 55, the quantity is not 32 hours for that same item, but now it's 160 hours? Do you see that?
A. Yes.
Q. You told me that that's your handwriting on Exhibit 55, is that correct?
A. Yes.
Q. Can you explain to me why it's 32 hours for miscellaneous hourly labor carpenter finish on Exhibit 60 and then it's changed to 160 hours for miscellaneous hourly labor carpenter finish on Exhibit 55?
A. I don't actually recollect the conversation. But typically on these work orders, I would be told we're going to do certain things different, add certain hours or sometimes it would even be changed for me or I would receive a little sticky note, add or delete certain things, and then

Page 161

I would make my adjustments on the return copy.
Because this copy and this copy (indicating), with the exception of the writings on the top, are two different copies. So he must have, when he sent me this -- I'm only assuming that I had the typical Sam Southern, make your adjustments on these work orders based on his conversation with Mr. Rigsby or some other factor, maybe even with the post office.
It's possible they increased the hours because they weren't going to give me overtime. It's possible they gave me extra hours because the nature of the work was going to be different, depending on -- at the time when they issue the work order to me, that's when we go over the final -- the draft work order that they produce and we go over everything one more time. So that's possible that's what happened. There could be other quantities in here that changed, too, for that matter.
Q. Now, the 160 on Exhibit 55 is your handwriting, correct?
A. Yes.
Q. Do you remember at what point in time you made the change from 32 to 160?

Page 162

A. Probably within a few days of receiving the document back from Mr. Southern.
Q. Well, but do you remember that actually happening, sir?
A. Receiving this?
Q. No, making the change.
A. Not exactly for St. Anne, but I know typically that's how we did business. I mean, it would always be that way on all the work orders I ever did with him. That was typical, whether it would be Sam or any other gentleman.
Q. Let's look at the third page of Exhibit 60 and the third page of Exhibit 55 together. Do you see on Exhibit 60 for St. Anne there is zero as the quantity for drywall casing bead? Do you see that?
A. Yes.
Q. And do you see that on Exhibit 55, there is now 275 for the drywall casing bead linear feet? Do you see that?
A. Yes.
Q. And did you make that change from zero to 275?
A. Yes.

Page 163

Q. Do you remember at what point in time you made that change?
A. Typically within a few days after receiving the change requested by the government or the post office.
Q. But my question is: As you sit here today, do you remember at what point in time you made the change?
A. Yes, within a few days of getting this document and sending it back to him. I'm trying to get work, so I would have immediately responded to this and sent it back to him with my adjustment acknowledging it so he would produce a work order to me.
Q. So are you telling me that you and Sam together prepared Exhibit 60, he takes it back to the postal service, they mail it back to you so you have a copy identical to Exhibit 60, and then you make changes to it and send it to the postal service?
A. Yeah, if they request it. Sometimes they don't. Sometimes it's no change; sometimes add this; sometimes delete that. And then I send it back to them, and then they prepare their -- my work

Page 164

order.
Q. But do you remember in the case of St. Anne that actually happening, that Sam sent it to you back, Exhibit 60, then you made the changes, and do you remember making the changes and sending it back to Sam Southern?
A. Yes.
Q. Do you remember why you made those changes at that time?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. Yes. He requested me to make adjustments as per usual.
BY MS. KIRCHNER:
Q. Did he tell you what adjustments to make?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. Yes, add whatever was on his sticky pad, add or subtract. There may be items I removed from this as well that I didn't put quantities, too, that may be written on this document, that at one time we considered it and we just didn't include it but that don't even have numbers. It's very possible that if

Page 165

I took a minute to look through this, I would find something. That's how they conducted their business with me.
BY MS. KIRCHNER:
Q. So are you telling me that Sam told you to change the zero for drywall casing bead to -- specifically to 275 for drywall casing bead?
MR. PROSEN: Objection, misconstrues the testimony and asked and answered.
BY THE WITNESS:
A. Yes. Otherwise, I wouldn't have put 275.
BY MS. KIRCHNER:
Q. It wasn't a conversation of the nature, "Think about that. Put in what you think is advisable"? It was a specific instruction to put in a specific number?
A. Yes.
Q. Was this an oral conversation as opposed to a sticky, do you remember?
A. I remember it always was a sticky.
Q. Oh, so these are not conversations. Do you have any of these documents, these copies of the scopes of work with the stickies?

Page 166

A. No. The sticky would have been -- I would have made an immediate adjustment, as I said, to this. I would have peeled the sticky off and threw it away and I would have mailed this right back to him hoping to get the work order based on my adds and subtractions.
Q. Do you remember specifically doing that in the case of St. Anne?
A. Yeah.
Q. Let's look at Exhibit 55 and Exhibit 59 together. If you can make sure you have those two in front of you.
A. 55 and 59.
Q. 55 is the scope of work for St. Anne with the extend prices filled in and 59 does not have the extend price column filled in, is that correct?
A. Yes.
Q. What I'd like you to do is look at the second to the last page of Exhibit 55 and then the first page of Exhibit 59 together.
A. Yes.
MR. PROSEN: I think if you go back a page.
BY MS. KIRCHNER:

Page 167

Q. Do you see here -- I want to look at the demolition backhoe line on these two documents, the first line. And do you see that on Exhibit 59, the quantity for demolition backhoe is eight hours, and that when we look at --
MR. PROSEN: I think you have to go back a page.
There you go.
THE WITNESS: Okay.
MS. KIRCHNER: Thank you, Larry.
BY MS. KIRCHNER:
Q. (Continuing) -- and when we look at the second to the last page of Exhibit 55, we see that the quantity is 16 for demolition backhoe? Do you see that?
A. Yes.
Q. And on Exhibit 55, do you see that there's additional handwriting on that line, and can you tell me whose handwriting that is?
MR. PROSEN: Objection, ambiguous.
BY MS. KIRCHNER:
Q. Let me be more specific with you.
Mr. Battaglin, we're on Exhibit 55, the second to the last page. We're looking at

Page 168

"demolition backhoe." And as you go across, there's handwriting on that same line. Can you read that to me?
A. You mean under "description"?
Q. Right.
A. Yeah, "two men at eight hours."
Q. Is that your handwriting?
A. Yes.
Q. When did you put that on the form?
A. When I got my note back that this was going to be probably two days instead of one day from Mr. Southern.
Q. So you're saying that Mr. Southern sent you a sticky or a note indicating that it was two men -- what exactly did he indicate to you on the note, if you recall?
A. Normally, it was just the line item, meaning the item number, as you see on this document, and he might just paraphrase it. Like in this case, say maybe this particular number backhoe, add eight hours.
Q. Well, do you remember specifically what the message was from Sam at this time?
A. No.

Page 169

Q. Do you remember when you made the change from eight to 16 for demolition backhoe hours?
A. It would have been the same time I made the other changes on this document.
Q. Let's look at the last page of Exhibit 55 and the last page of Exhibit 59.
Do you see that there's an item there that's, "Negotiated, hauling truck driver"? Do you see that item?
A. Yes.
Q. And if we take first Exhibit 59, can you tell me what sort of work that's referring to?
MR. PROSEN: Objection, best evidence, speaks for itself.
BY THE WITNESS:
A. It's to accommodate the need for a driver that is going to obviously take this particular truck that's going to haul material in a truck.
BY MS. KIRCHNER:
Q. Do you remember whether or not you and Sam talked about that at the time of the site visit?
A. When we initially did the work order, yes.

Page 170

Q. So did you and Sam talk about that it would be eight hours for a hauling truck driver at the time of the site visit?
A. Yes.
Q. Now, you'll see that that's changed -- did you change that to 16 --
A. Yes.
Q. -- on Exhibit 55?
A. Yes.
Q. Can you read for us -- if you look at that same line item on Exhibit 55, it says, "hauling truck driver." What does it say after that on that same line?
A. "Two men at eight hours each."
Q. Is that your handwriting?
A. Yes.
Q. When did you put that on the document?
A. When we received this back from the government saying make these adjustments. They added the backhoe, so you have to add for hauling.
Q. If we look at the first page of Exhibit 59, we had there the backhoe on as the first line item, is that correct?
A. Yes.

Page 171

Q. What do you mean, they added the backhoe?
A. Well, if you're adding, as we did on Exhibit 55, if he told me to add eight hours for the backhoe, I would need to add eight hours for the truck driver.
Q. So that's the same work?
MR. PROSEN: Objection, misconstrues the testimony.
BY THE WITNESS:
A. It's not the same work.
BY MS. KIRCHNER:
Q. Explain to me how they're different.
A. A backhoe removes the material and he has to dump it in something. So if he's working for eight hours, you need a truck for eight hours. If the backhoe is working for 16 hours, you need a truck available for 16 hours.
Q. Okay.
A. So one would have related to the other.
Q. I'm following you.
Now, if we look at the last -- I want to continue looking at the last page of Exhibit 59 and the last page of Exhibit 55. Do you see that

Page 172

there's an additional line item there, "premium time" --
A. Yes.
Q. -- on Exhibit 55?
A. Yes.
Q. Is that all in your handwriting?
A. Yes.
Q. If you could just read across on that line and tell me what you're indicating on the last line of Exhibit 55?
A. "Clause C-12 premium time." And in the quantity time, it's a percentage. The unit is 25 percent and the quantity is the amount of items covered by the work order to the -- and then I put in the extended price.
Q. When did you put that in on the document?
A. Probably when he determined that we would have to do some premium time work when he said to me we have to maybe do this on an extended period.
Q. Do you remember adding the line "clause C-12 premium time percent, 25 percent, $10,395.68," and then the $2,598.92. Do you remember adding that

Page 173

line?
A. No, but I see I did. I mean, I know this is my writing. So at some point when I received this back, I followed the direction and put that down.
Q. But as you sit here today, you don't remember specifically when you did that?
A. I only know that within a few days of getting these back, I always would right away send them back because then they would produce the work order that would permit me to go do my work authorized.
So if I didn't get it back to them, if I let this sit a month, I reduced my chances of getting any work. So this would be expedient. A couple of days of getting his requests back, I would immediately send it back to them.
And then they would produce the document called a draft work order for my review. Again, that could have been readjusted again. They could have readjusted it and did some other things and sent it back to me for my review. And then that becomes what I will do. Then that will be what I will actually accomplish if they made that decision.

Page 174

But this is what I sent back, and they never returned anything, so...
Q. When you say "this is what they sent back," what document are you referring to?
A. Exhibit 55 with all the changes that they requested.
Q. Well, are you telling me at the time you sent it back to them, it had the extend price column filled out?
A. No.
MR. PROSEN: Objection, misconstrues the testimony.
BY THE WITNESS:
A. No. I'm telling you that whatever quantities he needed me to adjust or line items to omit or line items to add, I would make that adjustment and send it back to him. And then I think I've said that I extended the price for the sake of the claim.
BY MS. KIRCHNER:
Q. Well --
A. I could have left it blank. It wouldn't have made any difference.
Q. For the sake of the claim, did you add

Page 175

the "clause C-12 premium time, 25 percent units, $10,395.68," and then the extend price of $2,598.92?
MR. PROSEN: I'm going to object, ambiguous, misconstrues the facts, lacks a foundation.
BY THE WITNESS:
A. The answer is no.
BY MS. KIRCHNER:
Q. Do you have your original document, sir?
A. No. All the originals would be taken with them and then they would send me a copy back.
Q. But Exhibit 55 is a document that your counsel provided me on Tuesday for the first time in this litigation.
Do you have the originals that we can look at it?
A. I only have the copies that he has somewhere. I never have an original. All my originals went with the government and I was sent back copies, and I have a copy of all my originals. I don't have any original work. The postal service has all the original work.
Q. We're focusing on Exhibit 55 specifically now.
A. Yes, specific to Exhibit 55, the

Page 176

original was sent in.
Q. No, I want you to -- I want to make this real clear, okay. Exhibit 55 with the extend column filled in, you filled in that extend column at the time of the claim in 1998, correct?
A. Yes.
MS. KIRCHNER: We need to see that document. That is his document that you have the original of. We need to see that.
THE WITNESS: Yeah, whatever you have --
MR. PROSEN: Let's go off the record for a second.
(WHEREUPON, a discussion was had off the record.)
MS. KIRCHNER: We've had a conversation between counsel and the witness, and I requested that the government see the original documents in the formal law firm's files. As I understand it, plaintiff's counsel is going to make arrangements to get those originals to Washington, D.C. so the government can see the original documents. And, of course, if there's privileged communications in the file, I'm not looking for the privileged communications. I'm just looking for the

Page 177

non-privileged documents, the originals in the law firm's files. And we wish to see the originals. Let's go on.
BY MS. KIRCHNER:
Q. At the time the scopes of work were filled out during the site visits, when you were filling them out, what typically did you use? Did you use pen, pencil, how did you typically fill it out?
A. I don't remember.
Q. Directing your attention to the last page of Exhibit 55, is it possible, sir, that you filled in the "clause C-12 premium time, 25 percent" and the unit column, and then the $10,395.68, that you filled that information in in 1998 when you were working on the claim?
MR. PROSEN: Objection, asked and answered, misconstrues the testimony and compound.
BY THE WITNESS:
A. No.
BY MS. KIRCHNER:
Q. Okay. Now, as I understand the procedure for St. Anne, what you're telling us is you had the site visit, the scopes of work from the

Page 178

site visit were taken by Sam Southern, you're telling us he sent them back to you with stickies or instructions or messages accompanying them, is that correct?
A. Yes.
Q. And then you then made changes in the scopes of work and sent them and did what with those?
MR. PROSEN: Asked and answered, objection.
BY THE WITNESS:
A. I sent everything back to the government, to the postal service.
BY MS. KIRCHNER:
Q. At the time, you understood that the government could make further changes in the scope of work for St. Anne and add line items or knock out line items and send it back to you?
A. Yes.
Q. Did you have any other conversations with Sam after the site visit where you say to him -- where you talk about the site visit after this has all gone on?
A. I think the record has shown that I have repeatedly sent letters and never got a response

Page 179

from the government, the postal service, whether it be Sam or Mr. Rigsby, regarding the status of these work orders.
Q. So you sent letters.
Did you have any conversations with Sam regarding the site visit after the site visit itself?
A. It would be just a typical conversation that may have included St. Anne, but I don't think I ever specifically talked about St. Anne after I returned the originals, other than probably I asked him what's the status, and he said, you know, Mr. Rigsby -- because I basically started writing Mr. Rigsby giving updates, and I think that's what I've clearly demonstrated, that that's where the bottleneck came in.
Q. I understand you're telling me of what may have occurred. I'm asking you about your recollection.
As you sit here today, 2004, do you remember having conversations with Sam Southern after you sent back in the scopes of work with the changes made to them that we've gone over today? Do you remember a conversation with Sam after that?

A. No.
Q. Let's go on. You told us that you went to the Momence Post Office and you had a site visit with Sam Southern, also.
A. Yes.
Q. Can you tell us about that particular site visit?
MR. PROSEN: Objection, vague.
BY MS. KIRCHNER:
Q. With Sam?
A. If I made a site visit with Mr. Southern, it would be --
Q. Okay. Let me just back up.
Remember you told us the same day that you went to St. Anne, you also went to Momence Post Office and you met there, again, with Sam Southern? Do you remember that?
A. Yes, I remember we went to Momence.
Q. And it was the same day?
A. Same day.
Q. Now, that particular site visit at Momence, tell me what happened during that site visit.
A. We would have typically measured



everything to produce the scope of work, or the scope of work that's in question in my claim.
Q. Did you and Sam together produce the scope of work?
A. Yes.
Q. What was the work that was the subject of the scope of work?
A. Well, sitting here, off the top of my head, I don't recall. I'd be guessing.
MS. KIRCHNER: Would you mark this, please?
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 61 for identification, as of 6/11/04.)
BY MS. KIRCHNER:
Q. Please take a look at what we've marked as Exhibit 61 to your deposition, sir, and tell me whether you recognize Exhibit 61.
A. Yes.
Q. What's Exhibit 61?
A. A scope of work for the Momence Post Office.
Q. Is this all in your handwriting?
A. Yes.
Q. And does that include the sketch? Is



that sketch on the last page your sketch?
A. Yes.
Q. Does that relate to the site visit with Sam Southern that you've been telling us about?
A. Yes.
Q. Does this refresh your recollection as to the nature of the work that was scoped out with Sam at this site visit?
A. Yes.
Q. Can you tell me, sir, what was the nature of the work?
A. This particular document shows a lock box lobby and lobby renovation.
Q. Now, what's shown in your sketch on the last page?
A. A line of counters.
Q. Did you make that at the time of the site visit?
A. Yes.
Q. Did you put all the entries in the quantity column of Exhibit 61? Did you make all those entries at the time of the site visit?
A. Yes.
Q. Did you go over those entries with



Mr. Southern at the time of the site visit?
A. Yes.
Q. Did you go over all of the entries in the quantity column with Mr. Southern at the time of the site visit?
MR. PROSEN: Objection, asked and answered.
BY THE WITNESS:
A. Yes.
BY MS. KIRCHNER:
Q. I mean each and every one?
A. Yes.
Q. Now, at the time of the site visit to Momence with Sam Southern, did you and he also scope out a handicap ramp?
A. Yes.
Q. Is that reflected in Exhibit 61?
A. No.
(WHEREUPON, a certain document was marked Battaglin Exhibit No. 62 for identification, as of 6/11/04.)
BY MR. PROSEN:
Q. Please take a look at what we've marked as Exhibit 62 to your deposition, and please let me know when you're ready.

Page 184

A. Yeah, go ahead.
Q. Okay. This, again, is one of the documents that counsel, plaintiff's counsel, gave me before we started depositions this week.
Okay. Now, there appears to be two documents in Exhibit 62. Is that your understanding, sir?
A. Yes.
Q. And the first one is five pages and then the second document is three pages, is that correct?
A. Yes.
Q. Now, is all of Exhibit 62 in your handwriting?
A. Yes.
Q. Let's look first at the first five-page document in Exhibit 62. Can you tell me what that is?
A. The first five pages of Exhibit 62?
Q. Yes.
A. Is a work order, draft -- excuse me, it's a scope of work order for Momence.
Q. Is this for the same lock box lobby work that you were telling us about before when we were looking at Exhibit 61?

Page 185

A. It appears to be.
Q. And you see that the extend price column is filled in on the first five pages of Exhibit 62, is that correct?
A. Yes.
Q. When did you fill in that column?
A. Back in '98 when the time came to come up with the number for the claim.
Q. So this is the same as in the case of St. Anne?
A. Correct.
Q. If we could look at the first page of Exhibit 61 and the first page of Exhibit 62. Do you see there for the item "miscellaneous hourly labor carpenter," for that item, that that item is 24 hours on Exhibit 61 and then it's changed to 160 hours on Exhibit 62. Do you see that?
A. Yes.
Q. Did you make that change?
A. Yes.
Q. How did you make the change? Do you erase it and then put in the correct number? How did you make it?
A. I would have removed the original number

Page 186

and added this number at the request.
Q. By crossing it out, by erasing it? How did you make the change?
A. I don't recall how I did it on this one, but I made a change, yeah.
Q. Well, how generally did you make the changes? Did you cross them out? Did you erase? How generally would you make changes?
MR. PROSEN: Objection, vague.
BY MS. KIRCHNER:
Q. Let me restart again. When you changed the draft scopes of work that were the result of site visits with the postal service, when you made those changes, generally how did you make the changes?
A. I don't remember how I would have made those changes.
Q. Not even generally?
A. Could have, would have, should have. Generally, I don't know. I never kept the original document, so I don't know what the medium was when I originally sent them to them. These are all copies of copies of copies. The originals were sent to the government.

Page 187

Q. As I understand your testimony, with regard to Exhibit 62 that has on it the extend price column filled in, that document you filled in in 1998 and you retained that document?
MR. PROSEN: Objection, misconstrues the testimony.
BY THE WITNESS:
A. No, I did not.
BY MS. KIRCHNER:
Q. Didn't you just tell me that you filled in the extend price column in 1998 at the time of your claim?
A. The only reason I would have extended the price column was because I don't have the computer generation that the postal service does to generate this column. I don't need that column. I only did it for the sake of the claim.
If you could eliminate that extended column now, the quantities are all that's important here, not the extended price. So I only would have done it because -- at the advice to provide it for visual aid to get to the bottom number.
How it got there, I don't even remember if I used pen, pencil. I don't know, but it was

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 12th day of May 2005, a copy of the foregoing "DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION AND AMENDED MOTION TO STRIKE DRAFT WORK ORDERS" was electronically filed. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

/s DOMENIQUE KIRCHNER