yes.
Q. In general, yes --
A. Yes.
Q. -- you remember receiving them?
A. Yes.
Q. Do you recall what these documents, these scopes of work that you received from L.P. Consulting looked like? Were they typed or handwritten?
A. I think the majority of them might have been generated by a computer or something.
Q. By computer?
A. Yeah. Not all of them. I'm saying the majority of them.
Q. I understand.
If the U.S. Postal Service developed on its own a scope of work for a work order, in these IQC contracts, who would have been the person normally to do that task?
A. A project manager would go out and determine what work was -- scope of work was to be done. And they could bring it back and give it to a contract technician and the technician could sit down and go into the computer system and generate



based on the numbers, on the shear numbers that are associated with that particular item.
Q. That's the FMS Win, when you're talking about the computer?
A. I think it may have been, yes.
Q. Did there come a time in the course of your dealings with L.P. Consulting with these IQC contracts where you requested L.P. Consulting to travel to various postal facilities to do, I guess you would call them, a facility survey or site survey?
A. Are you speaking in general terms?
Q. Yes, for now we're talking general.
A. There may have been a time. Because you wouldn't require all -- that would apply to any IQC, you would require them to go and look at the facility.
Q. Even if the government -- even if the U.S. Postal Service had internally developed the scope of work?
A. They do it for every IQC. Mr. Battaglin and his group was not the only IQC that was assigned to that zip code area. There were other IQCs also operating at the same time.



Q. Were they the only IQC contractor in those areas for this scope or area of work, this type of work?
A. IQC contractors? I'm certain there might have been two, maybe three.
Q. Do you recall who else, other than L.P.?
A. I think St. Louis Design and Construction. I think St. Louis Design and Construction.
Q. What would be the purpose of awarding IQC contracts for the same type of work in the same area to multiple contractors?
MS. KIRCHNER: Objection, hypothetical, ambiguous.
BY MR. PROSEN:
Q. You can answer.
MS. KIRCHNER: You can answer the question.
BY THE WITNESS:
A. Would you repeat the question, please?
BY MR. PROSEN:
Q. Sure. Why would the postal service award multiple IQC contracts to various contractors for the same defined geographic area or zip code or whatever for the same work? What does that



accomplish?
A. First of all, we have a right to do it. Secondly, the reason that we really do it is because -- we really did do it, I'm no longer a part of it, was because you want to have the opportunity that in the event you would call on one contractor to do something and you needed to get it done in a hurry and he was busy doing something else, you would be able to call on another contractor to do that.
Q. Under these IQC contracts, when I say "these," I'm referring Tabs 2 and 3 which are Southern Exhibits 3 and 4, the two contracts between the postal service and L.P. Consulting, how are the scopes of work and the work orders generally developed on those two projects -- on those two contracts? I'm sorry.
A. It depends -- you mean in this particular case or in general or what?
Q. On this particular case is fine, yeah.
A. In the case of L.P. Consulting, we knew the background of Mr. Battaglin, as far as his ability to go out and produce scopes. So the postal service would say go out and produce a scope, but a

PLAINTIFF'S EXHIBIT A

ALL-STATE LEGAL®

Page 23

ntractor in
work, this
n there
er than L.P.?
gn and
of awarding
ork in the same
pothetical,
ver the question.
ion, please?
service
ous contractors
or zip code or
loes that

Page 24

o do it.
o it is
longer a part
he opportunity
ne contractor
et it done in a
ng else, you
ractor to do
when I say
hich are
ntracts between
, how are the
enerally
those two
s
, yeah.
g, we knew
ar as his
So the postal
a scope, but a

Page 25

postal service employee may be with him, but there was not a need to duplicate the work order generation portion of it.

So he would be allowed to do that in some cases, generate a scope of work upon request, when he was requested to do it. If you go out and do that, bring the scope of work back; and if it was agreed upon, then it would be signed and we would proceed. But the ultimate scope is produced by the postal service.

Q. You said the ultimate scope is what?

A. The ultimate scope of work is produced by the postal service. It can only be generated by the postal service. What he may be supplying to us is a proposal; in other words, this is what he thinks needs to be done. In a lot of cases, it's just repetitive work. We use the same color in every post office, which is white, the same kind of counter. When you walk up to a counter in one office, it's the same as it is in another, so you know what you've got to do.

Q. Kind of like a corporate image so --

A. Corporate image. We use the same kind of tile on the floor.

Page 26

Q. -- every post office looks the same to a certain extent?

A. It's the same kind of tile on the floor. It's the same kind of door you come through all the time. So it wasn't rocket science, okay?

Q. So the two IQC contracts that we have here, L.P. was requested by you to go out and perform site surveys and submit a draft scope of work?

A. For specific projects.

Q. Okay. Okay.

A. So were other contractors, so were other IQC contractors.

Q. Who?

A. St. Louis Design and Construction.

Q. Anyone else you can recall, any other IQC contractors?

A. I can't think of the name of the guy out of Wisconsin.

Q. Summer?

A. Summers, right, Summers Construction.

Q. You would send them to the same projects or to different projects?

A. Never an IQC and an IQC to the same

Page 27

project.

Q. Okay. I just want to make sure we're clear.

Was there any -- I don't know how to quite -- system in place to decide which IQC was sent to which projects?

A. You try to cluster the projects and keep them in some proximity so you wouldn't have an IQC running all over from west to east.

Q. For example, in this IQC, 96-B-0098, it says for zip codes -- and I'm referring to Page 078 -- zip codes 604, 605 and 609.

There were other IQC contractors under separate IQC contracts that also were assigned to those same zip codes?

A. I'm almost certain there were other contractors in there.

Q. I'm just trying to make sure it's clear.

A. Yeah. I would say I'm 99 percent sure there were.

Q. Where an IQC contractor such as L.P. submitted a draft scope of work to you, did the government perform any sort of independent estimate or have anything to compare with the scope of work

Page 28

to make sure, in fact, the quantities on there were reasonable and accurate?

A. We have the same book -- we produce the book that we gave him to do the cost estimations, so we have the same source as he has.

Q. Right. But once -- those costs are the same, is that a fair statement?

A. Yes.

Q. The costs in there are the same. They competed -- the multiplier we saw was .85 percent in Southern Exhibit 5.

A. Uh-huh.

Q. So that cost is a fixed cost per unit, right? It's the quantities that's the variable?

A. That's absolutely right.

Q. How does the postal service verify that the quantities in an IQC contractor proposed scope of work are reasonable and accurate?

A. You have to have a project manager or someone visit the site. If he says he's going to put in 200 pieces of tile, you have to assume he's going to do it until you get a person out there to visit.

Q. And if it only fits 20 pieces of tile or