# In The United States Court of Federal Claims

No. 98-868 C

(Filed: July 7, 2005)

---

| | | |
|---|---|---|
| L.P. CONSULTING GROUP, INC., | * | |
| Plaintiff, | * | Summary judgment; Government contract case; Contract Disputes Act; Indefinite Quantity Contract (IQC); Express contract to perform work order; Waiver; Implied-in-fact contract to perform work order; No implied-in-fact contract where same subject covered by express contract; Implied duty of good faith and fair dealing; Bad faith. |
| v. | * | |
| THE UNITED STATES, | * | |
| Defendant. | * | |

---

**OPINION**

---

*Lawrence Michael Prosen,* Bell, Boyd & Lloyd, Washington, D.C., for plaintiff.

*Domenique Grace Kirchner*, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Peter D. Keisler*, for defendant.

**ALLEGRA, Judge:**

This government contract case, before the court on cross-motions for summary judgment, involves a series of claims under the Contract Disputes Act of 1978 (CDA) (41 U.S.C. § 609(a)). Plaintiff alleges that no less than twelve contracts arose out of two Indefinite Quantity Contracts (IQC), under which defendant allegedly promised plaintiff work on various projects. Plaintiff alleges that this work did not materialize and that it is owed lost profits on the contested project awards, as well as statutory interest under the CDA. For the reasons that follow, the court finds in favor of defendant.

## I. BACKGROUND

In May of 1994, the United States Postal Service (USPS) awarded L.P. Consulting, Inc., the plaintiff herein (plaintiff), IQC No. 162640-94-B-0083, with a two-year term. On June 3, 1996, and June 6, 1996, USPS awarded two more IQCs to plaintiff, numbered 162640-96-B-0098 and 162640-96-B-0094, respectively. The latter contracts, which are the foci of this case,

also had two-year terms and covered general construction work at postal facilities in North Central Illinois. Each contract entitled plaintiff to a minimum of $10,000 in work. Although the parties dispute the actual amount that plaintiff received under the contracts, they agree that it received more than $1,000,000 worth of work orders under the 1994 contract and over $440,000 on the 1996 contracts.

All three IQCs specified that "work will be done on work orders issued as required." They each further provided that "[p]rice proposals will be required for each Work Order." (Emphasis in original). After the price proposal had been submitted, the IQCs specified the steps to finalize a work order:

> No work will be performed until a written work order has been signed by the contractor and the contracting officer and written Notice to Proceed with the work under the work order has been issued by the contracting officer and received by the contractor.

This same provision warned – "[a]ny work performed by the contractor under a work order before receipt of a written Notice to Proceed for that work order will be at the contractor's own risk." Other provisions of the contract emphasized, in various ways, that work should not be performed until a formal written work order and a notice to proceed had been issued, stating, *inter alia*, that: (i) "[t]he date for beginning work under a work order may not be less than three calendar days nor more than ten calendar days from the date of receipt the contractor of the Notice to Proceed;" (ii) "[i]f the Notice to Proceed under a work order is not received by the contractor before the expiration date of the contract, the work order will be considered terminated for the convenience of the Postal Service;" and (iii) "[w]here . . . 'acceptance,' or words of a similar nature are used, it must be understood that such words refer to actions to be taken, in writing, by the Contracting Officer unless otherwise stated." Finally, the IQCs emphasized that "[t]he Postal Service reserves the right to undertake, by Postal Service sources or others, the same type of work or similar work as contracted for in this contract, in the area covered by this contract, while this contract is in force."

In the case *sub judice,* plaintiff asseverates that it had contracts to perform twelve projects on which it prepared draft work orders. It alleges that once it submitted the draft work orders, it either had express or implied-in-fact contracts with defendant to perform the work, and that defendant breached those contracts when it either chose not to proceed with the work or awarded the work to another contractor. On March 3, 1998, plaintiff submitted a claim to this effect to the contracting officer, in connection with four of the alleged projects. On April 13, 1998, plaintiff resubmitted this claim in certified form and submitted a certified claim in connection with eight more projects. On August 11, 1998, plaintiff submitted an amended certification for the above claims. After the claims were denied, on November 13, 1998, plaintiff filed suit in this court under the CDA, seeking a total of $135,337 for losses it allegedly sustained when defendant allegedly breached either the express or implied-in-fact contracts associated with the work orders. The case was subsequently stayed. On January 14, 2005, defendant filed a motion for

summary judgment; on February 18, 2005, plaintiff filed a cross-motion for summary judgment. On June 14, 2005, the court conducted oral argument on the cross-motions.

## II. DISCUSSION

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Disputes over facts that are not outcome-determinative will not preclude the entry of summary judgment. *Id.* at 248; *Cornejo-Ortega v. United States*, 61 Fed. Cl. 371, 373 (2004). The court must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether it is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 250-52; *United Medical Supply Co., Inc. v. United States*, 63 Fed. Cl. 430, 435 (2005). In doing this, all facts must be construed in a light most favorable to the nonmoving party and all inferences drawn from the evidence must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (citing *United States v. Diebold*, 369 U.S. 654, 655 (1962)).

At issue is whether plaintiff had actual or implied-in-fact contracts with the USPS to perform the work listed on the draft work orders it prepared. Plaintiff concedes that the requirements for creating express contracts under the 1996 IQCs were not met – as to each of the twelve projects, neither the requisite written work order nor a notice to proceed were issued. As such, under the terms of the IQCs, plaintiff proceeded at its "own risk." *Conventio vincit legem*.

Nonetheless, plaintiff argues that, owing to a prior course of conduct, the USPS waived both the formal written work order and notice to proceed requirements. The doctrine of waiver applies when defendant

> has administered an initially unambiguous contract in such a way as to give a reasonably intelligent and alert opposite party the impression that a contract requirement has been suspended or waived . . . . [T]he requirement cannot be suddenly revived to the prejudice of a party who has changed his position in reliance on the supposed suspension.

*Gresham & Co., Inc. v. United States*, 470 F.2d 542, 555 (Ct. Cl. 1972). In short, "a contract requirement for the benefit of a party becomes dead if that party knowingly fails to exact its performance, over such an extended period, that the other side reasonably believes the requirement to be dead." *Id* at 554.; *see also Int'l Resources Recovery, Inc. v. United States*, 60 Fed. Cl. 428, 431-32 (2004). Such waivers have been found where, over the course of a great number of prior similar contracts, the government failed to enforce a particular requirement or set thereof. *See, e.g.*, *Gresham*, 470 F.2d at 544-53 (government had waived requirement as to the configuration of dishwashing machines where it had not enforced the provision in thirty-six previous contracts with the same party); *Unlimited Supply Co.*, GSBCA No. 12371, 94-3 BCA ¶

27,170, 1994 WL 509148 (1994) (government waived specifications where it accepted nonconforming goods in 19 prior purchase orders); *compare Doyle Shirt Mfg. Corp. v. United States*, 462 F.2d 1150, 1154 (Ct. Cl. 1972) (no waiver where deviations occurred in only three prior contracts).

As a matter of law, however, plaintiff cannot establish the factual predicate for such a waiver on the undisputed facts here. Plaintiff has not shown a consistent prior course of dealing under which defendant compensated it for performing work orders without a written work order signed by the contracting officer and a notice to proceed. *Per contra*. The record reveals – and plaintiff essentially admits – that written work orders with both parties' signature and notices to proceed were issued in all of the previous ninety-plus contracts awarded under the IQCs. Moreover, it appears that these documents were issued before plaintiff began performance on any of these orders, thereby negating plaintiff's assertion that the documents in question had been treated as "mere formalities." Accordingly, there is no course of dealings that shows that the USPS intended to relinquish its rights under the IQCs – to the contrary, the past conduct here manifestly demonstrates that those requirements were uniformly enforced, if anything, reinforcing the importance of these provisions in the contract. Consequently, there was no waiver and, as a result, no express contracts arose here to perform the work orders in question.

In arguing to the contrary, plaintiff relies on two cases: *Miller Elevator Co. v. United States*, 30 Fed. Cl. 662 (1994); and *City Window & Construction Co.*, 02-1 BCA ¶ 31,706, 2001 WL 1830173 (2001). Neither is remotely like the case *sub judice*. In *Miller Elevator*, *supra*, defendant argued that it appropriately had rejected a contract change because the contractor had failed to secure prior written approval for the additional work. This court, however, ruled that the contract's approval requirement for such work had been waived because the government's representative on the contract "had repeatedly granted oral authorization for extra work under the instant contract as well as prior elevator maintenance contracts." 30 Fed. Cl. at 688. Similarly, in *City Windows*, *supra,* the Board held that an oral authorization of additional work under a contract was adequate, even though the contract again required a written authorization. But, it based this conclusion upon a course of dealing established in 31 prior contracts in which the contractor "was orally authorized to proceed with additional work, and was later allowed to submit a change order request and be fully compensated for the additional work." 02-1 BCA ¶31,706. There is no such pattern of dispensing with formal requirements here – to the contrary, while plaintiff may have received contracts in the past when it assisted in drafting work orders, it never received such an award, except through the means specified in the IQCs. The cited cases thus avail plaintiff naught.

It is also readily apparent that no implied-in-fact contracts arose here. An implied-in-fact contract must be "founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Hercules, Inc. v. United States*, 516 U.S. 417, 424 (1996) (*quoting Baltimore & Ohio R.R. Co. v. United States*, 261 U.S. 592, 597 (1923)); *see also Moore v. United States*, 48 Fed. Cl. 394, 401 (2000). The Federal Circuit,

however, has repeatedly instructed that "[t]he existence of an express contract precludes the existence of an implied contract dealing with the same subject, unless the implied contract is entirely unrelated to the express contract." *Atlas Corp. v. United States*, 895 F.2d 745, 754-55 (Fed. Cir. 1990), *cert. denied*, 498 U.S. 811 (1990); *see also Klebe v. United States*, 263 U.S. 188, 191-92 (1923); *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997) ("an implied-in-fact contract cannot exist if an express contract already covers the same subject matter"); *ITT Fed. Support Servs., Inc. v. United States,* 531 F.2d 522, 528 (Ct. Cl. 1976); *Moore*, 48 Fed. Cl. at 401. Notably, this rule has been applied to prevent parties from claiming the existence of an implied-in-fact contract to cover work that was not awarded consistent with the procedural provisions of an express contract. *See, e.g., Ruttenburg v. United States*, 65 Fed. Cl. 43, 49-50 (2005) (no implied-in-fact contract where contract required written authorization); *In re Metro Machine Corp*., 97-1 BCA ¶ 28,723, 1996 WL 748014 (1996) (same).

The court sees no reason why these principles ought not to apply here. Contrary to plaintiff's importunings, the work orders in question were not "entirely unrelated" to the IQCs, – rather, they went to a core aspect of the IQCs, *to wit*, the procedure for issuing work orders under those contracts and they involved work that was envisioned in the IQCs. The procedures for issuing work orders undoubtedly existed to avoid any misunderstandings as to when such work was ordered and to be pursued – in other words, they existed precisely to avoid claims of the sort at issue here. In arguing otherwise, plaintiff seizes on language in *ITT Fed. Support Services*, *supra*, to the effect that "[t]o be entirely unrelated to the express contract, the implied contract would at the least have to require [the parties] to assume some duties different from those under the formal agreement." 531 F.2d at 528. But, this language does not delimit when a subject is "entirely related," but merely establishes a threshold – "at the least" – that, if not met, resolves the issue against a contractor. Certainly, this language does not suggest that an implied-in-fact contract can arise in a fashion contrary to the procedures identified in an express contract. Nor does it denote that where, as here, an IQC generally described the work to be performed, subsequent alleged implied-in-fact work orders that involved specific work subsumed within that general description, *i.e.*, a subset – somehow involved a different subject matter. To rule otherwise would be to eviscerate the principle that an implied-in-fact contract must be "entirely unrelated" to an express contract and, more specifically, would deprive the standard work order provisions in every IQC of their intended effect. That this court will not do.[1]

---

[1] Plaintiff's case seemingly hinges on the proposition that because, in the past, every time it had been asked to do a draft work order, it ultimately received the work, the same had to occur here. But, any notion that having a USPS official request plaintiff to provide such a draft amounted to an award of the underlying work is belied by the fact that, in every prior circumstances, such an award was made formally, in compliance with the requirements of the IQCs. Again, the IQCs specifically warned plaintiff that "[a]ny work performed by the contractor under a work order before receipt of a written Notice to Proceed for that work order will be at the contractor's own risk." Plaintiff apparently took this admonition seriously as there is no indication that it began performing any of the work orders at issue, beyond perhaps lining

In a list ditch effort, plaintiff argues that the defendant breached not one, but two duties: first, an asserted duty to give plaintiff a fair opportunity to compete for the projects in question and the second, the implied duty of good faith and fair dealing. In the court's view, these duties are two sides of the same coin and should be analyzed in kind.[2] That said, this argument also proves too much.

To be sure, the government has an implied obligation to carry out its duties under a contract in good faith. *See e.g. Malone v. United States,* 849 F.2d 1441, 1445 (Fed. Cir. 1988); *Commerce Int'l Co. v. United States*, 338 F.2d 81, 85 (Ct. Cl. 1964). In order demonstrate a breach of such duty, plaintiff must demonstrate that the government acted in bad faith. *See Torncello v. United States*, 681 F.2d 756, 770-71 (Ct. Cl. 1982); *Asco-Falcon II Shipping Co. v. United States*, 32 Fed. Cl. 595, 604 (1994). It is well-settled, however, that government officials are presumed to act conscientiously and in good faith in the discharge of their duties. *See, e.g., Spezzaferro v. Fed. Aviation Admin*., 807 F.2d 169, 173 (Fed. Cir. 1986); *Asco-Falcon II Shipping Co.*, 32 Fed. Cl. at 604; *Kalvar Corp. v. United States*, 543 F.2d 1298, 1301-02 (Ct. Cl. 1976), *cert. denied*, 434 U.S. 830 (1977). In order to overcome this presumption, plaintiff "must ***allege and prove***, by clear and strong evidence, specific acts of bad faith on the part of the government." *Asco-Falcon*, 32 Fed. Cl. at 604 (emphasis in original); *Galen Medical Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004). The level of proof to overcome this presumption is high, often described as requiring "well nigh irrefragable proof." *Kalvar*, 543 F.2d at 1301-02; *see also Torncello*, 682 F.2d at 770 ("it requires 'well-nigh irrefragable proof' to induce the court to abandon the presumption of good faith dealing") (quoting *Knotts v. United States*, 121 F. Supp. 630, 631 (Ct. Cl. 1954). While this standard is not intended to "insulate government action from ***any*** review by courts," *Libertatia Assocs., Inc. v. United States*, 46 Fed. Cl. 702, 707 (2000) (emphasis in original), in this circuit, it has "been equated with evidence of

---

up subcontractors or suppliers. That plaintiff did not significantly proceed with the work, absent a written notice to proceed, is further indication that it knew that no meeting of the minds had occurred here.

[2] Plaintiff argues that defendant's duty to allow it to compete is distinct from its implied duty of good faith and fair dealing. Plaintiff cites the USPS purchasing manual as imposing the former duty in stating that the contracting officer is responsible for "[m]aking decisions and determinations that affect contract performance fairly, impartially, and in accordance with Postal Service policy and applicable law." But no case has ever recognized this distinction. Plaintiff cites to *Burke Court Reporting Co.*, 97-2 BCA ¶ 29,323, 1997 WL 570680 (1997), but that case refers only to the implied duty of good faith and fair dealing. The other case upon which it relies, *Community Consulting Int'l*, 02-2 BCA ¶ 31,940, 2002 WL 1788535 (2002), invokes specific FAR provisions and contract provisions not implicated here. Moreover, it should be observed that plaintiff is not contending that there was inadequate competition here. Rather, it is concerned that it was not included in every competition. In the court's view, this assertion does not raise considerations independent of those considered in dealing with the implied duty of good faith and fair dealing.

some ***specific intent to injure the plaintiff***." *Kalvar*, 543 F.2d at 1302 (emphasis in original); *see also Galen*, 369 F.3d at 1330; *Librach v. United States*, 147 Ct. Cl. 605, 614 (1959); *cf. Tecom, Inc. v. United States*, 2005 WL 1515902 at * 22-37 (Fed. Cl. June 27, 2005).

More is required to survive summary judgment on this point than "mere allegations unsupported by evidence." *Modern Systems Tech. Corp. v. United States*, 24 Cl. Ct. 699, 702 (1992). Here, plaintiff's evidence does not even hint of bad faith, let alone provide indication of the sort of *animus* or specific intent to harm required. Plaintiff alleges that the USPS breached its duty when it excluded plaintiff from the group of contractors allowed to compete for certain work orders – work orders that plaintiff had drafted. But, the record merely indicates that the contracting officer sought to compete individual work orders over a variety of contractors, using a group for each order large enough to provide a reasonable level of competition, but small enough so that work could be spread.[3] Any notion that plaintiff was targeted for exclusion under this process is belied by the fact that, although the IQCs ensured it of awards of only $10,000, it actually received a series of work orders worth over $440,000. Indeed, even after April 30, 1997, when plaintiff protested being excluded from one competition, it received work orders or expansions of existing work orders totaling more than $130,000. And, it should be noted that no work orders were issued for six of the twelve projects of which plaintiff complains – as to those, plaintiff certainly was excluded from nothing. In short, as plaintiff has provided no proof whatsoever of bad faith, it claims regarding various breaches of implied duties cannot escape summary judgment.[4]

---

[3] On brief, plaintiff cites the deposition of the contracting officer in asserting that the latter had decided that "LP had received enough work and that it would not be allowed to compete on future work orders." But, no statement remotely to this effect appears in the transcript. Rather, when asked why plaintiff had not bid on the work orders in question, the contracting officer stated that plaintiff "was not excluded for any particular reason. We just had enough competition."

Grasping at straws, plaintiff notes the involvement of another contractor, Mr. Fernandez, who, as part of his architectural and engineering work, sent out solicitations, received bids, and sometimes made recommendations on which contractor should receive an award. To be sure, Mr. Fernandez was convicted of receiving bribes from certain contractors in exchange for favorable recommendations. However, there is no indication in the record that any USPS official was ever implicated in Mr. Fernandez's activities. Moreover, it is essentially undisputed that Mr. Fernandez had no role in choosing which contractors would compete for a particular work order – the issue on which plaintiff has its rub. Rather, the contracting officer, in his sworn deposition, stated that he alone supplied Mr. Fernandez with the list of contractors to be solicited for particular work orders.

[4] Notably, in asserting that defendant violated its duty of good faith and fair dealing, plaintiff does not seek recovery of the costs associated with preparing the draft work orders in

## III. CONCLUSION

This court will not paint the lily. Based on the foregoing, it **GRANTS** defendant's motion for summary judgment, and **DENIES** plaintiff's cross-motion for summary judgment. The Clerk is directed to dismiss plaintiff's complaint, with prejudice. No costs.

**IT IS SO ORDERED.**

s/ Francis M. Allegra
Francis M. Allegra
Judge

question. At oral argument, plaintiff's counsel represented that those costs were not significant enough to pursue.